<div style="text-align:center">

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

</div>

# FILED

**APR 1 1 2019**



**JOAN M. GILMER**
**CIRCUIT CLERK, ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:18-CV-00624 JAR |
| COTTER CORPORATION, et al., | ) ) | *18SL-CC 00617* |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion To Remand. (Doc. No. 38). Defendants Cotter Corporation (N.S.L.) ("Cotter"), Commonwealth Edison Company ("ComEd"), and Exelon Corporation and Exelon Generation Company, LLC (collectively "Exelon") responded. (Doc. No. 52). Defendants DJR Holdings, Inc. ("DJR"), f/k/a Futura Coatings, Inc., and St. Louis Airport Authority ("Airport Authority") joined in the brief in opposition to Plaintiff's motion filed by Cotter, ComEd and Exelon. (Doc. No. 53). Plaintiff replied (Doc. No. 59) and Defendants, with leave of Court, filed a surreply in further opposition to remand (Doc. No. 65). The Court held a hearing and heard oral argument on the motion to remand. The motion is now ready for disposition.

**I.     Background**

From 1942 to 1957, uranium ore was processed in association with the Manhattan Project to develop nuclear weapons in a facility in downtown St. Louis City known as the St. Louis Downtown Site ("SLDS"). (First Amended Class Action Petition ("FAP"), Doc. No. 6, at ¶¶ 56, 57). In the late 1940's, the Manhattan Project acquired a tract adjacent to...

GREGORY J. LINHARES, CLERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
BY: _____
DEPUTY CLERK

<div style="text-align:center">1</div>

known as the St. Louis Airport Site ("SLAPS") to store radioactive waste from the uranium processing operations at SLDS. (Id. at ¶¶ 58, 79). In 1957, "approximately sixty truckloads of contaminated scrap metal, several contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on the western portion of SLAPS adjacent to Coldwater Creek," a tributary of the Missouri River which runs throughout North St. Louis County (Id. at ¶¶ 2, 60). In the 1960's, some of the radioactive waste that had been stored at SLAPS was moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"), a part of which later became the Hazelwood Interim Storage Site ("HISS"). (Id. at ¶¶ 61, 75). In the late 1960's, Cotter purchased the radioactive waste stored at both SLAPS and the Latty Avenue Site. (Id. at ¶¶ 63, 81). Between 1969 and 1973, Cotter stored, processed and transported radioactive waste at the SLAPS and Latty Avenue sites. (Id. at ¶ 66). In 1973, SLAPS was sold to the Airport Authority. (Id. at ¶ 73). The Latty Avenue Site was sold to Futura Coatings, n/k/a DJR. (Id. at ¶ 76).

Plaintiff Tamia Banks owns property located within the one hundred year flood plain of Coldwater Creek. (Id. at ¶ 8). On April 2, 2018, Plaintiff filed her amended class action petition in the Circuit Court of St. Louis County, Missouri. She alleges that, as a result of the Defendants' collective conduct over several decades, radioactive wastes were released into the environment in and around Coldwater Creek, resulting in the contamination of her home and property, as well as the property of other class members, and leading to various forms of property damage.

Plaintiff asserts state-law claims against Cotter, ComEd, Exelon, DJR, and the Airport Authority for: (1) trespass; (2) permanent nuisance; (3) temporary nuisance; (4) negligence; (5) negligence per se; (6) strict liability/absolute liability; (7) injunctive relief seeking medical monitoring; (8) punitive damages; and (9) civil conspiracy; and against the Airport Authority

2

only for (10) inverse condemnation; (11) violation of the Missouri State Constitution's due process guarantee; and (12) violation of the Missouri State Constitution's takings and just compensation clause. Plaintiff seeks damages resulting from the loss of use and enjoyment of her property; annoyance and discomfort; damage to her personal property; diminution in the market value of her property; costs and expenses incurred as a result of her exposure to radioactive emissions, including the cost of remediation and relocation; statutory damages under Missouri state law; punitive and exemplary damages; costs and attorneys' fees; and interest on the above amounts. Plaintiff also seeks injunctive relief in the form of medical and scientific monitoring of her home and property, as well as environmental testing, clean-up, and continued medical testing.

On April 18, 2018, Defendants removed the action to this Court on the grounds that Plaintiff's action arises out of the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, and that, therefore, the Court has subject matter jurisdiction. (Doc. No. 1). On May 25, 2018, Defendants moved to dismiss Plaintiff's claims. (Doc. Nos. 27, 29, 36, 37).

Plaintiff filed her motion to remand on May 29, 2018, asserting that she has pled only state law causes of action and that her original and amended petitions raise no claims under federal law. (Doc. No. 38). Plaintiff specifically alleges that her claims do not fall within the scope of the PAA because (i) Coldwater Creek is not and never has been a licensed nuclear facility; (ii) Defendants have never received a license to possess, transport, or dispose of any radioactive waste on or in Coldwater Creek; (iii) Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek; (iv) Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium; and (v) Defendants have never entered into an indemnification agreement with the United States

3

government under 42 U.S.C. § 2210 with respect to the complained activities. (FAP at ¶¶ 14 A-E).

On June 14, 2018, the Court granted Plaintiff's motion to stay Defendants' motions to dismiss pending resolution of her motion to remand and stayed proceedings for sixty days. (Doc. Nos. 51). Following a hearing on Plaintiff's motion to remand on August 8, 2018, the Court extended the stay until further order of the Court. (Doc. No. 71).

## II.    Legal standard

Federal courts are courts of limited jurisdiction. Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A., 551 F.3d 812, 816 (8th Cir. 2009). A federal district court may exercise removal jurisdiction only where the court would have had original subject-matter jurisdiction had the action initially been filed there. Krispin v. May Dep't Stores Co., 218 F.3d 919, 922 (8th Cir. 2000) (citing 28 U.S.C. § 1441(b)). A party seeking removal and opposing remand carries the burden of establishing federal subject-matter jurisdiction by a preponderance of the evidence. In re Prempro Prods. Liab. Litig., 591 F.3d 613, 620 (8th Cir. 2010). Generally, a court must resolve all doubts about federal jurisdiction in favor of remanding the case to state court. In re Prempro, 591 F.3d at 620.

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Bowler v. Alliedbarton Security Services, LLC, 123 F. Supp.3d 1152, 1155 (E.D. Mo. 2015) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). See also Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 542 (8th Cir. 1996) ("The 'well-pleaded complaint rule' requires that a federal cause of action must be stated on the face of the complaint before the

4

defendant may remove the action based on federal question jurisdiction.") (quoting Caterpillar, 482 U.S. at 392). Because federal law provides that plaintiffs are the "masters" of their claims, plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar, 482 U.S. at 392.

Even in situations where a cause of action based on a federal statute does not appear on the face of the complaint, preemption based on a federal statutory scheme may apply in circumstances where "the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." Bowler, 123 F. Supp.3d at 1155 (quoting Caterpillar, 482 U.S. at 393). See, e.g., Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987) (where a former employee alleged breach of contract, retaliatory discharge, and wrongful termination of disability benefits in state court complaint, the court held that the former employee's claims were preempted by ERISA; plaintiff's claims were necessarily federal in character; and, therefore, removal under 28 U.S.C. § 1441(a) was proper). "Where a complaint raises issues to which federal law applies with complete preemptive force, the [c]ourt must look beyond the face of the complaint in determining whether remand is proper." Bowler, 123 F. Supp.3d at 1155 (quoting Green v. Arizona Cardinals Football Club, LLC, 21 F. Supp.3d 1020, 1025 (E.D. Mo. 2014)).

As further explained by the Eighth Circuit, the exception to the well-pleaded complaint rule applies where a federal statute provides "an exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." Id. (quoting Johnson v. MFA Petroleum Co., 701 F.3d 243, 248 (8th Cir. 2012). Thus, although a plaintiff has only filed state law claims, a court may conclude that the plaintiff has "simply brought a

mislabeled federal claim, which may be asserted under some federal statute." Id. (quoting

Johnson, 701 F.3d at 247 (internal quotation marks and citation omitted).

### III.    Price-Anderson Act

### A. History

In 1954, Congress enacted the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. §§ 2011–

2281, to encourage private sector development of atomic energy for peaceful purposes under a

program of federal regulation and licensing. The Act alone failed to spur private sector entry into

the field of nuclear energy due in part to a fear of potentially bankrupting liability absent some

limiting legislation. Carey v. Kerr-McGee Chemical Corp., 60 F. Supp.2d 800, 803 (N.D. Ill.

1999) (citing Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 64

(1978)). Thus, in 1957, Congress amended the AEA with the Price-Anderson Act ("PAA"), 42

U.S.C. § 2011 et seq., for the express purpose of "protecting the public and ... encouraging the

development of the atomic energy industry." Id. (quoting El Paso Natural Gas Co. v. Neztsosie,

526 U.S. 473 (1999)). The PAA had three main features: (i) it established a limit on the

aggregate liability of those who undertake activity involving the handling or use of radioactive

materials; (ii) it channeled public liability resulting from nuclear incidents to the federal

government; and (iii) it established that all public liability claims above the amount of required

private insurance protection would be indemnified by the federal government up to the aggregate

limit on liability. Id.

Congress continues to build on the PAA's foundation, expanding its scope and functions.

Estate of Ware v. Hosp. of the Univ. of Pa., 871 F.3d 273, 278 (3d Cir. 2017) (citing In re TMI

Litig. Cases Consol. II, 940 F.2d 832, 852 (3d Cir. 1991)). The Act initially relied on state courts

and state law to rule on and govern liability for nuclear accidents. Id. However, amendments to

the PAA in 1966 "provided for the transfer, to a federal district court, of all claims arising out of an extraordinary nuclear occurrence" and brought about greater uniformity of liability determinations while retaining state-law causes of action. Id. The amendments required indemnified entities "to waive the defenses of negligence, contributory negligence, charitable or governmental immunity, and assumption of the risk in the event of an action arising as the result of an extraordinary nuclear occurrence." Id. These provisions were premised on "congressional concern that state tort law dealing with liability for nuclear incidents was generally unsettled and that some way of insuring a common standard of responsibility of all jurisdictions – strict liability – was needed. A waiver of defenses was thought to be the preferable approach since it entailed less interference with state tort law than would the enactment of a federal statute prescribing strict liability." Carey, 60 F. Supp. 2d at 803 (quoting O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1095 (7th Cir. 1994)).

The PAA was amended again in 1988 to provide for the removal to federal court of any "public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n). Courts that have considered generally the scope of jurisdiction following these amendments have found that Congress intended to create an exclusive federal cause of action for torts arising out of a "nuclear incident," as defined in the Act. See, e.g., In re Berg Litig., 293 F.3d 1127, 1132 (9th Cir. 2002) (public liability action as "exclusive means" of pursuing a nuclear incident claim); Roberts v. Florida Power & Light Co., 146 F.3d 1305, 1306 (11th Cir. 1998) (PAA creates "exclusive" federal cause of action); Nieman v. NLO, Inc., 108 F.3d 1546, 1553 (6th Cir. 1997) (PAA preempts state law claims and they "cannot stand as separate causes of action"); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1504 (10th Cir. 1997) (PAA as the "sole remedy" for claims involving atomic energy production); O'Conner v. Commonwealth Edison Co., 13 F.3d

1090, 1099–1100 (7th Cir. 1994) (noting that "a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action."); TMI II, 940 F.2d at 854 (noting that "Congress clearly intended to supplant all possible state causes of action when the factual prerequisite of the statute are met."). Although the 1988 amendments to the Act clearly created a "federal cause of action," Day v. NLO, Inc., 3 F.3d 153, 154 n. 3 (6th Cir. 1993), it is a federal cause of action of a "peculiar nature," Heinrich ex rel. Heinrich v. Sweet, 62 F. Supp. 2d 282, 296–97 (D. Mass. 1999). The Act incorporates state law as the substantive rule of decision to govern the federal cause of action, so long as the state law is not inconsistent with the purposes of the Act. Id. (citing 42 U.S.C. § 2014(hh)).

### B. Key provisions

Notably, the structure of the PAA, as set forth in the following provisions, has been described as "complicated," "interlocking," and "us[ing] words in unintuitive ways." Estate of Ware, 871 F.3d at 280. The PAA's jurisdictional provision, 42 U.S.C. § 2210(n)(2), provides in relevant part:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, ... shall have original jurisdiction without regard to citizenship of any party or the amount in controversy ...

A "public liability action" is "any suit asserting public liability." Id. § 2014(hh). "Public liability" means (apart from certain exceptions not relevant here) "any legal liability arising out of or resulting from a nuclear incident." Id. § 2014(w).

A "nuclear incident" is defined as:

> any occurrence, including an extraordinary nuclear occurrence, ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material[.]

8

Id. § 2014(q). The PAA does not define the term "occurrence." An "extraordinary nuclear occurrence" is defined as:

> any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite ... The Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or "the contract location" as defined in the applicable Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, indemnity agreement, entered into pursuant to section 2210 of this title.

Id. § 2014(j).

The term "byproduct material" is defined in relevant part as "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." Id. § 2014(e)(2). The term "source material" means "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." Id. § 2014 (z)(1), (2).

## IV.    Parties' arguments

Relying on a recent opinion from this District, Strong v. Republic Services, Inc., 283 F. Supp.3d 759 (E.D. Mo. 2017), Plaintiff argues that the PAA does not apply to her claims in the absence of an appropriate license or indemnity agreement covering the activities complained of. Without a license or indemnity agreement, there can be no "occurrence," that is, no event at the

site of "licensed activity," that would constitute a "nuclear incident." Without a "nuclear incident," Plaintiff's action is not a "public liability action" and is thus not preempted by § 2210(n)(2). (Doc. No. 39 at 1, 7-12). Plaintiff acknowledges that Cotter was issued a license by the Atomic Energy Commission (AEC) to possess "source material," i.e., uranium, in 1969; however, she contends that this license could not have covered uranium mill tailings because at that time, the definition of "byproduct material" did not include uranium or thorium mill tailings. Plaintiff argues that none of the Defendants herein had an indemnity agreement or license to handle, store or transport hazardous byproducts, such as uranium mill tailings, which Plaintiff alleges were the source of the contamination at issue. (Id. at 12). Plaintiff also argues that applying PAA preemption to her state law claims would violate her constitutional right to Due Process by depriving her of her common law property rights without providing a reasonable alternative remedy. (Doc. No. 39 at 15).

Defendants respond that neither the plain language of the PAA nor its legislative history supports Plaintiff's contention that a license or indemnity agreement is required for federal jurisdiction[1] and that numerous courts have criticized and rejected the same arguments she advances here. (Doc. No. 52 at 1-12). In any event, Defendants contend that Cotter had such a license.[2] (Id. at 9-11). Defendants further respond that PAA preemption of Plaintiff's state law

---

[1] During oral argument, Defendants noted this matter is related to similar lawsuits in this Court, including McClurg v. Mallinckrodt, Inc., No. 4:12-CV-00361-AGF (E.D. Mo. 2012). In McClurg, however, no motion to remand was filed and the parties have not challenged the Court's jurisdiction under the PAA. Thus, McClurg provides no guidance on the issues raised herein.

[2] A copy of the license was submitted as an exhibit to Defendants' opposition to Plaintiff's motion to remand. (See Doc. No. 52-7). Plaintiff agrees the exhibit is a public record that the Court can consider on remand. The License issued in 1969 authorized Cotter "to receive, possess and import the [designated] source material [ ], to use such material for the purpose(s) and at the place(s) designated [ ], and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations" of Title 10 of the Code of Federal Regulations, Chapter 1, Part 40. The License states that the "[a]uthorized place of use" was Cotter's facility located at 9200 Latty Avenue; that the "[m]aximum quantity of source material

10

claims would not violate her due process rights. Citing Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 88 (1978), Defendants assert that rather than abolishing any rights, the PAA "transforms" actions based on state law claims that seek to impose public liability into federal actions and provides a reasonable substitute remedy for the common law or state tort law remedies it replaced. (Doc. No. 52 at 13-14).

In reply, Plaintiff does not dispute that the 1988 amendments to the PAA expanded federal jurisdiction to nuclear incidents not considered "substantial;" rather, she contends that the amendments did not eliminate the Act's licensing/indemnity scheme. Plaintiff asserts that the PAA does not afford protections to private entities and persons engaged in activities without authorization, license or permission contemplated under the Act. (Doc. No. 59 at 4-5). Moreover, the legislative history of the PAA suggests that Congress did not intend to preempt all state law actions involving nuclear energy – just those rising to the level of a "nuclear incident."

Plaintiff submits declarations from Richard Stewart, an "environmental and administrative law expert" (Doc. No. 59-1), and Dr. Marvin Resnikoff, an "expert in nuclear waste transportation, storage and disposal" (Doc. No. 59-2). Stewart opines that the PAA does not apply in this case; Resnikoff opines that the radioactive wastes at issue were mill tailings which by definition were not byproduct material until the passage of the Uranium Mill Tailings Act ("UMTRCA") in 1978. In addition, Plaintiff cites to Envirocare of Utah & Snake River Alliance, 56 N.R.C. 53 (Dec. 13, 2000), to support her contention that the NRC has already determined that the radioactive wastes at issue are not subject to federal regulation. (Doc. No. 59 at 9-10).

---

which [Cotter] [could] possess at any one time under [the] license [was] unlimited"; and that the License would expire on December 31, 1974.

11

In their surreply, Defendants urge the Court to disregard the declarations of Plaintiff's "experts" because they improperly opine on matters of law and are based on unsupported factual assumptions.[3] (Doc. No. 65 at 2-7). Defendants also argue that Plaintiff's reliance on an NRC staff director decision is misplaced. (Id. at 8-9) Envirocare explicitly pertains to mill tailings, which Plaintiff assumes are at issue, but which Defendants dispute. Further, Plaintiff has not alleged that any part of the process that generated the material at issue in this case involved a uranium mill or that any of the sites at issue contained a uranium mill. (Id. at 9).

## V.    Discussion

There are numerous conflicting opinions as to whether a license or an indemnity agreement is required for federal subject matter jurisdiction pursuant to the PAA. Several courts, including one in this District, have reasoned that in the absence of a license or indemnification agreement covering the activities which giving rise to the liability alleged, there can be no "occurrence," that is, no event at the site of licensed activity, that would constitute a "nuclear incident." See Gilberg v. Stepan Co., 24 F. Supp.2d 325, 343 (D. N.J. 1998); Heinrich ex rel. Heinrich v. Sweet, 62 F. Supp. 2d 282, 297 (D. Mass. 1999); Joseph v. Sweet, 125 F. Supp.2d 573, 576 (D. Mass. 2000); Samples v. Conoco, Inc., 165 F. Supp.2d 1303, 1321-22 (N.D. Fl. 2001); Irwin v. CSX Transp., Inc., No. 3:10-CV-300, 2011 WL 976376, at *2 (E.D. Tenn. Mar. 16, 2011); Strong, 283 F. Supp.3d 759. Rejecting the contention that the PAA is now so broad as to cover *any* claim of property damage allegedly caused by certain nuclear material, these courts

---

[3] While it is generally improper to raise a new argument in a reply brief, courts may consider such an argument where, as here, the nonmoving party has been given leave to file a surreply to address the new argument, and did so. Etrailer Corp. v. Onyx Enterprises, Int'l Corp., No. 4:17-CV-01284-AGF, 2017 WL 3021496, at *3 (E.D. Mo. July 17, 2017) (citations omitted). As for the declarations, significant portions of Stewart's declaration are legal conclusions that the Court has not considered for purposes of this motion. As for Resnikoff's opinion, assuming the radioactive waste at issue in this case was mill tailings, consistent with the analysis in Strong, it would not be covered under Cotter's license because at the time the license was issued, the definition of "byproduct material" did not include uranium mill tailings.

focus on the original purpose of the PAA, i.e., to protect the public and encourage development of the atomic energy industry by providing certain licensees with a system of private insurance, government indemnification, and limited liability for certain nuclear tort claims. The courts further support their holdings by emphasizing that the word "occurrence" as used in the definition of "nuclear incident" means "that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract,* which may cause damage."

Other courts have concluded that such an interpretation runs counter to the plain language of the PAA as well as the Congressional intent behind the 1988 amendments. See Estate of Ware, 871 F.3d at 283; Acuna v. Brown & Root Inc., 200 F. 3d 335, 339 (5th Cir. 2000); O'Conner v. Commonwealth Edison Co., 807 F. Supp. 1376, 1378 (C.D. Ill. 1992); Carey v. Kerr-McGee Chem. Co., 60 F. Supp.2d 800, 806 (N.D. Ill. 1999); Cotromano v. United Technologies Corp., 7 F. Supp. 3d 1253 (S.D. Fla. 2014). This Court recently addressed the issue in Strong, 283 F. Supp.3d 759, a case involving the same facts, one of the same defendants (Cotter), and addressing virtually identical arguments from both sides. The Court finds the Strong court's reasoning persuasive and agrees that "whether as a matter of statutory construction or the structure and history of the PAA," a license or indemnity agreement is a prerequisite for federal subject matter jurisdiction pursuant to the PAA. Id. at 772.

In Strong, it was alleged that defendants accepted radioactive waste consisting of uranium mill tailings without a license to do so and that the waste had spread to the plaintiffs' family farm. The court held there was no federal subject matter jurisdiction under the PAA without a license or an indemnity agreement. Although the waste originated from the facility of a nonparty (Cotter) that had a license to receive, possess, and import the "source material," Strong held that such a source material license could not be the basis for federal subject matter

jurisdiction, because it did not cover uranium mill tailings. Accordingly, the case was remanded to state court. Id. at 772-74.

In reaching its conclusion that there cannot be a nuclear incident without an applicable license or indemnity agreement, the Strong court was persuaded by the analysis of the PAA and its history in Gilberg, 24 F. Supp.2d 325. Noting that case law did not clarify whether the PAA's jurisdictional provisions operate independently form its indemnification provisions, the court in Gilberg looked to the language of the Act itself. The court found it significant that the PAA's definition of nuclear incident uses "occurrence" together with the clause "including an extraordinary nuclear occurrence," so as to read, "[t]he term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." Id. at 332. The court then reviewed the express definition of an "extraordinary nuclear occurrence," i.e., "any event causing a discharge ... from its intended place of confinement in amounts off-site, or causing radiation levels off-site ...", and noted that as used in this subsection the term "off-site" means "away from the location or the contract location as defined in the applicable ... indemnity agreement entered into pursuant to § 2210 of this Title." Id. Because of what it termed "the proximity to and interrelationship between the word 'occurrence' and the phrase 'extraordinary nuclear occurrence,' Gilberg concluded, as a matter of statutory construction, that "the occurrence which underlies a 'nuclear incident,' can only be an event at 'the location' or 'the contract location' as that term is defined in an indemnity agreement entered into under § 2210." Id.

The court also examined the legislative history of the PAA, S. Rep. No. 85–296, 1957 WL 5103, at *1817–18 (May 9, 1957), and found implicit in its language[4] that the terms "nuclear

---

[4] IT WAS NOT THOUGHT THAT AN INCIDENT WOULD NECESSARILY HAVE TO OCCUR WITHIN ANY RELATIVELY SHORT PERIOD OF TIME .... THE *OCCURRENCE* WHICH IS THE SUBJECT OF THIS DEFINITION *IS THAT EVENT AT THE SITE OF THE LICENSED ACTIVITY, OR ACTIVITY FOR WHICH THE COMMISSION HAS ENTERED INTO A CONTRACT*, WHICH

incident" and "occurrence" are "inextricably intertwined" with "licenses" and "indemnification agreements," suggesting that licenses and indemnification agreements are an integral part of the PAA's statutory scheme. <u>Strong</u>, 283 F. Supp. 3d at 770–71.

The <u>Strong</u> court went on to reject the defendants' argument that Cotter's 1969 Source Material License – the same license at issue in the instant case – applied to the plaintiff's claims. <u>Id</u>. at 772. The court reasoned that in 1969 when Cotter received the license, and in 1973 when the defendants allegedly accepted the material at issue, the definition of "byproduct material" did not include uranium or thorium mill tailings. It was not until 1978 that Congress amended the definition of "byproduct material" to include uranium and thorium mill tailings. <u>Id</u>. at 772-73 (citing 42 U.S.C. § 2014(e)(2)). Moreover, the Uranium Mill Tailing Radiation Control Act of 1978 ("UMTRCA"), which first included uranium mill tailings in the definition of byproduct material, states that the amendments "shall take effect on the date of the enactment of the Act." PL 95–604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II - Uranium Mill Tailings Licensing and Regulation Definition, Sec. 208. Based on this analysis, the <u>Strong</u> court concluded that "Cotter's 1969 Source Material License could not have covered uranium mill tailings." <u>Id</u>. at 773.

Here, Defendants argue that Plaintiff's restrictive reading of the definition of "nuclear incident" as an event at "the location or the contract location" as that term is defined in the

MAY CAUSE DAMAGE, RATHER THAN THE SITE WHERE THE DAMAGE MAY PERHAPS BE CAUSED. THE SITE MUST BE WITHIN THE UNITED STATES.... ***IT DOES NOT MATTER WHAT LICENSE MAY BE APPLICABLE*** IF THE OCCURENCE IS WITHIN THE UNITED STATES.... THE INDEMNIFICATION AGREEMENTS ARE INTENDED TO COVER DAMAGES CAUSED BY NUCLEAR INCIDENTS FOR WHICH THERE MAY BE LIABILITY NO MATTER WHEN THE DAMAGE IS DISCOVERED, I.E., EVEN AFTER THE END OF THE LICENSE. THAT IS WHY THE DEFINITION OF 'NUCLEAR INCIDENT' HAS THE PHRASE 'ANY OCCURENCE * * * CAUSING BODILY INJURY, SICKNESS, DISEASE, OR DEATH' AND WHY THE DEFINITION OF 'PUBLIC LIABILITY' IS TIED TO ANY LEGAL LIABILITY ARISING OUT OF, OR RESULTING FROM, A NUCLEAR INCIDENT.

<u>Strong</u>, 283 F. Supp. 3d at 770–71.

applicable indemnity agreement entered into pursuant to 42 U.S.C. § 2210 narrows what Congress obviously intended to be a broader term - and effectively nullifies the 1988 amendments. In ascertaining the plain meaning of a statute, the Court relies on established rules of statutory interpretation, looking not only to the particular statutory language at issue, but also the design of the statute as a whole. DeBough v. Shulman, 799 F.3d 1210, 1212 (8th Cir. 2015); United States v. I.L., 614 F.3d 817, 820-21 (8th Cir. 2010) (citations omitted).

According to a Senate report, "[t]he Price–Anderson system is a comprehensive, compensation-oriented system of liability insurance for Department of Energy ("DOE") contractors and Nuclear Regulatory Commission ("NRC") licensees operating nuclear facilities.[5] Under the Price–Anderson system, there is a ready source of funds available to compensate the public after an accident, and the channeling of liability to a single entity and waiver of defenses insures that protracted litigation will be avoided. That is, the [PAA] provides a type of "no fault" insurance, by which all liability after an accident is assumed to rest with the facility operator, even though other parties (such as subcontractors or suppliers) might be liable under conventional tort principles. This "omnibus" feature permits a more unified and efficient approach to processing and settlement of claims, thus allowing quick compensation to the public from the pool of funds set up by the Price–Anderson system." S. Rep. No. 100-70 (1988), U.S. Code Cong. & Admin. News 1988, 1424, 1426-27.

---

[5] The coverage for NRC licensees encompasses activities of commercial nuclear power plants, certain fuel fabrication facilities, and non-DOE reactors used for educational and research purposes. Activities of DOE contractors are covered if they involve "the risk of public liability for a substantial nuclear incident." These contractor activities include nuclear weapons research, development and testing, nuclear energy research and development, and nuclear waste activities. The Act specifies the procedures for determining the amount and sources of compensation available to compensate persons injured as a result of a nuclear incident arising from these activities. Dan M. Berkovitz, Price–Anderson Act: Model Compensation Legislation? - The Sixty–Three Million Dollar Question, 13 Harv. Envt'l. L. Rev. 1, 1–2 (1989) (footnotes omitted).

It is clear that the 1988 amendments were enacted to expand the scope of federal jurisdiction to a broader class of nuclear liability cases than those arising just from extraordinary nuclear occurrences as well as to provide for consolidation of those claims in federal court. However, in light of the PAA's concerns related to liability limitation and indemnification, the Court is not convinced that the 1988 amendments were meant to extend the reach of the PAA to activities not covered by applicable licenses or indemnity agreements. Defendants' construction overlooks the original purposes and framework of the AEA and the PAA - to require those involved in the nuclear industry to obtain licenses and maintain financial protections. When faced with "competing preemption narratives," the Court has the "duty to accept the reading that disfavors preemption." Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1094 (10th Cir. 2015).

Defendants further argue that Strong did not conclude that Cotter's 1969 source material license could not support jurisdiction under the PAA. Rather, the court merely found that Cotter's license did not cover uranium mill tailings. Here, Plaintiff asserts that Cotter's license authorizing it "to receive, possess and import" uranium did not apply to the uranium mill tailings at issue.[6] Defendants dispute that the material at issue was mill tailings. Like in Strong, the Court cannot conclude, based on the record before it, that the material was in fact mill tailings. If, as Plaintiff contends, the material is uranium mill tailings, then consistent with the analysis in Strong, Cotter's 1969 Source Material License could not have covered it because at the time the license was issued, the term "byproduct material" did not include uranium mill tailings. 283 F. Supp. 3d at 772-73. Moreover, Defendants have not established that Cotter's 1969 Source Material License authorizing it "to receive, possess and import" uranium covered their activities

---

[6] The Court notes that Plaintiff's amended complaint does not specifically allege the material at issue was uranium mill tailings. (See FAP at ¶ 89) ("[t]he radioactive contamination that has polluted [Plaintiff's property] and continues to threaten to further pollute [Plaintiff's property] match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.").

at the sites involved in this case. Thus, Cotter's license does not provide a basis for federal subject matter jurisdiction.

## VI.    Conclusion

For all of these reasons, the Court finds that Defendants have failed to meet their burden of establishing federal subject matter jurisdiction for purposes of the PAA and that this matter should be remanded to state court. Given this finding, the Court need not address the merits of Plaintiff's due process argument. Strong, 283 F. Supp. 3d at 774. Finally, because the Court lacks subject matter jurisdiction over this action, Defendants' pending motions to dismiss will be denied without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Remand [38] is **GRANTED** and this matter is **REMANDED** to the Circuit Court of St. Louis County under 28 U.S.C. § 1447(c).

**IT IS FURTHER ORDERED** that Defendants' motions to dismiss [27, 29, 36, 37] are **DENIED** without prejudice to refiling in state court.

Dated this 29th day of March, 2019.

John A. Ross

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

18

Electronically Filed - St Louis County - April 22, 2019 - 03:49 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617-01 |
| vs. | ) ) | Division No.  2 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY,  A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUBMISSION PURUSANT TO RULE 55.34(b)**

Plaintiff Tamia Banks, individually and on behalf of all others similarly situated, hereby submits the following list of documents filed in the preceding federal court case *Banks v. Cotter Corporation et al.*, 4:18-cv-00624-JAR (E.D. Mo. 2018) to be incorporated into this Court's file in the above-captioned matter pursuant to Missouri Supreme Court Rule 55.34(b):

| ECF No. | Document Description |
|---|---|
| 1 | Notice of Removal |
| 2 | Civil Cover Sheet |
| 3 | Original Filing Form |
| 4 | Notice of Filing Notice of Removal – sent to Plaintiff |
| 5 | Petition Received from Circuit Court |
| 6 | Amended Petition Received from Circuit Court |
| 7 | Consent to Removal by Defendant Commonwealth Edison Company |
| 8 | Consent to Removal by Defendant Exelon Corporation |
| 9 | Consent to Removal by Defendant Exelon Generation Company, LLC |
| 10 | Consent to Removal by Defendant DJR Holdings, Inc. |
| 11 | Consent to Removal by Defendant St. Louis Airport Authority |
| 12 | Docket text order designating magistrate judge |
| 13 | Entry of Appearance by John F. Cowling for Defendant St. Louis Airport Authority |
| 14 | Notice of Filing Notice of Removal – sent to State Court |

Electronically Filed - St Louis County - April 22, 2019 - 03:49 PM

| 15 | Joint and Unopposed Motion for Extension of Time to File Answer |
|----|----|
| 16 | Entry of Appearance by Dale A. Guariglia for Defendants Commonwealth Edison Company, Cotter Corporation, Exelon Corporation, Exelon Generation Company, LLC |
| 17 | Docket text order granting Motion for Extension of Time to File Answer |
| 18 | Motion for Leave to Appear Pro Hac Vice by Su Jin Kim |
| 19 | Motion for Leave to Appear Pro Hac Vice by John McGahren |
| 20 | Motion for Leave to Appear Pro Hac Vice by Stephanie R. Feingold |
| 21 | Docket text order granting Pro Hac Vice admission for Su Jin Kim |
| 22 | Docket text order granting Pro Hac Vice admission for Stephanie R. Feingold and John McGahren |
| 23 | CJRA Order reassigning case to District Judge John A. Ross |
| 24 | Consent Motion for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation |
| 25 | Docket text order granting Consent Motion for Leave to File in Excess of Page Limitation |
| 26 | Entry of Appearance by Saturnin Martin Janksy for Defendant DJR Holdings, Inc. |
| 27 | Motion to Dismiss Case by Defendant St. Louis Airport Authority |
| 28 | Memorandum in Support of Motion to Dismiss Case by Defendant St. Louis Airport Authority |
| 29 | First Motion to Dismiss Case by Defendant DJR Holdings, Inc. |
| 30 | Memorandum in Support of First Motion to Dismiss Case by Defendant DJR Holdings, Inc. |
| 31 | Disclosure of Organizational Interests Certificate by Defendant DJR Holdings, Inc. |
| 32 | Disclosure of Organizational Interests Certificate by Defendant Commonwealth Edison Company |
| 33 | Disclosure of Organizational Interests Certificate by Defendant Cotter Corporation |
| 34 | Disclosure of Organizational Interests Certificate by Defendant Exelon Corporation |
| 35 | Disclosure of Organizational Interests Certificate by Defendant Exelon Generation Company, LLC |
| 36 | Motion to Dismiss Case by Defendant Cotter Corporation |
| 37 | Motion to Dismiss Case by Defendants Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC |
| 38 | Plaintiff's Motion to Remand Case to State Court to Circuit Court, County of St. Louis, Missouri |
| 39 | Memorandum in Support of Plaintiff's Motion to Remand Case |

Electronically Filed - St Louis County - April 22, 2019 - 03:49 PM

| 40 | Consent Motion for Extension of Time to File Response/Reply to Motion to Dismiss |
|----|----------------------------------------------------------------------------------|
| 41 | Docket Text Order granting Consent Motion for Extension of Time to File Response/Reply to Motion to Dismiss |
| 42 | Consent Motion for Extension of Time to File Response/Reply |
| 43 | Docket Text Order:  Consent Motion for Extension of Time to File Response/Reply to Motion to Remand Case |
| 44 | Motion for Leave to Appear Pro Hac Vice by Celeste Brustowicz |
| 45 | Docket Text Order granting Motion for Leave to Appear Proc Hac Vice by Celeste Brustowicz |
| 46 | Motion for Leave to Appear Pro Hac Vice Victor Cobb |
| 47 | Motion to Stay regarding First Motion to Dismiss Case |
| 48 | Docket Text Order granting Motion for Leave to Appear Pro Hac Vice by Victor Cobb |
| 49 | Order: Defendants shall file a response to Plaintiff's motion to stay proceedings in this case pending the Court's ruling on Plaintiff's motion for remand |
| 50 | Defendants' Response to Motion to Stay regarding First Motion to Dismiss Case |
| 51 | Memorandum and Order granting Plaintiff's Motion to Stay |
| 52 | Memorandum in Opposition re Motion to Remand Case to State Court to Circuit Court, County of St. Louis, Missouri filed by Defendants Commonwealth Edison Company, Cotter Corporation, Exelon Corporation, Exelon Generation Company, LLC |
| 53 | Memorandum in Opposition re Motion to Remand Case to State Court to Circuit Court, County of St. Louis, Missouri filed by Defendant DJR Holdings, Inc. |
| 54 | Motion for Extension of Time to File Response/Reply by Plaintiff |
| 55 | Docket Text Order: Plaintiff's Motion for Extension of Time to File her Reply Memoranda in Support of her Motion to Remand is Granted in part. |
| 56 | Plaintiff's Motion to Strike Defendant's Exhibits to Memorandum in Opposition to Motion for Remand, or in the alternative, to take the Deposition of Stephanie Feingold |
| 57 | Order:  Defendants shall file a response to Plaintiff's Motion to Strike Exhibits to Memorandum in Opposition to Motion for Remand of in the alternative to Take Deposition of Stephanie Feingold |
| 58 | Defendants' Memorandum in Opposition re Motion to Strike Memorandum in Opposition to Motion |
| 59 | Plaintiff's Reply to Response to Motion re Motion to Remand Case to State Court to Circuit Court, County of St. Louis, Missouri filed by Plaintiff Tamia Banks |
| 60 | Motion for Leave to File a Sur-Reply by Defendants Commonwealth Edison Company, Cotter Corporation, Exelon Corporation, Exelon Generation Company, LLC |
| 61 | Motion to Substitute Attorney/Law Firm; attorney Kimberly Starr Morr substituted for Alexander Braitberg by Plaintiff Tamia Banks |

Electronically Filed - St Louis County - April 22, 2019 - 03:49 PM

| 62 | Entry of Appearance by Kimberly Starr Morr for Plaintiff Tamia Banks |
|----|---|
| 63 | Docket Text Order granting re Defendants' Motion for Leave to File a Sur-Reply by Defendants Commonwealth Edison Company, Cotter Corporation, Exelon Corporation, Exelon Generation Company, LLC |
| 64 | Docket Text Order granting Motion to Substitute Attorney/Law Firm; attorney Kimberly Starr Morr substituted for Alexander Braitberg by Plaintiff Tamia Banks |
| 65 | Sur-Reply in Opposition to Plaintiff's Motion for Remand, filed by Defendants Commonwealth Edison Company, Cotter Corporation, Exelon Corporation, Exelon Generation Company, LLC |
| 66 | Order setting Plaintiff's Motion for Remand for oral argument on Wednesday, August 8, 2018 at 11 a.m. |
| 67 | Motion for Leave to Appear Pro Hac Vice by David R. Barney, Jr. |
| 68 | Motion for Leave to Appear Pro Hac Vice by Kevin W. Thompson |
| 69 | Docket Text Order Granting Motion for Leave to Appear Pro Hac Vice for Kevin W. Thompson by Plaintiff Tamia Banks |
| 70 | Minute Entry for proceedings held before District Judge John A. Ross:  Motion Hearing held on 8/8/2018. |
| 71 | Order that Plaintiff's Motion for Remand is taken under submission.  It is further ordered that Plaintiff's Motion to Strike Exhibits is Denied as moot in accordance with the rulings on the record.  It is finally ordered that the June 14, 2018 order staying all proceedings in this case shall remain in force until further order of the Court |
| 72 | Transcript Order Request for Oral Argument by Cotter Corporation before Judge John A. Ross. |
| 73 | Deleted – wrong document attached, (see corrected Doc #74) Entry of Appearance by Nathaniel Richard Carroll for Plaintiff Tamia Banks |
| 74 | Entry of Appearance by Nathaniel Richard Carroll for Plaintiff Tamia Banks |
| 75 | Memorandum and Order that Plaintiffs' Motion for Remand is Granted and this matter is Remanded to the Circuit Court of St. Louis County.  It is further ordered that Defendants' motion to dismiss are Denied without prejudice to refiling in state court. |

Plaintiff files herewith electronic copies of each of the foregoing documents, with the exception of all items labeled "Docket text order," for which no separate document is available. Thus, Plaintiff also files herewith a Docket Report from the PACER service reflecting the text of all docket text orders and additional details regarding each of the above-listed documents.

Dated: April 22, 2019

Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988

Electronically Filed - St Louis County - April 22, 2019 - 03:49 PM

7777 Bonhomme Ave, Ste 1600
St. Louis, MO 63105
Ph: (314) 391-4700
Fx: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com
*Attorneys for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 22, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - April 29, 2019 - 04:37 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | Cause No. 18SL-CC00617-01 |
| **vs.** | ) ) | Division No. 18 |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

<u>**COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, AND EXELON
GENERATION COMPANY, LLC'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**</u>

Pursuant to Missouri Rules of Civil Procedure 55.27(a)(2) and 55.27(a)(6), Defendants

Commonwealth Edison Company ("ComEd"), Exelon Corporation ("Exelon"), and Exelon

Generation Company, LLC ("Generation") (collectively "Defendants"), hereby move to dismiss

the first amended class-action complaint ("FAP") of Plaintiff Tamia Banks ("Plaintiff") for lack

of personal jurisdiction and failure to state a claim against Defendants.[1]   Plaintiff asserts twelve

counts alleging that various defendants' collective conduct caused radioactive materials to

contaminate and damage her property.   Plaintiff alleges no facts, however, that would allow this

Court to exercise personal jurisdiction over Defendants or grant the relief Plaintiff seeks.

---

[1] Defendants also hereby join the Motion to Dismiss filed by Defendant Cotter Corporation (N.S.L.) on April 29, 2019, and the arguments set forth therein.

Electronically Filed - St Louis County - April 29, 2019 - 04:37 PM

Defendants concurrently file and incorporate by reference their Memorandum of Law in Support of their motion to dismiss.  A proposed order is also attached.

First, Plaintiff does not allege any connection between Defendants and Missouri that can confer personal jurisdiction over Defendants.  Rather than showing that Defendants maintain minimum contacts with Missouri, Plaintiff instead attempts to manufacture personal jurisdiction based on: (1) other Missouri actions in which Defendants were sued, without regard to whether Defendants were properly named or consented to jurisdiction; (2) Defendants' purported parent-subsidiary relationships with defendant Cotter Corporation (N.S.L.) ("Cotter"); and (3) the existence of an alleged indemnity agreement to which Plaintiff has no connection.  None of Plaintiff's misguided theories provides a basis for this Court to exercise personal jurisdiction over Defendants, as explained in more detail in Defendants' Memorandum of Law.

Plaintiff's efforts to concoct personal jurisdiction instead reflect that neither ComEd nor Exelon: (1) is registered to do business in Missouri; (2) is otherwise doing business in Missouri; (3) has transacted business in Missouri with respect to any matter which is the subject of the FAP filed in this action; (4) offers any products or services within Missouri; (5) has employees in Missouri; (6) owns or leases any real property or facilities in Missouri; or (7) maintains an office to do business in Missouri.  And Plaintiff makes no attempt whatsoever to establish a connection between Generation and Missouri.  For these reasons, this Court lacks personal jurisdiction over ComEd, Exelon, and Generation and the action must be dismissed as to those Defendants.

Second, Plaintiff cannot establish liability against Defendants based solely on their alleged parent-child relationship with Cotter.  As an initial matter, Plaintiff alleges that Cotter committed certain wrongful acts through 1973, and that Cotter *later* became a subsidiary of either ComEd, Exelon, or Generation.  Defendants cannot possibly be liable for the alleged

Electronically Filed - St Louis County - April 29, 2019 - 04:37 PM

wrongful acts of a corporation that was, even according to *Plaintiff's own allegations*, not their subsidiary at any time relevant to the FAP.  But even if any Defendants *had* been Cotter's parent corporation when the allegedly wrongful acts were committed, parent corporations are generally not liable for the acts or omissions of their subsidiaries.  Plaintiff does not allege an alter ego or agency relationship between Cotter and Defendants, nor can she establish such relationship under the facts alleged, making any exceptions to this general rule inapplicable here.  Accordingly, the FAP must be dismissed as to Defendants.

For these reasons, as well as those set forth in Defendants' Memorandum of Law, the Court should dismiss Plaintiff's FAP as to Defendants with prejudice and award such further relief as the Court deems appropriate under the circumstances.

Dated: April 29, 2019                                   Respectfully Submitted,

                                                        */s/ Erin Brooks*
                                                        BRYAN CAVE LEIGHTON PAISNER LLP
                                                        Dale A. Guariglia, Mo. Bar 32988
                                                        daguariglia@bclplaw.com
                                                        Erin L. Brooks, Mo. Bar 62764
                                                        erin.brooks@bclplaw.com
                                                        One Metropolitan Square
                                                        211 N. Broadway, Suite 3600
                                                        St. Louis, Missouri 63102
                                                        (314) 259-2000 (telephone)
                                                        (314) 259-2020 (facsimile)

                                                        MORGAN LEWIS & BOCKIUS, LLP
                                                        John McGahren, Esq. (ID 046791990N)
                                                        *Pro hac vice application forthcoming*
                                                        john.mcgahren@morganlewis.com
                                                        Stephanie Feingold, Esq. (ID 23182005N)
                                                        *Pro hac vice application forthcoming*
                                                        stephanie.feingold@morganlewis.com
                                                        502 Carnegie Center
                                                        Princeton, NJ 08540
                                                        (609) 919-6600 (telephone)
                                                        (609) 919-6701 (facsimile)

                                                        ATTORNEYS FOR DEFENDANTS

Electronically Filed - St Louis County - April 29, 2019 - 04:37 PM

COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, AND EXELON
GENERATION COMPANY, LLC

Electronically Filed - St Louis County - April 29, 2019 - 04:37 PM

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2019, a true and correct copy of the foregoing was

electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri  63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

*/s/ Erin Brooks*                 
*Attorneys for Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC*

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| **vs.** | ) | Division No. 18 |
| | ) | |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, AND**</u>
<u>**EXELON GENERATION COMPANY, LLC'S**</u>
<u>**MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**</u>

Defendants Commonwealth Edison Company ("ComEd"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Generation") (collectively "Defendants"), hereby submit this memorandum in support of their motion to dismiss the first amended class-action petition ("FAP," Exhibit 1) of Plaintiff Tamia Banks ("Plaintiff") pursuant to Missouri Rules of Civil Procedure 55.27(a)(2) and 55.27(a)(6) for lack of personal jurisdiction and failure to state a claim against Defendants directly. Plaintiff cannot establish personal jurisdiction over ComEd, Exelon, or Generation (a) based on their status as defendants in other actions in the state, (b) through purported parent-subsidiary relationships with Cotter Corporation (N.S.L.) ("Cotter") (even though none was a parent of Cotter during the operative events of the FAP − or, in the cases of Exelon and Generation, at *any* time), or (c) through the mere existence of an

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

alleged indemnity agreement.   Nor can Plaintiff establish liability against any Defendant for these reasons.   Defendants further join the Motion to Dismiss filed by Cotter on April 29, 2019, and the arguments set forth therein.

## INTRODUCTION

On or about February 18, 2018, Plaintiff filed a Petition in the Circuit Court of St. Louis County, Missouri, Twenty-First Judicial Circuit, thereby commencing the putative class action styled, *Banks v. Cotter Corporation,* Case No. 18SL-CC00617.   (Exhibit 2).   On April 2, 2018, Plaintiff filed the FAP, with the permission of the Court whereby she added a count for civil conspiracy against the Defendants.   (Exhibit 1).   The Defendants timely removed the action to federal court on April 18, 2018, and the action was remanded to this Court on March 29, 2019. Defendants had filed motions to dismiss in federal court, but as part of the remand order, these motions were denied "without prejudice to refiling in state court."

In Plaintiff's FAP, she alleges that, as a result of the various defendants' collective conduct over the span of several decades, radioactive materials were released into the environment in and around the one-hundred-year floodplain of Coldwater Creek located in St. Louis County, Missouri (the "Creek"), contaminating Plaintiff's property with radioactive materials and causing various forms of property damage.   (*See generally*, FAP ¶¶ 1-10, 48-92).

Plaintiff's twelve-count FAP seeks injunctive and monetary relief against all defendants for damages suffered as a result of trespass, permanent nuisance, temporary nuisance, negligence, negligence *per se*, strict liability injuries, and civil conspiracy, seeks medical monitoring against all defendants, and asserts claims for inverse condemnation and violations of the Missouri Constitution against the St. Louis Airport Authority only.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

## FACTUAL ALLEGATIONS AGAINST
## DEFENDANTS COMED, EXELON, GENERATION, AND COTTER

Plaintiff sues six (6) defendants, including ComEd, Exelon, Generation, and Cotter. Plaintiff asserts that Cotter is a subsidiary of or otherwise related to ComEd, Exelon, and Generation. (*See* FAP ¶¶ 20, 21-24).

Plaintiff alleges that ComEd "is an Illinois corporation whose former subsidiary corporation, Cotter, conducted business operations in Missouri," (FAP ¶ 22), and that Exelon, "the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri." (FAP ¶ 23).

More specifically, with respect to ComEd, Plaintiff alleges that:

> ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

(FAP ¶ 22(A)).  Plaintiff further alleges that jurisdiction exists over ComEd because her damages "resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition." (*Id*. ¶ 22(B)). Plaintiff asserts similar allegations as to Exelon:

> Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

3

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

(FAP ¶ 23(A); *see also id.* at ¶ 23(B)).

Plaintiff also makes similar allegations as to Generation, claiming that "in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to" Generation, (FAP ¶ 24(A)), and that "Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here." (*Id.* at ¶ 24 (B)).

Thus, the sole allegations with respect to ComEd, Exelon, and Generation that, if liberally construed, might be deemed to speak to their "conduct," are based <u>entirely</u> on their alleged corporate relationships with Cotter.  First, Plaintiff sues ComEd, "which was the parent company of Cotter which agreed to indemnify Cotter for liability; . . . ."  (FAP ¶ 22).  According to the FAP, Cotter "was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975."  (FAP ¶ 21).  Then, Plaintiff claims, "[u]pon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities."  (FAP ¶ 22).  Second, Plaintiff sues Exelon, "which is the parent company of ComEd," (FAP ¶ 23).  Third, Plaintiff sues Generation, claiming "in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon[1] was transferred to" Generation. (FAP ¶ 24).

As to Cotter's conduct (which provides the basis for ComEd's, Exelon's, and Generation's purported liability), Plaintiff alleges, "[b]etween 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue Sites."  (FAP ¶ 66; *see also* ¶¶ 63-65).

---

[1] Plaintiff fails to identify how and when Exelon allegedly became responsible for the indemnity to Cotter.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**LEGAL ANALYSIS**

**I.     PURSUANT TO MO. R. CIV. P. 55.27(A)(2), THIS ACTION MUST BE DISMISSED AS TO DEFENDANTS FOR LACK OF PERSONAL JURISDICTION.**

Plaintiff cannot meet her burden of demonstrating that this Court has personal jurisdiction Defendants.  Plaintiff does not allege any connection between Defendants and Missouri that can possibly confer personal jurisdiction over Defendants.  And her attempts to conjure up minimum contacts by Defendants in Missouri are insufficient as a matter of law.

**A.     Legal Standard**

When a defendant's motion to dismiss argues that the court lacks personal jurisdiction over it, "the plaintiff has the burden of making a prima facie showing that the trial court has personal jurisdiction over [the] defendant." *Stavrides v. Zerjav*, 848 S.W.2d 523, 527 (Mo. Ct. App. 1993).  The plaintiff must show that: (1) exercising personal jurisdiction over the defendant is proper under Missouri's long arm statute; *and* (2) sufficient minimum contacts with Missouri exist to make exercising personal jurisdiction consistent with due process. *Medicine Shoppe Int'l v. J–Pral Corp.*, 662 S.W.2d 263, 268, 271 (Mo. Ct. App. 1983); *see also Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136 (8th Cir. 2015) (explaining that courts in the Eighth Circuit "first examin[e] whether the exercise of jurisdiction is proper under the forum state's long-arm statute.  If the activities of the non-resident defendant satisfy the statute's requirements, [courts] then address whether the exercise of personal jurisdiction comports with due process.").  When a defendant's motion to dismiss relies on facts not appearing in the record, the trial court may hear the matter on affidavits offered by the parties. *Chromalloy Am. Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 3 n.3 (Mo. 1997); *Medicine Shoppe Int'l.*, 662 S.W.2d at 268; *see also* Mo. R . Civ. P. 55.28.

5

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

Missouri's long-arm statute is Mo. Rev. Stat. § 506.500, "which authorizes the exercise of jurisdiction over nonresidents to the extent permissible under the due process clause[.]" *Eagle Tech.*, 783 F.3d at 1136; *see also Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216, 226 (Mo. 2015) ("Missouri's long-arm statute expands a court's jurisdictional reach only to the extent allowed by the due process clause of the Fourteenth Amendment of the United States Constitution."). Due process requires that a non-resident defendant have minimum contacts with the forum state such that the maintenance of the lawsuit does not "offend traditional notions of fair play and substantial justice." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This minimum contacts requirement reflects the notion that "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

To determine whether a defendant's contacts with Missouri satisfy due process, courts consider if "the defendant purposefully avail[ed] itself of the privilege of conducting activities within" Missouri. *Bryant*, 310 S.W.3d at 232 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Only where a defendant has purposely availed itself of the protections of Missouri law can it be said to have reasonably anticipated being amenable to suit in the state. *Id.* Purposeful availment requires that the defendant's contacts "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Peoples Bank v. Frazee*, 318 S.W.3d 121, 129 (Mo. 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This "substantial connection" must be shown through the defendant's contacts with "the forum State itself," not only "with the persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Such limitations "ensure[] that a defendant will not be haled into a

6

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

jurisdiction solely as the result of random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations and internal quotation marks omitted).

Finally, "[t]he minimum contacts necessary for due process may be the basis for either 'general' or 'specific' jurisdiction." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (internal citation omitted).  A court has specific jurisdiction over an out-of-state defendant if "a suit aris[es] out of or relate[s] to the defendant's contacts with the forum." *Bryant*, 310 S.W.3d at 232-33.  A court has general jurisdiction over an out-of-state defendant only where the defendant's "connections with the state are systematic, continuous and substantial enough to furnish personal jurisdiction over the defendant based on any cause of action even one that is unrelated to the defendant's contacts with the forum." *Bryant*, 310 S.W.3d at 232; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 414 n.9 (1984).

**B.      Plaintiff Has Failed to Adequately Allege that this Court Has Jurisdiction Over ComEd, Exelon, and Generation**

Other than conclusory allegations regarding the existence of general jurisdiction and fruitless attempts to manufacture personal jurisdiction from purported parent-subsidiary relationships and an alleged indemnity agreement, Plaintiff alleges *no* facts tying ComEd, Exelon, or Generation to Missouri for the purposes of either general or specific jurisdiction.

Plaintiff alleges that ComEd "is an Illinois corporation whose former subsidiary corporation, Cotter, conducted business operations in, Missouri," (FAP ¶ 22),[2] and that Exelon, "the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd,

---

[2] The FAP alleges that ComEd "continuously and systematically carries on business activities in the State of Missouri, *both on its own and through its subsidiaries* including Cotter and its parent company Exelon," whereas it alleges that "Exelon is the parent company of ComEd and, *through its subsidiaries* including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri."  (FAP ¶¶ 22-23).  Neither allegation is sufficient for this Court to have jurisdiction over ComEd and Exelon.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

conducted business in Missouri." (FAP ¶ 23).  Tellingly, Plaintiff does not allege – nor can she – that either ComEd or Exelon is authorized to do business in Missouri.

ComEd and Exelon have submitted Declarations attesting that neither: (1) is registered to do business in Missouri; (2) is otherwise doing business in Missouri; (3) has transacted business in Missouri with respect to any matter which is the subject of the FAP filed in this action; (4) offers any products or services within Missouri; (5) has any employees in Missouri; (6) owns or leases any real property or facilities in Missouri; or (7) maintains an office to do business in Missouri.  (*See* Declaration of Brian Buck on behalf of ComEd, attached hereto as Exhibit 3 and Declaration of Carter C. Culver on behalf of Exelon, attached hereto as Exhibit 4).  And Plaintiff fails to allege *any* connection between Generation and Missouri *whatsoever*.

Rather, in an attempt to fabricate jurisdiction over ComEd, Exelon, and Generation, Plaintiff alleges that Defendants "regularly and routinely avail[] [themselves] of the protection of Missouri laws in St. Louis County courts, and regularly appear[] to defend [themselves] in lawsuits tried here."  (FAP ¶¶ 22(A), 23(A), 24(A)).  Even if this allegation were true (which it is not),[3] simply being named as a defendant in a lawsuit does *not* mean that a defendant is "purposefully availing itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," such that sufficient minimum contacts exist between that defendant and the forum state.  *See Bryant*, 310 S.W.3d at 232.  Further, the mere fact that a defendant has been sued says nothing about whether that defendant has been properly named or, if not, even consents to the court's jurisdiction.

---

[3] A review of the Missouri Courts docket sheets demonstrates that other than the present litigation and the related *Dailey* litigation (4:17-cv-00024) that the Defendants removed to federal court, Exelon has been sued as a defendant *only two other times* in the last 12 years.  In *Union Pacific R.R. Co. v. Johnstown* (22062-00696), the plaintiffs voluntarily dismissed Exelon a few months after the litigation commenced, and the remaining defendants eventually removed the case to federal court.  In *Sutton v. 4520 Corp., Inc.* (1622-CC10904), a personal injury litigation involving asbestos with dozens of defendants, Exelon was never served with the Summons.  During that same time

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

ComEd, Exelon, and Generation have no control over whether anyone will sue them; the purposeful availment requirement is meant to protect against precisely these types of attempts by a plaintiff to create jurisdiction where a defendant has insufficient minimum contacts with a forum state for jurisdiction to exist in the first place.  *Id.*; *Peoples Bank*, 318 S.W.3d at 129; *see also Burger King Corp.*, 471 U.S. at 475.

Plaintiff has utterly failed to plead (much less demonstrate) sufficient contacts between the state of Missouri and any Defendant to form the basis for the Court's exercise of personal jurisdiction over them in this case.  *See Eagle Tech.*, 783 F.3d at 1136.  Thus, this Court lacks personal jurisdiction over ComEd, Exelon, and Generation.

### C. Jurisdiction Over a Parent Corporation May Not Be Predicated on the Contacts of a Subsidiary.

To the extent that Plaintiff attempts to argue that the Court has personal jurisdiction over ComEd, Exelon, and Generation based on their corporate relationships with Cotter, this argument fails.  Here, Plaintiff predicates personal jurisdiction over Defendants on the alleged activities of Cotter between 1969 and 1973, ComEd's later alleged acquisition of Cotter in 1975, Defendants' alleged agreements to indemnify Cotter for the latter's activities associated with Coldwater Creek, Exelon's alleged status as ComEd's and Cotter's parent corporation and alleged "responsibility to indemnify Cotter," and Generation's alleged "responsibility to indemnify Cotter."  (FAP ¶¶ 22-24).  However, none of these allegations, even if true, is a proper basis for personal jurisdiction over ComEd, Exelon, or Generation.

It is well settled that personal jurisdiction over a parent corporation cannot be based on the conduct or contacts of its separately incorporated subsidiaries, except in circumstances where the parent exercised such control and domination over the subsidiary that it was effectively the

---

period, Generation has been sued only once, also as a defendant in the *Union Pacific* case in which Exelon was

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

parent company's alter ego. *E.g.*, *United States v. Bliss*, 108 F.R.D. 127, 131 (E.D. Mo. 1985) (applying Missouri law and reasoning that, "[i]f a subsidiary's presence in the state is primarily to carry on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities."); *see also Cannon Manufacturing Company v. Cudahy Packing Company*, 267 U.S. 333, 335-37 (1925) (holding that when "the corporate separation" between a parent corporation and its subsidiary is "carefully maintained," it may not be "ignored in determining the existence of jurisdiction"); *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011) ("[P]ersonal jurisdiction can be based on the activities of a nonresident corporation's in-state subsidiary only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." (citation omitted)); *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014) ("[T]wo separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." (citation omitted)).

Even taking the allegations as true, the FAP is completely devoid of any allegation that any Defendant exercised such control or dominion over Cotter such that jurisdiction exists over ComEd, Exelon, or Generation, or that Cotter was an "in-state subsidiary." Moreover, under the facts that Plaintiff alleges, establishing the requisite alter-ego relationship would be impossible. According to the FAP, Cotter's alleged conduct giving rise to this matter took place between 1969 and 1973, inclusive. (*See* FAP ¶ 65). In contrast, no Defendant had any involvement with Cotter until after 1973 (if at all). According to Plaintiff's own allegations, ComEd's acquisition of Cotter did not occur until 1975 (FAP ¶ 21) (ComEd's acquisition of Cotter actually took place

---

named as a defendant. While ComEd has been sued more frequently, it was always a defendant.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

on July 31, 1974; *see* Exhibit 3 at ¶ 11).  Moreover, although Plaintiff does not allege when ComEd became a subsidiary of Exelon, ComEd, in fact, became a subsidiary of Exelon in October 2000, long after the operative events alleged in the FAP and after ComEd had sold Cotter in February 2000.  (*See* Exhibit 3 at ¶¶ 11-12).  At no point has Cotter ever been a subsidiary of either Exelon or Generation.  (*See* Exhibit 4 at ¶ 11; Declaration of Katherine Smith on behalf of Generation, attached hereto as Exhibit 5 at ¶ 6).

Nor does the existence of any alleged agreement by Defendants to indemnify a third party for Cotter's alleged actions in connection with the Creek, even if taken as true (as required in the context of a motion to dismiss),[4] necessarily mean that the Court can exercise personal jurisdiction over them, especially where they did not voluntarily agree to subject themselves to the jurisdiction of the courts in Missouri.  Any agreement to indemnify is between the parties to the agreement and cannot provide a basis for a remote third party to initiate a cause of action against an indemnitor based on an alleged tort by the indemnitee.  As a result, the alleged indemnity agreement here provides no basis for jurisdiction over Defendants.

For all of the foregoing reasons, this Court lacks personal jurisdiction as to ComEd, Exelon, and Generation and the action must be dismissed as to those Defendants.

## II.    IN THE ALTERNATIVE, THIS ACTION MUST BE DISMISSED AS TO DEFENDANTS BECAUSE A PARENT CORPORATION IS NOT LIABLE FOR THE CONDUCT OF ITS SUBSIDIARIES.

### A.    Legal Standard

To survive a motion to dismiss for failure to state a claim under Rule 55.27(a)(6), a petition must allege sufficient facts to satisfy the elements of a recognized cause of action.  *Avery Contracting, LLC v. Niehaus*, 492 S.W.3d 159, 162 (Mo. 2016).  "The failure to plead facts entitling the pleader to the relief requested . . . deprives the trial court of jurisdiction to grant"

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

such relief.  *Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617, 621 (Mo. Ct. App. 2007).

Although Missouri is a "fact pleading" jurisdiction, *State ex rel. United Indus. Corp. v.

Mummert*, 878 S.W.2d 494, 496 (Mo. Ct. App. 1994), a petition must "plead ultimate facts

demonstrating" an entitlement to relief "and cannot rely on mere conclusions." *Ford Motor

Credit Co.*, 218 S.W.3d at 621 (citation omitted).  Thus, Missouri "[c]ourts disregard conclusions

not supported by facts in determining whether a petition states a cause of action."  *Brock v.

Blackwood*, 143 S.W.3d 47, 56 (Mo. Ct. App. 2004).

> **B.    Plaintiff Cannot Establish Liability Against ComEd, Exelon, or Generation
> Predicated Solely on a Parent-Child Relationship**

This action must be dismissed as to ComEd, Exelon, and Generation because there are no

allegations of direct involvement by any of them relating to the events giving rise to the FAP

apart from their corporate relationship with Cotter, which is insufficient to establish liability

against either parent.  As discussed above, the FAP alleges that Cotter committed certain

wrongful acts in 1973, and that *subsequently*, Cotter became a subsidiary of ComEd, Exelon, or

Generation.

For the same reason that there is no personal jurisdiction over ComEd, Exelon, and

Generation based solely on the alleged parent-subsidiary relationship, there is also no liability.  A

parent corporation is not liable for the conduct of its subsidiaries.  Ordinarily, "two separate

corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the

other."  *Blanks*, 450 S.W.3d at 375 (Mo. Ct. App. 2014) (citing *Cent. Cooling & Supply Co.*, 648

S.W.2d at 548 (Mo. 1982)).  Accordingly, "[n]ormally, a parent corporation is not responsible

for the acts of its subsidiary corporation."  *Weitz Co. v. MH Washington*, 631 F.3d 510, 520 (8th

Cir. 2011) (citing *Grease Monkey Int'l, Inc. v. Godat*, 916 S.W.2d 257, 262 (Mo. Ct. App.

---

[4] *See Commercial Bank of St. Louis Co. v. James*, 658 S.W.2d 17, 21-22 (Mo. 1983)

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

1995)).  "The mere existence of a parent-subsidiary relationship, without more, does not subject a parent corporation to liability for acts of the subsidiary."  *Blanks*, 450 S.W.3d at 375.  "[T]he parent-subsidiary separation should be 'ignored with caution and only when the circumstances clearly justify it.'"  *Id.* at 376 (quoting *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013)).

There are two exceptions to the rule against finding liability for a parent corporation based on the conduct of its subsidiary, neither of which applies here: (1) "where one corporation so dominates and controls another that it becomes a mere 'alter ego' of the first and the formal corporate separateness is used to accomplish a fraud, injustice, or some unlawful purpose," *Weitz*, 631 F.3d at 520 (citing *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 283 (Mo. Ct. App. 1986)); and (2) an agency theory, whereby the principal exercises "such domination and control that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal," *Weitz*, 631 F.3d at 522 (citing *Sedalia Mercantile Bank and Trust Co. v. Loges Farms, Inc.*, 740 S.W.2d 188, 202 (Mo. Ct. App. 1987)). *See also Blanks*, 450 S.W.3d at 375-80.

Plaintiff does *not* allege that Cotter evolved into ComEd, or Exelon, or Generation, such that any of those entities is the same entity as Cotter, merely under new names.  Further, Plaintiff does not (and cannot) allege that Cotter acted under the direction of ComEd, Exelon, or Generation as an agent of its alleged parent companies, as it was not a subsidiary of any at the time of the alleged actions that give rise to the FAP.  Rather, the FAP merely alleges that Cotter "was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975;" "[u]pon the sale of Cotter [at an unidentified time], ComEd agreed to indemnify Cotter for certain liabilities associated with" activities at Latty Avenue; and "Exelon, through its

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

subsidiaries including Cotter and ComEd, conducted business in Missouri." (FAP ¶¶ 29-31). Simply put, these allegations are insufficient to establish either jurisdiction or liability for Exelon, ComEd, or Generation, as parent corporations, especially considering none was a parent of Cotter at the time of the alleged actions giving rise to the FAP, and indeed, Exelon and Generation were *never* parent corporations of Cotter. *See Blanks*, 450 S.W.3d at 375 ("The mere existence of a parent-subsidiary relationship, without more, does not subject a parent corporation to liability for acts of the subsidiary."); (Exhibit 3 at ¶¶ 11-12; Exhibit 4 at ¶ 11; Exhibit 5 at ¶ 6).

As stated above, under the facts alleged by Plaintiff, it is impossible for an alter ego or agency relationship to have existed between Cotter and ComEd, Exelon, or Generation. Accordingly, even taking Plaintiff's allegations as true, this action must be dismissed as to ComEd, Exelon, and Generation for failure to state a claim, because Defendants, as alleged parent corporations, are not liable for the acts or omissions of their subsidiaries, and no exceptions to that general rule apply here. *See Weitz*, 631 F.3d at 520, 522 (applying Missouri law); *Blanks*, 450 S.W.3d at 375-80.

Similarly, the FAP is devoid of any alleged facts against Defendants regarding any direct involvement by any of them with the Creek at any time relevant to this action. Accordingly, the FAP must be dismissed as to all three Defendants. *E.g.*, *Calon v. Bank of Am. Corp.*, No. 14–00913–CV–W–FJG, 2015 WL 3948171, at *4 (W.D. Mo. June 29, 2015) (applying Missouri law and stating that "[t]o bring a valid claim against [a parent company] that will survive a motion to dismiss, the Plaintiff must allege additional facts that *implicate [the parent] directly*.") (emphasis added).

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

## <u>CONCLUSION</u>

Defendants ComEd, Exelon, and Generation respectfully request that this Court grant their motion to dismiss the FAP for lack of personal jurisdiction on, in the alternative, failure to state a claim upon which relief can be granted.   Plaintiff's attempt to establish personal jurisdiction and liability fails, because Plaintiffs cannot rely on Defendants' status as defendants in other actions within Missouri, their purported parent-subsidiary relationships with Cotter alone (even though none was a parent of Cotter during the operative events of the FAP − or, in the cases of Exelon and Generation, at any time), or the mere existence of an indemnity agreement. Defendants also respectfully request that the Court grant the relief requested in the Motion to Dismiss filed by Defendant Cotter Corporation (N.S.L.) and the arguments set forth therein, which Defendants join.

15

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

Respectfully Submitted,

*/s/ Erin Brooks*
BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (ID 046791990N)
*Pro hac vice application forthcoming*
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq. (ID 23182005N)
*Pro hac vice application forthcoming*
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

ATTORNEYS FOR DEFENDANTS
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, AND EXELON
GENERATION COMPANY, LLC

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, a true and correct copy of the foregoing was

electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri  63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

/s/ Erin Brooks
*Attorneys for Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC*

17

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

# Exhibit 1

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and<br>all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 18SL-CC00617 |
| | ) | |
| vs. | ) | Division No.  2 |
| | ) | |
| COTTER CORPORATION, | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | JURY TRIAL DEMANDED |
| EXELON CORPORATION, | ) | |
| EXELON GENERATION COMPANY, LLC, | ) | |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS | ) | |
| AIRPORT AUTHORITY,  A | ) | |
| DEPARTMENT OF THE CITY OF | ) | |
| ST. LOUIS | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED CLASS ACTION PETITION**

COMES NOW Plaintiff Tamia Banks, on behalf of herself and all others similarly situated,

by and through counsel, and for her First Amended Class Action Petition and causes of action

against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation,

Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St.

Louis Airport Authority, a department of the City of St. Louis, states and alleges as follows:

1.	Since World War II, big companies have made significant profits processing,

handling, and storing radioactive materials in the St. Louis area. This activity began six decades

ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium

with high levels of radium from Africa. This special ore was extremely toxic—more so than the

ores available from anywhere else in the world. Despite the fact that these materials were some of

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

2.      Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste

2

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

8.      Plaintiff Tamia Banks (hereinafter "Plaintiff") owns and resides on property in St. Ann, Missouri that Defendants contaminated.  Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek.

3

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

Her property, including the land and her home, is entirely within the Coldwater Creek flood plain, and is contaminated with radioactive waste materials from Coldwater Creek.

9.      Testing on the Banks Property has confirmed radioactivity above normal background levels. The source of the radioactivity is small, microscopic particles, which among other things contain the hazardous, carcinogenic, toxic, radioactive substance known as thorium.

10.     Plaintiff Tamia Banks, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiff for her damages, and provide further relief as set forth below in this Petition.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

12.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act.

   A.  Coldwater Creek is not and has never been a licensed nuclear facility.

   B.  Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

   C.  Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

D.  Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

E.  Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

16.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property").  The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek.

19.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to the Banks Property and the loss of use and enjoyment of the

5

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

property. Plaintiffs first learned that the Banks Property was contaminated with radioactive material in 2018.

<div align="center">**Defendants**</div>

20.     There are four defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive residue wastes: Cotter Corporation ("Cotter"), Commonwealth Edison Company ("ComEd"), Cotter Corporation ("Cotter"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Exelon Generation").

21.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.

> A.  Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc.
>
> B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

22.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities.

<div align="center">6</div>

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

A.  ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.  This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

23.     Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri.

A.  Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.  This lawsuit arises out of damages that resulted from the Exelon Defendants' conduct including acts and omissions within the State of Missouri, as well as

7

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

the acts and omissions of the predecessors of the Exelon Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

24.     Exelon Generation Company, LLC ("Exelon Generation") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. Upon information and belief in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to Exelon Generation Company, LLC.

A.  Exelon Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.  This lawsuit arises out of damages that resulted from the conduct including acts and omissions of Exelon Generation and their subsidiaries, agents, and representatives within the State of Missouri, which gave rise to the violations of law and damage to property alleged in the Petition.

25.     DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

26.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff files this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

28.     Plaintiff brings this action on behalf of herself and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

29.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

30.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 below.**

---

[1] https://msc fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

31.    The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on a property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

32.     Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

33.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiff currently, it is ascertainable by appropriate discovery and Plaintiff, upon information and belief, alleges that the proposed Class may include more than twenty-five members. The requirement of numerosity is therefore satisfied.

34.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive classwide resolution of the claims of the proposed Class. These common questions of law or fact include:

> a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;
>
> b.   Whether Defendants unreasonably and unlawfully processed, stored or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");
>
> c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiff and Class Members' property;

11

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

    d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiff and Class Members' property;

    e.   Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiff and Class Members' loss of use and enjoyment of their property;

    f.   Whether the loss in property value suffered by Plaintiff and Class is a result of Defendants' actions;

    g.   Whether Plaintiff and Class are entitled to damages; and

    h.   Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

35.    The claims of the Plaintiff are typical of the claims of the Class. Plaintiff and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

36.    Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the members of the Class. Plaintiff has retained competent attorneys who have experience in class action litigation.

37.    Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

38.    Unless a class-wide injunction is issued, Defendants will continue to allow

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

contamination of the properties of Plaintiff and Class and will continue to violate Missouri law resulting in harm to thousands of Missouri citizens.

39.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiff, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

40.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

41.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

13

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

42.     All of the class members are citizens of Missouri.

43.     The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

44.     The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive waster alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri.

45.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

46.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

47.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

## FACTS

### Radioactive Wastes

48.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

49.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials

14

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

51.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

52.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

15

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

53.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers.  Illnesses such as cancers may take a number of years to appear.

54.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

55.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**Radioactive Waste in the St. Louis Area**

56.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[3]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

57.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

58.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

59.     Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

60.     In 1957, "approximately sixty truckloads of contaminated scrap metal, several

---

[3] *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

17

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on western portion of SLAPS adjacent to Coldwater Creek."

61.    In the 1960's, some of the hazardous, toxic, carcinogenic radioactive wastes that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

62.    These waste residues, which contained valuable metals, were sold and shipped to various other destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

63.    In the late 1960's, Cotter purchased the hazardous, toxic, carcinogenic radioactive wastes stored at both SLAPS and at the Latty Avenue Site .

64.    Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

65.    Cotter did not receive indemnity from the government in connection with this transaction.

66.    Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites.

67.    Upon information and belief, Cotter did not have a license to dispose of enriched thorium.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

68.     Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

### Saint Louis Airport Site ("SLAPS")

69.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

70.     Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

71.     From 1953, the property was managed and operated by Mallinckrodt.

72.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

73.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

74.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

### Latty Avenue Site

75.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

76.    Upon information and belief, Futura Coatings purchased the Latty Avenue property.

77.    Despite knowing that significant activities involving radioactive material were conducted on the site, Futura Coatings did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

**Coldwater Creek**

78.    Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

79.    Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

80.    By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly

20

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support  construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

81.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

82.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

83.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

84.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

85.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

86.     The Banks Property is contaminated by radioactive material.

21

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

87.     Samples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

88.     The Banks Property neighbors Coldwater Creek and is within its flood plain.  This proximity puts the Banks Property in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

89.     The radioactive contamination that has polluted the Banks Property and continues to threaten to further pollute the Banks Property match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

90.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

91.     Radioactive contamination of the Banks Property renders the Banks Property unfit for normal use and enjoyment, and destroys its fair market value.

92.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually and on behalf of the Property Damage Subclass)

93.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.     Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

22

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

95.     Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

96.     Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

97.     Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

98.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiff and the Property Damage Subclass ("Plaintiffs' property").

99.     Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

100.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper  disposal  of  radioactive wastes

101.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

102.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

103.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

104.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

23

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

105.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

106.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

107.    The migration of Radon gas and radioactive particles onto the property of Plaintiff and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiff and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiff and of the Property Damage Subclass.

108.    Plaintiff did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

109.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

110.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiff and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

24

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

## COUNT II – PERMANENT NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

111.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

113.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

114.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

115.    The radioactive waste caused by Defendants results from permanent construction that is necessarily injurious to Plaintiffs as installed.  It is not practical or possible to abate the presence of the radioactive waste in Coldwater Creek.

116.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

117.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

118.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

119.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

120.    Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

121.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

### COUNT III – TEMPORARY NUISANCE
**(brought individually and on behalf of the Property Damage Subclass)**

122.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

123.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described Paragraph 11 above.

124.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

125.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

126.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

127.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

128.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

129.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

130.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually and on behalf of the Class)

131.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers

27

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

133.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

134.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

135.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

136.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances

into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

28

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

137.     Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

138.      Defendants failed to act to prevent their releases from harming Plaintiffs.

139.     Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

140.     Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiff's property.

141.     Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

142.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

143.     The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

144.     Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

145.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

**COUNT V – NEGLIGENCE PER SE**
**(brought individually and on behalf of the Class)**

146.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

147.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

148.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

149.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

150.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

151.    Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

152.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

153.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

### COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually and on behalf of the Class)

154.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

155.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

156.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

157.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

31

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

158.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

159.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

160.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

161.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
### (brought individually and on behalf of the Class)

162.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.    Defendants have tortiously contaminated the property of Plaintiff and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

164.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiff and the proposed Class.

165.    The radioactive contamination of the property of Plaintiff and the proposed Class has caused a significant increased risk to Plaintiff and Class members, and therefore Plaintiff and

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

166.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

167.    Therefore, Plaintiff seeks injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiff and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

168.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

169.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiff and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
### (brought individually and on behalf of the Class)

170.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

171.     Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

172.     Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiff and others similarly situated.

173.     The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiff, and others similarly situated.

## COUNT IX – CIVIL CONSPIRACY
### (brought individually and on behalf of the Class)

174.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

175.     Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

176.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

177.     As result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**COUNT X – INVERSE CONDEMNATION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

180.    The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiff and the Property Damage Subclass for public use without just compensation.

181.    The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

182.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

183.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

184.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

185.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis,  as alleged herein constituted and invasion and appropriation of the property rights of Plaintiff and the Property Damage Subclass.

186.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

187.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

188.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

189.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

190.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiff's and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

36

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

191.    As a result of Defendants' conduct, Plaintiff and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

**COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

192.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

193.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

194.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

195.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiff and the Property Damage Subclass.

196.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiff or the Property Damage Subclass.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiff Tamia Banks prays for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a. an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b. an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c. an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d. costs and attorney fees;

e. interest on the above amounts as allowed by law;

f. for appropriate injunctive and equitable relief, as permitted by law or equity including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Respectfully submitted,

KEANE LAW LLC

 /s/ Ryan A. Keane

Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
forthcoming
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
forthcoming
508 St. Philip Street
New Orleans, LA 70116
Phone: (504) 566-1558
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

and

**LEAVE GRANTED:**

*Maura B McShane*

Judge                    Division 2

April 10, 2018

39

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630, *pro hac vice*
forthcoming
920 4th Street
Gretna, Louisiana 70053
Phone: (504) 227-8100
Fax: (504) 227-8122
raustin@austin-associates.net

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 2, 2018, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ Ryan A. Keane

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

# Exhibit 2

**18SL-CC00617**

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

## TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
## ST. LOUIS COUNTY

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Cause No.** |
| **vs.** | ) ) | **Division No.** |
| **COTTER CORPORATION,** Serve at: | ) ) | **JURY TRIAL DEMANDED** |
| The Corporation Company Registered Agent for Cotter Corporation 7700 E. Arapahoe Road, Suite 220 Centennial, CO 80112 | ) ) ) ) ) ) | |
| **COMMONWEALTH EDISON COMPANY,** Serve at: | ) ) | |
| Corporate Creations Network Inc. Registered Agent for Commonwealth Edison Company 350 S. Northwest Highway, Suite 300 Park Ridge, IL 60068 | ) ) ) ) ) ) | |
| **EXELON CORPORATION,** Serve at: | ) ) | |
| Corporate Creations Network Inc Registered Agent for Exelon Corporation 350 S. Northwest Highway, Suite 300 Park Ridge, IL 60068 | ) ) ) ) ) | |
| **EXELON GENERATION COMPANY, LLC,** Serve at: | ) ) | |
| Corporate Creations Network Inc Registered Agent for Exelon Generation Company, LLC 350 S. Northwest Highway, Suite 300 Park Ridge, IL 60068 | ) ) ) ) ) ) ) | |

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM, PM

**DJR HOLDINGS, INC. f/k/a FUTURA** )
**COATINGS, INC.,** )
**Serve:** )
    Rodney D. Jarboe )
    9200 Latty Avenue )
    Hazelwood, MO 63042 )
     )
    **and** )
     )
**ST. LOUIS AIRPORT AUTHORITY,** )
**A DEPARTMENT OF THE CITY OF** )
**ST. LOUIS** )
**Serve:** )
    Mayor Lyda Krewson )
    St. Louis City Hall )
    1200 Market St )
    St. Louis, MO 63103 )
     )
    **Defendants.** )

## CLASS ACTION PETITION

COMES NOW Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, by and through counsel, and for her Class Action Petition and causes of action against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states and alleges as follows:

1.    Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium with high levels of radium from Africa. This special ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of

2

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

2.      Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

8.      Plaintiff Tamia Banks (hereinafter "Plaintiff") owns property in St. Ann, Missouri that Defendants contaminated.  Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek.  Her property,

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

including the land and her home, is entirely within the Coldwater Creek flood plain, and is contaminated with radioactive waste materials from Coldwater Creek.

9.      Testing on the Banks Property has confirmed radioactivity above normal background levels. The source of the radioactivity is small, microscopic particles, which among other things contain the hazardous, carcinogenic, toxic, radioactive substance known as thorium.

10.     Plaintiff Tamia Banks, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiff for her damages, and provide further relief as set forth below in this Petition.

**JURISDICTION AND VENUE**

11.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

12.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price Anderson Act.

    A.  Coldwater Creek is not and has never been a licensed nuclear facility.

    B.  Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

    C.  Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

D.  Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

E.  Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

15.    Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

16.    At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

17.    The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## THE PARTIES

### Plaintiffs

18.    Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property").  The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek.

19.    As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to the Banks Property and the loss of use and enjoyment of the

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

property. Plaintiffs first learned that the Banks Property was contaminated with radioactive material in 2018.

<div align="center">

**Defendants**

</div>

20.    There are four defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive residue wastes: Cotter Corporation ("Cotter"), Commonwealth Edison Company ("ComEd"), Cotter Corporation ("Cotter"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Exelon Generation").

21.    Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.

   A.  Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc.

   B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

22.    Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities.

<div align="center">

7

</div>

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

A. ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B. This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

23.     Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri.

A. Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B. This lawsuit arises out of damages that resulted from the Exelon Defendants' conduct including acts and omissions within the State of Missouri, as well as

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

the acts and omissions of the predecessors of the Exelon Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

24.     Exelon Generation Company, LLC ("Exelon Generation") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. Upon information and belief in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to Exelon Generation Company, LLC.

A.   Exelon Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.   This lawsuit arises out of damages that resulted from the conduct including acts and omissions of Exelon Generation and their subsidiaries, agents, and representatives within the State of Missouri, which gave rise to the violations of law and damage to property alleged in the Petition.

25.     DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

26.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff files this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all owners of real property with any portion within the FEMA one hundred year

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

28.     Plaintiff brings this action on behalf of herself and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

29.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

30.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All persons who currently own real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 below.**

---

[1] https://msc fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

31.     The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All persons who currently reside, or have resided since 1973, on a property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

32.     Excluded from the Property Damage Subclass and the Medical Monitoring

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

33.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiff currently, it is ascertainable by appropriate discovery and Plaintiff, upon information and belief, alleges that the proposed Class may include more than twenty-five members. The requirement of numerosity is therefore satisfied.

34.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive classwide resolution of the claims of the proposed Class. These common questions of law or fact include:

   a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

   b.   Whether Defendants unreasonably and unlawfully processed, stored or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

   c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiff and Class Members' property;

   d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly,

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

willfully, wantonly and maliciously allowed the emission of Radon gas and

radioactive particles onto and around Plaintiff and Class Members' property;

e.   Whether Defendants' conduct or omissions affecting land surrounding the St.

Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood

Interim Storage Site ("HISS") resulted in Plaintiff and Class Members' loss of

use and enjoyment of their property;

f.   Whether the loss in property value suffered by Plaintiff and Class is a result of

Defendants' actions;

g.   Whether Plaintiff and Class are entitled to damages; and

h.   Whether Defendants' conduct rises to the level of willfulness so as to justify

punitive damages.

35.   The claims of the Plaintiff are typical of the claims of the Class. Plaintiff and all

Class Members own land within the FEMA one hundred year flood plain of Coldwater Creek in

St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and

dumped radioactive waste.

36.   Plaintiff will fairly and adequately represent the interests of the members of the

Class. Plaintiff has no interest adverse to the interests of the members of the Class. Plaintiff has

retained competent attorneys who have experience in class action litigation.

37.   Defendants have acted or refused to act on grounds that apply generally to the Class

as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

38.   Unless a class-wide injunction is issued, Defendants will continue to allow

contamination of the properties of Plaintiff and Class and will continue to violate Missouri law

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

resulting in harm to thousands of Missouri citizens.

39.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiff, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

40.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

41.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

42.     More than two-thirds of the class members are citizens of Missouri.

14

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

43.     The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

44.     The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive waster alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri

45.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

46.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

47.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

**<u>FACTS</u>**

**<u>Radioactive Wastes</u>**

48.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

49.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

15

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

51.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

52.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

16

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

53.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.   Somatic injuries are damages to the individual exposed.  This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers.  Illnesses such as cancers may take a number of years to appear.

54.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

55.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

### Radioactive Waste in the St. Louis Area

56.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[3]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

57.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

58.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

59.     Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

60.     In 1957, "approximately sixty truckloads of contaminated scrap metal, several contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on western portion of SLAPS adjacent to Coldwater Creek."

---

[3] *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

61.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive wastes  that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

62.     These waste residues, which contained valuable metals, were sold and shipped to various other destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

63.     In the late 1960's, Cotter purchased the hazardous, toxic, carcinogenic radioactive wastes stored at both SLAPS and at the Latty Avenue Site .

64.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

65.     Cotter did not receive indemnity from the government in connection with this transaction.

66.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites.

67.     Upon information and belief, Cotter did not have a license to dispose of enriched thorium.

68.     Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

**Saint Louis Airport Site ("SLAPS")**

69.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

70.     Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

71.     From 1953, the property was managed and operated by Mallinckrodt.

72.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

73.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

74.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

**Latty Avenue Site**

75.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

76.     Upon information and belief, Futura Coatings purchased the Latty Avenue property.

20

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM PM

77.     Despite knowing that significant activities involving radioactive material were conducted on the site, Futura Coatings did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

### Coldwater Creek

78.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

79.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

80.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support  construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

81.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

82.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

83.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

84.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

85.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

86.     The Banks Property is contaminated by radioactive material.

87.     Samples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

88.     The Banks Property neighbors Coldwater Creek and is within its flood plain.  This proximity puts the Banks Property in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

22

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

89.     The radioactive contamination that has polluted the Banks Property and continues to threaten to further pollute the Banks Property match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

90.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

91.     Radioactive contamination of the Banks Property renders the Banks Property unfit for normal use and enjoyment, and destroys its fair market value.

92.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually and on behalf of the Property Damage Subclass)

93.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.     Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

95.     Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

96.     Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

97.     Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

98.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiff and the Property Damage Subclass ("Plaintiffs' property").

99.     Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

100.     Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

101.     It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

102.     Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

103.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

104.     Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

105.     Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

24

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

106.     It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

107.     The migration of Radon gas and radioactive particles onto the property of Plaintiff and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiff and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiff and of the Property Damage Subclass.

108.     Plaintiff did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

109.     The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

110.     As a direct and proximate cause of this continuing and recurring physical interference, Plaintiff and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

**COUNT II – PERMANENT NUISANCE**
**(brought individually and on behalf of the Property Damage Subclass)**

111.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.     Plaintiff Tamia Banks owns and controls property at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

113.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

114.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

115.    The radioactive waste caused by Defendants results from permanent construction that is necessarily injurious to Plaintiffs as installed.  It is not practical or possible to abate the presence of the radioactive waste in Coldwater Creek.

116.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

117.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

118.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

119.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

120.    Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

121.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

### COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

122.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

123.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described Paragraph 11 above.

124.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

125.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

126.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

127.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

128.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

129.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

130.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
**(brought individually and on behalf of the Property Damage Subclass)**

131.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

133.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

134.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

135.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

136.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

137.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

138.    Defendants failed to act to prevent their releases from harming Plaintiffs.

29

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

139.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

140.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiff's property.

141.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

142.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

143.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

144.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

145.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

## COUNT V – NEGLIGENCE PER SE
### (brought individually and on behalf of the Property Damage Subclass)

146.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

147.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

148.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

149.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

150.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

151.     Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

152.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

153.     Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually and on behalf of the Property Damage Subclass)

154.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

155.     Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

156.     By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

157.     Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

158.     As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer

32

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM  PM

injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

159.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

160.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

161.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
### (brought individually and on behalf of the Class)

162.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.    Defendants have tortiously contaminated the property of Plaintiff and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

164.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiff and the proposed Class.

165.    The radioactive contamination of the property of Plaintiff and the proposed Class has caused a significant increased risk to Plaintiff and Class members, and therefore Plaintiff and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

166.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

167.    Therefore, Plaintiff seeks injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiff and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

168.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

169.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiff and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
### (brought individually and on behalf of the Class)

170.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

171.    .Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

172.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiff and others similarly situated.

173.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiff, and others similarly situated.

### COUNT IX – INVERSE CONDEMNATION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

174.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

175.    The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

176.    The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiff and the Property Damage Subclass for public use without just compensation.

177.    The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM

178.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

179.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

180.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

181.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis,  as alleged herein constituted and invasion and appropriation of the property rights of Plaintiff and the Property Damage Subclass.

182.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT X – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

183.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

184.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

185.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

186.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiff's and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

187.    As a result of Defendants' conduct, Plaintiff and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

**COUNT XI – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

188.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

189.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

190.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate,

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM  PM  PM

warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

191.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiff and the Property Damage Subclass.

192.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiff or the Property Damage Subclass.

**PRAYER FOR RELIEF**

**WHEREFORE**, as to each Count, and all Counts, Plaintiff Tamia Banks prays for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.   an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.   an award of double damages for malicious trespass as provided for under RSMo. §

38

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM PM

537.330;

c.   an award of punitive and exemplary damages as fair and reasonable in an amount

sufficient to punish Defendants and to deter similar conduct in the future;

d.   costs and attorney fees;

e.   interest on the above amounts as allowed by law;

f.   for appropriate injunctive and equitable relief, as permitted by law or equity

including a preliminary and/or permanent injunction enjoining Defendants from

continuing the unlawful conduct as set forth herein and directing Defendants to

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Respectfully submitted,

KEANE LAW LLC

 /s/ Ryan A. Keane

Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

39

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM. PM

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
forthcoming
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
forthcoming
508 St. Philip Street
New Orleans, LA 70116
Phone: (504) 566-1558
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

and

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630, *pro hac vice*
forthcoming
920 4th Street
Gretna, Louisiana 70053
Phone: (504) 227-8100
Fax: (504) 227-8122
raustin@austin-associates.net

*Attorneys for Plaintiffs and proposed Class*

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

# Exhibit 3

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | Cause No. 18SL-CC00617-01 |
| ) | |
| **vs.** ) | Division No. 18 |
| ) | |
| **COTTER CORPORATION,** ) | |
| **COMMONWEALTH EDISON COMPANY,** ) | |
| **EXELON CORPORATION,** ) | |
| **EXELON GENERATION COMPANY, LLC,** ) | |
| **DJR HOLDINGS, INC. f/k/a FUTURA** ) | |
| **COATINGS, INC.,** and **ST. LOUIS AIRPORT** ) | |
| **AUTHORITY, A DEPARTMENT OF THE** ) | |
| **CITY OF ST. LOUIS,** ) | |
| ) | |
| **Defendants.** ) | |

## DECLARATION OF BRIAN BUCK

I, Brian Buck, hereby declare and state as follows:

1. I am an Assistant Secretary of Commonwealth Edison Company ("ComEd").

2. I am an adult citizen and resident of the State of Illinois and am competent to provide this Declaration.  I am providing this Declaration based on my own personal knowledge, and on documents, records, and information of ComEd available to me in my position as an Assistant Secretary of ComEd.

3. ComEd is a corporation organized and existing under the laws of Illinois, having its principal place of business at 440 South LaSalle Street, Chicago, Illinois 60605-1028.

4. ComEd is not registered to do business in Missouri.

5. ComEd is not doing business in Missouri.

6. ComEd has not transacted business in Missouri with respect to any matter which is the subject of the Complaint filed in this action.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

7.  ComEd offers no products or services within Missouri.

8.  ComEd has no employees in Missouri.

9.  ComEd does not own or lease any real property or facilities in Missouri.

10. ComEd does not maintain an office to do business in Missouri.

11. ComEd acquired Cotter Corporation (N.S.L.), a New Mexico corporation, on July 31, 1974, and divested it in February 2000.

12. ComEd became a subsidiary of Exelon Corporation in October 2000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2019.

Brian Buck
Assistant Secretary
Commonwealth Edison Company

2

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

# Exhibit 4

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | Cause No. 18SL-CC00617-01 |
| **vs.** | ) ) | Division No. 18 |
| **COTTER CORPORATION,** **COMMONWEALTH EDISON COMPANY,** **EXELON CORPORATION,** **EXELON GENERATION COMPANY, LLC,** **DJR HOLDINGS, INC. f/k/a FUTURA** **COATINGS, INC.,** and **ST. LOUIS AIRPORT** **AUTHORITY, A DEPARTMENT OF THE** **CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## DECLARATION OF CARTER C. CULVER

I, Carter C. Culver, hereby declare and state as follows:

1. I am the Assistant Secretary of Exelon Corporation ("Exelon").

2. I am an adult citizen and resident of the State of Illinois and am competent to provide this Declaration. I am providing this Declaration based on my own personal knowledge, and on documents, records, and information of Exelon available to me in my position as the Secretary of Exelon.

3. Exelon is a corporation organized and existing under the laws of Pennsylvania, having its principal place of business at 10 South Dearborn Street, Chicago, Illinois 60680.

4. Exelon is not registered to do business in Missouri.

5. Exelon is not doing business in Missouri.

6. Exelon has not transacted business in Missouri with respect to any matter which is the subject of the Complaint filed in this action.

7. Exelon offers no products or services within Missouri.

8. Exelon has no employees in Missouri.

9. Exelon does not own or lease any real property or facilities in Missouri.

10. Exelon does not maintain an office to do business in Missouri.

11. At no time has Cotter Corporation (N.S.L.), a New Mexico corporation, ever been a subsidiary of Exelon.

 

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2019.

                                   Carter C. Culver
                                   Assistant Secretary
                                   Exelon Corporation

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

# Exhibit 5

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| **vs.** | ) | Division No. 18 |
| | ) | |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

**DECLARATION OF KATHERINE SMITH**

I, Katherine Smith hereby declare and state as follows:

1.  I am the Assistant Secretary of Exelon Generation Company, LLC ("Generation").

2.  I am an adult citizen and resident of the state of Illinois and am competent to provide this Declaration.  I am providing this Declaration based on my own personal knowledge, and on documents, records, and information of Generation available to me in my position as the Assistant Secretary of Generation.

3.  Generation is a corporation organized and existing under the laws of Pennsylvania, having its principal place of business at 300 Exelon Way, Kennett Square, PA 19348.

4.  Generation has not transacted business in Missouri with respect to any matter which is the subject of the Complaint filed in this action.

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

5. In 2001, an indemnity that covered certain activities that Cotter Corporation (N.S.L.) ("Cotter") undertook in St. Louis County, Missouri, was transferred from Exelon Corporation to Generation.

6. At no time has Cotter, a New Mexico corporation, ever been a subsidiary of Generation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 26, 2019.

Katherine Smith
Assistant Secretary
Exelon Generation Company, LLC

Electronically Filed - St Louis County - April 29, 2019 - 04:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | Cause No. 18SL-CC00617-01 |
| ) | |
| **vs.** ) | Division No. 18 |
| ) | |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** ) ) ) ) ) ) ) ) ) | |
| ) | |
| **Defendants.** ) | |

**[PROPOSED] ORDER**

      **AND NOW**, this _____ day of _____ 2019, upon consideration of Defendants

Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC's

(together, "Defendants") motion to dismiss Plaintiff's first amended class-action petition

("Motion"), and of the submissions of the parties relating thereto, and for good cause shown,

      **IT IS HEREBY ORDERED** that Defendants' Motion is **GRANTED** and Plaintiff's

first amended class-action petition is **DISMISSED** in its entirety with prejudice as to

Defendants.

      IT IS SO ORDERED.

DATED: _____

                                _____
                                J.

Electronically Filed - St Louis County - April 29, 2019 - 04:33 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | Cause No. 18SL-CC00617-01 |
| **vs.** | ) ) | Division No. 18 |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**<u>ENTRY OF APPEARANCE</u>**

COMES NOW Erin L. Brooks of Bryan Cave Leighton Paisner LLP enters her

appearance as counsel for Defendants Cotter Corporation, Commonwealth Edison Company,

Exelon Corporation, and Exelon Generation Company, LLC  in the above captioned case.


Dated:  April 29, 2019                    Respectfully submitted,
                                          BRYAN CAVE LEIGHTON PAISNER LLP

                                          By: */s/ Erin L. Brooks*
                                          Erin L. Brooks, MO #62764
                                          erin.brooks@bclplaw.com
                                          211 North Broadway, Suite 3600
                                          St. Louis, MO  63102
                                          (314) 259-2000 (telephone)
                                          (314) 259-2020 (facsimile)

                                          *Attorneys for Defendants*

Electronically Filed - St Louis County - April 29, 2019 - 04:33 PM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 29, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the electronic filing system, providing electronic service to all counsel of record.

*/s/ Erin L. Brooks*

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>                              Plaintiff,<br><br>    v.<br><br>COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC, AND ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,<br><br>                              Defendants. | **Civil Action No. 18SL-CC00617-01**<br><br>**Division No. 18**<br><br>**MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS-ACTION PETITION AND SUGGESTIONS OF LAW IN SUPPORT OF MOTION** |

Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation) moves to dismiss the first amended class-action petition ("FAP") of Plaintiff Tamia Banks ("Plaintiff") pursuant to Missouri Rules of Civil Procedure 55.05 and 55.27(a)(6) on the basis that Plaintiff has failed to state a claim upon which relief can be granted, because her claims are wholly preempted by a federal statute as set forth in the following suggestions of law in support.  Defendants Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC (collectively, "Exelon Defendants")[1] also join this motion.

As discussed in this motion and suggestions of law, Plaintiff's substantive state law causes of action against Cotter and the Exelon Defendants are completely preempted by the Price-Anderson Act ("PAA"), because Plaintiff's claims arise from and relate to a nuclear

---

[1] The Exelon Defendants are not alleged to have taken any independent actions relevant to Plaintiff's claims, but have been named as defendants solely because of their purported corporate relationship(s) to Cotter.  *See* FAP at ¶¶ 22-24 (Exhibit 1).  The Exelon Defendants have separately moved to dismiss Plaintiff's claims on the basis this Court lacks jurisdiction over the Exelon Defendants.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

incident.  Even assuming Plaintiff had asserted a claim under the PAA, that claim would necessarily fail because Plaintiff has not alleged an essential element: Cotter's breach of the federal dose and effluent limits.  Furthermore, Plaintiff is not entitled to medical monitoring, diminution in property value, or emotional distress damages, because she has not pleaded the requisite elements for these claims and/or because the PAA does not allow for such relief.  Even if Plaintiff's state law claims were not preempted by the PAA, therefore, they are all defectively pleaded and should be dismissed.  And because Plaintiff's substantive claims fail as a matter of law, her claims for injunctive relief and punitive damages should be dismissed.  Finally, Plaintiff's class allegations should be dismissed for failure to state a claim upon which relief can be granted, and also because her class definitions are impermissibly overbroad and do not meet the required elements of Rule 52.08(a).

## INTRODUCTION

As set forth herein, the PAA preempts state law claims pertaining to public liability arising from a nuclear incident and provides an exclusive federal cause of action.  Although the PAA provides that any right to relief on Plaintiff's claims would arise under an exclusive federal cause of action, the PAA applies in full when a case falling within its ambit is litigated in a state court forum.  Put simply, the PAA applies in this forum and this Court should determine that Plaintiff's claims are preempted by the PAA.  Because the Plaintiff has not alleged facts stating a claim under the PAA, the motion to dismiss should be granted.

The United States District Court for the Eastern District of Missouri remanded this case after being unable to conclusively determine that the PAA preempted Plaintiff's claims, and finding that it accordingly lacked subject matter jurisdiction over the case.  The case will now proceed before this Court, and nothing prevents this Court from affirmatively finding that the

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

PAA preempts Plaintiff's claims in this case.  The federal court's determination as to the forum is binding on remand; its determination (or lack thereof) on the substantive law is not.

Indeed, it is imperative that this Court consider the applicability of the PAA afresh.  The federal court missed the mark in following the outdated precedent in *Gilberg* and *Strong* and in its review of Cotter's license. Defendants had no opportunity to seek review in federal court. This Court is free to revisit the issue and to make its own independent determination.

## ALLEGATIONS IN THE FIRST AMENDED PETITION

Plaintiff alleges the following in her First Amended Petition: Plaintiff is a citizen of the state of Missouri, and owns and resides on certain real property she contends is contaminated with radioactive materials emitted from nearby Coldwater Creek. *See generally* FAP at ¶¶ 2-4, 18-24.  By way of background, from 1942 to 1957, uranium ore was processed at a site in downtown St. Louis ("SLDS") in connection with the United States' efforts under the Manhattan Project to develop the first nuclear weapons.  *See id.* at ¶¶ 56-57.  In the late 1940s, the United States government purchased a 21.7-acre tract of land near the Lambert-St. Louis International Airport ("Airport") to store materials generated from processing activities at SLDS.  *See id.* at ¶ 58.  This site is commonly referred to as the St. Louis Airport Site ("SLAPS").  *Id.*

Thereafter, various radioactive materials resulting from operations at SLDS were stored at SLAPS, and in 1957, radioactively impacted materials were buried on a portion of SLAPS adjacent to Coldwater Creek.  *See id.* at ¶¶ 59-60.  Plaintiff contends that in the 1960s, some radioactive materials that had been stored at SLAPS were moved to a site at Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") by an unnamed entity, including a portion of the Latty Avenue Site that later became known as the Hazelwood Interim Storage Site ("HISS"), which resulted in the contamination of the Latty Avenue Site.  *See id.* at ¶¶ 61-62.  Nowhere in

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

her FAP does Plaintiff allege that Cotter or any of the other Defendants had any role in the handling of radioactive materials during this time.

In the late 1960s, Cotter allegedly purchased some of the radioactive materials (including purported "enriched thorium") stored at SLAPS and the Latty Avenue Site from the United States government, which Cotter allegedly stored, processed, and transported at SLAPS and the Latty Avenue Site between 1969 and 1973.  *See* FAP at ¶¶ 63-66.  Plaintiff also alleges that "[i]n 1969, the hazardous, toxic, and radioactive wastes [sic] residues at Latty Avenue were sold to the Cotter Corporation."[2]  *Id*. at ¶ 81.  According to Plaintiff, various transport and handling activities to and from SLDS, SLAPS, the Latty Avenue Site, and HISS contaminated "haul routes to nearby properties."  *See id*. at ¶ 68.

Plaintiff claims that "radioactive wastes have migrated from the SLAPS, HISS, and Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire . . . one hundred year flood plain of Coldwater Creek."  *See id*. at ¶¶ 69-85.  Plaintiff contends that her property is within the one-hundred-year flood plain of Coldwater Creek, that there is radioactive contamination present on her property, that this contamination is linked to radioactive materials "generated in the processing of uranium ores in the St. Louis area," and that it is the result of the "improper handling, storage and disposal of radioactive materials."  *See id*. at ¶¶ 86-90.  Plaintiff claims that the alleged radioactive contamination of her property renders it unfit for normal use and enjoyment.  *See id.* at ¶ 91.

---

[2] Plaintiff's allegations are thus internally inconsistent, as Cotter could not have purchased the materials at SLAPS and then purchased those same materials at Latty Avenue again in 1969.  Indeed, publicly available documents filed in connection with federal court briefing in this action show that an entity called Continental Mining & Milling Co. ("CMM"), not Cotter, purchased the materials remaining at SLAPS in 1966 from the United States, underscoring these pleading inconsistencies.  *See* 4:18-cv-000624 (JAR), Doc. No. 36-1 at pages 4-17.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

**PROCEDURAL HISTORY**

On February 21, 2018, Plaintiff filed a class-action petition in the Circuit Court of St. Louis County, Missouri, and, on April 2, 2018, filed the FAP.

Plaintiff's FAP asserts various state-law claims against Defendants seeking monetary recovery stemming from purported damage to her property, alleging civil conspiracy on the part of the Defendants, requesting injunctive relief in the form of medical monitoring and the remediation of her property, and asking for punitive damages.[3]

Defendants collectively removed this action to the United States District Court for the Eastern District of Missouri on April 18, 2018, on the basis of subject matter jursidiction. Defendants removed the action because Plaintiff's state-law causes of action are preempted by the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, which provides a retroactive, federal public liability cause of action for all tort claims stemming from nuclear incidents and radiation injuries, and which vests original jurisdiction in the federal courts.  Plaintiff's claims arise from an alleged nuclear incident and consequent radiation injuries to property.  Liability for such claims is accordingly governed by the PAA.

Plaintiff moved to remand the action, and the federal district court agreed, holding Defendants could not conclusively establish that Cotter's license provided subject matter jurisdiction for purposes of the PAA.  *Banks v. Cotter Corp.*, 4:18-CV-00624-JAR, Dkt. 75 at 17-18 (E.D. Mo. Mar. 29, 2019).[4]  After explaining that courts generally resolve doubts about federal jurisdiction in favor of remand, the federal court noted a split in the courts as to whether a license or indemnity agreement was a prerequisite to establishing subject matter jurisdiction

---

[3] Counts X through XII of the FAP assert claims solely against the St. Louis Airport Authority for inverse condemnation and violations of the Missouri state constitution.  *See* FAP at ¶¶ 178-196.  Accordingly, those Counts are not addressed here.

[4] The parties and the District Court do not dispute that Cotter had a license.  *See* Memorandum and Order, 4:18-cv-000624 (JAR), Doc. No. 75 at 10, n. 10; *see also* Doc. No. 52-2.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

pursuant to the PAA. *Id.* at 4, 13 (explaining that courts have concluded this requirement would run contrary to the PAA's plain text and legislative history). Adopting the view that a license was required to establish jurisdiction, the federal court found it could not determine whether the material at issue was covered by Cotter's license. Faced with "competing preemption narratives," the federal court concluded that subject matter jurisdiction could not be conclusively established. *Id.* at 17–18. The case was remanded to this Court on March 29, 2019.

Cotter and the Exelon Defendants now move to dismiss the FAP because Plaintiff's claims are preempted by the PAA and nothing prevents this Court on remand from making its own determination that the claims are preempted by the PAA. In the alternative, even if this Court concludes that the PAA does not preempt Plaintiff's claims (which it should not), the FAP should still be dismissed, because the common law standard of care is the federal dosage and effluent limits, and Plaintiff has failed to allege sufficient facts establishing a breach of those standards.

## LEGAL ARGUMENT

Motions to dismiss serve as the primary way to dispose of baseless claims. *See ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). Missouri requires fact pleading. *Id.* A plaintiff must allege a "short and plain statement of the facts showing that the pleader is entitled to relief." Mo. R. Civ. P. 55.05. Ultimate facts on which a jury could return a verdict for the plaintiff must be pleaded— evidentiary facts are not sufficient. *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 (Mo. 2019), *reh'g denied* (Apr. 2, 2019).

6

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

A motion to dismiss for failure to state a claim on which relief can be granted attacks the sufficiency of a plaintiff's pleadings.  *In re T.Q.L.*, 386 S.W.3d 135, 139 (Mo. banc 2012). In reviewing a petition, a court "must accept all properly pleaded facts as true, giving the pleadings their broadest intendment, and construe all allegations favorably to the pleader."  *Bromwell v. Nixon*, 361 S.W.3d 393, 398 (Mo. banc 2012).   Factual allegations are not weighed for credibility or persuasiveness; a court only reviews "to determine if the facts alleged meet the elements of a recognized cause of action."  *Id.*  "In order to survive the motion, the petition must 'invoke substantive principles of law entitling plaintiff to relief and . . . ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial.'" *In re T.Q.L.*, 386 S.W.3d at 139 (quoting *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329 (Mo. banc 2009)).

I.      **The Price-Anderson Act Applies and Preempts the State Law Causes of Action.**

      A.      **The Price-Anderson Act Preempts Claims Litigated in State Courts.**

This Court has concurrent jurisdiction to adjudicate claims arising under the PAA.  The PAA's jurisdictional clause provides federal courts with original—but not necessarily exclusive—jurisdiction.   42 U.S.C. § 2210(n)(2) ("With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.").   Section 2210(n)(2) both vests federal courts with original jurisdiction and provides for removal to federal court on a party's motion within 30 days of the action becoming removable.  *Id.*  While there is a strong Congressional preference for PAA claims to be heard in federal court (as discussed further below), the PAA's jurisdictional provision expressly contemplates the possibility that the PAA may also apply to

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

claims litigated in state court, as it requires parties to affirmatively move to remove the action and to do so within 30 days.  *See id.*

Because Congress has indicated a strong preference that PAA claims be litigated in a federal forum, these cases are routinely removed to federal court.  *See El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484–85 (1999) (noting that Congress has "expressed an unmistakable preference for a federal forum" in litigating PAA claims).  Congress's preference for a federal forum also applies in determining the applicability of the PAA when removal is contested.  *Id.*  As a result, the vast majority of cases involving claims related to radioactive materials are litigated in federal court.  This congressional preference as to *forum* does not speak to the PAA's substantive applicability in state court, however.

The PAA (and its preemptive effect) applies with equal force in state courts.  *Osarczuk v. Associated Univs., Inc.*, 36 A.D. 3d 872, 874 (N.Y. App. Div. 2007) (holding that the PAA preempted state law claims and affirming the trial court's grant of summary judgment on the claim arising under the PAA); *Ne. Ohio Reg'l Sewer Dist. v. Advanced Med. Sys., Inc.*, 666 N.E.2d 612, 614 (Ohio Ct. App. 1995) (holding that PAA actions can be brought in state court because the Act provides federal courts with original but not exclusive jurisdiction).  The PAA preempts state law claims and provides an exclusive federal cause of action.  *See El Paso Natural Gas*, 526 U.S. at 477.  But this Court, as one of general jurisdiction, can adjudicate federal causes of action.  Congress preempted state law claims in enacting the PAA; it did not strip state courts of jurisdiction to adjudicate PAA claims.  *See* 42 U.S.C. § 22019(n)(2) (providing federal courts with original, not exclusive, jurisdiction).  Accordingly, there is no bar to this Court determining that the PAA governs this action simply because the action is being litigated in a state forum.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

**B.** **This Court Is Entitled to Reach its Own Independent Conclusion About the Applicability of the Price-Anderson Act to Plaintiff's Claims.**

As discussed above, the federal court had a duty to remand the case when faced with competing preemption narratives.  While that court did draw interim conclusions concerning the application of the PAA more generally, the federal court did not reach a definitive conclusion as to whether the PAA applies to Plaintiff's claims here.  Regardless, the only aspect of the federal court's decision that is binding on this Court is the determination that the action will be litigated in this forum.  It is this Court's determination of the substantive law that will govern the action, and this Court has the opportunity to get the law right.

When a case is remanded, a state court is free to reject the remanding court's reasoning. *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 647 (2006).  Collateral estoppel is not a bar to revisiting an issue because 42 U.S.C. § 1447(d) precludes appellate review of the remand order. *Id.*  While a state court does not review the remanding court's decision in an "appellate way," the determinations in remand orders are open to revision ***even where the remand's basis "coincides entirely with the merits of the federal question."***  *Id.* (emphasis added).  The only issue conclusively decided by a remand order is the forum.  *Id.*

Missouri law recognizes not only the propriety of this court making its own determination about legal issues following remand, but has even specifically recognized that on remand the court can determine that the claims are preempted and dismiss the case.  *Breeden v. Hueser*, 273 S.W.3d 1, 9 (Mo. Ct. App. 2008).  This independent analysis is warranted even where the federal court had determined the claims were not preempted by the federal act, and had on that basis, remanded the case.  *Id.*  Although "the federal district court already addressed the issue of preemption of [plaintiffs'] claims by the [federal act] in its remand to state court, this does not prevent a state court from thereafter dismissing the case based on its own determination

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

that the claims are preempted." *Id.* (citing *Kircher*, 547 U.S. at 646–67). The court proceeded to analyze independently whether the claims were preempted. *Id.*

*Breeden* is squarely on point. 273 S.W.3d at 9. Although the federal court remanded this case based on its inability to definitively conclude that the PAA conferred subject matter jurisdiction in this case, this Court is not precluded from making its own determination that the PAA preempts Plaintiff's claims. As in *Breeden*, this Court should undertake an independent analysis of the PAA preemption issue.

Nor is the federal court's analysis owed any weight by this Court. Due to the lack of appellate review in the federal forum, comity considerations do not favor deference to the remanding court. The unavailability of appellate review in the federal forum actually weighs in favor of robust independent analysis by this Court. It is ultimately this Court's legal determinations that will be subject to appellate review. There is no bar to this Court determining that the PAA applies and preempts Plaintiff's claims and then dismissing the PAA claim.

**C.**     **The Price-Anderson Act Preempts Plaintiff's State-Law Claims in this Action and Provides the Exclusive, Retroactive Cause of Action for Claims Arising from Nuclear Incidents or Radiation Injuries.**

Because Plaintiff's state law causes of action arise from a nuclear incident and seek recovery for radiation injuries, Plaintiff's claims are governed by the PAA, which Congress enacted in 1957 to "encourage the development of the nuclear industry." 42 U.S.C. § 2012(i); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 64 (1978). Over the past 60 years, the federal government has regulated the use and processing of radioactive materials through a comprehensive federal scheme, which preempts the states from regulating the health and safety aspects of essentially all radioactive materials. *See, e.g., Pacific Gas & Elec. Co. v.*

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

*State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 208 (1983); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1240-45 (10th Cir. 2004).

In response to the proliferation of lawsuits arising out of the 1979 Three Mile Island incident, Congress amended the PAA in 1988 to create an exclusive, retroactive, federal cause of action—called a "public liability action"—for any "public liability" arising from a "nuclear incident."  *See El Paso Natural Gas Co.*, 526 U.S. at 477; *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 857 (3d Cir. 1991); *see also* Pub. L. No. 100-408 § 20(b)(1), 102 Stat. 1084 ("The amendments governing judicial review of claims arising out of a [nuclear incident] shall apply to incidents occurring before, on, or after the date of the enactment of this Act.").  A "public liability action" is "any suit asserting public liability," which "shall be deemed to be an action arising under [the PAA], and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section.*"  42 U.S.C. § 2014(hh) (emphasis added).  The U.S. Supreme Court has observed:

> This structure, in which a public liability action becomes a federal action, but one decided under substantive state-law rules of decision that do not conflict with the [PAA], resembles what we have spoken of as complete preemption doctrine, *under which the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.*

*Neztsosie*, 526 U.S. at 484, n.6 (emphasis added).

The PAA defines "public liability" as "any legal liability arising out of or resulting from a nuclear incident . . . ." 42 U.S.C. § 2014(w).  In turn, the PAA defines a "nuclear incident" as "any occurrence . . . within the United States causing . . . loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material."  *Id*. § 2014(q).

11

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Therefore, under the plain language of § 2014(hh), the PAA will apply to "any suit asserting public liability," arising from a "nuclear incident."

The overwhelming majority of federal circuit courts have determined that state law causes of action arising from nuclear incidents and radiation injuries are entirely preempted by the PAA.  *See McClurg v. MI Holdings*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013).  In *Adkins v. Chevron Corp.*, the district court canvassed federal case law and found that virtually every federal court to address the issue has held the PAA "completely preempts state law causes of action for public liability arising out of or resulting from nuclear incidents."  960 F. Supp. 2d 761, 767 (E.D. Tenn. 2012) (citing *In re Berg Litig.*, 293 F.3d 1127, 1132 (9th Cir. 2002) (PAA is "exclusive means" for pursuing claims arising from a nuclear incident); *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1306 (11th Cir. 1998) (PAA creates "an exclusive federal cause of action for radiation injury"); *Nieman v. NLO*, 108 F.2d 1546, 1549 (6th Cir. 1997) (PAA "preempts [the plaintiff]'s state law claims" and "the state law claims cannot stand as separate causes of action"); *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1504 (10th Cir. 1997) (PAA "appear[s] broad enough to create a federal forum for any tort claims even remotely involving atomic energy production.  The [PAA] on its face provides the sole remedy for the torts alleged"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) ("a new federal cause of action supplants the prior state cause of action . . . [S]tate regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law"); *In re TMI II*, 940 F.2d at 854 ("no state cause of action based upon public liability [under the PAA] exists.  A claim growing out of any nuclear incident is compensable under the terms of the [PAA] or it is not compensable at all"); *see also Cotroneo v. Shaw Env't & Infras., Inc.*, 639 F.3d 186, 192 (5th Cir. 2011) ("[A] plaintiff who asserts any claim arising out of a 'nuclear incident' as defined in

the PAA . . . can sue under the PAA or not at all."); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2007) ("[t]he PAA is the exclusive means of compensating victims for any and all claims arising out of nuclear incidents."). State courts adjudicating these claims concur. *See, e.g.*, *Osarczuk*, 36 A.D. 3d at 874 (holding the PAA preempted state law claims).

Courts are in near universal agreement that a public liability action is "sweeping" in scope and encompasses any liability from "nuclear incidents." *Farley*, 115 F.3d at 1504.[5] Indeed, in *McClurg*, an action litigated in Missouri federal court, the court found that a "plaintiff who asserts any claim arising out of a nuclear incident as defined in the PAA, can sue under the PAA or not at all," and consequently dismissed the plaintiffs' "state claims." 933 F. Supp. 2d at 1186.

Here, Plaintiff's injuries indisputably arise from an alleged nuclear incident insofar as Plaintiff asserts the purported "radioactive contamination [of her property] was caused by the Defendants' improper handling, storage and disposal of radioactive materials." *See* FAP at ¶¶ 63-68, 81-90. Notwithstanding her failure to pinpoint any specific release or releases by Cotter (or the Exelon Defendants) that led to this alleged contamination on her property, Plaintiff has asserted claims for radiation-based damages to her property, and it is for this sort of injury that "Congress passed the [PAA]," thus "creating an exclusive federal cause of action for radiation injury," *see Roberts*, 146 F.3d at 1306. As a result, Plaintiff cannot assert any state law causes of action and must proceed exclusively under the PAA. Plaintiff's state law causes of action for trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict

---

[5] Despite the overwhelming body of case law holding that the PAA preempts state law causes of action arising from nuclear incidents, in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1999 (10th Cir. 2015), the Tenth Circuit found that under extremely limited circumstances, the PAA may not preempt or preclude "a state law nuisance claim when a nuclear incident is asserted but unproven." The decision in *Cook* was based on a parsing of the definition language that has not been applied by any other circuit court, and is not applicable here, where Plaintiff's FAP indisputably alleges claims arising from and related to a nuclear incident. Thus, Plaintiff's state law claims are preempted by the PAA.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

liability damages are therefore preempted by the PAA and should be dismissed.  *See, e.g.,*
*Nieman*, 108 F.3d at 1564 (concluding claims for negligence, strict liability, private nuisance,
trespass, and willful and wanton misconduct under Ohio law were preempted by the PAA);
*Adkins*, 960 F. Supp. 2d at 769 (E.D. Tenn. 2012) (holding that the PAA completely preempted
state law causes of action such as strict liability, wrongful death, and negligent infliction of
emotional distress); *Hennessy v. Commonwealth Edison Co.*, 764 F. Supp. 495 (N.D. Ill. 1991)
(dismissing claims for negligent infliction of emotional distress, strict liability, and battery).

> **D.** **Plaintiff Has Not Pleaded A Viable Claim For Which Relief Can Be Granted Under the Price-Anderson Act.**
>
> **1.** **Plaintiff Has Not and Cannot Allege Sufficient Factual Allegations to Support a Claim for Public Liability Under the Price-Anderson Act.**

Even if Plaintiff had pleaded a PAA public liability claim, the factual allegations in the
FAP are insufficient to support such a claim.  Namely, Plaintiff has failed to allege exposure to
radiation in exceedance of the applicable federal dose and effluent limits.  Further, Plaintiff has
not identified any federal nuclear safety regulations that Defendants may have breached.  Thus,
Plaintiff has failed to properly plead a public liability claim, and her FAP should be dismissed
with prejudice.

Courts throughout the country are in near universal agreement that liability for purposes
of the PAA is defined by a federal standard of care derived from federal nuclear safety
regulations.  *See, e.g.*, *Roberts*, 146 F.3d at 1308 (stating "federal safety regulations conclusively
establish the duty of care owed in a public liability action"); *O'Conner*, 13 F.3d at 1105 ("the
federal regulations must provide the sole measure of the defendants' duty in a public liability
cause of action."); *In re TMI II*, 940 F.2d at 859-60 (concluding "the federal statutes and
regulations governing the safety and operation of nuclear facilities" [*i.e.*, "federal permissible
dose limits"] would apply as "states are preempted from imposing a non-federal duty in tort,

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

because any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law"); *see also McClurg*, 933 F. Supp. 2d at 1187 (finding that to assert PAA public liability claim, plaintiffs must allege violation of federal radiation dose limit because "the maximum permissible radiation dose levels set by federal safety standards establish the duty of care for radiation injuries"); *Corcoran v. New York Power Authority,* 935 F. Supp. 376, 387 (S.D.N.Y. 1996) (holding that plaintiff must plead and establish a breach of the federal dose limits).   Indeed, in *McClurg*, the district court observed that "every Circuit Court" to address the issue—namely the Third, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits—has held "that the maximum permissible radiation dose levels set by federal safety standards establish the duty of care for radiation injures, and that imposing a non-federal duty would conflict with [the PAA]."  933 F. Supp. 2d at 1187.

These dose limits apply equally to both personal injury and property damage claims.  *See Reeves v. Commonwealth Edison Co.*, No. 06-CV-5540, 2008 WL 239030, at *4 (N.D. Ill. Jan. 28, 2008) (observing that "Federal nuclear regulatory standards . . . have been applied to [public liability] claims involving property damage") (citing multiple cases and reaffirming prior district court holdings that the federal dose limits are "the sole duty owed to the landowners under their property damage claims.").  As a result, regardless of whether a plaintiff alleges personal injury, property damage, or both as a result of radiation exposure, "every circuit court of appeals to address the question . . . has held that [a] plaintiff must prove a dose in excess of the federal permissible dose limits in order to show a breach of duty in a public liability action under the [PAA]." *Adkins*, 960 F. Supp. 2d at 769.  Ultimately, a plaintiff's failure to plead this "essential element of [her] claim" is fatal. *Id.*

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Here, Plaintiff has not alleged that she was exposed to radiation in excess of federal dose or effluent limits, nor has Plaintiff identified any federal nuclear safety regulations or standards that Cotter may have breached.  Rather, the closest the FAP comes to providing such allegations is its single, bald assertion that Defendants violated a host of "Missouri regulations for protection against Ionizing Radiation."  *See* FAP at ¶ 147.  Such conclusory allegations of misconduct are insufficient to withstand a motion to dismiss, and Plaintiff's failure to allege either the applicable standard of care or breach of the federal dose and effluent limitations is fatal to any nascent cause of action under the PAA.  *See Adkins*, 960 F. Supp. 2d at 772 (finding plaintiffs' complaint failed to state a claim under the PAA where plaintiffs failed to allege which specific standard of care applied to their claim, and instead made conclusory allegations regarding a nuclear facility's non-compliance with various "applicable federal, state and local laws").  *Adkins*'s conclusion is equally applicable in this state, which is a fact pleading state.  Absent such allegations, the FAP lacks sufficient factual support to allege a public liability claim under the PAA.  Thus, Plaintiff has not alleged an essential element for a claim for public liability, and the FAP should be dismissed with prejudice.

### 2. Plaintiff Cannot Recover for Medical Monitoring, Loss in Property Value, or Emotional Damages under the PAA

Plaintiff's claim for medical monitoring (which is embedded in her general claim for injunctive relief) and request for damages related to emotional injuries should also be dismissed because Plaintiff has not alleged any physical injury to herself, but only to her property, and her loss in property value and emotional damages claims are not cognizable under the PAA.

First, Plaintiff's claim for medical monitoring, *see* FAP, Count VII at ¶¶ 165-167, should be dismissed because the PAA clearly requires "bodily injury" in order for a plaintiff to obtain medical monitoring as relief.  42 U.S.C. 2014(q).  *See, e.g., June v. Union Carbide Corp.*, 577

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

F.3d 1234, 1251-52 (10th Cir. 2009); *In re Berg Litigation*, 293 F.3d at 1133 (stating that "a cause of action for medical monitoring because of a future risk of disease, and absent a physical injury, [ ] fails to meet the jurisdictional requirements of the Price Anderson Act."); *In re Hanford*, 534 F.3d at 996, 1009-10 (affirming dismissal of medical monitoring claims "as not cognizable under the PAA.").  Plaintiff alleges that she is entitled to medical monitoring because "Defendants have tortiously contaminated the property of Plaintiff . . . with hazardous, toxic, carcinogenic radioactive wastes," and that this "radioactive contamination of the property . . . has caused a significant increased risk to Plaintiff."  *See* FAP at ¶¶ 163, 165.  Plaintiff has not, however, alleged that she has suffered any physical injury as a result of this purported contamination.

At most, Plaintiff claims that the alleged contamination of her home "cause[d] a significant risk to Plaintiff," without specifying what that risk is or whether she has experienced any negative health effects.  *Id.*  A vague, conclusory reference to a "risk" without more is a far cry from alleging a bodily injury cognizable under the PAA, and insufficient to meet the pleading standard on a motion to dismiss.  *See, e.g., In re T.Q.L.*, 386 S.W.3d at 139.  Thus, Plaintiff has failed to meet the bodily injury prerequisite.

Second, Plaintiff is not entitled to recover for any loss in value of her property.  The PAA permits property owners to seek compensation only for "loss of or damage to property, or loss of use of property." 42 U.S.C. § 2014(q). Congress, however, chose not to allow recovery for a diminution in the value of property due to nuclear incidents.

Throughout the FAP, Plaintiff alleges that her property has been contaminated by radioactive material, and as a result, her property has decreased in value.  *See, e.g.,* FAP at ¶¶ 91, 110, 121, 130, 142, 152, 158.  Damages for diminution of property value provide no basis for a

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

PAA claim, however, as Congress specifically excluded such claims under the PAA.  *See* S. Rep. No. 296 (1957), reprinted in 1957 U.S.C.C.A.N. 1803, 1818 ("[I]t is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular location.").  Accordingly, Plaintiff's claim for diminution in property value should be dismissed, because the plain language of the PAA and its legislative history demonstrate that the statute does not provide for such remedies.

Third, to the extent Plaintiff seeks emotional injury damages due to "annoyance and discomfort," *see* FAP at p. 38, subsection a, such damages claims should be dismissed, as emotional distress is not recoverable in a PAA action.  *In re Berg*, 293 F.3d at 1133 (the PAA "grants only limited jurisdiction that does not include emotional distress claims.").  Once again, without the jurisdictional prerequisite for bodily injury, Plaintiff cannot recover under the PAA.

### 3.   Because Plaintiff's Substantive State-Law Causes of Action Are Preempted by the PAA,   Plaintiff's Claims for Injunctive Relief and Punitive Damages Should Be Dismissed

Because Plaintiff's claims for trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict liability damages are preempted by the PAA, as discussed in Section I.D.1 above, Plaintiff cannot sustain claims for injunctive relief or punitive damages against Cotter (or the Exelon Defendants).  As such, Counts VII and VIII of the FAP should be dismissed.

### a.   Injunctive Relief

Injunctive relief constitutes a remedy, not an independent cause of action.  *See Church v. Missouri*, 268 F. Supp. 3d 992, 1022 (W.D. Mo. 2017) (citing *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011) ("[A]n injunction is a remedy and not a cause of action[.]").

"Thus, a request for such [a] remed[y] 'must be based on some recognized and pleaded legal theory.'"  *Id.* (quoting *Goerlitz*, 333 S.W.3d at 455).  Plaintiff here has asserted substantive claims for relief under a number of legal theories—namely, trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict liability damages.  However, as set forth above, each of those claims has been preempted by PAA.  Given that these substantive claims should be dismissed, Plaintiff cannot obtain injunctive relief against Cotter (or the Exelon Defendants) because there are no longer any viable and operative legal theories independent of her claim for injunctive relief.  *Id.*  Therefore, Count VII of the FAP should be dismissed.

### b.      Punitive Damages

"Punitive damages cannot constitute an independent cause of action.  They can only be an incident of another cause of action." *Landum v. Livingston*, 394 S.W.3d 573, 578 (Mo. App. 1965).  "Before punitive damages can be recovered there must be a cause of action for compensatory damages." *Ibid.; see also Compton v. Williams Bros. Pipeline Co.*, 499 S.W.2d 795, 797 (Sup. Ct. Mo. 1973) (stating that it is well established "that actual or nominal damages must be recovered before punitive damages can be recovered").  Here, as set forth above, the only causes of action against Defendants that could give rise to a claim for punitive damages should be dismissed as preempted by the PAA.  Further, Plaintiff cannot allege a PAA violation against Cotter or the Exelon Defendants.  As such, Count VIII of the FAP should be dismissed with prejudice.

## II.     In the Alternative, If the Court Determines the Price-Anderson Act Does Not Preempt Plaintiff's State Law Claims, It Should Adopt the Federal Nuclear Regulations As the Standard of Care under Missouri Common Law.

Even if this Court disagrees that the PAA applies and holds that Plaintiff's state law claims are not preempted, the result should still be dismissal of Plaintiff's claims.  Nor does that

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

mean that the large body of jurisprudence addressing claims under the PAA is irrelevant to the Court's adjudication of the common law claims.  Any standard of care adopted under the common law for the handling of radioactive materials should align with the well-established standard of care in PAA cases—the framework that governs the vast majority of claims arising from the handling of radioactive materials.  Plaintiff has not proffered or alleged a breach of an alternate standard of care.  Because Plaintiff has not sufficiently pleaded a breach of the common law standard of care, her state law claims should be dismissed.

### A.    The Common Law Standard of Care Should Be Derived from the Dose Limits and Associated Limits in the Federal Regulations.

This Court should adopt liability standards for the care and handling of radioactive material consistent with the PAA regardless of whether the PAA applies.  The federal court remanded the case on the incorrect determination that Cotter's license did not definitively provide a basis for federal subject matter jurisdiction under the PAA.  Notably, the federal court's reasoning turned on licensing and not the underlying activity.  The activity underlying the state common law claims is necessarily the same activity underlying a PAA claim.  There is no reason, given the common factual predicate, for the common law standard of care to deviate from the PAA's standard of care or the associated effluent limitations.  Even if this Court concludes (contrary to the prevailing law) that Plaintiff's state law claims do not fall within the ambit of the PAA solely because there is not a qualifying license or indemnity agreement, the standard of care should still be based on the underlying radioactive material and mirror that of the PAA.

The PAA standard of care is derived from the federal regulations governing dose and effluent limits.  *See In re TMI (III)*, 67 F.3d 1103, 1113–14 (3d Cir. 1995); *see also Carey v. Kerr-McGee Chemical Corp.*, 60 F. Supp. 2d 800 (N.D. Ill. 1999) (determining the federal

20

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

dosing regulations apply to tort claims for property damage); *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 2929444, at *5-6 (E.D. Mo. July 7, 2017) (agreeing with and applying the dose and effluent standards identified by the Third Circuit in *In re TMI*).  The current federal dose limits for licensees are found in 10 C.F.R. § 20.1301(a)(1) (establishing limit of 100 millirems per year)  At the time of Cotter's operations (1970-1973) the federal dosing limit was 500 millirems per year, 10 C.F.R. § 20.105(a) (1969), and the effluent limitations were defined in Appendix 'B', Table II, of 10 C.F.R. § 20.106 (*see id.* at 12*; see also In re TMI (III)*, 67 F.3d at 1109).

The common law often looks to statutes and regulations for the applicable standard of care.  "The Restatement (Second) of Torts expressly provides that, in certain situations, a 'court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation.'" *In re TMI (III)*, 67 F.3d at 1113 n.24 (quoting Restatement (Second) of Torts § 286 (1965)).  The Restatement was considered in articulating the PAA's standard of care.  *Id.*  This Court should likewise be guided by the Restatement in determining the applicable standard of care.

Consistent with the Restatement, this is a situation where a regulation should be adopted as the standard.  The care and handling of radioactive materials at issue in this litigation is not something that ordinarily occurs.  This is a highly regulated field.  These regulations inform the behavior of the reasonable man.  Plaintiff would be hard pressed to identify an alternate source for the standard of care because of the pervasive regulation of radioactive materials.  Regulations and the actions of other regulated individuals are the only guide for determining the standard.  Public policy strongly favors consistency in the standard of care given that the underlying conduct is the care and handling of radioactive material.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Accordingly, even if the Court declines to find that the PAA governs Plaintiff's state law claims, the result should still be the same because the standard of care is the same.

**B.      Plaintiff Fails To Allege Sufficient Facts Relating to Any Standard of Care, and Her Claims Should Be Dismissed.**

As a global matter, because Plaintiff has failed to allege a dosage amount, she has failed to allege facts showing a breach of the standard of care and she fails to sufficiently plead her state law claims.  Her claims should therefore be dismissed.  Apart from this fatal global pleading deficiency, moreover, Plaintiff's individual claims are also defectively pleaded.  The claims rely on conclusory allegations devoid of factual allegations, as set forth below, and should be dismissed.

**1.      Plaintiff's Conclusory Allegations Fail to Allege a Negligence, Negligence Per Se, or Strict Liability Claim**

Plaintiff's formulaic recitations of the elements of her negligence, negligence per se, and strict liability claims fall far short of adequately pleading those claims.  "To make an adequate claim for common law negligence, a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." *Sill*, 87 S.W.3d at 391.  Apart from parroting the elements of a negligence claim, the FAP contains no factual allegations of how Cotter breached any duty of care toward Plaintiff or what that duty is.  *See* FAP at ¶¶ 136-140 (vaguely alleging Defendants' "conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines" without identifying what those standards were or how Cotter violated them, and alleging in a conclusory manner "Defendants failed to act to prevent their releases from harming Plaintiffs" without identifying what Defendants should have done).

Plaintiff's negligence per se claim suffers from the same defects as her negligence claim: "[a] claimant may proceed on a negligence per se claim 'if the following four elements are met:

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

(1) There was, in fact, a violation of the statute; (2) The injured plaintiff was a member of the class of persons intended to be protected by the statute; (3) The injury complained of was of the kind the statute was designed to prevent; and (4) The violation of the statute was the proximate cause of the injury.'"   *Id*. at 392.   Once again, Plaintiff merely recites the elements of a negligence per se claim without explaining what it is that Cotter did (or did not do) that constitutes negligence per se.   The FAP fails to identify how Cotter violated **any** of the statutes identified in paragraph 147 (listing Missouri's Solid Waste Management Law and Regulations, Missouri Clean Water Act, and Missouri Air Conservation regulations), such as whether any purported releases of radioactive materials from Latty Avenue were above any threshold levels or standards contained in any of the above regulations.

Especially troubling, Plaintiff alleges that her property (and the property of the putative class members, where the class is defined as those property owners within the one hundred-year floodplain of Coldwater Creek [*see* FAP at ¶¶ 30-31]) was contaminated "[a]s a result of . . . flooding," yet she is purportedly relying on air and solid waste regulations, rather than water regulations, to show a breach of duty by Defendants.   As a result, it is impossible for Cotter (and this Court) to parse out the basis on which Plaintiff claims Cotter is liable to her, and this claim should be dismissed accordingly.

Finally, Plaintiff has failed to adequately plead a strict liability claim against Cotter and once again merely recites the elements of such a claim without any supporting factual allegations.   *See Clay v. Missouri Highway & Transp. Comm'n*, 951 S.W.2d 617, 623 (Mo. Ct. App. 1997) ("a person is strictly liable 'when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings.'").   The FAP does not identify what activities Cotter performed

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

that were abnormally dangerous and inappropriate to the place where they were done, other than vague allegations that Cotter "stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites" that somehow caused her to lose the use of her property and caused her property to lose some unspecified measure of value.  FAP at ¶ 66.  The mere handling of radioactive residues alone, as Plaintiff alleges, does not necessarily equate to an abnormally dangerous activity.

2.      **Plaintiff Fails to Allege Facts Sufficient to Support Either Her Permanent or Temporary Nuisance Claims**

Cotter cannot be liable to Plaintiff for either permanent or temporary nuisance because, as even Plaintiff implicitly acknowledges (*see* FAP at ¶¶ 63-66, 81), Cotter was not the property owner of Latty Avenue at any time, and thus cannot be liable for nuisance.  *See Frank*, 687 S.W.2d at 880 ("[t]he law of nuisance recognizes two conflicting rights: *property owners* have a right to control their land and use it to benefit their best interests; the public and *neighboring land owners* have a right to prevent unreasonable use that substantially impairs the peaceful use and enjoyment of other land.") (emphases added); *State ex rel. Ely v. Bandall*, 299 S.W. 155, 157 (Mo. Ct. App. 1927) ("[W]e understand the general rule to be that a suit to abate or restrain a nuisance *must be brought against the owner of the fee*, unless the nuisance complained of is of such a character that his presence in the suit is not necessary to a complete determination of the controversy.").  Because Plaintiff has not alleged Cotter was the owner of either SLAPS or Latty Avenue (nor could she, as Cotter never owned either site), Plaintiff cannot maintain her nuisance actions against Cotter.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

     **3.**     **Plaintiff's Conclusory Allegations Do Not Indicate How Cotter Interfered with the Use or Enjoyment of Her Property, and, Therefore, She Cannot Recover     Damages for Any State Law Claim**

Plaintiff has not alleged any facts to show the actual loss of the use of her property or the diminution in value of her property that may be recoverable under state law, nor does she specify any type of damage caused to her property. Although she alleges in conclusory fashion that her property has been "contaminated by radioactive material" and that "[s]amples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation" which (purportedly) include thorium and radon gas (*see* FAP at ¶¶ 9, 86-87, 105, 107, 109, 117, 126, 141, 151), she fails to allege the amounts of those substances involved, how they damaged her property, or how she has lost the use of her property or how its value has diminished as a result of the alleged contamination.

Such conclusory allegations regarding interference with her use of her property or loss in value, without more, are insufficient to entitle her to relief under any of her state law claims. *See, e.g.*, *Looney v. Hindman*, 649 S.W.2d 207, 212 (Mo. 1983) ("A 'trespass' is a '*direct physical interference with the person or property of another.*'") (emphasis in original); *Frank v. Envt'l Sanitation Mgmt., Inc.*, 687 S.W.2d 876, 880 (Mo. 1985) ("Nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his property."); *Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 391 (Mo. Ct. App. 2002) ("Actual damages to the claimant's person or property are the fourth element of a negligence action."); *Chubb Grp. of Ins. Companies v. C.F. Murphy & Assocs., Inc.*, 656 S.W.2d 766, 781 (Mo. Ct. App. 1983) ("Regarding damages, three kinds—personal injury, damage to property other than the property sold, and damage to the property sold when rendered useless by a violent occurrence—have been held recoverable under a strict liability theory.").

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Without alleging how Cotter interfered with the use of her property or how she has been damaged at all by Cotter's actions, Plaintiff cannot sustain her state law claims against Cotter.

> **4.      Plaintiff Fails to Allege Facts Sufficient to Sustain a Claim for Civil Conspiracy**

Although Plaintiff amended the FAP to add a civil conspiracy claim, she has made no effort to support such a claim with plausible facts—or any facts at all.

A claim for civil conspiracy requires: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages."  *Brock v. McClure*, 404 S.W.3d 416, 421 (Mo. Ct. App. 2013).  The FAP is devoid of any mention of any meeting of the minds amongst the Defendants to accomplish any object whatsoever, let alone any interaction at all amongst them. Under Plaintiff's own allegations, each Defendant operated in its own sphere and never came into contact with another Defendant.  Cotter purportedly purchased radioactive residues from the federal government and "[b]etween 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, . . . at the SLAPS and Latty Avenue sites."  FAP at ¶¶ 64, 66.  Meanwhile, the Airport acquired SLAPS from the federal government in 1973 and then proceeded to do "nothing to prevent continued dispersal and runoff of" material in Coldwater Creek, and DJR purchased the Latty Avenue property at some point and similarly did nothing to prevent dispersal and runoff of material.  *Id.* ¶¶ 69, 73-74, 76-77.  Yet, based on these threadbare allegations, Plaintiff contends that these defendants somehow "wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein."  *Id.* ¶ 175.

To be clear, there are no facts "more fully alleged" anywhere within the FAP, and because Plaintiff has utterly failed to allege the existence of any conspiracy, that is, a meeting of

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

the minds among the Defendants to take unlawful, overt acts to accomplish some object, this Court should dismiss Count IX of Plaintiff's FAP.

> **5.      Plaintiff's General and Conclusory Allegations Concerning Unlawful Conduct by Defendants Fail to Plead Ultimate Facts.**

Plaintiff's general and conclusory allegations of misconduct by "Defendants" are insufficient to support her claims.  Furthermore, in those limited instances where Plaintiff has made specific allegations against Cotter, those allegations are both internally contradictory and controverted by case law precedent.  As such, Plaintiff has failed to assert any plausible claims against Cotter (or any of the Exelon Defendants), and her FAP should be dismissed.

A plaintiff must allege a "short and plain statement of the facts showing that the pleader is entitled to relief."  Mo. R. Civ. P. 55.05.  Ultimate facts on which a jury could return a verdict for the plaintiff must be pleaded—evidentiary facts are not sufficient.  *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 (Mo. 2019), *reh'g denied* (Apr. 2, 2019).  "In order to survive the motion, the petition must 'invoke substantive principles of law entitling plaintiff to relief and . .  .  ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial.'"  *In re T.Q.L.*, 386 S.W.3d at 139 (quoting *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329 (Mo. banc 2009)).  Plaintiff's use of "group pleading," generally referring to "Defendants," does not satisfy this standard.

Throughout the FAP, Plaintiff recites the history of radionuclide processing and transport in St. Louis and alleges limited (if any) facts showing involvement in very discrete portions of that history by each named Defendant, but then inexplicably concludes that all "Defendants" are liable for all events that occurred during that history.  What is most astonishing is that Plaintiff ignores the party that actually generated the radioactive residues at issue in this case as early as 1942 (*see* FAC at ¶ 56) and instead attributes all liability to Cotter, the Airport, and DJR, even

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

though the earliest actions any of them are alleged to have taken are in 1969, 27 years after the materials at issue in this litigation were first allegedly generated.

Similarly, Plaintiff repeatedly lumps together all Defendants with respect to the alleged misconduct underlying her claims.  *See id.* at ¶¶ 95-105, 113-120, 124-129, 133-142, 147-152, 155-160, 162-166, 171-172, 175-176 (alleging that all Defendants were responsible for broad categories of misconduct without delineating which specific defendant or defendants were actually responsible for each stated act).  Such general and perfunctory pleading renders it virtually impossible for Cotter to determine the specific misconduct it is being accused of.

Moreover, a review of Plaintiff's few allegations directly pertaining to Cotter further underscores the improperly sweeping and overly general allegations of misconduct in the FAC.  Although she broadly attributes the contamination of her home to radioactive materials that have migrated into Coldwater Creek from SLAPS, HISS, and Latty Avenue since 1946, Plaintiff specifically pleads that Cotter's involvement was limited to a four-year period, from 1969 to 1973. *See id.* at ¶ 66.  Plaintiff's claim that Cotter stored, processed, and transported materials at both SLAPS and Latty Avenue, *see id.,* is also contradicted by her later allegation that Cotter purchased only materials that were already at Latty Avenue, *id.* at ¶ 81.

*McClurg v. Mallinckrodt*, No. 4:12-CV-00361, 2015 WL 867455 (E.D. Mo. Feb. 27, 2015), a related case involving claims for personal injury arising from the radioactive contamination of Coldwater Creek by materials purportedly generated by Mallinckrodt, Inc. and Cotter, further underscores the overbroad and unsupportable nature of Plaintiff's allegations in the instant case.  In *McClurg*, this Court dismissed claims against Cotter by plaintiff David Powell alleging exposure to radiation between 1949 and 1963. *Id.* at *5.  After observing that the alleged radioactive materials were only purchased by Cotter in 1969 after those materials had

28

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

been transported to Latty Avenue, the Court noted that Cotter's allegedly unlawful activity did not begin until 1969, and thus any allegations pertaining to conduct that predated Cotter's involvement in the matter had to be dismissed.  *Id.* at \*2, \*5.  Here, as in *McClurg*, Cotter's involvement in this matter is limited to a four-year period of time and geographically restricted to purported conduct at Latty Avenue.  As such, Plaintiff's general and conclusory allegations of misconduct outside of this timespan and outside of the Latty Avenue site fail to form a basis of a claim against Cotter.  Moreover, in light of the *McClurg* court's findings, any amendment of the FAP would be futile.

In light of the above, Plaintiff's general allegations of misconduct fail to plead ultimate facts as to Cotter (or the other Defendants), and her attempt to impute liability to Cotter for actions that exceed its allegedly limited temporal and geographic role fails.

### 6. Plaintiff's Impermissibly Vague and Conclusory Allegations and Overbroad Class Definitions Likewise Fail to State Plausible Claims of Class-Wide Relief

Plaintiff has similarly failed to set forth plausible allegations sufficient to support a class action.  This state's rule governing class actions, Missouri Rule 52.08, is substantially similar to Federal Rule of Civil Procedure 23.  *Ressler v. Clay County*, 375 S.W.3d 132, 136–37 (Mo.App. W.D. 2012).   "When there is no Missouri interpretation of Rule 52.08, federal court interpretations of Federal Rule 23 are persuasive in interpreting Rule 52.08.4."  *Id.*  The Court of Appeals has held, after surveying federal cases, that Missouri Rule 52.08 allows a court to address substantive motions, such as summary judgment or a motion to dismiss prior to class certification.  *Id.*  A motion to dismiss is a proper vehicle for attacking class allegations.  *See Ralph v. Am. Family Mut. Ins. Co.*, 809 S.W.2d 173, 174 (Mo.App. E.D. 1991). In federal court, "[w]hen a defendant moves to dismiss class allegations prior to discovery, the Court should evaluate the motion under a standard similar to that of Fed. R. Civ. P. 12(b)(6)."  *Simpson v.*

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

*Boeing Co.*, 27 F. Supp. 3d 989, 993-94 (E.D. Mo. 2014) (internal citations omitted).  Similarly, under this state's rules, "the determination of class certification is based primarily upon the allegations in the petition" with the allegations accepted as true, and the motion should be decided under the fact pleading standard.  *See Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 74 (Mo.App. W.D. 2011).

A party seeking to certify a class must demonstrate numerosity, commonality, typicality, and adequacy of representation.  *See* Mo. R. Civ. P. 52.08(a); Fed. R. Civ. P. 23(a).  Plaintiff's proposed class definitions are impermissibly overbroad and do not meet the four required elements of Rule 52.08(a).[6]  Furthermore, because Plaintiff cannot establish the minimum pleading standards for either a claim pursuant to the PAA or any of her alleged state law claims, she cannot meet the class certification requirements.  *See Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925-27 (8th Cir. 2015) (reversing the district court's granting of class certification "in the absence of evidence showing class members were commonly affected by contamination on their property").

Plaintiff's class allegations should be dismissed outright because her proposed class definitions are fatally overbroad.  Both the property damage and medical monitoring subclasses are defined as any Missouri citizens who own real property or reside "within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri," (FAP at ¶¶ 30-31) **regardless of whether that property is alleged to be contaminated with radioisotopes attributable to any of the defendants**.  Courts have routinely rejected such overbroad class definitions, and this Court should do the same.  *See, e.g.*, *Green v. Fred Weber, Inc.*, 254 S,W3d 874, 883 (Mo. banc 2008) (holding that class certification was inappropriate where only the

---

[6] Plaintiff also fails to establish any of the Rule 52.08(b) elements, insofar as she relies heavily on conclusory allegations without alleging facts in support.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

named plaintiff felt vibrations from the quarry and there was no evidence that other individuals in the certified geographic area were similarly affected); *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008) (holding a class overbroad where "eighty percent of the putative class suffered no injury.").  As the FAP is currently pleaded, Plaintiff would have the Court certify property damage and medical monitoring subclasses that have not alleged any property damage or physical injury, but merely ownership of and residency at real property, respectively.

Not only are the class definitions impermissibly overbroad, Plaintiff herself has not alleged any <u>facts</u> plausibly showing any contamination of her own property.  The only allegations she has made are that sampling on her property show levels "above normal background levels" (FAP at ¶ 9, *see also* ¶ 87) without identifying the level and extent of contamination on her property, what background levels have been exceeded for which specific radioisotopes, and whether those levels exceed any applicable regulatory or statutory levels, including applicable standards of care.  Such conclusory allegations are not sufficiently pleaded ultimate facts. *See In re T.Q.L.*, 386 S.W.3d at 139.

Second, Plaintiff has failed to allege any facts plausibly showing any damages.  For instance, she has failed to allege how much her property has diminished in value (assuming this was even a valid claim under the PAA, which, as discussed above, it is not), or how she has lost the use or enjoyment of her property as a result of the alleged contamination.

Finally, assuming Plaintiff is permitted to proceed on her state law causes of action, the medical monitoring subclass should be dismissed, as there are no allegations of personal injury, rendering such a class inappropriate.  *See Smith v. ConocoPhillips Pipe Line Co.*, 298 F.R.D. 575, 582 (E.D. Mo. 2014) (denying certification of medical monitoring class because "Plaintiffs

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

have offered no evidence of actual exposure") (citing *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 718 (Mo. 2007) for the proposition that "entitlement to the costs of medical monitoring requires plaintiff to show that exposure led to an increased risk of developing a particular disease and that medical monitoring is reasonably necessary for early detection and treatment"), *rev'd on other grounds*.

Accordingly, the Court should dismiss Plaintiff's class allegations because the class definitions are impermissibly overbroad and are untethered to any allegations of contamination of any kind, including any attributable to the alleged conduct of any defendant, and because they are insufficient to meet the requirements of Missouri Rule of Civil Procedure 52.08.

<u>CONCLUSION</u>

For the foregoing reasons, Cotter's motion to dismiss should be granted.  Plaintiff's substantive state law causes of action against Cotter and the Exelon Defendants are completely preempted by the PAA because Plaintiff's claims arise from and relate to a nuclear incident. Even assuming Plaintiff had asserted a claim pursuant to the PAA, that claim would necessarily fail because Plaintiff has failed to allege an essential element of such a claim, namely, Cotter's (or, for that matter, any defendant's) breach of the federal dose and effluent limits.  Furthermore, Plaintiff is not entitled to medical monitoring, diminution in property value, or emotional distress damages because she has not pleaded the requisite elements for such claims, and/or because the PAA does not allow for such relief.

Even if Plaintiff's state law claims were not preempted by the PAA, they are all defectively pleaded and should be dismissed.  And given Plaintiff's general and conclusory allegations of misconduct against the defendants, her failure to delineate which defendants are responsible for the vague acts of misconduct she alleges, and her attempt to impute liability to

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Cotter for acts and omissions that exceed its temporal and geographic involvement in this matter, Plaintiff has failed to plead ultimate facts sufficient to survive a motion to dismiss.   Because Plaintiff's substantive claims fail as a matter of law, her claims for injunctive relief and punitive damages should also be dismissed.   Furthermore, the common law standard of care is still the federal dosage and effluent limits, and Plaintiff has failed to allege sufficient facts establishing a breach of those standards.   Finally, Plaintiff's class allegations should be dismissed for failure to state a claim upon which relief can be granted, and also because her class definitions are impermissibly overbroad and do not meet the four required elements of Rule 52.08(a).   As such, Counts I-IX of the FAP should be dismissed with prejudice.

Dated: April 29, 2019                  Respectfully submitted,

/s/ Erin Brooks
BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (*pro hac vice forthcoming*)
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq. (*pro hac vice forthcoming*)
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

*Attorneys for Cotter and Exelon Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri  63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

/s/ Erin Brooks
*Attorneys for Cotter and Exelon Defendants*

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Exhibit 1

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617 |
| vs. | ) ) | Division No.  2 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY,  A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

<u>**FIRST AMENDED CLASS ACTION PETITION**</u>

COMES NOW Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, by and through counsel, and for her First Amended Class Action Petition and causes of action against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states and alleges as follows:

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium with high levels of radium from Africa. This special ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

2.      Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste

2

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

8.      Plaintiff Tamia Banks (hereinafter "Plaintiff") owns and resides on property in St. Ann, Missouri that Defendants contaminated.  Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Her property, including the land and her home, is entirely within the Coldwater Creek flood plain, and is contaminated with radioactive waste materials from Coldwater Creek.

9.     Testing on the Banks Property has confirmed radioactivity above normal background levels. The source of the radioactivity is small, microscopic particles, which among other things contain the hazardous, carcinogenic, toxic, radioactive substance known as thorium.

10.     Plaintiff Tamia Banks, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiff for her damages, and provide further relief as set forth below in this Petition.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

12.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act.

   A.  Coldwater Creek is not and has never been a licensed nuclear facility.

   B.  Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

   C.  Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

4

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

D.  Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

E.  Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

16.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property").  The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek.

19.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to the Banks Property and the loss of use and enjoyment of the

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

property. Plaintiffs first learned that the Banks Property was contaminated with radioactive material in 2018.

<div align="center"><strong>Defendants</strong></div>

20.     There are four defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive residue wastes: Cotter Corporation ("Cotter"), Commonwealth Edison Company ("ComEd"), Cotter Corporation ("Cotter"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Exelon Generation").

21.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.

A.   Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc.

B.   This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

22.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

A.  ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.  This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

23.   Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri.

A.  Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.  This lawsuit arises out of damages that resulted from the Exelon Defendants' conduct including acts and omissions within the State of Missouri, as well as

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

the acts and omissions of the predecessors of the Exelon Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

24.     Exelon Generation Company, LLC ("Exelon Generation") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. Upon information and belief in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to Exelon Generation Company, LLC.

      A.  Exelon Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

      B.  This lawsuit arises out of damages that resulted from the conduct including acts and omissions of Exelon Generation and their subsidiaries, agents, and representatives within the State of Missouri, which gave rise to the violations of law and damage to property alleged in the Petition.

25.     DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

26.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff files this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

28.     Plaintiff brings this action on behalf of herself and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

29.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

30.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 below.**

---

[1] https://msc fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

31.     The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on a property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

10

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

32.     Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

33.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiff currently, it is ascertainable by appropriate discovery and Plaintiff, upon information and belief, alleges that the proposed Class may include more than twenty-five members. The requirement of numerosity is therefore satisfied.

34.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive classwide resolution of the claims of the proposed Class. These common questions of law or fact include:

a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

b.   Whether Defendants unreasonably and unlawfully processed, stored or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiff and Class Members' property;

11

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

    d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiff and Class Members' property;

    e.   Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiff and Class Members' loss of use and enjoyment of their property;

    f.   Whether the loss in property value suffered by Plaintiff and Class is a result of Defendants' actions;

    g.   Whether Plaintiff and Class are entitled to damages; and

    h.   Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

35.    The claims of the Plaintiff are typical of the claims of the Class. Plaintiff and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

36.    Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the members of the Class. Plaintiff has retained competent attorneys who have experience in class action litigation.

37.    Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

38.    Unless a class-wide injunction is issued, Defendants will continue to allow

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

contamination of the properties of Plaintiff and Class and will continue to violate Missouri law resulting in harm to thousands of Missouri citizens.

39.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiff, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

40.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

41.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

42.     All of the class members are citizens of Missouri.

43.     The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

44.     The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive waster alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri.

45.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

46.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

47.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

<u>**FACTS**</u>

<u>**Radioactive Wastes**</u>

48.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

49.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

51.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

52.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

15

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

53.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers.  Illnesses such as cancers may take a number of years to appear.

54.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

55.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

## Radioactive Waste in the St. Louis Area

56.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[3]   The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

57.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

58.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

59.     Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

60.     In 1957, "approximately sixty truckloads of contaminated scrap metal, several

---

[3] *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on western portion of SLAPS adjacent to Coldwater Creek."

61.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive wastes that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

62.     These waste residues, which contained valuable metals, were sold and shipped to various other destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

63.     In the late 1960's, Cotter purchased the hazardous, toxic, carcinogenic radioactive wastes stored at both SLAPS and at the Latty Avenue Site .

64.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

65.     Cotter did not receive indemnity from the government in connection with this transaction.

66.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites.

67.     Upon information and belief, Cotter did not have a license to dispose of enriched thorium.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

68.     Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

### Saint Louis Airport Site ("SLAPS")

69.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

70.     Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

71.     From 1953, the property was managed and operated by Mallinckrodt.

72.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

73.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

74.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

### Latty Avenue Site

75.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at

19

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

76.     Upon information and belief, Futura Coatings purchased the Latty Avenue property.

77.     Despite knowing that significant activities involving radioactive material were conducted on the site, Futura Coatings did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

### Coldwater Creek

78.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

79.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

80.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly

20

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support  construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

81.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

82.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

83.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

84.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

85.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

86.     The Banks Property is contaminated by radioactive material.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

87.     Samples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

88.     The Banks Property neighbors Coldwater Creek and is within its flood plain.  This proximity puts the Banks Property in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

89.     The radioactive contamination that has polluted the Banks Property and continues to threaten to further pollute the Banks Property match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

90.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

91.     Radioactive contamination of the Banks Property renders the Banks Property unfit for normal use and enjoyment, and destroys its fair market value.

92.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually and on behalf of the Property Damage Subclass)

93.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.     Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

95.     Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

96.     Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

97.     Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

98.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiff and the Property Damage Subclass ("Plaintiffs' property").

99.     Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

100.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

101.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

102.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

103.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

104.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

23

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

105.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

106.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

107.    The migration of Radon gas and radioactive particles onto the property of Plaintiff and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiff and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiff and of the Property Damage Subclass.

108.    Plaintiff did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

109.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

110.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiff and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

## COUNT II – PERMANENT NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

111.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

113.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

114.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

115.    The radioactive waste caused by Defendants results from permanent construction that is necessarily injurious to Plaintiffs as installed.  It is not practical or possible to abate the presence of the radioactive waste in Coldwater Creek.

116.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

117.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

25

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

118.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

119.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

120.    Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

121.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

122.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

123.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described Paragraph 11 above.

124.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

125.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

126.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

127.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

128.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

129.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

130.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually and on behalf of the Class)

131.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

133.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

134.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

135.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

136.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

137.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

138.     Defendants failed to act to prevent their releases from harming Plaintiffs.

139.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

140.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiff's property.

141.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

142.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

143.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

144.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

145.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

### COUNT V – NEGLIGENCE PER SE
### (brought individually and on behalf of the Class)

146.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

147.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

148.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

149.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

150.     Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

151.     Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

152.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

153.     Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually and on behalf of the Class)

154.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

155.     Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

156.     By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

157.     Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

158.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

159.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

160.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

161.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
### (brought individually and on behalf of the Class)

162.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.    Defendants have tortiously contaminated the property of Plaintiff and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

164.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiff and the proposed Class.

165.    The radioactive contamination of the property of Plaintiff and the proposed Class has caused a significant increased risk to Plaintiff and Class members, and therefore Plaintiff and

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

166.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

167.    Therefore, Plaintiff seeks injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiff and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

168.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

169.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiff and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
### (brought individually and on behalf of the Class)

170.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

171.     Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

172.     Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiff and others similarly situated.

173.     The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiff, and others similarly situated.

## COUNT IX – CIVIL CONSPIRACY
### (brought individually and on behalf of the Class)

174.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

175.     Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

176.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

177.     As result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

**COUNT X – INVERSE CONDEMNATION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

180.    The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiff and the Property Damage Subclass for public use without just compensation.

181.    The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

182.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

183.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

184.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

185.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis,  as alleged herein constituted and invasion and appropriation of the property rights of Plaintiff and the Property Damage Subclass.

186.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
### (brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

187.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

188.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

189.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

190.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiff's and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

191.    As a result of Defendants' conduct, Plaintiff and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
### (brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

192.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

193.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

194.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

195.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiff and the Property Damage Subclass.

196.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiff or the Property Damage Subclass.

37

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiff Tamia Banks prays for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a. an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b. an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c. an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d. costs and attorney fees;

e. interest on the above amounts as allowed by law;

f. for appropriate injunctive and equitable relief, as permitted by law or equity including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Respectfully submitted,

KEANE LAW LLC

 /s/ Ryan A. Keane

Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
forthcoming
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
forthcoming
508 St. Philip Street
New Orleans, LA 70116
Phone: (504) 566-1558
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

and

**LEAVE GRANTED:**

*Maura B McShane*

Judge                    Division 2

April 10, 2018

39

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630, *pro hac vice*
forthcoming
920 4th Street
Gretna, Louisiana 70053
Phone: (504) 227-8100
Fax: (504) 227-8122
raustin@austin-associates.net

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 2, 2018, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ Ryan A. Keane

Electronically Filed - St Louis County - April 29, 2019 - 05:30 PM

IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC, AND ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,<br><br>                Defendants. | **Civil Action No. 18SL-CC00617-01**<br><br>**Division No. 18** |

## [PROPOSED] ORDER

      **AND NOW**, this _____ day of _____ 2019, upon consideration of Defendant Cotter Corporation (N.S.L.)'s ("Cotter") motion to dismiss Plaintiff's first amended class-action petition ("Motion"), in which Defendants Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC (collectively, "Exelon Defendants") have joined, and upon consideration of the submissions of the parties relating thereto, and for good cause shown,

      **IT IS HEREBY ORDERED** that Cotter's Motion is **GRANTED** and Plaintiff's first amended class-action petition is **DISMISSED** in its entirety with prejudice as to Cotter and the Exelon Defendants.

      IT IS SO ORDERED.

DATED: _____          _____

                                       J.

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

|  |  |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,<br><br>               Defendants. | Case No. 18SL-CC00617-01<br><br>Division No. 17 |

## MOTION FOR ADMISSION PRO HAC VICE

Comes now Third-Party Defendant Cotter Corporation (N.S.L.) ("Cotter"), by and through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1. That Cotter respectfully moves this Court for Pro Hac Vice Admission for John McGahren, a partner of Morgan, Lewis & Bockius LLP.

2. Visiting attorney John McGahren has provided a Statement pursuant to Rule 9.03. (See Attached Statement, attached as Exhibit A and incorporated by reference.)

3. Dale A. Guariglia and Erin L. Brooks of Bryan Cave Leighton Paisner LLP are licensed to practice law in the State of Missouri, have an office in the State of Missouri, and are not under suspension or disbarment by any court in which they are licensed to practice.

4. Attached hereto as Exhibit B is a receipt from the Missouri Supreme Court acknowledging payment of the requisite fees.

5.      Attached hereto as Exhibit C is a proposed order respecting this Motion.

WHEREFORE, BRYAN CAVE LEIGHTON PAISNER LLP, attorneys for Cotter, pray

that this Honorable Court grant admission Pro Hac Vice to John McGahren, a partner of Morgan,

Lewis & Bockius LLP.

BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ Erin L. Brooks
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,<br><br>           Defendants. | Case No. 18SL-CC00617-01<br><br>Division No. 2 |

**STATEMENT OF ATTORNEY APPLYING FOR ADMISSION PRO HAC VICE
PURSUANT TO MISSOURI SUPREME COURT RULE 9.03**

Comes now Third-Party Defendant Cotter Corporation (N.S.L.), by and through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1.     I, John McGahren, am a member in good standing of the bar of another state or territory of the United States or District of Columbia.

2.     I, John McGahren, am not under disciplinary suspension or disbarment by the highest court of any state or territory of the United States or of the District of Columbia.

3.     I, John McGahren, have filed with my initial pleading the receipt for the fee required by Missouri Supreme Court Rule 6.01 and further state the following:

        a.     I am a member of the bar of the following state(s): New Jersey State Bar #046791990; New York State Bar #2480929; and West Virginia State Bar #6181.

Exhibit A

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

b.      I certify that neither I, nor any member of my firm, Morgan, Lewis & Bockius, 502 Carnegie Center, Princeton, NJ 08540, is under disciplinary suspension or disbarment by any such court.

c.      I designate Erin L. Brooks, having an office at Bryan Cave Leighton Paisner LLP, One Metropolitan Square, 211 N. Broadway, Suite 3600, St. Louis, within the state of Missouri as associate counsel and that said counsel shall:

i.   Enter an appearance as an attorney of record;

ii.  Sign all pleadings, briefs, and other filed or served documents; and

iii. Unless excused by the judge or presiding officer, be present at all hearings.

d.      I further agree by my appearance to comply with the Rules of Professional Conduct as set forth in Missouri Supreme Court Rule 4 and to be subject to discipline by the court of this State.

Date: May 3, 2019

John McGahren

Exhibit A

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM



**CLERK OF THE SUPREME COURT**
**STATE OF MISSOURI**
**POST OFFICE BOX 150**
**JEFFERSON CITY, MISSOURI**
**65102**

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

May 1, 2019

*This will hereby acknowledge receipt of $820 as required by*
*Rule 6.01(m) for Stephanie Feingold and John McGahren,*
*appearing in Tamia Banks, on behalf of herself and all others*
*similarly situated v. Cotter Corporation, et al., Case No. 18SL-*
*CC00617-01, before the Circuit Court of St. Louis County, State*
*of Missouri.*

Betsy AuBuchon, Clerk

Exhibit B

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                    Plaintiff,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                    Defendants.

Case No. 18SL-CC00617-01

Division No. 17

**[PROPOSED] ORDER FOR ADMISSION OF COUNSEL PRO HAC VICE**

The above-entitled matter having come before the court on the motion of counsel

accompanied by the application of John McGahren to be admitted to appear and participate in

the above entitled cause pursuant to Missouri Supreme Court Rule 9.03, and the court being fully

advised in the premises:

IT IS SO ORDERED that said Motion for Admission of Counsel Pro Hac Vice is granted for this

case only. Attorney John McGahren, New Jersey State Bar #046791990; New York State Bar

#2480929; and West Virginia State Bar #6181 is hereby allowed to appear and participate on

behalf of Morgan, Lewis & Bockius, LLP, a party in this case, without objection.

Date: May __, 2019          SO ORDERED: _____
                                 Judge Joseph L. Walsh, III

Exhibit C

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br>COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,<br><br>                Defendants. | Case No. 18SL-CC00617-01<br><br>Division No. 17 |

## MOTION FOR ADMISSION PRO HAC VICE OF STEPHANIE FEINGOLD

Comes now Third-Party Defendant Cotter Corporation (N.S.L.) ("Cotter"), by and through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1.     That Cotter respectfully moves this Court for Pro Hac Vice Admission for Stephanie Feingold, a partner of Morgan, Lewis & Bockius LLP.

2.     Visiting attorney Stephanie Feingold has provided a Statement pursuant to Rule 9.03. (See Attached Statement, attached as Exhibit A and incorporated by reference.)

3.     Dale A. Guariglia and Erin L. Brooks of Bryan Cave Leighton Paisner LLP are licensed to practice law in the State of Missouri, have an office in the State of Missouri, and are not under suspension or disbarment by any court in which they are licensed to practice.

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

4.      Attached hereto as Exhibit B is a receipt from the Missouri Supreme Court acknowledging payment of the requisite fees.

5.      Attached hereto as Exhibit C is a proposed order respecting this Motion.

WHEREFORE, BRYAN CAVE LEIGHTON PAISNER LLP, attorneys for Cotter, pray that this Honorable Court grant admission Pro Hac Vice to Stephanie Feingold, a partner of Morgan, Lewis & Bockius LLP.

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ Erin L. Brooks
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                 Plaintiff,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                 Defendants.

Case No. 18SL-CC00617-01

Division No. 2

## STATEMENT OF ATTORNEY APPLYING FOR ADMISSION PRO HAC VICE PURSUANT TO MISSOURI SUPREME COURT RULE 9.03

Comes now Third-Party Defendant Cotter Corporation (N.S.L.), by and through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1.     I, Stephanie Feingold, am a member in good standing of the bar of another state or territory of the United States or District of Columbia.

2.     I, Stephanie Feingold, am not under disciplinary suspension or disbarment by the highest court of any state or territory of the United States or of the District of Columbia.

3.     I, Stephanie Feingold, have filed with my initial pleading the receipt for the fee required by Missouri Supreme Court Rule 6.01 and further state the following:

       a.     I am a member of the bar of the following state(s): New York State Bar #3983541; New Jersey State Bar #023182005; and West Virginia State Bar #11770.

Exhibit A

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

b.    I certify that neither I, nor any member of my firm, Morgan, Lewis &

Bockius, 502 Carnegie Center, Princeton, NJ 08540, is under disciplinary suspension or

disbarment by any such court.

c.    I designate Erin L. Brooks, having an office at Bryan Cave Leighton

Paisner LLP, One Metropolitan Square, 211 N. Broadway, Suite 3600, St. Louis, within

the state of Missouri as associate counsel and that said counsel shall:

    i.  Enter an appearance as an attorney of record;

    ii.  Sign all pleadings, briefs, and other filed or served documents; and

    iii.  Unless excused by the judge or presiding officer, be present at all

        hearings.

d.    I further agree by my appearance to comply with the Rules of Professional

Conduct as set forth in Missouri Supreme Court Rule 4 and to be subject to discipline by

the court of this State.

Date: May 3, 2019

Stephanie Feingold

Exhibit A

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM



**CLERK OF THE SUPREME COURT**
STATE OF MISSOURI
POST OFFICE BOX 150
JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

May 1, 2019

*This will hereby acknowledge receipt of $820 as required by Rule 6.01(m) for Stephanie Feingold and John McGahren, appearing in Tamia Banks, on behalf of herself and all others similarly situated v. Cotter Corporation, et al., Case No. 18SL-CC00617-01, before the Circuit Court of St. Louis County, State of Missouri.*

Betsy AuBuchon, Clerk

Exhibit B

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                              Plaintiff,

     v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                            Defendants.

Case No. 18SL-CC00617-01

Division No. 17

## [PROPOSED] ORDER FOR ADMISSION OF COUNSEL PRO HAC VICE

The above-entitled matter having come before the court on the motion of counsel accompanied by the application of Stephanie Feingold to be admitted to appear and participate in the above entitled cause pursuant to Missouri Supreme Court Rule 9.03, and the court being fully advised in the premises:

IT IS SO ORDERED that said Motion for Admission of Counsel Pro Hac Vice is granted for this case only. Attorney Stephanie Feingold, New York State Bar #3983541; New Jersey State Bar #023182005; and West Virginia State Bar #11770 is hereby allowed to appear and participate on behalf of Morgan, Lewis & Bockius, LLP, a party in this case, without objection.

Date: May __, 2019              SO ORDERED: _____

                                       Judge Joseph L. Walsh, III

Exhibit C

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and<br>all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Cause no. 18SL-CC00617 |
| | ) | |
| vs. | ) | Division No.2 |
| | ) | |
| COTTER CORPORATION, | ) | |
| COMMONWELTH EDISON COMPANY, | ) | JURY TRIAL DEMANDED |
| EXEON CORPORATION, | ) | |
| EXELON GENERATION COMPANY, LLC | ) | |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS | ) | |
| AIRPORT AUTHORITY, A | ) | |
| DEPARTMENT OF THE CITY OF | ) | |
| ST. LOUIS | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## CELESTE BRUSTOWICZ

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Celeste Brustowicz to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and hearings herein. In support of this, Celeste Brustowicz states:

1.     Celeste Brustowicz is an attorney licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2.     Celeste Brustowicz and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Celeste Brustowicz desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

3.　　　Celeste Brustowicz is licensed to practice law in the State of Louisiana (Bar #: 16835), admitted on October 11, 1985, admitted on October 20, 1985, The State of California (Bar #: 238686), admitted on December 1, 2005, and the State of Mississippi (Bar #: 104041), admitted on April 26, 2012. Celeste Brustowicz is currently licensed and in good standing to practice law in each jurisdiction to which she is admitted.

4.　　　Neither Celeste Brustowicz, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5.　　　Celeste Brustowicz is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

4.　　　Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Celeste Brustowicz.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Celeste Brustowicz to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Date:  May 7, 2019　　　　　　　　Respectfully Submitted,

**KEANE LAW LLC**

By:/s/ *Nathaniel R. Carroll*
　　Ryan A. Keane # 62112
　　Nathaniel R. Carroll # 67988
　　7777 Bonhomme Ave, Suite 1600
　　St. Louis, MO 63105
　　Phone: (314) 391-4700
　　Fax: (314) 244-3778
　　ryan@keanelawllc.com

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
(314) 385-9500
agray@johnsongraylaw.com
*Attorneys for Plaintiff*

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served on all counsel and parties of record via this court's Case.net electronic filing and notification system on this 7th day of May, 2019.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM



**CLERK OF THE SUPREME COURT**
**STATE OF MISSOURI**
**POST OFFICE BOX 150**
**JEFFERSON CITY, MISSOURI**
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

April 30, 2019

*This will hereby acknowledge receipt of $820 as required by*
*Rule 6.01(m) for Victor Cobb and Celeste Brustowicz, appearing*
*in Tamia Banks vs. Cotter Corporation, et al., Case No. 18SL-*
*CC00617, before the Circuit Court of St. Louis County, State of*
*Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause no. 18SL-CC00617 |
| vs. | ) ) | Division No.2 |
| COTTER CORPORATION, COMMONWELTH EDISON COMPANY, EXEON CORPORATION, EXELON GENERATION COMPANY, LLC DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## VICTOR COBB

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Victor Cobb to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and hearings herein. In support of this Motion, movant states:

1. Victor Cobb is licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2. Victor Cobb and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Victor Cobb desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

3. Victor Cobb is licensed to practice law in the State of Louisiana (Bar #: 36830), admitted on May 12, 2016. Victor Cobb is currently licensed and in good standing to practice law in the jurisdiction to which he is admitted.

4. Neither Victor Cobb, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Victor Cobb is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Victor Cobb.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Victor Cobb to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Date:  May 7, 2019                     Respectfully Submitted,

**KEANE LAW LLC**

By:/s/ *Nathaniel R. Carroll*
    Ryan A. Keane # 62112
    Nathaniel R. Carroll # 67988
    7777 Bonhomme Ave, Suite 1600
    St. Louis, MO 63105
    Phone: (314) 391-4700
    Fax: (314) 244-3778
    ryan@keanelawllc.com
    nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray

319 North 4th Street Suite 212
St. Louis, MO 63102
(314) 385-9500
agray@johnsongraylaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served on all counsel and parties of record via this court's Case.net electronic filing and notification system on this 7th day of May, 2019.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM



**CLERK OF THE SUPREME COURT**
**STATE OF MISSOURI**
**POST OFFICE BOX 150**
**JEFFERSON CITY, MISSOURI**
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

April 30, 2019

*This will hereby acknowledge receipt of $820 as required by Rule 6.01(m) for Victor Cobb and Celeste Brustowicz, appearing in Tamia Banks vs. Cotter Corporation, et al., Case No. 18SL-CC00617, before the Circuit Court of St. Louis County, State of Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

# TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
## ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                    Plaintiff,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                    Defendants.



SO ORDERED

Judge
Division 17
5/13/19

Case No. 18SL-CC00617-01

Division No. 17

## MOTION FOR ADMISSION PRO HAC VICE

Comes now Third-Party Defendant Cotter Corporation (N.S.L.) ("Cotter"), by and through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1.      That Cotter respectfully moves this Court for Pro Hac Vice Admission for John McGahren, a partner of Morgan, Lewis & Bockius LLP.

2.      Visiting attorney John McGahren has provided a Statement pursuant to Rule 9.03. (See Attached Statement, attached as Exhibit A and incorporated by reference.)

3.      Dale A. Guariglia and Erin L. Brooks of Bryan Cave Leighton Paisner LLP are licensed to practice law in the State of Missouri, have an office in the State of Missouri, and are not under suspension or disbarment by any court in which they are licensed to practice.

4.      Attached hereto as Exhibit B is a receipt from the Missouri Supreme Court acknowledging payment of the requisite fees.

Electronically Filed - St Louis County - May 03, 2019 - 02:24 PM

5.      Attached hereto as Exhibit C is a proposed order respecting this Motion.

WHEREFORE, BRYAN CAVE LEIGHTON PAISNER LLP, attorneys for Cotter, pray

that this Honorable Court grant admission Pro Hac Vice to John McGahren, a partner of Morgan,

Lewis & Bockius LLP.


BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ Erin L. Brooks
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                              Plaintiff,

        v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                              Defendants.

SO ORDERED

Judge
Division 17

Case No. 18SL-CC00617-01

Division No. 17

## MOTION FOR ADMISSION PRO HAC VICE OF STEPHANIE FEINGOLD

Comes now Third-Party Defendant Cotter Corporation (N.S.L.) ("Cotter"), by and

through its attorneys, BRYAN CAVE LEIGHTON PAISNER LLP, and its Motion for

Admission Pro Hac Vice, and pursuant to Missouri Supreme Court Rule 9.03 states as follows:

1.      That Cotter respectfully moves this Court for Pro Hac Vice Admission for

Stephanie Feingold, a partner of Morgan, Lewis & Bockius LLP.

2.      Visiting attorney Stephanie Feingold has provided a Statement pursuant to Rule

9.03. (See Attached Statement, attached as Exhibit A and incorporated by reference.)

3.      Dale A. Guariglia and Erin L. Brooks of Bryan Cave Leighton Paisner LLP are

licensed to practice law in the State of Missouri, have an office in the State of Missouri, and are

not under suspension or disbarment by any court in which they are licensed to practice.

Electronically Filed - St Louis County - May 03, 2019 - 02:27 PM

4.      Attached hereto as Exhibit B is a receipt from the Missouri Supreme Court acknowledging payment of the requisite fees.

5.      Attached hereto as Exhibit C is a proposed order respecting this Motion.

WHEREFORE, BRYAN CAVE LEIGHTON PAISNER LLP, attorneys for Cotter, pray that this Honorable Court grant admission Pro Hac Vice to Stephanie Feingold, a partner of Morgan, Lewis & Bockius LLP.

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ Erin L. Brooks
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Electronically Filed - St Louis County - May 15, 2019 - 10:45 AM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC, AND ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS, | ) Case No. 4:18-cv-00624 (DDN) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## ENTRY OF APPEARANCE

COMES NOW, Dale A. Guariglia, as attorney, and hereby enters his appearance on behalf of Defendant, Cotter Corporation N.S.L.

Dated:  April 24, 2018

Respectfully submitted,

/s/      Dale A. Guariglia
BRYAN CAVE LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bryancave.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bryancave.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION N.S.L.

11668613

Electronically Filed - St Louis County - May 15, 2019 - 10:45 AM

COMMONWEALTH EDISON
COMPANY, EXELON CORPORATION,
and EXELON GENERATION COMPANY,
LLC

Electronically Filed - St Louis County - May 15, 2019 - 10:45 AM

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 24th day of April, 2018, I electronically filed the above with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/        Dale A. Guariglia
ATTORNEYS FOR DEFENDANT
COTTER CORPORATION N.S.L.
COMMONWEALTH EDISON
COMPANY, EXELON CORPORATION,
and EXELON GENERATION COMPANY,
LLC

11668613

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

## TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
## ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
                 )
         Plaintiff, )         Cause no. 18SL-CC00617
                 )
         vs. )         Division No.2
                 )
COTTER CORPORATION, )
COMMONWELTH EDISON COMPANY, )   JURY TRIAL DEMANDED
EXEON CORPORATION, )
EXELON GENERATION COMPANY, LLC )
DJR HOLDINGS, INC. f/k/a FUTURA )
COATINGS, INC., and ST. LOUIS )   SO ORDERED
AIRPORT AUTHORITY, A )                 5/15/19
DEPARTMENT OF THE CITY OF )   Judge
ST. LOUIS )   Division 17
                 )
         Defendants. )

## MOTION FOR PRO HAC VICE ADMISSION OF
## CELESTE BRUSTOWICZ

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Celeste Brustowicz to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and hearings herein. In support of this, Celeste Brustowicz states:

1.      Celeste Brustowicz is an attorney licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2.      Celeste Brustowicz and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Celeste Brustowicz desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

3.      Celeste Brustowicz is licensed to practice law in the State of Louisiana (Bar #: 16835), admitted on October 11, 1985, admitted on October 20, 1985, The State of California (Bar #: 238686), admitted on December 1, 2005, and the State of Mississippi (Bar #: 104041), admitted on April 26, 2012. Celeste Brustowicz is currently licensed and in good standing to practice law in each jurisdiction to which she is admitted.

4.      Neither Celeste Brustowicz, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5.      Celeste Brustowicz is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

4.      Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Celeste Brustowicz.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Celeste Brustowicz to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Date: May 7, 2019                              Respectfully Submitted,

                                       **KEANE LAW LLC**

                                       By:/s/ *Nathaniel R. Carroll*_____
                                          Ryan A. Keane # 62112
                                          Nathaniel R. Carroll # 67988
                                          7777 Bonhomme Ave, Suite 1600
                                          St. Louis, MO 63105
                                          Phone: (314) 391-4700
                                          Fax: (314) 244-3778
                                          ryan@keanelawllc.com

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
(314) 385-9500
agray@johnsongraylaw.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served on all counsel and parties of record via this court's Case.net electronic filing and notification system on this 7th day of May, 2019.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
                                     )
      Plaintiff, )           Cause no. 18SL-CC00617
                                       )
      vs. )           Division No.2
                                         )
COTTER CORPORATION, )
COMMONWELTH EDISON COMPANY, )    JURY TRIAL DEMANDED
EXEON CORPORATION, )
EXELON GENERATION COMPANY, LLC )
DJR HOLDINGS, INC. f/k/a FUTURA )
COATINGS, INC., and ST. LOUIS )
AIRPORT AUTHORITY, A )
DEPARTMENT OF THE CITY OF )
ST. LOUIS )
                                         )
      Defendants. )

SO ORDERED

_____ 5/15/19

Judge
Division 17

**MOTION FOR PRO HAC VICE ADMISSION OF**
**VICTOR COBB**

      Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this

court to permit Victor Cobb to practice specially in the Twenty-first Judicial Circuit Court of St.

Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others

similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and

hearings herein. In support of this Motion, movant states:

      1. Victor Cobb is licensed to practice law and a member of Cooper Law Firm LLC, 1525

Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

      2. Victor Cobb and the law firm of Cooper Law Firm LLC have been retained by Plaintiff

to act as counsel in this matter. Victor Cobb desires to be permitted to practice specially in this

Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

3. Victor Cobb is licensed to practice law in the State of Louisiana (Bar #: 36830), admitted on May 12, 2016. Victor Cobb is currently licensed and in good standing to practice law in the jurisdiction to which he is admitted.

4. Neither Victor Cobb, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Victor Cobb is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Victor Cobb.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Victor Cobb to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Date: May 7, 2019                     Respectfully Submitted,

                                      **KEANE LAW LLC**

                                      By:/s/ *Nathaniel R. Carroll*_____
                                         Ryan A. Keane # 62112
                                         Nathaniel R. Carroll # 67988
                                         7777 Bonhomme Ave, Suite 1600
                                         St. Louis, MO 63105
                                         Phone: (314) 391-4700
                                         Fax: (314) 244-3778
                                         ryan@keanelawllc.com
                                         nathaniel@keanelawllc.com

                                      **JOHNSON GRAY LLC**
                                      Anthony Gray

Electronically Filed - St Louis County - May 09, 2019 - 01:55 PM

319 North 4th Street Suite 212
St. Louis, MO 63102
(314) 385-9500
agray@johnsongraylaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served on all counsel and parties of record via this court's Case.net electronic filing and notification system on this 7th day of May, 2019.

*/s/ Nathaniel R. Carroll*

Electronically Filed - St Louis County - May 31, 2019 - 01:17 PM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC.** f/k/a **FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) ) | Cause No.  18SL-CC00617-01<br><br>Division No.  17 |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF HEARING

**TO:**   All Parties and Counsel of Record herein

**PLEASE TAKE NOTICE THAT** Defendants Cotter Corporation N.S.L., Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC will call up for hearing their Motion to Dismiss Plaintiff's Amended Class-Action Petition and Suggestions of Law, and their Motion to Dismiss for Lack of Personal Jurisdiction, on Monday, June 17, 2019 at 9:00 a.m. or as soon thereafter as counsel may be heard, in Division 17 of the Twenty-First Judicial Circuit Court of the State of Missouri, County of St. Louis.

12723034.1

Electronically Filed - St Louis County - May 31, 2019 - 01:17 PM

Dated:  May 31, 2019                    Respectfully submitted,

                                        */s/  Erin Brooks*
                                        BRYAN CAVE LEIGHTON PAISNER LLP
                                        Dale A. Guariglia, Mo. Bar 32988
                                        daguariglia@bclplaw.com
                                        Erin L. Brooks, Mo. Bar 62764
                                        erin.brooks@bclplaw.com
                                        One Metropolitan Square
                                        211 N. Broadway, Suite 3600
                                        St. Louis, Missouri 63102
                                        (314) 259-2000 (telephone)
                                        (314) 259-2020 (facsimile)

                                        MORGAN LEWIS & BOCKIUS, LLP
                                        John McGahren, Esq. (ID 046791990N)
                                        *Pro hac vice*
                                        john.mcgahren@morganlewis.com
                                        Stephanie Feingold, Esq. (ID 23182005N)
                                        *Pro hac vice*
                                        stephanie.feingold@morganlewis.com
                                        502 Carnegie Center
                                        Princeton, NJ 08540
                                        (609) 919-6600 (telephone)
                                        (609) 919-6701 (facsimile)

                                        ATTORNEYS FOR DEFENDANTS
                                        COTTER CORPORATION, N.S.L.,
                                        COMMONWEALTH EDISON COMPANY,
                                        EXELON CORPORATION, AND EXELON
                                        GENERATION COMPANY, LLC

12723034.1

Electronically Filed - St Louis County - May 31, 2019 - 01:17 PM

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

/s/  Erin Brooks
*Attorneys for Cotter Corporation, N.S.L., Commonwealth Edison Company, Exelon Corporation, and Exelon Generation Company, LLC*

12723034.1

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause no. 18SL-CC00617-01 |
| vs. | ) ) | Division 17 |
| COTTER CORPORATION, COMMONWELTH EDISON COMPANY, EXEON CORPORATION, EXELON GENERATION COMPANY, LLC DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## Barry Cooper, Jr.

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Barry Cooper, Jr. to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and hearings herein. In support of this Motion, movant states:

1. Barry Cooper, Jr. is licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2. Barry Cooper, Jr. and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Barry Cooper, Jr. desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

3. Barry Cooper, Jr. is licensed to practice law in the State of Louisiana (Bar #: 27202), admitted on April 20, 2001, and in the State of Texas (Bar#: 24057527), admitted on March 23,

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

2007. Barry Cooper, Jr. is currently licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4. Neither Barry Cooper, Jr., nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Barry Cooper, Jr. is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Barry Cooper, Jr.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Barry Cooper Jr., to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Dated:  June 5, 2019.

Respectfully Submitted**,**

**KEANE LAW LLC**

By:  */s/Ryan A. Keane*
Ryan A. Keane # 62112
Nathaniel R. Carroll # 67988
7777 Bonhomme Avenue, Suite 1600
St. Louis, Missouri 63105
Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.

/s/ *Ryan A. Keane*

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
 )
   Plaintiff, )
 )
v. )     No. 18SL-CC00617-01
 )
COTTER CORPORATION, *et al.*, )     Division 17
 )
  Defendants. )

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF DAVID R. BARNEY, JR.**

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, the undersigned counsel respectfully files this Motion for this Court to permit David R. Barney, Jr., to practice specially in this Court, by *pro hac vice* admission, in order to participate in the trial, proceedings and hearings herein on behalf of Plaintiff.  In support thereof, counsel avers that the proper fee, in accordance with Rule 6 of the Missouri Supreme Court Rules, has been paid and states as follows:

1. David R. Barney, Jr., is an attorney licensed to practice law and a member of the law firm of Thompson Barney which is located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia 25311-2204 and telephone number (304) 343-4401.

2. David R. Barney, Jr., and the law firm of Thompson Barney have been retained by Plaintiff to act as counsel in this matter.  David R. Barney, Jr., desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

3.      David R. Barney, Jr., is admitted to practice law in the State of West Virginia, admitted on September 29, 1999.  David R. Barney, Jr., currently is licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4.      Neither David R. Barney, Jr., nor any member of the firm of Thompson Barney with which David R. Barney, Jr., practices, is under suspension or disbarment by any Court to which David R. Barney, Jr., is admitted.

5.      David R. Barney, Jr., is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

6.      Ryan A. Keane of the law firm Keane Law, LLC, which is located at 7777 Bonhomme Avenue, Suite 1600, in St. Louis, Missouri 63105, has agreed to act as associate counsel herein for Plaintiff and to sponsor the Motion for the *pro hac vice* admission of David R. Barney, Jr.

7.      A receipt for the aforementioned payment of *pro hac vice* fees is attached hereto as "Exhibit A."

**WHEREFORE**, Ryan A. Keane respectfully requests that this Court grant the Motion to permit David R. Barney, Jr., to practice specially in this case as attorney of record for Plaintiff and to participate in the trial, proceedings and hearings herein, enter an Order effectuating this decision and provide any other relief deemed necessary or proper.

Dated:  June 5, 2019

Respectfully Submitted**,**

**KEANE LAW LLC**

By:      */s/Ryan A. Keane*
      Ryan A. Keane # 62112

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

Nathaniel R. Carroll # 67988
7777 Bonhomme Avenue, Suite 1600
St. Louis, Missouri 63105
Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com


**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500


<u>**CERTIFICATE OF SERVICE**</u>

 The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.


*/s/ Ryan A. Keane*

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 18SL-CC00617-01 |
| COTTER CORPORATION, *et al.*, | ) ) | Division 17 |
| Defendants. | ) | |

**MOTION FOR *PRO HAC VICE*
ADMISSION OF KEVIN W. THOMPSON**

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, the undersigned counsel respectfully files this Motion for this Court to permit Kevin W. Thompson, to practice specially in this Court, by *pro hac vice* admission, in order to participate in the trial, proceedings and hearings herein on behalf of Plaintiff.  In support thereof, counsel avers that the proper fee, in accordance with Rule 6 of the Missouri Supreme Court Rules, has been paid and states as follows:

1.     Kevin W. Thompson is an attorney licensed to practice law and a member of the law firm of Thompson Barney which is located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia 25311-2204 and telephone number (304) 343-4401.

2.     Kevin W. Thompson and the law firm of Thompson Barney have been retained by Plaintiff to act as counsel in this matter.  Kevin W. Thompson desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

3.      Kevin W. Thompson is admitted to practice law in the State of West Virginia, admitted on November 1, 1988.  Kevin W. Thompson currently is licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4.      Neither Kevin W. Thompson, nor any member of the firm of Thompson Barney with which Kevin W. Thompson practices, is under suspension or disbarment by any Court to which Kevin W. Thompson is admitted.

5.      Kevin W. Thompson is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

6.      Ryan A. Keane of the law firm Keane Law, LLC, which is located at 7777 Bonhomme Avenue, Suite 1600, in St. Louis, Missouri 63105, has agreed to act as associate counsel herein for Plaintiff and to sponsor the Motion for the *pro hac vice* admission of Kevin W. Thompson.

7.      A receipt for the aforementioned payment of *pro hac vice* fees is attached hereto as "Exhibit A".

**WHEREFORE**, Ryan A. Keane respectfully requests that this Court grant the Motion to permit Kevin W. Thompson to practice specially in this case as attorney of record for Plaintiff and to participate in the trial, proceedings and hearings herein, enter an Order effectuating this decision and provide any other relief deemed necessary or proper.

Dated: June 5, 2019                           Respectfully Submitted**,**

**KEANE LAW LLC**

By:      */s/Ryan A. Keane*
         Ryan A. Keane # 62112
         Nathaniel R. Carroll # 67988
         7777 Bonhomme Avenue, Suite 1600
         St. Louis, Missouri 63105

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com


**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500


<u>**CERTIFICATE OF SERVICE**</u>

 The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.


<u>*/s/ Ryan A. Keane*</u>

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 18SL-CC00617-01 |
| vs. | ) ) | Division 17 |
| COTTER CORPORATION, COMMONWELTH EDISON COMPANY, EXEON CORPORATION, EXELON GENERATION COMPANY, LLC DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## Stuart Smith

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Stuart Smith to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617-01 to participate in the trial, proceedings and hearings herein. In support of this Motion, movant states:

1. Stuart Smith is licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2. Stuart Smith and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Stuart Smith desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

3. Stuart Smith is licensed to practice law in the State of Louisiana (Bar #: 17805), admitted on October 10, 1986. Stuart Smith is currently licensed and in good standing to practice law in the jurisdiction to which he is admitted.

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

4. Neither Stuart Smith, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Stuart Smith is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Stuart Smith.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Stuart Smith to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Dated:  June 5, 2019

Respectfully Submitted**,**

**KEANE LAW LLC**

By:    */s/Ryan A. Keane*
       Ryan A. Keane # 62112
       Nathaniel R. Carroll # 67988
       7777 Bonhomme Avenue, Suite 1600
       St. Louis, Missouri 63105
       Telephone: (314) 391-4700
       Facsimile: (314) 244-3778
       ryan@keanelawllc.com
       nathaniel@keanelawllc.com


**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.

/s/ *Ryan A. Keane*

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

Electronically Filed - St Louis County - June 07, 2019 - 11:40 AM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and   )
all others similarly situated,          )
                       Plaintiff,       )
                                        )
Vs.                                     )      Cause No. 18SL-CC00617-01
                                        )
COTTER CORPORATION, et al.,             )      Division No. 17
                                        )
                       Defendants.      )

## NOTICE OF APPEARANCE

Now comes JAMES F. CLAYBORNE with the law firm of Clayborne, Sabo & Wagner,

LLP and hereby enters his appearance on behalf of Plaintiff, TAMIA BANKS, on behalf of herself

and all others similarly situated, in the above-captioned matter.

Respectfully Submitted,

CLAYBORNE, SABO & WAGNER LLP

By:    /s/ *James F. Clayborne*
James F. Clayborne, #45627
Jennifer Pitzer #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com
jpitzer@cswlawllp.com
*Attorneys for Plaintiff*

Electronically Filed - St Louis County - June 07, 2019 - 11:40 AM

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 7th day of June, 2019, he caused the foregoing document to be e-filed with the court, and served upon all attorneys of record via the Court's electronic filing system.

/s/ *James F. Clayborne*

Electronically Filed - St Louis County - June 07, 2019 - 11:15 AM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) | |
| Plaintiff, | ) ) | |
| Vs. | ) ) | Cause No. 18SL-CC00617-01 |
| COTTER CORPORATION, et al., | ) ) | Division No. 17 |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

Now comes JENNIFER C. PITZER with the law firm of Clayborne, Sabo & Wagner, LLP

and hereby enters her appearance on behalf of Plaintiff, TAMIA BANKS, on behalf of herself and

all others similarly situated in the above-captioned matter.

Respectfully Submitted,

CLAYBORNE, SABO & WAGNER LLP

By:   /s/ *Jennifer C. Pitzer*
James F. Clayborne, #45627
Jennifer Pitzer #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com
jpitzer@cswlawllp.com
***Attorneys for Plaintiff***

Electronically Filed - St Louis County - June 07, 2019 - 11:15 AM

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 7th day of June, 2019, she caused the foregoing document to be e-filed with the court, and served upon all attorneys of record via the Court's electronic filing system.

/s/ *Jennifer C. Pitzer*

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause no. 18SL-CC00617-01 |
| vs. | ) ) ) | Division 17 |
| COTTER CORPORATION, COMMONWELTH EDISON COMPANY, EXEON CORPORATION, EXELON GENERATION COMPANY, LLC DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED  SO ORDERED  Judge Division 17 |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## Barry Cooper, Jr.

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Barry Cooper, Jr. to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617 to participate in the trial, proceedings and hearings herein. In support of this Motion, movant states:

1. Barry Cooper, Jr. is licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2. Barry Cooper, Jr. and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Barry Cooper, Jr. desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

3. Barry Cooper, Jr. is licensed to practice law in the State of Louisiana (Bar #: 27202), admitted on April 20, 2001, and in the State of Texas (Bar#: 24057527), admitted on March 23,

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

2007. Barry Cooper, Jr. is currently licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4. Neither Barry Cooper, Jr., nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Barry Cooper, Jr. is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Barry Cooper, Jr.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Barry Cooper Jr., to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Dated:  June 5, 2019.

                                        Respectfully Submitted,

                                        **KEANE LAW LLC**

                              By:       */s/Ryan A. Keane*
                                        Ryan A. Keane # 62112
                                        Nathaniel R. Carroll # 67988
                                        7777 Bonhomme Avenue, Suite 1600
                                        St. Louis, Missouri 63105
                                        Telephone: (314) 391-4700
                                        Facsimile: (314) 244-3778
                                        ryan@keanelawllc.com
                                        nathaniel@keanelawllc.com


                                        **JOHNSON GRAY LLC**
                                        Anthony Gray
                                        319 North 4th Street Suite 212
                                        St. Louis, MO 63102
                                        Telephone:  (314) 385-9500

Electronically Filed - St Louis County - June 05, 2019 - 09:31 AM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.

/s/ Ryan A. Keane

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| COTTER CORPORATION, *et al.*, | ) ) |
| Defendants. | ) |

SO ORDERED

6/12/19

Judge
Division 17

No. 18SL-CC00617-01

Division 17

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF DAVID R. BARNEY, JR.**

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, the undersigned counsel respectfully files this Motion for this Court to permit David R. Barney, Jr., to practice specially in this Court, by *pro hac vice* admission, in order to participate in the trial, proceedings and hearings herein on behalf of Plaintiff. In support thereof, counsel avers that the proper fee, in accordance with Rule 6 of the Missouri Supreme Court Rules, has been paid and states as follows:

1.       David R. Barney, Jr., is an attorney licensed to practice law and a member of the law firm of Thompson Barney which is located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia 25311-2204 and telephone number (304) 343-4401.

2.       David R. Barney, Jr., and the law firm of Thompson Barney have been retained by Plaintiff to act as counsel in this matter. David R. Barney, Jr., desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

3.      David R. Barney, Jr., is admitted to practice law in the State of West Virginia, admitted on September 29, 1999.   David R. Barney, Jr., currently is licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4.      Neither David R. Barney, Jr., nor any member of the firm of Thompson Barney with which David R. Barney, Jr., practices, is under suspension or disbarment by any Court to which David R. Barney, Jr., is admitted.

5.      David R. Barney, Jr., is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

6.      Ryan A. Keane of the law firm Keane Law, LLC, which is located at 7777 Bonhomme Avenue, Suite 1600, in St. Louis, Missouri 63105, has agreed to act as associate counsel herein for Plaintiff and to sponsor the Motion for the *pro hac vice* admission of David R. Barney, Jr.

7.      A receipt for the aforementioned payment of *pro hac vice* fees is attached hereto as "Exhibit A."

**WHEREFORE**, Ryan A. Keane respectfully requests that this Court grant the Motion to permit David R. Barney, Jr., to practice specially in this case as attorney of record for Plaintiff and to participate in the trial, proceedings and hearings herein, enter an Order effectuating this decision and provide any other relief deemed necessary or proper.

Dated: June 5, 2019

Respectfully Submitted,

**KEANE LAW LLC**

By:      */s/Ryan A. Keane*
         Ryan A. Keane # 62112

Electronically Filed - St Louis County - June 05, 2019 - 09:36 AM

Nathaniel R. Carroll # 67988
7777 Bonhomme Avenue, Suite 1600
St. Louis, Missouri 63105
Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.

<u>*/s/ Ryan A. Keane*</u>

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | SO ORDERED 6/12/19 |
| Plaintiff, | ) ) ) | Judge Division 17 |
| v. | ) ) | No. 18SL-CC00617-01 |
| COTTER CORPORATION, *et al.,* | ) ) | Division 17 |
| Defendants. | ) | |

**MOTION FOR *PRO HAC VICE*
ADMISSION OF KEVIN W. THOMPSON**

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, the undersigned counsel respectfully files this Motion for this Court to permit Kevin W. Thompson, to practice specially in this Court, by *pro hac vice* admission, in order to participate in the trial, proceedings and hearings herein on behalf of Plaintiff. In support thereof, counsel avers that the proper fee, in accordance with Rule 6 of the Missouri Supreme Court Rules, has been paid and states as follows:

1.      Kevin W. Thompson is an attorney licensed to practice law and a member of the law firm of Thompson Barney which is located at 2030 Kanawha Boulevard, East, in Charleston, West Virginia 25311-2204 and telephone number (304) 343-4401.

2.      Kevin W. Thompson and the law firm of Thompson Barney have been retained by Plaintiff to act as counsel in this matter. Kevin W. Thompson desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

3. Kevin W. Thompson is admitted to practice law in the State of West Virginia, admitted on November 1, 1988.  Kevin W. Thompson currently is licensed and in good standing to practice law in each jurisdiction to which he is admitted.

4. Neither Kevin W. Thompson, nor any member of the firm of Thompson Barney with which Kevin W. Thompson practices, is under suspension or disbarment by any Court to which Kevin W. Thompson is admitted.

5. Kevin W. Thompson is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

6. Ryan A. Keane of the law firm Keane Law, LLC, which is located at 7777 Bonhomme Avenue, Suite 1600, in St. Louis, Missouri 63105, has agreed to act as associate counsel herein for Plaintiff and to sponsor the Motion for the *pro hac vice* admission of Kevin W. Thompson.

7. A receipt for the aforementioned payment of *pro hac vice* fees is attached hereto as "Exhibit A".

**WHEREFORE**, Ryan A. Keane respectfully requests that this Court grant the Motion to permit Kevin W. Thompson to practice specially in this case as attorney of record for Plaintiff and to participate in the trial, proceedings and hearings herein, enter an Order effectuating this decision and provide any other relief deemed necessary or proper.

Dated: June 5, 2019      Respectfully Submitted,

           **KEANE LAW LLC**

By: */s/Ryan A. Keane*
   Ryan A. Keane # 62112
   Nathaniel R. Carroll # 67988
   7777 Bonhomme Avenue, Suite 1600
   St. Louis, Missouri 63105

Electronically Filed - St Louis County - June 05, 2019 - 09:34 AM

Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com


**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.


/s/ *Ryan A. Keane*

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

## TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
## ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 18SL-CC00617-01 |
| vs. | ) ) | Division 17 |
| COTTER CORPORATION, COMMONWELTH EDISON COMPANY, EXEON CORPORATION, EXELON GENERATION COMPANY, LLC DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED  SO ORDERED  6/12/19  Judge Division 17 |
| Defendants. | ) | |

## MOTION FOR PRO HAC VICE ADMISSION OF
## Stuart Smith

Pursuant to Rule 9.03 of the Missouri Supreme Court Rules, we respectfully request this court to permit Stuart Smith to practice specially in the Twenty-first Judicial Circuit Court of St. Louis County as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated in case No. 18SL-CC00617-01 to participate in the trial, proceedings and hearings herein. In support of this Motion, movant states:

1. Stuart Smith is licensed to practice law and a member of Cooper Law Firm LLC, 1525 Religious Street, New Orleans, LA 70130, telephone number (504) 399-0009.

2. Stuart Smith and the law firm of Cooper Law Firm LLC have been retained by Plaintiff to act as counsel in this matter. Stuart Smith desires to be permitted to practice specially in this Court as counsel for Plaintiff in the above-styled cause.

3. Stuart Smith is licensed to practice law in the State of Louisiana (Bar #: 17805), admitted on October 10, 1986. Stuart Smith is currently licensed and in good standing to practice law in the jurisdiction to which he is admitted.

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

4. Neither Stuart Smith, nor any member of Cooper Law Firm is under suspension or disbarment by any Court to which they are admitted.

5. Stuart Smith is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

5. Ryan Keane of the law firm Keane Law LLC, 7777 Bonhomme Ave, #1600, St. Louis, MO 63105 and Anthony Gray of Johnson Gray LLC, 319 North 4th Street Suite 212, St. Louis, MO 63102, have agreed to act as associate counsel herein for Plaintiff and to sponsor the attorneys for the *pro hac vice* admission of Stuart Smith.

WHEREFORE, Ryan Keane respectfully requests that this Court permit Stuart Smith to practice specially in this case as attorney of record for Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, and to participate in the trial, proceedings and hearings herein. A receipt for payment of *pro hac vice* fees is attached as Exhibit A.

Dated: June 5, 2019

Respectfully Submitted,

**KEANE LAW LLC**

By:   */s/Ryan A. Keane*
Ryan A. Keane # 62112
Nathaniel R. Carroll # 67988
7777 Bonhomme Avenue, Suite 1600
St. Louis, Missouri 63105
Telephone: (314) 391-4700
Facsimile: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

**JOHNSON GRAY LLC**
Anthony Gray
319 North 4th Street Suite 212
St. Louis, MO 63102
Telephone:  (314) 385-9500

Electronically Filed - St Louis County - June 05, 2019 - 09:28 AM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon filing via this Court's electronic Case.net filing and notification system on this 5th day of June, 2019.

/s/ Ryan A. Keane

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

## TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
## ST. LOUIS COUNTY

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Cause No. 18SL-CC00617-01** |
| **vs.** | ) ) | **Division No. 17** |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPLANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS SIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS** | ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

Comes now Timothy Hulla, attorney for Plaintiff, and requests this Court grant the application for admission submitted by Attorney Michael G. Stag, pursuant to Rule 9.03 of the Missouri Supreme Court Rules. In support of this Motion, movant states:

1. That the undersigned is an attorney licensed to practice law in the state of Missouri;

2. Michael G. Stag is an attorney licensed to practice law in Louisiana and partner of the firm STAG LIUZZA, L.L.C., 365 Canal Street, Suite 2850, New Orleans, LA 70130, (504) 593-9600;

3. Michael Stag is currently licensed and in good standing in the State of Louisiana, and has completed the application attached as an exhibit to this Motion;

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

4.   That the fee of $410.00 pursuant to Rule 6.01(m) has been paid and the receipt is attached as an exhibit to this Motion;

5.   That the undersigned is aware and agrees that if the Court grants this Motion, he remains designated as local counsel on behalf of the party in this matter.

**WHEREFORE**, the undersigned respectfully prays that this Court enter an order granting the motion for admission *pro hac vice* on behalf of the applicant, for this case only.

Respectfully submitted,
**NAPOLI LAW PLLC**

By:  */s/ Timothy Hulla*
    Timothy Hulla, Bar No. 40119
    Mark Twain Plaza III
    105 West Vandalia Street, Suite 475
    Edwardsville, IL 62025

    **ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed with the Court and served to all counsel of record via EFS on the 10th day of June, 2019.

*/s/ Timothy Hulla*

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cause No. 18SL-CC00617-01** |
| | ) | |
| **vs.** | ) | **Division No. 17** |
| | ) | |
| **COTTER CORPORATION,** | ) | |
| **COMMONWEALTH EDISON COMPANY,** | ) | |
| **EXELON CORPORATION,** | ) | |
| **EXELON GENERATION COMPLANY, LLC,** | ) | |
| **DJR HOLDINGS, INC. f/k/a FUTURA** | ) | |
| **COATINGS, INC., and ST. LOUIS** | ) | |
| **SIRPORT AUTHORITY, A** | ) | |
| **DEPARTMENT OF THE CITY OF** | ) | |
| **ST. LOUIS** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER FOR ADMISSION</u>
## <u>OF COUNSEL PRO HAC VICE</u>

The above-entitled matter having come before the Court on the motion of counsel accompanied by the application of Michael G. Stag to be admitted to appear and participate in the above-entitled cause, and the Court being fully advised in the premises:

IT IS ORDERED that said Motion for Admission of Counsel *Pro Hac Vice* is granted for this case only.  Attorney Michael G. Stag is hereby allowed to appear and participate on behalf of Plaintiff.

DATE: _____          SO ORDERED:_____

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

# EXHIBIT A

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and**<br>**all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cause No. 18SL-CC00617-01** |
| | ) | |
| **vs.** | ) | **Division No. 17** |
| | ) | |
| **COTTER CORPORATION,** | ) | |
| **COMMONWEALTH EDISON COMPANY,** | ) | |
| **EXELON CORPORATION,** | ) | |
| **EXELON GENERATION COMPLANY, LLC,** | ) | |
| **DJR HOLDINGS, INC. f/k/a FUTURA** | ) | |
| **COATINGS, INC., and ST. LOUIS** | ) | |
| **SIRPORT AUTHORITY, A** | ) | |
| **DEPARTMENT OF THE CITY OF** | ) | |
| **ST. LOUIS** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>APPLICATION FOR ADMISSION OF COUNSEL PRO HAC VICE</u>

I, **Michael G. Stag,** pursuant to Supreme Court Rule 9.03 and the Local Rules of the Twenty-First Judicial Circuit, hereby request permission to appear and participate as an attorney at law in the above entitled cause, on behalf of plaintiff in this cause.

In support of this application, and under penalties of perjury as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, and therefore states as follows:

1.  My name is **Michael G. Stag**. I am a licensed attorney in good standing in the State of Louisiana. My bar number in the State of Louisiana is 23314.

2.  I have never been censured, sanctioned, suspended, disbarred, or otherwise disciplined by any attorney disciplinary authority of any state.

3.  I have read, am familiar with, and will abide by, the Missouri Code of Civil Procedure, Missouri Supreme Court Rules, and Local Rules of the Twenty-First Judicial Circuit.  In particular, I have read and am familiar with the Rules of Professional Conduct set forth in Rule 4 and agree to become subject to discipline by the courts of this state.

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

4.      I agree to immediately notify the Court and all counsel of record in the event any information provided in this application changes or becomes inaccurate.

5.      I authorize the Administrator of any attorney registration and disciplinary authority to disclose to the Presiding Judge in this cause all information contained in the files of such authority concerning my current status, any complaints that have been made, and the disposition thereof.

**Name of Applicant:**      Michael G. Stag
**Firm name:**              Stag Liuzza L.L.C.
**Business address:**       365 Canal Street, Suite 2850, New Orleans, LA 70130
**Telephone:**              (504) 593-9600
**E-mail:**                 mstag@stagliuzza.com

_____
Michael G. Stag

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

# EXHIBIT B

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM



**CLERK OF THE SUPREME COURT**
STATE OF MISSOURI
POST OFFICE BOX 150
JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

June 6, 2019

*This will hereby acknowledge receipt of $1230 as required by*
*Rule 6.01(m) for Michael G. Stag, Ashley M. Liuzza, and*
*Matthew D. Rogenes, appearing in Tamia Banks, o/b/o herself*
*and all others similarly situated v. Cotter Corp., et al., Case No.*
*18SL-CC00617-01, before the Circuit Court of St. Louis County,*
*State of Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617-01 |
| vs. | ) ) | Division No. 17 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPLANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS SIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

Comes now Timothy Hulla, attorney for Plaintiff, and requests this Court grant the application for admission submitted by Attorney Michael G. Stag, pursuant to Rule 9.03 of the Missouri Supreme Court Rules. In support of this Motion, movant states:

1. That the undersigned is an attorney licensed to practice law in the state of Missouri;

2. Michael G. Stag is an attorney licensed to practice law in Louisiana and partner of the firm STAG LIUZZA, L.L.C., 365 Canal Street, Suite 2850, New Orleans, LA 70130, (504) 593-9600;

3. Michael Stag is currently licensed and in good standing in the State of Louisiana, and has completed the application attached as an exhibit to this Motion;

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

4. That the fee of $410.00 pursuant to Rule 6.01(m) has been paid and the receipt is attached as an exhibit to this Motion;

5. That the undersigned is aware and agrees that if the Court grants this Motion, he remains designated as local counsel on behalf of the party in this matter.


**WHEREFORE**, the undersigned respectfully prays that this Court enter an order granting the motion for admission *pro hac vice* on behalf of the applicant, for this case only.


Respectfully submitted,
**NAPOLI LAW PLLC**

By:  */s/ Timothy Hulla*
    Timothy Hulla, Bar No. 40119
    Mark Twain Plaza III
    105 West Vandalia Street, Suite 475
    Edwardsville, IL 62025

    **ATTORNEY FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed with the Court and served to all counsel of record via EFS on the 10th day of June, 2019.


*/s/ Timothy Hulla*

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617-01 |
| vs. | ) ) | Division No. 17 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPLANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS SIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER FOR ADMISSION
## OF COUNSEL PRO HAC VICE

The above-entitled matter having come before the Court on the motion of counsel accompanied by the application of Michael G. Stag to be admitted to appear and participate in the above-entitled cause, and the Court being fully advised in the premises:

IT IS ORDERED that said Motion for Admission of Counsel *Pro Hac Vice* is granted for this case only.  Attorney Michael G. Stag is hereby allowed to appear and participate on behalf of Plaintiff.

DATE: _____          SO ORDERED:_____

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

# EXHIBIT A

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cause No. 18SL-CC00617-01** |
| | ) | |
| **vs.** | ) | **Division No. 17** |
| | ) | |
| **COTTER CORPORATION,** | ) | |
| **COMMONWEALTH EDISON COMPANY,** | ) | |
| **EXELON CORPORATION,** | ) | |
| **EXELON GENERATION COMPLANY, LLC,** | ) | |
| **DJR HOLDINGS, INC. f/k/a FUTURA** | ) | |
| **COATINGS, INC., and ST. LOUIS** | ) | |
| **SIRPORT AUTHORITY, A** | ) | |
| **DEPARTMENT OF THE CITY OF** | ) | |
| **ST. LOUIS** | ) | |
| | ) | |
| **Defendants.** | ) | |

## APPLICATION FOR ADMISSION OF COUNSEL PRO HAC VICE

I, **Michael G. Stag,** pursuant to Supreme Court Rule 9.03 and the Local Rules of the Twenty-First Judicial Circuit, hereby request permission to appear and participate as an attorney at law in the above entitled cause, on behalf of plaintiff in this cause.

In support of this application, and under penalties of perjury as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, and therefore states as follows:

1.  My name is **Michael G. Stag**. I am a licensed attorney in good standing in the State of Louisiana. My bar number in the State of Louisiana is 23314.

2.  I have never been censured, sanctioned, suspended, disbarred, or otherwise disciplined by any attorney disciplinary authority of any state.

3.  I have read, am familiar with, and will abide by, the Missouri Code of Civil Procedure, Missouri Supreme Court Rules, and Local Rules of the Twenty-First Judicial Circuit.  In particular, I have read and am familiar with the Rules of Professional Conduct set forth in Rule 4 and agree to become subject to discipline by the courts of this state.

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

4.      I agree to immediately notify the Court and all counsel of record in the event any information provided in this application changes or becomes inaccurate.

5.      I authorize the Administrator of any attorney registration and disciplinary authority to disclose to the Presiding Judge in this cause all information contained in the files of such authority concerning my current status, any complaints that have been made, and the disposition thereof.

**Name of Applicant:**      Michael G. Stag
**Firm name:**      Stag Liuzza L.L.C.
**Business address:**      365 Canal Street, Suite 2850, New Orleans, LA 70130
**Telephone:**      (504) 593-9600
**E-mail:**      mstag@stagliuzza.com


_____
Michael G. Stag

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

# EXHIBIT B

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM



**CLERK OF THE SUPREME COURT**
STATE OF MISSOURI
POST OFFICE BOX 150
JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

June 6, 2019

*This will hereby acknowledge receipt of $1230 as required by*
*Rule 6.01(m) for Michael G. Stag, Ashley M. Liuzza, and*
*Matthew D. Rogenes, appearing in Tamia Banks, o/b/o herself*
*and all others similarly situated v. Cotter Corp., et al., Case No.*
*18SL-CC00617-01, before the Circuit Court of St. Louis County,*
*State of Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

# EXHIBIT A

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617-01 |
| vs. | ) ) | Division No. 17 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPLANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS SIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## APPLICATION FOR ADMISSION OF COUNSEL PRO HAC VICE

I, **Ashley M. Liuzza,** pursuant to Supreme Court Rule 9.03 and the Local Rules of the Twenty-First Judicial Circuit, hereby request permission to appear and participate as an attorney at law in the above entitled cause, on behalf of plaintiff in this cause.

In support of this application, and under penalties of perjury as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, and therefore states as follows:

1. My name is **Ashley M. Liuzza**. I am a licensed attorney in good standing in the State of Louisiana. My bar number in the State of Louisiana is 34645.

2. I have never been censured, sanctioned, suspended, disbarred, or otherwise disciplined by any attorney disciplinary authority of any state.

3. I have read, am familiar with, and will abide by, the Missouri Code of Civil Procedure, Missouri Supreme Court Rules, and Local Rules of the Twenty-First Judicial Circuit. In particular, I have read and am familiar with the Rules of Professional Conduct set forth in Rule 4 and agree to become subject to discipline by the courts of this state.

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

4.   I agree to immediately notify the Court and all counsel of record in the event any information provided in this application changes or becomes inaccurate.

5.   I authorize the Administrator of any attorney registration and disciplinary authority to disclose to the Presiding Judge in this cause all information contained in the files of such authority concerning my current status, any complaints that have been made, and the disposition thereof.

**Name of Applicant:**   Ashley M. Liuzza
**Firm name:**   Stag Liuzza L.L.C.
**Business address:**   365 Canal Street, Suite 2850, New Orleans, LA 70130
**Telephone:**   (504) 593-9600
**E-mail:**   aliuzza@stagliuzza.com


_____
Ashley M. Liuzza

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

## IN THE CIRCUIT COURT
## STATE OF MISSOURI
## TWENTY-FIRST JUDICIAL CIRCUIT
### (St. Louis County)

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
                                 )
     Plaintiff, )      Cause No. 18SL-CC00617-01
                                 )
     vs. )      Div. 17
                                 )
COTTER CORPORATION, )
COMMONWEALTH EDISON COMPANY, )
EXELON CORPORATION, )
EXELON GENERATION COMPANY, LLC, )
DJR HOLDINGS, INC., f/k/a FUTURA )
COATINGS, INC., and ST. LOUIS )
AIRPORT AUTHORITY, A )
DEPARTMENT OF THE CITY OF )
ST. LOUIS, )
                                 )
     Defendants. )

*So ordered*
*[signature]*
*Div 17*
*7/22/19*

## MOTION TO WITHDRAW MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

COMES NOW Timothy Hulla and moves to withdraw the previously filed Motion for

Admission of Counsel pursuant to Missouri Supreme Court Rule 9.03, and in support thereof

states the following:

    1.      Counsel has recently learned that client Tamia Banks has decided to be

represented by counsel other than Michael G. Stag, Ashley Liuzza, and Matthew Rogenes.

    2.      Due to Ms Banks' decision, the Court does not need to consider the Motion for

Admission of Counsel.

WHEREFORE, the Court should grant this Motion to Withdraw Motion for Admission of

Counsel pursuant to Missouri Supreme Court Rule 9.03 and render such other relief as the Court

deems just and proper.

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**

By: */s/ Timothy Hulla*
  Timothy Hulla, Bar No. 40119
  Mark Twain Plaza III
  105 West Vandalia Street, Suite 475
  Edwardsville, IL 62025
  Telephone: (618) 307-4528
  Fax: (313) 610-5680
  THulla@Napolilaw.com
  **ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed with the Court and served to all counsel of record via EFS on the 11th day of July, 2019.

*/s/ Timothy P. Hulla*

# COOPER
# LAW FIRM LLC

1525 Religious Street
New Orleans, Louisiana 70130
Telephone: (504) 399-0009
Fax: (504) 309-6989
www.clfnola.com
**Barry J. Cooper Jr.**
Licensed LA-TX
bcooper@sch-llc.com

VIA E-MAIL: circuitcourt@stlouisco.com                                July 11th, 2019

Hon. Joan M. Gilmer, Clerk of Court
St. Louis County Circuit Court
21st Judicial Circuit of Missouri
105 South Central Avenue
Clayton, Missouri 63105

# FILED
## JUL 1 1 2019
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

Re:   Tamia Banks, *et al.* vs. Cotter Corporation, *et al.*
      21st Judicial Circuit of Missouri; Case No. 18SL-CC00617-01, Div. No. 17
      Application for *Pro Hac Vice* Filed by Michael G. Stag, Esq.,
      Ashley Liuzza, Esq., and Matthew Rongenes, Esq.
      Request to Strike, in the Alternative, Set for Contradictory Hearing

Dear Clerk of Court:

        Please be advised that I am counsel of record for the plaintiff, Ms. Tamia Banks, in the above-referenced civil action. I just became aware of a Motion for Admission of Counsel *Pro Hac Vice* (which by its terms contains an entry of limited appearance) filed by Timothy Hulla, Esq. on June 10th, 2019 for Michael G. Stag, Esq., Ashley Liuzza, Esq., and Matthew Rongenes, Esq. Neither I nor lead counsel, Stuart H. Smith, Esq., were served with a copy of these papers. Upon receipt of this filing from local counsel, Anthony D. Gray, Esq., who was kind enough to forward it to me, I attempted to locate Mr. Hulla but I was unable to contact him because the pleading does not contain the information required to contact him. Further, the law firm website does not contain the information required to communicate with him after business hours (*i.e.* facsimile, e-mail). Mr. Hulla is presumed to know the local rules and that *pro hac vice* counsel do not receive electronic notices.

        The filing is defective, not in compliance with Local Rules of Court, 55.03(b)(3), and must be stricken. As such, we kindly request that the Motion for Admission of Counsel be stricken from the record for non-compliance. Furthermore, Mr. Hulla is a stranger to counsel of record and unknown to us. Alternatively, if the Motion for Admission of Counsel is not to be stricken from the record, then we request that the Court be notified that the Motion is **opposed** and that it be set for contradictory hearing.

                                          Sincerely yours,

                                          *Barry J. Cooper, Jr.*
                                          Barry J. Cooper, Jr.

BJC/lnv
Cc:   Anthony D. Gray, Esq. (*via e-mail:* agray@johnsongraylaw.com)
      Ryan Keane, Esq. (*via e-mail:* ryan@keanelawllc.com)
      Stuart H. Smith, Esq. (*via e-mail:* ssmith@sch-llc.com)
      Timothy Hulla, Esq. (*via facsimile:* (646) 843-7603)

# C O O P E R   L A W   F I R M

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|-----|-------|
| Clerk of Court - Circuit Civil Court Division | Barry Cooper |
| **COMPANY:** | **DATE:** |
| Cooper Law Firm | 7.11.2019 |
| **FAX NUMBER:** | **TOTAL NO. OF PAGES, INCLUDING COVER** |
| 314.615.8739 | 2 |
| **PHONE NUMBER:** | **SENDER'S REFERENCE NUMBER:** |
| 5043990009 | |
| **RE:** | **YOUR REFERENCE NUMBER:** |
| Tamia Banks - Ltr to Circuit Court | |

☐ **URGENT**   ☐ **FOR REVIEW**   ☐ **PLEASE COMMENT**   ☐ **PLEASE REPLY**   ☐ **PLEASE RECYCLE**

**NOTES/COMMENTS:**

The information contained in this message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2310-2321, and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by fax. If the person actually receiving this information or any other reader of this information is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at 504-398-0009.

1525 RELIGIOUS STREET - NEW ORLEANS – LA -70130

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

**IN THE CIRCUIT COURT
STATE OF MISSOURI
TWENTY-FIRST JUDICIAL CIRCUIT
(St. Louis County)**

TAMIA BANKS, on behalf of herself and ) 
all others similarly situated, )
)
    Plaintiff, )    Cause No. 18SL-CC00617-01
)
    vs. )    Div. 17
)
COTTER CORPORATION, )
COMMONWEALTH EDISON COMPANY, )
EXELON CORPORATION, )
EXELON GENERATION COMPANY, LLC, )
DJR HOLDINGS, INC., f/k/a FUTURA )
COATINGS, INC., and ST. LOUIS )
AIRPORT AUTHORITY, A )
DEPARTMENT OF THE CITY OF )
ST. LOUIS, )
)
    Defendants. )

**MOTION TO WITHDRAW MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE***

    COMES NOW Timothy Hulla and moves to withdraw the previously filed Motion for Admission of Counsel pursuant to Missouri Supreme Court Rule 9.03, and in support thereof states the following:

    1.    Counsel has recently learned that client Tamia Banks has decided to be represented by counsel other than Michael G. Stag, Ashley Liuzza, and Matthew Rogenes.

    2.    Due to Ms Banks' decision, the Court does not need to consider the Motion for Admission of Counsel.

    WHEREFORE, the Court should grant this Motion to Withdraw Motion for Admission of Counsel pursuant to Missouri Supreme Court Rule 9.03 and render such other relief as the Court deems just and proper.

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**

By: _/s/ Timothy Hulla_
       Timothy Hulla, Bar No. 40119
       Mark Twain Plaza III
       105 West Vandalia Street, Suite 475
       Edwardsville, IL 62025
       Telephone: (618) 307-4528
       Fax: (313) 610-5680
       THulla@Napolilaw.com
       **ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed with the Court and served to all counsel of record via EFS on the 11th day of July, 2019.

                     _/s/ Timothy P. Hulla_

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**IN THE CIRCUIT COURT**
**OF ST. LOUIS COUNTY, MISSOURI**

TAMIA BANKS, on behalf of herself and all
others similarly situated,

                           Plaintiff,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC, AND ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

                        Defendants.

**Civil Action No. 18SL-CC00617-01**

**Division No. 18**

**STIPULATED PROTECTIVE ORDER**
**REGARDING THE PRODUCTION OF CERTAIN DOCUMENTS**
**FOR THE LIMITED PURPOSE OF JURISDICTIONAL REVIEW AND ANALYSIS**

Upon stipulation and agreement of the parties in accordance with Missouri Rule of Civil

Procedure 56.01(c), and it appearing to the Court that there is good cause to enter an appropriate

Protective Order to protect certain confidential, non-public documents that may be made

available for the limited purpose of Plaintiff's pre-motion jurisdictional review and analysis;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT the following

principles and procedures designed to assure the protection of these confidential, non-public

documents shall govern all pre-motion jurisdictional discovery and analysis among the parties:

**INDEMNITY AGREEMENTS**

1.    <u>Definitions</u>.

    (a)    "Indemnity Agreements" shall mean the document(s) identified in

            paragraphs 22 and 24 of Plaintiff's First Amended Class Action Petition,

1

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

filed in this matter on April 2, 2018 (which document(s) are also referenced in the Declarations submitted in support of Defendants Commonwealth Edison Corporation, Exelon Corporation, and Exelon Generation Company, LLC's April 29, 2019 Motion to Dismiss for Lack of Personal Jurisdiction).

(b) "Outside Counsel" shall include attorneys (and their support staff) who are not employees of a party or a party's parent company.

(c) "House Counsel" shall include attorneys who are employees of a party or a party's parent company.

(d) "Counsel" (without qualifier) shall include Outside Counsel and House Counsel.

2. <u>Disclosure Limits on Indemnity Agreements.</u> Unless otherwise ordered by the Court or permitted in writing by the party producing the Indemnity Agreements, the receiving party may disclose the Indemnity Agreements only to:

(a) Counsel (including administrative, paralegal, clerical, and secretarial staff employed by such counsel) to a party in this action;

(b) parties and court personnel, including court reporters and videographers appearing at depositions, hearings, trial or other proceedings in this case;

(c) non-attorney employees of a party who provide input and/or assistance to Counsel; and

(d) the author or recipient of the document in the ordinary course of business, or individuals identified as the source of the information contained in a document designated as Confidential.

2

The Indemnity Agreements may be disclosed or made available to individuals or entities other than those identified in Paragraph 2 only if (a) all parties agree to the disclosure, and (b) provided that first (i) a copy of this Order is provided to the receiving party and (ii) the Agreement to Maintain Confidentiality in the form attached hereto as Exhibit A is read and executed by the receiving party.

3.   Inadvertent Disclosure of the Indemnity Agreements. The inadvertent, unintentional, or *in camera* disclosure of the Indemnity Agreements shall not be deemed a waiver, in whole or in part, of any Defendant's claim of confidentiality.

## DESIGNATION OF THE INDEMNITY AGREEMENTS

4.   Designation. The Indemnity Agreements are designated "CONFIDENTIAL" pursuant to this Protective Order, and shall be so designated by the producing party by marking copies of the Indemnity Agreements with the legend "CONFIDENTIAL." Failure to so mark the document shall not be deemed a waiver of the CONFIDENTIAL designation.  Defendants may redact protected health information, personal medical information, cell phone numbers, credit card information, social security numbers, employee identification numbers, names and identifying information of family members, and home addresses, if any.  If additional categories of information for redaction become apparent, the parties agree to meet and confer concerning their inclusion in this paragraph.

5.   Time for Designation. The Indemnity Agreements are deemed confidential upon production to Plaintiff.

6.   Effect of "CONFIDENTIAL" Designation. Because the Indemnity Agreements are designated as "CONFIDENTIAL" under this Order, the information contained therein, and any summaries, copies, abstracts, testimony, or other documents derived in whole or in part from the Indemnity Agreements, shall be kept strictly confidential; shall be used only for purposes of

3

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

pre-motion jurisdictional review and analysis, and for no other purposes; and shall only be disclosed in accordance with this Order.

      7.    <u>Confidential Deposition Testimony</u>. Testimony taken at any deposition, conference, or hearing in connection with the pre-motion jurisdictional discovery and Motion to Dismiss for Lack of Personal Jurisdiction that references, quotes from, or discusses the Indemnity Agreements and the terms and obligations thereunder, may be designated as "CONFIDENTIAL" by designating such testimony as "CONFIDENTIAL" either (a) on the record, or (b) within five (5) business days of receipt of the transcript. Until the five (5) business day designation period expires, the complete deposition transcript and videotape shall be treated as "CONFIDENTIAL" unless otherwise specified in writing or on the record of the deposition by the producing party. Arrangements shall be made with the court reporter taking and transcribing such proceeding to separately bind such portions of the transcript containing information designated as "CONFIDENTIAL" and to label such portions appropriately. If a party objects to another party's designation of deposition testimony as "CONFIDENTIAL," the parties must then meet and confer within five (5) business days of the objection in a good faith effort to resolve the objection. If the parties are unable to resolve the objection or if the parties do not meet within five (5) business days, the party contesting the designation can contest the designation directly with the Court by motion.

      8.    <u>Retention of Verifications</u>. Counsel will retain executed copies of Attachment A and will, upon request, reasonably make such executed copies available to other Counsel.

## GENERAL PROVISIONS

      9.    <u>Filing Under Seal</u>. If a party wishes to use or file the Indemnity Agreements with any affidavits, briefs, memoranda of law, or other papers filed in this Court, or in connection with oral argument presented to this Court, the party shall not use or file such information

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

publicly.  The parties agree to inquire of the Court the method by which the Court would like the

Indemnity Agreements submitted, and to handle submission of the Indemnity Agreements

accordingly.  In the absence of direction by the Court, the parties shall file the Indemnity

Agreements under seal, and the Indemnity Agreements will be made available only to the Court

and to persons specifically authorized by this Stipulated Protective Order.  Unless instructed

otherwise by the Court, the party filing any paper that reflects, contains, or includes of the

Indemnity Agreements subject to this Stipulated Protective Order shall file such paper in a sealed

envelope, or other appropriately sealed container, which indicates the title of the action, the party

filing the materials, the nature of the materials filed, and the legend CONFIDENTIAL --- FILED

UNDER SEAL PURSUANT TO PROTECTIVE ORDER OF THIS COURT. The party filing an

Indemnity Agreement under seal shall publicly file a "Notice of Service of Document Containing

Information Designated as Confidential" citing this Order and the designation by the Producing

Party as the basis for the Notice. Contemporaneous with filing the Notice, the filing party will

serve the papers on all parties. The party may file the material under seal with the Court the

following business day. At the conclusion of this action, any Indemnity Agreement filed with the

Court under seal shall be kept under seal or be returned to the appropriate Defendant pursuant to

paragraph 10 of this Order, *infra.*

      10.   Purpose of Order.  This Order is entered solely for the purpose of facilitating the

exchange of the Indemnity Agreements between the parties to this action, for the limited purpose

of pre-motion jurisdictional review and analysis, without involving the Court unnecessarily in

the process. Nothing in this Order nor the production of any Indemnity Agreements under the

terms of this Order shall be deemed a waiver of confidentiality or any type of privilege

applicable to any Indemnity Agreements in this or any other action or proceeding. Nothing in

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

this Order shall be construed to affect the evidentiary admissibility of any of the Indemnity Agreements, including after the conclusion of pre-motion jurisdictional review and analysis. The parties anticipate that a separate protective order will be entered in this litigation to govern documents produced in discovery in the ordinary course.

11.     Return of Documents. Within no later than three weeks following a determination by the court or other resolution of the pending Motion to Dismiss for Lack of Personal Jurisdiction (dated April 29, 2019), Counsel for Plaintiff shall assemble and return to Counsel for Defendants all Indemnity Agreements and all copies of same. The foregoing does not prevent the Indemnity Agreements from being produced by Defendants subject to a new protective order in the ordinary course of discovery in this litigation.

12.     Modification. This Order shall not prevent any party from applying to the Court for modification of the Order or for further relief.

13.     Continuing Jurisdiction. This Court shall retain jurisdiction to enforce the terms of this Order.

The undersigned counsel of record for the parties hereby stipulate and consent to entry of the foregoing Stipulated Protective Order.

6

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: 7/23/19

_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

STIPULATED AND AGREED:

By: _____     By: _____

Dated: 07/09/19 _____     Dated: _____

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
Erin L. Brooks, Mo. Bar 62764
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
daguariglia@bclplaw.com
erin.brooks@bclplaw.com

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (ID 046791990N)
(*Pro hac vice*)
Stephanie Feingold, Esq. (ID 23182005N)
(*Pro hac vice*)
502 Carnegie Center
Princeton, NJ 08540
John.mcgahren@morganlewis.com
stephanie.feingold@morganlewis.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

*Attorneys for Defendants Cotter Corporation
(N.S.L.), Commonwealth Edison Company,
Exelon Corporation, and Exelon Generation
Company, LLC*

7

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: _____

_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

STIPULATED AND AGREED:

By: _____        By: _____

Dated: _7/11/19_____            Dated: _____

JOHNSON GRAY, LLC                BRYAN CAVE LEIGHTON PAISNER LLP
Anthony D. Gray, # 51534         Dale A. Guariglia, Mo. Bar 32988
319 North 4th Street, Suite 212  Erin L. Brooks, Mo. Bar 62764
St. Louis, MO 63102              One Metropolitan Square
agray@johnsongraylaw.com         211 N. Broadway, Suite 3600
                                 St. Louis, Missouri 63102
                                 daguariglia@bclplaw.com
                                 erin.brooks@bclplaw.com


KEANE LAW LLC                    MORGAN LEWIS & BOCKIUS, LLP
Ryan A. Keane, # 62112           John McGahren, Esq. (ID 046791990N)
Alex Braitberg, # 67045          (*Pro hac vice*)
7777 Bonhomme Ave., Ste. 1600    Stephanie Feingold, Esq. (ID 23182005N)
St. Louis, MO 63105              (*Pro hac vice*)
ryan@keanelawllc.com             502 Carnegie Center
alex@keanelawllc.com             Princeton, NJ 08540
                                 John.mcgahren@morganlewis.com
                                 stephanie.feingold@morganlewis.com

COOPER LAW FIRM, L.L.C.          *Attorneys for Defendants Cotter Corporation*
Barry J. Cooper, Jr.             *(N.S.L.), Commonwealth Edison Company,*
Celeste Brustowicz    1525 Religious St.   *Exelon Corporation, and Exelon Generation*
508 St. Philip Street            *Company, LLC*
New Orleans, LA 70116  70130
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

7

Electronically Filed - St Louis County - July 03, 2019 - 11:17 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and<br> all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| vs. | ) | Division No. 17 |
| | ) | |
| COTTER CORPORATION,<br>COMMONWEALTH EDISON COMPANY,<br>EXELON CORPORATION,<br>EXELON GENERATION COMPLANY, LLC,<br>DJR HOLDINGS, INC. f/k/a FUTURA<br>COATINGS, INC., and ST. LOUIS<br>SIRPORT AUTHORITY, A<br>DEPARTMENT OF THE CITY OF<br>ST. LOUIS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## ORDER FOR ADMISSION
## OF COUNSEL PRO HAC VICE

The above-entitled matter having come before the Court on the motion of counsel accompanied by the application of Michael G. Stag to be admitted to appear and participate in the above-entitled cause, and the Court being fully advised in the premises:

IT IS ORDERED that said Motion for Admission of Counsel *Pro Hac Vice* is granted for this case only. Attorney Michael G. Stag is hereby allowed to appear and participate on behalf of Plaintiff.

DATE: 7/17/19          SO ORDERED: _____

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

IN THE CIRCUIT COURT
STATE OF MISSOURI
TWENTY-FIRST JUDICIAL CIRCUIT
(St. Louis County)

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
                                )
     Plaintiff, )
                                 )     Cause No. 18SL-CC00617-01
vs. )
                                 )     Div. 17
COTTER CORPORATION, )
COMMONWEALTH EDISON COMPANY, )
EXELON CORPORATION, )
EXELON GENERATION COMPANY, LLC, )
DJR HOLDINGS, INC., f/k/a FUTURA )
COATINGS, INC., and ST. LOUIS )
AIRPORT AUTHORITY, A )
DEPARTMENT OF THE CITY OF )
ST. LOUIS, )
                                 )
     Defendants. )

*So ordered*

7/22/19

## MOTION TO WITHDRAW MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

COMES NOW Timothy Hulla and moves to withdraw the previously filed Motion for Admission of Counsel pursuant to Missouri Supreme Court Rule 9.03, and in support thereof states the following:

1.     Counsel has recently learned that client Tamia Banks has decided to be represented by counsel other than Michael G. Stag, Ashley Liuzza, and Matthew Rogenes.

2.     Due to Ms Banks' decision, the Court does not need to consider the Motion for Admission of Counsel.

WHEREFORE, the Court should grant this Motion to Withdraw Motion for Admission of Counsel pursuant to Missouri Supreme Court Rule 9.03 and render such other relief as the Court deems just and proper.

Electronically Filed - St Louis County - July 11, 2019 - 04:00 PM

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**

By: _/s/ Timothy Hulla_
    Timothy Hulla, Bar No. 40119
    Mark Twain Plaza III
    105 West Vandalia Street, Suite 475
    Edwardsville, IL 62025
    Telephone: (618) 307-4528
    Fax: (313) 610-5680
    THulla@Napolilaw.com
    **ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed with the Court and served to all counsel of record via EFS on the 11th day of July, 2019.

_/s/ Timothy P. Hulla_

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI**

TAMIA BANKS, on behalf of herself and all
others similarly situated,

|                                        | Civil Action No. 18SL-CC00617-01 |
|----------------------------------------|-----------------------------------|

Plaintiff,

**Civil Action No. 18SL-CC00617-01**

**Division No. 18**

v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
EXELON CORPORATION, EXELON
GENERATION COMPANY, LLC, DJR
HOLDINGS, INC, AND ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

Defendants.

**STIPULATED PROTECTIVE ORDER
REGARDING THE PRODUCTION OF CERTAIN DOCUMENTS
FOR THE LIMITED PURPOSE OF JURISDICTIONAL REVIEW AND ANALYSIS**

Upon stipulation and agreement of the parties in accordance with Missouri Rule of Civil

Procedure 56.01(c), and it appearing to the Court that there is good cause to enter an appropriate

Protective Order to protect certain confidential, non-public documents that may be made

available for the limited purpose of Plaintiff's pre-motion jurisdictional review and analysis;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT the following

principles and procedures designed to assure the protection of these confidential, non-public

documents shall govern all pre-motion jurisdictional discovery and analysis among the parties:

**INDEMNITY AGREEMENTS**

1.   Definitions.

    (a)    "Indemnity Agreements" shall mean the document(s) identified in

           paragraphs 22 and 24 of Plaintiff's First Amended Class Action Petition,

1

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

filed in this matter on April 2, 2018 (which document(s) are also referenced in the Declarations submitted in support of Defendants Commonwealth Edison Corporation, Exelon Corporation, and Exelon Generation Company, LLC's April 29, 2019 Motion to Dismiss for Lack of Personal Jurisdiction).

    (b)    "Outside Counsel" shall include attorneys (and their support staff) who are not employees of a party or a party's parent company.

    (c)    "House Counsel" shall include attorneys who are employees of a party or a party's parent company.

    (d)    "Counsel" (without qualifier) shall include Outside Counsel and House Counsel.

2.    <u>Disclosure Limits on Indemnity Agreements.</u> Unless otherwise ordered by the Court or permitted in writing by the party producing the Indemnity Agreements, the receiving party may disclose the Indemnity Agreements only to:

    (a)    Counsel (including administrative, paralegal, clerical, and secretarial staff employed by such counsel) to a party in this action;

    (b)    parties and court personnel, including court reporters and videographers appearing at depositions, hearings, trial or other proceedings in this case;

    (c)    non-attorney employees of a party who provide input and/or assistance to Counsel; and

    (d)    the author or recipient of the document in the ordinary course of business, or individuals identified as the source of the information contained in a document designated as Confidential.

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

The Indemnity Agreements may be disclosed or made available to individuals or entities other than those identified in Paragraph 2 <u>only</u> if (a) all parties agree to the disclosure, and (b) provided that first (i) a copy of this Order is provided to the receiving party and (ii) the Agreement to Maintain Confidentiality in the form attached hereto as Exhibit A is read and executed by the receiving party.

3.    <u>Inadvertent Disclosure of the Indemnity Agreements</u>. The inadvertent, unintentional, or *in camera* disclosure of the Indemnity Agreements shall not be deemed a waiver, in whole or in part, of any Defendant's claim of confidentiality.

## DESIGNATION OF THE INDEMNITY AGREEMENTS

4.    <u>Designation</u>. The Indemnity Agreements are designated "CONFIDENTIAL" pursuant to this Protective Order, and shall be so designated by the producing party by marking copies of the Indemnity Agreements with the legend "CONFIDENTIAL." Failure to so mark the document shall not be deemed a waiver of the CONFIDENTIAL designation. Defendants may redact protected health information, personal medical information, cell phone numbers, credit card information, social security numbers, employee identification numbers, names and identifying information of family members, and home addresses, if any. If additional categories of information for redaction become apparent, the parties agree to meet and confer concerning their inclusion in this paragraph.

5.    <u>Time for Designation</u>. The Indemnity Agreements are deemed confidential upon production to Plaintiff.

6.    <u>Effect of "CONFIDENTIAL" Designation</u>. Because the Indemnity Agreements are designated as "CONFIDENTIAL" under this Order, the information contained therein, and any summaries, copies, abstracts, testimony, or other documents derived in whole or in part from the Indemnity Agreements, shall be kept strictly confidential; shall be used only for purposes of

3

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

pre-motion jurisdictional review and analysis, and for no other purposes; and shall only be disclosed in accordance with this Order.

      7.    <u>Confidential Deposition Testimony</u>. Testimony taken at any deposition, conference, or hearing in connection with the pre-motion jurisdictional discovery and Motion to Dismiss for Lack of Personal Jurisdiction that references, quotes from, or discusses the Indemnity Agreements and the terms and obligations thereunder, may be designated as "CONFIDENTIAL" by designating such testimony as "CONFIDENTIAL" either (a) on the record, or (b) within five (5) business days of receipt of the transcript. Until the five (5) business day designation period expires, the complete deposition transcript and videotape shall be treated as "CONFIDENTIAL" unless otherwise specified in writing or on the record of the deposition by the producing party. Arrangements shall be made with the court reporter taking and transcribing such proceeding to separately bind such portions of the transcript containing information designated as "CONFIDENTIAL" and to label such portions appropriately. If a party objects to another party's designation of deposition testimony as "CONFIDENTIAL," the parties must then meet and confer within five (5) business days of the objection in a good faith effort to resolve the objection. If the parties are unable to resolve the objection or if the parties do not meet within five (5) business days, the party contesting the designation can contest the designation directly with the Court by motion.

      8.    <u>Retention of Verifications</u>. Counsel will retain executed copies of Attachment A and will, upon request, reasonably make such executed copies available to other Counsel.

<div align="center">

**GENERAL PROVISIONS**

</div>

      9.    <u>Filing Under Seal</u>. If a party wishes to use or file the Indemnity Agreements with any affidavits, briefs, memoranda of law, or other papers filed in this Court, or in connection with oral argument presented to this Court, the party shall not use or file such information

<div align="center">4</div>

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

publicly. The parties agree to inquire of the Court the method by which the Court would like the Indemnity Agreements submitted, and to handle submission of the Indemnity Agreements accordingly. In the absence of direction by the Court, the parties shall file the Indemnity Agreements under seal, and the Indemnity Agreements will be made available only to the Court and to persons specifically authorized by this Stipulated Protective Order. Unless instructed otherwise by the Court, the party filing any paper that reflects, contains, or includes of the Indemnity Agreements subject to this Stipulated Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, and the legend CONFIDENTIAL — FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER OF THIS COURT. The party filing an Indemnity Agreement under seal shall publicly file a "Notice of Service of Document Containing Information Designated as Confidential" citing this Order and the designation by the Producing Party as the basis for the Notice. Contemporaneous with filing the Notice, the filing party will serve the papers on all parties. The party may file the material under seal with the Court the following business day. At the conclusion of this action, any Indemnity Agreement filed with the Court under seal shall be kept under seal or be returned to the appropriate Defendant pursuant to paragraph 10 of this Order, *infra.*

10.    Purpose of Order. This Order is entered solely for the purpose of facilitating the exchange of the Indemnity Agreements between the parties to this action, for the limited purpose of pre-motion jurisdictional review and analysis, without involving the Court unnecessarily in the process. Nothing in this Order nor the production of any Indemnity Agreements under the terms of this Order shall be deemed a waiver of confidentiality or any type of privilege applicable to any Indemnity Agreements in this or any other action or proceeding. Nothing in

5

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

this Order shall be construed to affect the evidentiary admissibility of any of the Indemnity Agreements, including after the conclusion of pre-motion jurisdictional review and analysis. The parties anticipate that a separate protective order will be entered in this litigation to govern documents produced in discovery in the ordinary course.

11.     <u>Return of Documents</u>. Within no later than three weeks following a determination by the court or other resolution of the pending Motion to Dismiss for Lack of Personal Jurisdiction (dated April 29, 2019), Counsel for Plaintiff shall assemble and return to Counsel for Defendants all Indemnity Agreements and all copies of same. The foregoing does not prevent the Indemnity Agreements from being produced by Defendants subject to a new protective order in the ordinary course of discovery in this litigation.

12.     <u>Modification</u>. This Order shall not prevent any party from applying to the Court for modification of the Order or for further relief.

13.     <u>Continuing Jurisdiction</u>. This Court shall retain jurisdiction to enforce the terms of this Order.

The undersigned counsel of record for the parties hereby stipulate and consent to entry of the foregoing Stipulated Protective Order.

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: ___7/23/19___

_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

STIPULATED AND AGREED:

By: _____    By: _____

Dated: ___07/09/19_____    Dated: _____

JOHNSON GRAY, LLC                BRYAN CAVE LEIGHTON PAISNER LLP
Anthony D. Gray, # 51534         Dale A. Guariglia, Mo. Bar 32988
319 North 4th Street, Suite 212  Erin L. Brooks, Mo. Bar 62764
St. Louis, MO 63102              One Metropolitan Square
agray@johnsongraylaw.com         211 N. Broadway, Suite 3600
                                 St. Louis, Missouri 63102
                                 daguariglia@bclplaw.com
                                 erin.brooks@bclplaw.com


KEANE LAW LLC                    MORGAN LEWIS & BOCKIUS, LLP
Ryan A. Keane, # 62112           John McGahren, Esq. (ID 046791990N)
Alex Braitberg, # 67045          (*Pro hac vice*)
7777 Bonhomme Ave., Ste. 1600    Stephanie Feingold, Esq. (ID 23182005N)
St. Louis, MO 63105              (*Pro hac vice*)
ryan@keanelawllc.com             502 Carnegie Center
alex@keanelawllc.com             Princeton, NJ 08540
                                 John.mcgahren@morganlewis.com
                                 stephanie.feingold@morganlewis.com


COOPER LAW FIRM, L.L.C.          *Attorneys for Defendants Cotter Corporation*
Barry J. Cooper, Jr.             *(N.S.L.), Commonwealth Edison Company,*
Celeste Brustowicz               *Exelon Corporation, and Exelon Generation*
508 St. Philip Street            *Company, LLC*
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

Electronically Filed - St Louis County - July 11, 2019 - 05:01 PM

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: _____

_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

STIPULATED AND AGREED:

By: _____       By: _____

Dated: __7/11/19_____       Dated: _____

JOHNSON GRAY, LLC                    BRYAN CAVE LEIGHTON PAISNER LLP
Anthony D. Gray, # 51534             Dale A. Guariglia, Mo. Bar 32988
319 North 4th Street, Suite 212      Erin L. Brooks, Mo. Bar 62764
St. Louis, MO 63102                  One Metropolitan Square
agray@johnsongraylaw.com             211 N. Broadway, Suite 3600
                                     St. Louis, Missouri 63102
                                     daguariglia@bclplaw.com
                                     erin.brooks@bclplaw.com


KEANE LAW LLC                        MORGAN LEWIS & BOCKIUS, LLP
Ryan A. Keane, # 62112               John McGahren, Esq. (ID 046791990N)
Alex Braitberg, # 67045              (*Pro hac vice*)
7777 Bonhomme Ave., Ste. 1600        Stephanie Feingold, Esq. (ID 23182005N)
St. Louis, MO 63105                  (*Pro hac vice*)
ryan@keanelawllc.com                 502 Carnegie Center
alex@keanelawllc.com                 Princeton, NJ 08540
                                     John.mcgahren@morganlewis.com
                                     stephanie.feingold@morganlewis.com

COOPER LAW FIRM, L.L.C.              *Attorneys for Defendants Cotter Corporation*
Barry J. Cooper, Jr.                 *(N.S.L.), Commonwealth Edison Company,*
Celeste Brustowicz   1525 Religious St.   *Exelon Corporation, and Exelon Generation*
~~508 St. Philip Street~~            *Company, LLC*
New Orleans, LA ~~70116~~ 70130
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

7

Electronically Filed - St Louis County - October 01, 2019 - 04:14 PM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and | ) | |
| all others similarly situated, | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| COTTER CORPORATION, et al., | ) | Division No. 17 |
| | ) | |
| Defendants. | ) | |

## **NOTICE OF HEARING**

BE ADVISED THAT a hearing on Clayborne & Wagner, LLP's Motion to Withdraw as Counsel has been set on Friday, October 18, 2019 at 9:00 a.m., before the Honorable Joseph Walsh, at the St. Louis County Courthouse located at 105 S. Central Avenue, Clayton, Missouri, at which time and place you may appear if you so desire.

Respectfully Submitted,

CLAYBORNE, SABO & WAGNER LLP

/s/ *James F. Clayborne*
James F. Clayborne, #45627
Jennifer C. Pitzer, #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com

Electronically Filed - St Louis County - October 01, 2019 - 04:14 PM

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 1st day of October, 2019, he caused a true and correct copy of **Notice of Hearing** to be e-filed and served upon all attorneys of record via the Court's electronic filing system.

/s/ *James F. Clayborne*

Electronically Filed - St Louis County - October 01, 2019 - 04:12 PM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and | ) | |
| all others similarly situated, | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| COTTER CORPORATION, et al., | ) | Division No. 17 |
| | ) | |
| Defendants. | ) | |

## **MOTION TO WITHDRAW AS COUNSEL**

COMES NOW the law firm of CLAYBORNE & WAGNER LLP, and hereby move to Withdraw as Counsel for Plaintiff, TAMIA BANKS, on behalf of herself and all others similarly situated in the above-captioned matter, and as grounds for same, state as follows:

1.      That on or about June 7, 2019 we filed an Entry of Appearance for James F. Clayborne and Jennifer C. Pitzer on behalf of Plaintiff, TAMIA BANKS, on behalf of herself and all others similarly situated in the above-captioned matter.

2.      That it has recently come to our attention that representing Plaintiff, TAMIA BANKS, on behalf of herself and all others similarly situated in the above-captioned matter creates a conflict with an already existing client.

4.      That we have not been able to obtain a signed waiver from our existing client.

WHEREFORE, CLAYBORNE & WAGNER LLP, prays this Court enter an order allowing our firm to withdraw as counsel for Plaintiff, TAMIA BANKS, on behalf of herself and all others similarly situated in the above-captioned matter.

Electronically Filed - St Louis County - October 01, 2019 - 04:12 PM

Respectfully Submitted,

CLAYBORNE, SABO & WAGNER LLP

/s/ *James F. Clayborne*

James F. Clayborne, #45627
Jennifer C. Pitzer, #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 1st day of October, 2019, he caused a true and correct copy of **Motion to Withdraw as Counsel** to be e-filed and served upon all attorneys of record via the Court's electronic filing system.

/s/ *James F. Clayborne*

Electronically Filed - St Louis County - October 11, 2019 - 03:51 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No.  18SL-CC00617-01 |
| v. | Div.  17 |
| COTTER CORPORATION., et al., | |
| Defendants. | |

## NOTICE OF HEARING

YOU ARE HEREBY NOTIFIED that Plaintiff, by and through her attorneys of record, will call up for hearing Plaintiff's Motion for Leave to File Second Amended Class Action Petition in St. Louis County Circuit Court Division 17 on Friday, October 18, 2019 at 9:00 a.m. or as soon thereafter as counsel may be heard.

Dated: October 11, 2019

Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, # 67988
7777 Bonhomme Ave, Ste 1600
St. Louis, MO 63105
Ph: (314) 391-4700
Fx: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385- 9500
agray@johnsongraylaw.com

1

Electronically Filed - St Louis County - October 11, 2019 - 03:51 PM

and

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 11, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>COTTER CORPORATION., et al.,<br><br>    Defendants. | Case No.  18SL-CC00617-01<br><br>Div.  17 |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE
SECOND AMENDED CLASS ACTION PETITION**

COMES NOW Plaintiff Tamia Banks, by and through her attorneys, and for her Motion for Leave to File Second Amended Class Action Petition pursuant to Missouri Rule of Civil Procedure 52 and 55.33, states as follows:

1. On February 18, 2018, Plaintiff Banks filed this class action lawsuit against Defendants and, on April 2, 2018, Plaintiff filed an Amended Class Action Petition.

2. On April 18, 2018, Defendants removed this case to federal court.

3. On March 29, 2019, after extensive briefing and oral argument, the District Court for the Eastern District of Missouri entered an order remanding this case back to St. Louis County Circuit Court.

4. Plaintiff Banks resides in and owns real property that has been contaminated by Defendants' conduct.

5. By way of amendment to her Petition, Plaintiff Banks now seeks to add additional Plaintiffs and seeks to drop two Defendants.

1

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

6.      Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, the proposed additional named Plaintiffs (hereinafter "Additional Plaintiffs"), also reside in and/or own real property that has been contaminated by Defendants' conduct.

7.      Plaintiff Banks and the Additional Plaintiffs all reside in and/or own real property located in the Coldwater Creek floodplain.  In addition, Plaintiff Banks and the Additional Plaintiffs are residents and citizens of the State of Missouri.

8.      Plaintiff Banks seeks to add the Additional Plaintiffs as named Plaintiffs pursuant to the Missouri Supreme Court Rules as well as supporting case law.

9.      The proposed Second Amended Class Action Petition also includes amended factual allegations with regard to the liability of certain defendants, and removes Defendants Exelon Corporation and Exelon Generation Company, LLC, as parties to this case.

10.     Rule 52.06 states that "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

11.     Rule 55.33(a) states that "leave to amend pleadings shall be freely given when justice so requires."

12.     Accordingly, Plaintiff seeks leave of this Court to file her Second Amended Class Action Petition, as attached hereto and labeled Exhibit 1.

13.     Missouri courts have held that "motions to amend to add or substitute a party should be freely granted when justice so requires. Missouri rules of procedure provide that a party may amend his pleadings at any time by leave of the court and that such leave should be freely given." *Asmus v. Capital Region Family Practice*, 115 S.W.3d 427, 432 (Mo. App. W.D. 2003) (citing Rules 52.06 and 55.33(a) and *Sher v. Chand,* 889 S.W.2d 79, 83 (Mo. App. E.D. 1994)).

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

"Furthermore, the trial judge has broad discretion to permit amendment of the pleadings at any stage of the proceedings, even after verdict." *Id.*

14.     In addition, Rule 52.05(a) allows for joinder of persons who are not "necessary parties" but have a common legal or factual interest in the case.  The rule provides for joinder of parties as plaintiffs or defendants:  "All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action."  MO. R. CIV. P. 52.05(a).

15.     Plaintiff Banks and the Additional Plaintiffs are all directly affected by Defendants' conduct, and all seek relief arising out of same conduct that caused contamination of their property.

16.     Adding the Additional Plaintiffs to this action will not prejudice Defendants, nor will the inclusion of the Additional Plaintiffs cause any undue delay.  No trial date has been set in this case, and no scheduling or discovery order has been entered by the Court.  As such, Plaintiff's Motion for Leave to Amend should be freely given.

17.     As of the date of this filing, only Defendant City of St. Louis, by and through its counsel, consented to Plaintiff's request to file a Second Amended Petition.  The other remaining Defendants have not stated yet whether they consent or oppose.

WHEREFORE, Plaintiff Banks prays that this Court grant Plaintiff's Motion for Leave to File Second Amended Class Action Petition, as attached hereto as Exhibit 1, and for such other and further relief as this Court deems proper.

Dated: October 11, 2019                     Respectfully submitted,

                                            KEANE LAW LLC

                                            /s/ *Nathaniel R. Carroll*
                                            Ryan A. Keane, # 62112

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

Nathaniel R. Carroll, # 67988
7777 Bonhomme Ave, Ste 1600
St. Louis, MO 63105
Ph: (314) 391-4700
Fx: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385- 9500
agray@johnsongraylaw.com

and

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:   304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

4

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 11, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS,** ) | |
| **BARBARA HOOKS, JOEL HOGAN,** ) | |
| **KENNETH NIEBLING, KENDALL LACY,** ) | |
| **TANJA LACY, WILLIE CLAY,** ) | |
| **BOBBIE JEAN CLAY, ANGELA STATUM,** ) | |
| **and MISSOURI RENTALS** ) | |
| **COMPANY, LLC, on behalf of themselves** ) | |
| **and all others similarly situated,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | **Cause No. 18SL-CC00617** |
| ) | |
| **vs.** ) | **Division No.   2** |
| ) | |
| **COTTER CORPORATION,** ) | |
| **COMMONWEALTH EDISON COMPANY,** ) | **JURY TRIAL DEMANDED** |
| **DJR HOLDINGS, INC. f/k/a FUTURA** ) | |
| **COATINGS, INC., and ST. LOUIS** ) | |
| **AIRPORT AUTHORITY, A** ) | |
| **DEPARTMENT OF THE CITY OF** ) | |
| **ST. LOUIS** ) | |
| ) | |
| **Defendants.** ) | |

## SECOND AMENDED CLASS ACTION PETITION

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan,

Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and

Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by and

through counsel, and for their Second Amended Class Action Petition and causes of action against

Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura

Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states

and alleges as follows:

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City highly concentrated uranium with abnormal levels of radium from Africa. This particular ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants negligently moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis City to the St. Louis Airport, then to Hazelwood.

2.      Radioactive materials have been and will likely continue to be stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") part of which later became the Hazelwood Interim Storage Site ("HISS"). The Latty Avenue site and the HISS site are contained in the properties located at 9170 Latty Avenue and 9200 Latty Avenue in Hazelwood, Missouri.

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

and prodding their backyards and sampling the dust of their vacuum cleaners to identify the quantity and toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which consists of businesses and homes, surrounding the Coldwater Creek carries the distinct fingerprint (or profile) of the ore which had been processed in St. Louis and possessed by Defendants and/or their predecessors in interest.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the local public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on a limited class of victims.

8.      Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiffs for their

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

damages, and provide further relief as set forth below in this Petition.

9.      Pursuant to Missouri common law applicable at the time of Defendants' tortious conduct, which occurred prior to the 2005 enactment of R.S.Mo. § 537.067, Defendants are jointly and severally liable for any and all damages Plaintiffs and the Class have sustained as a result of Defendants' negligent handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental, consequential, nuisance, and trespass damages.

10.     Upon information and belief, by acquiring and continuing to operate ongoing operations throughout time, Defendants are liable for acts and omissions and the consequential damages caused by their predecessors in interest. To the extent that Defendants provided indemnity or committed fraud, they are liable to those to whom they sold or lease the ongoing operations.

11.     Upon information and belief, the properties of all Plaintiffs and the putative class are impacted by uranium mill tailings. The source of the radioactivity is small, microscopic particles yet containable when properly handled. These particles contain hazardous carcinogenic, harmful toxics, and other radioactive substances known as uranium and thorium and their daughter products. Such radioactive waste is legally and commonly referred to as "uranium mill tailings," which result from the processing of uranium ore.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri and out of torts committed solely in Missouri by resident and non-resident defendants.

13.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in the locality of St. Louis County,

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

Missouri.

14.     Plaintiffs do not allege any causes of action arising under any laws of the United States.

15.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act, because:

      A.     Coldwater Creek is not and has never been a licensed nuclear facility.

      B.     Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

      C.     Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

      D.     Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

      E.     Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims offending traditional state regulations and do not implicate the Price-Anderson Act and its textually manifest objectives related to liability limitation and indemnification.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic mill tailings at issue in this Petition.

## THE PARTIES

### Plaintiffs

Electronically Filed - St. Louis County - October 11, 2019 - 03:50 PM

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Tamia Banks first learned that her property was in the zone of contamination in 2018.

19.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

20.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek.  His home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

21.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one hundred year flood

plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

22.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

23.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

24.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

25.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

        7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
        8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
        8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one hundred year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

26.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including damages to their Property and the loss of use and enjoyment, thereof.

**Defendants**

27.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive mill tailings: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

28.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately after announcing that there was no radioactive contamination on the properties upon which it operated. It was then sold to General Atomics in 2000.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

A. Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

B. This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition.

29.    Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001.

A. ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality.

B. When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Petition. ComEd furthermore assumed the environmental safety and health

9

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter had operated and which it knowingly and intentionally abandoned immediately prior to its announced sale to ComEd. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter. After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter was the proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

C.  This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of state law and damage to property alleged in the Petition.

30.    DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

31.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs file this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

33.     Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

34.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

35.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

**All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest**

---

[1]FEMA.GOV, https://msc.fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor (last visited September 24, 2019).

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

**and Old Halls Ferry Road to the northeast, as shown in blue in the map in Figure 1 below.**

### Figure 1. Class Area



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

36.    The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

**All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

37.    Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

38.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

39.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

  a. Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

  b. Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

  c. Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property;

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

d.  Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property;

e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property;

f.  Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

g.  Whether Plaintiffs and Class are entitled to damages; and

h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

40.  The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

41.  Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

42.  Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

43.  Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law

14

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

resulting in harm to thousands of Missouri citizens.

44.    A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

45.    Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

46.    There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

47.    All of the class members are citizens of Missouri.

48.    The principal injuries resulting from the conduct of the Defendants were incurred

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

in Missouri.

49. The conduct alleged in this Petition took place in Missouri.

A. The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis

B. All transportation of radioactive waste alleged herein took place in Missouri

C. All processing of radioactive wastes alleged herein took place in Missouri.

D. All storage of radioactive waste alleged herein took place in Missouri.

50. Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

51. No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

52. For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

## FACTS

### Radioactive Wastes

53. Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

54. Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

55. Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

56.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

57.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

58.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can include damages to the skin, reproductive system, blood forming

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes." *See* Radiation Health Effects, EPA.GOV, https://www.epa.gov/radiation/radiation-health-effects (last visited September 24, 2019).

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

59.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

60.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

61.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[34]

**Radioactive Waste in the St. Louis Area**

---

[3] *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 199 6-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.
[4] *See* Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_Interi mSto_PHA-508.pdf.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

62.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[5]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

63.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

64.     The wastes created by processing at the SLDS are known in the scientific and regulatory communities as Uranium Mill Tailings and were created as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt.

65.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive mill tailings from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

66.     Radioactive mill tailings accumulated locally at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored locally at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

67.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive mill tailings that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

---

[5]  *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

68.     These mill tailings, which contained valuable metals, were sold and shipped to various other local destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

69.     In the late 1960's, Cotter and/or its predecessors in interest, and its successors, purchased the hazardous, toxic, carcinogenic radioactive mill tailings associated with both SLAPS and the Latty Avenue Site.

70.     Upon information and belief, as part of the contract between Cotter and/or its predecessors in interest and the federal government for sale of the radioactive waste, Cotter assumed all liability, including ultimate disposition of the waste.

71.     Cotter and/or its predecessors in interest did not receive indemnity from the government in connection with this transaction.

72.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue sites.

73.     Upon information and belief, Cotter did not have a license to handle or dispose of enriched thorium.

74.     Transport and migration of hazardous, toxic and radioactive mill tailings to/from the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

75.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

76.     Hundreds of thousands of tons of hazardous, toxic, and radioactive mill tailings were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

77.     From 1953, the property was managed and operated by Mallinckrodt.

78.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

79.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

80.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Latty Avenue Site**

81.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

82.     Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos purchased and/or leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

83.     Despite knowing that significant activities involving radioactive material were conducted on the site, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

### Coldwater Creek

84.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

85.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

86.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

87.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

88.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

89.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

90.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

91.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

92.     Plaintiffs' properties are contaminated by radioactive material.

93.     Samples taken on and around Plaintiffs' properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

94.     Plaintiffs' properties neighbor Coldwater Creek and are within its flood plain.  This proximity puts the Plaintiffs' properties in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

95.     The radioactive contamination that has polluted the Plaintiffs' properties and continues to threaten to further pollute the Plaintiffs' properties match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

96.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

97.     Radioactive contamination of the Plaintiffs' properties renders the Plaintiffs' properties unfit for normal use and enjoyment, creates a stigma attached to the properties, and destroys their fair market value.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

99.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

100.    Plaintiff Tamia Banks owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

101.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control the Hooks Property located at 13712 Old Halls Ferry Rd., Florissant, Missouri, more particularly described above.

102.    Plaintiff Joel Hogan owns and controls the Hogan Property located at 435 Moule Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

103.    Plaintiff Kenneth Niebling owns and controls the Niebling Property located at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

104.    Plaintiffs Kendall Lacy and Tonja Lacy own and control the Lacy Property located at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

105.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control the Clay Property located at 9 Cricket Court, Florissant, Missouri, more particularly described above.

106.    Plaintiff Angela Statum owns and controls the Statum Property located at 7565 Hazelcrest Drive, Florissant, Missouri, more particularly described above.

107.    Plaintiff Missouri Rentals Company, LLC owns and controls the Missouri Rentals Properties, as more particularly described above and listed as follows:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

108.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

109.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

110.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

111.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

112.    Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

113.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

114.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

115.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

116.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

117.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

118.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

119.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

120.    The migration of Radon gas and radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

121.    Plaintiffs did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

122.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

123.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

<div align="center">

**COUNT II – PERMANENT NUISANCE**
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

</div>

124.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

126.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

127.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

128.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

129.   Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

130.   Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

131.   Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

132.   Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

133.   Defendants unreasonably and unlawfully stored and used radioactive materials at SLAPS, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' property.

134.   The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

135.   The radioactive contamination created a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

136.   Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

137.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

138.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

**COUNT III – TEMPORARY NUISANCE**
**(brought individually and on behalf of the Property Damage Subclass)**

139.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

140.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

141.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

142.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

143.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

144.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

145.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

146.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

147.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

148.    Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS Site, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' properties.

149.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' properties.

150.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

151.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

152.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

153.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

154.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

155.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

156.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

157.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

158.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

159.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

160.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances

into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

161.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

162.     Defendants failed to act to prevent their releases from harming Plaintiffs.

163.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

164.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

165.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

166.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

167.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

168.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

169.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

170.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

171.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

172.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

173.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

174.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

175.    Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

176.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

177.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

180.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

181.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

182.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

183.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

184.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

185.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

186.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.     Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

188.     The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

189.     The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

190.     The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

191.     Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

192.     Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

193.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

## COUNT VIII – PUNITIVE DAMAGES
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

194.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

195.    Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

196.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

197.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

## COUNT IX – CIVIL CONSPIRACY
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

198.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.    Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

200.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

201.     As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

### COUNT X – INVERSE CONDEMNATION

**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

202.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

203.     The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

204.     The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

205.     The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

206.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

207.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

208.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

209.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

210.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

211.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

213.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

214.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

215.    As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

216.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

218.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

219.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

220.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.  an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c.  an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d.  costs and attorney fees;

e.  interest on the above amounts as allowed by law;

f.  for appropriate injunctive and equitable relief, as permitted by law or equity

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

g.  for any further relief this Court deems just and proper.

Dated:  October 11, 2019                     Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Electronically Filed - St Louis County - October 11, 2019 - 03:50 PM

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:   304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 11, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

In the
# CIRCUIT COURT
of St. Louis County, Missouri



[ For File Stamp Only ]

**FILED IN DIV. 17**

OCT 18 2019

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

Plaintiff(s) _Tamia Banks_

vs.

Defendant(s) _Cotter Corporation et al._

Date: 10/18/2019

Case Number: 18SL-CC00617-01

Division: 17

## ORDER

Cause called for hearing on Attorney James Clayborne's Motion to Withdraw. Attorney Clayborne appears along with Plaintiff's additional counsel, Ryan Keane, Anthony Gray, and Nathaniel Carroll. The Motion to Withdraw is granted.

Plaintiff's Motion for Leave to File Second Amended Petition is also called for hearing, and argument is heard. The Second Amended Petition adds additional Plaintiffs and removes Defendants Exelon Generation Company LLC and Exelon Corporation. Exelon Generation Company LLC and Exelon Corporation are hereby Dismissed Without Prejudice. The Second Amended Petition does not change any causes of action, and does not make any substantive changes except as noted above. Motion for Leave is hereby Granted.

**SO ORDERED**

Attorney _____ #U2704

Address _Bryan Cave Leighton Paisner LLP_

Phone No. _____ Fax No. _____

Attorney _Atty for PMA_ #63112

Bar No. _____

Address _____

Judge _Div 17_

ENTERED: 10/18/19
(Date)

Phone No. _314-881-6124_ #7022 Fax No.

for DJR  JANSKY

CCOPR47-WS   Rev. 02/14

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS,** | ) | |
| **BARBARA HOOKS, JOEL HOGAN,** | ) | |
| **KENNETH NIEBLING, KENDALL LACY,** | ) | |
| **TANJA LACY, WILLIE CLAY,** | ) | |
| **BOBBIE JEAN CLAY, ANGELA STATUM,** | ) | |
| **and MISSOURI RENTALS** | ) | |
| **COMPANY, LLC, on behalf of themselves** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Cause No. 18SL-CC00617** |
| | ) | |
| **vs.** | ) | **Division No.  2** |
| | ) | |
| **COTTER CORPORATION,** | ) | |
| **COMMONWEALTH EDISON COMPANY,** | ) | **JURY TRIAL DEMANDED** |
| **DJR HOLDINGS, INC. f/k/a FUTURA** | ) | |
| **COATINGS, INC., and ST. LOUIS** | ) | |
| **AIRPORT AUTHORITY, A** | ) | |
| **DEPARTMENT OF THE CITY OF** | ) | |
| **ST. LOUIS** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**SECOND AMENDED CLASS ACTION PETITION**</u>

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan,

Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and

Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by and

through counsel, and for their Second Amended Class Action Petition and causes of action against

Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura

Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states

and alleges as follows:

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City highly concentrated uranium with abnormal levels of radium from Africa. This particular ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants negligently moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis City to the St. Louis Airport, then to Hazelwood.

2.      Radioactive materials have been and will likely continue to be stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") part of which later became the Hazelwood Interim Storage Site ("HISS"). The Latty Avenue site and the HISS site are contained in the properties located at 9170 Latty Avenue and 9200 Latty Avenue in Hazelwood, Missouri.

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

and prodding their backyards and sampling the dust of their vacuum cleaners to identify the quantity and toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which consists of businesses and homes, surrounding the Coldwater Creek carries the distinct fingerprint (or profile) of the ore which had been processed in St. Louis and possessed by Defendants and/or their predecessors in interest.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the local public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on a limited class of victims.

8.      Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiffs for their

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

damages, and provide further relief as set forth below in this Petition.

9.      Pursuant to Missouri common law applicable at the time of Defendants' tortious conduct, which occurred prior to the 2005 enactment of R.S.Mo. § 537.067, Defendants are jointly and severally liable for any and all damages Plaintiffs and the Class have sustained as a result of Defendants' negligent handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental, consequential, nuisance, and trespass damages.

10.     Upon information and belief, by acquiring and continuing to operate ongoing operations throughout time, Defendants are liable for acts and omissions and the consequential damages caused by their predecessors in interest. To the extent that Defendants provided indemnity or committed fraud, they are liable to those to whom they sold or lease the ongoing operations.

11.     Upon information and belief, the properties of all Plaintiffs and the putative class are impacted by uranium mill tailings. The source of the radioactivity is small, microscopic particles yet containable when properly handled. These particles contain hazardous carcinogenic, harmful toxics, and other radioactive substances known as uranium and thorium and their daughter products. Such radioactive waste is legally and commonly referred to as "uranium mill tailings," which result from the processing of uranium ore.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri and out of torts committed solely in Missouri by resident and non-resident defendants.

13.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in the locality of St. Louis County,

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

Missouri.

14.     Plaintiffs do not allege any causes of action arising under any laws of the United States.

15.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act, because:

    A.     Coldwater Creek is not and has never been a licensed nuclear facility.

    B.     Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

    C.     Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

    D.     Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

    E.     Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims offending traditional state regulations and do not implicate the Price-Anderson Act and its textually manifest objectives related to liability limitation and indemnification.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic mill tailings at issue in this Petition.

## **THE PARTIES**

### **Plaintiffs**

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Tamia Banks first learned that her property was in the zone of contamination in 2018.

19.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

20.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek.  His home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

21.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one hundred year flood

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

22.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

23.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

24.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

25.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one hundred year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

26.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including damages to their Property and the loss of use and enjoyment, thereof.

**Defendants**

27.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive mill tailings: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

28.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately after announcing that there was no radioactive contamination on the properties upon which it operated. It was then sold to General Atomics in 2000.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

    A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

    B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition.

29.    Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001.

    A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality.

    B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Petition. ComEd furthermore assumed the environmental safety and health

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter had operated and which it knowingly and intentionally abandoned immediately prior to its announced sale to ComEd. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter. After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter was the proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

C. This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of state law and damage to property alleged in the Petition.

30. DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from

10

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

31.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs file this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

33.     Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

34.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

35.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest**

---

[1] FEMA.GOV,
https://msc.fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor (last visited September 24, 2019).

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

**and Old Halls Ferry Road to the northeast, as shown in blue in the map in Figure 1 below.**

<div align="center">

**Figure 1. Class Area**

</div>



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

36.     The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

37.     Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

38.    The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

39.    Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

    a.    Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

    b.    Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

    c.    Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property;

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

    d.  Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property;

    e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property;

    f.  Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

    g.  Whether Plaintiffs and Class are entitled to damages; and

    h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

40.    The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

41.    Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

42.    Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

43.    Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

resulting in harm to thousands of Missouri citizens.

44.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

45.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

46.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

47.     All of the class members are citizens of Missouri.

48.     The principal injuries resulting from the conduct of the Defendants were incurred

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

in Missouri.

49.     The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive wastes alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri.

50.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

51.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

52.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

<u>**FACTS**</u>

<u>**Radioactive Wastes**</u>

53.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

54.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

55.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

56.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

57.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

58.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can include damages to the skin, reproductive system, blood forming

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes." *See* Radiation Health Effects, EPA.GOV, https://www.epa.gov/radiation/radiation-health-effects (last visited September 24, 2019).

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

59.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

60.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

61.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[34]

**Radioactive Waste in the St. Louis Area**

---

[3] *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 1996-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.
[4] *See* Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_InterimSto_PHA-508.pdf.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

62.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[5]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

63.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

64.     The wastes created by processing at the SLDS are known in the scientific and regulatory communities as Uranium Mill Tailings and were created as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt.

65.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive mill tailings from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

66.     Radioactive mill tailings accumulated locally at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored locally at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

67.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive mill tailings that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

---

[5]  *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

68.     These mill tailings, which contained valuable metals, were sold and shipped to various other local destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

69.     In the late 1960's, Cotter and/or its predecessors in interest, and its successors, purchased the hazardous, toxic, carcinogenic radioactive mill tailings associated with both SLAPS and the Latty Avenue Site.

70.     Upon information and belief, as part of the contract between Cotter and/or its predecessors in interest and the federal government for sale of the radioactive waste, Cotter assumed all liability, including ultimate disposition of the waste.

71.     Cotter and/or its predecessors in interest did not receive indemnity from the government in connection with this transaction.

72.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue sites.

73.     Upon information and belief, Cotter did not have a license to handle or dispose of enriched thorium.

74.     Transport and migration of hazardous, toxic and radioactive mill tailings to/from the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

75.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

76.    Hundreds of thousands of tons of hazardous, toxic, and radioactive mill tailings were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

77.    From 1953, the property was managed and operated by Mallinckrodt.

78.    By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

79.    In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

80.    Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Latty Avenue Site**

81.    Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

82.    Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos purchased and/or leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

83.     Despite knowing that significant activities involving radioactive material were conducted on the site, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

### Coldwater Creek

84.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

85.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

86.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

87.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

88.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

89.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

90.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

91.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

92.     Plaintiffs' properties are contaminated by radioactive material.

93.     Samples taken on and around Plaintiffs' properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

94.     Plaintiffs' properties neighbor Coldwater Creek and are within its flood plain.  This proximity puts the Plaintiffs' properties in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

95.     The radioactive contamination that has polluted the Plaintiffs' properties and continues to threaten to further pollute the Plaintiffs' properties match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

96.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

97.     Radioactive contamination of the Plaintiffs' properties renders the Plaintiffs' properties unfit for normal use and enjoyment, creates a stigma attached to the properties, and destroys their fair market value.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)

99.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

100.    Plaintiff Tamia Banks owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

101.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control the Hooks Property located at 13712 Old Halls Ferry Rd., Florissant, Missouri, more particularly described above.

102.    Plaintiff Joel Hogan owns and controls the Hogan Property located at 435 Moule Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

103.    Plaintiff Kenneth Niebling owns and controls the Niebling Property located at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

104.    Plaintiffs Kendall Lacy and Tonja Lacy own and control the Lacy Property located at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

105.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control the Clay Property located at 9 Cricket Court, Florissant, Missouri, more particularly described above.

106.    Plaintiff Angela Statum owns and controls the Statum Property located at 7565 Hazelcrest Drive, Florissant, Missouri, more particularly described above.

107.    Plaintiff Missouri Rentals Company, LLC owns and controls the Missouri Rentals Properties, as more particularly described above and listed as follows:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

108.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

109.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

110.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

111.   Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

112.   Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

113.   Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

114.   It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

115.   Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

116.   Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

117.   Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

118.   Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

119.   It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

120.   The migration of Radon gas and radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

121.    Plaintiffs did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

122.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

123.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

### COUNT II – PERMANENT NUISANCE
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

124.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

126.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

127.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

128.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

129.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

130.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

131.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

132.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

        7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
        8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
        8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

133.    Defendants unreasonably and unlawfully stored and used radioactive materials at SLAPS, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' property.

134.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

135.    The radioactive contamination created a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

136.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

enjoyment of their property.   Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

137.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

138.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

139.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

140.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

141.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

142.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

143.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

144.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

145.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

146.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

147.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

148.    Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS Site, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' properties.

149.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' properties.

150.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

151.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

152.     Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

153.     Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

154.     As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

155.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

156.     Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

157.     Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

158.     Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

159.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

160.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

161.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

162.     Defendants failed to act to prevent their releases from harming Plaintiffs.

163.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

164.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

32

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

165.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

166.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

167.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

168.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

169.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

**COUNT V – NEGLIGENCE PER SE**
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

170.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

171.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

172.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

173.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

174.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

175.    Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

176.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

177.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

180.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

181.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

182.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

183.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

184.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

185.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

186.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.     Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

188.     The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

189.     The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

190.     The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

191.     Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

192.     Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

193.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

194.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

195.    Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

196.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

197.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

### COUNT IX – CIVIL CONSPIRACY
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

198.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.    Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

200.    Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

201.    As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

## COUNT X – INVERSE CONDEMNATION

**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

202.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

203.    The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

204.    The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

205.    The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

206.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

207.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

208.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

209.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

210.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

## COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
### (brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

211.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

213.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

214.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

215.    As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

216.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

218.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

219.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

220.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.  an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c.  an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d.  costs and attorney fees;

e.  interest on the above amounts as allowed by law;

f.  for appropriate injunctive and equitable relief, as permitted by law or equity

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Dated:  October 29, 2019                   Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:  304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 29, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

43

Electronically Filed - St Louis County - October 29, 2019 - 04:59 PM

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | Cause No. 18SL-CC00617-01 |
| | Division No. 18 |
| **Plaintiffs,** )<br>) | |
| **vs.** )<br>) | |
| **COTTER CORPORATION and COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Defendants.** )<br>) | |

## COMMONWEALTH EDISON COMPANY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Pursuant to Missouri Rules of Civil Procedure 55.27(a)(2) and 55.27(a)(6), Defendant Commonwealth Edison Company ("ComEd") hereby moves to dismiss the second amended class-action complaint ("SAP") of Plaintiffs for lack of personal jurisdiction and failure to state a claim against ComEd.[1] Plaintiffs originally asserted twelve counts alleging that defendants' collective conduct caused radioactive materials to contaminate and damage their property, and Plaintiffs' new filing alleges no additional facts that would allow this Court to exercise personal jurisdiction over ComEd or grant the relief Plaintiffs seek.

---

[1] ComEd also joins the Motion to Dismiss filed by Defendant Cotter Corporation (N.S.L.) on November 8, 2019, and the arguments set forth therein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

ComEd concurrently files and incorporates by reference its Memorandum of Law in Support of its Motion to Dismiss. A proposed order will also be filed concurrently.

First, Plaintiffs do not allege any connection between ComEd and Missouri that can confer personal jurisdiction over ComEd.  Plaintiffs fail to allege any new facts in their SAP that would preclude dismissal on personal jurisdiction grounds. Rather than showing that ComEd maintains minimum contacts with Missouri, Plaintiffs instead attempt to manufacture personal jurisdiction based on: (1) other Missouri actions in which ComEd was sued, without regard to whether ComEd was properly named or consented to jurisdiction; (2) ComEd's parent-subsidiary relationship with defendant Cotter Corporation (N.S.L.) ("Cotter"); and (3) the existence of an alleged indemnity agreement to which Plaintiffs have no connection. None of Plaintiffs' misguided theories provides a basis for this Court to exercise personal jurisdiction over ComEd, as explained in more detail in ComEd's Memorandum of Law.

Plaintiffs' efforts to concoct personal jurisdiction instead reflect that ComEd: (1) is not registered to do business in Missouri; (2) is not otherwise doing business in Missouri; (3) has not transacted business in Missouri with respect to any matter which is the subject of the SAP filed in this action; (4) does not offer any products or services within Missouri; (5) has no employees in Missouri; (6) does not own or lease any real property or facilities in Missouri; and (7) does not maintain an office to do business in Missouri. Plaintiffs do not allege any new facts in their SAP that would suggest that ComEd has any such contacts with Missouri. Instead, Plaintiffs raise only conclusory allegations that are bereft of any factual support. For these reasons, this Court lacks personal jurisdiction over ComEd and the action must be dismissed as to it.

Second, Plaintiffs cannot establish liability against ComEd based solely on its alleged parent-child relationship with Cotter. As an initial matter, Plaintiffs allege that Cotter committed

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

certain wrongful acts through 1973, and that Cotter *later* became a subsidiary of ComEd. ComEd cannot possibly be liable for the alleged wrongful acts of a corporation that was, even according to *Plaintiffs' own allegations*, not its subsidiary at any time relevant to the SAP. But even if ComEd *had* been Cotter's parent corporation when the allegedly wrongful acts were committed, parent corporations are generally not liable for the acts or omissions of their subsidiaries. Plaintiffs do not allege an alter ego or agency relationship between Cotter and ComEd, nor can Plaintiffs establish such a relationship under the facts alleged, making any exceptions to this general rule inapplicable here. Plaintiffs also fail to allege any of the facts necessary to successfully plead their conspiracy and fraud claims. Plaintiffs' SAP fails to cure the defects of either of its earlier filings, and does not adequately allege that ComEd has ever had enough control over Cotter for the two to be considered a single entity. Accordingly, the SAP must be dismissed as to ComEd.

For these reasons, as well as those set forth in ComEd's Memorandum of Law, the Court should dismiss Plaintiffs' SAP as to ComEd with prejudice and award such further relief as the Court deems appropriate under the circumstances.

Dated: November 8, 2019                           Respectfully Submitted,

                                                  */s/ Erin Brooks*
                                                  _____
                                                  BRYAN CAVE LEIGHTON PAISNER LLP
                                                  Dale A. Guariglia, Mo. Bar 32988
                                                  daguariglia@bclplaw.com
                                                  Erin L. Brooks, Mo. Bar 62764
                                                  erin.brooks@bclplaw.com
                                                  One Metropolitan Square
                                                  211 N. Broadway, Suite 3600
                                                  St. Louis, Missouri 63102
                                                  (314) 259-2000 (telephone)
                                                  (314) 259-2020 (facsimile)

601317622.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (ID 046791990N)
*Admitted Pro hac vice*
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq. (ID 23182005N)
*Admitted Pro hac vice*
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

ATTORNEYS FOR DEFENDANTS
COMMONWEALTH EDISON COMPANY
AND COTTER CORPORATION (N.S.L.)

601317622.1

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

/s/Erin Brooks
*Attorney for Commonwealth Edison Company
and Cotter Corporation (N.S.L.)*

601317622.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS,** ) | |
| **BARBARA HOOKS, JOEL HOGAN,** ) | |
| **KENNETH NIEBLING, KENDALL LACY,** ) | |
| **TANJA LACY, WILLIE CLAY, BOBBIE** ) | |
| **JEAN CLAY, ANGELA STATUM, and** ) | Cause No. 18SL-CC00617-01 |
| **MISSOURI RENTALS COMPANY, LLC, on** ) | |
| behalf of themselves and all others similarly ) | Division No. 18 |
| situated, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **COTTER CORPORATION and** ) | |
| **COMMONWEALTH EDISON COMPANY,** ) | |
| **DJR HOLDINGS, INC. f/k/a FUTURA** ) | |
| **COATINGS, INC., and ST. LOUIS AIRPORT** ) | |
| **AUTHORITY, A DEPARTMENT OF THE** ) | |
| **CITY OF ST. LOUIS,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**COMMONWEALTH EDISON COMPANY'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Commonwealth Edison Company ("ComEd") hereby submits this memorandum in support of its motion to dismiss the second amended class-action petition ("SAP," Exhibit 4) of Plaintiffs pursuant to Missouri Rules of Civil Procedure 55.27(a)(2) and 55.27(a)(6) for lack of personal jurisdiction and failure to state a claim against ComEd directly. Plaintiffs cannot establish personal jurisdiction over ComEd (a) based on its status as a defendant in other actions in the state, (b) through its purported parent-subsidiary relationship with Cotter Corporation (N.S.L.) ("Cotter") (even though ComEd was not a parent of Cotter during the operative events of the SAP), or (c) through the mere existence of an indemnity agreement. Nor

601317729.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

can Plaintiffs establish liability against ComEd for these reasons. ComEd further joins the Motion to Dismiss filed by Cotter on November 8, 2019, and the arguments set forth therein.

## INTRODUCTION

On or about February 18, 2018, Plaintiff Banks filed a Petition in the Circuit Court of St. Louis County, Missouri, Twenty-First Judicial Circuit, thereby commencing the putative class action styled, *Banks v. Cotter Corporation*, Case No. 18SL-CC00617. (Exhibit 2). On April 2, 2018, Plaintiff Banks filed the first amended class-action complaint ("FAP"), whereby she added a count for civil conspiracy against the defendants. (Exhibit 1). The then-defendants timely removed the action to federal court on April 18, 2018, and the action was remanded to this Court on March 29, 2019. The then-defendants had filed motions to dismiss in federal court, but as part of the remand order, these motions were denied "without prejudice to refiling in state court."

On April 29, 2019, defendants Cotter and ComEd[1] timely refiled their respective motions to dismiss the FAP in this Court.  Argument was set for those motions for June 17, 2019.  That argument was adjourned while the parties engaged in discussions concerning limited pre-motion discovery on jurisdictional issues.  On October 11, 2019, Plaintiffs filed their motion for leave to amend; that motion was granted on October 18, 2019.

On October 29, 2019, Plaintiffs filed the SAP, adding an additional ten (10) Plaintiffs, and removing Exelon Corporation and Exelon Generation Company, LLC as defendants. Plaintiffs also added various allegations and legal conclusions, including allegations that the defendants are jointly and severally liable under Missouri common law for harms because of the defendants' collective negligence, that the defendants are collectively liable for acts and

---

[1] Exelon Generation Company, LLC and Exelon Corporation were also party to those motions.  Those two entities have since been dismissed by Plaintiffs.

601317729.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

omissions and damages caused by their predecessors in interest, and that the radioactive wastes are "mill tailings."  Plaintiffs did not add any new causes of action.

In Plaintiffs' SAP, they allege that, as a result of the various defendants' collective conduct over the span of several decades, radioactive materials were released into the environment in and around the one-hundred-year floodplain of Coldwater Creek located in St. Louis County, Missouri (the "Creek"), contaminating the Plaintiffs' property with radioactive materials and causing various forms of property damage. (*See generally*, SAP ¶¶ 18-31, 84-98).

In their twelve-count SAP, Plaintiffs seek injunctive and monetary relief against all defendants for damages suffered as a result of trespass, permanent nuisance, temporary nuisance, negligence, negligence *per se*, strict liability injuries, and civil conspiracy, sought medical monitoring against all defendants, and asserted claims for inverse condemnation and violations of the Missouri Constitution against the St. Louis Airport Authority only.

## FACTUAL ALLEGATIONS AGAINST DEFENDANT COMED

Plaintiffs sue four (4) defendants, including ComEd and Cotter. Plaintiffs assert that Cotter is a subsidiary of or otherwise related to ComEd. (*See* SAP ¶¶27-31).

Plaintiffs allege that ComEd "is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri." (SAP ¶ 29), and that "[t]he responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001." *Id.*

More specifically, with respect to ComEd, Plaintiffs allege that:

> ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

protection of Missouri laws in St. Louis County courts, and
regularly appears to defend itself in lawsuits tried in that locality.

(SAP ¶ 29(A)). Plaintiffs further allege that jurisdiction exists over ComEd because Plaintiffs'

damages "resulted from the Cotter Defendants'[2] conduct, including acts and omissions within the

State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants,

which gave rise to the violations…" (SAP ¶ 28(B)).  Plaintiffs have failed to identify in any of

their three petitions any examples of ComEd itself engaging in any such activities. Instead,

Plaintiffs only assert conclusory allegations, which this Court does not have to credit without any

factual support.  Under Missouri law, a plaintiff must allege a "short and plain statement of the

facts showing that the pleader is entitled to relief," (Mo. R. Civ. P. 55.05) and ultimate *facts* on

which a jury could return a verdict for the plaintiff must be pleaded.  *R.M.A. by Appleberry v.

Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 (Mo. 2019), *reh'g denied* (Apr. 2, 2019).

The sole allegation with respect to ComEd that, if liberally construed, might be deemed

to speak to its "conduct," is based <u>entirely</u> on its alleged corporate relationship with Cotter.

Plaintiffs sue ComEd because it allegedly "agreed to indemnify Cotter for liabilities associated

with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic,

radioactive wastes as alleged herein." (SAP ¶ 29(A)). According to the SAP, Cotter "was

purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974." (SAP

¶ 28). Then, Plaintiffs claims, "[u]pon the sale of Cotter, ComEd agreed to indemnify Cotter for

certain liabilities associated with these activities." (SAP ¶ 29).

As to Cotter's conduct (which provides the basis for ComEd's purported liability),

Plaintiffs allege, "[b]etween 1969 and 1973, Cotter stored, processed, and transported hazardous,

---

[2] Notably, the term "Cotter Defendants" is not defined.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue Sites." (SAP ¶ 72).

## LEGAL ANALYSIS

**I.      PURSUANT TO MO. R. CIV. P. 55.27(A)(2), THIS ACTION MUST BE DISMISSED AS TO COMED FOR LACK OF PERSONAL JURISDICTION.**

Plaintiffs cannot meet their burden of demonstrating that this Court has personal jurisdiction over ComEd. Plaintiffs do not allege any connection between ComEd and Missouri that can possibly confer personal jurisdiction over ComEd. And their attempts to conjure up minimum contacts by ComEd in Missouri are insufficient as a matter of law.

### A.      Legal Standard

When a defendant's motion to dismiss argues that the court lacks personal jurisdiction over it, "the plaintiff has the burden of making a prima facie showing that the trial court has personal jurisdiction over [the] defendant." *Stavrides v. Zerjav*, 848 S.W.2d 523, 527 (Mo. Ct. App. 1993). The plaintiff must show that: (1) exercising personal jurisdiction over the defendant is proper under Missouri's long arm statute; *and* (2) sufficient minimum contacts with Missouri exist to make exercising personal jurisdiction consistent with due process. *Medicine Shoppe Int'l v. J–Pral Corp.*, 662 S.W.2d 263, 268, 271 (Mo. Ct. App. 1983); *see also Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136 (8th Cir. 2015) (explaining that courts in the Eighth Circuit "first examin[e] whether the exercise of jurisdiction is proper under the forum state's long-arm statute. If the activities of the non-resident defendant satisfy the statute's requirements, [courts] then address whether the exercise of personal jurisdiction comports with due process."). When a defendant's motion to dismiss relies on facts not appearing in the record, the trial court may hear the matter on affidavits offered by the parties. *Chromalloy Am. Corp. v.*

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

*Elyria Foundry Co.*, 955 S.W.2d 1, 3 n.3 (Mo. 1997); *Medicine Shoppe Int'l.*, 662 S.W.2d at 268; *see also* Mo. R . Civ. P. 55.28.

Missouri's long-arm statute is Mo. Rev. Stat. § 506.500, "which authorizes the exercise of jurisdiction over nonresidents to the extent permissible under the due process clause[.]" *Eagle Tech.*, 783 F.3d at 1136; *see also Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216, 226 (Mo. 2015) ("Missouri's long-arm statute expands a court's jurisdictional reach only to the extent allowed by the due process clause of the Fourteenth Amendment of the United States Constitution."). Due process requires that a non-resident defendant have minimum contacts with the forum state such that the maintenance of the lawsuit does not "offend traditional notions of fair play and substantial justice." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This minimum contacts requirement reflects the notion that "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

To determine whether a defendant's contacts with Missouri satisfy due process, courts consider if "the defendant purposefully avail[ed] itself of the privilege of conducting activities within" Missouri. *Bryant*, 310 S.W.3d at 232 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Only where a defendant has purposely availed itself of the protections of Missouri law can it be said to have reasonably anticipated being amenable to suit in the state. *Id*. Purposeful availment requires that the defendant's contacts "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Peoples Bank v. Frazee*, 318 S.W.3d 121, 129 (Mo. 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This "substantial connection" must be shown through the defendant's contacts

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

with "the forum State itself," not only "with the persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Such limitations "ensure[] that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations and internal quotation marks omitted).

Finally, "[t]he minimum contacts necessary for due process may be the basis for either 'general' or 'specific' jurisdiction." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (internal citation omitted). A court has specific jurisdiction over an out-of-state defendant if "a suit aris[es] out of or relate[s] to the defendant's contacts with the forum." *Bryant*, 310 S.W.3d at 232-33. A court has general jurisdiction over an out-of-state defendant only where the defendant's "connections with the state are systematic, continuous and substantial enough to furnish personal jurisdiction over the defendant based on any cause of action even one that is unrelated to the defendant's contacts with the forum." *Bryant*, 310 S.W.3d at 232; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 414 n.9 (1984).

**B.      Plaintiffs Have Failed to Adequately Allege that this Court Has Jurisdiction Over ComEd.**

Other than conclusory allegations regarding the existence of general jurisdiction and fruitless attempts to manufacture personal jurisdiction from purported parent-subsidiary relationships and an indemnity agreement, Plaintiffs allege *no facts* tying ComEd to Missouri for the purposes of either general or specific jurisdiction. Plaintiffs' second amended pleading fails to account for the defects of either of the two prior filings, and does not allege any additional facts that would confer personal jurisdiction over ComEd.

Plaintiffs allege that ComEd "is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri." (SAP ¶ 29)[3]. Tellingly,

---

[3] In the SAP, Plaintiffs allege that ComEd "continuously and systematically carried on local business activities in

7

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Plaintiffs do not allege – nor can they – that ComEd is authorized to do business in Missouri. Instead, Plaintiffs only allege that ComEd "knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations," despite the fact that the alleged activity occurred prior to ComEd's acquisition of Cotter in 1974. (SAP ¶ 29(B)). Plaintiffs attempt to manufacture personal jurisdiction by claiming that ComEd was obligated to ensure that Cotter comply with Missouri law by virtue of ComEd's acquisition of Cotter, and that the two conspired "to perpetuate the fraud that there was no radioactive contamination." *Id*. These new claims, even if taken as true, still fail to allege any actual contacts with Missouri, and do not demonstrate personal jurisdiction over ComEd.

ComEd has submitted a Declaration attesting that: (1) it is not registered to do business in Missouri; (2) it is not otherwise doing business in Missouri; (3) it has not transacted business in Missouri with respect to any matter which is the subject of the SAP filed in this action; (4) it does not offer any products or services within Missouri; (5) it has no employees in Missouri; (6) it does not own or lease any real property or facilities in Missouri; and (7) it does not maintain an office to do business in Missouri. (*See* Declaration of Brian Buck on behalf of ComEd, attached hereto as Exhibit 3).  Plaintiffs have failed to allege anything in their amended filing that contradicts these facts.

Rather, in an attempt to fabricate jurisdiction over ComEd, Plaintiffs allege that ComEd "regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality." (SAP ¶ 29(A)). Even if this allegation were true (which it is not), simply being named as a defendant in a lawsuit does *not* mean that a defendant is "purposefully availing itself of the privilege of conducting

the State of Missouri, *both on its own and through its subsidiary* Cotter." (SAP ¶ 29A). This conclusory allegation, without any associated factual allegations, is not a sufficient basis for this Court to have jurisdiction over ComEd.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

activities within the forum State, thus invoking the benefits and protections of its laws," such that sufficient minimum contacts exist between that defendant and the forum state. [4] *See Bryant*, 310 S.W.3d at 232. Further, the mere fact that a defendant has been sued says nothing about whether that defendant has been properly named or, if not, even consents to the court's jurisdiction. Tellingly, Plaintiffs made no attempt to bolster this argument when given the chance to do so in their SAP (even though this is the third time that ComEd is now pointing out these fatal defects in Plaintiffs' pleadings).

ComEd has no control over whether anyone will sue them; the purposeful availment requirement is meant to protect against precisely these types of attempts by a plaintiff to create jurisdiction where a defendant has insufficient minimum contacts with a forum state for jurisdiction to exist in the first place. *Id.*; *Peoples Bank*, 318 S.W.3d at 129; *see also Burger King Corp.*, 471 U.S. at 475.

Plaintiffs have utterly failed to plead (much less demonstrate) sufficient contacts between the state of Missouri and ComEd to form the basis for the Court's exercise of personal jurisdiction over it in this case. *See Eagle Tech.*, 783 F.3d at 1136. Thus, this Court lacks personal jurisdiction over ComEd.

### C.    Jurisdiction Over a Parent Corporation May Not Be Predicated on the Contacts of a Subsidiary.

To the extent that Plaintiffs attempt to argue that the Court has personal jurisdiction over ComEd based on its corporate relationship with Cotter, this argument fails. Here, Plaintiffs predicate personal jurisdiction over ComEd on the alleged activities of Cotter between 1969 and 1973, ComEd's later alleged acquisition of Cotter in 1974, and ComEd's alleged agreement to indemnify Cotter for the latter's activities associated with Coldwater Creek. (SAP ¶ 29).

---

[4] A review of the Missouri Courts docket sheets for the last 12 years demonstrates that while ComEd has been sued in Missouri, it was always a defendant.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

However, none of these allegations, even if true, is a proper basis for personal jurisdiction over ComEd.

It is well settled that personal jurisdiction over a parent corporation cannot be based on the conduct or contacts of its separately incorporated subsidiaries, except in circumstances where the parent exercised such control and domination over the subsidiary that it was effectively the parent company's alter ego. *E.g., United States v. Bliss*, 108 F.R.D. 127, 131 (E.D. Mo. 1985) (applying Missouri law and reasoning that, "[i]f a subsidiary's presence in the state is primarily to carry on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities."); *see also Cannon Manufacturing Company v. Cudahy Packing Company*, 267 U.S. 333, 335-37 (1925) (holding that when "the corporate separation" between a parent corporation and its subsidiary is "carefully maintained," it may not be "ignored in determining the existence of jurisdiction"); *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011) ("[P]ersonal jurisdiction can be based on the activities of a nonresident corporation's in-state subsidiary only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." (citation omitted)); *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014) ("[T]wo separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." (citation omitted)).

Even taking the allegations as true, the SAP is completely devoid of any allegation that ComEd exercised such control or dominion over Cotter such that jurisdiction exists over ComEd, or that Cotter was an "in-state subsidiary." Plaintiffs also fail to allege that Cotter had no

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

"semblance of independence" from ComEd. *United States v. Bliss*, 108 F.R.D. 127, 131 (E.D. Mo. 1985).  Instead, Plaintiffs only argue that "ComEd is liable as a corporate successor to Cotter." (SAP ¶ 29(B)). Moreover, under the facts that Plaintiffs allege, establishing the requisite alter-ego relationship would be impossible. According to the SAP, Cotter's alleged conduct giving rise to this matter took place between 1969 and 1973, inclusive. (*See* SAP ¶ 72). In contrast, ComEd did not have any involvement with Cotter until after 1973. According to Plaintiffs' own allegations, ComEd's acquisition of Cotter did not occur until 1974. (SAP ¶ 28). Nor have Plaintiffs cured this defect in their filings when given the chance to do so. Instead, Plaintiffs argue "ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination" and that "ComEd's control over Cotter was the proximate cause of the contamination." (SAP ¶ 29(B)). Even if true, which it is not, this allegation falls far short of the complete control and domination required to allege an alter-ego relationship.

Nor does the existence of any alleged agreement by ComEd to indemnify a third party for Cotter's alleged actions in connection with Coldwater Creek, even if taken as true (as required in the context of a motion to dismiss),[5] necessarily mean that the Court can exercise personal jurisdiction over ComEd, especially where it did not voluntarily agree to subject itself to the jurisdiction of the courts in Missouri. Any agreement to indemnify is between the parties to the agreement and cannot provide a basis for a remote third party to initiate a cause of action against an indemnitor based on an alleged tort by the indemnitee. As a result, the indemnity agreement alleged here provides no basis for jurisdiction over ComEd.  Moreover, as the Plaintiffs themselves note, ComEd is no longer under any obligation to indemnify Cotter, as that responsibility was transferred to a nonparty to this action when ComEd restructured in 2001. (SAP ¶ 29). Plaintiffs have thus failed to raise any new allegations in their amended filings that

---

[5] *See Commercial Bank of St. Louis Co. v. James*, 658 S.W.2d 17, 21-22 (Mo. 1983).

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

would provide the court with personal jurisdiction over ComEd based on the alleged indemnity agreement.

For all of the foregoing reasons, this Court lacks personal jurisdiction over ComEd. Plaintiffs have therefore failed to cure the defects of their prior two pleadings, and the action must be dismissed as to ComEd.

## II.   IN THE ALTERNATIVE, THIS ACTION MUST BE DISMISSED AS TO COMED BECAUSE A PARENT CORPORATION IS NOT LIABLE FOR THE CONDUCT OF ITS SUBSIDIARIES.

### A.   Legal Standard

To survive a motion to dismiss for failure to state a claim under Rule 55.27(a)(6), a petition must allege sufficient facts to satisfy the elements of a recognized cause of action. *Avery Contracting, LLC v. Niehaus*, 492 S.W.3d 159, 162 (Mo. 2016). "The failure to plead facts entitling the pleader to the relief requested . . . deprives the trial court of jurisdiction to grant" such relief. *Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617, 621 (Mo. Ct. App. 2007). Although Missouri is a "fact pleading" jurisdiction, *State ex rel. United Indus. Corp. v. Mummert*, 878 S.W.2d 494, 496 (Mo. Ct. App. 1994), a petition must "plead ultimate facts demonstrating" an entitlement to relief "and cannot rely on mere conclusions." *Ford Motor Credit Co.*, 218 S.W.3d at 621 (citation omitted). Thus, Missouri "[c]ourts disregard conclusions not supported by facts in determining whether a petition states a cause of action." *Brock v. Blackwood*, 143 S.W.3d 47, 56 (Mo. Ct. App. 2004).

### B.   Plaintiffs Cannot Establish Liability Against ComEd Predicated Solely on a Parent-Child Relationship

This action must be dismissed as to ComEd because there is no allegation of direct involvement by ComEd relating to the events giving rise to the SAP apart from its corporate relationship with Cotter, which is insufficient to establish liability against a parent. As discussed

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

above, the SAP alleges that Cotter committed certain wrongful acts in 1973, and that *subsequently*, Cotter became a subsidiary of ComEd.

For the same reason that there is no personal jurisdiction over ComEd based solely on the alleged parent-subsidiary relationship, there is also no liability. A parent corporation is not liable for the conduct of its subsidiaries. Ordinarily, "two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." *Blanks*, 450 S.W.3d at 375 (Mo. Ct. App. 2014) (citing *Cent. Cooling & Supply Co.*, 648 S.W.2d at 548 (Mo. 1982)). Accordingly, "[n]ormally, a parent corporation is not responsible for the acts of its subsidiary corporation." *Weitz Co. v. MH Washington*, 631 F.3d 510, 520 (8th Cir. 2011) (citing *Grease Monkey Int'l, Inc. v. Godat*, 916 S.W.2d 257, 262 (Mo. Ct. App. 1995)). "The mere existence of a parent-subsidiary relationship, without more, does not subject a parent corporation to liability for acts of the subsidiary." *Blanks*, 450 S.W.3d at 375. "[T]he parent-subsidiary separation should be 'ignored with caution and only when the circumstances clearly justify it.'" *Id.* at 376 (quoting *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013)).

There are two exceptions to the rule against finding liability for a parent corporation based on the conduct of its subsidiary, neither of which applies here: (1) "where one corporation so dominates and controls another that it becomes a mere 'alter ego' of the first and the formal corporate separateness is used to accomplish a fraud, injustice, or some unlawful purpose," *Weitz*, 631 F.3d at 520 (citing *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 283 (Mo. Ct. App. 1986)); and (2) an agency theory, whereby the principal exercises "such domination and control that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal," *Weitz*, 631 F.3d at 522 (citing *Sedalia*

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

*Mercantile Bank and Trust Co. v. Loges Farms, Inc.*, 740 S.W.2d 188, 202 (Mo. Ct. App. 1987)). *See also Blanks*, 450 S.W.3d at 375-80.

Plaintiffs only offer a few conclusory allegations in support of this argument, without any explanation as to the specific facts underlying this claim. *See* SAP ¶ 29(B). The SAP includes no statement as to how ComEd, who briefly owned Cotter as a subsidiary, is a successor in fact, much less in law, of Cotter.  Plaintiffs *do not and cannot* allege that Cotter evolved into ComEd such that the two are a single entity merely under new names. Further, Plaintiffs *do not and cannot* allege that Cotter acted under the direction of ComEd as an agent of its alleged parent company, as it was not a subsidiary of ComEd at the time of the alleged actions that give rise to the SAP. Rather, the SAP merely alleges that Cotter "was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974" and that "[u]pon the sale of Cotter [in 2000], ComEd agreed to indemnify Cotter for certain liabilities associated with" activities at Latty Avenue. (SAP ¶¶ 28, 29). Simply put, these allegations are insufficient to establish either jurisdiction or liability for ComEd as a parent corporation, especially considering that it was not a parent of Cotter at the time of the alleged actions giving rise to the SAP. *See Blanks*, 450 S.W.3d at 375 ("The mere existence of a parent-subsidiary relationship, without more, does not subject a parent corporation to liability for acts of the subsidiary."); (Exhibit 3 at ¶¶ 11-12).

As stated above, under the facts alleged by Plaintiffs, it is impossible for an alter ego or agency relationship to have existed between Cotter and ComEd. Moreover, Plaintiffs' SAP fails to allege any additional facts that would demonstrate such a relationship. Accordingly, even taking Plaintiffs' allegations as true, this action must be dismissed as to ComEd for failure to state a claim, because ComEd, as an alleged parent corporation, is not liable for the acts or

601317729.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

omissions of its subsidiaries, and no exceptions to that general rule apply here. *See Weitz*, 631 F.3d at 520, 522 (applying Missouri law); *Blanks*, 450 S.W.3d at 375-80.

Similarly, Plaintiffs have also failed to adequately raise any claims as to the alleged conspiracy to commit fraud, because "[m]erely alleging the commission of *wrongful* acts is conclusory and insufficient to state a claim for civil conspiracy." *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996). In order to successfully plead conspiracy, a plaintiff must allege specific facts that show, "'''(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [the plaintiff] was thereby damaged.'''" *Williston v. Vasterling*, 536 S.W.3d 321, 335 (Mo. Ct. App. 2017). Instead, the Plaintiffs vaguely allege that a conspiracy existed between ComEd and Cotter, without alleging any facts that would demonstrate any of the elements of conspiracy. In addition, Missouri law requires that all allegations of fraud "shall be stated with particularity," which, again, Plaintiffs have failed to do. Mo. R. S. Ct. 55.15. Plaintiffs' most specific allegation with respect to ComEd's alleged conspiracy to commit fraud is simply that Cotter and ComEd "jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations." (SAP ¶ 29(B)). Such a broad statement does not sufficiently plead any facts, let alone with particularity.

Similarly, the SAP is devoid of any alleged facts against ComEd regarding any direct involvement by it with Coldwater Creek at any time relevant to this action. Accordingly, the SAP must be dismissed as to ComEd. *See, e.g.*, *Calon v. Bank of Am. Corp.*, No. 14–00913–CV–W–FJG, 2015 WL 3948171, at *4 (W.D. Mo. June 29, 2015) (applying Missouri law and stating that "[t]o bring a valid claim against [a parent company] that will survive a motion to

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

dismiss, the Plaintiff must allege additional facts that *implicate [the parent] directly*.") (emphasis added).

<div align="center">**CONCLUSION**</div>

Defendant ComEd respectfully requests that this Court grant its motion to dismiss the SAP for lack of personal jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. Plaintiffs' attempts to establish personal jurisdiction and liability fail, because Plaintiffs cannot rely on ComEd's status as a defendant in other actions within Missouri, its purported parent-subsidiary relationships with Cotter alone (even though it was not a parent of Cotter during the operative events of the SAP), or the mere existence of an indemnity agreement. ComEd also respectfully requests that the Court grant the relief requested in the Motion to Dismiss filed by Defendant Cotter Corporation (N.S.L.) and the arguments set forth therein, which ComEd joins.

Respectfully Submitted,

*/s/ Erin Brooks*
BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (ID 046791990N)
*Admitted Pro hac vice*
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq. (ID 23182005N)
*Admitted pro hac vice*
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540

<div align="center">16</div>

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

ATTORNEYS FOR DEFENDANTS COTTER
CORPORATION (N.S.L.) and
COMMONWEALTH EDISON COMPANY

17

601317729.1

Electronically Filed - St. Louis County - November 08, 2019 - 06:06 PM

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiffs and the proposed Class*

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

/s/Erin Brooks
*Attorneys for Cotter Corporation (N.S.L.)
and Commonwealth Edison Company*

18

601317729.1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

# Exhibit 1

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 18SL-CC00617 |
| vs. | ) ) | Division No.  2 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY,  A DEPARTMENT OF THE CITY OF ST. LOUIS | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**FIRST AMENDED CLASS ACTION PETITION**

COMES NOW Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, by and through counsel, and for her First Amended Class Action Petition and causes of action against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states and alleges as follows:

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium with high levels of radium from Africa. This special ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

2.      Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

8.      Plaintiff Tamia Banks (hereinafter "Plaintiff") owns and resides on property in St. Ann, Missouri that Defendants contaminated.  Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek.

3

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Her property, including the land and her home, is entirely within the Coldwater Creek flood plain, and is contaminated with radioactive waste materials from Coldwater Creek.

9.      Testing on the Banks Property has confirmed radioactivity above normal background levels. The source of the radioactivity is small, microscopic particles, which among other things contain the hazardous, carcinogenic, toxic, radioactive substance known as thorium.

10.     Plaintiff Tamia Banks, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiff for her damages, and provide further relief as set forth below in this Petition.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

12.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act.

A.  Coldwater Creek is not and has never been a licensed nuclear facility.

B.  Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

C.  Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

4

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

D.  Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

E.  Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

16.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property").  The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek.

19.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to the Banks Property and the loss of use and enjoyment of the

5

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

property. Plaintiffs first learned that the Banks Property was contaminated with radioactive material in 2018.

## Defendants

20.     There are four defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive residue wastes: Cotter Corporation ("Cotter"), Commonwealth Edison Company ("ComEd"), Cotter Corporation ("Cotter"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Exelon Generation").

21.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.

> A.  Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc.
>
> B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

22.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

A. ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B. This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

23.    Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri.

A. Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B. This lawsuit arises out of damages that resulted from the Exelon Defendants' conduct including acts and omissions within the State of Missouri, as well as

7

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the acts and omissions of the predecessors of the Exelon Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

24.    Exelon Generation Company, LLC ("Exelon Generation") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. Upon information and belief in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to Exelon Generation Company, LLC.

A.    Exelon Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

B.    This lawsuit arises out of damages that resulted from the conduct including acts and omissions of Exelon Generation and their subsidiaries, agents, and representatives within the State of Missouri, which gave rise to the violations of law and damage to property alleged in the Petition.

25.    DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

26.    The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff files this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within

8

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

28.     Plaintiff brings this action on behalf of herself and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

29.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

30.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 below.**

---

[1] https://msc fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

31.    The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on a property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

10

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

32.     Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

33.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiff currently, it is ascertainable by appropriate discovery and Plaintiff, upon information and belief, alleges that the proposed Class may include more than twenty-five members. The requirement of numerosity is therefore satisfied.

34.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive classwide resolution of the claims of the proposed Class. These common questions of law or fact include:

    a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

    b.   Whether Defendants unreasonably and unlawfully processed, stored or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

    c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiff and Class Members' property;

11

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiff and Class Members' property;

e.   Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiff and Class Members' loss of use and enjoyment of their property;

f.   Whether the loss in property value suffered by Plaintiff and Class is a result of Defendants' actions;

g.   Whether Plaintiff and Class are entitled to damages; and

h.   Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

35.     The claims of the Plaintiff are typical of the claims of the Class. Plaintiff and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

36.     Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the members of the Class. Plaintiff has retained competent attorneys who have experience in class action litigation.

37.     Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

38.     Unless a class-wide injunction is issued, Defendants will continue to allow

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

contamination of the properties of Plaintiff and Class and will continue to violate Missouri law resulting in harm to thousands of Missouri citizens.

39.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiff, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

40.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

41.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

42.    All of the class members are citizens of Missouri.

43.    The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

44.    The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive waster alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri.

45.    Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

46.    No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

47.    For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

<div align="center">

**FACTS**

**Radioactive Wastes**

</div>

48.    Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

49.    Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

51.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

52.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

53.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers.  Illnesses such as cancers may take a number of years to appear.

54.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

55.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

16

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**Radioactive Waste in the St. Louis Area**

56.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[3]   The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

57.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

58.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

59.     Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

60.     In 1957, "approximately sixty truckloads of contaminated scrap metal, several

---

[3] *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

17

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on western portion of SLAPS adjacent to Coldwater Creek."

61.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive wastes that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

62.     These waste residues, which contained valuable metals, were sold and shipped to various other destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

63.     In the late 1960's, Cotter purchased the hazardous, toxic, carcinogenic radioactive wastes stored at both SLAPS and at the Latty Avenue Site .

64.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

65.     Cotter did not receive indemnity from the government in connection with this transaction.

66.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites.

67.     Upon information and belief, Cotter did not have a license to dispose of enriched thorium.

18

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

68.     Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

69.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

70.     Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

71.     From 1953, the property was managed and operated by Mallinckrodt.

72.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

73.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

74.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

**Latty Avenue Site**

75.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at

19

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

76.    Upon information and belief, Futura Coatings purchased the Latty Avenue property.

77.    Despite knowing that significant activities involving radioactive material were conducted on the site, Futura Coatings did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

### Coldwater Creek

78.    Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

79.    Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

80.    By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly

20

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support  construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

81.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

82.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

83.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

84.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

85.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

86.     The Banks Property is contaminated by radioactive material.

21

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

87.    Samples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

88.    The Banks Property neighbors Coldwater Creek and is within its flood plain.  This proximity puts the Banks Property in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

89.    The radioactive contamination that has polluted the Banks Property and continues to threaten to further pollute the Banks Property match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

90.    This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

91.    Radioactive contamination of the Banks Property renders the Banks Property unfit for normal use and enjoyment, and destroys its fair market value.

92.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually and on behalf of the Property Damage Subclass)

93.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

95.     Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

96.     Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

97.     Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

98.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiff and the Property Damage Subclass ("Plaintiffs' property").

99.     Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

100.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

101.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

102.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

103.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

104.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

23

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

105.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

106.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

107.    The migration of Radon gas and radioactive particles onto the property of Plaintiff and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiff and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiff and of the Property Damage Subclass.

108.    Plaintiff did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

109.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

110.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiff and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

## COUNT II – PERMANENT NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

111.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

113.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

114.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

115.    The radioactive waste caused by Defendants results from permanent construction that is necessarily injurious to Plaintiffs as installed.  It is not practical or possible to abate the presence of the radioactive waste in Coldwater Creek.

116.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

117.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

118.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

119.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

120.    Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

121.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

122.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

123.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described Paragraph 11 above.

124.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

125.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

126.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

127.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

128.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

129.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

130.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually and on behalf of the Class)

131.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

133. Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

134. Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

135. Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

136. Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances

into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

28

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

137.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

138.     Defendants failed to act to prevent their releases from harming Plaintiffs.

139.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

140.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiff's property.

141.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

142.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

143.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

144.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

29

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

145.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE
### (brought individually and on behalf of the Class)

146.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

147.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

148.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

149.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

30

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

150.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

151.    Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

152.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

153.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

### COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually and on behalf of the Class)

154.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

155.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

156.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

157.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

31

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

158.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

159.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

160.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

161.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
**(brought individually and on behalf of the Class)**

162.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.    Defendants have tortiously contaminated the property of Plaintiff and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

164.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiff and the proposed Class.

165.    The radioactive contamination of the property of Plaintiff and the proposed Class has caused a significant increased risk to Plaintiff and Class members, and therefore Plaintiff and

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

166.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

167.    Therefore, Plaintiff seeks injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiff and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

168.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

169.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiff and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
### (brought individually and on behalf of the Class)

170.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

171.     Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

172.     Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiff and others similarly situated.

173.     The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiff, and others similarly situated.

## COUNT IX – CIVIL CONSPIRACY
### (brought individually and on behalf of the Class)

174.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

175.     Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

176.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

177.     As result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**COUNT X – INVERSE CONDEMNATION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

178.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.     The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

180.     The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiff and the Property Damage Subclass for public use without just compensation.

181.     The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

182.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

183.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

184.     The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

185.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis,  as alleged herein constituted and invasion and appropriation of the property rights of Plaintiff and the Property Damage Subclass.

186.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

**COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

187.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

188.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

189.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

190.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiff's and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

36

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

191.    As a result of Defendants' conduct, Plaintiff and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
### (brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

192.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

193.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

194.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

195.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiff and the Property Damage Subclass.

196.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiff or the Property Damage Subclass.

37

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**PRAYER FOR RELIEF**

**WHEREFORE**, as to each Count, and all Counts, Plaintiff Tamia Banks prays for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

    a.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

    b.  an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

    c.  an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

    d.  costs and attorney fees;

    e.  interest on the above amounts as allowed by law;

    f.  for appropriate injunctive and equitable relief, as permitted by law or equity including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to

38

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Respectfully submitted,

KEANE LAW LLC

 /s/ Ryan A. Keane

Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
forthcoming
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
forthcoming
508 St. Philip Street
New Orleans, LA 70116
Phone: (504) 566-1558
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

and

**LEAVE GRANTED:**

*Maura B McShane*

Judge                    Division 2

April 10, 2018

39

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630, *pro hac vice*
forthcoming
920 4th Street
Gretna, Louisiana 70053
Phone: (504) 227-8100
Fax: (504) 227-8122
raustin@austin-associates.net

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 2, 2018, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ Ryan A. Keane

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Exhibit 2

**18SL-CC00617**

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

### TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
### ST. LOUIS COUNTY

| | | |
|---|---|---|
| **TAMIA BANKS**, on behalf of herself and all others similarly situated, | ) ) ) | |
| **Plaintiff,** | ) ) | **Cause No.** |
| **vs.** | ) ) | **Division No.** |
| **COTTER CORPORATION,** | ) ) | **JURY TRIAL DEMANDED** |
| Serve at: | ) | |
|     The Corporation Company | ) | |
|     Registered Agent for | ) | |
|     Cotter Corporation | ) | |
|     7700 E. Arapahoe Road, Suite 220 | ) | |
|     Centennial, CO 80112 | ) | |
| | ) | |
| **COMMONWEALTH EDISON COMPANY,** | ) | |
| Serve at: | ) | |
|     Corporate Creations Network Inc. | ) | |
|     Registered Agent for | ) | |
|     Commonwealth Edison Company | ) | |
|     350 S. Northwest Highway, Suite 300 | ) | |
|     Park Ridge, IL 60068 | ) | |
| | ) | |
| **EXELON CORPORATION,** | ) | |
| Serve at: | ) | |
|     Corporate Creations Network Inc | ) | |
|     Registered Agent for Exelon Corporation | ) | |
|     350 S. Northwest Highway, Suite 300 | ) | |
|     Park Ridge, IL 60068 | ) | |
| | ) | |
| **EXELON GENERATION COMPANY, LLC,** | ) | |
| Serve at: | ) | |
|     Corporate Creations Network Inc | ) | |
|     Registered Agent for | ) | |
|     Exelon Generation Company, LLC | ) | |
|     350 S. Northwest Highway, Suite 300 | ) | |
|     Park Ridge, IL 60068 | ) | |
| | ) | |
| | ) | |

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

| | |
|---|---|
| **DJR HOLDINGS, INC. f/k/a FUTURA** | ) |
| **COATINGS, INC.,** | ) |
| **Serve:** | ) |
|     Rodney D. Jarboe | ) |
|     9200 Latty Avenue | ) |
|     Hazelwood, MO 63042 | ) |
| | ) |
| **and** | ) |
| | ) |
| **ST. LOUIS AIRPORT AUTHORITY,** | ) |
| **A DEPARTMENT OF THE CITY OF** | ) |
| **ST. LOUIS** | ) |
| **Serve:** | ) |
|     Mayor Lyda Krewson | ) |
|     St. Louis City Hall | ) |
|     1200 Market St | ) |
|     St. Louis, MO 63103 | ) |
| | ) |
| **Defendants.** | ) |

## CLASS ACTION PETITION

COMES NOW Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, by and through counsel, and for her Class Action Petition and causes of action against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states and alleges as follows:

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City special highly concentrated uranium with high levels of radium from Africa. This special ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of

2

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the most harmful on Earth, Defendants moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis to the St. Louis Airport, then to Hazelwood.

2.      Until the 1970s, radioactive materials were stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue is Hazelwood, Missouri (the "Latty Avenue Site") (part of which later became the Hazelwood Interim Storage Site ("HISS").

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

found today in the real property, which contains businesses and homes, surrounding the Coldwater Creek has the fingerprint (or profile) of the ore processed in St. Louis by Defendants.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

8.      Plaintiff Tamia Banks (hereinafter "Plaintiff") owns property in St. Ann, Missouri that Defendants contaminated.  Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek.  Her property,

4

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

including the land and her home, is entirely within the Coldwater Creek flood plain, and is contaminated with radioactive waste materials from Coldwater Creek.

9.     Testing on the Banks Property has confirmed radioactivity above normal background levels. The source of the radioactivity is small, microscopic particles, which among other things contain the hazardous, carcinogenic, toxic, radioactive substance known as thorium.

10.     Plaintiff Tamia Banks, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiff for her damages, and provide further relief as set forth below in this Petition.

**JURISDICTION AND VENUE**

11.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri  and out of torts committed solely in Missouri by resident and non-resident defendants.

12.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price Anderson Act.

A.  Coldwater Creek is not and has never been a licensed nuclear facility.

B.  Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

C.  Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

5

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

D. Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

E. Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

16.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price Anderson Act did not apply because the wastes at issue were not subject to said Act.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Petition.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property").  The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek.

19.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to the Banks Property and the loss of use and enjoyment of the

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

property. Plaintiffs first learned that the Banks Property was contaminated with radioactive material in 2018.

<div align="center"><strong>Defendants</strong></div>

20.     There are four defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive residue wastes: Cotter Corporation ("Cotter"), Commonwealth Edison Company ("ComEd"), Cotter Corporation ("Cotter"), Exelon Corporation ("Exelon"), and Exelon Generation Company, LLC ("Exelon Generation").

21.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. It was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1975.

A.  Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, through its parent companies ComEd and Exelon, as well as through its subsidiary General Atomics, Inc.

B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

22.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities.

<div align="center">7</div>

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

    A.  ComEd continuously and systematically carries on business activities in the State of Missouri, both on its own and through its subsidiaries including Cotter and its parent company Exelon. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

    B.  This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

23.  Exelon Corporation ("Exelon"), the parent company of ComEd, is a Pennsylvania corporation with its principal place of business in Chicago, Illinois. Exelon, through its subsidiaries including Cotter and ComEd, conducted business in Missouri.

    A.  Exelon is the parent company of ComEd and, through its subsidiaries including Cotter and ComEd, continuously and systematically carries out business activities in the State of Missouri. Exelon regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

    B.  This lawsuit arises out of damages that resulted from the Exelon Defendants' conduct including acts and omissions within the State of Missouri, as well as

8

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the acts and omissions of the predecessors of the Exelon Defendants, which gave rise to the violations of law and damage to property alleged in the Petition.

24.     Exelon Generation Company, LLC ("Exelon Generation") is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. Upon information and belief in connection with Exelon's corporate restructuring in 2001, the responsibility to indemnify Cotter, previously held by Exelon was transferred to Exelon Generation Company, LLC.

    A.  Exelon Generation regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

    B.  This lawsuit arises out of damages that resulted from the conduct including acts and omissions of Exelon Generation and their subsidiaries, agents, and representatives within the State of Missouri, which gave rise to the violations of law and damage to property alleged in the Petition.

25.     DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri.

26.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff files this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all owners of real property with any portion within the FEMA one hundred year

9

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

28.     Plaintiff brings this action on behalf of herself and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

29.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

30.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All persons who currently own real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 below.**

---

[1] https://msc fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

31.     The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All persons who currently reside, or have resided since 1973, on a property with any portion within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

32.     Excluded from the Property Damage Subclass and the Medical Monitoring

11

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

33.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiff currently, it is ascertainable by appropriate discovery and Plaintiff, upon information and belief, alleges that the proposed Class may include more than twenty-five members. The requirement of numerosity is therefore satisfied.

34.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive classwide resolution of the claims of the proposed Class. These common questions of law or fact include:

   a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

   b.   Whether Defendants unreasonably and unlawfully processed, stored or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

   c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiff and Class Members' property;

   d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly,

12

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiff and Class Members' property;

e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiff and Class Members' loss of use and enjoyment of their property;

f.  Whether the loss in property value suffered by Plaintiff and Class is a result of Defendants' actions;

g.  Whether Plaintiff and Class are entitled to damages; and

h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

35.     The claims of the Plaintiff are typical of the claims of the Class. Plaintiff and all Class Members own land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

36.     Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the members of the Class. Plaintiff has retained competent attorneys who have experience in class action litigation.

37.     Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

38.     Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiff and Class and will continue to violate Missouri law

13

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

resulting in harm to thousands of Missouri citizens.

39.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiff, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

40.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

41.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

42.     More than two-thirds of the class members are citizens of Missouri.

14

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

43.     The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

44.     The conduct alleged in this Petition took place in Missouri.

    A.   The radioactive waste at issue in this case was generated as a result of chemical processes that took place in facilities in St. Louis

    B.   All transportation of radioactive waste alleged herein took place in Missouri

    C.   All processing of radioactive waster alleged herein took place in Missouri.

    D.   All storage of radioactive waste alleged herein took place in Missouri

45.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

46.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

47.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

## FACTS

### Radioactive Wastes

48.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

49.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

15

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

51.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

52.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

16

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

53.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers.  Illnesses such as cancers may take a number of years to appear.

54.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

55.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

17

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**Radioactive Waste in the St. Louis Area**

56.    From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[3]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

57.    This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

58.    In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

59.    Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

60.    In 1957, "approximately sixty truckloads of contaminated scrap metal, several contaminated vehicles, in addition to miscellaneous radioactive wastes were buried on western portion of SLAPS adjacent to Coldwater Creek."

---

[3] *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

61.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive wastes  that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

62.     These waste residues, which contained valuable metals, were sold and shipped to various other destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

63.     In the late 1960's, Cotter purchased the hazardous, toxic, carcinogenic radioactive wastes stored at both SLAPS and at the Latty Avenue Site .

64.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

65.     Cotter did not receive indemnity from the government in connection with this transaction.

66.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites.

67.     Upon information and belief, Cotter did not have a license to dispose of enriched thorium.

68.     Transport and migration of hazardous, toxic and radioactive waste residues to/from the SLDS, the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

19

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**Saint Louis Airport Site ("SLAPS")**

69.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

70.     Hundreds of thousands of tons of hazardous, toxic, and radioactive wastes were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

71.     From 1953, the property was managed and operated by Mallinckrodt.

72.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

73.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

74.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

**Latty Avenue Site**

75.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

76.     Upon information and belief, Futura Coatings purchased the Latty Avenue property.

20

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

77.     Despite knowing that significant activities involving radioactive material were conducted on the site, Futura Coatings did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes, including into Coldwater Creek.

**Coldwater Creek**

78.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

79.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

80.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support  construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

81.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

82.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

83.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

84.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

85.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

86.     The Banks Property is contaminated by radioactive material.

87.     Samples taken on and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

88.     The Banks Property neighbors Coldwater Creek and is within its flood plain.  This proximity puts the Banks Property in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

22

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

89.     The radioactive contamination that has polluted the Banks Property and continues to threaten to further pollute the Banks Property match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

90.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

91.     Radioactive contamination of the Banks Property renders the Banks Property unfit for normal use and enjoyment, and destroys its fair market value.

92.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually and on behalf of the Property Damage Subclass)

93.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.     Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

95.     Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure of their proper disposal.

96.     Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

97.     Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

98.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiff and the Property Damage Subclass ("Plaintiffs' property").

99.     Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

100.     Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

101.     It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

102.     Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

103.     Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

104.     Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

105.     Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

24

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

106.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

107.    The migration of Radon gas and radioactive particles onto the property of Plaintiff and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiff and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiff and of the Property Damage Subclass.

108.    Plaintiff did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

109.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

110.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiff and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

### COUNT II – PERMANENT NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

111.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

25

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

113.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

114.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

115.    The radioactive waste caused by Defendants results from permanent construction that is necessarily injurious to Plaintiffs as installed.  It is not practical or possible to abate the presence of the radioactive waste in Coldwater Creek.

116.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

117.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

118.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

119.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

120.    Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

121.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

122.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

123.    Plaintiff owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described Paragraph 11 above.

124.    Defendants unreasonably and unlawfully stored and used radioactive materials at the St. Louis Airport Site ("SLAPS"), the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek, which adjoins Plaintiffs' property.

125.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

126.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Banks Property.

27

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

127.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

128.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

129.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

130.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

**COUNT IV – NEGLIGENCE**
**(brought individually and on behalf of the Property Damage Subclass)**

131.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

133.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

134.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

135.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

136.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

137.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

138.     Defendants failed to act to prevent their releases from harming Plaintiffs.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

139.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

140.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiff's property.

141.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

142.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

143.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

144.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

145.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**COUNT V – NEGLIGENCE PER SE**
**(brought individually and on behalf of the Property Damage Subclass)**

146.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

147.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

148.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

149.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

150.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

151.    Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

152.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

153.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually and on behalf of the Property Damage Subclass)

154.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

155.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

156.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

157.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

158.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

159.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

160.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

161.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
### (brought individually and on behalf of the Class)

162.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.    Defendants have tortiously contaminated the property of Plaintiff and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

164.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiff and the proposed Class.

165.    The radioactive contamination of the property of Plaintiff and the proposed Class has caused a significant increased risk to Plaintiff and Class members, and therefore Plaintiff and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

166.     The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

167.     Therefore, Plaintiff seeks injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiff and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

168.     Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

169.     Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiff and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

## COUNT VIII – PUNITIVE DAMAGES
### (brought individually and on behalf of the Class)

170.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

171.    .Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

172.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiff and others similarly situated.

173.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiff, and others similarly situated.

**COUNT IX – INVERSE CONDEMNATION**
**(brought individually and on behalf of the Property Damage Subclass**
**against the St. Louis Airport Authority, a department of the City of St. Louis)**

174.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

175.    The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

176.    The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiff and the Property Damage Subclass for public use without just compensation.

177.    The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

35

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

178.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

179.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

180.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

181.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis,  as alleged herein constituted and invasion and appropriation of the property rights of Plaintiff and the Property Damage Subclass.

182.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT X – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

183.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

184.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

185.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

186.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiff's and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

187.    As a result of Defendants' conduct, Plaintiff and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XI – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

188.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

189.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

190.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate,

37

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

191.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiff and the Property Damage Subclass.

192.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiff or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiff Tamia Banks prays for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, Exelon Corporation, Exelon Generation Company, LLC, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.    an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.    an award of double damages for malicious trespass as provided for under RSMo. §

537.330;

c.   an award of punitive and exemplary damages as fair and reasonable in an amount

sufficient to punish Defendants and to deter similar conduct in the future;

d.   costs and attorney fees;

e.   interest on the above amounts as allowed by law;

f.   for appropriate injunctive and equitable relief, as permitted by law or equity

including a preliminary and/or permanent injunction enjoining Defendants from

continuing the unlawful conduct as set forth herein and directing Defendants to

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Respectfully submitted,

KEANE LAW LLC

  /s/ Ryan A. Keane

Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
alex@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

39

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
forthcoming
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
forthcoming
508 St. Philip Street
New Orleans, LA 70116
Phone: (504) 566-1558
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

and

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630, *pro hac vice*
forthcoming
920 4th Street
Gretna, Louisiana 70053
Phone: (504) 227-8100
Fax: (504) 227-8122
raustin@austin-associates.net

*Attorneys for Plaintiffs and proposed Class*

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

# Exhibit 3

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | Cause No. 18SL-CC00617-01 |
| ) | |
| **vs.** ) | Division No. 18 |
| ) | |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**DECLARATION OF BRIAN BUCK**</u>

I, Brian Buck, hereby declare and state as follows:

1.  I am an Assistant Secretary of Commonwealth Edison Company ("ComEd").

2.  I am an adult citizen and resident of the State of Illinois and am competent to provide this Declaration.  I am providing this Declaration based on my own personal knowledge, and on documents, records, and information of ComEd available to me in my position as an Assistant Secretary of ComEd.

3.  ComEd is a corporation organized and existing under the laws of Illinois, having its principal place of business at 440 South LaSalle Street, Chicago, Illinois 60605-1028.

4.  ComEd is not registered to do business in Missouri.

5.  ComEd is not doing business in Missouri.

6.  ComEd has not transacted business in Missouri with respect to any matter which is the subject of the Complaint filed in this action.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

7. ComEd offers no products or services within Missouri.

8. ComEd has no employees in Missouri.

9. ComEd does not own or lease any real property or facilities in Missouri.

10. ComEd does not maintain an office to do business in Missouri.

11. ComEd acquired Cotter Corporation (N.S.L.), a New Mexico corporation, on July 31, 1974, and divested it in February 2000.

12. ComEd became a subsidiary of Exelon Corporation in October 2000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2019.

Brian Buck
Assistant Secretary
Commonwealth Edison Company

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

# EXHIBIT 4

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, | ) | |
| BARBARA HOOKS, JOEL HOGAN, | ) | |
| KENNETH NIEBLING, KENDALL LACY, | ) | |
| TANJA LACY, WILLIE CLAY, | ) | |
| BOBBIE JEAN CLAY, ANGELA STATUM, | ) | |
| and MISSOURI RENTALS | ) | |
| COMPANY, LLC, on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 18SL-CC00617 |
| | ) | |
| vs. | ) | Division No.   2 |
| | ) | |
| COTTER CORPORATION, | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | JURY TRIAL DEMANDED |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS | ) | |
| AIRPORT AUTHORITY, A | ) | |
| DEPARTMENT OF THE CITY OF | ) | |
| ST. LOUIS | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED CLASS ACTION PETITION

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan,

Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and

Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by and

through counsel, and for their Second Amended Class Action Petition and causes of action against

Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura

Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states

and alleges as follows:

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City highly concentrated uranium with abnormal levels of radium from Africa. This particular ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants negligently moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis City to the St. Louis Airport, then to Hazelwood.

2.      Radioactive materials have been and will likely continue to be stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") part of which later became the Hazelwood Interim Storage Site ("HISS"). The Latty Avenue site and the HISS site are contained in the properties located at 9170 Latty Avenue and 9200 Latty Avenue in Hazelwood, Missouri.

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

and prodding their backyards and sampling the dust of their vacuum cleaners to identify the quantity and toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which consists of businesses and homes, surrounding the Coldwater Creek carries the distinct fingerprint (or profile) of the ore which had been processed in St. Louis and possessed by Defendants and/or their predecessors in interest.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the local public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on a limited class of victims.

8.      Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiffs for their

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

damages, and provide further relief as set forth below in this Petition.

9.     Pursuant to Missouri common law applicable at the time of Defendants' tortious conduct, which occurred prior to the 2005 enactment of R.S.Mo. § 537.067, Defendants are jointly and severally liable for any and all damages Plaintiffs and the Class have sustained as a result of Defendants' negligent handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental, consequential, nuisance, and trespass damages.

10.     Upon information and belief, by acquiring and continuing to operate ongoing operations throughout time, Defendants are liable for acts and omissions and the consequential damages caused by their predecessors in interest. To the extent that Defendants provided indemnity or committed fraud, they are liable to those to whom they sold or lease the ongoing operations.

11.     Upon information and belief, the properties of all Plaintiffs and the putative class are impacted by uranium mill tailings. The source of the radioactivity is small, microscopic particles yet containable when properly handled. These particles contain hazardous carcinogenic, harmful toxics, and other radioactive substances known as uranium and thorium and their daughter products. Such radioactive waste is legally and commonly referred to as "uranium mill tailings," which result from the processing of uranium ore.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri and out of torts committed solely in Missouri by resident and non-resident defendants.

13.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in the locality of St. Louis County,

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Missouri.

14.    Plaintiffs do not allege any causes of action arising under any laws of the United States.

15.    Plaintiffs' claims do not fall within the scope of the Price-Anderson Act, because:

    A.    Coldwater Creek is not and has never been a licensed nuclear facility.

    B.    Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

    C.    Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

    D.    Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

    E.    Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

16.    Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims offending traditional state regulations and do not implicate the Price-Anderson Act and its textually manifest objectives related to liability limitation and indemnification.

17.    The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic mill tailings at issue in this Petition.

### THE PARTIES

**Plaintiffs**

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Tamia Banks first learned that her property was in the zone of contamination in 2018.

19.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

20.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek.  His home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

21.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one hundred year flood

Electronically Filed - St. Louis County - November 08, 2019 - 06:06 PM

plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

22.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

23.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

24.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

25.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one hundred year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

26.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including damages to their Property and the loss of use and enjoyment, thereof.

**Defendants**

27.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive mill tailings: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

28.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately after announcing that there was no radioactive contamination on the properties upon which it operated. It was then sold to General Atomics in 2000.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition.

29.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001.

A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality.

B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Petition. ComEd furthermore assumed the environmental safety and health

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter had operated and which it knowingly and intentionally abandoned immediately prior to its announced sale to ComEd. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter. After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter was the proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

C. This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of state law and damage to property alleged in the Petition.

30.    DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

31.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs file this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

33.     Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

34.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

35.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

**All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest**

---

[1] FEMA.GOV, https://msc.fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor (last visited September 24, 2019).

11

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**and Old Halls Ferry Road to the northeast, as shown in blue in the map in Figure 1 below.**

### Figure 1. Class Area



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

36.     The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

37.     Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

38.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

39.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

b.   Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property;

13

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

d.  Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property;

e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property;

f.  Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

g.  Whether Plaintiffs and Class are entitled to damages; and

h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

40.  The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

41.  Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

42.  Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

43.  Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

resulting in harm to thousands of Missouri citizens.

44.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

45.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

46.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

47.     All of the class members are citizens of Missouri.

48.     The principal injuries resulting from the conduct of the Defendants were incurred

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

in Missouri.

49.     The conduct alleged in this Petition took place in Missouri.

A.   The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis

B.   All transportation of radioactive waste alleged herein took place in Missouri

C.   All processing of radioactive wastes alleged herein took place in Missouri.

D.   All storage of radioactive waste alleged herein took place in Missouri.

50.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

51.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

52.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

## FACTS

### Radioactive Wastes

53.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

54.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

55.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

56.    People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

57.    One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

58.    The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can include damages to the skin, reproductive system, blood forming

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes." *See* Radiation Health Effects, EPA.GOV, https://www.epa.gov/radiation/radiation-health-effects (last visited September 24, 2019).

Electronically Filed - St. Louis County - November 08, 2019 - 06:06 PM

system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

59.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

60.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

61.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[34]

**Radioactive Waste in the St. Louis Area**

---

[3] *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 199 6-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.
[4] *See* Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_Interi mSto_PHA-508.pdf.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

62.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[5]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

63.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

64.     The wastes created by processing at the SLDS are known in the scientific and regulatory communities as Uranium Mill Tailings and were created as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt.

65.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive mill tailings from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

66.     Radioactive mill tailings accumulated locally at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored locally at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

67.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive mill tailings that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

---

[5]  *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

68.     These mill tailings, which contained valuable metals, were sold and shipped to various other local destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

69.     In the late 1960's, Cotter and/or its predecessors in interest, and its successors, purchased the hazardous, toxic, carcinogenic radioactive mill tailings associated with both SLAPS and the Latty Avenue Site.

70.     Upon information and belief, as part of the contract between Cotter and/or its predecessors in interest and the federal government for sale of the radioactive waste, Cotter assumed all liability, including ultimate disposition of the waste.

71.     Cotter and/or its predecessors in interest did not receive indemnity from the government in connection with this transaction.

72.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue sites.

73.     Upon information and belief, Cotter did not have a license to handle or dispose of enriched thorium.

74.     Transport and migration of hazardous, toxic and radioactive mill tailings to/from the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

75.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

76.     Hundreds of thousands of tons of hazardous, toxic, and radioactive mill tailings were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

77.     From 1953, the property was managed and operated by Mallinckrodt.

78.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

79.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

80.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Latty Avenue Site**

81.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

82.     Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos purchased and/or leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

83.     Despite knowing that significant activities involving radioactive material were conducted on the site, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Coldwater Creek**

84.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

85.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

86.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

87.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

88.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

89.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

90.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

91.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

92.     Plaintiffs' properties are contaminated by radioactive material.

93.     Samples taken on and around Plaintiffs' properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

94.     Plaintiffs' properties neighbor Coldwater Creek and are within its flood plain.  This proximity puts the Plaintiffs' properties in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

95.     The radioactive contamination that has polluted the Plaintiffs' properties and continues to threaten to further pollute the Plaintiffs' properties match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

96.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

97.     Radioactive contamination of the Plaintiffs' properties renders the Plaintiffs' properties unfit for normal use and enjoyment, creates a stigma attached to the properties, and destroys their fair market value.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

### COUNT I – TRESPASS
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

99.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

100.     Plaintiff Tamia Banks owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

101.     Plaintiffs Ronnie Hooks and Barbara Hooks own and control the Hooks Property located at 13712 Old Halls Ferry Rd., Florissant, Missouri, more particularly described above.

102.     Plaintiff Joel Hogan owns and controls the Hogan Property located at 435 Moule Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

103.    Plaintiff Kenneth Niebling owns and controls the Niebling Property located at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

104.    Plaintiffs Kendall Lacy and Tonja Lacy own and control the Lacy Property located at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

105.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control the Clay Property located at 9 Cricket Court, Florissant, Missouri, more particularly described above.

106.    Plaintiff Angela Statum owns and controls the Statum Property located at 7565 Hazelcrest Drive, Florissant, Missouri, more particularly described above.

107.    Plaintiff Missouri Rentals Company, LLC owns and controls the Missouri Rentals Properties, as more particularly described above and listed as follows:

    7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
    7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
    7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
    7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
    7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
    8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
    8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
    8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

108.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

109.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

110.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

111.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

112.    Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

113.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

114.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

115.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

116.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

117.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

118.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

119.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

120.    The migration of Radon gas and radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

121.    Plaintiffs did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

122.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

123.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

<div align="center">

**COUNT II – PERMANENT NUISANCE**
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

</div>

124.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

126.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

127.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

128.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

<div align="center">

27

</div>

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

129.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

130.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

131.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

132.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

        7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
        7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
        8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
        8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
        8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

133.    Defendants unreasonably and unlawfully stored and used radioactive materials at SLAPS, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' property.

134.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

135.    The radioactive contamination created a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

136.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and

28

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

137.   Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

138.   As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

139.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

140.   Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

141.   Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

142.   Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

143.   Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

144.   Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

145.   Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

146.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

147.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

148.    Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS Site, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' properties.

149.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' properties.

150.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

151.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

152.     Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

153.     Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

154.     As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

155.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

156.     Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

157.     Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

158.     Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

159.     Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

160.     Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

161.     Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

162.      Defendants failed to act to prevent their releases from harming Plaintiffs.

163.     Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

164.     Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

165.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

166.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

167.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

168.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

169.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

170.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

171.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

172.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

173.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

174.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

175.    Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

176.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

177.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

178.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.   Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

180.   By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

181.   Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

182.   As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

183.   Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

184.   The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

185.   Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

186.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.    Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

188.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

189.    The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

190.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

191.    Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

192.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

193.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

194.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

195.    Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

196.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

197.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

### COUNT IX – CIVIL CONSPIRACY
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

198.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.    Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

200. Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

201. As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

**COUNT X – INVERSE CONDEMNATION**

**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

202. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

203. The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

204. The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

205. The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

206. The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

207.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

208.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

209.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

210.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

### COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

211.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

213.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

214. The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

215. As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
### (brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

216. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217. Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

218. The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

219. The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

220.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

**PRAYER FOR RELIEF**

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.  an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c.  an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d.  costs and attorney fees;

e.  interest on the above amounts as allowed by law;

f.  for appropriate injunctive and equitable relief, as permitted by law or equity

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

including a preliminary and/or permanent injunction enjoining Defendants from

continuing the unlawful conduct as set forth herein and directing Defendants to

identify, with Court supervision, members of the Class in order to compensate them

and to clean up all contamination, and including medical monitoring; and

g.  for any further relief this Court deems just and proper.

Dated:  October 29, 2019                          Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:  304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 29, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*_____

Electronically Filed - St Louis County - November 08, 2019 - 06:06 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,** ) ) ) ) ) ) ) ) ) ) | Cause No. 18SL-CC00617-01<br><br>Division No. 18 |
| **Plaintiff,** ) )  | |
| **vs.** ) )  | |
| **COTTER CORPORATION and COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** ) ) ) ) | |
| **Defendants.** | |

## [PROPOSED] ORDER

**AND NOW**, this _____ day of _____ 2019, upon consideration of Defendant

Commonwealth Edison Company's motion to dismiss Plaintiffs' second amended class-action

petition ("Motion"), and submissions of the parties relating thereto, and for good cause shown,

**IT IS HEREBY ORDERED** that Defendant's Motion is **GRANTED** and Plaintiff's

second amended class-action petition is **DISMISSED** in its entirety with prejudice as to

Defendant Commonwealth Edison Company.

IT IS SO ORDERED.

DATED: _____          _____

Hon. Ellen H. Ribaudo

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

                                Plaintiffs,

        v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., AND ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

                                Defendants.

Civil Action No. 18SL-CC00617-01

Division No. 18

**MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED
CLASS-ACTION PETITION AND
SUGGESTIONS OF LAW IN
SUPPORT OF MOTION**

        On October 29, 2019, Plaintiffs filed their second amended class-action petition ("SAP")
in this action.  Not only does Plaintiffs' SAP fail to cure the deficiencies of the prior two
petitions, but Plaintiffs' brazen efforts to avoid the Price-Anderson Act's ("PAA") clear
governance of their claims by incorrectly characterizing the radioactive wastes at issue as "mill
tailings" is misleading and inaccurate as a matter of law.  Even Plaintiffs acknowledge in their
pleadings there was a license for the radioactive materials at the sites – something that would not
have been possible under the regulatory scheme in place at the time of the actions alleged (and in
particular, at the time of the events alleged involving Defendant Cotter Corporation (N.S.L.)
("Cotter") (improperly named as Cotter Corporation)) – if the radioactive wastes were, in fact,
mill tailings.  Accordingly, Cotter moves to dismiss the SAP of Plaintiffs Tamia Banks, Ronnie

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

and Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall and Tanja Lacy, Willie and Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC ("Plaintiffs") pursuant to Missouri Rules of Civil Procedure 55.05 and 55.27(a)(6) on the basis that Plaintiffs have failed to state a claim upon which relief can be granted, because their claims are wholly preempted by a federal statute as set forth in the following suggestions of law in support.   Defendant Commonwealth Edison Company ("ComEd")[1] also joins this motion.

As discussed in this motion and suggestions of law, Plaintiffs' substantive state law causes of action against Cotter and ComEd are completely preempted by the PAA, because Plaintiffs' claims arise from and relate to a nuclear incident involving "source material" that was the subject of a license issued by the federal government.  As such, Plaintiffs' exclusive right to relief would arise under the PAA.  But Plaintiffs have not sufficiently alleged a PAA claim. Specifically, they fail to plead an essential element of such of a claim: Cotter's breach of the federal dose and effluent limits.  Furthermore, Plaintiffs are not entitled to medical monitoring, diminution in property value, or emotional distress damages because they have not pleaded the requisite elements for these claims and/or because the PAA does not allow for such relief.  Even if Plaintiffs' state law claims were not preempted by the PAA, therefore, they are all defectively pleaded and should be dismissed.  And because Plaintiffs' substantive claims fail as a matter of law, the claims for injunctive relief and punitive damages should be dismissed.  Finally, Plaintiffs' class allegations should be dismissed for failure to state a claim upon which relief can be granted, and also because the class definitions are impermissibly overbroad and do not meet the required elements of Rule 52.08(a).

---

[1] ComEd is not alleged to have taken any independent actions relevant to Plaintiffs' claims, but has been named as a defendant solely because of its purported corporate relationship(s) to Cotter. *See* SAP at ¶ 29, attached hereto as Exhibit 1.  ComEd has separately moved to dismiss Plaintiffs' claims on the basis this Court lacks jurisdiction over it.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**INTRODUCTION**

As set forth herein, the PAA preempts state law claims pertaining to public liability arising from a nuclear incident and provides an exclusive federal cause of action.  Although the PAA provides that any right to relief on Plaintiffs' claims would arise under an exclusive federal cause of action, the PAA applies in full when a case falling within its ambit is litigated in a state court forum.  Put simply, the PAA applies in this forum and this Court should determine that Plaintiffs' claims are preempted by the PAA.  Because the Plaintiffs have not alleged facts stating a claim under the PAA, the motion to dismiss should be granted.

The United States District Court for the Eastern District of Missouri remanded this case because it could not conclusively determine that it had federal subject matter jurisdiction, and it is required under the applicable law to resolve doubts about jurisdiction in favor of remand.  That court did not conclusively rule that there was no preemption under the PAA as a matter of law. Upon remand, this Court must now determine whether the PAA preempts Plaintiffs' claims in this case. While the federal court's determination as to the *forum* is binding on remand, its determination (or lack thereof) on the substantive law is not.  This Court can, and should, consider the applicability of the PAA afresh.

**ALLEGATIONS IN THE SECOND AMENDED PETITION**

Plaintiffs allege the following in the Second Amended Petition: Plaintiffs are citizens of the state of Missouri, and own and reside on certain real property they contend is contaminated with radioactive materials emitted from nearby Coldwater Creek. *See generally* SAP at ¶¶ 2-4, 18-25.  By way of background, from 1942 to 1957, uranium ore was processed at a site in downtown St. Louis ("SLDS") in connection with the United States' efforts under the Manhattan Project to develop the first nuclear weapons.  *See id*. at ¶¶ 62-63.  In the late 1940s, the United

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

States government purchased a 21.7-acre tract of land near the Lambert-St. Louis International Airport ("Airport") to store materials generated from processing activities at SLDS.  *See id.* at ¶ 65.  This site is commonly referred to as the St. Louis Airport Site ("SLAPS").  *Id.*

Thereafter, various radioactive materials resulting from operations at SLDS were stored at SLAPS, and in 1957, radioactively impacted materials were buried on a portion of SLAPS adjacent to Coldwater Creek.  *See id.* at ¶¶ 65-66.[2]  Plaintiffs contend that in the 1960s, some radioactive materials that had been stored at SLAPS were moved to a site at Latty Avenue in Hazelwood, Missouri ("Latty Avenue" or the "Latty Avenue Site") by an unnamed entity, including a portion of the Latty Avenue Site that later became known as the Hazelwood Interim Storage Site ("HISS"), which resulted in the contamination of the Latty Avenue Site.  *See id.* at ¶¶ 67-68.  Nowhere in the SAP do Plaintiffs allege that Cotter or ComEd had any role in the handling of radioactive materials during this time.

In the late 1960s, Cotter[3] allegedly purchased some of the radioactive materials (including purported "enriched thorium") stored at SLAPS and the Latty Avenue Site from the United States government, which Cotter allegedly stored, processed, and transported at the SLAPS and the Latty Avenue Site between 1969 and 1973.  *See* SAP at ¶¶ 69-72.  Plaintiffs also allege that "[i]n 1969, the hazardous, toxic, and radioactive wastes [sic] residues at Latty Avenue were sold to the Cotter Corporation."[4]  *Id.* at ¶ 87.  According to Plaintiffs, various transport and

---

[2] As discussed herein, Plaintiffs have now – improperly – sought to overrule the regulating agency's own classification of these materials by incorrectly calling them "mill tailings."
[3] Plaintiffs have amended this claim in the SAP to include Cotter's "predecessors in interest, and its successors." This claim is both internally inconsistent with the allegations in Paragraph 87 (identifying only "Cotter Corporation" as the alleged purchaser), and belied by publicly available documents demonstrating that a company wholly separate from Cotter purchased the material from SLAPS.  Moreover, it defies logic to argue that a "successor" could have been involved in events that *preceded* that entity's involvement in the matters alleged in the petition.  Accordingly, this conclusory new allegation must be dismissed out of hand.
[4] Plaintiffs' allegations are thus internally inconsistent, as Cotter could not have purchased the materials at SLAPS and then purchased those same materials at Latty Avenue again in 1969.

handling activities to and from SLDS, SLAPS, the Latty Avenue Site, and HISS (by unnamed entities) contaminated "haul routes to nearby properties." *See id*. at ¶ 74.

Plaintiffs claim that "radioactive wastes have migrated from the SLAPS, HISS, and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire . . . one hundred year flood plain of Coldwater Creek." *See id*. at ¶ 88. Plaintiffs contend that their properties are within the one-hundred-year flood plain of Coldwater Creek, that there is radioactive contamination present on their properties, that this contamination is linked to radioactive materials "generated in the processing of uranium ores in the St. Louis area," and that it is the result of the "improper handling, storage, and disposal of radioactive materials." *See id*. at ¶¶ 92-98. Plaintiffs claim that the alleged radioactive contamination of their properties renders them unfit for normal use and enjoyment. *See id.* at ¶ 97.

## PROCEDURAL HISTORY

On February 21, 2018, Plaintiff Tamia Banks filed a class-action petition in the Circuit Court of St. Louis County, Missouri. On April 2, 2018, plaintiffs filed a first amended petition. On October 29, 2019, Plaintiffs filed the SAP, adding an additional ten (10) Plaintiffs.

Plaintiffs' SAP asserts various state-law claims against Defendants seeking monetary recovery stemming from purported damage to their properties, alleging civil conspiracy on the part of the Defendants, requesting injunctive relief in the form of medical monitoring and the remediation of their property, and asking for punitive damages.[5]

---

[5] Counts X through XII of the SAP assert claims solely against the St. Louis Airport Authority for inverse condemnation and violations of the Missouri state constitution. *See* SAP at ¶¶ 202-220. Accordingly, those Counts are not addressed here.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Defendants[6] collectively removed this action to the United States District Court for the Eastern District of Missouri on April 18, 2018, on the basis of subject matter jurisdiction. Defendants removed the action because Plaintiff's state-law causes of action are preempted by the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, which provides a retroactive, federal public liability cause of action for all tort claims stemming from nuclear incidents and radiation injuries, and which vests original jurisdiction in the federal courts. Banks's (and the additional plaintiffs') claims arise from an alleged nuclear incident and consequent radiation injuries to property. Liability for such claims is accordingly governed by the PAA.

Banks moved to remand the action, and the federal district court granted her motion, holding Defendants could not conclusively establish that Cotter's license provided subject matter jurisdiction for purposes of the PAA. *Banks v. Cotter Corp.*, 4:18-CV-00624-JAR, Dkt. 75 at 17-18 (E.D. Mo. Mar. 29, 2019).[7] After explaining that courts generally resolve doubts about federal jurisdiction in favor of remand, the federal court noted a split in the courts as to whether a license or indemnity agreement was a prerequisite to establishing subject matter jurisdiction pursuant to the PAA. *Id.* at 4, 13 (explaining that courts have concluded this requirement would run contrary to the PAA's plain text and legislative history). Adopting the view that a license was required to establish jurisdiction, the federal court found it could not determine whether the material at issue was covered by Cotter's license. Faced with "competing preemption narratives," the federal court concluded that subject matter jurisdiction could not be conclusively established. *Id.* at 17–18. The case was remanded to this Court on March 29, 2019.

---

[6] At this time there were two additional defendants in the suit: Exelon Corporation and Exelon Generation Company, LLC. The SAP removes the two entities as defendants in this suit.
[7] The parties and the District Court do not dispute that Cotter had a source material license. *See* Memorandum and Order, 4:18-cv-000624 (JAR), Doc. No. 75 at 10, n. 10; *see also* Doc. No. 52-2.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Cotter, ComEd, and the additional defendants at that time moved to dismiss the FAP because Banks's claims are preempted by the PAA, and this Court on remand can, and should, make its own determination that the claims are preempted by the PAA.  In the alternative, the Defendants argued that even if this Court concludes that the PAA does not preempt Banks's claims, the FAP should still have been dismissed, because the common law standard of care is the federal dosage and effluent limits, and Banks failed to allege sufficient facts establishing a breach of those standards.

Before this Court ruled on the motion to dismiss the FAP, leave to file a second amended complaint was granted.  The amended allegations in the SAP do not cure the FAP's deficiencies, however.  While Plaintiffs attempt to further distance themselves from Cotter's AEC license by characterizing the radioactive waste at issue as "mill tailings," this characterization is misleading and inaccurate as a matter of law.   For these reasons, Cotter and ComEd renew their motion and ask that the Court dismiss the claims in the SAP.

## LEGAL ARGUMENT

Motions to dismiss serve as the primary way to dispose of baseless claims.  *See ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993).  Missouri requires fact pleading.  *Id.*  A plaintiff must allege a "short and plain statement of the facts showing that the pleader is entitled to relief."  Mo. R. Civ. P. 55.05.  Ultimate facts on which a jury could return a verdict for the plaintiff must be pleaded—evidentiary facts are not sufficient.  *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 (Mo. 2019), *reh'g denied* (Apr. 2, 2019).

A motion to dismiss for failure to state a claim on which relief can be granted attacks the sufficiency of a plaintiff's pleadings.  *In re T.Q.L.*, 386 S.W.3d 135, 139 (Mo. banc 2012). In

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

reviewing a petition, a court "must accept all properly pleaded facts as true, giving the pleadings their broadest intendment, and construe all allegations favorably to the pleader." *Bromwell v. Nixon*, 361 S.W.3d 393, 398 (Mo. banc 2012).  Factual allegations are not weighed for credibility or persuasiveness; a court only reviews "to determine if the facts alleged meet the elements of a recognized cause of action." *Id.*  "In order to survive the motion, the petition must 'invoke substantive principles of law entitling plaintiff to relief and . . .  ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial.'" *In re T.Q.L.*, 386 S.W.3d at 139 (quoting *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329 (Mo. banc 2009)).

## I.    The Price-Anderson Act Applies and Preempts the State Law Causes of Action.

### A.    The Price-Anderson Act Preempts Claims Litigated in State Courts.

This Court has concurrent jurisdiction to adjudicate claims arising under the PAA.  The PAA's jurisdictional clause provides federal courts with original—but not necessarily exclusive—jurisdiction.  42 U.S.C. § 2210(n)(2) ("With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.").  Section 2210(n)(2) both vests federal courts with original jurisdiction and provides for removal to federal court on a party's motion within 30 days of the action becoming removable.  *Id.*  While there is a strong Congressional preference for PAA claims to be heard in federal court (as discussed further below), the PAA's jurisdictional provision expressly contemplates the possibility that the PAA may also apply to claims litigated in state court, as it requires parties to affirmatively move to remove the action and to do so within 30 days.  *See id.*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Because Congress has indicated a strong preference that PAA claims be litigated in a federal forum, these cases are routinely removed to federal court. *See El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484–85 (1999) (noting that Congress has "expressed an unmistakable preference for a federal forum" in litigating PAA claims). Congress's preference for a federal forum also applies in determining the applicability of the PAA when removal is contested. *Id.* As a result, the vast majority of cases involving claims related to radioactive materials are litigated in federal court. This congressional preference as to *forum* does not speak to the PAA's substantive applicability in state court, however.

The PAA (and its preemptive effect) applies with equal force in state courts. *Osarczuk v. Associated Univs., Inc.*, 36 A.D. 3d 872, 874 (N.Y. App. Div. 2007) (holding that the PAA preempted state law claims and affirming the trial court's grant of summary judgment on the claim arising under the PAA); *Ne. Ohio Reg'l Sewer Dist. v. Advanced Med. Sys., Inc.*, 666 N.E.2d 612, 614 (Ohio Ct. App. 1995) (holding that PAA actions can be brought in state court because the Act provides federal courts with original but not exclusive jurisdiction). The PAA preempts state law claims and provides an exclusive federal cause of action. *See El Paso Natural Gas*, 526 U.S. at 477. But this Court, as one of general jurisdiction, can adjudicate federal causes of action. Congress preempted state law claims in enacting the PAA; it did not strip state courts of jurisdiction to adjudicate PAA claims. *See* 42 U.S.C. § 22019(n)(2) (providing federal courts with original, not exclusive, jurisdiction). Accordingly, there is no bar to this Court determining that the PAA governs this action simply because the action is being litigated in a state forum.

601317909.1

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**B.** **This Court Is Entitled to Reach its Own Independent Conclusion About the Applicability of the Price-Anderson Act to Plaintiffs' Claims.**

As discussed above, the federal court had a duty to remand the case when faced with competing preemption narratives.  While that court did draw interim conclusions concerning the application of the PAA more generally, the federal court did not reach a definitive conclusion as to whether the PAA applies to Banks's (and now the additional SAP plaintiffs') claims here. Therefore, the only aspect of the federal court's decision that is binding on this Court is the determination that the action will be litigated in this forum.  It is this Court's determination of the substantive law that will govern the action, and this Court has the opportunity to get the law right.

When a case is remanded, a state court is free to reject the remanding court's reasoning. *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 647 (2006).  Collateral estoppel is not a bar to revisiting an issue because 42 U.S.C. § 1447(d) precludes appellate review of the remand order. *Id.*  While a state court does not review the remanding court's decision in an "appellate way," the determinations in remand orders are open to revision ***even where the remand's basis "coincides entirely with the merits of the federal question."*** *Id.* (emphasis added).  The only issue conclusively decided by a remand order is the forum.  *Id.*

Missouri law recognizes not only the propriety of this court making its own determination about legal issues following remand, but has even specifically recognized that on remand the court can determine that the claims are preempted and dismiss the case.  *Breeden v. Hueser*, 273 S.W.3d 1, 9 (Mo. Ct. App. 2008).  This independent analysis is warranted even where the federal court had determined the claims were not preempted by the federal act, and had on that basis, remanded the case.  *Id.*  Although "the federal district court already addressed the issue of preemption of [plaintiffs'] claims by the [federal act] in its remand to state court, this

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

does not prevent a state court from thereafter dismissing the case based on its own determination that the claims are preempted." *Id.* (citing *Kircher*, 547 U.S. at 646–67).  The court proceeded to analyze independently whether the claims were preempted.  *Id.*

*Breeden* is squarely on point.  273 S.W.3d at 9.  Although the federal court remanded this case based on its inability to definitively conclude that the PAA conferred subject matter jurisdiction in this case, this Court is not precluded from making its own determination that the PAA preempts the Plaintiffs' claims.  As in *Breeden*, this Court should undertake an independent analysis of the PAA preemption issue.

Nor is the federal court's analysis owed any weight by this Court.  Due to the lack of appellate review in the federal forum, comity considerations do not favor deference to the remanding court.  The unavailability of appellate review in the federal forum actually weighs in favor of robust independent analysis by this Court.   It is ultimately this Court's legal determinations that will be subject to appellate review.  There is no bar to this Court determining that the PAA applies and preempts Plaintiffs' claims and then dismissing the PAA claim.

**C.**   **The Price-Anderson Act Preempts Plaintiffs' State-Law Claims in this Action and Provides the Exclusive, Retroactive Cause of Action for Claims Arising from Nuclear Incidents or Radiation Injuries.**

Because Plaintiffs' state law causes of action arise from a nuclear incident and seek recovery for radiation injuries, Plaintiffs' claims are governed by the PAA, which Congress enacted in 1957 to "encourage the development of the nuclear industry." 42 U.S.C. § 2012(i); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 64 (1978).  Over the past 60 years, the federal government has regulated the use and processing of radioactive materials through a comprehensive federal scheme, which preempts the states from regulating the health and safety aspects of essentially all radioactive materials.  *See, e.g.*, *Pacific Gas & Elec. Co. v.*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

*State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 208 (1983); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1240-45 (10th Cir. 2004).

In response to the proliferation of lawsuits arising out of the 1979 Three Mile Island incident, Congress amended the PAA in 1988 to create an exclusive, retroactive, federal cause of action—called a "public liability action"—for any "public liability" arising from a "nuclear incident." *See El Paso Natural Gas Co.*, 526 U.S. at 477; *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 857 (3d Cir. 1991); *see also* Pub. L. No. 100-408 § 20(b)(1), 102 Stat. 1084 ("The amendments governing judicial review of claims arising out of a [nuclear incident] shall apply to incidents occurring before, on, or after the date of the enactment of this Act."). A "public liability action" is "any suit asserting public liability," which "shall be deemed to be an action arising under [the PAA], and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section*." 42 U.S.C. § 2014(hh) (emphasis added). The U.S. Supreme Court has observed:

> This structure, in which a public liability action becomes a federal action, but one decided under substantive state-law rules of decision that do not conflict with the [PAA], resembles what we have spoken of as complete preemption doctrine, *under which the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.*

*Neztsosie*, 526 U.S. at 484, n.6 (emphasis added).

The PAA defines "public liability" as "any legal liability arising out of or resulting from a nuclear incident . . . ." 42 U.S.C. § 2014(w). In turn, the PAA defines a "nuclear incident" as "any occurrence . . . within the United States causing . . . loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id*. § 2014(q).

12

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Therefore, under the plain language of § 2014(hh), the PAA will apply to "any suit asserting public liability," arising from a "nuclear incident."

The overwhelming majority of federal circuit courts have determined that state law causes of action arising from nuclear incidents and radiation injuries are entirely preempted by the PAA.  *See McClurg v. MI Holdings*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013).  In *Adkins v. Chevron Corp.*, the district court canvassed federal case law and found that virtually every federal court to address the issue has held the PAA "completely preempts state law causes of action for public liability arising out of or resulting from nuclear incidents."  960 F. Supp. 2d 761, 767 (E.D. Tenn. 2012) (citing *In re Berg Litig.*, 293 F.3d 1127, 1132 (9th Cir. 2002) (PAA is "exclusive means" for pursuing claims arising from a nuclear incident); *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1306 (11th Cir. 1998) (PAA creates "an exclusive federal cause of action for radiation injury"); *Nieman v. NLO*, 108 F.2d 1546, 1549 (6th Cir. 1997) (PAA "preempts [the plaintiff]'s state law claims" and "the state law claims cannot stand as separate causes of action"); *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1504 (10th Cir. 1997) (PAA "appear[s] broad enough to create a federal forum for any tort claims even remotely involving atomic energy production.  The [PAA] on its face provides the sole remedy for the torts alleged"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) ("a new federal cause of action supplants the prior state cause of action . . . [S]tate regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law"); *In re TMI II*, 940 F.2d at 854 ("no state cause of action based upon public liability [under the PAA] exists. A claim growing out of any nuclear incident is compensable under the terms of the [PAA] or it is not compensable at all"); *see also Cotroneo v. Shaw Env't & Infras., Inc.*, 639 F.3d 186, 192 (5th Cir. 2011) ("[A] plaintiff who asserts any claim arising out of a 'nuclear incident' as defined in

13

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

the PAA . . . can sue under the PAA or not at all."); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2007) ("[t]he PAA is the exclusive means of compensating victims for any and all claims arising out of nuclear incidents."). State courts adjudicating these claims concur. *See, e.g., Osarczuk*, 36 A.D. 3d at 874 (holding the PAA preempted state law claims).

Courts are in near universal agreement that a public liability action is "sweeping" in scope and encompasses any liability from "nuclear incidents." *Farley*, 115 F.3d at 1504.[8] Indeed, in *McClurg*, an action litigated in Missouri federal court involving the exact same sites at issue here – SLAPS, SLDS, and the Latty Avenue Site, as well as Coldwater Creek – the court found that a "plaintiff who asserts any claim arising out of a nuclear incident as defined in the PAA, can sue under the PAA or not at all," and consequently dismissed the plaintiffs' "state claims." 933 F. Supp. 2d at 1186.

Here, Plaintiffs' injuries indisputably arise from an alleged nuclear incident insofar as Plaintiffs assert the purported "radioactive contamination [of Plaintiffs' properties] was caused by the Defendants' improper handling, storage and disposal of radioactive mill tailings." *See* SAP at ¶¶ 69-74, 92-98. And Plaintiffs' newly cast allegation that the PAA does not apply to the "mill tailings" at issue in this litigation is not legally correct. SAP ¶ 17.

Plaintiffs' allegation that the materials at issue are "mill tailings" is a legal conclusion masquerading as a fact. Plaintiffs cannot successfully allege that the materials at issue here are "mill tailings" because the existence of a government-issued license at the time of the activities alleged means they had to either be "source materials" or "byproduct materials," which excludes

---

[8] Despite the overwhelming body of case law holding that the PAA preempts state law causes of action arising from nuclear incidents, in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1999 (10th Cir. 2015), the Tenth Circuit found that under extremely limited circumstances, the PAA may not preempt or preclude "a state law nuisance claim when a nuclear incident is asserted but unproven." The decision in *Cook* was based on a parsing of the definition language that has not been applied by any other circuit court, and is not applicable here, where Plaintiffs' SAP indisputably alleges claims arising from and related to a nuclear incident. Interestingly, *Cook* was silent regarding the 10th Circuit precedent of *Kerr-McGee v Farley*, 115 F.3d 1498, 1504 (10th Cir. 1997), discussed above. In any event *Cook* does not change the analysis, and Plaintiff's state law claims are still preempted by the PAA.

601317909.1

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

classifying the materials as "mill tailings,"[9] as further discussed below.  *See* SAP ¶ 37 (admitting the Latty Avenue Site has a "radioactive material license associated with it").[10]  Plaintiffs' allegation that it was "mill tailings" that were stored at the Latty Avenue Site, SAP ¶¶ 64-67, cannot be squared with the Atomic Energy Commission's regulation of the materials at that site as either *source materials* or *byproduct materials*.  Otherwise, the site would not have fallen within the AEC's regulatory purview to issue a license.  *See Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Com'n*., 903 F.2d 1, 3 (D.C. Cir. 1990).  Plaintiffs and this Court are not free to retroactively reclassify those licensed radioactive materials as "mill tailings."

That the materials at Latty Avenue cannot be classified as "mill tailings" is confirmed by the statutory and regulatory structure.  As early as 1960, the AEC concluded that mill tailings fell outside of its "statutory licensing authority and therefore [were] beyond its regulatory reach." *Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Com'n*., 903 F.2d 1, 3 (D.C. Cir. 1990). At the time of the allegations in the petition related to moving the materials to Latty Avenue in the 1960s, SAP ¶ 67, the AEC was aware mill tailings were outside its regulatory purview and it could not have issued such a license.  But a license for the materials was issued here, making it implausible that materials stored at Latty Avenue are "mill tailings."

---

[9] *See Banks v. Cotter Corp.*, 4:18-CV-00624-JAR, Dkt. 75 at 10 (E.D. Mo. Mar. 29, 2019).

[10] In so alleging, Plaintiffs acknowledge the existence of *a* license for materials at the Latty Avenue Site.  Plaintiffs plead (incorrectly) that "Defendants did not have a license to handle the particular materials they handled as alleged herein."  SAP ¶ 15(d).  Plaintiffs also allege that Cotter "did not have a license to handle or dispose of *enriched thorium*." SAP ¶ 73 (emphasis added). Together with the allegations in paragraph 37, Plaintiffs seek to define that license by what it is *not*.  By process of elimination based on the pleadings, if there was a "radioactive material license" it would have to be for the only other radioactive material mentioned in the pleadings which is "concentrated uranium . . . ore."  SAP ¶ 1.  There is no allegation that any milling occurred at the Latty Avenue Site, only that the materials were stored there.  SAP ¶¶ 64, 67.  Based on the pleadings and the applicable regulations at the time of Cotter's activities at the Latty Avenue Site (as pleaded in the SAC and as further discussed in this section), the license associated with Latty Avenue could only be a license for source material or byproduct material, both of which are covered by the PAA.  *See generally* 42 U.S.C. §§ 2071–2114 (there are no allegations in the petition that this material would fall within the definition of special nuclear material, so a license at the Latty Avenue Site would either be for source material or byproduct material).

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Moreover, when Congress did fill the statutory and regulatory gap to address the issue of "mill tailings" by passing the Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"), Pub. L. No. 95-604, 92 Stat. 3021, 95th Cong., 2d Sess. (1978) (codified at 42 U.S.C. §§ 2022, 7901-7942 (as later amended), the Latty Avenue Site was not among the sites designated for remediation for mill tailings.  *See* 42 U.S.C. § 7912.  If the material at Latty Avenue was mill tailings, then the site would have been specifically designated for remediation under this Act.  42 U.S.C. §§ 7911(6)(a)(2), (7)(a), & (8); § 7912 (designating processing sites for remediation).  The absence of Latty Avenue (or any other site in Missouri) from the statutory scheme specifically structured to address the issue of mill tailings outside the regulatory purview is only further confirmation that the government did not consider the material at the Latty Avenue Site as "mill tailings."[11]

Plaintiffs cannot plead their way out of the PAA's grasp by characterizing the materials at issue as "mill tailings."  Given that the activities at Latty Avenue were performed pursuant to a license issued at a time when mill tailings were outside the regulatory purview and the absence of the sites at issue from the statutory scheme specifically designed to address the issue of mill tailings, Plaintiffs have not pleaded sufficient ultimate facts to show the material at issue can be mill tailings under the regulatory and statutory schemes.  Therefore, Plaintiffs' characterization of the materials as "mill tailings" is no more than a legal conclusion and is not an ultimate fact that could potentially take the allegations outside the PAA.[12]  *Cf. Bohac v. Walsh*, 223 S.W.3d 858, 862 (Mo.App.2007) ("If the petition contains only conclusions and does not contain the

---

[11] Even Plaintiffs apparently cannot make up their minds, referring to the contamination as, alternatively, "radioactive waste … generated as a result of chemical processes that took place in local facilities in St. Louis," (SAP ¶ 49A), and the "result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt." (SAP ¶ 64).

[12] Even if the materials at issue were "mill tailings," Cotter asserts that PAA still applies and provides the exclusive remedy, because they would be "byproduct material" as currently defined under the Atomic Energy Act and fall within the definition of a nuclear incident.  *See* 42 U.S.C.§ 2014(e)(2), (q) (covering "source, special nuclear, or byproduct material").

16

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

ultimate facts or any allegations from which to infer those facts, the petition may be dismissed for failure to state a claim."); *see also* SAP ¶ 11 (pleading that "mill tailings" is a legal classification). The materials at issue in the petition are radioactive material that are subject to the PAA. 42 U.S.C. § 2014 (w), (q).[13]

At bottom, notwithstanding their failure to pinpoint any specific release or releases by Cotter (or ComEd) that led to this alleged contamination on their property, Plaintiffs have asserted claims for radiation-based damages to their property, and it is for this sort of injury that "Congress passed the [PAA]," thus "creating an exclusive federal cause of action for radiation injury," *see Roberts*, 146 F.3d at 1306. As a result, Plaintiffs cannot assert any state law causes of action and must proceed exclusively under the PAA. Plaintiffs' state law causes of action for trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict liability damages are therefore preempted by the PAA and should be dismissed. *See, e.g.,* *Nieman*, 108 F.3d at 1564 (concluding claims for negligence, strict liability, private nuisance, trespass, and willful and wanton misconduct under Ohio law were preempted by the PAA); *Adkins*, 960 F. Supp. 2d at 769 (E.D. Tenn. 2012) (holding that the PAA completely preempted state law causes of action such as strict liability, wrongful death, and negligent infliction of emotional distress); *Hennessy v. Commonwealth Edison Co.*, 764 F. Supp. 495 (N.D. Ill. 1991) (dismissing claims for negligent infliction of emotional distress, strict liability, and battery).

---

[13] A license is not required for the PAA to apply. "In passing the [PAA], Congress recognized that a nuclear incident might be caused by any number of participants in the nuclear industry beyond the actual licensee." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1378 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). However, to the extent Plaintiffs attempt to argue otherwise, they have pleaded there is a license associated with the Latty Avenue Site and that license can only be one that definitively brings the materials at the site within the scope of the PAA.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**D.** **Plaintiffs Have Not Pleaded A Viable Claim For Which Relief Can Be Granted Under the Price-Anderson Act.**

    **1.** **Plaintiffs Have Not and Cannot Allege Sufficient Factual Allegations to Support a Claim for Public Liability Under the Price-Anderson Act.**

Even if Plaintiffs had pleaded a PAA public liability claim, the factual allegations in the SAP are insufficient to support such a claim. Namely, Plaintiffs have failed to allege exposure to radiation in exceedance of the applicable federal dose and effluent limits. Further, Plaintiffs have not identified any federal nuclear safety regulations that Defendants may have breached. Thus, Plaintiffs have failed to properly plead a public liability claim, and the SAP should be dismissed with prejudice.

Courts throughout the country are in near universal agreement that liability for purposes of the PAA is defined by a federal standard of care derived from federal nuclear safety regulations. *See, e.g.*, *Roberts*, 146 F.3d at 1308 (stating "federal safety regulations conclusively establish the duty of care owed in a public liability action"); *O'Conner*, 13 F.3d at 1105 ("the federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action."); *In re TMI II*, 940 F.2d at 859-60 (concluding "the federal statutes and regulations governing the safety and operation of nuclear facilities" [*i.e.*, "federal permissible dose limits"] would apply as "states are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law"); *see also McClurg*, 933 F. Supp. 2d at 1187 (finding that to assert PAA public liability claim, plaintiffs must allege violation of federal radiation dose limit because "the maximum permissible radiation dose levels set by federal safety standards establish the duty of care for radiation injuries"); *Corcoran v. New York Power Authority,* 935 F. Supp. 376, 387 (S.D.N.Y. 1996) (holding that plaintiff must plead and establish

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

a breach of the federal dose limits).  Indeed, in *McClurg*, the district court observed that "every Circuit Court" to address the issue—namely the Third, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits—has held "that the maximum permissible radiation dose levels set by federal safety standards establish the duty of care for radiation injures, and that imposing a non-federal duty would conflict with [the PAA]."  933 F. Supp. 2d at 1187.

These dose limits apply equally to both personal injury and property damage claims.  *See Reeves v. Commonwealth Edison Co.*, No. 06-CV-5540, 2008 WL 239030, at *4 (N.D. Ill. Jan. 28, 2008) (observing that "Federal nuclear regulatory standards . . . have been applied to [public liability] claims involving property damage") (citing multiple cases and reaffirming prior district court holdings that the federal dose limits are "the sole duty owed to the landowners under their property damage claims.").  As a result, regardless of whether a plaintiff alleges personal injury, property damage, or both as a result of radiation exposure, "every circuit court of appeals to address the question . . . has held that [a] plaintiff must prove a dose in excess of the federal permissible dose limits in order to show a breach of duty in a public liability action under the [PAA]."  *Adkins*, 960 F. Supp. 2d at 769.  Ultimately, a plaintiff's failure to plead this "essential element of [her] claim" is fatal.  *Id.*

Here, Plaintiffs have not alleged that they were exposed to radiation in excess of federal dose or effluent limits, nor have Plaintiffs identified any federal nuclear safety regulations or standards that Cotter may have breached.  Rather, the closest the SAP comes to providing such allegations is its single, bald assertion that Defendants violated a host of "Missouri regulations for Protection against Ionizing Radiation."  *See* SAP at ¶ 171.  Such conclusory allegations of misconduct are insufficient to withstand a motion to dismiss, and Plaintiffs' failure to allege either the applicable standard of care or breach of the federal dose and effluent limitations is fatal

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

to any nascent cause of action under the PAA.  *See Adkins*, 960 F. Supp. 2d at 772 (finding plaintiffs' complaint failed to state a claim under the PAA where plaintiffs failed to allege which specific standard of care applied to their claim, and instead made conclusory allegations regarding a nuclear facility's non-compliance with various "applicable federal, state and local laws").  *Adkins*'s conclusion is equally applicable in this state, which is a fact pleading state. Absent such allegations, the SAP lacks sufficient factual support to allege a public liability claim under the PAA.  Thus, Plaintiffs have not alleged an essential element for a claim for public liability, and the SAP should be dismissed with prejudice.

### 2. Plaintiffs Cannot Recover for Medical Monitoring, Loss in Property Value, or Emotional Damages under the PAA

Plaintiffs' claim for medical monitoring (which is embedded in their general claim for injunctive relief) and request for damages related to emotional injuries should also be dismissed because Plaintiffs have not alleged any physical injury to themselves, but only to their property, and their loss in property value and emotional damages claims are not cognizable under the PAA.

First, Plaintiffs' claim for medical monitoring, *see* SAP, Count VII at ¶¶ 186-193, should be dismissed because the PAA clearly requires "bodily injury" in order for a plaintiff to obtain medical monitoring as relief.  42 U.S.C. 2014(q).  *See, e.g., June v. Union Carbide Corp.*, 577 F.3d 1234, 1251-52 (10th Cir. 2009); *In re Berg Litigation*, 293 F.3d at 1133 (stating that "a cause of action for medical monitoring because of a future risk of disease, and absent a physical injury, [ ] fails to meet the jurisdictional requirements of the Price Anderson Act."); *In re Hanford*, 534 F.3d at 996, 1009-10 (affirming dismissal of medical monitoring claims "as not cognizable under the PAA.").  Plaintiffs alleges that they are entitled to medical monitoring because "Defendants have tortiously contaminated the property of Plaintiffs . . . with hazardous,

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

toxic, carcinogenic, radioactive wastes," and that this "radioactive contamination of the property . . . has caused a significant increased risk to Plaintiffs." *See* SAP at ¶¶ 187, 189.  Plaintiffs have not, however, alleged that they have suffered any physical injury as a result of this purported contamination.

At most, Plaintiffs claim that the alleged contamination of their home "cause[d] a significant risk to Plaintiffs," without specifying what that risk is or whether they had experienced any negative health effects. *Id.*  A vague, conclusory reference to a "risk" without more is a far cry from alleging a bodily injury cognizable under the PAA, and insufficient to meet the pleading standard on a motion to dismiss. *See, e.g., In re T.Q.L.*, 386 S.W.3d at 139.

And although Plaintiffs cite to a government study for the proposition that "[g]overnmental authorities have identified significant increases of cancer and risks of cancer within the Class," the document cited actually *refutes* the allegation that this increased risk resulted from any radiation exposure.  *See* SAP, ¶ 61, 61 n3.  The study cited by Plaintiffs concluded that "an increased cancer risk in the population due to environmental radiation exposure is unlikely," and the elevated cancer rates are likely due to "smoking, physical inactivity, unhealthy diets, and diabetes." *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 1996-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.  Thus, Plaintiffs have failed to meet the bodily injury prerequisite.

Second, Plaintiffs are not entitled to recover for any loss in value of their property.  The PAA permits property owners to seek compensation only for "loss of or damage to property, or loss of use of property." 42 U.S.C. § 2014(q). Congress, however, chose not to allow recovery for a diminution in the value of property due to nuclear incidents.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Throughout the SAP, Plaintiffs allege that their property has been contaminated by radioactive material creating a permanent stigma, and as a result, their property has decreased in value.  *See, e.g.,* SAP at ¶¶ 97, 123, 135, 138, 154, 166, 176, 182.  Damages for diminution of property value provide no basis for a PAA claim, however, as Congress specifically excluded such claims under the PAA.  *See* S. Rep. No. 296 (1957), reprinted in 1957 U.S.C.C.A.N. 1803, 1818 ("[I]t is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular location.").  Accordingly, Plaintiffs' claim for diminution in property value should be dismissed, because the plain language of the PAA and its legislative history demonstrate that the statute does not provide for such remedies.

Third, to the extent Plaintiffs seek emotional injury damages due to "annoyance and discomfort," *see* SAP at p. 41, subsection a, such damages claims should be dismissed, as emotional distress is not recoverable in a PAA action.  *In re Berg*, 293 F.3d at 1133 (the PAA "grants only limited jurisdiction that does not include emotional distress claims.").  Once again, without the jurisdictional prerequisite for bodily injury, Plaintiffs cannot recover under the PAA.

**3.      Because Plaintiffs' Substantive State-Law Causes of Action Are Preempted by the PAA, Plaintiffs' Claims for Injunctive Relief and Punitive Damages Should Be Dismissed**

Because Plaintiffs' claims for trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict liability damages are preempted by the PAA, as discussed in Section I.D.1 above, Plaintiffs cannot sustain claims for injunctive relief or punitive damages against Cotter (or ComEd).  As such, Counts VII and VIII of the SAP should be dismissed.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

### a.    Injunctive Relief

Injunctive relief constitutes a remedy, not an independent cause of action.  *See Church v. Missouri*, 268 F. Supp. 3d 992, 1022 (W.D. Mo. 2017) (citing *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011) ("[A]n injunction is a remedy and not a cause of action[.]"). "Thus, a request for such [a] remed[y] 'must be based on some recognized and pleaded legal theory.'"  *Id.* (quoting *Goerlitz*, 333 S.W.3d at 455).  Plaintiffs here have asserted substantive claims for relief under a number of legal theories—namely, trespass, permanent nuisance, temporary nuisance, negligence, negligence per se, and strict liability damages.  However, as set forth above, each of those claims has been preempted by the PAA.  Given that these substantive claims should be dismissed, Plaintiffs cannot obtain injunctive relief against Cotter (or ComEd) because there are no longer any viable and operative legal theories independent of their claim for injunctive relief.  *Id.*  Therefore, Count VII of the SAP should be dismissed.[14]

### b.    Punitive Damages

"Punitive damages cannot constitute an independent cause of action.  They can only be an incident of another cause of action." *Landum v. Livingston*, 394 S.W.3d 573, 578 (Mo. App.

---

[14] Moreover, as referenced in the petition (*see* SAP ¶ 3, complaining of the "technicians testing and prodding [Plaintiffs'] backyards and sampling the dust of their vacuum cleaners"), any claims for injunctive relief are arguably preempted by the ongoing federal investigation and cleanup of the sites at issue and Coldwater Creek, including residential properties along the Creek, by the United States Army Corps of Engineers under the Formerly Utilized Sites Remedial Action Program (FUSRAP).  FUSRAP was created in 1974 to identify, investigate, clean up and manage sites that were part of the nation's early atomic energy and weapons program.  As Plaintiffs acknowledge, the wastes at issue were produced as part of the Manhattan Project – "the U.S. research project designed to develop the first nuclear weapons." *See* SAP ¶ 62; *see also* ¶¶ 63-67, 74.  "The St. Louis Downtown Site (SLDS), the St. Louis Airport Site (SLAPS), the Hazelwood Interim Storage Site and former Futura Company (HISS/FUTURA), and properties contaminated in association with these sites were designated for FUSRAP in the St. Louis area.  The U.S. Army Corps of Engineers (USACE) has been in charge of FUSRAP management since 1997, with the Environmental Protection Agency (EPA) providing primary regulatory oversight." https://dnr.mo.gov/env/hwp/fedfac/fusrap/ index.html.  The US Department of Energy (and now the USACE) and EPA are already working together to clean up the sites that are the subject of this action.  By alleging they have radioactive waste on their land from known Superfund sites undergoing investigation and remediation under FUSRAP, Plaintiffs bring their property under EPA's – and the USACE's – purview.  For this additional reason, Count VII of the SAP should be dismissed.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

1965).  "Before punitive damages can be recovered there must be a cause of action for compensatory damages."  *Ibid.; see also Compton v. Williams Bros. Pipeline Co.*, 499 S.W.2d 795, 797 (Sup. Ct. Mo. 1973) (stating that it is well established "that actual or nominal damages must be recovered before punitive damages can be recovered").  Here, as set forth above, the only causes of action against Defendants that could give rise to a claim for punitive damages should be dismissed as preempted by the PAA.  Further, Plaintiffs cannot allege a PAA violation against Cotter or ComEd.  As such, Count VIII of the SAP should be dismissed with prejudice.

## II.    In the Alternative, If the Court Determines the Price-Anderson Act Does Not Preempt Plaintiffs' State Law Claims, It Should Adopt the Federal Nuclear Regulations As the Standard of Care under Missouri Common Law.

Even if this Court disagrees that the PAA applies and holds that Plaintiffs' state law claims are not preempted, the result should still be dismissal of Plaintiffs' claims.  Nor does that mean that the large body of jurisprudence addressing claims under the PAA is irrelevant to the Court's adjudication of the common law claims.  Any standard of care adopted under the common law for the handling of radioactive materials (including mill tailings)[15] should align with the well-established standard of care in PAA cases—the framework that governs the vast majority of claims arising from the handling of radioactive materials.  Plaintiffs have not proffered or alleged a breach of an alternate standard of care.  Because Plaintiffs have not sufficiently pleaded a breach of the common law standard of care, their state law claims should be dismissed.

---

[15] As discussed above, Cotter disputes that the materials referenced in the complaint are "mill tailings."  However, assuming arguendo that the materials at issue were "mill tailings," as plaintiffs allege, they would be considered "byproduct material" under the Atomic Energy Act, and Plaintiffs have not pleaded any basis for the standard of care to deviate from the standard of care for other radioactive materials as set forth in the PAA.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**A.    The Common Law Standard of Care Should Be Derived from the Dose Limits and Associated Limits in the Federal Regulations.**

This Court should adopt liability standards for the care and handling of all radioactive material consistent with the PAA regardless of whether the PAA applies.  The federal court remanded the case on the incorrect determination that Cotter's license did not definitively provide a basis for federal subject matter jurisdiction under the PAA.  Notably, the federal court's reasoning turned on licensing and not the underlying activity.  The activity underlying the state common law claims is necessarily the same activity underlying a PAA claim.  There is no reason, given the common factual predicate, for the common law standard of care to deviate from the PAA's standard of care or the associated effluent limitations.  Even if this Court concludes (contrary to the prevailing law) that Plaintiff's state law claims do not fall within the ambit of the PAA solely because there is not a qualifying license or indemnity agreement, the standard of care should still be based on the underlying radioactive material and mirror that of the PAA.

The PAA standard of care is derived from the federal regulations governing dose and effluent limits.  *See In re TMI (III)*, 67 F.3d 1103, 1113–14 (3d Cir. 1995); *see also Carey v. Kerr-McGee Chemical Corp.*, 60 F. Supp. 2d 800 (N.D. Ill. 1999) (determining the federal dosing regulations apply to tort claims for property damage); *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 2929444, at *5-6 (E.D. Mo. July 7, 2017) (agreeing with and applying the dose and effluent standards identified by the Third Circuit in *In re TMI*).  The current federal dose limits for licensees are found in 10 C.F.R. § 20.1301(a)(1) (establishing limit of 100 millirems per year).  At the time of Cotter's operations (1970-1973) the federal dosing limit was 500 millirems per year, 10 C.F.R. § 20.105(a) (1969), and the effluent limitations were

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

defined in Appendix 'B', Table II, of 10 C.F.R. § 20.106 (*see id.* at 12*; see also In re TMI (III)*, 67 F.3d at 1109).

The common law often looks to statutes and regulations for the applicable standard of care. "The Restatement (Second) of Torts expressly provides that, in certain situations, a 'court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation.'" *In re TMI (III)*, 67 F.3d at 1113 n.24 (quoting Restatement (Second) of Torts § 286 (1965)). The Restatement was considered in articulating the PAA's standard of care. *Id.* This Court should likewise be guided by the Restatement in determining the applicable standard of care.

Consistent with the Restatement, this is a situation where a regulation should be adopted as the standard. The care and handling of radioactive materials at issue in this litigation is not something that ordinarily occurs. This is a highly regulated field. These regulations inform the behavior of the reasonable man. Plaintiffs would be hard pressed to identify an alternate source for the standard of care because of the pervasive regulation of radioactive materials. Regulations and the actions of other regulated individuals are the only guide for determining the standard. Public policy strongly favors consistency in the standard of care given that the underlying conduct is the care and handling of radioactive material.

Accordingly, even if the Court declines to find that the PAA governs Plaintiffs' state law claims, the result should still be the same because the standard of care is the same.

**B.** **Plaintiffs Fail To Allege Sufficient Facts Relating to Any Standard of Care, and Their Claims Should Be Dismissed.**

As a global matter, because Plaintiffs have failed to allege a dosage amount, they have failed to allege facts showing a breach of the standard of care and they fail to sufficiently plead their state law claims. Plaintiffs' claims should therefore be dismissed. Apart from this fatal

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

global pleading deficiency, moreover, Plaintiffs' individual claims are also defectively pleaded. The claims rely on conclusory allegations devoid of factual allegations, as set forth below, and should be dismissed.

### 1. Plaintiffs' Conclusory Allegations Fail to Allege a Negligence, Negligence Per Se, or Strict Liability Claim

Plaintiffs' formulaic recitations of the elements of their negligence, negligence per se, and strict liability claims fall far short of adequately pleading those claims. "To make an adequate claim for common law negligence, a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." *Sill*, 87 S.W.3d at 391. Apart from parroting the elements of a negligence claim, the SAP contains no factual allegations of how Cotter (or ComEd) breached any duty of care toward Plaintiffs or what that duty is. *See* SAP at ¶¶ 160-164 (vaguely alleging Defendants' "conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines" without identifying what those standards were or how Cotter (or ComEd) violated them, and alleging in a conclusory manner "Defendants failed to act to prevent their releases from harming Plaintiffs," without identifying what Defendants should have done).

Plaintiffs' negligence per se claim suffers from the same defects as their negligence claim: "[a] claimant may proceed on a negligence per se claim 'if the following four elements are met: (1) There was, in fact, a violation of the statute; (2) The injured plaintiff was a member of the class of persons intended to be protected by the statute; (3) The injury complained of was of the kind the statute was designed to prevent; and (4) The violation of the statute was the proximate cause of the injury.'" *Id*. at 392. Once again, Plaintiffs merely recites the elements of a negligence per se claim without explaining what it is that Cotter (or ComEd) did (or did not do)

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

that constitutes negligence per se.  The SAP fails to identify how Cotter (or ComEd) violated ***any*** of the statutes identified in paragraph 171 of the SAP (listing Missouri's Solid Waste Management Law and Regulations, Missouri Clean Water Act, and Missouri Air Conservation regulations), such as whether any purported releases of radioactive materials from Latty Avenue were above any threshold levels or standards contained in any of the above regulations.

Especially troubling, Plaintiffs allege that their property (and the property of the putative class members, where the class is defined as those property owners within the one hundred-year floodplain of Coldwater Creek [*see* SAP at ¶¶ 35-36]) was contaminated "[a]s a result of . . . flooding," SAP ¶ 91, yet they are purportedly relying on air and solid waste regulations, rather than water regulations, to show a breach of duty by Defendants.  *See* SAP ¶ 171.  As a result, it is impossible for Cotter and ComEd (and this Court) to parse out the basis on which Plaintiffs claim Cotter (or ComEd) is liable to them, and this claim should be dismissed accordingly.

Finally, Plaintiffs have failed to adequately plead a strict liability claim against Cotter (or ComEd) and once again merely recite the elements of such a claim without any supporting factual allegations.  *See Clay v. Missouri Highway & Transp. Comm'n*, 951 S.W.2d 617, 623 (Mo. Ct. App. 1997) ("a person is strictly liable 'when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings.'").  The SAP does not identify what activities Cotter (or ComEd) performed that were abnormally dangerous and inappropriate to the place where they were done, other than vague allegations that Cotter "stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites" that somehow caused them to lose the use of their property and caused their property to lose some unspecified measure of value.  SAP at ¶ 72.  The mere handling of

28

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

radioactive residues alone, as Plaintiffs alleges does not necessarily equate to an abnormally dangerous activity.

### 2. Plaintiffs Fail to Allege Facts Sufficient to Support Either Their Permanent or Temporary Nuisance Claims

Cotter (and ComEd) cannot be liable to Plaintiffs for either permanent or temporary nuisance because, as even Plaintiffs implicitly acknowledge (*see* SAP at ¶¶ 69-72, 87), Cotter was not the property owner of Latty Avenue at any time, and thus cannot be liable for nuisance. *See Frank*, 687 S.W.2d at 880 ("[t]he law of nuisance recognizes two conflicting rights: *property owners* have a right to control their land and use it to benefit their best interests; the public and *neighboring land owners* have a right to prevent unreasonable use that substantially impairs the peaceful use and enjoyment of other land.") (emphases added); *State ex rel. Ely v. Bandall*, 299 S.W. 155, 157 (Mo. Ct. App. 1927) ("[W]e understand the general rule to be that a suit to abate or restrain a nuisance *must be brought against the owner of the fee*, unless the nuisance complained of is of such a character that his presence in the suit is not necessary to a complete determination of the controversy."). Because Plaintiffs have not alleged Cotter or ComEd was the owner of either SLAPS or Latty Avenue (nor could they, as neither Cotter nor ComEd ever owned either site), Plaintiffs cannot maintain their nuisance actions against Cotter or ComEd.[16]

### 3. Plaintiffs' Conclusory Allegations Do Not Indicate How Cotter or ComEd Interfered with the Use or Enjoyment of Their Property, and, Therefore, They Cannot Recover Damages for Any State Law Claim

Plaintiffs have not alleged any facts to show the actual loss of the use of their property or the diminution in value of their property that may be recoverable under state law, nor do they specify any type of damage caused to their property. Although they allege in conclusory fashion that their property has been "contaminated by radioactive material" and that "[s]amples taken on

---

[16] There are no allegations that ComEd owned any of the properties at issue, at any point in time.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

and around the Banks Property confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation" which (purportedly) include thorium and radon gas (*see* SAP at ¶¶ 92-93, 118, 120, 122, 136, 150, 165, 175), they fail to allege the amounts of those substances involved, how the substances damaged their property, or how they have lost the use of their property or how its value has diminished as a result of the alleged contamination.

Such conclusory allegations regarding interference with their use of their property or loss in value, without more, are insufficient to entitle Plaintiffs to relief under any of their state law claims.  *See, e.g.*, *Looney v. Hindman*, 649 S.W.2d 207, 212 (Mo. 1983) ("A 'trespass' is a '*direct* physical interference with the person or property of another.'") (emphasis in original); *Frank v. Envt'l Sanitation Mgmt., Inc.*, 687 S.W.2d 876, 880 (Mo. 1985) ("Nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his property."); *Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 391 (Mo. Ct. App. 2002) ("Actual damages to the claimant's person or property are the fourth element of a negligence action."); *Chubb Grp. of Ins. Companies v. C.F. Murphy & Assocs., Inc.*, 656 S.W.2d 766, 781 (Mo. Ct. App. 1983) ("Regarding damages, three kinds—personal injury, damage to property other than the property sold, and damage to the property sold when rendered useless by a violent occurrence—have been held recoverable under a strict liability theory.").

Without alleging how Cotter or Com Ed interfered with the use of their property or how they have been damaged at all by Cotter's or Com Ed's actions, Plaintiffs cannot sustain their state law claims against Cotter or Com Ed.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

4.      **Plaintiffs Fail to Allege Facts Sufficient to Sustain a Claim for Civil Conspiracy**

Although Plaintiffs' SAP includes a civil conspiracy claim (which was added to the FAP), they have made no effort to support such a claim with plausible facts—or any facts at all.

A claim for civil conspiracy requires: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages." *Brock v. McClure*, 404 S.W.3d 416, 421 (Mo. Ct. App. 2013). The SAP is devoid of any mention of any meeting of the minds amongst the Defendants to accomplish any object whatsoever, let alone any interaction at all amongst them.

The closest Plaintiffs come is the conclusory allegation that: "After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations." SAP ¶ 29. This pleading is deficient to assert a conspiracy claim. "Merely alleging the commission of wrongful acts is conclusory and insufficient to state a claim for civil conspiracy." *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996). Plaintiffs must plead "facts that, if true, constitute an unlawful act." *Id.* Fraud, which is the unlawful act alleged here, must be pleaded with particularity. Mo. R. S. Ct. 55.15. Plaintiffs have made no attempt to plead facts—much less facts sufficiently particular—to support the allegation of fraud between Cotter and ComEd.

As to the other defendants, under Plaintiffs' own allegations, each Defendant operated in its own sphere and never came into contact with another Defendant. Cotter purportedly purchased radioactive residues from the federal government and "[b]etween 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, . . . at the SLAPS and Latty Avenue Sites." SAP at ¶¶ 70, 72. Meanwhile, the Airport acquired SLAPS from the federal government in 1973 and then proceeded to do "nothing to prevent continued

31

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

dispersal and runoff of" material in Coldwater Creek, and DJR purchased the Latty Avenue property at some point and similarly did nothing to prevent dispersal and runoff of material. *Id.* ¶¶ 75, 79-80, 82-83. Yet, based on these threadbare allegations, Plaintiffs contend that these defendants somehow "wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein." *Id.* ¶ 199.

To be clear, there are no facts "more fully alleged" anywhere within the SAP, and because Plaintiffs have utterly failed to allege the existence of any conspiracy, that is, a meeting of the minds among the Defendants to take unlawful, overt acts to accomplish some object, this Court should dismiss Count IX of Plaintiffs' SAP.

### 5. Plaintiffs' General and Conclusory Allegations Concerning Unlawful Conduct by Defendants Fail to Plead Ultimate Facts.

Plaintiffs' general and conclusory allegations of misconduct by "Defendants" are insufficient to support their claims. Furthermore, in those limited instances where Plaintiffs have made specific allegations against Cotter, those allegations are both internally contradictory and controverted by case law precedent. As such, Plaintiffs have failed to assert any plausible claims against Cotter (or ComEd), and the SAP should be dismissed.

A plaintiff must allege a "short and plain statement of the facts showing that the pleader is entitled to relief." Mo. R. Civ. P. 55.05. Ultimate facts on which a jury could return a verdict for the plaintiff must be pleaded—evidentiary facts are not sufficient. *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 (Mo. 2019), *reh'g denied* (Apr. 2, 2019). "In order to survive the motion, the petition must 'invoke substantive principles of law entitling plaintiff to relief and . . . ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial.'" *In re T.Q.L.*, 386 S.W.3d at 139 (quoting *State ex rel. Henley v.*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

*Bickel*, 285 S.W.3d 327, 329 (Mo. banc 2009)).  Plaintiffs' use of "group pleading," generally referring to "Defendants," does not satisfy this standard.

Throughout the SAP, Plaintiffs recite the history of radionuclide processing and transport in St. Louis and allege limited (if any) facts showing involvement in very discrete portions of that history by each named Defendant, but then inexplicably concludes that all "Defendants" are liable for all events that occurred during that history.  What is most astonishing is that Plaintiffs ignore the party that actually generated the radioactive residues at issue in this case as early as 1942 (*see* SAP at ¶ 62) and instead attributes all liability to Cotter, the Airport, and DJR, even though the earliest actions any of them are alleged to have taken are in 1969, 27 years after the materials at issue in this litigation were first allegedly generated.

Similarly, Plaintiffs repeatedly lump together all Defendants with respect to the alleged misconduct underlying the claims.  *See id.* at ¶¶ 108-118, 133-137, 148-153, 157-166, 171-176, 179-184, 187-190, 195-196, 199-200 (alleging that all Defendants were responsible for broad categories of misconduct without delineating which specific defendant or defendants were actually responsible for each stated act).  Such general and perfunctory pleading renders it virtually impossible for Cotter to determine the specific misconduct it is being accused of.

Moreover, a review of Plaintiffs' few allegations directly pertaining to Cotter further underscores the improperly sweeping and overly general allegations of misconduct in the SAP. Although Plaintiffs broadly attribute the contamination of their home to radioactive materials that have migrated into Coldwater Creek from SLAPS, HISS, and Latty Avenue since 1946, Plaintiffs specifically plead that Cotter's involvement was limited to a four-year period, from 1969 to 1973.  *See id.* at ¶ 72.  Plaintiffs' claim that Cotter stored, processed, and transported

materials at both SLAPS and Latty Avenue, *see id.,* is also contradicted by their later allegation that Cotter purchased only materials that were already at Latty Avenue, *id.* at ¶ 87.

*McClurg v. Mallinckrodt*, No. 4:12-CV-00361, 2015 WL 867455 (E.D. Mo. Feb. 27, 2015), a related case involving claims for personal injury arising from the radioactive contamination of Coldwater Creek by materials purportedly generated by Mallinckrodt, Inc. and Cotter, further underscores the overbroad and unsupportable nature of Plaintiffs' allegations in the instant case.   In *McClurg*, this Court dismissed claims against Cotter by plaintiff David Powell alleging exposure to radiation between 1949 and 1963.  *Id.* at *5.  After observing that the alleged radioactive materials were only purchased by Cotter in 1969 after those materials had been transported to Latty Avenue, the Court noted that Cotter's allegedly unlawful activity did not begin until 1969, and thus any allegations pertaining to conduct that predated Cotter's involvement in the matter had to be dismissed.  *Id.* at *2, *5.  Here, as in *McClurg*, Cotter's involvement in this matter is limited to a four-year period of time and geographically restricted to purported conduct at Latty Avenue.  As such, Plaintiffs' general and conclusory allegations of misconduct outside of this timespan and outside of the Latty Avenue Site fail to form a basis of a claim against Cotter.  Moreover, in light of the *McClurg* court's findings, any amendment of the SAP would be futile.

In light of the above, Plaintiffs' general allegations of misconduct fail to plead ultimate facts as to Cotter (or the other Defendants), and their attempt to impute liability to Cotter for actions that exceed its allegedly limited temporal and geographic role fails.

### 6. Plaintiffs' Impermissibly Vague and Conclusory Allegations and Overbroad Class Definitions Likewise Fail to State Plausible Claims of Class-Wide Relief

Plaintiffs have similarly failed to set forth plausible allegations sufficient to support a class action.  This state's rule governing class actions, Missouri Rule 52.08, is substantially

34

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

similar to Federal Rule of Civil Procedure 23. *Ressler v. Clay County*, 375 S.W.3d 132, 136–37 (Mo.App. W.D. 2012). "When there is no Missouri interpretation of Rule 52.08, federal court interpretations of Federal Rule 23 are persuasive in interpreting Rule 52.08.4." *Id.* The Court of Appeals has held, after surveying federal cases, that Missouri Rule 52.08 allows a court to address substantive motions, such as summary judgment or a motion to dismiss prior to class certification. *Id.* A motion to dismiss is a proper vehicle for attacking class allegations. *See Ralph v. Am. Family Mut. Ins. Co.*, 809 S.W.2d 173, 174 (Mo.App. E.D. 1991). In federal court, "[w]hen a defendant moves to dismiss class allegations prior to discovery, the Court should evaluate the motion under a standard similar to that of Fed. R. Civ. P. 12(b)(6)." *Simpson v. Boeing Co.*, 27 F. Supp. 3d 989, 993-94 (E.D. Mo. 2014) (internal citations omitted). Similarly, under this state's rules, "the determination of class certification is based primarily upon the allegations in the petition" with the allegations accepted as true, and the motion should be decided under the fact pleading standard. *See Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 74 (Mo.App. W.D. 2011).

A party seeking to certify a class must demonstrate numerosity, commonality, typicality, and adequacy of representation. *See* Mo. R. Civ. P. 52.08(a); Fed. R. Civ. P. 23(a). Plaintiffs' proposed class definitions are impermissibly overbroad and do not meet the four required elements of Rule 52.08(a).[17] Furthermore, because Plaintiffs cannot establish the minimum pleading standards for either a claim pursuant to the PAA or any of the alleged state law claims, they cannot meet the class certification requirements. *See Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925-27 (8th Cir. 2015) (reversing the district court's granting of class

---

[17] Plaintiff also fails to establish any of the Rule 52.08(b) elements, insofar as they rely heavily on conclusory allegations without alleging facts in support.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

certification "in the absence of evidence showing class members were commonly affected by contamination on their property").

Plaintiffs' class allegations should be dismissed outright because the proposed class definitions are fatally overbroad. Both the property damage and medical monitoring subclasses are defined as any Missouri citizens who own real property or reside "within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri," (SAP at ¶¶ 35-36) **regardless of whether that property is alleged to be contaminated with radioisotopes attributable to any of the Defendants**. Courts have routinely rejected such overbroad class definitions, and this Court should do the same. *See, e.g.*, *Green v. Fred Weber, Inc.*, 254 S,W3d 874, 883 (Mo. banc 2008) (holding that class certification was inappropriate where only the named plaintiff felt vibrations from the quarry and there was no evidence that other individuals in the certified geographic area were similarly affected); *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008) (holding a class overbroad where "eighty percent of the putative class suffered no injury."). As the SAP is currently pleaded, Plaintiffs would have the Court certify property damage and medical monitoring subclasses that have not alleged any property damage or physical injury, but merely ownership of and residency at real property, respectively.

Not only are the class definitions impermissibly overbroad, Plaintiffs themselves have not alleged any <u>facts</u> plausibly showing any contamination of their own property. Plaintiffs only generally plead contamination of their properties, simply because they allege they are located within a broad swath of 100-year floodplain. SAP ¶¶ 18-25. The only allegations Plaintiffs have made are that sampling "on and around" their property show levels "above the normal background levels" (SAP at ¶ 93) without identifying the level and extent of contamination on

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

their property, what background levels have been exceeded for which specific radioisotopes, and whether those levels exceed any applicable regulatory or statutory levels, including applicable standards of care.  Additionally, given the SAP's phrasing, there is no allegation that samples from any of the Plaintiffs' actual properties—as opposed to surrounding properties–show elevated levels.  The only such allegation that a sample from a specific property—the Banks property—showed elevated levels, was removed from this version of the pleadings.  *Compare generally* SAP *with* FAP ¶ 9.  Such conclusory allegations are not sufficiently pleaded ultimate facts that show that any particular property actually is contaminated.  *See In re T.Q.L.*, 386 S.W.3d at 139.

Second, Plaintiffs have failed to allege any facts plausibly showing any damages.  For instance, they have failed to allege how much their property has diminished in value (assuming this was even a valid claim under the PAA, which, as discussed above, it is not), or how they have lost the use or enjoyment of their property as a result of the alleged contamination.

Finally, assuming Plaintiffs are permitted to proceed on their state law causes of action, the medical monitoring subclass should be dismissed, as there are no allegations of personal injury, rendering such a class inappropriate.  *See Smith v. ConocoPhillips Pipe Line Co.*, 298 F.R.D. 575, 582 (E.D. Mo. 2014) (denying certification of medical monitoring class because "Plaintiffs have offered no evidence of actual exposure") (citing *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 718 (Mo. 2007) for the proposition that "entitlement to the costs of medical monitoring requires plaintiff to show that exposure led to an increased risk of developing a particular disease and that medical monitoring is reasonably necessary for early detection and treatment"), *rev'd on other grounds*.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Accordingly, the Court should dismiss Plaintiffs' class allegations because the class definitions are impermissibly overbroad and are untethered to any allegations of contamination of any kind, including any attributable to the alleged conduct of any defendant, and because they are insufficient to meet the requirements of Missouri Rule of Civil Procedure 52.08.

## **CONCLUSION**

For the foregoing reasons, Cotter's motion to dismiss should be granted.  Plaintiffs' substantive state law causes of action against Cotter and ComEd are completely preempted by the PAA because Plaintiffs' claims arise from and relate to a nuclear incident.  Even assuming Plaintiffs had asserted a claim pursuant to the PAA, that claim would necessarily fail because Plaintiffs have failed to allege an essential element of such a claim, namely, Cotter's (or, for that matter, any defendant's) breach of the federal dose and effluent limits.  Furthermore, Plaintiffs are not entitled to medical monitoring, diminution in property value, or emotional distress damages because they have not pleaded the requisite elements for such claims, and/or because the PAA does not allow for such relief.

Even if Plaintiffs' state law claims were not preempted by the PAA, they are all defectively pleaded and should be dismissed.  And given Plaintiffs' general and conclusory allegations of misconduct against the defendants, the failure to delineate which defendants are responsible for the vague acts of misconduct they allege, and their attempt to impute liability to Cotter for acts and omissions that exceed its temporal and geographic involvement in this matter, Plaintiffs have failed to plead ultimate facts sufficient to survive a motion to dismiss.  Because Plaintiffs' substantive claims fail as a matter of law, the claims for injunctive relief and punitive damages should also be dismissed.  Furthermore, the common law standard of care is still the federal dosage and effluent limits, and Plaintiffs have failed to allege sufficient facts establishing

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

a breach of those standards.   Finally, Plaintiffs' class allegations should be dismissed for failure to state a claim upon which relief can be granted, and also because the class definitions are impermissibly overbroad and do not meet the four required elements of Rule 52.08(a).   Cotter and ComEd already moved once to dismiss the claims on essentially the same grounds as above and Plaintiffs failed to cure the defects.   As such, Counts I-IX of the SAP should be dismissed with prejudice.

Dated: November 8, 2019                          Respectfully submitted,


                                                 /s/ Erin Brooks_____
                                                 BRYAN CAVE LEIGHTON PAISNER LLP
                                                 Dale A. Guariglia, Mo. Bar 32988
                                                 daguariglia@bclplaw.com
                                                 Erin L. Brooks, Mo. Bar 62764
                                                 erin.brooks@bclplaw.com
                                                 One Metropolitan Square
                                                 211 N. Broadway, Suite 3600
                                                 St. Louis, Missouri 63102
                                                 (314) 259-2000 (telephone)
                                                 (314) 259-2020 (facsimile)

                                                 MORGAN LEWIS & BOCKIUS, LLP
                                                 John McGahren, Esq. (admitted *pro hac vice*)
                                                 john.mcgahren@morganlewis.com
                                                 Stephanie Feingold, Esq. (admitted *pro hac vice*)
                                                 stephanie.feingold@morganlewis.com
                                                 502 Carnegie Center
                                                 Princeton, NJ 08540
                                                 (609) 919-6600 (telephone)
                                                 (609) 919-6701 (facsimile)

                                                 *Attorneys for Cotter Corporation (N.S.L.) and*
                                                 *Commonwealth Edison Company*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, providing electronic service to the following:

KEANE LAW LLC
Ryan A. Keane, # 62112
Alex Braitberg, # 67045
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
ryan@keanelawllc.com
alex@keanelawllc.com

ARMSTRONG TEASDALE LLP
John F. Cowling, Mo. Bar 30920
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
jcowling@armstrongteasdale.com

*Attorney for the City of St. Louis (the owner and operator of St. Louis Lambert International Airport®)*

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Barry J. Cooper, Jr.
Celeste Brustowicz
508 St. Philip Street
New Orleans, LA 70116
bcooper@sch-llc.com
cbrustowicz@sch-llc.com

MARTIN JANSKY LAW FIRM, PC
S. Martin Janskey, Mo. 47022
2001 S. Big Bend Blvd.
St. Louis, Missouri  63117
martin@janskylaw.com

*Attorney for DJR Holdings, Inc.*

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin
920 4th Street
Gretna, Louisiana 70053
raustin@austin-associates.net

*Attorneys for Plaintiff and the proposed Class*

/s/ Erin Brooks
*Attorney for Cotter Corporation (N.S.L.) and Commonwealth Edison Company*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

# Exhibit 1

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, | ) | |
| BARBARA HOOKS, JOEL HOGAN, | ) | |
| KENNETH NIEBLING, KENDALL LACY, | ) | |
| TANJA LACY, WILLIE CLAY, | ) | |
| BOBBIE JEAN CLAY, ANGELA STATUM, | ) | |
| and MISSOURI RENTALS | ) | |
| COMPANY, LLC, on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 18SL-CC00617 |
| | ) | |
| vs. | ) | Division No.   2 |
| | ) | |
| COTTER CORPORATION, | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | **JURY TRIAL DEMANDED** |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS | ) | |
| AIRPORT AUTHORITY, A | ) | |
| DEPARTMENT OF THE CITY OF | ) | |
| ST. LOUIS | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED CLASS ACTION PETITION

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan,

Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and

Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by and

through counsel, and for their Second Amended Class Action Petition and causes of action against

Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura

Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states

and alleges as follows:

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City highly concentrated uranium with abnormal levels of radium from Africa. This particular ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants negligently moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis City to the St. Louis Airport, then to Hazelwood.

2.      Radioactive materials have been and will likely continue to be stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") part of which later became the Hazelwood Interim Storage Site ("HISS"). The Latty Avenue site and the HISS site are contained in the properties located at 9170 Latty Avenue and 9200 Latty Avenue in Hazelwood, Missouri.

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

and prodding their backyards and sampling the dust of their vacuum cleaners to identify the quantity and toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which consists of businesses and homes, surrounding the Coldwater Creek carries the distinct fingerprint (or profile) of the ore which had been processed in St. Louis and possessed by Defendants and/or their predecessors in interest.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the local public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on a limited class of victims.

8.      Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiffs for their

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

damages, and provide further relief as set forth below in this Petition.

9.     Pursuant to Missouri common law applicable at the time of Defendants' tortious conduct, which occurred prior to the 2005 enactment of R.S.Mo. § 537.067, Defendants are jointly and severally liable for any and all damages Plaintiffs and the Class have sustained as a result of Defendants' negligent handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental, consequential, nuisance, and trespass damages.

10.     Upon information and belief, by acquiring and continuing to operate ongoing operations throughout time, Defendants are liable for acts and omissions and the consequential damages caused by their predecessors in interest. To the extent that Defendants provided indemnity or committed fraud, they are liable to those to whom they sold or lease the ongoing operations.

11.     Upon information and belief, the properties of all Plaintiffs and the putative class are impacted by uranium mill tailings. The source of the radioactivity is small, microscopic particles yet containable when properly handled. These particles contain hazardous carcinogenic, harmful toxics, and other radioactive substances known as uranium and thorium and their daughter products. Such radioactive waste is legally and commonly referred to as "uranium mill tailings," which result from the processing of uranium ore.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri and out of torts committed solely in Missouri by resident and non-resident defendants.

13.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in the locality of St. Louis County,

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Missouri.

14.     Plaintiffs do not allege any causes of action arising under any laws of the United States.

15.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act, because:

    A.     Coldwater Creek is not and has never been a licensed nuclear facility.

    B.     Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

    C.     Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

    D.     Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

    E.     Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims offending traditional state regulations and do not implicate the Price-Anderson Act and its textually manifest objectives related to liability limitation and indemnification.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic mill tailings at issue in this Petition.

<div align="center">

**THE PARTIES**

**Plaintiffs**

</div>

<div align="center">5</div>

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Tamia Banks first learned that her property was in the zone of contamination in 2018.

19.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

20.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek.  His home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

21.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one hundred year flood

Electronically Filed - St. Louis County - November 08, 2019 - 08:08 PM

plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

22.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

23.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

24.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

25.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one hundred year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

26.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including damages to their Property and the loss of use and enjoyment, thereof.

**Defendants**

27.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive mill tailings: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

28.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately after announcing that there was no radioactive contamination on the properties upon which it operated. It was then sold to General Atomics in 2000.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition.

29.   Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001.

A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality.

B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Petition. ComEd furthermore assumed the environmental safety and health

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter had operated and which it knowingly and intentionally abandoned immediately prior to its announced sale to ComEd. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter. After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter was the proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

C.   This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of state law and damage to property alleged in the Petition.

30.   DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

31.    The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

## CLASS ACTION ALLEGATIONS

32.    Plaintiffs file this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

33.    Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

34.    This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

35.    The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest**

---

[1]FEMA.GOV,
https://msc.fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor (last visited September 24, 2019).

11

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**and Old Halls Ferry Road to the northeast, as shown in blue in the map in Figure 1 below.**

**Figure 1. Class Area**



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

36.    The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

**All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

37.    Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

38.     The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

39.     Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

a.   Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

b.   Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

c.   Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property;

13

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

d.  Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property;

e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property;

f.  Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

g.  Whether Plaintiffs and Class are entitled to damages; and

h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

40.     The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

41.     Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

42.     Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

43.     Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

resulting in harm to thousands of Missouri citizens.

44.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

45.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

46.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

47.     All of the class members are citizens of Missouri.

48.     The principal injuries resulting from the conduct of the Defendants were incurred

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

in Missouri.

49.     The conduct alleged in this Petition took place in Missouri.

      A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis

      B.  All transportation of radioactive waste alleged herein took place in Missouri

      C.  All processing of radioactive wastes alleged herein took place in Missouri.

      D.  All storage of radioactive waste alleged herein took place in Missouri.

50.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

51.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

52.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

<div align="center">

**FACTS**

**Radioactive Wastes**

</div>

53.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

54.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

55.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

56.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

57.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

58.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can include damages to the skin, reproductive system, blood forming

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  *See* Radiation Health Effects, EPA.GOV, https://www.epa.gov/radiation/radiation-health-effects (last visited September 24, 2019).

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

59.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

60.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

61.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[34]

**<u>Radioactive Waste in the St. Louis Area</u>**

---

[3] *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 1996-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at
https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.
[4] *See* Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at
https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_InterimSto_PHA-508.pdf.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

62.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[5]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

63.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

64.     The wastes created by processing at the SLDS are known in the scientific and regulatory communities as Uranium Mill Tailings and were created as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt.

65.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive mill tailings from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

66.     Radioactive mill tailings accumulated locally at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored locally at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

67.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive mill tailings that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

---

[5]  *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

68.     These mill tailings, which contained valuable metals, were sold and shipped to various other local destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

69.     In the late 1960's, Cotter and/or its predecessors in interest, and its successors, purchased the hazardous, toxic, carcinogenic radioactive mill tailings associated with both SLAPS and the Latty Avenue Site.

70.     Upon information and belief, as part of the contract between Cotter and/or its predecessors in interest and the federal government for sale of the radioactive waste, Cotter assumed all liability, including ultimate disposition of the waste.

71.     Cotter and/or its predecessors in interest did not receive indemnity from the government in connection with this transaction.

72.     Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue sites.

73.     Upon information and belief, Cotter did not have a license to handle or dispose of enriched thorium.

74.     Transport and migration of hazardous, toxic and radioactive mill tailings to/from the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

75.     Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

76.     Hundreds of thousands of tons of hazardous, toxic, and radioactive mill tailings were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

77.     From 1953, the property was managed and operated by Mallinckrodt.

78.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

79.     In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

80.     Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Latty Avenue Site**

81.     Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

82.     Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos purchased and/or leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

83.     Despite knowing that significant activities involving radioactive material were conducted on the site, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Coldwater Creek**

84.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

85.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

86.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

87.    During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

88.    Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

89.    Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

90.    Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

91.    As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

92.    Plaintiffs' properties are contaminated by radioactive material.

93.    Samples taken on and around Plaintiffs' properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

94.    Plaintiffs' properties neighbor Coldwater Creek and are within its flood plain.  This proximity puts the Plaintiffs' properties in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

95.     The radioactive contamination that has polluted the Plaintiffs' properties and continues to threaten to further pollute the Plaintiffs' properties match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

96.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

97.     Radioactive contamination of the Plaintiffs' properties renders the Plaintiffs' properties unfit for normal use and enjoyment, creates a stigma attached to the properties, and destroys their fair market value.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
### (brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)

99.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

100.     Plaintiff Tamia Banks owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

101.     Plaintiffs Ronnie Hooks and Barbara Hooks own and control the Hooks Property located at 13712 Old Halls Ferry Rd., Florissant, Missouri, more particularly described above.

102.     Plaintiff Joel Hogan owns and controls the Hogan Property located at 435 Moule Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

103.    Plaintiff Kenneth Niebling owns and controls the Niebling Property located at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

104.    Plaintiffs Kendall Lacy and Tonja Lacy own and control the Lacy Property located at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

105.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control the Clay Property located at 9 Cricket Court, Florissant, Missouri, more particularly described above.

106.    Plaintiff Angela Statum owns and controls the Statum Property located at 7565 Hazelcrest Drive, Florissant, Missouri, more particularly described above.

107.    Plaintiff Missouri Rentals Company, LLC owns and controls the Missouri Rentals Properties, as more particularly described above and listed as follows:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

108.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

109.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

110.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

111.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

112.    Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

113.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

114.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

115.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

116.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

117.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

118.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

119.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

120.    The migration of Radon gas and radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

121.    Plaintiffs did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

122.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

123.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

## COUNT II – PERMANENT NUISANCE
### (brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)

124.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

126.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

127.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

128.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

129.     Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

130.     Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

131.     Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

132.     Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

133.     Defendants unreasonably and unlawfully stored and used radioactive materials at SLAPS, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' property.

134.     The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

135.     The radioactive contamination created a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

136.     Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and

28

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

137.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

138.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

139.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

140.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

141.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

142.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

143.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

144.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

145.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

146.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

147.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

148.    Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS Site, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' properties.

149.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' properties.

150.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

151.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

152.   Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

153.   Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

154.   As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

155.   Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

156.   Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

157.   Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

158.   Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

159.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

160.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

161.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

162.     Defendants failed to act to prevent their releases from harming Plaintiffs.

163.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

164.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

165.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

166.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

167.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

168.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

169.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

### COUNT V – NEGLIGENCE PER SE
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

170.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

171.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

172.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

173.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

174.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

175.    Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

176.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

177.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

180.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

181.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

182.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

183.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

184.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

185.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

186.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.    Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

188.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

189.    The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

190.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

191.    Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

192.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

193.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

194.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

195.    Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

196.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

197.    The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

### COUNT IX – CIVIL CONSPIRACY
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

198.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.    Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

200.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

201.     As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

## COUNT X – INVERSE CONDEMNATION

**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

202.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

203.     The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

204.     The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

205.     The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

206.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

207.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

208.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

209.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

210.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

## COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
### (brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

211.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

213.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

39

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

214.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

215.    As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
**(brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

216.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

218.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

219.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

220.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.   an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.   an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c.   an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d.   costs and attorney fees;

e.   interest on the above amounts as allowed by law;

f.   for appropriate injunctive and equitable relief, as permitted by law or equity

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Dated:  October 29, 2019                    Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:   304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 29, 2019, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - November 08, 2019 - 08:08 PM

IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

   v.

COTTER CORPORATION and
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

                Defendants.

Civil Action No. 18SL-CC00617-01

Division No. 18

**[PROPOSED] ORDER**

    **AND NOW**, this _____ day of _____ 2019, upon consideration of Defendant

Cotter Corporation (N.S.L.)'s ("Cotter") motion to dismiss Plaintiff's first amended class-action

petition ("Motion"), in which Defendant Commonwealth Edison Company has joined, and upon

consideration of the submissions of the parties relating thereto, and for good cause shown,

    **IT IS HEREBY ORDERED** that Cotter's Motion is **GRANTED** and Plaintiff's second

amended class-action petition is **DISMISSED** in its entirety with prejudice as to Cotter and

Commonwealth Edison Company.

    IT IS SO ORDERED.

DATED: _____          _____
                                          Hon. Ellen H. Ribaudo

Electronically Filed - St Louis County - January 31, 2020 - 04:23 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST. LOUIS COUNTY, MISSOURI**

| | |
|---|---|
| TAMIA BANKS, et al., on behalf of themselves )<br>and all others similarly situated,            )<br>                                               )<br>           Plaintiffs,                         )<br>                                               )<br>vs.                                            )<br>                                               )<br>COTTER CORPORATION,                            )<br>COMMONWEALTH EDISON COMPANY,                   )<br>DJR HOLDINGS, INC. f/k/a FUTURA                )<br>COATINGS, INC., and ST. LOUIS AIRPORT          )<br>AUTHORITY, A DEPARTMENT OF THE                 )<br>CITY OF ST. LOUIS,                             )<br>                                               )<br>           Defendants.                         ) | Cause No. 18SL-CC00617-01 |

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that Plaintiffs served their First Set of Interrogatories to Defendant Cotter Corporation and their First Requests for Production to Defendant Cotter Corporation via electronic mail on this 31st day of January, 2020 to the following counsel of record and in the format indicated below:

Dale A. Guariglia (Microsoft Word format) – daguariglia@bclplaw.com
Erin L. Brooks (Microsoft Word format) – erin.brooks@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John McGahren (Microsoft Word format) – john.mcgahren@morganlewis.com
Stephanie Feingold (Microsoft Word format) – stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John F. Cowling (PDF Format) – jcowling@armstrongteasdale.com
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
*Attorney for the City of St. Louis and St. Louis Airport Authority*

1

Electronically Filed - St Louis County - January 31, 2020 - 04:23 PM

S. Martin Jansky (PDF Format) – martin@janskylaw.com
MARTIN JANSKY LAW FIRM, PC
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
*Attorney for DJR Holdings, Inc.*


Dated:  January 31, 2020                    Respectfully submitted,

                                            KEANE LAW LLC

                                            /s/ *Nathaniel R. Carroll*
                                            Ryan A. Keane, #62112
                                            Nathaniel R. Carroll, #67988
                                            7777 Bonhomme Ave., Suite 1600
                                            St. Louis, MO 63105
                                            Ph:   314-391-4700
                                            Fax:  314-244-3778
                                            ryan@keanelawllc.com
                                            nathaniel@keanelawllc.com
                                            *Attorneys for Plaintiffs and Proposed Class*

Electronically Filed - St Louis County - January 31, 2020 - 04:23 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI**

| | |
|---|---|
| TAMIA BANKS, et al., on behalf of themselves ) and all others similarly situated, ) ) Plaintiffs, ) ) vs. ) ) COTTER CORPORATION, ) COMMONWEALTH EDISON COMPANY, ) DJR HOLDINGS, INC. f/k/a FUTURA ) COATINGS, INC., and ST. LOUIS AIRPORT ) AUTHORITY, A DEPARTMENT OF THE ) CITY OF ST. LOUIS, ) ) Defendants. ) | Cause No. 18SL-CC00617-01 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that Plaintiffs served their First Set of Interrogatories to Defendant DJR Holdings, Inc. and their First Requests for Production to Defendant DJR Holdings, Inc. via electronic mail on this 31st day of January, 2020 to the following counsel of record and in the format indicated below:

S. Martin Jansky (Microsoft Word format) – martin@janskylaw.com
MARTIN JANSKY LAW FIRM, PC
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
*Attorney for DJR Holdings, Inc.*

Dale A. Guariglia (PDF format) – daguariglia@bclplaw.com
Erin L. Brooks (PDF format) – erin.brooks@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John McGahren (PDF format) – john.mcgahren@morganlewis.com
Stephanie Feingold (PDF format) – stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John F. Cowling (PDF format) – jcowling@armstrongteasdale.com
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
*Attorney for the City of St. Louis and St. Louis Airport Authority*

Dated: January 31, 2020                              Respectfully submitted,

                                                     KEANE LAW LLC

                                                     /s/ *Nathaniel R. Carroll*
                                                     Ryan A. Keane, #62112
                                                     Nathaniel R. Carroll, #67988
                                                     7777 Bonhomme Ave., Suite 1600
                                                     St. Louis, MO 63105
                                                     Ph:   314-391-4700
                                                     Fax: 314-244-3778
                                                     ryan@keanelawllc.com
                                                     nathaniel@keanelawllc.com
                                                     *Attorneys for Plaintiffs and Proposed Class*

Electronically Filed - St Louis County - January 31, 2020 - 04:22 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI**

| | | |
|---|---|---|
| TAMIA BANKS, et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Cause No. 18SL-CC00617-01 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that Plaintiffs served their First Set of Interrogatories to Defendant Commonwealth Edison Company and their First Requests for Production to Defendant Commonwealth Edison Company via electronic mail on this 31st day of January, 2020 to the following counsel of record and in the format indicated below:

Dale A. Guariglia (Microsoft Word format) – daguariglia@bclplaw.com
Erin L. Brooks (Microsoft Word format) – erin.brooks@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John McGahren (Microsoft Word format) – john.mcgahren@morganlewis.com
Stephanie Feingold (Microsoft Word format) – stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

John F. Cowling (PDF Format) – jcowling@armstrongteasdale.com
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
*Attorney for the City of St. Louis and St. Louis Airport Authority*

1

Electronically Filed - St Louis County - January 31, 2020 - 04:22 PM

S. Martin Jansky (PDF Format) – martin@janskylaw.com
MARTIN JANSKY LAW FIRM, PC
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
*Attorney for DJR Holdings, Inc.*


Dated:  January 31, 2020                    Respectfully submitted,

                                            KEANE LAW LLC

                                            /s/ *Nathaniel R. Carroll*
                                            Ryan A. Keane, #62112
                                            Nathaniel R. Carroll, #67988
                                            7777 Bonhomme Ave., Suite 1600
                                            St. Louis, MO 63105
                                            Ph:   314-391-4700
                                            Fax:  314-244-3778
                                            ryan@keanelawllc.com
                                            nathaniel@keanelawllc.com
                                            *Attorneys for Plaintiffs and Proposed Class*

Electronically Filed - St Louis County - January 31, 2020 - 04:24 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST. LOUIS COUNTY, MISSOURI**

| | |
|---|---|
| TAMIA BANKS, et al., on behalf of themselves ) and all others similarly situated, ) )      Plaintiffs, ) ) vs. ) ) COTTER CORPORATION, ) COMMONWEALTH EDISON COMPANY, ) DJR HOLDINGS, INC. f/k/a FUTURA ) COATINGS, INC., and ST. LOUIS AIRPORT ) AUTHORITY, A DEPARTMENT OF THE ) CITY OF ST. LOUIS, ) )      Defendants. ) | Cause No. 18SL-CC00617-01 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that Plaintiffs served their First Set of Interrogatories to Defendant St. Louis Airport Authority and their First Requests for Production to Defendant St. Louis Airport Authority via electronic mail on this 31st day of January, 2020 to the following counsel of record and in the format indicated below:

> John F. Cowling (Microsoft Word format) – jcowling@armstrongteasdale.com
> ARMSTRONG TEASDALE LLP
> 7700 Forsyth Boulevard, Suite 1800
> St. Louis, Missouri 63105
> *Attorney for the City of St. Louis and St. Louis Airport Authority*
>
> Dale A. Guariglia (PDF format) – daguariglia@bclplaw.com
> Erin L. Brooks (PDF format) – erin.brooks@bclplaw.com
> BRYAN CAVE LEIGHTON PAISNER LLP
> One Metropolitan Square
> 211 N. Broadway, Suite 3600
> St. Louis, Missouri 63102
> *Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*
>
> John McGahren (PDF format) – john.mcgahren@morganlewis.com
> Stephanie Feingold (PDF format) – stephanie.feingold@morganlewis.com
> 502 Carnegie Center
> Princeton, NJ 08540
> *Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*

1

Electronically Filed - St Louis County - January 31, 2020 - 04:24 PM

S. Martin Jansky (PDF Format) – martin@janskylaw.com
MARTIN JANSKY LAW FIRM, PC
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
*Attorney for DJR Holdings, Inc.*


Dated:  January 31, 2020                    Respectfully submitted,

                                            KEANE LAW LLC

                                            /s/ *Nathaniel R. Carroll*
                                            Ryan A. Keane, #62112
                                            Nathaniel R. Carroll, #67988
                                            7777 Bonhomme Ave., Suite 1600
                                            St. Louis, MO 63105
                                            Ph:   314-391-4700
                                            Fax:  314-244-3778
                                            ryan@keanelawllc.com
                                            nathaniel@keanelawllc.com
                                            *Attorneys for Plaintiffs and Proposed Class*

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,    )
BARBARA HOOKS, JOEL HOGAN,    )
KENNETH NIEBLING, KENDALL LACY,    )
TANJA LACY, WILLIE CLAY,    )
BOBBIE JEAN CLAY, ANGELA STATUM,    )
and MISSOURI RENTALS COMPANY, LLC, )
on behalf of themselves and all others    )
similarly situated,    )
                                      )
       Plaintiffs,    )
                                        )
v.    )    Cause No. 18SL-CC00617-01
                                        )
COTTER CORPORATION,    )    **JURY TRIAL DEMANDED**
COMMONWEALTH EDISON COMPANY,    )
DJR HOLDINGS, INC. f/k/a FUTURA    )
COATINGS, INC., and ST. LOUIS AIRPORT    )
AUTHORITY, A DEPARTMENT OF THE    )
CITY OF ST. LOUIS,    )
                                        )
       Defendants.    )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT COMMONWEALTH EDISON COMPANY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC (together, "Plaintiffs"), by and through their counsel of record, hereby oppose Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Missouri Rules of Civil Procedure 55.27(a)(2) and 55.27(a)(6). This Court has personal jurisdiction over Commonwealth Edison Company ("ComEd") based on ComEd's purchase of Cotter Corporation ("Cotter"), ComEd's agreements to assume the liabilities of Cotter throughout various purchases and corporate restructurings, and Cotter's function as alter ego of ComEd after Cotter was purchased. Defendant's motion should therefore be denied, or in the

1

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

alternative, the Court should grant discovery on the corporate relationships and any relevant agreements between the relevant entities and then grant Plaintiffs leave to amend the petition accordingly, if warranted.

## **INTRODUCTION**

This action arises from Defendants' negligent dumping and disposing of highly toxic radioactive material, such that Plaintiffs and others similarly situated suffered contamination in their homes and neighborhoods.  Plaintiffs allege in their Second Amended Petition ("SAP") causes of action based on tort law; specifically the SAP alleges that Defendants—including ComEd—committed trespass, created a permanent nuisance, created a temporary nuisance, committed negligence, committed negligence per se, committed conspiracy, and are subjected to strict liability/absolute liability.  (*See generally*, SAP).

## **RELEVANT FACTS**

Plaintiff filed suit on February 18, 2018 in the Circuit Court of St. Louis County Missouri, Twenty-First Judicial Circuit. Subsequently, Plaintiff filed the First Amended Petition ("FAP") on April 2, 2018, adding a count for civil conspiracy.  The action was subsequently removed to Federal Court on April 18, 2018, but ultimately remanded back to the Twenty-First Judicial Circuit on March 29, 2019.  Defendants filed a similar motion in state court on April 29, 2019, which became moot when Plaintiffs, with leave of the Court, filed their Second Amended Petition ("SAP") on October 29, 2019.  Defendant ComEd filed the present Motion to Dismiss on November 8, 2019.

The SAP alleges causes of action based on tort law; specifically, the SAP alleges that Defendants—including ComEd—committed trespass, created a permanent nuisance, created a

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

temporary nuisance, committed negligence, committed negligence per se, committed conspiracy, and are subjected to strict liability/absolute liability.  (*See* SAP).

The SAP alleges that Cotter is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California Corporation.  (SAP ¶ 28).  The SAP further alleges that Cotter "continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd" and that the suit "arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition."  (SAP ¶ 28).  Cotter has not joined ComEd's Motion to Dismiss based on lack of personal jurisdiction, and the Court's personal jurisdiction of Cotter is not in dispute.

The SAP alleges that ComEd is an Illinois Corporation "whose former subsidiary corporation, Cotter, conducted business operations in Missouri."  (SAP ¶ 29).  Specifically, ComEd "agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein." (SAP ¶ 29.A.)  Further, documents filed with the Securities and Exchange Commission ("SEC") admit that "ComEd agreed to indemnity Cotter for any liability arising in connection with the West Lake Landfill . . .[and] that the Latty Avenue site is included in ComEd's indemnification responsibilities discussed above as part of the sale of Cotter." (Exelon Corporation Form 10-Q, filed May 2, 2018, p. 152, attached hereto as Exhibit A.).

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## LEGAL ANALYSIS

**I.    PLAINTIFFS HAVE ADEQUATELY PLEADED THAT COMED FALLS WITHIN MISSOURI'S LONG ARM STATUTE TO ESTABLISH PERSONAL JURISDICTION AND DEFENDANT'S MOTION MUST THEREFORE BE DENIED**

Defendant's Motion to Dismiss this action for lack of personal jurisdiction overlooks a well-established exception to the general rule regarding the exercise of personal jurisdiction over parent companies based on the actions of their subsidiaries.  Missouri law is clear. Parent companies can consent or agree to personal jurisdiction.  Specifically, an agreement or consent to transfer liability during a purchase or corporate restructuring can bring a purchaser or parent corporation within the personal jurisdiction of the seller and/or subsidiary corporation.  Plaintiff has adequately alleged that such an agreement exists between the named parties in this suit.  If the Court finds Plaintiff's allegations on this point insufficient, Plaintiff should be permitted to conduct further discovery into the corporate structure and agreements of the various defendants and to amend their Petition.

**A.    Legal Standard**

Plaintiffs have the burden of establishing personal jurisdiction when it is challenged. *Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 231 (Mo. banc. 2010).  The question turns on whether the pleadings, taken as true, establish adequate facts to invoke Missouri's long arm statute and support a finding of minimum contacts sufficient to satisfy due process.  *Id.*   The facts must be construed in the light most favorable to a finding of jurisdiction.  *Moore v. Christian Fidelity Life Ins. Co.*, 687 S.W.2d 210, 211 (Mo. App. 1984) ("In the assessment of that proof, the allegations of the petition are given an intendment most favorable to the existence of the jurisdictional fact.").  A court may consider affidavits if properly filed.  *Bryant*, 310 S.W.3d at 231.

4

Under Missouri law, the test to establish personal jurisdiction has two components. *Conway v. Royalite Plastics, Ltd.*, 12 S.W.3d 314, 318 (Mo. banc 2000). First, the defendant's conduct must satisfy Missouri's long-arm statute, section 506.500. *Id.* Once the long-arm statute is satisfied, the second step requires the Court to consider whether the defendant has sufficient minimum contacts with Missouri to comport with due process. *Conway*, 12 S.W.3d at 318.

**B.     This Missouri Court Has Personal Jurisdiction Over ComEd Via Missouri's Long-Arm Statute.**

Defendant does not dispute that Plaintiff has adequately pleaded a tortious course of conduct pursuant to Missouri's long-arm statute, and thus concedes Plaintiffs have satisfied the first element of the personal jurisdiction test by pleading Defendants have committed a tortious act within the state of Missouri. *See* R.S.Mo. § 506.500.1(3) ("Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such a person, firm, or corporation . . . to the jurisdiction of the courts of this state as to any cause of action arising from . . . (3) The commission of a tortious act within the state….").

Missouri's long-arm statute is construed to extend the reach of Missouri's personal jurisdiction to the maximum extent permissible under the Due Process Clause of the Constitution. *Bryant*, 310 S.W.3d at 232. "If a defendant can reasonably foresee his or her negligent actions having consequences felt in Missouri, jurisdiction is authorized." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012) (analyzing and applying Missouri Supreme Court precedent, which "lead[s] us to believe *foreseeability* is the standard to be applied when evaluating whether jurisdiction is appropriate over a tortious act occurring in another state with actionable consequences in Missouri.").

5

Here, there is no doubt that ComEd would have performed its due diligence before purchasing Cotter in 1974, and thus ComEd knew or should have known that it was purchasing Cotter's hazardous and uncontained radioactive waste as well.  (SAP ¶¶ 29, 163)  Furthermore, given the extremely hazardous and free-roaming nature of uncontained radioactive waste, ComEd could certainly foresee that the mere act of owning Cotter and its radioactive waste piles in Missouri—and failing to remove, remediate, or otherwise contain those radioactive emissions— would foreseeably cause harm to nearby Missourians such that ComEd would be subjected to tort claims for negligence (SAP ¶¶ 155-169) and strict liability (SAP ¶¶ 178-185).  *See Empiregas, Inc., of Noel v. Hoover Ball & Bearing Co.*, 507 S.W.2d 657, 661 (Mo. 1974) (reversing trial court's dismissal based on lack of personal jurisdiction where amended petition alleged four foreign corporations were strictly liable and negligent for Missouri explosion of train carrying hazardous chemicals); *see also State ex rel. Birdsboro Corp. v. Kimberlin*, 461 S.W.2d 292 (Mo. App. 1970) (petition's general allegations of negligence against foreign corporation who committed tort in Missouri held to be sufficient); *Myers v. Casino Queen, Inc.*, 689 F.3d 904 (8th Cir. 2012) (Illinois casino subject to Missouri's long-arm specific jurisdiction where it was foreseeable that plaintiff would be robbed in Missouri of his large winnings on his way home from the casino).

**C.**     **Under Missouri Law, whether a defendant will be subjected to specific jurisdiction may be established by the contacts of another entity where there is a transfer of the liabilities between entities.**

Contrary to Defendant's argument—which frequently conflates the distinctions between the general and specific jurisdiction as they relate to personal jurisdiction—ComEd is subject to personal jurisdiction in Missouri because ComEd assumed Cotter's liabilities in Missouri when it purchased Cotter, who undisputedly had sufficient contacts with Missouri. *See Green v.*

6

*Montgomery Ward & Co., Inc.*, 775 S.W.2d 162, 165 (Mo. App. W.D. 1989), applying *Tucker v. Paxon Machine Co.*, 645 F.2d 620, 622 (8th Cir. 1981).

Missouri law is unambiguous on this point.  The liabilities of the transferor are assumed by a corporate transferee in any of the following four instances: "(1) where the purchaser agrees, either expressly or impliedly, to assume such debts; (2) where the transaction is a consolidation or merger; (3) where the purchasing corporation is simply a mere continuation of the seller; and (4) where the transaction was entered into to escape liability for such debts on a fraudulent basis." *Green*, 775 S.W.2d at 165, citing *Tucker,* 645 F.2d at 622.

Next, in a circumstance where the transferee has assumed the liabilities, they will be subjected to personal jurisdiction in the forum state where the transferor had sufficient contacts to allow an exercise of personal jurisdiction.  *Green*, 775 S.W. 2d at 166; *Bennett v. Rapid American Corp.*, 816 S.W.2d 677 (Mo. banc 1981); *see also Ostrem v. Prideco Secure Loan Fund LP*, 841 N.W.2d 882, 897 (Iowa 2014);  *Jeffrey v. Rapid American Corp.*, 529 N.W.2d 644 (Mich. 1995); *Williams v. Bowman Livestock Equipment Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991); *City of Richmond, Virginia v. Madison Management Group, Inc.*, 918 F.2d 438, 454-55 (4th Cir. 1990); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982) *cert. granted on other grounds,* 459 U.S. 1014 (1982); *United States v. Bliss*, 108 F.R.D. 127, 133-34 (E.D. Mo. 1985).

Here, Plaintiffs alleged that when ComEd purchased Cotter in 1974, Cotter became a wholly owned subsidiary of ComEd, who then owned Cotter until 2000. (SAP ¶ 28.)  Assuming the truth of that assertion—as this Court must—Plaintiffs readily clear the first of two hurdles established in *Green*, because ComEd expressly or impliedly assumed the liabilities of Cotter in 1974, which is further evidenced by ComEd's agreement to indemnify Cotter after selling Cotter in February 2000.  *See Green*, 775 S.W.2d at 164.  As for the second hurdle, there is no dispute

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

that Cotter has sufficient contacts to establish specific jurisdiction over this matter, and therefore, as a matter of law, ComEd is subject to Missouri's personal jurisdiction. *See Green*, 775 S.W. 2d at 166.

Moreover, Defendants' own submissions and documents admit the existence of an agreement.  Even though Plaintiffs have not yet had an adequate opportunity to conduct discovery into the corporate relationship between Cotter and ComEd, public filings with the SEC also show an agreement by ComEd to indemnify Cotter in connection with that sale for actions specifically related to Cotter's mishandling of the same radioactive waste—in the state of Missouri—at issue here.[1] The assumption of Cotter's liability is dispositive on this issue.  In sum, Defendant ComEd has consented and agreed to assume Cotter's liabilities; they have thereby consented to an obligation to stand up in Court wherever Cotter is subject to personal jurisdiction, including the instant lawsuit, and to substitute itself for Cotter on the issue of personal jurisdiction.

Defendant's arguments that ComEd's indemnity agreements have no legal significance on the question of personal jurisdiction is flat-out wrong.  Notably, they cite no case law for this proposition, and Plaintiffs' research has confirmed that no Missouri case law exists to support Defendant's argument.

---

[1] *See* Ex. A, attached hereto, at p. 152. *See also* Form 10-Q, Excelon Corporation Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarter Ended June 30, 2001, at p. 25, available at https://www.sec.gov/Archives/edgar/data/22606/000095015901500230/exelon6-01q.txt ("On February 18, 2000, ComEd sold Cotter to an unaffiliated third party. As part of the sale, ComEd agreed to indemnify Cotter for any liability incurred by Cotter…"). *See also* Form 10-K, Excelon Corp – EXC, Filed Feb. 7, 2008, at p. 309, available at https://www.exeloncorp.com/sustainability/Documents/pdf_EXELONCORP10K.pdf.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

    **D.**    **Alternatively, even if the Court finds, *arguendo,* that Plaintiffs have not adequately pleaded grounds for personal jurisdiction over ComEd, the Court should allow Plaintiffs to conduct discovery into the relationships and agreements between ComEd and the other Defendants and re-plead, if warranted.**

Even though Plaintiffs' SAP contains sufficient allegations for this Court to establish personal jurisdiction over ComEd, if the Court finds the ultimate question of personal jurisdiction is lacking, it should permit Plaintiffs to conduct discovery on this issue and to replead, if necessary. Past precedent requires discovery and liberal amendment when confronted with an issue of this complexity. *See Green*, 775 S.W.2d at 166 (remanding for further discovery on predecessor corporations' contacts with the state of Missouri for determining personal jurisdiction over successor in interest to wood saw manufacturer); *Bennett*, 816 S.W.2d at 679-680 (Missouri Supreme Court reversed trial court order dismissing petitions against successor corporation for lack of personal jurisdiction and remanded with directions to trial court to permit amendment); Mo. R. Civ. P. 55.33 (leave to amend "shall be freely given when justice so requires.").

**II.**    **DISMISSAL ON THE ISSUE OF PREDECESSOR/SUCCESSOR LIABILITY WOULD BE PREMATURE AT THIS TIME; PLAINTIFFS ADEQUATELY ALLEGED GROUNDS UPON WHICH COMED MAY BE HELD LIABLE TO PLAINTIFFS**

Missouri law prefers a trial on the merits and courts should interpret the law consistently with this preference. *Goe v. City of Mexico*, 64 S.W. 3d 836 (Mo. App. E.D. 2001).  A petition will be found sufficient to withstand a motion to dismiss where it invokes the substantive principles of the law which entitle plaintiffs to relief and facts which inform the defendant of what plaintiffs will attempt to establish at trial. *Scheibel v. Hillis*, 531 S.W.2d 285, 290 (Mo. banc 1976).  A court must not dismiss a suit unless the plaintiff will be unable to prove any set of facts that would entitle her to relief. *Goe*, 64 S.W.3d at 839.  "A pleader is required to state only the ultimate facts and it is not necessary to plead the facts or circumstances by which the

ultimate facts will be established." *Scheibel*, 531 S.W. 2d at 290.

"To pierce the corporate veil, a plaintiff must meet a two-part test: first, the corporation must be controlled and influenced by persons or another corporation; second, evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetuate a fraud." *Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.*, 885 S.W.2d 771, 773 (Mo. App. E.D. 1994). "Implicit in this test for piercing the corporate veil is the requirement that the wrong done be the proximate cause of the injury to third persons who dealt with the corporation." *Id.* at 773-74, citing *Collet v. American Nat. Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. App. E.D. 1986).

ComEd argues that Plaintiffs meet neither the alter ego test of liability nor an agency theory of liability, and that the Second Amended Complaint is "completely devoid of any allegation that ComEd exercised such control or dominion over Cotter such that jurisdiction exists over ComEd, or that Cotter was an 'in-state subsidiary." (Def.'s Mot. at p. 10).  This statement ignores Plaintiffs' clear allegations of ComEd's control and dominion over Cotter, which include:

- "When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and *was obligated to require its subsidiary* to comply with the rules and regulations in Missouri …";

- "ComEd furthermore *assumed the environmental safety and health functions of its subsidiary, Cotter*";

- "ComEd, through its pre-purchase due diligence, *knew about the remaining contamination, yet did nothing to mitigate the threat to public health*, such that ComEd is liable as a corporate successor to Cotter";

- "After the sale of Cotter to ComEd, they *jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's*

10

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*abandoned operations.*";

- "…ComEd **controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination** in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter **was the proximate cause** of the contamination to Plaintiffs' and the Class Members' properties."

(SAP ¶ 29B at pp. 9-10) (emphasis added).

Taken together, Plaintiffs' allegations state that ComEd controlled Cotter's policy and business after the merger (the first element of veil-piercing) to ignore and to cover up the fact that Cotter had left radioactive contamination, ("the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetuate a fraud"), and rather than remediate the mess Cotter left behind, ComEd chose to cover up the existence of radioactive contamination for over 25 years while the radiation actively and continuously poisoned Missourians nearby, hoping that no one would ever notice, while the radioactive contamination continuously harmed Plaintiffs and Class Members for generations. *See Edward D. Gevers*, 885 S.W.2d at 773-74.

It is disingenuous to pretend that Plaintiffs have not alleged that ComEd's control over Cotter was not designed as "a subterfuge to defeat public convenience" for the contamination Cotter caused and ComEd concealed for decades, and that ComEd's control over Cotter in concealing the contamination was the proximate cause of ongoing injury to third persons. *See Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.*, 885 S.W.2d 771, 773-74 (Mo. App. E.D. 1994).

But that is not the end of the analysis.  ComEd claims the Second Amended Petition fails to allege any direct involvement by ComEd relating to the events giving rise to the SAP. However, there are exceptions to the general legal concept of successor non-liability, which serve to protect the interests of creditors from transactions fashioned to avoid obligations incurred in

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

the course of business.  *See* 13 A.L.R.6th 355 (Originally published in 2006).  These exceptions are both relevant to the concept of personal jurisdiction, as discussed above; they also can be used to establish liability.

A transferee will be liable for a transferor's debts and liabilities when (1) the purchaser expressly or impliedly agrees to assume the debts and liabilities; (2) when the transaction amounts to a consolidation or merger of the corporation; (3) when the purchasing corporation is merely a continuation of the selling corporation; and (4) when the transaction is entered into fraudulently in order to escape liability.  *Chemical Design, Inc. v. American Standard, Inc.*, 847 S.W.2d 488, 492 (Mo. App. E.D. 1993) (citing *Young v. Fulton Iron Works Co.*, 709 S.W.2d 927, 938 (Mo App. S.D. 1986); *see also Green*, 775 S.W.2d at 164.

Plaintiffs' SAP alleges that ComEd is liable for the acts and omissions of its predecessors.  (SAP ¶¶ 28-29).  These allegations are consistent with invoking the exceptions to successor (or transferee) liability.  Moreover, the SAP also alleges the existence of ComEd's agreement to indemnify Cotter upon its sale in 2000.  (SAP ¶ 29).  Logically, this allegation means that when ComEd *purchased* Cotter in 1974, there was an agreement, either express or implied, to assume the debts and liabilities of the predecessor corporation, Cotter.  The Second Amended Petition thus adequately includes allegations from which a reasonable person could infer that one of the exceptions against imposing liability upon a transferee corporation applies.

Moreover, under Missouri law, the determination of whether one of the exceptions to successor non-liability applies is fact-specific.  *Chemical Design Inc.*, 847 S.W.2d at 493 (considering on summary judgment successor corporation's product line, sales territory, and involvement of prior officers); *Green*, 775 S.W.2d at 166 (finding transferee Magna to be a continuation of Yuba based on the fact that they assembled Yuba's product from assets acquired in the merger); *Gorsuch v. Formtek Metal Forming, Inc.*, 803 F.Supp.2d 1016, 1023 (E.D. Mo.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

2011) (applying Missouri law and considering on summary judgment the nature of the original transaction forming the new corporate enterprises, the use of the predecessor corporation's name in doing business, and the use of assets and manufacturing practices).

Plaintiffs here have not had an opportunity to conduct adequate discovery in this matter.[2] They should be given the opportunity to inquire into the specifics of the various corporate transactions between ComEd and other entities related to Cotter and the radioactive materials. Plaintiffs should also be permitted to inquire into the nature of any agreements between the Defendants, the distribution of their assets, the composition of their control groups, the use of subsidiaries' names and product lines, etc. At this early stage, there are insufficient facts available in the proceedings for a court to conclude that ComEd does not fall into one of the recognized exceptions establishing transferee liability. Plaintiffs should be permitted to conduct discovery on this point to further develop their theory that ComEd—through either its agreements, the nature of the various transactions, or the method of conducting business—assumed the liabilities of its predecessor, Cotter.

## CONCLUSION

Because Plaintiffs have sufficiently alleged that ComEd assumed the liabilities of Cotter—over whom this Court has undisputed personal jurisdiction—when it purchased Cotter, this Court has specific personal jurisdiction over Defendant ComEd through Missouri's long-arm statute or through ComEd's actions as alter-ego of Cotter, and should deny ComEd's Motion to Dismiss for Lack of Personal Jurisdiction. Further, because Plaintiffs have sufficiently pleaded facts that could

---

[2] Plaintiffs served their First Interrogatories and First Requests for Production to each Defendant on January 31, 2020.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

establish ComEd's transferee liability for Cotter's actions, this Court should likewise deny ComEd's Motion to Dismiss for Failure to State a Claim. In the alternative, if this Court finds Plaintiffs' allegations insufficient on any of the above grounds, Plaintiffs respectfully request leave of the Court to conduct discovery related to the Defendants' corporate transactions and agreements and to re-plead, if warranted.

Dated:  February 4, 2020                    Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, #62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Suite 1600
St. Louis, MO 63105
314-391-4700
314-244-3778 (fax)
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, #51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
(314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar #17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*

14

2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompson@gmail.com

And

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630 *pro hac vice*
Catherine Hilton, LA Bar # 27238 *pro hac vice*
Lillian Williams, LA Bar # 37358 *pro hac vice*
920 4th Street
Gretna, Louisiana 70053
Telephone: (504) 227-8100
Facsimile: (504) 227-8122
raustin@ronaustinandassociates.com
chilton@ronaustinandassociates.com

*Attorneys for Plaintiffs and Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 4, 2020, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice and a copy of the filing to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

EDGAR pro
by EDGAR Online

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

# EXELON CORP

## FORM 10-Q
### (Quarterly Report)

## Filed 05/02/18 for the Period Ending 03/31/18

| | |
|---|---|
| Address | PO BOX 805398 |
| | CHICAGO, IL, 60680-5398 |
| Telephone | 3123947399 |
| CIK | 0001109357 |
| Symbol | EXC |
| SIC Code | 4911 - Electric Services |
| Fiscal Year | 12/31 |



Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2020, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Quarterly Period Ended March 31, 2018**

or

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

| Commission File Number | Name of Registrant; State or Other Jurisdiction of Incorporation; Address of Principal Executive Offices; and Telephone Number | IRS Employer Identification Number |
|---|---|---|
| 1-16169 | EXELON CORPORATION<br>(a Pennsylvania corporation)<br>10 South Dearborn Street<br>P.O. Box 805379<br>Chicago, Illinois 60680-5379<br>(800) 483-3220 | 23-2990190 |
| 333-85496 | EXELON GENERATION COMPANY, LLC<br>(a Pennsylvania limited liability company)<br>300 Exelon Way<br>Kennett Square, Pennsylvania 19348-2473<br>(610) 765-5959 | 23-3064219 |
| 1-1839 | COMMONWEALTH EDISON COMPANY<br>(an Illinois corporation)<br>440 South LaSalle Street<br>Chicago, Illinois 60605-1028<br>(312) 394-4321 | 36-0938600 |
| 000-16844 | PECO ENERGY COMPANY<br>(a Pennsylvania corporation)<br>P.O. Box 8699<br>2301 Market Street<br>Philadelphia, Pennsylvania 19101-8699<br>(215) 841-4000 | 23-0970240 |
| 1-1910 | BALTIMORE GAS AND ELECTRIC COMPANY<br>(a Maryland corporation)<br>2 Center Plaza<br>110 West Fayette Street<br>Baltimore, Maryland 21201-3708<br>(410) 234-5000 | 52-0280210 |
| 001-31403 | PEPCO HOLDINGS LLC<br>(a Delaware limited liability company)<br>701 Ninth Street, N.W.<br>Washington, District of Columbia 20068<br>(202) 872-2000 | 52-2297449 |
| 001-01072 | POTOMAC ELECTRIC POWER COMPANY<br>(a District of Columbia and Virginia corporation)<br>701 Ninth Street, N.W.<br>Washington, District of Columbia 20068<br>(202) 872-2000 | 53-0127880 |
| 001-01405 | DELMARVA POWER & LIGHT COMPANY<br>(a Delaware and Virginia corporation)<br>500 North Wakefield Drive<br>Newark, Delaware 19702<br>(202) 872-2000 | 51-0084283 |
| 001-03559 | ATLANTIC CITY ELECTRIC COMPANY<br>(a New Jersey corporation)<br>500 North Wakefield Drive<br>Newark, Delaware 19702<br>(202) 872-2000 | 21-0398280 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  ☒    No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes  ☒    No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | Large Accelerated Filer | Accelerated Filer | Non-accelerated Filer | Smaller Reporting Company | Emerging Growth Company |
|---|---|---|---|---|---|
| Exelon Corporation | ☒ | | | | |
| Exelon Generation Company, LLC | | | ☒ | | |
| Commonwealth Edison Company | | | ☒ | | |
| PECO Energy Company | | | ☒ | | |
| Baltimore Gas and Electric Company | | | ☒ | | |
| Pepco Holdings LLC | | | ☒ | | |
| Potomac Electric Power Company | | | ☒ | | |
| Delmarva Power & Light Company | | | ☒ | | |
| Atlantic City Electric Company | | | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes  ☐    No  ☒

The number of shares outstanding of each registrant's common stock as of March 31, 2018 was:

| | |
|---|---|
| Exelon Corporation Common Stock, without par value | 965,381,919 |
| Exelon Generation Company, LLC | not applicable |
| Commonwealth Edison Company Common Stock, $12.50 par value | 127,021,264 |
| PECO Energy Company Common Stock, without par value | 170,478,507 |
| Baltimore Gas and Electric Company Common Stock, without par value | 1,000 |
| Pepco Holdings LLC | not applicable |
| Potomac Electric Power Company Common Stock, $0.01 par value | 100 |
| Delmarva Power & Light Company Common Stock, $2.25 par value | 1,000 |
| Atlantic City Electric Company Common Stock, $3.00 par value | 8,546,017 |

Electronically Filed - St. Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**TABLE OF CONTENTS**

|  |  | Page No. |
|---|---|---:|
| **GLOSSARY OF TERMS AND ABBREVIATIONS** | | 4 |
| **FILING FORMAT** | | 10 |
| **CAUTIONARY STATEMENTS REGARDING FORWARD-LOOKING INFORMATION** | | 10 |
| **WHERE TO FIND MORE INFORMATION** | | 10 |
| **PART I.** | **FINANCIAL INFORMATION** | 11 |
| **ITEM 1.** | **FINANCIAL STATEMENTS** | 11 |
| | **Exelon Corporation** | |
| | Consolidated Statements of Operations and Comprehensive Income | 12 |
| | Consolidated Statements of Cash Flows | 13 |
| | Consolidated Balance Sheets | 14 |
| | Consolidated Statement of Changes in Shareholders' Equity | 16 |
| | **Exelon Generation Company, LLC** | |
| | Consolidated Statements of Operations and Comprehensive Income | 17 |
| | Consolidated Statements of Cash Flows | 18 |
| | Consolidated Balance Sheets | 19 |
| | Consolidated Statement of Changes in Equity | 21 |
| | **Commonwealth Edison Company** | |
| | Consolidated Statements of Operations and Comprehensive Income | 22 |
| | Consolidated Statements of Cash Flows | 23 |
| | Consolidated Balance Sheets | 24 |
| | Consolidated Statement of Changes in Shareholders' Equity | 26 |
| | **PECO Energy Company** | |
| | Consolidated Statements of Operations and Comprehensive Income | 27 |
| | Consolidated Statements of Cash Flows | 28 |
| | Consolidated Balance Sheets | 29 |
| | Consolidated Statement of Changes in Shareholder's Equity | 31 |
| | **Baltimore Gas and Electric Company** | |
| | Consolidated Statements of Operations and Comprehensive Income | 32 |
| | Consolidated Statements of Cash Flows | 33 |
| | Consolidated Balance Sheets | 34 |
| | Consolidated Statement of Changes in Shareholders' Equity | 36 |
| | **Pepco Holdings LLC** | |
| | Consolidated Statements of Operations and Comprehensive Income | 37 |
| | Consolidated Statements of Cash Flows | 38 |
| | Consolidated Balance Sheets | 39 |
| | Consolidated Statement of Changes in Equity | 41 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

|                                                                        | Page No. |
|------------------------------------------------------------------------|---------:|
| **Potomac Electric Power Company**                                     |          |
| Statements of Operations and Comprehensive Income                      | 42       |
| Statements of Cash Flows                                               | 43       |
| Balance Sheets                                                         | 44       |
| Statement of Changes in Shareholder's Equity                           | 46       |
| **Delmarva Power & Light Company**                                     |          |
| Statements of Operations and Comprehensive Income                      | 47       |
| Statements of Cash Flows                                               | 48       |
| Balance Sheets                                                         | 49       |
| Statement of Changes in Shareholder's Equity                           | 51       |
| **Atlantic City Electric Company**                                     |          |
| Consolidated Statements of Operations and Comprehensive Income         | 52       |
| Consolidated Statements of Cash Flows                                  | 53       |
| Consolidated Balance Sheets                                            | 54       |
| Consolidated Statement of Changes in Shareholder's Equity              | 56       |
| **Combined Notes to Consolidated Financial Statements**                | 57       |
| 1. Significant Accounting Policies                                     | 58       |
| 2. New Accounting Standards                                            | 63       |
| 3. Variable Interest Entities                                          | 65       |
| 4. Mergers, Acquisitions and Dispositions                              | 71       |
| 5. Revenue from Contracts with Customers                               | 73       |
| 6. Regulatory Matters                                                  | 76       |
| 7. Impairment of Long-Lived Assets                                     | 90       |
| 8. Early Plant Retirements                                             | 90       |
| 9. Fair Value of Financial Assets and Liabilities                      | 94       |
| 10. Derivative Financial Instruments                                   | 114      |
| 11. Debt and Credit Agreements                                         | 130      |
| 12. Income Taxes                                                       | 131      |
| 13. Nuclear Decommissioning                                            | 136      |
| 14. Retirement Benefits                                                | 138      |
| 15. Changes in Accumulated Other Comprehensive Income                  | 142      |
| 16. Earnings Per Share and Equity                                      | 145      |
| 17. Commitments and Contingencies                                      | 146      |
| 18. Supplemental Financial Information                                 | 157      |
| 19. Segment Information                                                | 163      |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

|  |  | Page No. |
|---|---|---|
| **ITEM 2.** | **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS** | 172 |
| | Exelon Corporation | 172 |
| |     Executive Overview | 172 |
| |         Financial Results of Operations | 174 |
| |         Significant 2018 Transactions and Developments | 179 |
| |         Exelon's Strategy and Outlook for 2018 and Beyond | 183 |
| |         Liquidity Considerations | 185 |
| |     Other Key Business Drivers and Management Strategies | 185 |
| |     Critical Accounting Policies and Estimates | 190 |
| |     Results of Operations By Registrant | 192 |
| |         Exelon Generation Company, LLC | 193 |
| |         Commonwealth Edison Company | 201 |
| |         PECO Energy Company | 207 |
| |         Baltimore Gas and Electric Company | 212 |
| |         Pepco Holdings LLC | 218 |
| |         Potomac Electric Power Company | 221 |
| |         Delmarva Power & Light Company | 226 |
| |         Atlantic City Electric Company | 232 |
| |     Liquidity and Capital Resources | 237 |
| |     Contractual Obligations and Off-Balance Sheet Arrangements | 251 |
| **ITEM 3.** | **QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK** | 252 |
| **ITEM 4.** | **CONTROLS AND PROCEDURES** | 259 |
| **PART II.** | **OTHER INFORMATION** | 261 |
| **ITEM 1.** | **LEGAL PROCEEDINGS** | 261 |
| **ITEM 1A.** | **RISK FACTORS** | 261 |
| **ITEM 4.** | **MINE SAFETY DISCLOSURES** | 261 |
| **ITEM 6.** | **EXHIBITS** | 261 |
| **SIGNATURES** | | 265 |
| | Exelon Corporation | 265 |
| | Exelon Generation Company, LLC | 266 |
| | Commonwealth Edison Company | 267 |
| | PECO Energy Company | 268 |
| | Baltimore Gas and Electric Company | 269 |
| | Pepco Holdings LLC | 270 |
| | Potomac Electric Power Company | 271 |
| | Delmarva Power & Light Company | 272 |
| | Atlantic City Electric Company | 273 |

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Exelon Corporation and Related Entities**

| | |
|---|---|
| *Exelon* | Exelon Corporation |
| *Generation* | Exelon Generation Company, LLC |
| *ComEd* | Commonwealth Edison Company |
| *PECO* | PECO Energy Company |
| *BGE* | Baltimore Gas and Electric Company |
| *Pepco Holdings or PHI* | Pepco Holdings LLC (formerly Pepco Holdings, Inc.) |
| *Pepco* | Potomac Electric Power Company |
| *DPL* | Delmarva Power & Light Company |
| *ACE* | Atlantic City Electric Company |
| *Registrants* | Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, collectively |
| *Utility Registrants* | ComEd, PECO, BGE, Pepco, DPL and ACE, collectively |
| *Legacy PHI* | PHI, Pepco, DPL and ACE, collectively |
| *ACE Funding or ATF* | Atlantic City Electric Transition Funding LLC |
| *Antelope Valley* | Antelope Valley Solar Ranch One |
| *BondCo* | RSB BondCo LLC |
| *BSC* | Exelon Business Services Company, LLC |
| *CENG* | Constellation Energy Nuclear Group, LLC |
| *ConEdison Solutions* | The competitive retail electricity and natural gas business of Consolidated Edison Solutions, Inc., a subsidiary of Consolidated Edison, Inc. |
| *Constellation* | Constellation Energy Group, Inc. |
| *EEDC* | Exelon Energy Delievery Company, LLC |
| *EGR IV* | ExGen Renewables IV, LLC |
| *EGTP* | ExGen Texas Power, LLC |
| *Entergy* | Entergy Nuclear FitzPatrick, LLC |
| *Exelon Corporate* | Exelon in its corporate capacity as a holding company |
| *Exelon Transmission Company* | Exelon Transmission Company, LLC |
| *Exelon Wind* | Exelon Wind, LLC and Exelon Generation Acquisition Company, LLC |
| *FitzPatrick* | James A. FitzPatrick nuclear generating station |
| *PCI* | Potomac Capital Investment Corporation and its subsidiaries |
| *PEC L.P.* | PECO Energy Capital, L.P. |
| *PECO Trust III* | PECO Capital Trust III |
| *PECO Trust IV* | PECO Energy Capital Trust IV |
| *Pepco Energy Services or PES* | Pepco Energy Services, Inc. and its subsidiaries |
| *PHI Corporate* | PHI in its corporate capacity as a holding company |
| *PHISCO* | PHI Service Company |
| *RPG* | Renewable Power Generation |
| *SolGen* | SolGen, LLC |

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Other Terms and Abbreviations**

| | |
|---|---|
| *TMI* | Three Mile Island nuclear facility |
| *UII* | Unicom Investments, Inc. |
| *Note "—" of the Exelon 2017 Form 10-K* | Reference to specific Combined Note to Consolidated Financial Statements within Exelon's 2017 Annual Report on Form 10-K |
| *AEC* | Alternative Energy Credit that is issued for each megawatt hour of generation from a qualified alternative energy source |
| *AESO* | Alberta Electric Systems Operator |
| *AFUDC* | Allowance for Funds Used During Construction |
| *AGE* | Albany Green Energy Project |
| *AMI* | Advanced Metering Infrastructure |
| *AMP* | Advanced Metering Program |
| *AOCI* | Accumulated Other Comprehensive Income |
| *ARC* | Asset Retirement Cost |
| *ARO* | Asset Retirement Obligation |
| *ARP* | Alternative Revenue Program |
| *CAISO* | California ISO |
| *CAP* | Customer Assistance Program |
| *CCGTs* | Combined-Cycle Gas Turbines |
| *CERCLA* | Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended |
| *CES* | Clean Energy Standard |
| *Clean Air Act* | Clean Air Act of 1963, as amended |
| *Clean Water Act* | Federal Water Pollution Control Amendments of 1972, as amended |
| *Conectiv* | Conectiv, LLC, a wholly owned subsidiary of PHI and the parent of DPL and ACE |
| *Conectiv Energy* | Conectiv Energy Holdings, Inc. and substantially all of its subsidiaries, which were sold to Calpine in July 2010 |
| *CSAPR* | Cross-State Air Pollution Rule |
| *D.C. Circuit Court* | United States Court of Appeals for the District of Columbia Circuit |
| *DC PLUG* | District of Columbia Power Line Undergrounding Initiative |
| *DCPSC* | District of Columbia Public Service Commission |
| *Default Electricity Supply* | The supply of electricity by PHI's electric utility subsidiaries at regulated rates to retail customers who do not elect to purchase electricity from a competitive supplier, and which, depending on the jurisdiction, is also known as Standard Offer Service or BGS |
| *DOE* | United States Department of Energy |
| *DOJ* | United States Department of Justice |
| *DPSC* | Delaware Public Service Commission |
| *DRP* | Direct Stock Purchase and Dividend Reinvestment Plan |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Other Terms and Abbreviations**

| | |
|---|---|
| *DSP* | Default Service Provider |
| *EDF* | Electricite de France SA and its subsidiaries |
| *EE&C* | Energy Efficiency and Conservation/Demand Response |
| *EIMA* | Energy Infrastructure Modernization Act (Illinois Senate Bill 1652 and Illinois House Bill 3036) |
| *EmPower* | A Maryland demand-side management program for Pepco and DPL |
| *EPA* | United States Environmental Protection Agency |
| *EPSA* | Electric Power Supply Association |
| *ERCOT* | Electric Reliability Council of Texas |
| *ERISA* | Employee Retirement Income Security Act of 1974, as amended |
| *EROA* | Expected Rate of Return on Assets |
| *ESPP* | Employee Stock Purchase Plan |
| *FASB* | Financial Accounting Standards Board |
| *FEJA* | Illinois Public Act 99-0906 or Future Energy Jobs Act |
| *FERC* | Federal Energy Regulatory Commission |
| *FRCC* | Florida Reliability Coordinating Council |
| *GAAP* | Generally Accepted Accounting Principles in the United States |
| *GCR* | Gas Cost Rate |
| *GHG* | Greenhouse Gas |
| *GSA* | Generation Supply Adjustment |
| *GWh* | Gigawatt hour |
| *IBEW* | International Brotherhood of Electrical Workers |
| *ICC* | Illinois Commerce Commission |
| *ICE* | Intercontinental Exchange |
| *Illinois EPA* | Illinois Environmental Protection Agency |
| *Illinois Settlement Legislation* | Legislation enacted in 2007 affecting electric utilities in Illinois |
| *Integrys* | Integrys Energy Services, Inc. |
| *IPA* | Illinois Power Agency |
| *IRC* | Internal Revenue Code |
| *IRS* | Internal Revenue Service |
| *ISO* | Independent System Operator |
| *ISO-NE* | Independent System Operator New England Inc. |
| *ISO-NY* | Independent System Operator New York |
| *kV* | Kilovolt |
| *kW* | Kilowatt |
| *kWh* | Kilowatt-hour |
| *LIBOR* | London Interbank Offered Rate |
| *LLRW* | Low-Level Radioactive Waste |

6

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Other Terms and Abbreviations**

| | |
|---|---|
| *LT Plan* | Long-term renewable resources procurement plan |
| *LTIP* | Long-Term Incentive Plan |
| *MAPP* | Mid-Atlantic Power Pathway |
| *MATS* | U.S. EPA Mercury and Air Toxics Rule |
| *MBR* | Market Based Rates Incentive |
| *MDE* | Maryland Department of the Environment |
| *MDPSC* | Maryland Public Service Commission |
| *MGP* | Manufactured Gas Plant |
| *MISO* | Midcontinent Independent System Operator, Inc. |
| *mmcf* | Million Cubic Feet |
| *Moody's* | Moody's Investor Service |
| *MOPR* | Minimum Offer Price Rule |
| *MRV* | Market-Related Value |
| *MW* | Megawatt |
| *MWh* | Megawatt hour |
| *n.m.* | not meaningful |
| *NAAQS* | National Ambient Air Quality Standards |
| *NAV* | Net Asset Value |
| *NDT* | Nuclear Decommissioning Trust |
| *NEIL* | Nuclear Electric Insurance Limited |
| *NERC* | North American Electric Reliability Corporation |
| *NGS* | Natural Gas Supplier |
| *NJBPU* | New Jersey Board of Public Utilities |
| *NJDEP* | New Jersey Department of Environmental Protection |
| *Non-Regulatory Agreements Units* | Nuclear generating units or portions thereof whose decommissioning-related activities are not subject to contractual elimination under regulatory accounting |
| *NOSA* | Nuclear Operating Services Agreement |
| *NPDES* | National Pollutant Discharge Elimination System |
| *NRC* | Nuclear Regulatory Commission |
| *NSPS* | New Source Performance Standards |
| *NUGs* | Non-utility generators |
| *NWPA* | Nuclear Waste Policy Act of 1982 |
| *NYMEX* | New York Mercantile Exchange |
| *NYPSC* | New York Public Service Commission |
| *OCI* | Other Comprehensive Income |
| *OIESO* | Ontario Independent Electricity System Operator |
| *OPC* | Office of People's Counsel |
| *OPEB* | Other Postretirement Employee Benefits |
| *PA DEP* | Pennsylvania Department of Environmental Protection |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Other Terms and Abbreviations**

| | |
|---|---|
| *PAPUC* | Pennsylvania Public Utility Commission |
| *PGC* | Purchased Gas Cost Clause |
| *PJM* | PJM Interconnection, LLC |
| *POLR* | Provider of Last Resort |
| *POR* | Purchase of Receivables |
| *PPA* | Power Purchase Agreement |
| *Price-Anderson Act* | Price-Anderson Nuclear Industries Indemnity Act of 1957 |
| *Preferred Stock* | Originally issued shares of non-voting, non-convertible and non-transferable Series A preferred stock, par value $0.01 per share |
| *PRP* | Potentially Responsible Parties |
| *PSEG* | Public Service Enterprise Group Incorporated |
| *PV* | Photovoltaic |
| *RCRA* | Resource Conservation and Recovery Act of 1976, as amended |
| *REC* | Renewable Energy Credit which is issued for each megawatt hour of generation from a qualified renewable energy source |
| *Regulatory Agreement Units* | Nuclear generating units or portions thereof whose decommissioning-related activities are subject to contractual elimination under regulatory accounting |
| *RES* | Retail Electric Suppliers |
| *RFP* | Request for Proposal |
| *Rider* | Reconcilable Surcharge Recovery Mechanism |
| *RGGI* | Regional Greenhouse Gas Initiative |
| *RMC* | Risk Management Committee |
| *ROE* | Return on equity |
| *RPM* | PJM Reliability Pricing Model |
| *RPS* | Renewable Energy Portfolio Standards |
| *RSSA* | Reliability Support Services Agreement |
| *RTEP* | Regional Transmission Expansion Plan |
| *RTO* | Regional Transmission Organization |
| *S&P* | Standard & Poor's Ratings Services |
| *SEC* | United States Securities and Exchange Commission |
| *Senate Bill 1* | Maryland Senate Bill 1 |
| *SERC* | SERC Reliability Corporation (formerly Southeast Electric Reliability Council) |
| *SGIG* | Smart Grid Investment Grant from DOE |
| *SILO* | Sale-In, Lease-Out |
| *SNF* | Spent Nuclear Fuel |
| *SOS* | Standard Offer Service |
| *SPFPA* | Security, Police and Fire Professionals of America |

8

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**GLOSSARY OF TERMS AND ABBREVIATIONS**

**<u>Other Terms and Abbreviations</u>**

| | |
|---|---|
| *SPP* | Southwest Power Pool |
| *TCJA* | Tax Cuts and Jobs Act |
| *Transition Bond Charge* | Revenue ACE receives, and pays to ACE Funding, to fund the principal and interest payments on Transition Bonds and related taxes, expenses and fees |
| *Transition Bonds* | Transition Bonds issued by ACE Funding |
| *Upstream* | Natural gas exploration and production activities |
| *VIE* | Variable Interest Entity |
| *WECC* | Western Electric Coordinating Council |
| *ZEC* | Zero Emission Credit |
| *ZES* | Zero Emission Standard |

9

**FILING FORMAT**

This combined Form 10-Q is being filed separately by Exelon Corporation, Exelon Generation Company, LLC, Commonwealth Edison Company, PECO Energy Company, Baltimore Gas and Electric Company, Pepco Holdings LLC, Potomac Electric Power Company, Delmarva Power & Light Company and Atlantic City Electric Company (Registrants). Information contained herein relating to any individual Registrant is filed by such Registrant on its own behalf. No Registrant makes any representation as to information relating to any other Registrant.

**CAUTIONARY STATEMENTS REGARDING FORWARD-LOOKING INFORMATION**

This Report contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, that are subject to risks and uncertainties. The factors that could cause actual results to differ materially from the forward-looking statements made by the Registrants include those factors discussed herein, as well as the items discussed in (1) the Registrants' combined 2017 Annual Report on Form 10-K in (a) ITEM 1A. Risk Factors, (b) ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and (c) ITEM 8. Financial Statements and Supplementary Data: Note 23 , Commitments and Contingencies; (2) this Quarterly Report on Form 10-Q in (a) Part II, Other Information, ITEM 1A. Risk Factors; (b) Part 1, Financial Information, ITEM 2. Management's Discussion and Analysis of Financial Condition and Results of Operations and (c) Part I, Financial Information, ITEM 1. Financial Statements: Note 17 , Commitments and Contingencies; and (3) other factors discussed in filings with the SEC by the Registrants. Readers are cautioned not to place undue reliance on these forward-looking statements, which apply only as of the date of this Report. None of the Registrants undertakes any obligation to publicly release any revision to its forward-looking statements to reflect events or circumstances after the date of this Report.

**WHERE TO FIND MORE INFORMATION**

The public may read and copy any reports or other information that the Registrants file with the SEC at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. These documents are also available to the public from commercial document retrieval services, the website maintained by the SEC at www.sec.gov and the Registrants' websites at www.exeloncorp.com . Information contained on the Registrants' websites shall not be deemed incorporated into, or to be a part of, this Report.

10

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

11

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON CORPORATION AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions, except per share data) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Operating revenues** | | |
| Competitive businesses revenues | $ 5,113 | $ 4,550 |
| Rate-regulated utility revenues | 4,570 | 4,118 |
| Revenues from alternative revenue programs | 10 | 79 |
| Total operating revenues | 9,693 | 8,747 |
| **Operating expenses** | | |
| Competitive businesses purchased power and fuel | 3,289 | 2,795 |
| Rate-regulated utility purchased power and fuel | 1,438 | 1,104 |
| Operating and maintenance | 2,384 | 2,438 |
| Depreciation and amortization | 1,091 | 896 |
| Taxes other than income | 446 | 436 |
| Total operating expenses | 8,648 | 7,669 |
| **Gain on sales of assets and businesses** | 56 | 4 |
| **Bargain purchase gain** | — | 226 |
| **Operating income** | 1,101 | 1,308 |
| **Other income and (deductions)** | | |
| Interest expense, net | (365) | (363) |
| Interest expense to affiliates | (6) | (10) |
| Other, net | (28) | 257 |
| Total other income and (deductions) | (399) | (116) |
| **Income before income taxes** | 702 | 1,192 |
| **Income taxes** | 59 | 211 |
| **Equity in losses of unconsolidated affiliates** | (7) | (10) |
| **Net income** | 636 | 971 |
| **Net income (loss) attributable to noncontrolling interests** | 51 | (19) |
| **Net income attributable to common shareholders** | $ 585 | $ 990 |
| **Comprehensive income, net of income taxes** | | |
| Net income | $ 636 | $ 971 |
| **Other comprehensive income (loss), net of income taxes** | | |
| Pension and non-pension postretirement benefit plans: | | |
| Prior service benefit reclassified to periodic benefit cost | (17) | (13) |
| Actuarial loss reclassified to periodic benefit cost | 61 | 49 |
| Pension and non-pension postretirement benefit plan valuation adjustment | 18 | (59) |
| Unrealized gain on cash flow hedges | 8 | 6 |
| Unrealized gain on investments in unconsolidated affiliates | 1 | 3 |
| Unrealized gain on foreign currency translation | 1 | 1 |
| Unrealized gain on marketable securities | — | 1 |
| Other comprehensive income (loss) | 72 | (12) |
| **Comprehensive income** | 708 | 959 |
| **Comprehensive income (loss) attributable to noncontrolling interests** | 52 | (21) |
| **Comprehensive income attributable to common shareholders** | $ 656 | $ 980 |
| **Average shares of common stock outstanding:** | | |
| Basic | 966 | 928 |
| Diluted | 968 | 930 |
| **Earnings per average common share:** | | |
| Basic | $ 0.61 | $ 1.07 |
| Diluted | $ 0.60 | $ 1.06 |
| **Dividends declared per common share** | $ 0.35 | $ 0.33 |

See the Combined Notes to Consolidated Financial Statements

12

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON CORPORATION AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
|---|---|---|
| **Cash flows from operating activities** | **2018** | **2017** |
| Net income | $ 636 | $ 971 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation, amortization and accretion, including nuclear fuel and energy contract amortization | 1,501 | 1,274 |
| Impairment of long-lived assets and losses on regulatory assets | — | 10 |
| Gain on sales of assets and businesses | (56) | (4) |
| Bargain purchase gain | — | (226) |
| Deferred income taxes and amortization of investment tax credits | (14) | 185 |
| Net fair value changes related to derivatives | 259 | 47 |
| Net realized and unrealized gains (losses) on nuclear decommissioning trust fund investments | 68 | (175) |
| Other non-cash operating activities | 240 | 118 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 133 | 291 |
| Inventories | 167 | 109 |
| Accounts payable and accrued expenses | (451) | (728) |
| Option premiums paid, net | (27) | (6) |
| Collateral posted, net | (214) | (110) |
| Income taxes | 86 | 50 |
| Pension and non-pension postretirement benefit contributions | (331) | (307) |
| Other assets and liabilities | (495) | (425) |
| Net cash flows provided by operating activities | 1,502 | 1,074 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (1,880) | (2,009) |
| Proceeds from nuclear decommissioning trust fund sales | 1,189 | 1,767 |
| Investment in nuclear decommissioning trust funds | (1,248) | (1,833) |
| Acquisition of businesses, net | — | (212) |
| Proceeds from sales of assets and businesses | 79 | 22 |
| Other investing activities | 3 | (18) |
| Net cash flows used in investing activities | (1,857) | (2,283) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 726 | 721 |
| Proceeds from short-term borrowings with maturities greater than 90 days | 1 | 560 |
| Repayments on short-term borrowings with maturities greater than 90 days | (1) | (500) |
| Issuance of long-term debt | 1,130 | 763 |
| Retirement of long-term debt | (1,241) | (65) |
| Dividends paid on common stock | (333) | (303) |
| Proceeds from employee stock plans | 12 | 12 |
| Other financing activities | (30) | (4) |
| Net cash flows provided by financing activities | 264 | 1,184 |
| **Decrease in cash, cash equivalents and restricted cash** | (91) | (25) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 1,190 | 914 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,099 | $ 889 |

See the Combined Notes to Consolidated Financial Statements

13

Table of Contents

**EXELON CORPORATION AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 787 | $ 898 |
| Restricted cash and cash equivalents | 209 | 207 |
| Accounts receivable, net | | |
|     Customer | 4,190 | 4,445 |
|     Other | 1,103 | 1,132 |
| Mark-to-market derivative assets | 978 | 976 |
| Unamortized energy contract assets | 55 | 60 |
| Inventories, net | | |
|     Fossil fuel and emission allowances | 180 | 340 |
|     Materials and supplies | 1,291 | 1,311 |
| Regulatory assets | 1,245 | 1,267 |
| Other | 1,495 | 1,260 |
|     Total current assets | 11,533 | 11,896 |
| **Property, plant and equipment, net** | 74,711 | 74,202 |
| **Deferred debits and other assets** | | |
| Regulatory assets | 8,063 | 8,021 |
| Nuclear decommissioning trust funds | 13,149 | 13,272 |
| Investments | 640 | 640 |
| Goodwill | 6,677 | 6,677 |
| Mark-to-market derivative assets | 527 | 337 |
| Unamortized energy contract assets | 385 | 395 |
| Other | 1,333 | 1,330 |
|     Total deferred debits and other assets | 30,774 | 30,672 |
| **Total assets** [(a)] | $ 117,018 | $ 116,770 |

See the Combined Notes to Consolidated Financial Statements

14

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON CORPORATION AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ 1,654 | $ 929 |
| Long-term debt due within one year | 1,203 | 2,088 |
| Accounts payable | 3,207 | 3,532 |
| Accrued expenses | 1,569 | 1,837 |
| Payables to affiliates | 5 | 5 |
| Regulatory liabilities | 522 | 523 |
| Mark-to-market derivative liabilities | 415 | 232 |
| Unamortized energy contract liabilities | 202 | 231 |
| Renewable energy credit obligation | 333 | 352 |
| PHI merger related obligation | 87 | 87 |
| Other | 956 | 982 |
| Total current liabilities | 10,153 | 10,798 |
| **Long-term debt** | 32,905 | 32,176 |
| **Long-term debt to financing trusts** | 389 | 389 |
| **Deferred credits and other liabilities** | | |
| Deferred income taxes and unamortized investment tax credits | 11,344 | 11,235 |
| Asset retirement obligations | 10,126 | 10,029 |
| Pension obligations | 3,433 | 3,736 |
| Non-pension postretirement benefit obligations | 2,114 | 2,093 |
| Spent nuclear fuel obligation | 1,151 | 1,147 |
| Regulatory liabilities | 9,724 | 9,865 |
| Mark-to-market derivative liabilities | 468 | 409 |
| Unamortized energy contract liabilities | 579 | 609 |
| Other | 2,067 | 2,097 |
| Total deferred credits and other liabilities | 41,006 | 41,220 |
| Total liabilities (a) | 84,453 | 84,583 |
| **Commitments and contingencies** | | |
| **Shareholders' equity** | | |
| Common stock (No par value, 2,000 shares authorized, 965 shares and 963 shares outstanding at March 31, 2018 and December 31, 2017, respectively) | 18,973 | 18,964 |
| Treasury stock, at cost (2 shares at March 31, 2018 and December 31, 2017) | (123) | (123) |
| Retained earnings | 14,346 | 14,081 |
| Accumulated other comprehensive loss, net | (2,965) | (3,026) |
| Total shareholders' equity | 30,231 | 29,896 |
| Noncontrolling interests | 2,334 | 2,291 |
| Total equity | 32,565 | 32,187 |
| **Total liabilities and shareholders' equity** | $ 117,018 | $ 116,770 |

(a)   Exelon's consolidated assets include $9,727 million and $9,597 million at March 31, 2018 and December 31, 2017 , respectively, of certain VIEs that can only be used to settle the liabilities of the VIE. Exelon's consolidated liabilities include $3,556 million and $3,618 million at March 31, 2018 and December 31, 2017 , respectively, of certain VIEs for which the VIE creditors do not have recourse to Exelon. See Note 3 — Variable Interest Entities .

See the Combined Notes to Consolidated Financial Statements

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON CORPORATION AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY**
**(Unaudited)**

| (In millions, shares in thousands) | Issued Shares | Common Stock | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Loss, net | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | 965,168 | $ 18,964 | $ (123) | $ 14,081 | $ (3,026) | $ 2,291 | $ 32,187 |
| Net income | — | — | — | 585 | — | 51 | 636 |
| Long-term incentive plan activity | 1,685 | (3) | — | — | — | — | (3) |
| Employee stock purchase plan issuances | 361 | 12 | — | — | — | — | 12 |
| Changes in equity of noncontrolling interests | — | — | — | — | — | (9) | (9) |
| Common stock dividends | — | — | — | (334) | — | — | (334) |
| Other comprehensive income, net of income taxes | — | — | — | — | 71 | 1 | 72 |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | — | — | — | 14 | (10) | — | 4 |
| **Balance, March 31, 2018** | 967,214 | $ 18,973 | $ (123) | $ 14,346 | $ (2,965) | $ 2,334 | $ 32,565 |

See the Combined Notes to Consolidated Financial Statements
16

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**EXELON GENERATION COMPANY, LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Operating revenues** | | |
| Operating revenues | $ 5,114 | $ 4,548 |
| Operating revenues from affiliates | 398 | 330 |
| Total operating revenues | 5,512 | 4,878 |
| **Operating expenses** | | |
| Purchased power and fuel | 3,289 | 2,796 |
| Purchased power and fuel from affiliates | 4 | 2 |
| Operating and maintenance | 1,178 | 1,313 |
| Operating and maintenance from affiliates | 161 | 179 |
| Depreciation and amortization | 448 | 302 |
| Taxes other than income | 138 | 143 |
| Total operating expenses | 5,218 | 4,735 |
| **Gain on sales of assets and businesses** | 53 | 4 |
| **Bargain purchase gain** | — | 226 |
| **Operating income** | 347 | 373 |
| **Other income and (deductions)** | | |
| Interest expense, net | (91) | (90) |
| Interest expense to affiliates | (10) | (10) |
| Other, net | (44) | 259 |
| Total other income and (deductions) | (145) | 159 |
| **Income before income taxes** | 202 | 532 |
| **Income taxes** | 9 | 123 |
| **Equity in losses of unconsolidated affiliates** | (7) | (10) |
| **Net income** | 186 | 399 |
| **Net income (loss) attributable to noncontrolling interests** | 50 | (19) |
| **Net income attributable to membership interest** | $ 136 | $ 418 |
| **Comprehensive income, net of income taxes** | | |
| Net income | $ 186 | $ 399 |
| **Other comprehensive income (loss), net of income taxes** | | |
| Unrealized gain on cash flow hedges | 7 | 6 |
| Unrealized gain on investments in unconsolidated affiliates | 1 | 4 |
| Unrealized (loss) gain on foreign currency translation | (1) | 1 |
| Other comprehensive income | 7 | 11 |
| **Comprehensive income** | 193 | 410 |
| **Comprehensive income (loss) attributable to noncontrolling interests** | 51 | (21) |
| **Comprehensive income attributable to membership interest** | $ 142 | $ 431 |

See the Combined Notes to Consolidated Financial Statements

17

**EXELON GENERATION COMPANY, LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 186 | $ 399 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation, amortization and accretion, including nuclear fuel and energy contract amortization | 858 | 678 |
| Impairment of long-lived assets | — | 10 |
| Gain on sales of assets and businesses | (53) | (4) |
| Bargain purchase gain | — | (226) |
| Deferred income taxes and amortization of investment tax credits | (68) | 108 |
| Net fair value changes related to derivatives | 264 | 51 |
| Net realized and unrealized gains on nuclear decommissioning trust fund investments | 68 | (175) |
| Other non-cash operating activities | 45 | (10) |
| Changes in assets and liabilities: | | |
| Accounts receivable | 194 | 173 |
| Receivables from and payables to affiliates, net | (15) | 23 |
| Inventories | 122 | 81 |
| Accounts payable and accrued expenses | (317) | (236) |
| Option premiums paid, net | (27) | (6) |
| Collateral posted, net | (214) | (102) |
| Income taxes | 79 | (81) |
| Pension and non-pension postretirement benefit contributions | (125) | (110) |
| Other assets and liabilities | (142) | (153) |
| Net cash flows provided by operating activities | 855 | 420 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (628) | (625) |
| Proceeds from nuclear decommissioning trust fund sales | 1,189 | 1,767 |
| Investment in nuclear decommissioning trust funds | (1,248) | (1,833) |
| Acquisition of businesses, net | — | (212) |
| Proceeds from sales of assets and businesses | 79 | 22 |
| Other investing activities | (7) | (29) |
| Net cash flows used in investing activities | (615) | (910) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 165 | (42) |
| Proceeds from short-term borrowings with maturities greater than 90 days | 1 | 60 |
| Repayments of short-term borrowings with maturities greater than 90 days | (1) | — |
| Issuance of long-term debt | 4 | 762 |
| Retirement of long-term debt | (29) | (30) |
| Changes in Exelon intercompany money pool | — | (1) |
| Distributions to member | (188) | (164) |
| Other financing activities | (9) | (3) |
| Net cash flows (used in) provided by financing activities | (57) | 582 |
| **Increase in cash, cash equivalents and restricted cash** | 183 | 92 |
| **Cash, cash equivalents and restricted cash at beginning of period** | 554 | 448 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 737 | $ 540 |

See the Combined Notes to Consolidated Financial Statements
18

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON GENERATION COMPANY, LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 610 | $ | 416 |
| Restricted cash and cash equivalents | | 127 | | 138 |
| Accounts receivable, net | | | | |
| Customer | | 2,478 | | 2,697 |
| Other | | 294 | | 321 |
| Mark-to-market derivative assets | | 978 | | 976 |
| Receivables from affiliates | | 153 | | 140 |
| Unamortized energy contract assets | | 55 | | 60 |
| Inventories, net | | | | |
| Fossil fuel and emission allowances | | 151 | | 264 |
| Materials and supplies | | 916 | | 937 |
| Other | | 1,122 | | 933 |
| Total current assets | | 6,884 | | 6,882 |
| **Property, plant and equipment, net** | | 24,714 | | 24,906 |
| **Deferred debits and other assets** | | | | |
| Nuclear decommissioning trust funds | | 13,149 | | 13,272 |
| Investments | | 431 | | 433 |
| Goodwill | | 47 | | 47 |
| Mark-to-market derivative assets | | 527 | | 334 |
| Prepaid pension asset | | 1,571 | | 1,502 |
| Unamortized energy contract assets | | 385 | | 395 |
| Deferred income taxes | | 10 | | 16 |
| Other | | 657 | | 670 |
| Total deferred debits and other assets | | 16,777 | | 16,669 |
| **Total assets** [a] | $ | 48,375 | $ | 48,457 |

See the Combined Notes to Consolidated Financial Statements
19

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON GENERATION COMPANY, LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 166 | $ | 2 |
| Long-term debt due within one year | | 373 | | 346 |
| Accounts payable | | 1,447 | | 1,773 |
| Accrued expenses | | 951 | | 1,022 |
| Payables to affiliates | | 114 | | 123 |
| Borrowings from Exelon intercompany money pool | | 54 | | 54 |
| Mark-to-market derivative liabilities | | 391 | | 211 |
| Unamortized energy contract liabilities | | 39 | | 43 |
| Renewable energy credit obligation | | 333 | | 352 |
| Other | | 288 | | 265 |
| Total current liabilities | | 4,156 | | 4,191 |
| **Long-term debt** | | 7,685 | | 7,734 |
| **Long-term debt to affiliate** | | 907 | | 910 |
| **Deferred credits and other liabilities** | | | | |
| Deferred income taxes and unamortized investment tax credits | | 3,749 | | 3,811 |
| Asset retirement obligations | | 9,941 | | 9,844 |
| Non-pension postretirement benefit obligations | | 911 | | 916 |
| Spent nuclear fuel obligation | | 1,151 | | 1,147 |
| Payables to affiliates | | 2,970 | | 3,065 |
| Mark-to-market derivative liabilities | | 221 | | 174 |
| Unamortized energy contract liabilities | | 40 | | 48 |
| Other | | 686 | | 658 |
| Total deferred credits and other liabilities | | 19,669 | | 19,663 |
| Total liabilities [a] | | 32,417 | | 32,498 |
| **Commitments and contingencies** | | | | |
| **Equity** | | | | |
| Member's equity | | | | |
| Membership interest | | 9,357 | | 9,357 |
| Undistributed earnings | | 4,303 | | 4,349 |
| Accumulated other comprehensive loss, net | | (34) | | (37) |
| Total member's equity | | 13,626 | | 13,669 |
| Noncontrolling interests | | 2,332 | | 2,290 |
| Total equity | | 15,958 | | 15,959 |
| **Total liabilities and equity** | $ | 48,375 | $ | 48,457 |

[a] Generation's consolidated assets include $9,688 million and $9,556 million at March 31, 2018 and December 31, 2017 , respectively, of certain VIEs that can only be used to settle the liabilities of the VIE. Generation's consolidated liabilities include $3,461 million and $3,516 million at March 31, 2018 and December 31, 2017 , respectively, of certain VIEs for which the VIE creditors do not have recourse to Generation. See Note 3 — Variable Interest Entities .

See the Combined Notes to Consolidated Financial Statements

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**EXELON GENERATION COMPANY, LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN EQUITY**
**(Unaudited)**

| (In millions) | Member's Equity | | | Noncontrolling Interests | Total Equity |
| --- | --- | --- | --- | --- | --- |
| | Membership Interest | Undistributed Earnings | Accumulated Other Comprehensive Loss, net | | |
| **Balance, December 31, 2017** | $ 9,357 | $ 4,349 | $ (37) | $ 2,290 | $ 15,959 |
| Net income | — | 136 | — | 50 | 186 |
| Changes in equity of noncontrolling interests | — | — | — | (9) | (9) |
| Distributions to member | — | (188) | — | — | (188) |
| Other comprehensive income, net of income taxes | — | — | 6 | 1 | 7 |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | — | 6 | (3) | — | 3 |
| **Balance, March 31, 2018** | $ 9,357 | $ 4,303 | $ (34) | $ 2,332 | $ 15,958 |

See the Combined Notes to Consolidated Financial Statements
21

**COMMONWEALTH EDISON COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Operating revenues** | | |
| Electric operating revenues | $ 1,493 | $ 1,279 |
| Revenues from alternative revenue programs | 5 | 14 |
| Operating revenues from affiliates | 14 | 5 |
| Total operating revenues | 1,512 | 1,298 |
| **Operating expenses** | | |
| Purchased power | 411 | 329 |
| Purchased power from affiliate | 194 | 5 |
| Operating and maintenance | 253 | 307 |
| Operating and maintenance from affiliate | 60 | 63 |
| Depreciation and amortization | 228 | 208 |
| Taxes other than income | 77 | 72 |
| Total operating expenses | 1,223 | 984 |
| **Gain on sales of assets** | 3 | — |
| **Operating income** | 292 | 314 |
| **Other income and (deductions)** | | |
| Interest expense, net | (86) | (82) |
| Interest expense to affiliates | (3) | (3) |
| Other, net | 8 | 4 |
| Total other income and (deductions) | (81) | (81) |
| **Income before income taxes** | 211 | 233 |
| **Income taxes** | 46 | 92 |
| **Net income** | $ 165 | $ 141 |
| **Comprehensive income** | $ 165 | $ 141 |

See the Combined Notes to Consolidated Financial Statements

22

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMMONWEALTH EDISON COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| **Cash flows from operating activities** | | | | |
| Net income | $ | 165 | $ | 141 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | | | |
| Depreciation and amortization | | 228 | | 208 |
| Deferred income taxes and amortization of investment tax credits | | 50 | | 137 |
| Other non-cash operating activities | | 46 | | 31 |
| Changes in assets and liabilities: | | | | |
| Accounts receivable | | 39 | | 92 |
| Receivables from and payables to affiliates, net | | (19) | | (16) |
| Inventories | | 5 | | 4 |
| Accounts payable and accrued expenses | | (158) | | (236) |
| Collateral posted, net | | (3) | | (7) |
| Income taxes | | (5) | | (34) |
| Pension and non-pension postretirement benefit contributions | | (38) | | (35) |
| Other assets and liabilities | | (176) | | (49) |
| Net cash flows provided by operating activities | | 134 | | 236 |
| **Cash flows from investing activities** | | | | |
| Capital expenditures | | (531) | | (626) |
| Other investing activities | | 8 | | 7 |
| Net cash flows used in investing activities | | (523) | | (619) |
| **Cash flows from financing activities** | | | | |
| Changes in short-term borrowings | | 317 | | 365 |
| Issuance of long-term debt | | 800 | | — |
| Retirement of long-term debt | | (700) | | — |
| Contributions from parent | | 113 | | 100 |
| Dividends paid on common stock | | (114) | | (105) |
| Other financing activities | | (9) | | (1) |
| Net cash flows provided by financing activities | | 407 | | 359 |
| **Increase (Decrease) in cash, cash equivalents and restricted cash** | | 18 | | (24) |
| **Cash, cash equivalents and restricted cash at beginning of period** | | 144 | | 58 |
| **Cash, cash equivalents and restricted cash at end of period** | $ | 162 | $ | 34 |

See the Combined Notes to Consolidated Financial Statements
23

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMMONWEALTH EDISON COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 70 | $ 76 |
| Restricted cash | 9 | 5 |
| Accounts receivable, net | | |
| Customer | 485 | 559 |
| Other | 290 | 266 |
| Receivables from affiliates | 28 | 13 |
| Inventories, net | 146 | 152 |
| Regulatory assets | 226 | 225 |
| Other | 82 | 68 |
| Total current assets | 1,336 | 1,364 |
| **Property, plant and equipment, net** | 21,010 | 20,723 |
| **Deferred debits and other assets** | | |
| Regulatory assets | 1,125 | 1,054 |
| Investments | 6 | 6 |
| Goodwill | 2,625 | 2,625 |
| Receivables from affiliates | 2,464 | 2,528 |
| Prepaid pension asset | 1,177 | 1,188 |
| Other | 259 | 238 |
| Total deferred debits and other assets | 7,656 | 7,639 |
| **Total assets** | $ 30,002 | $ 29,726 |

See the Combined Notes to Consolidated Financial Statements

24

**COMMONWEALTH EDISON COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ 317 | $ — |
| Long-term debt due within one year | 440 | 840 |
| Accounts payable | 491 | 568 |
| Accrued expenses | 198 | 327 |
| Payables to affiliates | 70 | 74 |
| Customer deposits | 111 | 112 |
| Regulatory liabilities | 212 | 249 |
| Mark-to-market derivative liability | 24 | 21 |
| Other | 82 | 103 |
| Total current liabilities | 1,945 | 2,294 |
| **Long-term debt** | 7,254 | 6,761 |
| **Long-term debt to financing trust** | 205 | 205 |
| **Deferred credits and other liabilities** | | |
| Deferred income taxes and unamortized investment tax credits | 3,539 | 3,469 |
| Asset retirement obligations | 111 | 111 |
| Non-pension postretirement benefits obligations | 215 | 219 |
| Regulatory liabilities | 6,212 | 6,328 |
| Mark-to-market derivative liability | 243 | 235 |
| Other | 572 | 562 |
| Total deferred credits and other liabilities | 10,892 | 10,924 |
| Total liabilities | 20,296 | 20,184 |
| **Commitments and contingencies** | | |
| **Shareholders' equity** | | |
| Common stock | 1,588 | 1,588 |
| Other paid-in capital | 6,935 | 6,822 |
| Retained deficit unappropriated | (1,639) | (1,639) |
| Retained earnings appropriated | 2,822 | 2,771 |
| Total shareholders' equity | 9,706 | 9,542 |
| **Total liabilities and shareholders' equity** | $ 30,002 | $ 29,726 |

See the Combined Notes to Consolidated Financial Statements

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMMONWEALTH EDISON COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | Other Paid-In Capital | Retained Deficit Unappropriated | Retained Earnings Appropriated | Total Shareholders' Equity |
|---|---|---|---|---|---|
| **Balance, December 31, 2017** | $ 1,588 | $ 6,822 | $ (1,639) | $ 2,771 | $ 9,542 |
| Net income | — | — | 165 | — | 165 |
| Appropriation of retained earnings for future dividends | — | — | (165) | 165 | — |
| Common stock dividends | — | — | — | (114) | (114) |
| Contributions from parent | — | 113 | — | — | 113 |
| **Balance, March 31, 2018** | $ 1,588 | $ 6,935 | $ (1,639) | $ 2,822 | $ 9,706 |

See the Combined Notes to Consolidated Financial Statements

26

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PECO ENERGY COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| **Operating revenues** | | | | |
| Electric operating revenues | $ | 633 | $ | 589 |
| Natural gas operating revenues | | 232 | | 206 |
| Revenues from alternative revenue programs | | (1) | | — |
| Operating revenues from affiliates | | 2 | | 1 |
| Total operating revenues | | 866 | | 796 |
| **Operating expenses** | | | | |
| Purchased power | | 199 | | 156 |
| Purchased fuel | | 98 | | 86 |
| Purchased power from affiliate | | 36 | | 45 |
| Operating and maintenance | | 233 | | 174 |
| Operating and maintenance from affiliates | | 42 | | 34 |
| Depreciation and amortization | | 75 | | 71 |
| Taxes other than income | | 41 | | 38 |
| Total operating expenses | | 724 | | 604 |
| **Operating income** | | 142 | | 192 |
| **Other income and (deductions)** | | | | |
| Interest expense, net | | (30) | | (28) |
| Interest expense to affiliates | | (3) | | (3) |
| Other, net | | 2 | | 2 |
| Total other income and (deductions) | | (31) | | (29) |
| **Income before income taxes** | | 111 | | 163 |
| **Income taxes** | | (2) | | 36 |
| **Net income** | $ | 113 | $ | 127 |
| **Comprehensive income** | $ | 113 | $ | 127 |

See the Combined Notes to Consolidated Financial Statements

27

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PECO ENERGY COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| (In millions) | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 113 | $ 127 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 75 | 71 |
| Deferred income taxes and amortization of investment tax credits | (4) | 24 |
| Other non-cash operating activities | 21 | 23 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (51) | (25) |
| Receivables from and payables to affiliates, net | 7 | (10) |
| Inventories | 12 | 19 |
| Accounts payable and accrued expenses | 6 | (40) |
| Income taxes | 5 | 25 |
| Pension and non-pension postretirement benefit contributions | (24) | (23) |
| Other assets and liabilities | (141) | (85) |
| Net cash flows provided by operating activities | 19 | 106 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (217) | (201) |
| Changes in Exelon intercompany money pool | — | 131 |
| Other investing activities | 2 | 1 |
| Net cash flows used in investing activities | (215) | (69) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 220 | — |
| Issuance of long-term debt | 325 | — |
| Retirement of long-term debt | (500) | — |
| Changes in Exelon intercompany money pool | 194 | — |
| Dividends paid on common stock | (287) | (72) |
| Other financing activities | (5) | — |
| Net cash flows used in financing activities | (53) | (72) |
| **Decrease in cash, cash equivalents and restricted cash** | (249) | (35) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 275 | 67 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 26 | $ 32 |

See the Combined Notes to Consolidated Financial Statements

Table of Contents

**PECO ENERGY COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 21 | $ | 271 |
| Restricted cash and cash equivalents | | 5 | | 4 |
| Accounts receivable, net | | | | |
| Customer | | 349 | | 327 |
| Other | | 117 | | 105 |
| Inventories, net | | | | |
| Fossil fuel | | 16 | | 31 |
| Materials and supplies | | 33 | | 30 |
| Prepaid utility taxes | | 97 | | 8 |
| Regulatory assets | | 78 | | 29 |
| Other | | 20 | | 17 |
| Total current assets | | 736 | | 822 |
| **Property, plant and equipment, net** | | 8,176 | | 8,053 |
| **Deferred debits and other assets** | | | | |
| Regulatory assets | | 408 | | 381 |
| Investments | | 25 | | 25 |
| Receivable from affiliates | | 505 | | 537 |
| Prepaid pension asset | | 359 | | 340 |
| Other | | 9 | | 12 |
| Total deferred debits and other assets | | 1,306 | | 1,295 |
| **Total assets** | $ | 10,218 | $ | 10,170 |

See the Combined Notes to Consolidated Financial Statements
29

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PECO ENERGY COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 220 | $ | — |
| Long-term debt due within one year | | — | | 500 |
| Accounts payable | | 379 | | 370 |
| Accrued expenses | | 91 | | 114 |
| Payables to affiliates | | 59 | | 53 |
| Borrowings from Exelon intercompany money pool | | 194 | | — |
| Customer deposits | | 66 | | 66 |
| Regulatory liabilities | | 117 | | 141 |
| Other | | 29 | | 23 |
| Total current liabilities | | 1,155 | | 1,267 |
| **Long-term debt** | | 2,723 | | 2,403 |
| **Long-term debt to financing trusts** | | 184 | | 184 |
| **Deferred credits and other liabilities** | | | | |
| Deferred income taxes and unamortized investment tax credits | | 1,824 | | 1,789 |
| Asset retirement obligations | | 27 | | 27 |
| Non-pension postretirement benefits obligations | | 288 | | 288 |
| Regulatory liabilities | | 529 | | 549 |
| Other | | 85 | | 86 |
| Total deferred credits and other liabilities | | 2,753 | | 2,739 |
| Total liabilities | | 6,815 | | 6,593 |
| **Commitments and contingencies** | | | | |
| **Shareholder's equity** | | | | |
| Common stock | | 2,489 | | 2,489 |
| Retained earnings | | 914 | | 1,087 |
| Accumulated other comprehensive income, net | | — | | 1 |
| Total shareholder's equity | | 3,403 | | 3,577 |
| **Total liabilities and shareholder's equity** | $ | 10,218 | $ | 10,170 |

See the Combined Notes to Consolidated Financial Statements

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PECO ENERGY COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDER'S EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | | Retained Earnings | | Accumulated Other Comprehensive Income, net | | Total Shareholder's Equity | |
|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | $ | 2,489 | $ | 1,087 | $ | 1 | $ | 3,577 |
| Net income | | — | | 113 | | — | | 113 |
| Common stock dividends | | — | | (287) | | — | | (287) |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | | — | | 1 | | (1) | | — |
| **Balance, March 31, 2018** | $ | 2,489 | $ | 914 | $ | — | $ | 3,403 |

See the Combined Notes to Consolidated Financial Statements

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**BALTIMORE GAS AND ELECTRIC COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Operating revenues** | | |
| Electric operating revenues | $ 654 | $ 640 |
| Natural gas operating revenues | 330 | 271 |
| Revenues from alternative revenue programs | (13) | 35 |
| Operating revenues from affiliates | 6 | 5 |
| Total operating revenues | 977 | 951 |
| **Operating expenses** | | |
| Purchased power | 192 | 133 |
| Purchased fuel | 123 | 83 |
| Purchased power from affiliate | 65 | 134 |
| Operating and maintenance | 184 | 148 |
| Operating and maintenance from affiliates | 37 | 35 |
| Depreciation and amortization | 134 | 128 |
| Taxes other than income | 65 | 62 |
| Total operating expenses | 800 | 723 |
| **Operating income** | 177 | 228 |
| **Other income and (deductions)** | | |
| Interest expense, net | (25) | (23) |
| Interest expense to affiliates | — | (4) |
| Other, net | 4 | 4 |
| Total other income and (deductions) | (21) | (23) |
| **Income before income taxes** | 156 | 205 |
| **Income taxes** | 28 | 80 |
| **Net income** | $ 128 | $ 125 |
| **Comprehensive income** | $ 128 | $ 125 |

See the Combined Notes to Consolidated Financial Statements

32

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**BALTIMORE GAS AND ELECTRIC COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 128 | $ 125 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 134 | 128 |
| Deferred income taxes and amortization of investment tax credits | 22 | 72 |
| Other non-cash operating activities | 20 | 24 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (32) | (7) |
| Receivables from and payables to affiliates, net | — | (7) |
| Inventories | 20 | 17 |
| Accounts payable and accrued expenses | (9) | (81) |
| Income taxes | 14 | 33 |
| Pension and non-pension postretirement benefit contributions | (45) | (44) |
| Other assets and liabilities | 61 | (52) |
| Net cash flows provided by operating activities | 313 | 208 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (224) | (206) |
| Other investing activities | 1 | 4 |
| Net cash flows used in investing activities | (223) | (202) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | (32) | 50 |
| Dividends paid on common stock | (52) | (49) |
| Net cash flows (used in) provided by financing activities | (84) | 1 |
| **Increase in cash, cash equivalents and restricted cash** | 6 | 7 |
| **Cash, cash equivalents and restricted cash at beginning of period** | 18 | 50 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 24 | $ 57 |

See the Combined Notes to Consolidated Financial Statements
33

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**BALTIMORE GAS AND ELECTRIC COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $          22 | $          17 |
| Restricted cash and cash equivalents | 2 | 1 |
| Accounts receivable, net | | |
| Customer | 394 | 375 |
| Other | 91 | 94 |
| Receivables from affiliates | — | 1 |
| Inventories, net | | |
| Gas held in storage | 12 | 37 |
| Materials and supplies | 45 | 40 |
| Prepaid utility taxes | 35 | 69 |
| Regulatory assets | 149 | 174 |
| Other | 5 | 3 |
| Total current assets | 755 | 811 |
| **Property, plant and equipment, net** | 7,725 | 7,602 |
| **Deferred debits and other assets** | | |
| Regulatory assets | 391 | 397 |
| Investments | 5 | 5 |
| Prepaid pension asset | 313 | 285 |
| Other | 6 | 4 |
| Total deferred debits and other assets | 715 | 691 |
| **Total assets** | $       9,195 | $       9,104 |

See the Combined Notes to Consolidated Financial Statements

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**BALTIMORE GAS AND ELECTRIC COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $              45 | $              77 |
| Accounts payable | 253 | 265 |
| Accrued expenses | 162 | 164 |
| Payables to affiliates | 51 | 52 |
| Customer deposits | 118 | 116 |
| Regulatory liabilities | 102 | 62 |
| Other | 26 | 24 |
| Total current liabilities | 757 | 760 |
| **Long-term debt** | 2,578 | 2,577 |
| **Deferred credits and other liabilities** | | |
| Deferred income taxes and unamortized investment tax credits | 1,286 | 1,244 |
| Asset retirement obligations | 22 | 23 |
| Non-pension postretirement benefits obligations | 199 | 202 |
| Regulatory liabilities | 1,083 | 1,101 |
| Other | 53 | 56 |
| Total deferred credits and other liabilities | 2,643 | 2,626 |
| Total liabilities | 5,978 | 5,963 |
| **Commitments and contingencies** | | |
| **Shareholders' equity** | | |
| Common stock | 1,605 | 1,605 |
| Retained earnings | 1,612 | 1,536 |
| Total shareholders' equity | 3,217 | 3,141 |
| **Total liabilities and shareholders' equity** | $          9,195 | $          9,104 |

See the Combined Notes to Consolidated Financial Statements

35

Table of Contents

**BALTIMORE GAS AND ELECTRIC COMPANY AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | | Retained Earnings | | Total Shareholders' Equity | |
|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | $ | 1,605 | $ | 1,536 | $ | 3,141 |
| Net income | | — | | 128 | | 128 |
| Common stock dividends | | — | | (52) | | (52) |
| **Balance, March 31, 2018** | $ | 1,605 | $ | 1,612 | $ | 3,217 |

See the Combined Notes to Consolidated Financial Statements

36

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**PEPCO HOLDINGS LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| (In millions) | 2018 | 2017 |
| **Operating revenues** | | |
| Electric operating revenues | $ 1,151 | $ 1,067 |
| Natural gas operating revenues | 78 | 66 |
| Revenues from alternative revenue programs | 18 | 30 |
| Operating revenues from affiliates | 4 | 12 |
| Total operating revenues | 1,251 | 1,175 |
| **Operating expenses** | | |
| Purchased power | 374 | 288 |
| Purchased fuel | 41 | 29 |
| Purchased power and fuel from affiliates | 105 | 144 |
| Operating and maintenance | 271 | 223 |
| Operating and maintenance from affiliates | 38 | 33 |
| Depreciation, amortization and accretion | 183 | 167 |
| Taxes other than income | 113 | 111 |
| Total operating expenses | 1,125 | 995 |
| **Operating income** | 126 | 180 |
| **Other income and (deductions)** | | |
| Interest expense, net | (63) | (62) |
| Other, net | 11 | 13 |
| Total other income and (deductions) | (52) | (49) |
| **Income before income taxes** | 74 | 131 |
| **Income taxes** | 9 | (9) |
| **Net income** | $ 65 | $ 140 |
| **Comprehensive income** | $ 65 | $ 140 |

See the Combined Notes to Consolidated Financial Statements
37

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PEPCO HOLDINGS LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| (In millions) | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 65 | $ 140 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 183 | 167 |
| Deferred income taxes and amortization of investment tax credits | 17 | 13 |
| Other non-cash operating activities | 53 | (8) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (9) | 68 |
| Receivables from and payables to affiliates, net | 10 | (8) |
| Inventories | 4 | (11) |
| Accounts payable and accrued expenses | 44 | (81) |
| Income taxes | (9) | 55 |
| Pension and non-pension postretirement benefit contributions | (55) | (66) |
| Other assets and liabilities | (24) | (75) |
| Net cash flows provided by operating activities | 279 | 194 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (258) | (320) |
| Other investing activities | — | (3) |
| Net cash flows used in investing activities | (258) | (323) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 57 | 145 |
| Repayments of short-term borrowings with maturities greater than 90 days | — | (500) |
| Issuance of long-term debt | — | 1 |
| Retirement of long-term debt | (12) | (24) |
| Distributions to member | (71) | (69) |
| Contributions from member | — | 500 |
| Change in Exelon intercompany money pool | 13 | 13 |
| Net cash flows (used in) provided by financing activities | (13) | 66 |
| **Increase (Decrease) in cash, cash equivalents and restricted cash** | 8 | (63) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 95 | 236 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 103 | $ 173 |

See the Combined Notes to Consolidated Financial Statements
38

Table of Contents

**PEPCO HOLDINGS LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 43 | $ | 30 |
| Restricted cash and cash equivalents | | 40 | | 42 |
| Accounts receivable, net | | | | |
| Customer | | 484 | | 486 |
| Other | | 210 | | 206 |
| Inventories, net | | | | |
| Gas held in storage | | 2 | | 7 |
| Materials and supplies | | 152 | | 151 |
| Regulatory assets | | 507 | | 554 |
| Other | | 55 | | 75 |
| Total current assets | | 1,493 | | 1,551 |
| **Property, plant and equipment, net** | | 12,688 | | 12,498 |
| **Deferred debits and other assets** | | | | |
| Regulatory assets | | 2,453 | | 2,493 |
| Investments | | 132 | | 132 |
| Goodwill | | 4,005 | | 4,005 |
| Long-term note receivable | | 4 | | 4 |
| Prepaid pension asset | | 527 | | 490 |
| Deferred income taxes | | 4 | | 4 |
| Other | | 69 | | 70 |
| Total deferred debits and other assets | | 7,194 | | 7,198 |
| **Total assets** [(a)] | $ | 21,375 | $ | 21,247 |

See the Combined Notes to Consolidated Financial Statements
39

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PEPCO HOLDINGS LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND MEMBER'S EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 407 | $ | 350 |
| Long-term debt due within one year | | 385 | | 396 |
| Accounts payable | | 469 | | 348 |
| Accrued expenses | | 246 | | 261 |
| Payables to affiliates | | 100 | | 90 |
| Borrowings from Exelon intercompany money pool | | 13 | | — |
| Unamortized energy contract liabilities | | 162 | | 188 |
| Customer deposits | | 114 | | 119 |
| Merger related obligation | | 42 | | 42 |
| Regulatory liabilities | | 77 | | 56 |
| Other | | 52 | | 81 |
| Total current liabilities | | 2,067 | | 1,931 |
| **Long-term debt** | | 5,464 | | 5,478 |
| **Deferred credits and other liabilities** | | | | |
| Regulatory liabilities | | 1,888 | | 1,872 |
| Deferred income taxes and unamortized investment tax credits | | 2,103 | | 2,070 |
| Asset retirement obligations | | 16 | | 16 |
| Non-pension postretirement benefit obligations | | 102 | | 105 |
| Unamortized energy contract liabilities | | 539 | | 561 |
| Other | | 377 | | 389 |
| Total deferred credits and other liabilities | | 5,025 | | 5,013 |
| Total liabilities [(a)] | | 12,556 | | 12,422 |
| **Commitments and contingencies** | | | | |
| **Member's equity** | | | | |
| Membership interest | | 8,835 | | 8,835 |
| Undistributed earnings (losses) | | (16) | | (10) |
| Total member's equity | | 8,819 | | 8,825 |
| **Total liabilities and member's equity** | $ | 21,375 | $ | 21,247 |

(a)   PHI's consolidated total assets include $39 million and $41 million at March 31, 2018 and December 31, 2017 , respectively, of PHI's consolidated VIE that can only be used to settle the liabilities of the VIE. PHI's consolidated total liabilities include $95 million and $102 million at March 31, 2018 and December 31, 2017 , respectively, of PHI's consolidated VIE for which the VIE creditors do not have recourse to PHI. See Note 3 — Variable Interest Entities .

See the Combined Notes to Consolidated Financial Statements
40

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PEPCO HOLDINGS LLC AND SUBSIDIARY COMPANIES**
**CONSOLIDATED STATEMENT OF CHANGES IN EQUITY**
**(Unaudited)**

| (In millions) | Membership Interest | | Undistributed Earnings (Losses) | | Member's Equity | |
|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | $ | 8,835 | $ | (10) | $ | 8,825 |
| Net income | | — | | 65 | | 65 |
| Distribution to member | | — | | (71) | | (71) |
| **Balance, March 31, 2018** | $ | 8,835 | $ | (16) | $ | 8,819 |

See the Combined Notes to Consolidated Financial Statements

41

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**POTOMAC ELECTRIC POWER COMPANY**
**STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| (In millions) | | 2018 | | 2017 |
| **Operating revenues** | | | | |
| Electric operating revenues | $ | 536 | $ | 514 |
| Revenues from alternative revenue programs | | 19 | | 15 |
| Operating revenues from affiliates | | 2 | | 1 |
| Total operating revenues | | 557 | | 530 |
| **Operating expenses** | | | | |
| Purchased power | | 130 | | 83 |
| Purchased power from affiliates | | 52 | | 83 |
| Operating and maintenance | | 73 | | 101 |
| Operating and maintenance from affiliates | | 57 | | 12 |
| Depreciation and amortization | | 96 | | 82 |
| Taxes other than income | | 93 | | 90 |
| Total operating expenses | | 501 | | 451 |
| **Operating income** | | 56 | | 79 |
| **Other income and (deductions)** | | | | |
| Interest expense, net | | (31) | | (29) |
| Other, net | | 8 | | 8 |
| Total other income and (deductions) | | (23) | | (21) |
| **Income before income taxes** | | 33 | | 58 |
| **Income taxes** | | 2 | | — |
| **Net income** | $ | 31 | $ | 58 |
| **Comprehensive income** | $ | 31 | $ | 58 |

See the Combined Notes to Consolidated Financial Statements
42

Table of Contents

**POTOMAC ELECTRIC POWER COMPANY**
**STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 31 | $ 58 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 96 | 82 |
| Deferred income taxes and amortization of investment tax credits | 4 | 5 |
| Other non-cash operating activities | 10 | (15) |
| Changes in assets and liabilities: | | |
| Accounts receivable | — | 45 |
| Receivables from and payables to affiliates, net | (18) | (6) |
| Inventories | (2) | (10) |
| Accounts payable and accrued expenses | 36 | (49) |
| Income taxes | (3) | 20 |
| Pension and non-pension postretirement benefit contributions | (7) | (64) |
| Other assets and liabilities | (21) | (37) |
| Net cash flows provided by operating activities | 126 | 29 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (127) | (139) |
| Other investing activities | — | (5) |
| Net cash flows used in investing activities | (127) | (144) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 34 | 144 |
| Issuance of long-term debt | — | 1 |
| Dividends paid on common stock | (25) | (30) |
| Other financing activities | — | (1) |
| Net cash flows provided by financing activities | 9 | 114 |
| **Increase (decrease) in cash, cash equivalents and restricted cash** | 8 | (1) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 40 | 42 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 48 | $ 41 |

See the Combined Notes to Consolidated Financial Statements
43

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**POTOMAC ELECTRIC POWER COMPANY**
**BALANCE SHEETS**
**(Unaudited)**

| (In millions) | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 15 | $ | 5 |
| Restricted cash and cash equivalents | | 33 | | 35 |
| Accounts receivable, net | | | | |
| Customer | | 246 | | 250 |
| Other | | 87 | | 87 |
| Inventories, net | | 89 | | 87 |
| Regulatory assets | | 207 | | 213 |
| Other | | 19 | | 33 |
| Total current assets | | 696 | | 710 |
| **Property, plant and equipment, net** | | 6,095 | | 6,001 |
| **Deferred debits and other assets** | | | | |
| Regulatory assets | | 656 | | 678 |
| Investments | | 104 | | 102 |
| Prepaid pension asset | | 323 | | 322 |
| Other | | 22 | | 19 |
| Total deferred debits and other assets | | 1,105 | | 1,121 |
| **Total assets** | $ | 7,896 | $ | 7,832 |

See the Combined Notes to Consolidated Financial Statements
44

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**POTOMAC ELECTRIC POWER COMPANY**
**BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 60 | $ | 26 |
| Long-term debt due within one year | | 19 | | 19 |
| Accounts payable | | 181 | | 139 |
| Accrued expenses | | 145 | | 137 |
| Payables to affiliates | | 56 | | 74 |
| Customer deposits | | 52 | | 54 |
| Regulatory liabilities | | 7 | | 3 |
| Merger related obligation | | 42 | | 42 |
| Current portion of DC PLUG obligation | | 30 | | 28 |
| Other | | 8 | | 28 |
| Total current liabilities | | 600 | | 550 |
| **Long-term debt** | | 2,521 | | 2,521 |
| **Deferred credits and other liabilities** | | | | |
| Regulatory liabilities | | 838 | | 829 |
| Deferred income taxes and unamortized investment tax credits | | 1,076 | | 1,063 |
| Non-pension postretirement benefit obligations | | 34 | | 36 |
| Other | | 288 | | 300 |
| Total deferred credits and other liabilities | | 2,236 | | 2,228 |
| Total liabilities | | 5,357 | | 5,299 |
| **Commitments and contingencies** | | | | |
| **Shareholder's equity** | | | | |
| Common stock | | 1,470 | | 1,470 |
| Retained earnings | | 1,069 | | 1,063 |
| Total shareholder's equity | | 2,539 | | 2,533 |
| **Total liabilities and shareholder's equity** | $ | 7,896 | $ | 7,832 |

See the Combined Notes to Consolidated Financial Statements

45

Table of Contents

**POTOMAC ELECTRIC POWER COMPANY**
**STATEMENT OF CHANGES IN SHAREHOLDER'S EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | Retained Earnings | Total Shareholder's Equity |
|---|---|---|---|
| **Balance, December 31, 2017** | $ 1,470 | $ 1,063 | $ 2,533 |
| Net income | — | 31 | 31 |
| Common stock dividends | — | (25) | (25) |
| **Balance, March 31, 2018** | $ 1,470 | $ 1,069 | $ 2,539 |

See the Combined Notes to Consolidated Financial Statements
46

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**DELMARVA POWER & LIGHT COMPANY**
**STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Operating revenues** | | |
| Electric operating revenues | $ 303 | $ 285 |
| Natural gas operating revenues | 78 | 66 |
| Revenues from alternative revenue programs | 1 | 9 |
| Operating revenues from affiliates | 2 | 2 |
| Total operating revenues | 384 | 362 |
| **Operating expenses** | | |
| Purchased power | 90 | 77 |
| Purchased fuel | 41 | 29 |
| Purchased power from affiliate | 46 | 51 |
| Operating and maintenance | 57 | 66 |
| Operating and maintenance from affiliates | 41 | 7 |
| Depreciation and amortization | 45 | 39 |
| Taxes other than income | 15 | 15 |
| Total operating expenses | 335 | 284 |
| **Operating income** | 49 | 78 |
| **Other income and (deductions)** | | |
| Interest expense, net | (13) | (13) |
| Other, net | 2 | 3 |
| Total other income and (deductions) | (11) | (10) |
| **Income before income taxes** | 38 | 68 |
| **Income taxes** | 7 | 11 |
| **Net income** | $ 31 | $ 57 |
| **Comprehensive income** | $ 31 | $ 57 |

See the Combined Notes to Consolidated Financial Statements
47

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**DELMARVA POWER & LIGHT COMPANY**
**STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 31 | $ 57 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 45 | 39 |
| Deferred income taxes and amortization of investment tax credits | 10 | 13 |
| Other non-cash operating activities | 19 | (7) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (1) | 6 |
| Receivables from and payables to affiliates, net | (16) | 1 |
| Inventories | 7 | 1 |
| Accounts payable and accrued expenses | 18 | 14 |
| Income Taxes | (5) | 21 |
| Other assets and liabilities | 7 | (23) |
| Net cash flows provided by operating activities | 115 | 122 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (65) | (82) |
| Other investing activities | — | 2 |
| Net cash flows used in investing activities | (65) | (80) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | (5) | — |
| Retirement of long-term debt | (4) | (14) |
| Dividends paid on common stock | (36) | (30) |
| Net cash flows used in financing activities | (45) | (44) |
| **Increase (Decrease) in cash, cash equivalents and restricted cash** | 5 | (2) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 2 | 46 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 7 | $ 44 |

See the Combined Notes to Consolidated Financial Statements

48

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**DELMARVA POWER & LIGHT COMPANY**
**BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 7 | $ | 2 |
| Accounts receivable, net | | | | |
| Customer | | 141 | | 146 |
| Other | | 43 | | 38 |
| Receivables from affiliates | | 2 | | — |
| Inventories, net | | | | |
| Gas held in storage | | 2 | | 7 |
| Materials and supplies | | 34 | | 36 |
| Regulatory assets | | 63 | | 69 |
| Other | | 22 | | 27 |
| Total current assets | | 314 | | 325 |
| **Property, plant and equipment, net** | | 3,620 | | 3,579 |
| **Deferred debits and other assets** | | | | |
| Regulatory assets | | 242 | | 245 |
| Goodwill | | 8 | | 8 |
| Prepaid pension asset | | 192 | | 193 |
| Other | | 7 | | 7 |
| Total deferred debits and other assets | | 449 | | 453 |
| **Total assets** | $ | 4,383 | $ | 4,357 |

See the Combined Notes to Consolidated Financial Statements
49

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**DELMARVA POWER & LIGHT COMPANY**
**BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 211 | $ | 216 |
| Long-term debt due within one year | | 79 | | 83 |
| Accounts payable | | 106 | | 82 |
| Accrued expenses | | 43 | | 35 |
| Payables to affiliates | | 32 | | 46 |
| Customer deposits | | 34 | | 35 |
| Regulatory liabilities | | 48 | | 42 |
| Other | | 5 | | 8 |
| Total current liabilities | | 558 | | 547 |
| **Long-term debt** | | 1,217 | | 1,217 |
| **Deferred credits and other liabilities** | | | | |
| Regulatory liabilities | | 598 | | 593 |
| Deferred income taxes and unamortized investment tax credits | | 618 | | 603 |
| Non-pension postretirement benefit obligations | | 13 | | 14 |
| Other | | 49 | | 48 |
| Total deferred credits and other liabilities | | 1,278 | | 1,258 |
| Total liabilities | | 3,053 | | 3,022 |
| **Commitments and contingencies** | | | | |
| **Shareholder's equity** | | | | |
| Common stock | | 764 | | 764 |
| Retained earnings | | 566 | | 571 |
| Total shareholder's equity | | 1,330 | | 1,335 |
| **Total liabilities and shareholder's equity** | $ | 4,383 | $ | 4,357 |

See the Combined Notes to Consolidated Financial Statements
50

Table of Contents

**DELMARVA POWER & LIGHT COMPANY**
**STATEMENT OF CHANGES IN SHAREHOLDER'S EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | Retained Earnings | Total Shareholder's Equity |
|---|---|---|---|
| **Balance, December 31, 2017** | $ 764 | $ 571 | $ 1,335 |
| Net income | — | 31 | 31 |
| Common stock dividends | — | (36) | (36) |
| **Balance, March 31, 2018** | $ 764 | $ 566 | $ 1,330 |

See the Combined Notes to Consolidated Financial Statements
51

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**ATLANTIC CITY ELECTRIC COMPANY AND SUBSIDIARY COMPANY**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
|---|---|---|
|  | 2018 | 2017 |
| **Operating revenues** | | |
| Electric operating revenues | $ 311 | $ 268 |
| Revenues from alternative revenue programs | (2) | 6 |
| Operating revenues from affiliates | 1 | 1 |
| Total operating revenues | 310 | 275 |
| **Operating expenses** | | |
| Purchased power | 155 | 128 |
| Purchased power from affiliates | 6 | 9 |
| Operating and maintenance | 54 | 69 |
| Operating and maintenance from affiliates | 36 | 7 |
| Depreciation and amortization | 33 | 35 |
| Taxes other than income | 3 | 2 |
| Total operating expenses | 287 | 250 |
| **Operating income** | 23 | 25 |
| **Other income and (deductions)** | | |
| Interest expense, net | (16) | (15) |
| Other, net | 1 | 2 |
| Total other income and (deductions) | (15) | (13) |
| **Income before income taxes** | 8 | 12 |
| **Income taxes** | 1 | (16) |
| **Net income** | $ 7 | $ 28 |
| **Comprehensive income** | $ 7 | $ 28 |

See the Combined Notes to Consolidated Financial Statements
52

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**ATLANTIC CITY ELECTRIC COMPANY AND SUBSIDIARY COMPANY**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 7 | $ 28 |
| Adjustments to reconcile net income to net cash flows provided by operating activities: | | |
| Depreciation and amortization | 33 | 35 |
| Deferred income taxes and amortization of investment tax credits | 2 | (7) |
| Other non-cash operating activities | 9 | 2 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (5) | 14 |
| Receivables from and payables to affiliates, net | (4) | (5) |
| Inventories | — | (1) |
| Accounts payable and accrued expenses | 30 | (5) |
| Income taxes | — | 3 |
| Pension and non-pension postretirement benefit contributions | (6) | — |
| Other assets and liabilities | (7) | (6) |
| Net cash flows provided by operating activities | 59 | 58 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (63) | (88) |
| Other investing activities | (1) | 1 |
| Net cash flows used in investing activities | (64) | (87) |
| **Cash flows from financing activities** | | |
| Changes in short-term borrowings | 28 | — |
| Retirement of long-term debt | (8) | (10) |
| Dividends paid on common stock | (9) | (10) |
| Net cash flows provided by (used in) financing activities | 11 | (20) |
| **Increase (Decrease) in cash, cash equivalents and restricted cash** | 6 | (49) |
| **Cash, cash equivalents and restricted cash at beginning of period** | 31 | 133 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 37 | $ 84 |

See the Combined Notes to Consolidated Financial Statements
53

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**ATLANTIC CITY ELECTRIC COMPANY AND SUBSIDIARY COMPANY**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 10 | $ | 2 |
| Restricted cash and cash equivalents | | 7 | | 6 |
| Accounts receivable, net | | | | |
| Customer | | 97 | | 92 |
| Other | | 51 | | 56 |
| Receivables from affiliates | | 1 | | — |
| Inventories, net | | 29 | | 29 |
| Regulatory assets | | 64 | | 71 |
| Other | | 4 | | 2 |
| Total current assets | | 263 | | 258 |
| **Property, plant and equipment, net** | | 2,767 | | 2,706 |
| **Deferred debits and other assets** | | | | |
| Regulatory assets | | 377 | | 359 |
| Long-term note receivable | | 4 | | 4 |
| Prepaid pension asset | | 76 | | 73 |
| Other | | 43 | | 45 |
| Total deferred debits and other assets | | 500 | | 481 |
| **Total assets** [a] | $ | 3,530 | $ | 3,445 |

See the Combined Notes to Consolidated Financial Statements

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**ATLANTIC CITY ELECTRIC COMPANY AND SUBSIDIARY COMPANY**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| (In millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| **Current liabilities** | | | | |
| Short-term borrowings | $ | 136 | $ | 108 |
| Long-term debt due within one year | | 278 | | 281 |
| Accounts payable | | 166 | | 118 |
| Accrued expenses | | 41 | | 33 |
| Payables to affiliates | | 26 | | 29 |
| Customer deposits | | 28 | | 31 |
| Regulatory liabilities | | 21 | | 11 |
| Other | | 7 | | 8 |
| Total current liabilities | | 703 | | 619 |
| **Long-term debt** | | 836 | | 840 |
| **Deferred credits and other liabilities** | | | | |
| Deferred income taxes and unamortized investment tax credits | | 496 | | 493 |
| Non-pension postretirement benefit obligations | | 14 | | 14 |
| Regulatory liabilities | | 416 | | 411 |
| Other | | 24 | | 25 |
| Total deferred credits and other liabilities | | 950 | | 943 |
| Total liabilities [(a)] | | 2,489 | | 2,402 |
| **Commitments and contingencies** | | | | |
| **Shareholder's equity** | | | | |
| Common stock | | 912 | | 912 |
| Retained earnings | | 129 | | 131 |
| Total shareholder's equity | | 1,041 | | 1,043 |
| **Total liabilities and shareholder's equity** | $ | 3,530 | $ | 3,445 |

(a)   ACE's consolidated total assets include $27 million and $29 million at March 31, 2018 and December 31, 2017 , respectively, of ACE's consolidated VIE that can only be used to settle the liabilities of the VIE. ACE's consolidated total liabilities include $83 million and $90 million at March 31, 2018 and December 31, 2017 , respectively, of ACE's consolidated VIE for which the VIE creditors do not have recourse to ACE. See Note 3 — Variable Interest Entities .

See the Combined Notes to Consolidated Financial Statements

Table of Contents

**ATLANTIC CITY ELECTRIC COMPANY AND SUBSIDIARY COMPANY**
**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDER'S EQUITY**
**(Unaudited)**

| (In millions) | Common Stock | Retained Earnings | Total Shareholder's Equity |
|---|---|---|---|
| **Balance, December 31, 2017** | $ 912 | $ 131 | $ 1,043 |
| Net income | — | 7 | 7 |
| Common stock dividends | — | (9) | (9) |
| **Balance, March 31, 2018** | $ 912 | $ 129 | $ 1,041 |

See the Combined Notes to Consolidated Financial Statements
56

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in millions, except per share data, unless otherwise noted)**

**Index to Combined Notes To Consolidated Financial Statements**

The notes to the consolidated financial statements that follow are a combined presentation. The following list indicates the Registrants to which the footnotes apply:

**Applicable Notes**

| Registrant | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exelon Corporation | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Exelon Generation Company, LLC | • | • | • | • | | • | • | | • | • | • | • | | • | • | • | • | • | • |
| Commonwealth Edison Company | • | • | • | | • | • | • | | • | • | • | • | • | • | | • | • | • | • |
| PECO Energy Company | • | • | • | | • | • | | • | | • | • | • | • | • | | • | • | • | • |
| Baltimore Gas and Electric Company | • | • | • | | • | • | • | | • | • | • | • | • | • | | • | • | • | • |
| Pepco Holdings LLC | • | • | • | | | • | • | | • | • | • | • | • | • | | • | • | • | • |
| Potomac Electric Power Company | • | • | • | | • | • | • | | • | • | • | • | • | • | | • | • | • | • |
| Delmarva Power & Light Company | • | • | • | | • | • | | • | | • | • | • | | • | | • | • | • | • |
| Atlantic City Electric Company | • | • | • | | • | • | • | | • | • | • | • | | • | | • | • | • | • |

57

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

# 1 .  Significant Accounting Policies (All Registrants)

## Description of Business (All Registrants)

Exelon is a utility services holding company engaged through its principal subsidiaries in the energy generation and energy distribution and transmission businesses.

| Name of Registrant | Business | Service Territories |
|---|---|---|
| **Exelon Generation Company, LLC** | Generation, physical delivery and marketing of power across multiple geographical regions through its customer-facing business, Constellation, which sells electricity to both wholesale and retail customers. Generation also sells natural gas, renewable energy and other energy-related products and services. | Six reportable segments: Mid-Atlantic, Midwest, New England, New York, ERCOT and Other Power Regions |
| **Commonwealth Edison Company** | Purchase and regulated retail sale of electricity<br><br>Transmission and distribution of electricity to retail customers | Northern Illinois, including the City of Chicago |
| **PECO Energy Company** | Purchase and regulated retail sale of electricity and natural gas<br><br>Transmission and distribution of electricity and distribution of natural gas to retail customers | Southeastern Pennsylvania, including the City of Philadelphia (electricity)<br><br>Pennsylvania counties surrounding the City of Philadelphia (natural gas) |
| **Baltimore Gas and Electric Company** | Purchase and regulated retail sale of electricity and natural gas<br><br>Transmission and distribution of electricity and distribution of natural gas to retail customers | Central Maryland, including the City of Baltimore (electricity and natural gas) |
| **Pepco Holdings LLC** | Utility services holding company engaged, through its reportable segments Pepco, DPL and ACE | Service Territories of Pepco, DPL and ACE |
| **Potomac Electric Power Company** | Purchase and regulated retail sale of electricity<br><br>Transmission and distribution of electricity to retail customers | District of Columbia, and major portions of Montgomery and Prince George's Counties, Maryland |
| **Delmarva Power &  Light Company** | Purchase and regulated retail sale of electricity and natural gas<br><br>Transmission and distribution of electricity and distribution of natural gas to retail customers | Portions of Delaware and Maryland (electricity)<br><br>Portions of New Castle County, Delaware (natural gas) |
| **Atlantic City Electric Company** | Purchase and regulated retail sale of electricity<br><br>Transmission and distribution of electricity to retail customers | Portions of Southern New Jersey |

## Basis of Presentation (All Registrants)

Each of the Registrant's Consolidated Financial Statements includes the accounts of its subsidiaries. All intercompany transactions have been eliminated.

The accompanying consolidated financial statements as of March 31, 2018 and 2017 and for the three months then ended are unaudited but, in the opinion of the management of each Registrant include all adjustments that are considered necessary for a fair statement of the Registrants' respective financial statements in accordance with GAAP. All adjustments are of a normal, recurring nature, except as otherwise disclosed. The December 31, 2017 revised Consolidated Balance Sheets were derived from audited financial statements. Financial results for interim periods are not necessarily indicative of results that may be expected for any other interim period or for the fiscal year ending December 31, 2018 . These Combined Notes to Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the SEC for Quarterly Reports on Form 10-Q. Certain information and note disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

**Prior Period Adjustments and Reclassifications (All Registrants)**

In the second quarter of 2017, errors were identified related to the Exelon, Generation, ComEd, PECO and BGE Consolidated Statements of Cash Flows for the three months ended March 31, 2017. These classification errors related to the presentation of changes in Accounts payable and accrued expenses and Accounts receivable within Cash flows provided by operating activities and Capital expenditures and Proceeds from sale of long-lived assets within Cash flows used in investing activities. These errors have been corrected in Exelon's, Generation's, ComEd's, PECO's, and BGE's Consolidated Statements of Cash Flows for the three months ended March 31, 2017 that are presented in this first quarter 2018 Form 10-Q. As revised, the Cash flows provided by operating activities for the three months ended March 31, 2017 are $1,074 million , $420 million , $236 million , $106 million and $208 million for Exelon, Generation, ComEd, PECO and BGE, respectively, an increase (decrease) of $(127) million , $(320) million , $91 million , $42 million and $40 million for Exelon, Generation, ComEd, PECO and BGE, respectively, from the originally reported amounts. As revised, the Cash flows used in investing activities are $2,283 million , $910 million , $619 million , $69 million and $202 million for Exelon, Generation, ComEd, PECO and BGE, respectively, an increase (decrease) of $(127) million , $(320) million , $91 million , $42 million and $40 million for Exelon, Generation, ComEd, PECO and BGE, respectively, from the originally reported amounts. Management concluded that the errors are not material to the previously issued financial statements.

Certain prior year amounts in the Registrants' Consolidated Statements of Operations and Comprehensive Income, Consolidated Statements of Cash Flows, Consolidated Balance Sheets and Consolidated Statements of Changes in Shareholders' Equity have been recasted to reflect new accounting standards issued by the FASB and adopted as of January 1, 2018.

Beginning on January 1, 2018, Exelon adopted the following new accounting standards requiring reclassification or adjustments to previously reported information as follows:

- *Statement of Cash Flows: Classification of Restricted Cash.* The Registrants applied the new guidance using the full retrospective method and, accordingly, have recasted the presentation of restricted cash in their Consolidated Statements of Cash Flows in the prior periods presented. See Note 18 — Supplemental Financial Information for further information.

- *Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* . Exelon early adopted and retrospectively applied the new guidance to when the effects of the TCJA were recognized and, accordingly, recasted its December 31, 2017 AOCI and retained earnings in its Consolidated Balance Sheet and Consolidated Statement of Changes in Shareholders' Equity. Exelon's accounting policy is to release the stranded tax effects from AOCI related to its pension and OPEB plans under a portfolio (or aggregate) approach as an entire pension or OPEB plan is liquidated or terminated. See Note 2 — New Accounting Standards for further information.

- *Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost.* Exelon applied this guidance retrospectively for the presentation of the service and other non-service costs components of net benefit cost and, accordingly, have recasted those amounts, which were not material, in its Consolidated Statement of Operations and Comprehensive Income in prior periods presented. As part of the adoption, Exelon elected the practical expedient that permits an employer to use the amounts disclosed in its pension and other postretirement benefit plan note for the comparative periods as the estimation basis for applying the retrospective presentation requirements. See Note 14 — Retirement Benefits for further information.

- *Revenue from Contracts with Customers* . The Registrants applied the new guidance using the full retrospective method and, accordingly, have recasted certain amounts in their Consolidated

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Statements of Operations and Comprehensive Income, Consolidated Statements of Cash Flows, Consolidated Balance Sheets, Consolidated Statements of Changes in Shareholders' Equity and Combined Notes to Consolidated Financial Statements in the prior periods presented. The amounts recasted in the Registrants' Consolidated Statements of Operations and Comprehensive Income are shown in the table below. The amounts recasted in the Registrants' Consolidated Statements of Cash Flows, Consolidated Balance Sheets, Consolidated Statements of Changes in Shareholders' Equity and Combined Notes to Consolidated Financial Statements were not material.  See Note 5 — Revenue from Contracts with Customers for further information.

60

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| Three Months Ended March 31, 2017 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| ***Operating Revenues - As reported*** | | | | | | | | | |
| Competitive business revenues | $ 4,560 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Rate-regulated utility revenues | 4,197 | — | — | — | — | — | — | — | — |
| Operating revenues | — | 4,558 | — | — | — | — | — | — | — |
| Electric operating revenues | — | — | 1,293 | 589 | 665 | 1,097 | 529 | 294 | 274 |
| Natural gas operating revenues | — | — | — | 206 | 281 | 66 | — | 66 | — |
| Operating revenues from affiliates | — | 330 | 5 | 1 | 5 | 12 | 1 | 2 | 1 |
| Total operating revenues | $ 8,757 | $ 4,888 | $ 1,298 | $ 796 | $ 951 | $ 1,175 | $ 530 | $ 362 | $ 275 |
| | | | | | | | | | |
| ***Operating Revenues - Adjustments*** | | | | | | | | | |
| Competitive business revenues | $ (10) | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Rate-regulated utility revenues | (79) | — | — | — | — | — | — | — | — |
| Operating revenues | — | (10) | — | — | — | — | — | — | — |
| Electric operating revenues | — | — | (14) | — | (25) | (30) | (15) | (9) | (6) |
| Natural gas operating revenues | — | — | — | — | (10) | — | — | — | — |
| Revenues from alternative revenue programs | 79 | — | 14 | — | 35 | 30 | 15 | 9 | 6 |
| Operating revenues from affiliates | — | — | — | — | — | — | — | — | — |
| Total operating revenues | $ (10) | $ (10) | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| | | | | | | | | | |
| ***Operating Revenues - Retrospective application*** | | | | | | | | | |
| Competitive business revenues | $ 4,550 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Rate-regulated utility revenues | 4,118 | — | — | — | — | — | — | — | — |
| Operating revenues | — | 4,548 | — | — | — | — | — | — | — |
| Electric operating revenues | — | — | 1,279 | 589 | 640 | 1,067 | 514 | 285 | 268 |
| Natural gas operating revenues | — | — | — | 206 | 271 | 66 | — | 66 | — |
| Revenues from alternative revenue programs | 79 | — | 14 | — | 35 | 30 | 15 | 9 | 6 |
| Operating revenues from affiliates | — | 330 | 5 | 1 | 5 | 12 | 1 | 2 | 1 |
| Total operating revenues | $ 8,747 | $ 4,878 | $ 1,298 | $ 796 | $ 951 | $ 1,175 | $ 530 | $ 362 | $ 275 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

**Revenues (All Registrants)**

**Operating Revenues** .  The Registrants' operating revenues generally consist of revenues from contracts with customers involving the sale and delivery of energy commodities and related products and services, utility revenues from alternative revenue programs (ARP), and realized and unrealized revenues recognized under mark-to-market energy commodity derivative contracts. The Registrants recognize revenue from contracts with customers to depict the transfer of goods or services to customers in an amount that the entities expect to be entitled to in exchange for those goods or services. Generation's primary sources of revenue include competitive sales of power, natural gas, and other energy-related products and services. The Utility Registrants' primary sources of revenue include regulated electric and natural gas tariff sales, distribution and transmission services. At the end of each month, the Registrants accrue an estimate for the unbilled amount of energy delivered or services provided to customers.

ComEd records ARP revenue for its best estimate of the electric distribution, energy efficiency, and transmission revenue impacts resulting from future changes in rates that ComEd believes are probable of approval by the ICC and FERC in accordance with its formula rate mechanisms. BGE, Pepco and DPL record ARP revenue for their best estimate of the electric and natural gas distribution revenue impacts resulting from future changes in rates that they believe are probable of approval by the MDPSC and/or DCPSC in accordance with their revenue decoupling mechanisms. PECO, BGE, Pepco, DPL and ACE record ARP revenue for their best estimate of the transmission revenue impacts resulting from future changes in rates that they believe are probable of approval by FERC in accordance with their formula rate mechanisms. See Note 5 — Revenue from Contracts with Customers and Note 6 — Regulatory Matters for further information.

**RTOs and ISOs** .  In RTO and ISO markets that facilitate the dispatch of energy and energy-related products, the Registrants generally report sales and purchases conducted on a net hourly basis in either revenues or purchased power on their Consolidated Statements of Operations and Comprehensive Income, the classification of which depends on the net hourly sale or purchase position. In addition, capacity revenue and expense classification is based on the net sale or purchase position of the Registrants in the different RTOs and ISOs.

**Option Contracts, Swaps and Commodity Derivatives** .  Certain option contracts and swap arrangements that meet the definition of derivative instruments are recorded at fair value with subsequent changes in fair value recognized as revenue or expense. The classification of revenue or expense is based on the intent of the transaction. For example, gas transactions may be used to hedge the sale of power. This will result in the change in fair value recorded through revenue. To the extent a Utility Registrant receives full cost recovery for energy procurement and related costs from retail customers, it records the fair value of its energy swap contracts with unaffiliated suppliers as well as an offsetting regulatory asset or liability on its Consolidated Balance Sheets. Refer to Note 6 — Regulatory Matters and Note 10 — Derivative Financial Instruments for further information.

**Taxes Directly Imposed on Revenue-Producing Transactions.** The Registrants collect certain taxes from customers such as sales and gross receipts taxes, along with other taxes, surcharges and fees that are levied by state or local governments on the sale or distribution of natural gas and electricity. Some of these taxes are imposed on the customer, but paid by the Registrants, while others are imposed directly on the Registrants. The Registrants do not recognize revenue or expense in their Consolidated Statements of Operations and Comprehensive Income when these taxes are imposed on the customer, such as sales taxes. However, when these taxes are imposed directly on the Registrants, such as gross receipts taxes or other surcharges or fees, the Registrants recognize revenue for the taxes collected from customers along with an offsetting expense. See Note 18 — Supplemental Financial Information for Generation's, ComEd's, PECO's, BGE's, Pepco's, DPL's and ACE's utility taxes that are presented on a gross basis.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

**2 .  New Accounting Standards (All Registrants)**

*New Accounting Standards Adopted:* In 2018, the Registrants have adopted the following new authoritative accounting guidance issued by the FASB.

*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income (Issued February 2018):* Provides an election for a reclassification from AOCI to Retained earnings to eliminate the stranded tax effects resulting from the TCJA. This standard is effective January 1, 2019, with early adoption permitted, and may be applied either in the period of adoption or retrospective to each period in which the effects of the TCJA were recognized. Exelon early adopted this standard during the first quarter 2018 and elected to apply the guidance retrospectively as of December 31, 2017, which resulted in an increase to Exelon's Retained earnings and Accumulated other comprehensive loss of $539 million related to deferred income taxes associated with Exelon's pension and OPEB obligations. There was no impact for Generation, ComEd, PECO, BGE, PHI, Pepco, DPL or ACE.

See Note 1 — Significant Accounting Policies of the Exelon 2017 Form 10-K for information on other new accounting standards issued and adopted as of January 1, 2018.

*New Accounting Standards Issued and Not Yet Adopted as of March 31, 2018:* The following new authoritative accounting guidance issued by the FASB has not yet been adopted and reflected by the Registrants in their consolidated financial statements as of March 31, 2018. Unless otherwise indicated, the Registrants are currently assessing the impacts such guidance may have (which could be material) on their Consolidated Balance Sheets, Consolidated Statements of Operations and Comprehensive Income, Consolidated Statements of Cash Flows and disclosures, as well as the potential to early adopt where applicable. The Registrants have assessed other FASB issuances of new standards which are not listed below given the current expectation that such standards will not significantly impact the Registrants' financial reporting.

*Leases (Issued February 2016):* Increases transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The standard is effective January 1, 2019. Early adoption is permitted, however the Registrants will not early adopt the standard. The issued guidance required a modified retrospective transition approach, which requires lessees and lessors to recognize and measure leases at the beginning of the earliest period presented (January 1, 2017). In January 2018, the FASB proposed amending the standard to give entities another option for transition. The proposed transition method would allow entities to initially apply the requirements of the standard in the period of adoption (January 1, 2019). The Registrants will assess this transition option when the FASB issues the standard.

The new guidance requires lessees to recognize both the right-of-use assets and lease liabilities in the balance sheet for most leases, whereas today only finance lease liabilities (referred to as capital leases) are recognized in the balance sheet. In addition, the definition of a lease has been revised which may result in changes to the classification of an arrangement as a lease. Under the new guidance, an arrangement that conveys the right to control the use of an identified asset by obtaining substantially all of its economic benefits and directing how it is used is a lease, whereas the current definition focuses on the ability to control the use of the asset or to obtain its output. Quantitative and qualitative disclosures related to the amount, timing and judgments of an entity's accounting for leases and the related cash flows are expanded. Disclosure requirements apply to both lessees and lessors, whereas current disclosures relate only to lessees. Significant changes to lease systems, processes and procedures are required to implement the requirements of the new standard. The recognition, measurement, and presentation of expenses and cash flows arising from a lease by a lessee have not significantly changed from current GAAP. Lessor accounting is also largely unchanged.

The standard provides a number of transition practical expedients that entities may elect. These include a "package of three" expedients that must be taken together and allow entities to (1) not reassess

63

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

whether existing contracts contain leases, (2) carryforward the existing lease classification, and (3) not reassess initial direct costs associated with existing leases. The Registrants expect to elect this practical expedient.

In January 2018, the FASB issued additional guidance which provides another optional transition practical expedient. This practical expedient allows entities to not evaluate land easements under the new guidance at adoption if they were not previously accounted for as leases.

The Registrants have assessed the lease standard and are executing a detailed implementation plan in preparation for adoption on January 1, 2019. Key activities in the implementation plan include:

- Developing a complete lease inventory and abstracting the required data attributes into a lease accounting system that supports the Registrants' lease portfolios and integrates with existing systems.

- Evaluating the transition practical expedients available under the guidance.

- Identifying, assessing and documenting technical accounting issues, policy considerations and financial reporting implications which includes completing a detailed contract assessment for a sample of transactions to determine whether they are leases under the new guidance.

- Identifying and implementing changes to processes and controls to ensure all impacts of the new guidance are effectively addressed.

*Impairment of Financial Instruments (Issued June 2016):* Provides for a new Current Expected Credit Loss (CECL) impairment model for specified financial instruments including loans, trade receivables, debt securities classified as held-to-maturity investments and net investments in leases recognized by a lessor. Under the new guidance, on initial recognition and at each reporting period, an entity is required to recognize an allowance that reflects the entity's current estimate of credit losses expected to be incurred over the life of the financial instrument. The standard does not make changes to the existing impairment models for non-financial assets such as fixed assets, intangibles and goodwill. The standard will be effective January 1, 2020 (with early adoption as of January 1, 2019 permitted) and requires a modified retrospective transition approach through a cumulative-effect adjustment to retained earnings as of the beginning of the period of adoption.

*Goodwill Impairment (Issued January 2017):* Simplifies the accounting for goodwill impairment by removing Step 2 of the current test, which requires calculation of a hypothetical purchase price allocation. Under the revised guidance, goodwill impairment will be measured as the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill (currently Step 1 of the two-step impairment test). Entities will continue to have the option to perform a qualitative assessment to determine if a quantitative impairment test is necessary. Exelon, Generation, ComEd, PHI and DPL have goodwill as of March 31, 2018 . This updated guidance is not currently expected to impact the Registrants' financial reporting. The standard is effective January 1, 2020, with early adoption permitted, and must be applied on a prospective basis.

*Derivatives and Hedging (Issued September 2017):* Allows more financial and nonfinancial hedging strategies to be eligible for hedge accounting. The amendments are intended to more closely align hedge accounting with companies' risk management strategies, simplify the application of hedge accounting, and increase transparency as to the scope and results of hedging programs. There are also amendments related to effectiveness testing and disclosure requirements. The guidance is effective January 1, 2019 and early adoption is permitted with a modified retrospective transition approach. The Registrants are currently assessing this standard but do not currently expect a significant impact given the limited activity for which the Registrants elect hedge accounting and because the Registrants do not anticipate increasing their use of hedge accounting as a result of this standard.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

**3 .   Variable Interest Entities (All Registrants)**

A VIE is a legal entity that possesses any of the following characteristics: an insufficient amount of equity at risk to finance its activities, equity owners who do not have the power to direct the significant activities of the entity (or have voting rights that are disproportionate to their ownership interest) or equity owners who do not have the obligation to absorb expected losses or the right to receive the expected residual returns of the entity. Companies are required to consolidate a VIE if they are its primary beneficiary, which is the enterprise that has the power to direct the activities that most significantly affect the entity's economic performance.

At March 31, 2018 and December 31, 2017 , Exelon, Generation, PHI and ACE collectively consolidated five VIEs or VIE groups for which the applicable Registrant was the primary beneficiary ( *see Consolidated Variable Interest Entities below)* . As of March 31, 2018 and December 31, 2017 , Exelon and Generation collectively had significant interests in seven other VIEs for which the applicable Registrant does not have the power to direct the entities' activities and, accordingly, was not the primary beneficiary ( *see Unconsolidated Variable Interest Entities below)* .

**Consolidated Variable Interest Entities**

As of March 31, 2018 and December 31, 2017 , Exelon's and Generation's consolidated VIEs consist of:

- energy related companies involved in distributed generation, backup generation and energy development

- renewable energy project companies formed by Generation to build, own and operate renewable power facilities

- certain retail power and gas companies for which Generation is the sole supplier of energy, and

- CENG.

As of March 31, 2018 and December 31, 2017 , Exelon's, PHI's and ACE's consolidated VIE consist of:

- ATF , a special purpose entity formed by ACE for the purpose of securitizing authorized portions of ACE's recoverable stranded costs through the issuance and sale of transition bonds.

As of March 31, 2018 and December 31, 2017 , ComEd, PECO, BGE, Pepco and DPL did not have any material consolidated VIEs.

As of March 31, 2018 and December 31, 2017 , Exelon and Generation provided the following support to their respective consolidated VIEs:

- Generation provides operating and capital funding to the renewable energy project companies and there is limited recourse to Generation related to certain renewable energy project companies.

- Generation provides operating and capital funding to one of the energy related companies involved in backup generation.

- Generation provides approximately $30 million in credit support for the retail power and gas companies for which Generation is the sole supplier of energy.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

- Exelon and Generation, where indicated, provide the following support to CENG (see Note 26 — Related Party Transactions of the Exelon 2017 Form 10-K for additional information regarding Generation's and Exelon's transactions with CENG):

  - under power purchase agreements with CENG, Generation purchased or will purchase 50.01% of the available output generated by the CENG nuclear plants not subject to other contractual agreements from January 2015 through the end of the operating life of each respective plant. However, pursuant to amendments dated March 31, 2015, the energy obligations under the Ginna Nuclear Power Plant (Ginna) PPAs were suspended during the term of the Reliability Support Services Agreement (RSSA), through the end of March 31, 2017. With the expiration of the RSSA, the PPA was reinstated beginning April 1, 2017 (see Note 6 — Regulatory Matters for additional details),

  - Generation provided a $400 million loan to CENG. As of March 31, 2018 , the remaining obligation is $337 million , including accrued interest, which reflects the principal payment made in January 2015,

  - Generation executed an Indemnity Agreement pursuant to which Generation agreed to indemnify EDF against third-party claims that may arise from any future nuclear incident (as defined in the Price-Anderson Act) in connection with the CENG nuclear plants or their operations. Exelon guarantees Generation's obligations under this Indemnity Agreement. (See Note 17 — Commitments and Contingencies for more details),

  - Generation and EDF share in the $637 million of contingent payment obligations for the payment of contingent retrospective premium adjustments for the nuclear liability insurance,

  - Exelon has executed an agreement to provide up to $245 million to support the operations of CENG as well as a $165 million guarantee of CENG's cash pooling agreement with its subsidiaries.

As of March 31, 2018 and December 31, 2017 , Exelon, PHI and ACE provided the following support to their respective consolidated VIE:

- In the case of ATF, proceeds from the sale of each series of transition bonds by ATF were transferred to ACE in exchange for the transfer by ACE to ATF of the right to collect a non-bypassable Transition Bond Charge from ACE customers pursuant to bondable stranded costs rate orders issued by the NJBPU in an amount sufficient to fund the principal and interest payments on transition bonds and related taxes, expenses and fees. During the three months ended March 31, 2018 , ACE transferred $8 million to ATF. During the three months ended March 31, 2017 , ACE transferred $19 million to ATF.

For each of the consolidated VIEs, except as otherwise noted:

- the assets of the VIEs are restricted and can only be used to settle obligations of the respective VIE;

- Exelon, Generation, PHI and ACE did not provide any additional material financial support to the VIEs;

- Exelon, Generation, PHI and ACE did not have any material contractual commitments or obligations to provide financial support to the VIEs; and

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

- the creditors of the VIEs did not have recourse to Exelon's, Generation's, PHI's or ACE's general credit.

The carrying amounts and classification of the consolidated VIEs' assets and liabilities included in the Registrants' consolidated financial statements at March 31, 2018 and December 31, 2017 are as follows:

| | March 31, 2018 | | | | December 31, 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | Exelon [a] | Generation | PHI [a] | ACE | Exelon [a] | Generation | PHI [a] | ACE |
| Current assets | $ 823 | $ 812 | $ 11 | $ 7 | $ 662 | $ 652 | $ 10 | $ 6 |
| Noncurrent assets | 9,279 | 9,251 | 28 | 20 | 9,317 | 9,286 | 31 | 23 |
| Total assets | $ 10,102 | $ 10,063 | $ 39 | $ 27 | $ 9,979 | $ 9,938 | $ 41 | $ 29 |
| Current liabilities | $ 269 | $ 236 | $ 33 | $ 29 | $ 308 | $ 272 | $ 36 | $ 32 |
| Noncurrent liabilities | 3,292 | 3,230 | 62 | 54 | 3,316 | 3,250 | 66 | 58 |
| Total liabilities | $ 3,561 | $ 3,466 | $ 95 | $ 83 | $ 3,624 | $ 3,522 | $ 102 | $ 90 |

(a)   Includes certain purchase accounting adjustments not pushed down to the ACE standalone entity.

67

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

*Assets and Liabilities of Consolidated VIEs*

Included within the balances above are assets and liabilities of certain consolidated VIEs for which the assets can only be used to settle obligations of those VIEs, and liabilities that creditors or beneficiaries do not have recourse to the general credit of the Registrants. As of March 31, 2018 and December 31, 2017 , these assets and liabilities primarily consisted of the following:

| | March 31, 2018 | | | | December 31, 2017 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Exelon (a) | Generation | PHI (a) | ACE | Exelon (a) | Generation | PHI (a) | ACE |
| Cash and cash equivalents | $ 280 | $ 280 | $ — | $ — | $ 126 | $ 126 | $ — | $ — |
| Restricted cash | 73 | 66 | 7 | 7 | 64 | 58 | 6 | 6 |
| Accounts receivable, net | | | | | | | | |
| Customer | 154 | 154 | — | — | 170 | 170 | — | — |
| Other | 29 | 29 | — | — | 25 | 25 | — | — |
| Inventory | | | | | | | | |
| Materials and supplies | 202 | 202 | — | — | 205 | 205 | — | — |
| Other current assets | 55 | 51 | 4 | — | 45 | 41 | 4 | — |
| Total current assets | 793 | 782 | 11 | 7 | 635 | 625 | 10 | 6 |
| Property, plant and equipment, net | 6,181 | 6,181 | — | — | 6,186 | 6,186 | — | — |
| Nuclear decommissioning trust funds | 2,483 | 2,483 | — | — | 2,502 | 2,502 | — | — |
| Other noncurrent assets | 270 | 242 | 28 | 20 | 274 | 243 | 31 | 23 |
| Total noncurrent assets | 8,934 | 8,906 | 28 | 20 | 8,962 | 8,931 | 31 | 23 |
| Total assets | $ 9,727 | $ 9,688 | $ 39 | $ 27 | $ 9,597 | $ 9,556 | $ 41 | $ 29 |
| Long-term debt due within one year | $ 102 | $ 70 | $ 32 | $ 28 | $ 102 | $ 67 | $ 35 | $ 31 |
| Accounts payable | 93 | 93 | — | — | 114 | 114 | — | — |
| Accrued expenses | 52 | 51 | 1 | 1 | 67 | 66 | 1 | 1 |
| Unamortized energy contract liabilities | 17 | 17 | — | — | 18 | 18 | — | — |
| Other current liabilities | 5 | 5 | — | — | 7 | 7 | — | — |
| Total current liabilities | 269 | 236 | 33 | 29 | 308 | 272 | 36 | 32 |
| Long-term debt | 1,125 | 1,063 | 62 | 54 | 1,154 | 1,088 | 66 | 58 |
| Asset retirement obligations | 2,062 | 2,062 | — | — | 2,035 | 2,035 | — | — |
| Unamortized energy contract liabilities | 1 | 1 | — | — | 5 | 5 | — | — |
| Other noncurrent liabilities | 99 | 99 | — | — | 116 | 116 | — | — |
| Total noncurrent liabilities | 3,287 | 3,225 | 62 | 54 | 3,310 | 3,244 | 66 | 58 |
| Total liabilities | $ 3,556 | $ 3,461 | $ 95 | $ 83 | $ 3,618 | $ 3,516 | $ 102 | $ 90 |

_____
(a)   Includes certain purchase accounting adjustments not pushed down to the ACE standalone entity.

**Unconsolidated Variable Interest Entities**

Exelon's and Generation's variable interests in unconsolidated VIEs generally include equity investments and energy purchase and sale contracts. For the equity investments, the carrying amount of the investments is reflected on Exelon's and Generation's Consolidated Balance Sheets in Investments. For the energy purchase and sale contracts (commercial agreements), the carrying amount of assets and liabilities in Exelon's and Generation's Consolidated Balance Sheets that relate to their involvement with the VIEs are predominately related to working capital accounts and generally represent

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

the amounts owed by, or owed to, Exelon and Generation for the deliveries associated with the current billing cycles under the commercial agreements. Further, Exelon and Generation have not provided material debt or equity support, liquidity arrangements or performance guarantees associated with these commercial agreements.

As of March 31, 2018 and December 31, 2017 , Exelon's and Generation's unconsolidated VIEs consist of:

- Energy purchase and sale agreements with VIEs for which Generation has concluded that consolidation is not required.

- Asset sale agreement with ZionSolutions, LLC and EnergySolutions, Inc. in which Generation has a variable interest but has concluded that consolidation is not required.

- Equity investments in distributed energy companies for which Generation has concluded that consolidation is not required.

As of March 31, 2018 and December 31, 2017 , ComEd, PECO, BGE, PHI, Pepco, ACE and DPL did not have any material unconsolidated VIEs.

As of March 31, 2018 and December 31, 2017 , Exelon and Generation had significant unconsolidated variable interests in seven VIEs for which Exelon or Generation, as applicable, was not the primary beneficiary; including certain equity investments and certain commercial agreements. Exelon and Generation only include unconsolidated VIEs that are individually material in the tables below. However, Generation has several individually immaterial VIEs that in aggregate represent a total investment of $9 million . These immaterial VIEs are equity and debt securities in energy development companies. The maximum exposure to loss related to these securities is limited to the $9 million included in Investments on Exelon's and Generation's Consolidated Balance Sheets . The risk of a loss was assessed to be remote and, accordingly, Exelon and Generation have not recognized a liability associated with any portion of the maximum exposure to loss.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following tables present summary information about Exelon's and Generation's significant unconsolidated VIE entities:

| March 31, 2018 | Commercial Agreement VIEs | | Equity Investment VIEs | | Total | |
|---|---|---|---|---|---|---|
| Total assets [a] | $ | 626 | $ | 501 | $ | 1,127 |
| Total liabilities [a] | | 37 | | 225 | | 262 |
| Exelon's ownership interest in VIE [a] | | — | | 246 | | 246 |
| Other ownership interests in VIE [a] | | 588 | | 30 | | 618 |
| Registrants' maximum exposure to loss: | | | | | | |
|     Carrying amount of equity method investments | | — | | 246 | | 246 |
|     Contract intangible asset | | 8 | | — | | 8 |
|     Net assets pledged for Zion Station decommissioning [b] | | 2 | | — | | 2 |

| December 31, 2017 | Commercial Agreement VIEs | | Equity Investment VIEs | | Total | |
|---|---|---|---|---|---|---|
| Total assets [a] | $ | 625 | $ | 509 | $ | 1,134 |
| Total liabilities [a] | | 37 | | 228 | | 265 |
| Exelon's ownership interest in VIE [a] | | — | | 251 | | 251 |
| Other ownership interests in VIE [a] | | 588 | | 30 | | 618 |
| Registrants' maximum exposure to loss: | | | | | | |
|     Carrying amount of equity method investments | | — | | 251 | | 251 |
|     Contract intangible asset | | 8 | | — | | 8 |
|     Net assets pledged for Zion Station decommissioning [b] | | 2 | | — | | 2 |

_____

(a)   These items represent amounts on the unconsolidated VIE balance sheets, not on Exelon's or Generation's Consolidated Balance Sheets. These items are included to provide information regarding the relative size of the unconsolidated VIEs.

(b)   These items represent amounts on Exelon's and Generation's Consolidated Balance Sheets related to the asset sale agreement with ZionSolutions, LLC. The net assets pledged for Zion Station decommissioning includes gross pledged assets of $30 million and $39 million as of March 31, 2018 and December 31, 2017 , respectively; offset by payables to ZionSolutions, LLC of $28 million and $37 million as of March 31, 2018 and December 31, 2017 , respectively. These items are included to provide information regarding the relative size of the ZionSolutions, LLC unconsolidated VIE. See Note 13 — Nuclear Decommissioning for additional details.

For each of the unconsolidated VIEs, Exelon and Generation have assessed the risk of a loss equal to their maximum exposure to be remote and, accordingly, Exelon and Generation have not recognized a liability associated with any portion of the maximum exposure to loss. In addition, there are no material agreements with, or commitments by, third parties that would affect the fair value or risk of their variable interests in these VIEs.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

**4 . Mergers, Acquisitions and Dispositions (Exelon and Generation)**

**Acquisition of Handley Generating Station (Exelon and Generation)**

On November 7, 2017, EGTP and all of its wholly owned subsidiaries filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, which resulted in Exelon and Generation deconsolidating EGTP's assets and liabilities from their consolidated financial statements in the fourth quarter of 2017. Concurrently with the Chapter 11 filings, Generation entered into an asset purchase agreement to acquire one of EGTP's generating plants, the Handley Generating Station, subject to a potential adjustment for fuel oil and assumption of certain liabilities. In the Chapter 11 Filings, EGTP requested that the proposed acquisition of the Handley Generating Station be consummated through a court-approved and supervised sales process. The acquisition was approved by the Bankruptcy Court in January 2018 and closed on April 4, 2018 for a purchase price of $62 million . The Chapter 11 bankruptcy proceedings were finalized on April 17, 2018, resulting in the ownership of EGTP assets (other than the Handley Generating Station) being transferred to EGTP's lenders.

**Acquisition of James A. FitzPatrick Nuclear Generating Station (Exelon and Generation)**

On March 31, 2017, Generation acquired the 842 MW single-unit James A. FitzPatrick (FitzPatrick) nuclear generating station located in Scriba, New York from Entergy Nuclear FitzPatrick LLC (Entergy) for a total purchase price of $289 million , which consisted of a cash purchase price of $110 million and a net cost reimbursement to and on behalf of Entergy of $179 million . As part of the acquisition agreements, Generation provided nuclear fuel and reimbursed Entergy for incremental costs to prepare for and conduct a plant refueling outage; and Generation reimbursed Entergy for incremental costs to operate and maintain the plant for the period after the refueling outage through the acquisition closing date. These reimbursements covered costs that Entergy otherwise would have avoided had it shut down the plant as originally intended in January 2017. The amounts reimbursed by Generation were offset by FitzPatrick's electricity and capacity sales revenues for this same post-outage period. As part of the transaction, Generation received the FitzPatrick NDT fund assets and assumed the obligation to decommission FitzPatrick. The NRC license for FitzPatrick expires in 2034.

The fair values of FitzPatrick's assets and liabilities were determined based on significant estimates and assumptions that are judgmental in nature, including projected future cash flows (including timing), discount rates reflecting risk inherent in the future cash flows and future power and fuel market prices. The valuations performed in the first quarter of 2017 to determine the fair value of the FitzPatrick assets acquired and liabilities assumed were updated in the third quarter of 2017. The purchase price allocation is now final.

For the three months ended March 31, 2017, an after-tax bargain purchase gain of $226 million is included within Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income and primarily reflects differences in strategies between Generation and Entergy for the intended use and ultimate decommissioning of the plant. During the third quarter of 2017, Exelon and Generation recorded an additional after-tax bargain purchase gain of $7 million for the three months ended September 30, 2017. The total after-tax bargain purchase gain recorded at Exelon and Generation was $233 million for the twelve months ended December 31, 2017. See Note 13 — Nuclear Decommissioning and Note 14 — Retirement Benefits for additional information regarding the FitzPatrick decommissioning ARO and pension and OPEB updates.

71

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The following table summarizes the acquisition-date fair value of the consideration transferred and the assets and liabilities assumed for the FitzPatrick acquisition by Generation:

| | | |
|---|---|---:|
| Cash paid for purchase price | $ | 110 |
| Cash paid for net cost reimbursement | | 125 |
| Nuclear fuel transfer | | 54 |
| Total consideration transferred | $ | 289 |
| | | |
| **Identifiable assets acquired and liabilities assumed** | | |
| Current assets | $ | 60 |
| Property, plant and equipment | | 298 |
| Nuclear decommissioning trust funds | | 807 |
| Other assets [a] | | 114 |
| Total assets | $ | 1,279 |
| | | |
| Current liabilities | $ | 6 |
| Nuclear decommissioning ARO | | 444 |
| Pension and OPEB obligations | | 33 |
| Deferred income taxes | | 149 |
| Spent nuclear fuel obligation | | 110 |
| Other liabilities | | 15 |
| Total liabilities | $ | 757 |
| Total net identifiable assets, at fair value | $ | 522 |
| | | |
| Bargain purchase gain (after-tax) | $ | 233 |

_____
[a]   Includes a $110 million asset associated with a contractual right to reimbursement from the New York Power Authority (NYPA), a prior owner of FitzPatrick, associated with the DOE one-time fee obligation. See Note 23 - Commitments and Contingencies of the Exelon 2017 Form 10-K for additional background regarding SNF obligations to the DOE.

Exelon and Generation incurred $32 million of merger and integration costs related to FitzPatrick for the three months ended March 31, 2017 , which are included within Operating and maintenance expense in Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income. Exelon and Generation did not incur any merger and integration costs related to FitzPatrick for the three months ended March 31, 2018 .

**Asset Dispositions**

In December 2017, Generation entered into an agreement to sell its interest in an electrical contracting business that primarily installs, maintains and repairs underground and high-voltage cable transmission and distribution systems. As a result, as of December 31, 2017, certain assets and liabilities were classified as held for sale and included in the Other current assets and Other current liabilities balances on Exelon's and Generations' Consolidated Balance Sheet. On February 28, 2018, Generation completed the sale of its interest for $87 million , resulting in a pre-tax gain which is included in Gain on sales of assets and businesses on Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income for the three months ended March 31, 2018 .

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

**5 . Revenue from Contracts with Customers (All Registrants)**

The Registrants recognize revenue from contracts with customers to depict the transfer of goods or services to customers at an amount that the entities expect to be entitled to in exchange for those goods or services. Generation's primary sources of revenue include competitive sales of power, natural gas, and other energy-related products and services. The Utility Registrants' primary sources of revenue include regulated electric and gas tariff sales, distribution and transmission services. The performance obligations associated with these sources of revenue are further discussed below.

Unless otherwise noted, for each of the significant revenue categories and related performance obligations described below, the Registrants have the right to consideration from the customer in an amount that corresponds directly with the value transferred to the customer for the performance completed to date. Therefore, the Registrant's have elected to use the right to invoice practical expedient for the contracts within these revenue categories and generally recognize revenue in the amount for which they have the right to invoice the customer. As a result, there are generally no significant judgments used in determining or allocating the transaction price.

**Competitive Power Sales (Exelon and Generation)**

Generation sells power and other energy-related commodities to both wholesale and retail customers across multiple geographic regions through its customer-facing business, Constellation. Power sale contracts generally contain various performance obligations including the delivery of power and other energy-related commodities such as capacity, ZECs, RECs or other ancillary services. Revenues related to such contracts are generally recognized over time as the power is generated and simultaneously delivered to the customer. However, revenues related to the sale of any goods or services that are not simultaneously received and consumed by the customer are recognized as the performance obligations are satisfied at a point in time. Payment terms generally require that the customers pay for the power or the energy-related commodity within the month following delivery to the customer and there are generally no significant financing components.

Certain contracts may contain limits on the total amount of revenue we are able to collect over the entire term of the contract. In such cases, the Registrants estimate the total consideration expected to be received over the term of the contract net of the constraint, and allocate the expected consideration to the performance obligations in the contract such that revenue is recognized ratably over the term of the entire contract as the performance obligations are satisfied.

**Competitive Natural Gas Sales (Exelon and Generation)**

Generation sells natural gas on a full requirements basis or for an agreed upon volume to both commercial and residential customers. The primary performance obligation associated with natural gas sale contracts is the delivery of the natural gas to the customer. Revenues related to the sale of natural gas are recognized over time as the natural gas is delivered to and consumed by the customer. Payment from customers is typically due within the month following delivery of the natural gas to the customer and there are generally no significant financing components.

**Other Competitive Products and Services (Exelon and Generation)**

Generation also sells other energy-related products and services such as long-term construction and installation of energy efficiency assets and new power generating facilities, primarily to commercial and industrial customers. These contracts generally contain a single performance obligation, which is the construction and/or installation of the asset for the customer. The average contract term for these projects is approximately 18 months. Revenues, and associated costs, are recognized throughout the contract term using an input method to measure progress towards completion. The method recognizes revenue based on the various inputs used to satisfy the performance obligation, such as costs incurred

73

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

and total labor hours expended. The total amount of revenue that will be recognized is based on the agreed upon contractually-stated amount. Payments from customers are typically due within 30 or 45 days from the date the invoice is generated and sent to the customer.

**Regulated Electric and Gas Tariff Sales (Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE)**

The Utility Registrants sell electricity and electricity distribution services to residential, commercial, industrial and governmental customers through regulated tariff rates approved by their state regulatory commissions. PECO, BGE and DPL also sell natural gas and gas distribution services to residential, commercial, and industrial customers through regulated tariff rates approved by their state regulatory commissions. The performance obligation associated with these tariff sale contracts is the delivery of electricity and/or natural gas. Tariff sales are generally considered daily contracts given that customers can discontinue service at any time. Revenues are generally recognized over time (each day) as the electricity and/or natural gas is delivered to customers. Payment terms generally require that customers pay for the services within the month following delivery of the electricity or natural gas to the customer and there are generally no significant financing components or variable consideration.

Electric and natural gas utility customers have the choice to purchase electricity or natural gas from competitive electric generation and natural gas suppliers. While the Utility Registrants are required under state legislation to bill their customers for the supply and distribution of electricity and/or natural gas, they recognize revenue related only to the distribution services when customers purchase their electricity or natural gas from competitive suppliers.

**Regulated Transmission Services (Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE)**

Under FERC's open access transmission policy, the Utility Registrants, as owners of transmission facilities, are required to provide open access to their transmission facilities under filed tariffs at cost-based rates approved by FERC. The Utility Registrants are members of PJM, the regional transmission organization designated by FERC to coordinate the movement of wholesale electricity in PJM's region, which includes portions of the mid-Atlantic and Midwest. In accordance with FERC-approved rules, the Utility Registrants and other transmission owners in the PJM region make their transmission facilities available to PJM, which directs and controls the operation of these transmission facilities and accordingly compensates the Utility Registrants and other transmission owners. The performance obligations associated with the Utility Registrants' contract with PJM include (i) Network Integration Transmission Services (NITS), (ii) scheduling, system control and dispatch services, and (iii) access to the wholesale grid. These performance obligations are satisfied over time, and Utility Registrants utilize output methods to measure the progress towards their completion. Passage of time is used for NITS and access to the wholesale grid and MWhs of energy transported over the wholesale grid is used for scheduling, system control and dispatch services. PJM pays the Utility Registrants for these services on a weekly basis and there are no financing components or variable consideration.

**Costs to Obtain or Fulfill a Contract with a Customer (Exelon and Generation)**

Generation incurs incremental costs in order to execute certain retail power and gas sales contracts. These costs primarily relate to retail broker fees and sales commissions. Generation has capitalized such contract acquisition costs in the amount of $25 million and $26 million as of March 31, 2018 and December 31, 2017 , respectively, within Other current assets and Other deferred debits in Exelon's and Generation's Consolidated Balance Sheets. These costs are capitalized when incurred and amortized using the straight-line method over the average length of such retail contracts, which is approximately 2 years. Exelon and Generation recognized amortization expense associated with these costs in the amount of $5 million and $9 million for the three months ended March 31, 2018 and 2017 , respectively, within Operating and maintenance expense in Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income. Generation does not incur material costs to fulfill contracts

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

with customers that are not already capitalized under existing guidance. In addition, the Utility Registrants do not incur any material costs to obtain or fulfill contracts with customers.

**Contract Balances (All Registrants)**

*Contract Assets*

Generation records contract assets for the revenue recognized on the construction and installation of energy efficiency assets and new power generating facilities before Generation has an unconditional right to bill for and receive the consideration from the customer. These contract assets are subsequently reclassified to receivables when the right to payment becomes unconditional. Generation records contract assets and contract receivables within Other current assets and Accounts receivable, net - Customer, respectively, within Exelon's and Generation's Consolidated Balance Sheets. The following table provides a rollforward of the contract assets reflected on Exelon's and Generation's Consolidated Balance Sheets from January 1, 2018 to March 31, 2018:

| Contract Assets | Exelon and Generation | |
|---|---|---|
| Balance as of January 1, 2018 | $ | 283 |
| Increases as a result of changes in the estimate of the stage of completion | | 28 |
| Amounts reclassified to receivables | | (9) |
| Balance at March 31, 2018 | $ | 302 |

The Utility Registrants do not have any contract assets.

*Contract Liabilities*

Generation records contract liabilities when consideration is received or due prior to the satisfaction of the performance obligations. These contract liabilities primarily relate to upfront consideration received or due for equipment service plans, solar panel leases and the Illinois ZEC program that introduces a cap on the total consideration to be received by Generation. Generation records contract liabilities within Other current liabilities and Other noncurrent liabilities within Exelon's and Generation's Consolidated Balance Sheets. The following table provides a rollforward of the contract liabilities reflected on Exelon's and Generation's Consolidated Balance Sheet from January 1, 2018 to March 31, 2018:

| Contract Liabilities | Exelon and Generation | |
|---|---|---|
| Balance as of January 1, 2018 | $ | 35 |
| Increases as a result of additional cash received or due | | 227 |
| Amounts recognized into revenues | | (216) |
| Balance at March 31, 2018 | $ | 46 |

The Utility Registrants also record contract liabilities when consideration is received prior to the satisfaction of the performance obligations. As of March 31, 2018 and December 31, 2017 , the Utility Registrants' contract liabilities were immaterial.

**Transaction Price Allocated to Remaining Performance Obligations (All Registrants)**

The following table shows the amounts of future revenues expected to be recorded in each year for performance obligations that are unsatisfied or partially unsatisfied as of March 31, 2018 . Generation has elected the exemption which permits the exclusion from this disclosure of certain variable contract consideration. As such, the majority of Generation's power and gas sales contracts are excluded from this disclosure as they contain variable volumes and/or variable pricing. Thus, this disclosure only

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

includes contracts for which the total consideration is fixed and determinable at contract inception. The average contract term varies by customer type and commodity but ranges from one month to several years.

The majority of the Utility Registrants' tariff sale contracts are generally day-to-day contracts and, therefore, do not contain any future, unsatisfied performance obligations to be included in this disclosure. Further, the Utility Registrants have elected the exemption to not disclose the transaction price allocation to remaining performance obligations for contracts with an original expected duration of one year or less. As such, gas and electric tariff sales contracts and transmission revenue contracts are excluded from this disclosure.

| | 2019 | 2020 | 2021 | 2022 | 2023 and thereafter | Total |
|---|---|---|---|---|---|---|
| Exelon | $ 544 | $ 264 | $ 104 | $ 46 | $ 128 | $ 1,086 |
| Generation | 544 | 264 | 104 | 46 | $ 128 | $ 1,086 |

**Revenue Disaggregation (All Registrants)**

The Registrants disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors. See Note 19 — Segment Information for the presentation of the Registrant's revenue disaggregation.

**6 .   Regulatory Matters (All Registrants)**

Except for the matters noted below, the disclosures set forth in Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K reflect, in all material respects, the current status of regulatory and legislative proceedings of the Registrants. The following is an update to that discussion.

**Illinois Regulatory Matters**

*Tax Cuts and Jobs Act (Exelon and ComEd).* On January 18, 2018, the ICC approved ComEd's petition filed on January 5, 2018 seeking approval to pass back to customers beginning February 1, 2018 $201 million in tax savings resulting from the enactment of the TCJA through a reduction in electric distribution rates. The amounts being passed back to customers reflect the benefit of lower income tax rates beginning January 1, 2018 and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. Refer to Note 12 — Income Taxes for more detail on Corporate Tax Reform.

*Electric Distribution Formula Rate (Exelon and ComEd).* On April 16, 2018, ComEd filed its annual distribution formula rate update with the ICC. The filing establishes the revenue requirement used to set the rates that will take effect in January 2019 after the ICC's review and approval, which is due by December 2018. The revenue requirement requested is based on 2017 actual costs plus projected 2018 capital additions as well as an annual reconciliation of the revenue requirement in effect in 2017 to the actual costs incurred that year. ComEd's 2018 filing request includes a total decrease to the revenue requirement of $23 million , reflecting a decrease of $58 million for the initial revenue requirement for 2018 and an increase of $35 million related to the annual reconciliation for 2017. The revenue requirement for 2018 provides for a weighted average debt and equity return on distribution rate base of 6.52% inclusive of an allowed ROE of 8.69% , reflecting the average rate on 30 -year treasury notes plus 580 basis points. The annual reconciliation for 2017 provided for a weighted average debt and equity return on distribution rate base of 6.52% inclusive of an allowed ROE of 8.69% , reflecting the average rate on 30 -year treasury notes plus 580 basis points. See table below for ComEd's regulatory

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

assets associated with its electric distribution formula rate. For additional information on ComEd's distribution formula rate filings see Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K.

During the first quarter 2018, ComEd revised its electric distribution formula rate, as provided for by FEJA, to reduce the ROE collar calculation from plus or minus 50 basis points to 0 basis points beginning with the reconciliation filed in 2018 for the 2017 calendar year. This revision effectively offsets the favorable or unfavorable impacts to ComEd's electric distribution formula rate revenues associated with variations in delivery volumes associated with above or below normal weather, numbers of customers or usage per customer. ComEd began reflecting the impacts of this change in its electric distribution services costs regulatory asset in the first quarter 2017.

**Zero Emission Standard (Exelon, Generation and ComEd).** Pursuant to FEJA, on January 25, 2018, the ICC announced that Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation executed the ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and began recognizing revenue. Winning bidders are entitled to compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA. In the first quarter of 2018, Generation recognized approximately $202 million of revenue, of which $150 million related to ZECs generated from June 1, 2017 through December 31, 2017.

ComEd recovers all costs associated with purchasing ZECs through a rate rider that provides for an annual reconciliation and true-up to actual costs incurred by ComEd to purchase ZECs, with any difference to be credited to or collected from ComEd's retail customers in subsequent periods with interest. ComEd began billing its retail customers under its new ZEC rate rider on June 1, 2017.

On February 14, 2017, two lawsuits were filed in the Northern District of Illinois against the IPA alleging that the state's ZEC program violates certain provisions of the U.S. Constitution. One lawsuit was filed by customers of ComEd, led by the Village of Old Mill Creek, and the other was brought by the EPSA and three other electric suppliers. Both lawsuits argue that the Illinois ZEC program will distort PJM's FERC-approved energy and capacity market auction system of setting wholesale prices, and seek a permanent injunction preventing the implementation of the program. Exelon intervened and filed motions to dismiss in both lawsuits. In addition, on March 31, 2017, plaintiffs in both lawsuits filed motions for preliminary injunction with the court; the court stayed briefing on the motions for preliminary injunction until the resolution of the motions to dismiss. On July 14, 2017, the district court granted the motions to dismiss. On July 17, 2017, the plaintiffs appealed the decision to the Seventh Circuit. Briefs were fully submitted on December 12, 2017, the Court heard oral argument on January 3, 2018. At the argument, the Court asked for supplemental briefing, which was filed on January 26, 2018. On February 21, 2018, the Seventh Circuit issued an order inviting the Solicitor General to express the views of the United States on the matter, however the timing of that response is currently uncertain. Exelon cannot predict the outcome of these lawsuits. It is possible that resolution of these matters could have a material, unfavorable impact on Exelon's and Generation's results of operations, cash flows, and financial positions.

See Note 8 — Early Plant Retirements for additional information regarding the economic challenges facing Generation's Clinton and Quad Cities nuclear plants and the expected benefits of the ZES.

**Pennsylvania Regulatory Matters**

**2018 Pennsylvania Electric Distribution Base Rate Case (Exelon and PECO).** On March 29, 2018, PECO filed a request with the PAPUC seeking approval to increase its electric distribution base rates by $82 million beginning January 1, 2019. This requested amount includes the effect of an approximately $71 million reduction as a result of the ongoing annual tax savings beginning January 1, 2019 associated with the TCJA. The requested ROE is 10.95% . PECO expects a decision on its electric

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

distribution rate case proceeding in the fourth quarter of 2018 but cannot predict what increase, if any, the PAPUC will approve.

*Tax Cuts and Jobs Act (Exelon and PECO).* As part of the rate case filing referenced above, PECO is seeking approval to pass back to electric distribution customers $68 million in 2018 TCJA tax savings, which would be an additional offset to the proposed increase to its electric distribution rates. PECO will file with the PAPUC in 2018 seeking approval to pass back to gas distribution customers $4 million in TCJA tax savings beginning January 1, 2019. The amounts being proposed to be passed back to customers reflect the annual benefit of lower income tax rates established upon enactment of the TCJA . PECO cannot predict the amount or timing of the refunds the PAPUC will ultimately approve. See Note 12 — Income Taxes for more detail on Corporate Tax Reform and the table below for regulatory liabilities recognized during 2018 associated with TCJA tax savings that will be passed through future customer rates.

**Maryland Regulatory Matters**

*Tax Cuts and Jobs Act (Exelon, BGE, PHI, Pepco and DPL).* On January 12, 2018, the MDPSC issued an order that directed each of BGE, Pepco and DPL to track the impacts of the TCJA beginning January 1, 2018 and file by February 15, 2018 how and when they expect to pass through such impacts to their customers.

On January 31, 2018, the MDPSC approved BGE's petition to pass back to customers $103 million in ongoing annual tax savings resulting from the enactment of the TCJA through a reduction in distribution base rates beginning February 1, 2018, of which $72 million and $31 million were related to electric and natural gas, respectively. The amounts being passed back to customers reflect the ongoing annual benefit of lower income tax rates and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. It is expected that the MDPSC will address later in 2018 the treatment of BGE's TCJA tax savings for the period January 1, 2018 through February 1, 2018.

On April 20, 2018, Pepco entered into a settlement agreement with several parties to resolve all issues in its pending electric distribution base rate case, including the treatment of the annual ongoing TCJA tax savings as well as the TCJA tax savings from January 1, 2018 through the expected effective date of the rate change. See discussion below for further details.

On February 9, 2018, DPL filed with the MDPSC seeking approval to pass back to customers $13 million in ongoing annual TCJA tax savings through a reduction in electric distribution base rates beginning in 2018. On April 18, 2018, the MDPSC approved a settlement agreement to pass back to customers $14 million in ongoing annual TCJA tax savings through a reduction in electric distribution base rates beginning April 20, 2018. The amounts being passed back to customers reflect the ongoing annual benefit of lower income tax rates and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. In addition, the MDPSC separately ordered DPL to provide a one-time bill credit to customers of $2 million in June 2018 representing the TCJA tax savings from January 1, 2018 through March 31, 2018.

See Note 12 — Income Taxes for more detail on Corporate Tax Reform and the table below for regulatory liabilities recognized during 2018 associated with TCJA tax savings that will be passed through future customer rates.

*2018 Maryland Electric Distribution Base Rates (Exelon, PHI and Pepco).* On January 2, 2018, Pepco filed an application with the MDPSC to increase its annual electric distribution base rates by $41 million , reflecting a requested ROE of 10.1% . On February 5, 2018, Pepco filed with the MDPSC an update to its current distribution base rate case to reflect $31 million in ongoing annual TCJA tax savings, thereby reducing the requested annual base rate increase to $11 million . On March 8, 2018, Pepco filed with the MDPSC a subsequent update to its electric distribution base rate case, which further reduced

78

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

the requested annual base rate increase to $3 million . On April 20, 2018, Pepco entered into a settlement agreement with several parties to resolve all issues in the rate case and filed the settlement agreement with the MDPSC. The settlement agreement provides for a net decrease to annual electric distribution base rates of $15 million , which includes annual ongoing TCJA tax savings, and reflects a ROE of 9.5% . The parties to the settlement agreement have requested that Pepco's new rates be effective on June 1, 2018. In addition, the settlement agreement separately provides a one-time bill credit to customers of approximately $10 million representing the TCJA tax savings from January 1, 2018 through the expected rate effective date of June 1, 2018. Pepco expects a decision in the matter in the second quarter of 2018.

*2017 Maryland Electric Distribution Base Rates (Exelon, PHI and DPL).* On July 14, 2017, DPL filed an application with the MDPSC to increase its annual electric distribution base rates by $27 million , which was updated to $19 million on November 16, 2017, reflecting a requested ROE of 10.1% . On December 18, 2017, a settlement agreement was filed with the MDPSC wherein DPL will be granted a base rate increase of $13 million , and a ROE of 9.5% solely for purposes of calculating AFUDC and regulatory asset carrying costs. On February 9, 2018, the MDPSC approved the settlement agreement and the new rates became effective.

**Delaware Regulatory Matters**

*Tax Cuts and Jobs Act (Exelon, PHI and DPL).* On January 16, 2018, the DPSC opened a docket indicating that DPL's TCJA tax savings would be addressed in its pending rate cases. See discussion below for more details.

*2017 Delaware Electric and Natural Gas Distribution Base Rates (Exelon, PHI and DPL).* On August 17, 2017, DPL filed applications with the DPSC to increase its annual electric and natural gas distribution base rates by $24 million and $13 million , respectively, reflecting a requested ROE of 10.1% . DPL filed updated testimony on October 18, 2017, to request a $31 million increase in electric distribution base rates, and updated testimony on November 7, 2017, to request an $11 million increase in natural gas distribution base rates. On October 16, 2017 and November 1, 2017, $2.5 million of the proposed rate increases for electric and natural gas, respectively, were put into effect, subject to refund, based on the final DPSC order. On February 9, 2018, DPL filed with the DPSC updates to its distribution base rate cases to reflect $26 million in ongoing annual TCJA tax savings, of which $19 million and $7 million is related to electric and natural gas, respectively. The proposed distribution base rate increase in each rate case were lowered by those amounts, which reflect the ongoing annual benefit of lower income tax rates and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. It is expected that the DPSC will address in a future rate proceeding DPL's treatment of the TCJA tax savings for the period February 1, 2018 through the effective date of any final customer rate adjustments in the pending rate proceedings. On March 17, 2018, an additional $3 million of the proposed rate increase in the electric distribution base rate case and $1 million in the natural gas distribution base rate case was put into effect subject to refund based on the final DPSC order. DPL expects decisions on its electric and natural gas distribution base rate proceedings in the third and fourth quarters of 2018, respectively, but cannot predict how much of the requested increases the DPSC will approve.

See Note 12 — Income Taxes for more detail on Corporate Tax Reform and the table below for regulatory liabilities recognized during 2018 associated with TCJA tax savings that will be passed through future customer rates.

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

**District of Columbia Regulatory Matters**

*Tax Cuts and Jobs Act (Exelon, PHI and Pepco) .* On January 23, 2018, the DCPSC opened a rate proceeding directing Pepco to track the impacts of the TCJA beginning January 1, 2018 and file its plan to reduce the current revenue requirement by customer class by February 12, 2018. The DCPSC stated it will address the impact of the TCJA on future rates within Pepco's pending electric distribution base rate case discussed below.

On February 6, 2018, Pepco filed with the DCPSC seeking approval to pass back to customers $39 million in ongoing annual tax savings resulting from the enactment of the TCJA through a reduction to existing electric distribution base rates beginning in 2018. On April 17, 2018, Pepco entered into a settlement agreement with several parties to resolve all issues in its pending electric distribution base rate case, including the treatment of the annual ongoing TCJA tax savings as well as the TCJA tax savings from January 1, 2018 through the expected effective date of the rate change. See discussion below for more details.

*2017 District of Columbia Electric Distribution Base Rates (Exelon, PHI and Pepco).* On December 19, 2017 (and updated on February 9, 2018), Pepco filed an application with the DCPSC to increase its annual electric distribution base rates by $66 million , reflecting a requested ROE of 10.1% . On April 17, 2018, Pepco entered into a settlement agreement with several parties to resolve both the pending electric distribution base rate case and the $39 million rate reduction request in the TCJA proceeding discussed above, and filed the settlement agreement with the DCPSC. The settlement agreement provides for a net decrease to annual electric distribution rates of $24 million , which includes annual ongoing TCJA tax savings, and a ROE of 9.525% . The parties to the settlement agreement have requested that Pepco's new rates be effective on July 1, 2018. In addition, the settlement agreement separately provides a one-time bill credit to customers of approximately $19 million representing the TCJA benefits for the period January 1, 2018 through the expected rate effective date of July 1, 2018. Pepco expects a decision in the matter in the second quarter of 2018.

See Note 12 — Income Taxes for more detail on Corporate Tax Reform and the table below for regulatory liabilities recognized during 2018 associated with TCJA tax savings that will be passed through future customer rates.

**New Jersey Regulatory Matters**

*Tax Cuts and Jobs Act (Exelon, PHI and ACE).* On January 31, 2018, the NJBPU issued an order mandating that New Jersey utility companies, including ACE, pass any economic benefit from the TCJA to rate payers. The order directed New Jersey utility companies to file by March 2, 2018 proposed tariff sheets reflecting TCJA benefits, with new rates to be implemented in two phases effective April 1, 2018 and July 1, 2018. In addition, the NJBPU directed New Jersey utility companies to file by March 2, 2018 a Petition with the NJBPU outlining how they propose to refund any over-collection associated with revised rates not being in place from January 1, 2018 through March 31, 2018, with interest.

On March 2, 2018, ACE filed with the NJBPU seeking approval to pass back to customers $23 million in ongoing annual TCJA tax savings through a reduction in electric distribution base rates beginning in 2018. The amounts being passed back to customers would reflect the ongoing annual benefit of lower income tax rates and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. On March 26, 2018, the NJBPU issued an order accepting ACE's proposed bill reduction. A portion of the annual decrease in electric distribution base rates totaling approximately $13 million was effective as of April 1, 2018, but considered interim, with the proposed final electric distribution base rates, representing the full $23 million decrease to be effective on July 1, 2018. It is expected that the NJBPU will address in a future rate proceeding ACE's treatment of the TCJA tax savings for the period January 1, 2018 through the effective date of any final customer rate adjustments. See Note 12 — Income Taxes for more detail on Corporate Tax Reform and the table below for regulatory

80

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

liabilities recognized during 2018 associated with TCJA tax savings that will be passed through future customer rates.

*ACE Infrastructure Investment Program Filing (Exelon, PHI and ACE).* On February 28, 2018, ACE filed with the NJBPU the company's Infrastructure Investment Program (IIP) proposing to seek recovery through a new rider mechanism a series of investments, totaling $338 million , between 2019-2022 to provide safe and reliable service for its customers. The IIP will allow for more timely recovery of investments made to modernize and enhance ACE's electric system. An NJBPU decision has been requested by the fourth quarter of 2018.

*Update and Reconciliation of Certain Under-Recovered Balances (Exelon, PHI and ACE).* On February 5, 2018, ACE submitted its 2018 annual petition with the NJBPU seeking to reconcile and update (i) charges related to the recovery of above-market costs associated with ACE's long-term power purchase contracts with the non-utility generators and (ii) costs related to surcharges for the New Jersey Societal Benefit Program (a statewide public interest program that is intended to benefit low income customers and address other public policy goals) and ACE's uncollectible accounts. The net impact of adjusting the charges as proposed is an overall annual rate decrease of approximately $19 million , including New Jersey sales and use tax. The matter is pending at the NJBPU. ACE has requested that the NJBPU place the new rates into effect by June 1, 2018. An NJBPU decision has been requested by the fourth quarter of 2018.

**New York Regulatory Matters**

*New York Clean Energy Standard (Exelon and Generation).* On August 1, 2016, the New York Public Service Commission (NYPSC) issued an order establishing the New York CES, a component of which is a Tier 3 ZEC program targeted at preserving the environmental attributes of zero-emissions nuclear-powered generating facilities that meet the criteria demonstrating public necessity as determined by the NYPSC. The ZEC price for the first tranche has been set at $17.48 per MWh of production. Following the first tranche, the price will be updated bi-annually.

On October 19, 2016, a coalition of fossil-generation companies filed a complaint in federal district court against the NYPSC alleging that the ZEC program violates certain provisions of the U.S. Constitution; specifically, that the ZEC program interferes with FERC's jurisdiction over wholesale rates and that it discriminates against out of state competitors. On December 9, 2016, Generation and CENG filed a motion to intervene in the case and to dismiss the lawsuit. The State also filed a motion to dismiss. On July 25, 2017, the court granted both motions to dismiss. On August 24, 2017, plaintiffs appealed the decision to the Second Circuit. Plaintiffs-Appellants' initial brief was filed on October 13, 2017. Briefing in the appeal was completed in December 2017 and oral argument was held on March 12, 2018.

In addition, on November 30, 2016, a group of parties, including certain environmental groups and individuals, filed a Petition in New York State court seeking to invalidate the ZEC program. The Petition, which was amended on January 13, 2017, argued that the NYPSC did not have authority to establish the program, that it violated state environmental law and that it violated certain technical provisions of the State Administrative Procedures Act (SAPA) when adopting the ZEC program. On February 15, 2017, Generation and CENG filed a motion to dismiss the state court action. The NYPSC also filed a motion to dismiss the state court action. On March 24, 2017, the plaintiffs filed a memorandum of law opposing the motions to dismiss, and Generation and CENG filed a reply brief on April 28, 2017. Oral argument was held on June 19, 2017. On January 22, 2018, the court dismissed the environmental claims and the majority of the plaintiffs from the case, but denied the motions to dismiss with respect to the remaining five plaintiffs and claims, without commenting on the merits of the case. The case is now proceeding to summary judgment with the full record. Exelon's and the state's answers and briefs were filed on March 30, 2018. Plaintiffs' responses are due on May 11, 2018.

81

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Other legal challenges remain possible, the outcomes of which remain uncertain. See Note 8 — Early Plant Retirements for additional information relative to Ginna and Nine Mile Point.

**Federal Regulatory Matters**

*Tax Cuts and Jobs Act and Transmission-Related Income Tax Regulatory Assets (Exelon, ComEd, BGE, PHI, Pepco, DPL and ACE).* Pursuant to their respective transmission formula rates, ComEd, BGE, Pepco, DPL and ACE will begin passing back to customers on June 1, 2018, the benefit of lower income tax rates effective January 1, 2018. ComEd's, BGE's, Pepco's, DPL's and ACE's transmission formula rates currently do not provide for the pass back or recovery of income tax-related regulatory liabilities or assets, including those established upon enactment of the TCJA.

On December 13, 2016 (and as amended on March 13, 2017), BGE filed with FERC to begin recovering certain existing and future transmission-related income tax regulatory assets through its transmission formula rate. BGE's existing regulatory assets included (1) amounts that, if BGE's transmission formula rate provided for recovery, would have been previously amortized and (2) amounts that would be amortized and recovered prospectively. On November 16, 2017, FERC issued an order rejecting BGE's proposed revisions to its transmission formula rate to recover these transmission-related income tax regulatory assets. On December 18, 2017, BGE filed for clarification and rehearing of FERC's order, still seeking full recovery of its existing transmission-related income tax regulatory asset amounts.

On February 27, 2018 (and updated on March 26, 2018), BGE submitted a letter to FERC advising that the lower federal corporate income tax rate effective January 1, 2018 provided for in TCJA will be reflected in BGE's annual formula rate update effective June 1, 2018, but that the deferred income tax benefits will not be passed back to customers unless BGE's formula rate is revised to provide for pass back and recovery of transmission-related income tax-related regulatory liabilities and assets.

ComEd, Pepco, DPL and ACE have similar transmission-related income tax regulatory liabilities and assets also requiring FERC approval separate from their transmission formula rate mechanisms. On February 23, 2018, ComEd, Pepco, DPL, and ACE each filed with FERC to revise their transmission formula rate mechanisms to facilitate passing back to customers ongoing annual TCJA tax savings and to permit recovery of transmission-related income tax regulatory assets. The companies requested the revisions be effective as of April 24, 2018. On April 24, 2018, the FERC issued a letter order neither approving or rejecting the filings, but rather indicating that the filings were deficient and requiring the parties to file additional information within 30 days. Similar regulatory assets and liabilities at PECO are not subject to the same FERC transmission rate recovery formula and, thus, are not impacted by BGE's November 16, 2017 FERC order. As discussed below, PECO is currently in settlement discussions regarding its transmission formula rate and expects to pass back TCJA benefits to customers through its annual formula rate update.

Each of BGE, ComEd, Pepco, DPL and ACE believe there is sufficient basis to support full recovery of their existing transmission-related income tax regulatory assets, as evidenced by the further pursuit of full recovery with FERC. However, upon further consideration of the November 16, 2017 FERC order, management of each company concluded that the portion of the total transmission-related income tax regulatory assets that would have been previously amortized and recovered through rates had the transmission formula rate provided for such recovery was no longer probable of recovery. As a result, Exelon, ComEd, BGE, PHI, Pepco, DPL and ACE recorded charges to Income tax expense within their Consolidated Statements of Operations and Comprehensive Income in the fourth quarter 2017, reducing their associated transmission-related income tax regulatory assets.

82

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

If any of the companies are ultimately successful with FERC allowing future recovery of these amounts, the associated regulatory assets will be reestablished, with corresponding decreases to Income tax expense. To the extent all or a portion of the prospective amortization amounts were no longer considered probable of recovery, Exelon, ComEd, BGE, PHI, Pepco, DPL and ACE would record additional charges to Income tax expense, which could be up to approximately $82 million , $41 million , $22 million , $19 million , $9 million , $7 million and $3 million , respectively, as of March 31, 2018 .

The Utility Registrants cannot predict the outcome of these FERC proceedings.

**Transmission Formula Rate (Exelon and PECO).** On May 1, 2017, PECO filed a request with FERC seeking approval to update its transmission rates and change the manner in which PECO's transmission rate is determined from a fixed rate to a formula rate. The formula rate would be updated annually to ensure that under this rate customers pay the actual costs of providing transmission services. The formula rate filing includes a requested increase of $22 million to PECO's annual transmission revenues and a requested rate of return on common equity of 11% , inclusive of a 50 basis point adder for being a member of a regional transmission organization. PECO requested that the new transmission rate be effective as of July 2017. On June 27, 2017, FERC issued an Order accepting the filing and suspending the proposed rates until December 1, 2017, subject to refund, and set the matter for hearing and settlement judge procedures. PECO cannot predict the final outcome of the settlement or hearing proceedings, or the transmission formula FERC may approve.

**DOE Notice of Proposed Rulemaking (Exelon and Generation).** On August 23, 2017, the DOE staff released its report on the reliability of the electric grid. One aspect of the wide-ranging report is the DOE's recognition that the electricity markets do not currently value the resiliency provided by baseload generation, such as nuclear plants. On September 28, 2017, the DOE issued a Notice of Proposed Rulemaking (NOPR) that would entitle certain eligible resilient generating units (i.e., those located in organized markets, with a 90-day supply of fuel on site, not already subject to state cost of service regulation and satisfying certain other requirements) to recover fully allocated costs and earn a fair return on equity on their investment. The DOE's NOPR recommended that the FERC take comments for 45 days after publication in the Federal Register and issue a final order 60 days after such publication. On January 8, 2018, the FERC issued an order terminating the rulemaking docket that was initiated to address the proposed rule in the DOE NOPR, concluding the proposed rule did not sufficiently demonstrate there is a resiliency issue and that it proposed a remedy that did not appear to be just, reasonable and nondiscriminatory as required under the Federal Power Act. At the same time, the FERC initiated a new proceeding to consider resiliency challenges to the bulk power system and evaluate whether additional FERC action to address resiliency would be appropriate. The FERC directed each RTO and ISO to respond within 60 days to 24 specific questions about how they assess and mitigate threats to resiliency. Interested parties may submit reply comments through May 9, 2018. Exelon has been and will continue to be an active participant in these proceedings, but cannot predict the final outcome or its potential financial impact, if any, on Exelon or Generation.

**Operating License Renewals (Exelon and Generation).** On August 29, 2012, Generation submitted a hydroelectric license application to FERC for a 46 -year license for the Conowingo Hydroelectric Project (Conowingo). In connection with Generation's efforts to obtain a water quality certification pursuant to Section 401 of the Clean Water Act (401 certification) with Maryland Department of the Environment (MDE) for Conowingo, Generation continues to work with MDE and other stakeholders to resolve water quality licensing issues, including: (1) water quality, (2) fish habitat, and (3) sediment.

On April 21, 2016, Exelon and the US Fish and Wildlife Service of the US Department of the Interior executed a Settlement Agreement resolving all fish passage issues between the parties. The financial impact of the Settlement Agreement is estimated to be $3 million to $7 million per year, on average, over the 46-year life of the new license, including both capital and operating costs. The actual timing and

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

amount of these costs are not currently fixed and may vary significantly from year to year throughout the life of the new license.

On April 27, 2018, MDE issued its 401 certification for Conowingo. As issued, the 401 certification imposes requirements and conditions which could have a material, unfavorable impact on Exelon's and Generation's results of operations, cash flows and financial positions through an increase in capital expenditures and operating costs if implemented. Generation is reviewing the certification and will determine next steps to ensure the long-term viability of the Conowingo Dam.

As of March 31, 2018 , $32 million of direct costs associated with Conowingo licensing efforts have been capitalized. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information on Generation's operating license renewal efforts.

**Regulatory Assets and Liabilities (Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE)**

Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE each prepare their consolidated financial statements in accordance with the authoritative guidance for accounting for certain types of regulation. Under this guidance, regulatory assets represent incurred costs that have been deferred because of their probable future recovery from customers through regulated rates. Regulatory liabilities represent the excess recovery of costs or accrued credits that have been deferred because it is probable such amounts will be returned to customers through future regulated rates or represent billings in advance of expenditures for approved regulatory programs.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following tables provide information about the regulatory assets and liabilities of Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE as of March 31, 2018 and December 31, 2017 . For additional information on the specific regulatory assets and liabilities, refer to Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K.

| March 31, 2018 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| **Regulatory assets** | | | | | | | | |
| Pension and other postretirement benefits [a] | $ 3,844 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Deferred income taxes | 336 | — | 327 | — | 9 | 9 | — | — |
| AMI programs [c] | 621 | 151 | 33 | 208 | 229 | 154 | 75 | — |
| Electric distribution formula rate [d] | 256 | 256 | — | — | — | — | — | — |
| Energy efficiency costs | 220 | 220 | — | — | — | — | — | — |
| Debt costs | 108 | 36 | 1 | 11 | 71 | 15 | 7 | 5 |
| Fair value of long-term debt | 745 | — | — | — | 607 | — | — | — |
| Fair value of PHI's unamortized energy contracts | 701 | — | — | — | 701 | — | — | — |
| Asset retirement obligations | 111 | 75 | 22 | 14 | — | — | — | — |
| MGP remediation costs | 284 | 263 | 21 | — | — | — | — | — |
| Under-recovered uncollectible accounts | 69 | 69 | — | — | — | — | — | — |
| Renewable energy | 268 | 267 | — | — | 1 | — | — | 1 |
| Energy and transmission programs [e][f][g][h][i][j] | 117 | 8 | 43 | 21 | 45 | 7 | 14 | 24 |
| Deferred storm costs | 46 | — | — | — | 46 | 12 | 5 | 29 |
| Energy efficiency and demand response programs | 559 | — | 1 | 269 | 289 | 212 | 77 | — |
| Merger integration costs [k][l][m] | 46 | — | — | 5 | 41 | 20 | 11 | 10 |
| Under-recovered revenue decoupling [n] | 44 | — | — | 6 | 38 | 38 | — | — |
| COPCO acquisition adjustment | 5 | — | — | — | 5 | — | 5 | — |
| Workers compensation and long-term disability costs | 33 | — | — | — | 33 | 33 | — | — |
| Vacation accrual | 27 | — | 14 | — | 13 | — | 8 | 5 |
| Securitized stranded costs | 71 | — | — | — | 71 | — | — | 71 |
| CAP arrearage | 12 | — | 12 | — | — | — | — | — |
| Removal costs | 535 | — | — | — | 535 | 150 | 94 | 292 |
| DC PLUG charge | 187 | — | — | — | 187 | 187 | — | — |
| Other | 63 | 6 | 12 | 6 | 39 | 26 | 9 | 4 |
| Total regulatory assets | 9,308 | 1,351 | 486 | 540 | 2,960 | 863 | 305 | 441 |
| Less: current portion | 1,245 | 226 | 78 | 149 | 507 | 207 | 63 | 64 |
| Total noncurrent regulatory assets | $ 8,063 | $ 1,125 | $ 408 | $ 391 | $ 2,453 | $ 656 | $ 242 | $ 377 |

85

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| March 31, 2018 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| **Regulatory liabilities** | | | | | | | | |
| Other postretirement benefits | $ 26 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Deferred income taxes [b] | 5,189 | 2,458 | — | 1,011 | 1,720 | 804 | 506 | 410 |
| Nuclear decommissioning | 2,969 | 2,464 | 505 | — | — | — | — | — |
| Removal costs | 1,570 | 1,348 | — | 92 | 130 | 20 | 110 | — |
| Deferred rent | 35 | — | — | — | 35 | — | — | — |
| Energy efficiency and demand response programs | 16 | 4 | 11 | — | 1 | — | — | 1 |
| DLC program costs | 7 | — | 7 | — | — | — | — | — |
| Electric distribution tax repairs | 27 | — | 27 | — | — | — | — | — |
| Gas distribution tax repairs | 8 | — | 8 | — | — | — | — | — |
| Energy and transmission programs [e][f][g][h][i][j] | 153 | 53 | 56 | 22 | 22 | 4 | 6 | 12 |
| Over-recovered revenue decoupling [n] | 14 | — | — | 11 | 3 | — | 3 | — |
| Renewable portfolio standards costs | 81 | 81 | — | — | — | — | — | — |
| Zero emission credit costs | 8 | 8 | — | — | — | — | — | — |
| Over-recovered uncollectible accounts | 4 | — | — | — | 4 | — | — | 4 |
| Merger integration costs [l] | 1 | — | — | — | 1 | — | 1 | — |
| TCJA income tax benefit over-recoveries [o] | 54 | — | 10 | 17 | 27 | 14 | 7 | 6 |
| Other | 84 | 8 | 22 | 32 | 22 | 3 | 13 | 4 |
| Total regulatory liabilities | 10,246 | 6,424 | 646 | 1,185 | 1,965 | 845 | 646 | 437 |
| Less: current portion | 522 | 212 | 117 | 102 | 77 | 7 | 48 | 21 |
| Total noncurrent regulatory liabilities | $ 9,724 | $ 6,212 | $ 529 | $ 1,083 | $ 1,888 | $ 838 | $ 598 | $ 416 |

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| December 31, 2017 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| **Regulatory assets** | | | | | | | | |
| Pension and other postretirement benefits (a) | $ 3,848 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Deferred income taxes | 306 | — | 297 | — | 9 | 9 | — | — |
| AMI programs (c) | 640 | 155 | 36 | 214 | 235 | 158 | 77 | |
| Electric distribution formula rate (d) | 244 | 244 | — | — | — | — | — | — |
| Energy efficiency costs | 166 | 166 | — | — | — | — | — | — |
| Debt costs | 116 | 37 | 1 | 11 | 73 | 15 | 8 | 5 |
| Fair value of long-term debt | 758 | — | — | — | 619 | — | — | — |
| Fair value of PHI's unamortized energy contracts | 750 | — | — | — | 750 | — | — | — |
| Asset retirement obligations | 109 | 73 | 22 | 14 | — | — | — | — |
| MGP remediation costs | 295 | 273 | 22 | — | — | — | — | — |
| Under-recovered uncollectible accounts | 61 | 61 | — | — | — | — | — | — |
| Renewable energy | 258 | 256 | — | — | 2 | — | 1 | 1 |
| Energy and transmission programs (e)(g)(h)(i)(j) | 82 | 6 | 1 | 23 | 52 | 11 | 15 | 26 |
| Deferred storm costs | 27 | — | — | — | 27 | 7 | 5 | 15 |
| Energy efficiency and demand response programs | 596 | — | 1 | 285 | 310 | 229 | 81 | — |
| Merger integration costs (k)(l)(m) | 45 | — | — | 6 | 39 | 20 | 10 | 9 |
| Under-recovered revenue decoupling (n) | 55 | — | — | 14 | 41 | 38 | 3 | — |
| COPCO acquisition adjustment | 5 | — | — | — | 5 | — | 5 | — |
| Workers compensation and long-term disability costs | 35 | — | — | — | 35 | 35 | — | — |
| Vacation accrual | 19 | — | 6 | — | 13 | — | 8 | 5 |
| Securitized stranded costs | 79 | — | — | — | 79 | — | — | 79 |
| CAP arrearage | 8 | — | 8 | — | — | — | — | — |
| Removal costs | 529 | — | — | — | 529 | 150 | 93 | 286 |
| DC PLUG charge | 190 | — | — | — | 190 | 190 | — | — |
| Other | 67 | 8 | 16 | 4 | 39 | 29 | 8 | 4 |
| Total regulatory assets | 9,288 | 1,279 | 410 | 571 | 3,047 | 891 | 314 | 430 |
| Less: current portion | 1,267 | 225 | 29 | 174 | 554 | 213 | 69 | 71 |
| Total noncurrent regulatory assets | $ 8,021 | $ 1,054 | $ 381 | $ 397 | $ 2,493 | $ 678 | $ 245 | $ 359 |

| December 31, 2017 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| **Regulatory liabilities** | | | | | | | | |
| Other postretirement benefits | $ 30 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Deferred income taxes (b) | 5,241 | 2,479 | — | 1,032 | 1,730 | 809 | 510 | 411 |
| Nuclear decommissioning | 3,064 | 2,528 | 536 | — | — | — | — | — |
| Removal costs | 1,573 | 1,338 | — | 105 | 130 | 20 | 110 | — |
| Deferred rent | 36 | — | — | — | 36 | — | — | — |
| Energy efficiency and demand response programs | 23 | 4 | 19 | — | — | — | — | — |
| DLC program costs | 7 | — | 7 | — | — | — | — | — |
| Electric distribution tax repairs | 35 | — | 35 | — | — | — | — | — |
| Gas distribution tax repairs | 9 | — | 9 | — | — | — | — | — |
| Energy and transmission programs (e)(f)(i)(j) | 111 | 47 | 60 | — | 4 | — | 1 | 3 |
| Renewable portfolio standard costs | 63 | 63 | — | — | — | — | — | — |
| Zero emission credit costs | 112 | 112 | — | — | — | — | — | — |
| Over-recovered uncollectible accounts | 2 | — | — | — | 2 | — | — | 2 |
| Other | 82 | 6 | 24 | 26 | 26 | 3 | 14 | 6 |
| Total regulatory liabilities | 10,388 | 6,577 | 690 | 1,163 | 1,928 | 832 | 635 | 422 |
| Less: current portion | 523 | 249 | 141 | 62 | 56 | 3 | 42 | 11 |
| Total noncurrent regulatory liabilities | $ 9,865 | $ 6,328 | $ 549 | $ 1,101 | $ 1,872 | $ 829 | $ 593 | $ 411 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

_____

(a) Includes regulatory regulatory assets established at the Constellation and PHI merger dates of $427 million and $934 million , respectively, as of March 31, 2018 and $440 million and $953 million , respectively, as of December 31, 2017 related to the rate regulated portions of the deferred costs associated with legacy Constellation's and PHI's pension and other postretirement benefit plans that are being amortized and recovered over approximately 12 years and 3 to 15 years, respectively (as established at the respective acquisition dates). The Utility Registrants are not earning or paying a return on these amounts.

(b) As of March 31, 2018 , includes transmission-related income tax regulatory liabilities that require FERC approval separate from the transmission formula rate of $479 million , $135 million , $147 million and $147 million for ComEd, BGE, Pepco, DPL and ACE, respectively. As of December 31, 2017 , includes transmission-related income tax regulatory liabilities that require FERC approval separate from the transmission formula rate of $484 million , $ 137 million , $147 million , $148 million and $147 million for ComEd, BGE, Pepco, DPL and ACE, respectively.

(c) As of March 31, 2018 , BGE's regulatory asset of $208 million includes $125 million of unamortized incremental deployment costs under the program, $51 million of unamortized costs of the non-AMI meters replaced under the AMI program, and $32 million related to post-test year incremental program deployment costs incurred prior to approval became effective June 2016. As of December 31, 2017 , BGE's regulatory asset of $214 million includes $129 million of unamortized incremental deployment costs under the program, $53 million of unamortized costs of the non-AMI meters replaced under the AMI program, and $32 million related to post-test year incremental program deployment costs incurred prior to approval became effective June 2016. Recovery of the post-test year incremental deployment costs will be addressed in a future base rate proceeding.

(d) As of March 31, 2018 , ComEd's regulatory asset of $256 million was comprised of $195 million for the 2016, 2017 and 2018 annual reconciliations and $61 million related to significant one-time events. As of December 31, 2017 , ComEd's regulatory asset of $244 million was comprised of $186 million for the 2016 and 2017 annual reconciliations and $58 million related to significant one-time events.

(e) As of March 31, 2018 , ComEd's regulatory liability of $8 million represents transmission costs recoverable through its FERC approved formula rate. As of March 31, 2018 , ComEd's regulatory liability of $53 million included $21 million related to over-recovered energy costs and $32 million associated with revenues received for renewable energy requirements. As of December 31, 2017 , ComEd's regulatory asset of $6 million represents transmission costs recoverable through its FERC approved formula rate. As of December 31, 2017 , ComEd's regulatory liability of $47 million included $14 million related to over-recovered energy costs and $33 million associated with revenues received for renewable energy requirements.

(f) As of March 31, 2018 , PECO's regulatory liability of $56 million included $44 million related to over-recovered costs under the DSP program, $3 million related to the over-recovered transmission service charges and $9 million related to over-recovered non-bypassable transmission service charges. As of December 31, 2017 , PECO's regulatory liability of $60 million included $36 million related to over-recovered costs under the DSP program, $12 million related to over-recovered non-bypassable transmission service charges and $12 million related to the over-recovered natural gas costs under the PGC.

(g) As of March 31, 2018 , BGE's regulatory asset of $21 million included $13 million of costs associated with transmission costs recoverable through its FERC approved formula rate, $5 million related to under-recovered electric energy costs and $3 million of abandonment costs to be recovered upon FERC approval. As of March 31, 2018 , BGE's regulatory liability of $22 million related to over-recovered natural gas costs. As of December 31, 2017 , BGE's regulatory asset of $23 million included $7 million of costs associated with transmission costs recoverable through its FERC approved formula rate, $5 million related to under-recovered electric energy costs, $3 million of abandonment costs to be recovered upon FERC approval and $8 million of under-recovered natural gas costs.

(h) As of March 31, 2018 , Pepco's regulatory asset of $7 million included $4 million of transmission costs recoverable through its FERC approved formula rate and $3 million related to under-recovered electric energy costs. As of March 31, 2018 , Pepco's regulatory liability of $4 million related to over-recovered electric energy costs. As of December 31, 2017 , Pepco's regulatory asset of $11 million included $3 million of transmission costs recoverable through its FERC approved formula rate and $8 million of under-recovered electric energy costs.

(i) As of March 31, 2018 , DPL's regulatory asset of $14 million included $11 million of transmission costs recoverable through its FERC approved formula rate and $3 million related to under-recovered electric energy costs. As of March 31, 2018 , DPL's regulatory liability of $6 million related to over-recovered electric energy and gas fuel costs. As of December 31, 2017 , DPL's regulatory asset of $15 million included $8 million of transmission costs recoverable through its FERC approved formula rate and $7 million related to under-recovered electric energy costs. As of December 31, 2017 , DPL's regulatory liability of $1 million related to over-recovered electric energy costs.

(j) As of March 31, 2018 , ACE's regulatory asset of $24 million included $9 million of transmission costs recoverable through its FERC approved formula rate and $15 million of under-recovered electric energy costs. As of March 31, 2018 , ACE's regulatory liability of $12 million related to over-recovered electric energy costs. As of December 31, 2017 , ACE's regulatory asset of $26 million included $11 million of transmission costs recoverable through its FERC approved formula rate and $15 million of under-recovered electric energy costs. As of December 31, 2017 , DPL's regulatory liability of $3 million related to over-recovered electric energy costs.

(k) As of March 31, 2018 and December 31, 2017 , Pepco's regulatory asset of $20 million represents previously incurred PHI integration costs, including $11 million authorized for recovery in Maryland and $9 million expected to be recovered in the District of Columbia service territory.

(l) As of March 31, 2018 , DPL's regulatory asset of $11 million represents previously incurred PHI integration costs, including $4 million authorized for recovery in Maryland, $5 million authorized for recovery in Delaware electric rates and $2 million authorized for recovery in Delaware gas rates. As of March 31, 2018 , DPL's regulatory liability of $1 million represents net synergy savings incurred related to PHI integration costs that are expected to be returned in electric and gas rates in the Delaware service territory. As of December 31, 2017 , DPL's regulatory asset of  $10 million  represents previously incurred PHI integration costs, including  $4 million  authorized for recovery in Maryland,  $5 million  authorized for recovery in Delaware electric rates, and  $1 million  expected to be recovered in electric and gas rates in the Maryland and Delaware service territories.

(m) As of March 31, 2018 and December 31, 2017 , ACE's regulatory asset of $10 million and $9 million , respectively, represents previously incurred PHI integration costs expected to be recovered in the New Jersey service territory.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

(n)   Represents the electric and natural gas distribution costs recoverable from customers under BGE's decoupling mechanism. As of March 31, 2018 , BGE had a regulatory asset of $6 million related to under-recovered electric revenue decoupling and a regulatory liability of $11 million related to over-recovered natural gas revenue decoupling. As of December 31, 2017 , BGE had a regulatory asset of $10 million related to under-recovered electric revenue decoupling and $4 million related to under-recovered natural gas revenue decoupling.

(o)   Represents over-recoveries related to the change in the federal income tax rate with the enactment of the TCJA. These regulatory liabilities will be amortized as the TCJA income tax benefits are passed back to customers. See Tax Cuts and Jobs Act disclosures above for further details on the regulatory proceedings.

**Capitalized Ratemaking Amounts Not Recognized (Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE)**

The following table illustrates our authorized amounts capitalized for ratemaking purposes related to earnings on shareholders' investment that are not recognized for financial reporting purposes on our Consolidated Balance Sheets. These amounts will be recognized as revenues in our Consolidated Statements of Operations and Comprehensive Income in the periods they are billable to our customers.

|  | Exelon | ComEd [a] | PECO | BGE [b] | PHI | Pepco [c] | DPL [c] | ACE |
|---|---|---|---|---|---|---|---|---|
| March 31, 2018 | $ 69 | $ 7 | $ — | $ 52 | $ 10 | $ 6 | $ 4 | $ — |

|  | Exelon | ComEd [a] | PECO | BGE [b] | PHI | Pepco [c] | DPL [c] | ACE |
|---|---|---|---|---|---|---|---|---|
| December 31, 2017 | $ 69 | $ 6 | $ — | $ 53 | $ 10 | $ 6 | $ 4 | $ — |

(a)   Reflects ComEd's unrecognized equity returns earned for ratemaking purposes on its electric distribution formula rate regulatory assets.
(b)   BGE's authorized amounts capitalized for ratemaking purposes primarily relate to earnings on shareholders' investment on its AMI programs.
(c)   Pepco's and DPL's authorized amounts capitalized for ratemaking purposes relate to earnings on shareholders' investment on their respective AMI Programs and Energy Efficiency and Demand Response Programs. The earnings on energy efficiency are on Pepco DC and DPL DE programs only.

**Purchase of Receivables Programs (Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE)**

ComEd, PECO, BGE, Pepco, DPL and ACE are required, under separate legislation and regulations in Illinois, Pennsylvania, Maryland, District of Columbia and New Jersey, to purchase certain receivables from retail electric and natural gas suppliers that participate in the utilities' consolidated billing. ComEd, BGE, Pepco and DPL purchase receivables at a discount to recover primarily uncollectible accounts expense from the suppliers. PECO is required to purchase receivables at face value and is permitted to recover uncollectible accounts expense, including those from Third Party Suppliers, from customers through distribution rates. ACE purchases receivables at face value. ACE recovers all uncollectible accounts expense, including those from Third Party Suppliers, through the Societal Benefits Charge (SBC) rider, which includes uncollectible accounts expense as a component. The SBC is filed annually with the NJBPU. Exelon, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE do not record unbilled commodity receivables under the POR programs. Purchased billed receivables are classified in Other accounts receivable, net on Exelon's, ComEd's, PECO's, BGE's, PHI's, Pepco's, DPL's and ACE's Consolidated Balance Sheets. The following tables provide information about the purchased receivables of those companies as of March 31, 2018 and December 31, 2017 .

| As of March 31, 2018 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Purchased receivables | $ 317 | $ 88 | $ 73 | $ 64 | $ 92 | $ 55 | $ 17 | $ 20 |
| Allowance for uncollectible accounts [a] | (35) | (16) | (6) | (4) | (9) | (5) | (1) | (3) |
| Purchased receivables, net | $ 282 | $ 72 | $ 67 | $ 60 | $ 83 | $ 50 | $ 16 | $ 17 |

89

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

| As of December 31, 2017 | Exelon | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Purchased receivables | $ 298 | $ 87 | $ 70 | $ 58 | $ 83 | $ 56 | $ 9 | $ 18 |
| Allowance for uncollectible accounts [(a)] | (31) | (14) | (5) | (3) | (9) | (5) | (1) | (3) |
| Purchased receivables, net | $ 267 | $ 73 | $ 65 | $ 55 | $ 74 | $ 51 | $ 8 | $ 15 |

_____
(a)   For ComEd, BGE, Pepco and DPL, reflects the incremental allowance for uncollectible accounts recorded, which is in addition to the purchase discount. For ComEd, the incremental uncollectible accounts expense is recovered through its Purchase of Receivables with Consolidated Billing tariff.

## 7 . Impairment of Long-Lived Assets (Exelon and Generation)

During the first quarter of 2018, Mystic Unit 9 did not clear in the ISO-NE capacity auction for the 2021 - 2022 planning year. On March 29, 2018, Generation announced it had formally notified ISO-NE of the early retirement of its Mystic Generating Station's Units 7, 8, 9 and the Mystic Jet Unit (Mystic Generating Station assets) absent regulatory reforms. These events suggested that the carrying value of its New England asset group may be impaired. As a result, Generation completed a comprehensive review of the estimated undiscounted future cash flows of the New England asset group and no impairment charge was required. Further developments such as the failure of ISO-NE to adopt interim and long-term solutions for reliability and fuel security could potentially result in future impairments of the New England asset group, which could be material. See Note 8 — Early Plant Retirements for additional information on the early retirement of the Mystic Generating Station assets.

## 8 . Early Plant Retirements (Exelon and Generation)

Exelon and Generation continue to evaluate the current and expected economic value of each of Generation's plants. Factors that will continue to affect the economic value of Generation's plants include, but are not limited to: market power prices, results of capacity auctions, potential legislative and regulatory solutions to ensure plants are fairly compensated for benefits they provide through their carbon-free emissions, reliability, or fuel security, and the impact of potential rules from the EPA requiring reduction of carbon and other emissions and the efforts of states to implement those final rules. The precise timing of an early retirement date for any plant, and the resulting financial statement impacts, may be affected by many factors, including the status of potential regulatory or legislative solutions, results of any transmission system reliability study assessments, the nature of any co-owner requirements and stipulations, and decommissioning trust fund requirements for nuclear plants, among other factors. However, the earliest retirement date for any plant would usually be the first year in which the unit does not have capacity or other obligations, and where applicable, just prior to its next scheduled nuclear refueling outage.

In 2015 and 2016, Generation identified the Clinton and Quad Cities nuclear plants in Illinois, Ginna and Nine Mile Point nuclear plants in New York and Three Mile Island nuclear plant in Pennsylvania as having the greatest risk of early retirement based on economic valuation and other factors.

Assuming the continued effectiveness of the Illinois ZES and the New York CES, Generation and CENG, through its ownership of Ginna and Nine Mile Point, no longer consider Clinton, Quad Cities, Ginna or Nine Mile Point to be at heightened risk for early retirement. However, to the extent either the Illinois ZES or the New York CES programs do not operate as expected over their full terms, each of these plants could again be at heightened risk for early retirement, which could have a material impact on Exelon's and Generation's future results of operations, cash flows and financial positions. Refer to Note 6 — Regulatory Matters for additional discussion on the New York CES and the Illinois ZES.

In Pennsylvania, the TMI nuclear plant did not clear in the May 2017 PJM capacity auction for the 2020-2021 planning year, the third consecutive year that TMI failed to clear the PJM base residual

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents
Case: 4:20-cv-01227-JAR   Doc. #:  1-5   Filed: 09/10/20   Page: 779 of 1382 PageID #: 1106
COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

capacity auction. The plant is currently committed to operate through May 2019 and is licensed to operate through 2034. On May 30, 2017, based on these capacity auction results, prolonged periods of low wholesale power prices, and the absence of federal or state policies that place a value on nuclear energy for its ability to produce electricity without air pollution, Exelon announced that Generation will permanently cease generation operations at TMI on or about September 30, 2019. Generation has filed the required market and regulatory notifications to shut down the plant. PJM has subsequently notified Generation that it has not identified any reliability issues and has approved the deactivation of TMI as proposed.

On February 2, 2018, Exelon announced that Generation will permanently cease generation operations at Oyster Creek at the end of its current operating cycle by October 2018. In 2010, Generation announced that Oyster Creek would retire by the end of 2019 as part of an agreement with the State of New Jersey to avoid significant costs associated with the construction of cooling towers to meet the State's then new environmental regulations. Since then, like other nuclear sites, Oyster Creek has continued to face rising operating costs amid a historically low wholesale power price environment. The decision to retire Oyster Creek in 2018 at the end of its current operating cycle involved consideration of several factors, including economic and operating efficiencies, and avoids a refueling outage scheduled for the fall of 2018 that would have required advanced purchasing of fuel fabrication and materials beginning in late February 2018. Generation has filed the required market and regulatory notifications to shut down the plant. PJM has subsequently notified Generation that it has not identified any reliability issues and has approved the deactivation of Oyster Creek as proposed.

As a result of these plant retirement decisions, Exelon and Generation recognized one-time charges in Operating and maintenance expense related to materials and supplies inventory reserve adjustments, employee-related costs and CWIP impairments, among other items. In addition to these one-time charges, annual incremental non-cash charges to earnings stemming from shortening the expected economic useful lives primarily related to accelerated depreciation of plant assets (including any ARC), accelerated amortization of nuclear fuel, and additional ARO accretion expense associated with the changes in decommissioning timing and cost assumptions were also recorded. See Note 13 — Nuclear Decommissioning for additional detail on changes to the nuclear decommissioning ARO balance.

Exelon's and Generation's first quarter 2018 results included a net incremental $178 million of total pre-tax expense associated with the early retirement decisions for TMI and Oyster Creek, as summarized in the table below.

| Income statement expense (pre-tax) | | Q1 2018 |
|---|---|---|
| Depreciation and amortization [a] | | |
|     Accelerated depreciation [b] | $ | 137 |
|     Accelerated nuclear fuel amortization | | 15 |
| Operating and maintenance [c] | | 26 |
| Total | $ | 178 |

---
(a)   Reflects incremental accelerated depreciation and amortization for TMI for the quarter ended March 31, 2018 , and for Oyster Creek from February 2, 2018 through March 31, 2018 .
(b)   Reflects incremental accelerated depreciation of plant assets, including any ARC.
(c)   Primarily includes materials and supplies inventory reserve adjustments, employee related costs and CWIP impairments.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Exelon's and Generation's 2017 results included a net incremental $339 million of total pre-tax expense associated with the early retirement decision for TMI, as summarized in the table below.

| Income statement expense (pre-tax) | Q2 2017 | Q3 2017 | Q4 2017 | YTD 2017 |
|---|---|---|---|---|
| Depreciation and amortization [a] | | | | |
| Accelerated depreciation [b] | $ 35 | $ 106 | $ 109 | $ 250 |
| Accelerated Nuclear Fuel amortization | 2 | 6 | 4 | 12 |
| Operating and maintenance [c] | 71 | 5 | 1 | 77 |
| Total | $ 108 | $ 117 | $ 114 | $ 339 |

_____
(a)   Reflects incremental charges for TMI including incremental accelerated depreciation and amortization from May 30, 2017 through December 31, 2017.
(b)   Reflects incremental accelerated depreciation of plant assets, including any ARC.
(c)   Primarily includes materials and supplies inventory reserve adjustments, employee related costs and CWIP impairments.

In 2017, PSEG made public similar financial challenges facing its New Jersey nuclear plants including Salem, of which Generation owns a 42.59% ownership interest. Although Salem is committed to operate through May 2021, the plant faces continued economic challenges and PSEG, as the operator of the plant, is exploring all options.

On April 12, 2018, a bill was passed by both Houses of the New Jersey legislature that would establish a ZEC program providing compensation for nuclear plants that demonstrate to the NJBPU that they meet certain requirements, including that they make a significant contribution to air quality in the state and that their revenues are insufficient to cover their costs and risks. The program provides transparency and includes robust customer protections.  The New Jersey Governor has up to 45 days to sign the bill, with the bill becoming effective immediately upon signing. The NJBPU then has 180 days from the effective date to establish procedures for implementation of the ZEC program and 330 days from the effective date to determine which nuclear power plants are selected to receive ZECs under the program. Selected nuclear plants will receive ZEC payments for each energy year (12-month period from June 1 through May 31) within 90 days after the completion of such energy year. Exelon and Generation continue to work with stakeholders.

The following table provides the balance sheet amounts as of March 31, 2018 for Generation's ownership share of the significant assets and liabilities associated with Salem.

| | March 31, 2018 |
|---|---|
| Asset Balances | |
| Materials and supplies inventory | $ 45 |
| Nuclear fuel inventory, net | 102 |
| Completed plant, net | 618 |
| Construction work in progress | 27 |
| Liability Balances | |
| Asset retirement obligation | (446) |

| | |
|---|---|
| NRC License Renewal Term | 2036 (Unit 1) |
| | 2040 (Unit 2) |

On March 29, 2018, Generation announced it had formally notified grid operator ISO-NE of its plans to early retire its Mystic Generating Station assets absent regulatory reforms on June 1, 2022, at the

92

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

end of the current capacity commitment for Mystic Units 7 & 8. Mystic Unit 9 is currently committed through May 2021. Absent any regulatory reforms to properly value reliability and regional fuel security, these units will not participate in the Forward Capacity Auction (FCA) scheduled for February 2019 for the 2022 - 2023 planning year.

The ISO-NE recently announced that it would take a three-step approach to fuel security. First, ISO-NE will make a filing soon to obtain tariff waivers to allow it to retain Mystic 8 and 9 for fuel security for the 2022 - 2024 planning years. Second, ISO-NE will file tariff revisions to allow it to retain other resources for fuel security in the capacity market if necessary in the future. Third, ISO-NE will work with stakeholders to develop long-term market rule changes to address system resiliency considering significant reliability risks identified in ISO-NE's January 2018 fuel security report. On April 3, 2018, ISO-NE issued a memorandum to the NEPOOL Participants' Committee announcing its intention to seek FERC approval for waiver of certain tariff provisions in order to allow it to retain Mystic Units 8 and 9 for fuel security reasons. On April 4, 2018, Generation issued a letter indicating its willingness to cooperate and submit to full cost-of-service compensation for the Mystic Units 8 and 9, provided that the cost-of-service rate is determined before it commits to any future capacity obligation.

The following table provides the balance sheet amounts as of March 31, 2018 for Generation's significant assets and liabilities associated with the Mystic Generating Station assets.

|  | March 31, 2018 |
|---|---|
| **Asset Balances** | |
| Materials and supplies inventory | $ 26 |
| Fuel inventory | 18 |
| Completed plant, net | 896 |
| Construction work in progress | 4 |
| Prepaid expense [(a)] | 9 |
| **Liability Balances** | |
| Asset retirement obligation | (5) |
| Accrued expense [(a)] | (2) |

(a)   Reflects ending balances only as they relate to Mystic's Long-term Service Agreement.

93

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

**9 .   Fair Value of Financial Assets and Liabilities (All Registrants)**

**Fair Value of Financial Liabilities Recorded at Amortized Cost**

The following tables present the carrying amounts and fair values of the Registrants' short-term liabilities, long-term debt, SNF obligation and trust preferred securities (long-term debt to financing trusts or junior subordinated debentures) as of March 31, 2018 and December 31, 2017 :

*Exelon*

| | | March 31, 2018 | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [(a)] | $ 1,654 | $ — | $ 1,654 | $ — | $ 1,654 |
| Long-term debt (including amounts due within one year) [(b)(c)] | 34,108 | — | 33,091 | 1,893 | 34,984 |
| Long-term debt to financing trusts [(d)] | 389 | — | | 421 | 421 |
| SNF obligation | 1,151 | — | 922 | — | 922 |

| | | December 31, 2017 | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [(a)] | $ 929 | $ — | $ 929 | $ — | $ 929 |
| Long-term debt (including amounts due within one year) [(b)(c)] | 34,264 | — | 34,735 | 1,970 | 36,705 |
| Long-term debt to financing trusts [(d)] | 389 | — | | 431 | 431 |
| SNF obligation | 1,147 | — | 936 | — | 936 |

*Generation*

| | | March 31, 2018 | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [(a)] | $ 166 | $ — | $ 166 | $ — | $ 166 |
| Long-term debt (including amounts due within one year) [(b)(c)] | 8,965 | — | 7,585 | 1,610 | 9,195 |
| SNF obligation | 1,151 | — | 922 | — | 922 |

| | | December 31, 2017 | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [(a)] | $ 2 | $ — | $ 2 | $ — | $ 2 |
| Long-term debt (including amounts due within one year) [(b)(c)] | 8,990 | — | 7,839 | 1,673 | 9,512 |
| SNF obligation | 1,147 | — | 936 | — | 936 |

94

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*ComEd*

| | March 31, 2018 | | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 317 | $ — | $ 317 | $ — | $ 317 |
| Long-term debt (including amounts due within one year) [b][c] | 7,694 | — | 8,061 | — | 8,061 |
| Long-term debt to financing trusts [d] | 205 | — | — | 222 | 222 |

| | December 31, 2017 | | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Long-term debt (including amounts due within one year) [b][c] | $ 7,601 | $ — | $ 8,418 | $ — | $ 8,418 |
| Long-term debt to financing trusts [d] | 205 | — | — | 227 | 227 |

*PECO*

| | March 31, 2018 | | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 220 | $ — | $ 220 | $ — | $ 220 |
| Long-term debt (including amounts due within one year) [b][c] | 2,723 | — | 2,870 | — | 2,870 |
| Long-term debt to financing trusts [d] | 184 | — | — | 199 | 199 |

| | December 31, 2017 | | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Long-term debt (including amounts due within one year) [b][c] | $ 2,903 | $ — | $ 3,194 | $ — | $ 3,194 |
| Long-term debt to financing trusts [d] | 184 | — | — | 204 | 204 |

*BGE*

| | March 31, 2018 | | | | |
| | Carrying Amount | Fair Value | | | |
| | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 45 | $ — | $ 45 | $ — | $ 45 |
| Long-term debt (including amounts due within one year) [b][c] | $ 2,578 | $ — | $ 2,689 | $ — | $ 2,689 |

95

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| | | December 31, 2017 | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 77 | $ — | $ 77 | $ — | $ 77 |
| Long-term debt (including amounts due within one year) [b][c] | 2,577 | — | 2,825 | — | 2,825 |

*PHI*

| | March 31, 2018 | | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 407 | $ — | $ 407 | $ — | $ 407 |
| Long-term debt (including amounts due within one year) [b][c] | 5,849 | — | 5,423 | 283 | 5,706 |

| | December 31, 2017 | | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 350 | $ — | $ 350 | $ — | $ 350 |
| Long-term debt (including amounts due within one year) [b][c] | 5,874 | — | 5,722 | 297 | 6,019 |

*Pepco*

| | March 31, 2018 | | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 60 | $ — | $ 60 | $ — | $ 60 |
| Long-term debt (including amounts due within one year) [b][c] | 2,540 | — | 2,933 | 9 | 2,942 |

| | December 31, 2017 | | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 26 | $ — | $ 26 | $ — | $ 26 |
| Long-term debt (including amounts due within one year) [b][c] | 2,540 | — | 3,114 | 9 | 3,123 |

*DPL*

| | March 31, 2018 | | | | |
| | | Fair Value | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 211 | $ — | $ 211 | $ — | $ 211 |
| Long-term debt (including amounts due within one year) [b][c] | 1,296 | — | 1,320 | — | 1,320 |

96

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| | | December 31, 2017 | | | | |
| | | Fair Value | | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 216 | $ — | $ 216 | $ — | $ 216 |
| Long-term debt (including amounts due within one year) [b][c] | 1,300 | — | 1,393 | — | 1,393 |

**ACE**

| | | March 31, 2018 | | | | |
| | | Fair Value | | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 136 | $ — | $ 136 | $ — | $ 136 |
| Long-term debt (including amounts due within one year) [b][c] | 1,114 | — | 916 | 274 | 1,190 |

| | | December 31, 2017 | | | | |
| | | Fair Value | | | | |
| | Carrying Amount | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| Short-term liabilities [a] | $ 108 | $ — | $ 108 | $ — | $ 108 |
| Long-term debt (including amounts due within one year) [b][c] | 1,121 | — | 949 | 288 | 1,237 |

---

(a) Level 1 securities consist of dividends payable (included in other current liabilities). Level 2 securities consist of short term borrowings.
(b) Includes unamortized debt issuance costs which are not fair valued of $213 million , $57 million , $60 million , $20 million , $16 million , $6 million , $32 million , $11 million and $5 million for Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, respectively, as of March 31, 2018 . Includes unamortized debt issuance costs which are not fair valued of $201 million , $60 million , $52 million , $17 million , $6 million , $32 million , $11 million and $5 million for Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, respectively, as of December 31, 2017 .
(c) Level 2 securities consist of fixed-rate taxable debt securities, fixed-rate tax-exempt debt, variable rate tax-exempt debt and variable rate non-recourse debt. Level 3 securities consist of fixed-rate private placement taxable debt securities, fixed rate nonrecourse debt and government-backed fixed rate non-recourse debt.
(d) Includes unamortized debt issuance costs which are not fair valued of $1 million and $1 million for Exelon and ComEd, respectively, as of March 31, 2018 and December 31, 2017 .

**Recurring Fair Value Measurements**

Exelon records the fair value of assets and liabilities in accordance with the hierarchy established by the authoritative guidance for fair value measurements. The hierarchy prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Registrants have the ability to liquidate as of the reporting date.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data.

- Level 3 — unobservable inputs, such as internally developed pricing models or third-party valuations for the asset or liability due to little or no market activity for the asset or liability.

Transfers in and out of levels are recognized as of the end of the reporting period when the transfer occurred. Given derivatives categorized within Level 1 are valued using exchange-based quoted prices within observable periods, transfers between Level 2 and Level 1 were not material. Additionally, there

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

were no material transfers between Level 1 and Level 2 during the three months ended March 31, 2018 for cash equivalents, nuclear decommissioning trust fund investments, Pledged assets for Zion Station decommissioning, Rabbi trust investments, and Deferred compensation obligations. For derivative contracts, transfers into Level 2 from Level 3 generally occur when the contract tenor becomes more observable and due to changes in market liquidity or assumptions for certain commodity contracts.

*Generation and Exelon*

In accordance with the applicable guidance on fair value measurement, certain investments that are measured at fair value using the NAV per share as a practical expedient are no longer classified within the fair value hierarchy and are included under "Not subject to leveling" in the table below.

The following tables present assets and liabilities measured and recorded at fair value on Exelon's and Generation's Consolidated Balance Sheets on a recurring basis and their level within the fair value hierarchy as of March 31, 2018 and December 31, 2017 :

| As of March 31, 2018 | Generation | | | | | Exelon | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total |
| **Assets** | | | | | | | | | | |
| Cash equivalents (a) | 343 | — | — | — | 343 | 517 | — | — | — | 517 |
| NDT fund investments | | | | | | | | | | |
| Cash equivalents (b) | 222 | 105 | — | — | 327 | 222 | 105 | — | — | 327 |
| Equities | 4,002 | 983 | — | 2,119 | 7,104 | 4,002 | 983 | — | 2,119 | 7,104 |
| Fixed income | | | | | | | | | | |
| Corporate debt | — | 1,583 | 240 | — | 1,823 | — | 1,583 | 240 | — | 1,823 |
| U.S. Treasury and agencies | 1,869 | 88 | — | — | 1,957 | 1,869 | 88 | — | — | 1,957 |
| Foreign governments | — | 86 | — | — | 86 | — | 86 | — | — | 86 |
| State and municipal debt | — | 254 | — | — | 254 | — | 254 | — | — | 254 |
| Other (c) | — | 39 | — | 532 | 571 | — | 39 | — | 532 | 571 |
| Fixed income subtotal (d) | 1,869 | 2,050 | 240 | 532 | 4,691 | 1,869 | 2,050 | 240 | 532 | 4,691 |
| Middle market lending | — | — | 369 | 127 | 496 | — | — | 369 | 127 | 496 |
| Private equity | — | — | — | 253 | 253 | — | — | — | 253 | 253 |
| Real estate | — | — | — | 488 | 488 | — | — | — | 488 | 488 |
| NDT fund investments subtotal (d) | 6,093 | 3,138 | 609 | 3,519 | 13,359 | 6,093 | 3,138 | 609 | 3,519 | 13,359 |
| Pledged assets for Zion Station decommissioning | | | | | | | | | | |
| Cash equivalents | 13 | — | — | — | 13 | 13 | — | — | — | 13 |

98

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| As of March 31, 2018 | Generation | | | | | Exelon | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total |
| Middle market lending | — | — | 16 | — | 16 | — | — | 16 | — | 16 |
| Pledged assets for Zion Station decommissioning subtotal (e) | 13 | — | 16 | — | 29 | 13 | — | 16 | — | 29 |
| Rabbi trust investments | | | | | | | | | | |
| Cash equivalents | 5 | — | — | — | 5 | 77 | — | — | — | 77 |
| Mutual funds | 24 | — | — | — | 24 | 59 | — | — | — | 59 |
| Fixed income | — | — | — | — | — | — | 10 | — | — | 10 |
| Life insurance contracts | — | 22 | — | — | 22 | — | 71 | 23 | — | 94 |
| Rabbi trust investments subtotal (f) | 29 | 22 | — | — | 51 | 136 | 81 | 23 | — | 240 |
| Commodity derivative assets | | | | | | | | | | |
| Economic hedges | 286 | 2,923 | 1,892 | — | 5,101 | 286 | 2,923 | 1,892 | — | 5,101 |
| Proprietary trading | — | 151 | 58 | — | 209 | — | 151 | 58 | — | 209 |
| Effect of netting and allocation of collateral (g) (h) | (335) | (2,589) | (895) | — | (3,819) | (335) | (2,589) | (895) | — | (3,819) |
| Commodity derivative assets subtotal | (49) | 485 | 1,055 | — | 1,491 | (49) | 485 | 1,055 | — | 1,491 |
| Interest rate and foreign currency derivative assets | | | | | | | | | | |
| Derivatives designated as hedging instruments | — | 12 | — | — | 12 | — | 12 | — | — | 12 |
| Economic hedges | — | 6 | — | — | 6 | — | 6 | — | — | 6 |
| Effect of netting and allocation of collateral | (1) | (3) | — | — | (4) | (1) | (3) | — | — | (4) |
| Interest rate and foreign currency derivative assets subtotal | (1) | 15 | — | — | 14 | (1) | 15 | — | — | 14 |
| Other investments | — | — | 36 | — | 36 | — | — | 36 | — | 36 |
| **Total assets** | 6,428 | 3,660 | 1,716 | 3,519 | 15,323 | 6,709 | 3,719 | 1,739 | 3,519 | 15,686 |
| **Liabilities** | | | | | | | | | | |
| Commodity derivative liabilities | | | | | | | | | | |
| Economic hedges | (415) | (3,317) | (1,203) | — | (4,935) | (415) | (3,317) | (1,470) | — | (5,202) |
| Proprietary trading | — | (164) | (15) | — | (179) | — | (164) | (15) | — | (179) |
| Effect of netting and allocation of collateral (g) (h) | 415 | 3,007 | 1,081 | — | 4,503 | 415 | 3,007 | 1,081 | — | 4,503 |
| Commodity derivative liabilities subtotal | — | (474) | (137) | — | (611) | — | (474) | (404) | — | (878) |
| Interest rate and foreign currency derivative liabilities | | | | | | | | | | |
| Derivatives designated as hedging instruments | — | — | — | — | — | — | (4) | — | — | (4) |

99

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| As of March 31, 2018 | Generation | | | | | Exelon | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total |
| Economic hedges | (1) | (4) | — | — | (5) | (1) | (4) | — | — | (5) |
| Effect of netting and allocation of collateral | 1 | 3 | — | — | 4 | 1 | 3 | — | — | 4 |
| Interest rate and foreign currency derivative liabilities subtotal | — | (1) | — | — | (1) | — | (5) | — | — | (5) |
| Deferred compensation obligation | — | (35) | — | — | (35) | — | (138) | — | — | (138) |
| Total liabilities | — | (510) | (137) | — | (647) | — | (617) | (404) | — | (1,021) |
| Total net assets | $ 6,428 | $ 3,150 | $ 1,579 | $ 3,519 | $ 14,676 | $ 6,709 | $ 3,102 | $ 1,335 | $ 3,519 | $ 14,665 |

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| As of December 31, 2017 | Generation | | | | | Exelon | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total |
| **Assets** | | | | | | | | | | |
| Cash equivalents (a) | $ 168 | $ — | $ — | $ — | $ 168 | $ 656 | $ — | $ — | $ — | $ 656 |
| **NDT fund investments** | | | | | | | | | | |
| Cash equivalents (b) | 135 | 85 | — | — | 220 | 135 | 85 | — | — | 220 |
| Equities | 4,163 | 915 | — | 2,176 | 7,254 | 4,163 | 915 | — | 2,176 | 7,254 |
| Fixed income | | | | | | | | | | |
| Corporate debt | — | 1,614 | 251 | — | 1,865 | — | 1,614 | 251 | — | 1,865 |
| U.S. Treasury and agencies | 1,917 | 52 | — | — | 1,969 | 1,917 | 52 | — | — | 1,969 |
| Foreign governments | — | 82 | — | — | 82 | — | 82 | — | — | 82 |
| State and municipal debt | — | 263 | — | — | 263 | — | 263 | — | — | 263 |
| Other (c) | — | 47 | — | 510 | 557 | — | 47 | — | 510 | 557 |
| Fixed income subtotal | 1,917 | 2,058 | 251 | 510 | 4,736 | 1,917 | 2,058 | 251 | 510 | 4,736 |
| Middle market lending | — | — | 397 | 131 | 528 | — | — | 397 | 131 | 528 |
| Private equity | — | — | — | 222 | 222 | — | — | — | 222 | 222 |
| Real estate | — | — | — | 471 | 471 | — | — | — | 471 | 471 |
| NDT fund investments subtotal (d) | 6,215 | 3,058 | 648 | 3,510 | 13,431 | 6,215 | 3,058 | 648 | 3,510 | 13,431 |
| **Pledged assets for Zion Station decommissioning** | | | | | | | | | | |
| Cash equivalents | 2 | — | — | — | 2 | 2 | — | — | — | 2 |
| Equities | — | 1 | — | — | 1 | — | 1 | — | — | 1 |
| Middle market lending | — | — | 12 | 24 | 36 | — | — | 12 | 24 | 36 |
| Pledged assets for Zion Station decommissioning subtotal (e) | 2 | 1 | 12 | 24 | 39 | 2 | 1 | 12 | 24 | 39 |
| **Rabbi trust investments** | | | | | | | | | | |
| Cash equivalents | 5 | — | — | — | 5 | 77 | — | — | — | 77 |
| Mutual funds | 23 | — | — | — | 23 | 58 | — | — | — | 58 |
| Fixed income | — | — | — | — | — | — | 12 | — | — | 12 |
| Life insurance contracts | — | 22 | — | — | 22 | — | 71 | 22 | — | 93 |
| Rabbi trust investments subtotal (f) | 28 | 22 | — | — | 50 | 135 | 83 | 22 | — | 240 |
| **Commodity derivative assets** | | | | | | | | | | |
| Economic hedges | 557 | 2,378 | 1,290 | — | 4,225 | 557 | 2,378 | 1,290 | — | 4,225 |
| Proprietary trading | 2 | 31 | 35 | — | 68 | 2 | 31 | 35 | — | 68 |
| Effect of netting and allocation of collateral (g) (h) | (585) | (1,769) | (635) | — | (2,989) | (585) | (1,769) | (635) | — | (2,989) |
| Commodity derivative assets subtotal | (26) | 640 | 690 | — | 1,304 | (26) | 640 | 690 | — | 1,304 |
| **Interest rate and foreign currency derivative assets** | | | | | | | | | | |
| Derivatives designated as hedging instruments | — | 3 | — | — | 3 | — | 6 | — | — | 6 |
| Economic hedges | — | 10 | — | — | 10 | — | 10 | — | — | 10 |

101

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| As of December 31, 2017 | Generation | | | | | Exelon | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total | Level 1 | Level 2 | Level 3 | Not subject to leveling | Total |
| Effect of netting and allocation of collateral | (2) | (5) | — | — | (7) | (2) | (5) | — | — | (7) |
| Interest rate and foreign currency derivative assets subtotal | (2) | 8 | — | — | 6 | (2) | 11 | — | — | 9 |
| Other investments | — | — | 37 | — | 37 | — | — | 37 | — | 37 |
| **Total assets** | 6,385 | 3,729 | 1,387 | 3,534 | 15,035 | 6,980 | 3,793 | 1,409 | 3,534 | 15,716 |
| **Liabilities** | | | | | | | | | | |
| Commodity derivative liabilities | | | | | | | | | | |
|   Economic hedges | (712) | (2,226) | (845) | — | (3,783) | (713) | (2,226) | (1,101) | — | (4,040) |
|   Proprietary trading | (2) | (42) | (9) | — | (53) | (2) | (42) | (9) | — | (53) |
| Effect of netting and allocation of collateral (g) (h) | 650 | 2,089 | 716 | — | 3,455 | 651 | 2,089 | 716 | — | 3,456 |
| Commodity derivative liabilities subtotal | (64) | (179) | (138) | — | (381) | (64) | (179) | (394) | — | (637) |
| Interest rate and foreign currency derivative liabilities | | | | | | | | | | |
|   Derivatives designated as hedging instruments | — | (2) | — | — | (2) | — | (2) | — | — | (2) |
|   Economic hedges | (1) | (8) | — | — | (9) | (1) | (8) | — | — | (9) |
| Effect of netting and allocation of collateral | 2 | 5 | — | — | 7 | 2 | 5 | — | — | 7 |
| Interest rate and foreign currency derivative liabilities subtotal | 1 | (5) | — | — | (4) | 1 | (5) | — | — | (4) |
| Deferred compensation obligation | — | (38) | — | — | (38) | — | (145) | — | — | (145) |
| **Total liabilities** | (63) | (222) | (138) | — | (423) | (63) | (329) | (394) | — | (786) |
| **Total net assets** | $ 6,322 | $ 3,507 | $ 1,249 | $ 3,534 | $ 14,612 | $ 6,917 | $ 3,464 | $ 1,015 | $ 3,534 | $ 14,930 |

(a)  Generation excludes cash of $371 million and $259 million at March 31, 2018 and December 31, 2017 and restricted cash of $23 million and $127 million at March 31, 2018 and December 31, 2017 . Exelon excludes cash of $531 million and $389 million at March 31, 2018 and December 31, 2017 and restricted cash of $51 million and $145 million at March 31, 2018 and December 31, 2017 and includes long-term restricted cash of $103 million and $85 million at March 31, 2018 and December 31, 2017 , which is reported in Other deferred debits on the Consolidated Balance Sheets.

(b)  Includes $53 million and $77 million of cash received from outstanding repurchase agreements at March 31, 2018 and December 31, 2017 , respectively, and is offset by an obligation to repay upon settlement of the agreement as discussed in (d) below.

(c)  Includes derivative instruments of $2 million and less than $1 million , which have a total notional amount of $949 million and $811 million at March 31, 2018 and December 31, 2017 , respectively. The notional principal amounts for these instruments provide one measure of the transaction volume outstanding as of the fiscal years ended and do not represent the amount of the company's exposure to credit or market loss.

(d)  Excludes net liabilities of $84 million and $82 million at March 31, 2018 and December 31, 2017 , respectively. These items consist of receivables related to pending securities sales, interest and dividend receivables, repurchase agreement obligations, and payables related to pending securities purchases. The repurchase agreements are generally short-term in nature with durations generally of 30 days or less.

(e)  Excludes net assets of $1 million at March 31, 2018 . These items consist of receivables related to pending securities sales, interest and dividend receivables, and payables related to pending securities purchases.

(f)  The amount of unrealized gains/(losses) at Generation totaled less than $1 million and $1 million for the three months ended March 31, 2018 and March 31, 2017 , respectively. The amount of unrealized gains/(losses) at Exelon totaled $1 million and $2 million for the three months ended March 31, 2018 and March 31, 2017 , respectively.

(g)  Collateral posted/(received) from counterparties totaled $80 million , $418 million and $186 million allocated to Level 1, Level 2 and Level 3 mark-to-market derivatives, respectively, as of March 31, 2018 . Collateral posted/(received) from counterparties, net of collateral paid to counterparties, totaled $65 million , $320 million and $81 million allocated to Level 1, Level 2 and Level 3 mark-to-market derivatives, respectively, as of December 31, 2017 .

(h)  Of the collateral posted/(received), $156 million represents variation margin on the exchanges as of March 31, 2018 . Of the collateral posted/(received), $(117) million represents variation margin on the exchanges as of December 31, 2017 .

102

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Exelon and Generation hold investments without readily determinable fair values with carrying amounts of $68 million as of March 31, 2018 . Changes were immaterial in fair value, cumulative adjustments and impairments for the three months ended March 31, 2018 .

### ComEd, PECO and BGE

The following tables present assets and liabilities measured and recorded at fair value on ComEd's, PECO's and BGE's Consolidated Balance Sheets on a recurring basis and their level within the fair value hierarchy as of March 31, 2018 and December 31, 2017 :

| As of March 31, 2018 | ComEd Level 1 | Level 2 | Level 3 | Total | PECO Level 1 | Level 2 | Level 3 | Total | BGE Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Cash equivalents [a] | $ 93 | $ — | $ — | $ 93 | $ 6 | $ — | $ — | $ 6 | $ — | $ — | $ — | $ — |
| Rabbi trust investments | | | | | | | | | | | | |
|   Mutual funds | — | — | — | — | 7 | — | — | 7 | 6 | — | — | 6 |
|   Life insurance contracts | — | — | — | — | — | 10 | — | 10 | — | — | — | — |
|   Rabbi trust investments subtotal [b] | — | — | — | — | 7 | 10 | — | 17 | 6 | — | — | 6 |
| **Total assets** | 93 | — | — | 93 | 13 | 10 | — | 23 | 6 | — | — | 6 |
| **Liabilities** | | | | | | | | | | | | |
| Deferred compensation obligation | — | (8) | — | (8) | — | (11) | — | (11) | — | (4) | — | (4) |
| Mark-to-market derivative liabilities [c] | — | — | (267) | (267) | — | — | — | — | — | — | — | — |
| **Total liabilities** | — | (8) | (267) | (275) | — | (11) | — | (11) | — | (4) | — | (4) |
| **Total net assets (liabilities)** | $ 93 | $ (8) | $ (267) | $ (182) | $ 13 | $ (1) | $ — | $ 12 | $ 6 | $ (4) | $ — | $ 2 |

| As of December 31, 2017 | ComEd Level 1 | Level 2 | Level 3 | Total | PECO Level 1 | Level 2 | Level 3 | Total | BGE Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Cash equivalents [a] | $ 98 | $ — | $ — | $ 98 | $ 228 | $ — | $ — | $ 228 | $ — | $ — | $ — | $ — |
| Rabbi trust investments | | | | | | | | | | | | |
|   Mutual funds | — | — | — | — | 7 | — | — | 7 | 6 | — | — | 6 |
|   Life insurance contracts | — | — | — | — | — | 10 | — | 10 | — | — | — | — |
|   Rabbi trust investments subtotal [b] | — | — | — | — | 7 | 10 | — | 17 | 6 | — | — | 6 |
| **Total assets** | 98 | — | — | 98 | 235 | 10 | — | 245 | 6 | — | — | 6 |
| **Liabilities** | | | | | | | | | | | | |
| Deferred compensation obligation | — | (8) | — | (8) | — | (11) | — | (11) | — | (5) | — | (5) |
| Mark-to-market derivative liabilities [c] | — | — | (256) | (256) | — | — | — | — | — | — | — | — |
| **Total liabilities** | — | (8) | (256) | (264) | — | (11) | — | (11) | — | (5) | — | (5) |
| **Total net assets (liabilities)** | $ 98 | $ (8) | $ (256) | $ (166) | $ 235 | $ (1) | $ — | $ 234 | $ 6 | $ (5) | $ — | $ 1 |

---

(a)  ComEd excludes cash of $69 million and $45 million at March 31, 2018 and December 31, 2017 and includes long-term restricted cash of $83 million and $62 million at March 31, 2018 and December 31, 2017 , which is reported in Other deferred debits on the Consolidated Balance Sheets.  PECO excludes cash of $20 million and $47 million at March 31, 2018 and December 31, 2017 .  BGE

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

excludes cash of $22 million and $17 million at March 31, 2018 and December 31, 2017 and restricted cash of $2 million and $1 million at March 31, 2018 and December 31, 2017 .

(b)  The amount of unrealized gains/(losses) at ComEd, PECO and BGE totaled less than $1 million for the three months ended March 31, 2018 and March 31, 2017 , respectively.

(c)  The Level 3 balance consists of the current and noncurrent liability of $24 million and $243 million , respectively, at March 31, 2018 , and $21 million and $235 million , respectively, at December 31, 2017 , related to floating-to-fixed energy swap contracts with unaffiliated suppliers.

### *PHI, Pepco, DPL and ACE*

The following tables present assets and liabilities measured and recorded at fair value on PHI's, Pepco's, DPL's and ACE's Consolidated Balance Sheets on a recurring basis and their level within the fair value hierarchy as of March 31, 2018 and December 31, 2017 :

| PHI | As of March 31, 2018 | | | | As of December 31, 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | | | | |
| Cash equivalents [a] | $ 67 | $ — | $ — | $ 67 | $ 83 | $ — | $ — | $ 83 |
| Rabbi trust investments | | | | | | | | |
|     Cash equivalents | 72 | — | — | 72 | 72 | — | — | 72 |
|     Fixed income | — | 10 | — | 10 | — | 12 | — | 12 |
|     Life insurance contracts | — | 23 | 23 | 46 | — | 23 | 22 | 45 |
|     Rabbi trust investments subtotal [b] | 72 | 33 | 23 | 128 | 72 | 35 | 22 | 129 |
| **Total assets** | 139 | 33 | 23 | 195 | 155 | 35 | 22 | 212 |
| **Liabilities** | | | | | | | | |
| Deferred compensation obligation | — | (23) | — | (23) | — | (25) | — | (25) |
| Mark-to-market derivative liabilities [c] | — | — | — | — | (1) | — | — | (1) |
| Effect of netting and allocation of collateral | — | — | — | — | 1 | — | — | 1 |
| Mark-to-market derivative liabilities subtotal | — | — | — | — | — | — | — | — |
| **Total liabilities** | — | (23) | — | (23) | — | (25) | — | (25) |
| **Total net assets** | $ 139 | $ 10 | $ 23 | $ 172 | $ 155 | $ 10 | $ 22 | $ 187 |

104

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| As of March 31, 2018 | Pepco Level 1 | Level 2 | Level 3 | Total | DPL Level 1 | Level 2 | Level 3 | Total | ACE Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Cash equivalents (a) | $ 33 | $ — | $ — | $ 33 | $ — | $ — | $ — | $ — | $ 27 | $ — | $ — | $ 27 |
| Rabbi trust investments | | | | | | | | | | | | |
|     Cash equivalents | 44 | — | | 44 | — | | | — | — | | | — |
|     Fixed income | — | 10 | | 10 | — | | | — | — | | | — |
|     Life insurance contracts | — | 23 | 23 | 46 | | | | | | | | |
|     Rabbi trust investments subtotal (b) | 44 | 33 | 23 | 100 | — | | | — | — | | | — |
| **Total assets** | 77 | 33 | 23 | 133 | — | | | — | 27 | — | — | 27 |
| **Liabilities** | | | | | | | | | | | | |
| Deferred compensation obligation | — | (4) | — | (4) | — | (1) | — | (1) | — | — | — | — |
| **Total liabilities** | — | (4) | | (4) | — | (1) | | (1) | — | | | — |
| **Total net assets (liabilities)** | $ 77 | $ 29 | $ 23 | $ 129 | $ — | $ (1) | $ — | $ (1) | $ 27 | $ — | $ — | $ 27 |

| As of December 31, 2017 | Pepco Level 1 | Level 2 | Level 3 | Total | DPL Level 1 | Level 2 | Level 3 | Total | ACE Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Cash equivalents (a) | $ 36 | $ — | $ — | $ 36 | $ — | $ — | $ — | $ — | $ 29 | $ — | $ — | $ 29 |
| Rabbi trust investments | | | | | | | | | | | | |
|     Cash equivalents | 44 | — | | 44 | — | | | — | — | | | — |
|     Fixed income | — | 12 | | 12 | — | | | — | — | | | — |
|     Life insurance contracts | — | 23 | 22 | 45 | | | | | | | | |
|     Rabbi trust investments subtotal (b) | 44 | 35 | 22 | 101 | — | | | — | — | | | — |
| **Total assets** | 80 | 35 | 22 | 137 | — | | | — | 29 | | | 29 |
| **Liabilities** | | | | | | | | | | | | |
| Deferred compensation obligation | — | (4) | — | (4) | — | (1) | — | (1) | — | — | — | — |
| Mark-to-market derivative liabilities (c) | — | | | — | (1) | — | | (1) | | | | — |
| Effect of netting and allocation of collateral | — | | | — | 1 | | | 1 | | | | — |
| Mark-to-market derivative liabilities subtotal | — | | | — | — | | | — | | | | — |
| **Total liabilities** | — | (4) | | (4) | — | (1) | | (1) | — | | | — |
| **Total net assets (liabilities)** | $ 80 | $ 31 | $ 22 | $ 133 | $ — | $ (1) | $ — | $ (1) | $ 29 | $ — | $ — | $ 29 |

(a)   PHI excludes cash of $36 million and $12 million at March 31, 2018 and December 31, 2017 , respectively, and includes long-term restricted cash of $20 million and $23 million at March 31, 2018 and December 31, 2017 , respectively, which is reported in Other deferred debits on the Consolidated Balance Sheets.  Pepco excludes cash of $15 million and $4 million at March 31, 2018 and December 31, 2017 , respectively. DPL excludes cash of $7 million and $2 million at March 31, 2018 and December 31, 2017 , respectively. ACE excludes cash of $10 million and $2 million at March 31, 2018 and December 31, 2017 , respectively, and includes long-term restricted cash of $20 million and $23 million at March 31, 2018 and December 31, 2017 , respectively, which is reported in Other deferred debits on the Consolidated Balance Sheets.

(b)   The amount of unrealized gains/(losses) at PHI, Pepco, DPL and ACE totaled less than $1 million for the three months ended March 31, 2018 and March 31, 2017 .

(c)   Represents natural gas futures purchased by DPL as part of a natural gas hedging program approved by the DPSC.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The following tables present the fair value reconciliation of Level 3 assets and liabilities measured at fair value on a recurring basis during the three months ended March 31, 2018 and 2017 :

| Three Months Ended March 31, 2018 | Generation | | | | | ComEd | PHI | Eliminated in Consolidation | Exelon |
| | NDT Fund Investments | Pledged Assets for Zion Station Decommissioning | Mark-to-Market Derivatives | Other Investments | Total Generation | Mark-to-Market Derivatives | Life Insurance Contracts (c) | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2017 | $ 648 | $ 12 | $ 552 | $ 37 | $ 1,249 | $ (256) | $ 22 | $ — | $ 1,015 |
| Total realized / unrealized gains (losses) | | | | | | | | | |
| Included in net income | — | — | 184 (a) | 1 | 185 | — | 1 | | 186 |
| Included in noncurrent payables to affiliates | 7 | — | — | — | 7 | — | — | (7) | — |
| Included in payable for Zion Station decommissioning | — | 4 | — | — | 4 | — | — | | 4 |
| Included in regulatory assets/liabilities | — | — | — | — | — | (11) (b) | — | 7 | (4) |
| Change in collateral | — | — | 105 | — | 105 | — | — | | 105 |
| Purchases, sales, issuances and settlements | | | | | | | | | |
| Purchases | 2 | — | 88 | — | 90 | — | — | | 90 |
| Sales | — | — | (3) | — | (3) | — | — | | (3) |
| Settlements | (48) | — | — | — | (48) | — | — | | (48) |
| Transfers into Level 3 | — | — | (8) | — | (8) | — | — | | (8) |
| Transfers out of Level 3 | — | — | — | (2) | (2) | — | — | | (2) |
| Balance at March 31, 2018 | $ 609 | $ 16 | $ 918 | $ 36 | $ 1,579 | $ (267) | $ 23 | $ — | $ 1,335 |
| The amount of total gains (losses) included in income attributed to the change in unrealized gains (losses) related to assets and liabilities as of March 31, 2018 | $ — | $ — | $ 256 | $ 1 | $ 257 | $ — | $ 1 | $ — | $ 258 |

106

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| Three Months Ended March 31, 2017 | Generation | | | | | ComEd | PHI | Eliminated in Consolidation | Exelon |
| | NDT Fund Investments | Pledged Assets for Zion Station Decommissioning | Mark-to-Market Derivatives | Other Investments | Total Generation | Mark-to-Market Derivatives | Life Insurance Contracts (c) | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2016 | $ 677 | $ 19 | $ 493 | $ 42 | $ 1,231 | $ (258) | $ 20 | $ — | $ 993 |
| Total realized / unrealized gains (losses) | | | | | | | | | |
| Included in net income | 3 | — | (43) (a) | 1 | (39) | — | 1 | — | (38) |
| Included in noncurrent payables to affiliates | 9 | — | — | — | 9 | — | — | (9) | — |
| Included in regulatory assets/liabilities | — | — | — | — | — | (24) (b) | — | 9 | (15) |
| Change in collateral | — | — | 38 | — | 38 | — | — | — | 38 |
| Purchases, sales, issuances and settlements | | | | | | | | | |
| Purchases | 17 | 1 | 69 | 2 | 89 | — | — | — | 89 |
| Sales | — | — | (2) | — | (2) | — | — | — | (2) |
| Issuances | — | — | — | — | — | — | (1) | — | (1) |
| Settlements | (23) | — | — | — | (23) | — | — | — | (23) |
| Transfers into Level 3 | — | — | (1) | — | (1) | — | — | — | (1) |
| Transfers out of Level 3 | — | — | 11 | (5) | 6 | — | — | — | 6 |
| Balance as of March 31, 2017 | $ 683 | $ 20 | $ 565 | $ 40 | $ 1,308 | $ (282) | $ 20 | $ — | $ 1,046 |
| The amount of total gains (losses) included in income attributed to the change in unrealized gains (losses) related to assets and liabilities as of March 31, 2017 | $ 2 | $ — | $ 59 | $ — | $ 61 | $ — | $ 1 | $ — | $ 62 |

(a) Includes a reduction for the reclassification of $72 million and $102 million of realized gains due to the settlement of derivative contracts for the three months ended March 31, 2018 and March 31, 2017 , respectively.

(b) Includes $ 17 million of decreases in fair value and an increase for realized losses due to settlements of $ 6 million recorded in purchased power expense associated with floating-to-fixed energy swap contracts with unaffiliated suppliers for the three months ended March 31, 2018 . Includes $30 million of decreases in fair value and an increase for realized losses due to settlements of $6 million recorded in purchased power expense associated with floating-to-fixed energy swap contracts with unaffiliated suppliers for the three months ended March 31, 2017 .

(c) The amounts represented are life insurance contracts at Pepco.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following tables present the income statement classification of the total realized and unrealized gains (losses) included in income for Level 3 assets and liabilities measured at fair value on a recurring basis during the three months ended March 31, 2018 and 2017 :

| | Generation | | | PHI | Exelon | | | |
| | Operating Revenues | Purchased Power and Fuel | Other, net (a) | Operating and Maintenance | Operating Revenues | Purchased Power and Fuel | Operating and Maintenance | Other, net (a) |
|---|---|---|---|---|---|---|---|---|
| Total gains (losses) included in net income for the three months ended March 31, 2018 | $ 335 | $ (151) | $ 1 | $ 1 | $ 335 | $ (151) | $ 1 | $ 1 |
| Change in the unrealized gains (losses) relating to assets and liabilities held for the three months ended March 31, 2018 | 309 | (53) | 1 | 1 | 309 | (53) | 1 | 1 |

| | Generation | | | PHI | Exelon | | |
| | Operating Revenues | Purchased Power and Fuel | Other, net (a) | Other, net (a) | Operating Revenues | Purchased Power and Fuel | Other, net (a) |
|---|---|---|---|---|---|---|---|
| Total gains (losses) included in net income for the three months ended March 31, 2017 | $ 88 | $ (131) | $ 3 | $ 1 | $ 88 | $ (131) | $ 4 |
| Change in the unrealized gains (losses) relating to assets and liabilities held for the three months ended March 31, 2017 | 140 | (81) | 2 | 1 | 140 | (81) | 3 |

(a)   Other, net activity consists of realized and unrealized gains (losses) included in income for the NDT funds held by Generation, accrued interest on a convertible promissory note at Generation and the life insurance contracts held by PHI and Pepco.

**Valuation Techniques Used to Determine Fair Value**

The following describes the valuation techniques used to measure the fair value of the assets and liabilities shown in the tables above.

*Cash Equivalents (Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE).* The Registrants' cash equivalents include investments with original maturities of three months or less when purchased. The cash equivalents shown in the fair value tables are comprised of investments in mutual and money market funds. The fair values of the shares of these funds are based on observable market prices and, therefore, have been categorized in Level 1 in the fair value hierarchy.

*Nuclear Decommissioning Trust Fund Investments and Pledged Assets for Zion Station Decommissioning (Exelon and Generation).* The trust fund investments have been established to satisfy Generation's and CENG's nuclear decommissioning obligations as required by the NRC. The NDT funds hold debt and equity securities directly and indirectly through commingled funds and mutual funds, which are included in Equities and Fixed Income. Generation's and CENG's NDT fund investments policies outline investment guidelines for the trusts and limit the trust funds' exposures to investments in highly illiquid markets and other alternative investments. Investments with maturities of three months or less when purchased, including certain short-term fixed income securities are considered cash equivalents and included in the recurring fair value measurements hierarchy as Level 1 or Level 2.

With respect to individually held equity securities, the trustees obtain prices from pricing services, whose prices are generally obtained from direct feeds from market exchanges, which Generation is able to independently corroborate. The fair values of equity securities held directly by the trust funds which are based on quoted prices in active markets are categorized in Level 1. Certain equity securities have been categorized as Level 2 because they are based on evaluated prices that reflect observable market information, such as actual trade information or similar securities. Equity securities held individually are

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

primarily traded on the New York Stock Exchange and NASDAQ-Global Select Market, which contain only actively traded securities due to the volume trading requirements imposed by these exchanges.

For fixed income securities, multiple prices from pricing services are obtained whenever possible, which enables cross-provider validations in addition to checks for unusual daily movements. A primary price source is identified based on asset type, class or issue for each security. With respect to individually held fixed income securities, the trustees monitor prices supplied by pricing services and may use a supplemental price source or change the primary price source of a given security if the portfolio managers challenge an assigned price and the trustees determine that another price source is considered to be preferable. Generation has obtained an understanding of how these prices are derived, including the nature and observability of the inputs used in deriving such prices. Additionally, Generation selectively corroborates the fair values of securities by comparison to other market-based price sources. U.S. Treasury securities are categorized as Level 1 because they trade in a highly liquid and transparent market. The fair values of fixed income securities, excluding U.S. Treasury securities, are based on evaluated prices that reflect observable market information, such as actual trade information or similar securities, adjusted for observable differences and are categorized in Level 2. The fair values of private placement fixed income securities, which are included in Corporate debt, are determined using a third party valuation that contains significant unobservable inputs and are categorized in Level 3.

Equity and fixed income commingled funds and mutual funds are maintained by investment companies and hold certain investments in accordance with a stated set of fund objectives such as holding short-term fixed income securities or tracking the performance of certain equity indices by purchasing equity securities to replicate the capitalization and characteristics of the indices. The values of some of these funds are publicly quoted. For mutual funds which are publicly quoted, the funds are valued based on quoted prices in active markets and have been categorized as Level 1. For commingled funds and mutual funds, which are not publicly quoted, the funds are valued using NAV as a practical expedient for fair value, which is primarily derived from the quoted prices in active markets on the underlying securities, and are not classified within the fair value hierarchy. These investments typically can be redeemed monthly with 30 or less days of notice and without further restrictions.

Derivative instruments consisting primarily of futures and interest rate swaps to manage risk are recorded at fair value. Over the counter derivatives are valued daily based on quoted prices in active markets and trade in open markets, and have been categorized as Level 1. Derivative instruments other than over the counter derivatives are valued based on external price data of comparable securities and have been categorized as Level 2.

Middle market lending are investments in loans or managed funds which lend to private companies. Generation elected the fair value option for its investments in certain limited partnerships that invest in middle market lending managed funds. The fair value of these loans is determined using a combination of valuation models including cost models, market models and income models. Investments in loans are categorized as Level 3 because the fair value of these securities is based largely on inputs that are unobservable and utilize complex valuation models. Managed funds are valued using NAV or its equivalent as a practical expedient, and therefore, are not classified within the fair value hierarchy. Investments in middle market lending typically cannot be redeemed until maturity of the term loan.

Private equity and real estate investments include those in limited partnerships that invest in operating companies and real estate holding companies that are not publicly traded on a stock exchange, such as, leveraged buyouts, growth capital, venture capital, distressed investments, investments in natural resources, and direct investments in pools of real estate properties. The fair value of private equity and real estate investments is determined using NAV or its equivalent as a practical expedient, and therefore, are not classified within the fair value hierarchy. These investments typically cannot be redeemed and are generally liquidated over a period of 8 to 10 years from the initial investment date. Private equity and real estate valuations are reported by the fund manager and are based on the valuation

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

of the underlying investments, which include inputs such as cost, operating results, discounted future cash flows, market based comparable data, and independent appraisals from sources with professional qualifications. These valuation inputs are unobservable.

As of March 31, 2018 , Generation has outstanding commitments to invest in equities, fixed income, middle market lending, private equity and real estate investments of approximately $208 million , $65 million , $386 million , $194 million , and $107 million , respectively. These commitments will be funded by Generation's existing nuclear decommissioning trust funds.

*Concentrations of Credit Risk* . Generation evaluated its NDT portfolios for the existence of significant concentrations of credit risk as of March 31, 2018 . Types of concentrations that were evaluated include, but are not limited to, investment concentrations in a single entity, type of industry, foreign country, and individual fund. As of March 31, 2018 , there were no significant concentrations (generally defined as greater than 10 percent) of risk in Generation's NDT assets.

See Note 13 — Nuclear Decommissioning for further discussion on the NDT fund investments.

*Rabbi Trust Investments (Exelon, Generation, PECO, BGE, PHI, Pepco, DPL and ACE)*. The Rabbi trusts were established to hold assets related to deferred compensation plans existing for certain active and retired members of Exelon's executive management and directors. The Rabbi trusts assets are included in investments in the Registrants' Consolidated Balance Sheets and consist primarily of money market funds, mutual funds, fixed income securities and life insurance policies. The mutual funds are maintained by investment companies and hold certain investments in accordance with a stated set of fund objectives, which are consistent with Exelon's overall investment strategy. Money market funds and mutual funds are publicly quoted and have been categorized as Level 1 given the clear observability of the prices. The fair values of fixed income securities are based on evaluated prices that reflect observable market information, such as actual trade information or similar securities, adjusted for observable differences and are categorized in Level 2. The life insurance policies are valued using the cash surrender value of the policies, net of loans against those policies, which is provided by a third-party. Certain life insurance policies, which consist primarily of mutual funds that are priced based on observable market data, have been categorized as Level 2 because the life insurance policies can be liquidated at the reporting date for the value of the underlying assets. Life insurance policies that are valued using unobservable inputs have been categorized as Level 3.

*Mark-to-Market Derivatives (Exelon, Generation, ComEd, PHI and DPL)* . Derivative contracts are traded in both exchange-based and non-exchange-based markets. Exchange-based derivatives that are valued using unadjusted quoted prices in active markets are categorized in Level 1 in the fair value hierarchy. Certain derivatives' pricing is verified using indicative price quotations available through brokers or over-the-counter, on-line exchanges and are categorized in Level 2. These price quotations reflect the average of the bid-ask, mid-point prices and are obtained from sources that the Registrants believe provide the most liquid market for the commodity. The price quotations are reviewed and corroborated to ensure the prices are observable and representative of an orderly transaction between market participants. This includes consideration of actual transaction volumes, market delivery points, bid-ask spreads and contract duration. The remainder of derivative contracts are valued using the Black model, an industry standard option valuation model. The Black model takes into account inputs such as contract terms, including maturity, and market parameters, including assumptions of the future prices of energy, interest rates, volatility, credit worthiness and credit spread. For derivatives that trade in liquid markets, such as generic forwards, swaps and options, model inputs are generally observable. Such instruments are categorized in Level 2. The Registrants' derivatives are predominantly at liquid trading points. For derivatives that trade in less liquid markets with limited pricing information model inputs generally would include both observable and unobservable inputs. These valuations may include an estimated basis adjustment from an illiquid trading point to a liquid trading point for which active price quotations are available. Such instruments are categorized in Level 3.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Exelon may utilize fixed-to-floating interest rate swaps, which are typically designated as fair value hedges, as a means to achieve its targeted level of variable-rate debt as a percent of total debt. In addition, the Registrants may utilize interest rate derivatives to lock in interest rate levels in anticipation of future financings. These interest rate derivatives are typically designated as cash flow hedges. Exelon determines the current fair value by calculating the net present value of expected payments and receipts under the swap agreement, based on and discounted by the market's expectation of future interest rates. Additional inputs to the net present value calculation may include the contract terms, counterparty credit risk and other market parameters. As these inputs are based on observable data and valuations of similar instruments, the interest rate swaps are categorized in Level 2 in the fair value hierarchy. See Note 10 — Derivative Financial Instruments for further discussion on mark-to-market derivatives.

*Deferred Compensation Obligations (Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE).* The Registrants' deferred compensation plans allow participants to defer certain cash compensation into a notional investment account. The Registrants include such plans in other current and noncurrent liabilities in their Consolidated Balance Sheets. The value of the Registrants' deferred compensation obligations is based on the market value of the participants' notional investment accounts. The underlying notional investments are comprised primarily of equities, mutual funds, commingled funds, and fixed income securities which are based on directly and indirectly observable market prices. Since the deferred compensation obligations themselves are not exchanged in an active market, they are categorized as Level 2 in the fair value hierarchy.

The value of certain employment agreement obligations (which are included with the Deferred Compensation Obligation in the tables above) are based on a known and certain stream of payments to be made over time and are categorized as Level 2 within the fair value hierarchy.

**Additional Information Regarding Level 3 Fair Value Measurements (Exelon, Generation, ComEd, PHI, Pepco, DPL and ACE)**

*Nuclear Decommissioning Trust Fund Investments and Pledged Assets for Zion Station Decommissioning (Exelon and Generation).* For middle market lending and certain corporate debt securities investments, the fair value is determined using a combination of valuation models including cost models, market models and income models. The valuation estimates are based on discounting the forecasted cash flows, market-based comparable data, credit and liquidity factors, as well as other factors that may impact value. Significant judgment is required in the application of discounts or premiums applied for factors such as size, marketability, credit risk and relative performance.

Because Generation relies on third-party fund managers to develop the quantitative unobservable inputs without adjustment for the valuations of its Level 3 investments, quantitative information about significant unobservable inputs used in valuing these investments is not reasonably available to Generation. This includes information regarding the sensitivity of the fair values to changes in the unobservable inputs. Generation gains an understanding of the fund managers' inputs and assumptions used in preparing the valuations. Generation performed procedures to assess the reasonableness of the valuations.

*Rabbi Trust Investments - Life insurance contracts (Exelon, PHI, Pepco, DPL and ACE).* For life insurance policies categorized as Level 3, the fair value is determined based on the cash surrender value of the policy, which contains unobservable inputs and assumptions. Because Exelon relies on its third-party insurance provider to develop the inputs without adjustment for the valuations of its Level 3 investments, quantitative information about significant unobservable inputs used in valuing these investments is not reasonably available to Exelon. Exelon gains an understanding of the types of inputs and assumptions used in preparing the valuations and performs procedures to assess the reasonableness of the valuations.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

*Mark-to-Market Derivatives (Exelon, Generation and ComEd).* For valuations that include both observable and unobservable inputs, if the unobservable input is determined to be significant to the overall inputs, the entire valuation is categorized in Level 3. This includes derivatives valued using indicative price quotations whose contract tenure extends into unobservable periods. In instances where observable data is unavailable, consideration is given to the assumptions that market participants would use in valuing the asset or liability. This includes assumptions about market risks such as liquidity, volatility and contract duration. Such instruments are categorized in Level 3 as the model inputs generally are not observable. Exelon's RMC approves risk management policies and objectives for risk assessment, control and valuation, counterparty credit approval, and the monitoring and reporting of risk exposures. The RMC is chaired by the chief executive officer and includes the chief risk officer, chief strategy officer, chief executive officer of Exelon Utilities, chief commercial officer, chief financial officer and chief executive officer of Constellation. The RMC reports to the Finance and Risk Committee of the Exelon Board of Directors on the scope of the risk management activities. Forward price curves for the power market utilized by the front office to manage the portfolio, are reviewed and verified by the middle office, and used for financial reporting by the back office. The Registrants consider credit and nonperformance risk in the valuation of derivative contracts categorized in Level 2 and 3, including both historical and current market data in its assessment of credit and nonperformance risk by counterparty. Due to master netting agreements and collateral posting requirements, the impacts of credit and nonperformance risk were not material to the financial statements.

Disclosed below is detail surrounding the Registrants' significant Level 3 valuations. The calculated fair value includes marketability discounts for margining provisions and other attributes. Generation's Level 3 balance generally consists of forward sales and purchases of power and natural gas and certain transmission congestion contracts. Generation utilizes various inputs and factors including market data and assumptions that market participants would use in pricing assets or liabilities as well as assumptions about the risks inherent in the inputs to the valuation technique. The inputs and factors include forward commodity prices, commodity price volatility, contractual volumes, delivery location, interest rates, credit quality of counterparties and credit enhancements.

For commodity derivatives, the primary input to the valuation models is the forward commodity price curve for each instrument. Forward commodity price curves are derived by risk management for liquid locations and by the traders and portfolio managers for illiquid locations. All locations are reviewed and verified by risk management considering published exchange transaction prices, executed bilateral transactions, broker quotes, and other observable or public data sources. The relevant forward commodity curve used to value each of the derivatives depends on a number of factors, including commodity type, delivery location, and delivery period. Price volatility varies by commodity and location. When appropriate, Generation discounts future cash flows using risk free interest rates with adjustments to reflect the credit quality of each counterparty for assets and Generation's own credit quality for liabilities. The level of observability of a forward commodity price varies generally due to the delivery location and delivery period. Certain delivery locations including PJM West Hub (for power) and Henry Hub (for natural gas) are more liquid and prices are observable for up to three years in the future. The observability period of volatility is generally shorter than the underlying power curve used in option valuations. The forward curve for a less liquid location is estimated by using the forward curve from the liquid location and applying a spread to represent the cost to transport the commodity to the delivery location. This spread does not typically represent a majority of the instrument's market price. As a result, the change in fair value is closely tied to liquid market movements and not a change in the applied spread. The change in fair value associated with a change in the spread is generally immaterial. An average spread calculated across all Level 3 power and gas delivery locations is approximately $2.99 and $0.46 for power and natural gas, respectively. Many of the commodity derivatives are short-term in nature and thus a majority of the fair value may be based on observable inputs even though the contract as a whole must be classified as Level 3.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

On December 17, 2010, ComEd entered into several 20-year floating to fixed energy swap contracts with unaffiliated suppliers for the procurement of long-term renewable energy and associated RECs. See Note 10 — Derivative Financial Instruments for more information. The fair value of these swaps has been designated as a Level 3 valuation due to the long tenure of the positions and internal modeling assumptions. The modeling assumptions include using natural gas heat rates to project long term forward power curves adjusted by a renewable factor that incorporates time of day and seasonality factors to reflect accurate renewable energy pricing. In addition, marketability reserves are applied to the positions based on the tenor and supplier risk.

The table below discloses the significant inputs to the forward curve used to value these positions.

| Type of trade | Fair Value at March 31, 2018 | Valuation Technique | Unobservable Input | Range | | |
|---|---|---|---|---|---|---|
| Mark-to-market derivatives — Economic Hedges (Exelon and Generation) [(a)(b)] | $            689 | Discounted Cash Flow | Forward power price | $1 | - | $202 |
| | | | Forward gas price | $1.12 | - | $12.80 |
| | | Option Model | Volatility percentage | 10% | - | 227% |
| Mark-to-market derivatives — Proprietary trading (Exelon and Generation) [(a)(b)] | $             43 | Discounted Cash Flow | Forward power price | $4 | - | $202 |
| Mark-to-market derivatives (Exelon and ComEd) | $           (267) | Discounted Cash Flow | Forward heat rate [(c)] | 9x | - | 10x |
| | | | Marketability reserve | 4% | - | 8% |
| | | | Renewable factor | 87% | - | 122% |

113

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| Type of trade | Fair Value at December 31, 2017 | | Valuation Technique | Unobservable Input | Range | | |
|---|---|---|---|---|---|---|---|
| Mark-to-market derivatives — Economic Hedges (Exelon and Generation) [a][b] | $ | 445 | Discounted Cash Flow | Forward power price | $3 | - | $124 |
| | | | | Forward gas price | $1.27 | - | $12.80 |
| | | | Option Model | Volatility percentage | 11% | - | 139% |
| Mark-to-market derivatives — Proprietary trading (Exelon and Generation) [a][b] | $ | 26 | Discounted Cash Flow | Forward power price | $14 | - | $94 |
| Mark-to-market derivatives (Exelon and ComEd) | $ | (256) | Discounted Cash Flow | Forward heat rate [c] | 9x | - | 10x |
| | | | | Marketability reserve | 4% | - | 8% |
| | | | | Renewable factor | 88% | - | 120% |

_____
(a)  The valuation techniques, unobservable inputs and ranges are the same for the asset and liability positions.
(b)  The fair values do not include cash collateral posted on level three positions of $186 million and $81 million as of March 31, 2018 and December 31, 2017 , respectively.
(c)  Quoted forward natural gas rates are utilized to project the forward power curve for the delivery of energy at specified future dates. The natural gas curve is extrapolated beyond its observable period to the end of the contract's delivery.

The inputs listed above would have a direct impact on the fair values of the above instruments if they were adjusted. The significant unobservable inputs used in the fair value measurement of Generation's commodity derivatives are forward commodity prices and for options is price volatility. Increases (decreases) in the forward commodity price in isolation would result in significantly higher (lower) fair values for long positions (contracts that give Generation the obligation or option to purchase a commodity), with offsetting impacts to short positions (contracts that give Generation the obligation or right to sell a commodity). Increases (decreases) in volatility would increase (decrease) the value for the holder of the option (writer of the option). Generally, a change in the estimate of forward commodity prices is unrelated to a change in the estimate of volatility of prices. An increase to the reserves listed above would decrease the fair value of the positions. An increase to the heat rate or renewable factors would increase the fair value accordingly. Generally, interrelationships exist between market prices of natural gas and power. As such, an increase in natural gas pricing would potentially have a similar impact on forward power markets.

## 10 .  Derivative Financial Instruments (All Registrants)

The Registrants use derivative instruments to manage commodity price risk, interest rate risk and foreign exchange risk related to ongoing business operations.

## Commodity Price Risk (All Registrants)

To the extent the amount of energy Generation produces differs from the amount of energy it has contracted to sell, Exelon and Generation are exposed to market fluctuations in the prices of electricity, fossil fuels and other commodities. Each of the Registrants employ established policies and procedures to manage their risks associated with market fluctuations in commodity prices by entering into physical and financial derivative contracts, including swaps, futures, forwards, options and short-term and long-

114

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

term commitments to purchase and sell energy and commodity products. The Registrants believe these instruments, which are either determined to be non-derivative or classified as economic hedges, mitigate exposure to fluctuations in commodity prices.

Derivative authoritative guidance requires that derivative instruments be recognized as either assets or liabilities at fair value, with changes in fair value of the derivative recognized in earnings immediately. Other accounting treatments are available through special election and designation, provided they meet specific, restrictive criteria both at the time of designation and on an ongoing basis. These alternative permissible accounting treatments include normal purchase normal sale (NPNS), cash flow hedges and fair value hedges. For Generation, all derivative economic hedges related to commodities are recorded at fair value through earnings for the consolidated company, referred to as economic hedges in the following tables. Additionally, Generation is exposed to certain market risks through its proprietary trading activities. The proprietary trading activities are a complement to Generation's energy marketing portfolio but represent a small portion of Generation's overall energy marketing activities.

Fair value authoritative guidance and disclosures about offsetting assets and liabilities requires the fair value of derivative instruments to be shown in the Combined Notes to Consolidated Financial Statements on a gross basis, even when the derivative instruments are subject to legally enforceable master netting agreements and qualify for net presentation in the Consolidated Balance Sheet. A master netting agreement is an agreement between two counterparties that may have derivative and non-derivative contracts with each other providing for the net settlement of all referencing contracts via one payment stream, which takes place as the contracts deliver, when collateral is requested or in the event of default. Generation's use of cash collateral is generally unrestricted, unless Generation is downgraded below investment grade (i.e., to BB+ or Ba1). In the table below, Generation's energy-related economic hedges and proprietary trading derivatives are shown gross. The impact of the netting of fair value balances with the same counterparty that are subject to legally enforceable master netting agreements, as well as netting of cash collateral, including margin on exchange positions, is aggregated in the collateral and netting column. As of March 31, 2018 and December 31, 2017 , $8 million and $4 million of cash collateral held, respectively, was not offset against derivative positions because such collateral was not associated with any energy-related derivatives, were associated with accrual positions, or had no positions to offset as of the balance sheet date. Excluded from the tables below are economic hedges that qualify for the NPNS scope exception and other non-derivative contracts that are accounted for under the accrual method of accounting.

ComEd's use of cash collateral is generally unrestricted unless ComEd is downgraded below investment grade (i.e., to BB+ or Ba1).

Cash collateral held by PECO and BGE must be deposited in an unaffiliated major U.S. commercial bank or foreign bank with a U.S. branch office that meet certain qualifications.

In the table below, DPL's economic hedges are shown gross. The impact of the netting of fair value balances with the same counterparty that are subject to legally enforceable master netting agreements, as well as netting of cash collateral, including margin on exchange positions, is aggregated in the collateral and netting column.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following table provides a summary of the derivative fair value balances recorded by the Registrants as of March 31, 2018 :

| Derivatives | Generation | | | | ComEd | DPL | | | Exelon |
|---|---|---|---|---|---|---|---|---|---|
| | Economic Hedges | Proprietary Trading | Collateral and Netting [a][e] | Subtotal [b] | Economic Hedges [c] | Economic Hedges [d] | Collateral and Netting [a] | Subtotal | Total Derivatives |
| Mark-to-market derivative assets (current assets) | $ 3,343 | $ 166 | $ (2,533) | $ 976 | $ — | $ — | $ — | $ — | $ 976 |
| Mark-to-market derivative assets (noncurrent assets) | 1,758 | 43 | (1,286) | 515 | — | — | — | — | 515 |
| Total mark-to-market derivative assets | 5,101 | 209 | (3,819) | 1,491 | — | — | — | — | 1,491 |
| Mark-to-market derivative liabilities (current liabilities) | (3,185) | (151) | 2,945 | (391) | (24) | — | — | — | (415) |
| Mark-to-market derivative liabilities (noncurrent liabilities) | (1,750) | (28) | 1,558 | (220) | (243) | — | — | — | (463) |
| Total mark-to-market derivative liabilities | (4,935) | (179) | 4,503 | (611) | (267) | — | — | — | (878) |
| Total mark-to-market derivative net assets (liabilities) | $ 166 | $ 30 | $ 684 | $ 880 | $ (267) | $ — | $ — | $ — | $ 613 |

(a)  Exelon, Generation and DPL net all available amounts allowed under the derivative authoritative guidance on the balance sheet. These amounts include unrealized derivative transactions with the same counterparty under legally enforceable master netting agreements and cash collateral. In some cases Exelon and Generation may have other offsetting exposures, subject to a master netting or similar agreement, such as trade receivables and payables, transactions that do not qualify as derivatives, letters of credit and other forms of non-cash collateral. These are not reflected in the table above.

(b)  Current and noncurrent assets are shown net of collateral of $192 million and $103 million , respectively, and current and noncurrent liabilities are shown net of collateral of $220 million and $169 million , respectively. The total cash collateral posted, net of cash collateral received and offset against mark-to-market assets and liabilities was $684 million at March 31, 2018 .

(c)  Includes current and noncurrent liabilities relating to floating-to-fixed energy swap contracts with unaffiliated suppliers.

(d)  Represents natural gas futures purchased by DPL as part of a natural gas hedging program approved by the DPSC.

(e)  Of the collateral posted/(received), $156 million represents variation margin on the exchanges.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following table provides a summary of the derivative fair value balances recorded by the Registrants as of December 31, 2017 :

| Description | Generation | | | | ComEd | DPL | | | Exelon |
|---|---|---|---|---|---|---|---|---|---|
| | Economic Hedges | Proprietary Trading | Collateral and Netting (a)(e) | Subtotal (b) | Economic Hedges (c) | Economic Hedges (d) | Collateral and Netting (a) | Subtotal | Total Derivatives |
| Mark-to-market derivative assets (current assets) | $ 3,061 | $ 56 | $ (2,144) | $ 973 | $ — | $ — | $ — | $ — | $ 973 |
| Mark-to-market derivative assets (noncurrent assets) | 1,164 | 12 | (845) | 331 | — | — | — | — | 331 |
| Total mark-to-market derivative assets | 4,225 | 68 | (2,989) | 1,304 | — | — | — | — | 1,304 |
| Mark-to-market derivative liabilities (current liabilities) | (2,646) | (43) | 2,480 | (209) | (21) | (1) | 1 | — | (230) |
| Mark-to-market derivative liabilities (noncurrent liabilities) | (1,137) | (10) | 975 | (172) | (235) | | | | (407) |
| Total mark-to-market derivative liabilities | (3,783) | (53) | 3,455 | (381) | (256) | (1) | 1 | — | (637) |
| Total mark-to-market derivative net assets (liabilities) | $ 442 | $ 15 | $ 466 | $ 923 | $ (256) | $ (1) | $ 1 | $ — | $ 667 |

(a)   Exelon, Generation and DPL net all available amounts allowed under the derivative authoritative guidance on the balance sheet. These amounts include unrealized derivative transactions with the same counterparty under legally enforceable master netting agreements and cash collateral. In some cases Exelon and Generation may have other offsetting exposures, subject to a master netting or similar agreement, such as trade receivables and payables, transactions that do not qualify as derivatives, and letters of credit and other forms of non-cash collateral. These are not reflected in the table above.

(b)   Current and noncurrent assets are shown net of collateral of $169 million and $53 million , respectively, and current and noncurrent liabilities are shown net of collateral of $167 million and $77 million , respectively. The total cash collateral posted, net of cash collateral received and offset against mark-to-market assets and liabilities was $466 million at December 31, 2017 .

(c)   Includes current and noncurrent liabilities relating to floating-to-fixed energy swap contracts with unaffiliated suppliers.

(d)   Represents natural gas futures purchased by DPL as part of a natural gas hedging program approved by the DPSC.

(e)   Of the collateral posted/(received), $(117) million represents variation margin on the exchanges.

117

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Economic Hedges (Commodity Price Risk)*

Within Exelon, Generation has the most exposure to commodity price risk. As such, Generation uses a variety of derivative and non-derivative instruments to manage the commodity price risk of its electric generation facilities, including power and gas sales, fuel and power purchases, natural gas transportation and pipeline capacity agreements and other energy-related products marketed and purchased. To manage these risks, Generation may enter into fixed-price derivative or non-derivative contracts to hedge the variability in future cash flows from expected sales of power and gas and purchases of power and fuel. The objectives for executing such hedges include fixing the price for a portion of anticipated future electricity sales at a level that provides an acceptable return. Generation is also exposed to differences between the locational settlement prices of certain economic hedges and the hedged generating units. This price difference is actively managed through other instruments which include derivative congestion products, whose changes in fair value are recognized in earnings each period, and auction revenue rights, which are accounted for on an accrual basis. For the three months ended March 31, 2018 and 2017 , Exelon and Generation recognized the following net pre-tax commodity mark-to-market gains (losses) which are also located in the "Net fair value changes related to derivatives" on the Consolidated Statements of Cash Flows.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Income Statement Location | Gain (Loss) | |
| Operating revenues | $ (100) | $ 46 |
| Purchased power and fuel | (167) | (93) |
| Total Exelon and Generation | $ (267) | $ (47) |

In general, increases and decreases in forward market prices have a positive and negative impact, respectively, on Generation's owned and contracted generation positions that have not been hedged. Generation hedges commodity price risk on a ratable basis over three-year periods. As of March 31, 2018 , the percentage of expected generation hedged is 91% - 94% , 63% - 66% and 33% - 36% for 2018 , 2019 and 2020 , respectively.

On December 17, 2010, ComEd executed several 20-year floating-to-fixed energy swap contracts with unaffiliated suppliers for the procurement of long-term renewable energy and associated RECs. Delivery under the contracts began in June 2012. These contracts are designed to lock in a portion of the long-term commodity price risk resulting from the renewable energy resource procurement requirements in the Illinois Settlement Legislation. ComEd has not elected hedge accounting for these derivative financial instruments. ComEd records the fair value of the swap contracts on its balance sheet. Because ComEd receives full cost recovery for energy procurement and related costs from retail customers, the change in fair value each period is recorded by ComEd as a regulatory asset or liability. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information.

PECO's natural gas procurement policy is designed to achieve a reasonable balance of long-term and short-term gas purchases under different pricing approaches to achieve system supply reliability at the least cost. PECO's reliability strategy is two-fold. First, PECO must assure that there is sufficient transportation capacity to satisfy delivery requirements. Second, PECO must ensure that a firm source of supply exists to utilize the capacity resources. All of PECO's natural gas supply and asset management agreements that are derivatives either qualify for the NPNS scope exception and have been designated as such, or have no mark-to-market balances because the derivatives are index priced. Additionally, in accordance with the 2016 PAPUC PGC settlement and to reduce the exposure of PECO and its customers to natural gas price volatility, PECO has continued its program to purchase natural gas for both winter and summer supplies using a layered approach of locking-in prices ahead of each season with long-

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

term gas purchase agreements (those with primary terms of at least twelve months). Under the terms of the 2016 PGC settlement, PECO is required to lock in (i.e., economically hedge) the price of a minimum volume of its long-term gas commodity purchases. PECO's gas-hedging program is designed to cover about 20% of planned natural gas purchases in support of projected firm sales. The hedging program for natural gas procurement has no direct impact on PECO's results of operations and financial position as natural gas costs are fully recovered from customers under the PGC.

BGE has contracts to procure SOS electric supply that are executed through a competitive procurement process approved by the MDPSC. The SOS rates charged recover BGE's wholesale power supply costs and include an administrative fee. BGE's commodity price risk related to electric supply procurement is limited. BGE locks in fixed prices for all of its SOS requirements through full requirements contracts. Certain of BGE's full requirements contracts, which are considered derivatives, qualify for the NPNS scope exception under current derivative authoritative guidance. Other BGE full requirements contracts are not derivatives.

BGE provides natural gas to its customers under a MBR mechanism approved by the MDPSC. Under this mechanism, BGE's actual cost of gas is compared to a market index (a measure of the market price of gas in a given period). The difference between BGE's actual cost and the market index is shared equally between shareholders and customers. BGE must also secure fixed price contracts for at least 10% , but not more than 20% , of forecasted system supply requirements for flowing (i.e., non-storage) gas for the November through March period. These fixed-price contracts are not subject to sharing under the MBR mechanism. BGE also ensures it has sufficient pipeline transportation capacity to meet customer requirements. BGE's natural gas supply and asset management agreements qualify for the NPNS scope exception and result in physical delivery.

Pepco has contracts to procure SOS electric supply that are executed through a competitive procurement process approved by the MDPSC and DCPSC. The SOS rates charged recover Pepco's wholesale power supply costs and include an administrative fee. The administrative fee includes an incremental cost component and a shareholder return component for residential and commercial rate classes. Pepco's commodity price risk related to electric supply procurement is limited. Pepco locks in fixed prices for its SOS requirements through full requirements contracts. Certain of Pepco's full requirements contracts, which are considered derivatives, qualify for the NPNS scope exception under current derivative authoritative guidance. Other Pepco full requirements contracts are not derivatives.

DPL has contracts to procure SOS electric supply that are executed through a competitive procurement process approved by the MDPSC and the DPSC. The SOS rates charged recover DPL's wholesale power supply costs. In Delaware, DPL is also entitled to recover a Reasonable Allowance for Retail Margin (RARM). The RARM includes a fixed annual margin of approximately $2.75 million , plus an incremental cost component and a cash working capital allowance. In Maryland, DPL charges an administrative fee intended to allow it to recover its administrative costs. DPL locks in fixed prices for its SOS requirements through full requirements contracts. DPL's commodity price risk related to electric supply procurement is limited. Certain of DPL's full requirements contracts, which are considered derivatives, qualify for the NPNS scope exception under current derivative authoritative guidance. Other DPL full requirements contracts are not derivatives.

DPL provides natural gas to its customers under an Annual GCR mechanism approved by the DPSC. Under this mechanism, DPL's Annual GCR Filing establishes a future GCR for firm bundled sales customers by using a forecast of demand and commodity costs. The actual costs are trued up against forecasts on a monthly basis and any shortfall or excess is carried forward as a recovery balance in the next GCR filing. The demand portion of the GCR is based upon DPL's firm transportation and storage contracts. DPL has firm deliverability of swing and seasonal storage; a liquefied natural gas facility and firm transportation capacity to meet customer demand and provide a reserve margin. The commodity portion of the GCR includes a commission approved hedging program which is intended to reduce gas

119

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St. Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

commodity price volatility while limiting the firm natural gas customers' exposure to adverse changes in the market price of natural gas. The hedge program requires that DPL hedge, on a non-discretionary basis, an amount equal to 50% of estimated purchase requirements for each month, including estimated monthly purchases for storage injections. The 50% hedge monthly target is achieved by hedging 1/12th of the 50% target each month beginning 12-months prior to the month in which the physical gas is to be purchased. Currently, DPL uses only exchange traded futures for its gas hedging program, which are considered derivatives, however, it retains the capability to employ other physical and financial hedges if needed. DPL has not elected hedge accounting for these derivative financial instruments. Because of the DPSC-approved fuel adjustment clause for DPL's derivatives, the change in fair value of the derivatives each period, in addition to all premiums paid and other transaction costs incurred as part of the gas hedging program, are fully recoverable and are recorded by DPL as regulatory assets or liabilities. DPL's physical gas purchases are currently all daily, monthly or intra-month transactions. From time to time, DPL will enter into seasonal purchase or sale arrangements, however, there are none currently in the portfolio. Certain of DPL's full requirements contracts, which are considered derivatives, qualify for the NPNS scope exception under current derivative authoritative guidance. Other DPL full requirements contracts are not derivatives.

ACE has contracts to procure BGS electric supply that are executed through a competitive procurement process approved by the NJBPU. The BGS rates charged recover ACE's wholesale power supply costs. ACE does not make any profit or incur any loss on the supply component of the BGS it supplies to customers. ACE's commodity price risk related to electric supply procurement is limited. ACE locks in fixed prices for all of its BGS requirements through full requirements contracts. Certain of ACE's full requirements contracts, which are considered derivatives, qualify for the NPNS scope exception under current derivative authoritative guidance. Other ACE full requirements contracts are not derivatives.

*Proprietary Trading (Commodity Price Risk)*

Generation also executes commodity derivatives for proprietary trading purposes. Proprietary trading includes all contracts executed with the intent of benefiting from shifts or changes in market prices as opposed to those executed with the intent of hedging or managing risk. Proprietary trading activities are subject to limits established by Exelon's RMC. The proprietary trading portfolio is subject to a risk management policy that includes stringent risk management limits to manage exposure to market risk. Additionally, the Exelon risk management group and Exelon's RMC monitor the financial risks of the proprietary trading activities. The proprietary trading activities are a complement to Generation's energy marketing portfolio, but represent a small portion of Generation's overall revenue from energy marketing activities. Gains and losses associated with proprietary trading are reported as Operating revenues in Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income. For the three months ended March 31, 2018 and 2017 Exelon and Generation recognized the following net pre-tax commodity mark-to-market gains (losses) which are also included in the "Net fair value changes related to derivatives" on the Consolidated Statements of Cash Flows. The Utility Registrants do not execute derivatives for proprietary trading purposes.

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | 2018 | | 2017 |
| Income Statement Location | Gain (Loss) | | |
| Operating revenues | $ | 2 | $ (1) |

**Interest Rate and Foreign Exchange Risk (All Registrants)**

The Registrants use a combination of fixed-rate and variable-rate debt to manage interest rate exposure. The Registrants utilize fixed-to-floating interest rate swaps, which are typically designated as fair value hedges, to manage their interest rate exposure. In addition, the Registrants may utilize interest

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

rate derivatives to lock in rate levels, which are typically designated as cash flow hedges to manage interest rate risk. To manage foreign exchange rate exposure associated with international commodity purchases in currencies other than U.S. dollars, Generation utilizes foreign currency derivatives, which are treated as economic hedges. Below is a summary of the interest rate and foreign exchange hedge balances as of March 31, 2018 :

| | Generation | | | | Exelon Corporate | Exelon |
| | Derivatives Designated as Hedging Instruments | Economic Hedges | Collateral and Netting [a] | Subtotal | Derivatives Designated as Hedging Instruments | Total |
| Description | | | | | | |
|---|---|---|---|---|---|---|
| Mark-to-market derivative assets (current assets) | $    — | $    5 | $    (3) | $    2 | $    — | $    2 |
| Mark-to-market derivative assets (noncurrent assets) | 12 | 1 | (1) | 12 | — | 12 |
| Total mark-to-market derivative assets | 12 | 6 | (4) | 14 | — | 14 |
| Mark-to-market derivative liabilities (current liabilities) | — | (3) | 3 | — | — | — |
| Mark-to-market derivative liabilities (noncurrent liabilities) | — | (2) | 1 | (1) | (4) | (5) |
| Total mark-to-market derivative liabilities | — | (5) | 4 | (1) | (4) | (5) |
| Total mark-to-market derivative net assets (liabilities) | $    12 | $    1 | $    — | $    13 | $    (4) | $    9 |

_____

(a)  Exelon and Generation net all available amounts allowed under the derivative authoritative guidance on the balance sheet. These amounts include unrealized derivative transactions with the same counterparty under legally enforceable master netting agreements and cash collateral. In some cases, Exelon and Generation may have other offsetting counterparty exposures subject to a master netting or similar agreement, such as accrued interest, transactions that do not qualify as derivatives, letters of credit and other forms of non-cash collateral, which are not reflected in the table above.

121

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following table provides a summary of the interest rate and foreign exchange hedge balances recorded by the Registrants as of December 31, 2017 :

| Description | Generation | | | | Exelon Corporate | Exelon |
| --- | --- | --- | --- | --- | --- | --- |
| | Derivatives Designated as Hedging Instruments | Economic Hedges | Collateral and Netting (a) | Subtotal | Derivatives Designated as Hedging Instruments | Total |
| Mark-to-market derivative assets (current assets) | $ — | $ 10 | $ (7) | $ 3 | $ — | $ 3 |
| Mark-to-market derivative assets (noncurrent assets) | 3 | — | — | 3 | 3 | 6 |
| Total mark-to-market derivative assets | 3 | 10 | (7) | 6 | 3 | 9 |
| Mark-to-market derivative liabilities (current liabilities) | (2) | (7) | 7 | (2) | — | (2) |
| Mark-to-market derivative liabilities (noncurrent liabilities) | — | (2) | — | (2) | — | (2) |
| Total mark-to-market derivative liabilities | (2) | (9) | 7 | (4) | — | (4) |
| Total mark-to-market derivative net assets (liabilities) | $ 1 | $ 1 | $ — | $ 2 | $ 3 | $ 5 |

_____
(a)   Exelon and Generation net all available amounts allowed under the derivative authoritative guidance on the balance sheet. These amounts include unrealized derivative transactions with the same counterparty under legally enforceable master netting agreements and cash collateral. In some cases, Exelon and Generation may have other offsetting counterparty exposures subject to a master netting or similar agreement, such as accrued interest, transactions that do not qualify as derivatives, letters of credit and other forms of non-cash collateral, which are not reflected in the table above.

*Fair Value Hedges (Interest Rate Risk)*

For derivative instruments that qualify and are designated as fair value hedges, the gain or loss on the derivative as well as the offsetting loss or gain on the hedged item attributable to the hedged risk are recognized in earnings immediately. Exelon and Generation include the gain or loss on the hedged items and the offsetting loss or gain on the related interest rate swaps as follows:

| | Income Statement Location | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2018 | 2017 | 2018 | 2017 |
| | | Loss on Swaps | | Gain on Borrowings | |
| Exelon | Interest expense | $ (7) | $ (4) | $ 13 | $ 8 |

The table below provides the notional amounts of fixed-to-floating hedges outstanding held by Exelon at March 31, 2018 and December 31, 2017 :

| | As of | |
| --- | --- | --- |
| | March 31, 2018 | December 31, 2017 |
| Fixed-to-floating hedges | $ 800 | $ 800 |

During the three months ended March 31, 2018 and 2017 , the impact on the results of operations as a result of ineffectiveness from fair value hedges was a $6 million gain and a $4 million gain, respectively.

122

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

### Cash Flow Hedges (Interest Rate Risk)

For derivative instruments that qualify and are designated as cash flow hedges, the gain or loss on the effective portion of the derivative will be deferred in AOCI and reclassified into earnings when the underlying transaction occurs. To mitigate interest rate risk, Exelon and Generation enter into floating-to-fixed interest rate swaps to manage a portion of interest rate exposure associated with debt issuances. The table below provides the notional amounts of floating-to-fixed hedges outstanding held by Exelon and Generation as of March 31, 2018 .

|  | As of | |
|---|---|---|
|  | **March 31, 2018** | **December 31, 2017** |
| Floating-to-fixed hedges | $          636 | $          636 |

The tables below provide the activity of OCI related to cash flow hedges for the three months ended March 31, 2018 and 2017 , containing information about the changes in the fair value of cash flow hedges and the reclassification from AOCI into results of operations. The amounts reclassified from OCI, when combined with the impacts of the hedged transactions, result in the ultimate recognition of net revenues or expenses at the contractual price.

|  |  | Total Cash Flow Hedge OCI Activity, Net of Income Tax | |
|---|---|---|---|
|  |  | **Generation** | **Exelon** |
| **Three Months Ended March 31, 2018** | **Income Statement Location** | **Total Cash Flow Hedges** | **Total Cash Flow Hedges** |
| AOCI derivative loss at December 31, 2017 |  | $          (16) | $          (14) |
| Effective portion of changes in fair value |  | 7 | 8 |
| AOCI derivative loss at March 31, 2018 |  | $          (9) | $          (6) |

|  |  | Total Cash Flow Hedge OCI Activity, Net of Income Tax | |
|---|---|---|---|
|  |  | **Generation** | **Exelon** |
| **Three Months Ended March 31, 2017** | **Income Statement Location** | **Total Cash Flow Hedges** | **Total Cash Flow Hedges** |
| AOCI derivative loss at December 31, 2016 |  | $          (19) | $          (17) |
| Effective portion of changes in fair value |  | 2 | 2 |
| Reclassifications from AOCI to net income | Interest Expense | 4 [a] | 4 [a] |
| AOCI derivative loss at March 31, 2017 |  | $          (13) | $          (11) |

(a)   Amount is net of related income tax expense of $3 million for the three months ended March 31, 2017 .

During the three months ended March 31, 2018 and 2017 , the impact on the results of operations as a result of ineffectiveness from cash flow hedges in continuing designated hedge relationships was immaterial. The estimated amount of existing gains and losses that are reported in AOCI at the reporting date that are expected to be reclassified into earnings within the next twelve months is immaterial.

### Economic Hedges (Interest Rate and Foreign Exchange Risk)

Exelon and Generation executes these instruments to mitigate exposure to fluctuations in interest rates or foreign exchange but for which the fair value or cash flow hedge elections were not made. Generation also enters into interest rate derivative contracts and foreign exchange currency swaps

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

("treasury") to manage the exposure related to the interest rate component of commodity positions and international purchases of commodities in currencies other than U.S. Dollars.

At March 31, 2018 and December 31, 2017 , Generation had immaterial notional amounts of interest rate derivative contracts to economically hedge risk associated with the interest rate component of commodity positions. The following table provides notional amounts outstanding held by Exelon and Generation at March 31, 2018 and December 31, 2017 related to foreign currency exchange rate swaps that are marked-to-market to manage the exposure associated with international purchases of commodities in currencies other than U.S. dollars.

| | As of | |
|---|---|---|
| | March 31, 2018 | December 31, 2017 |
| Foreign currency exchange rate swaps | $ 87 | $ 94 |

For the three months ended March 31, 2018 and 2017 , Exelon and Generation recognized the following net pre-tax mark-to-market gains (losses) in the Consolidated Statements of Operations and Comprehensive Income and are included in "Net fair value changes related to derivatives" in Exelon's and Generation's Consolidated Statements of Cash Flows.

| | | Three Months Ended March 31, | |
|---|---|---|---|
| | Income Statement Location | 2018 | 2017 |
| | | Gain (Loss) | |
| Generation | Operating Revenues | $ 2 | $ (2) |
| Generation | Purchased Power and Fuel | (1) | — |
| Total Generation | | $ 1 | $ (2) |

| | | Three Months Ended March 31, | |
|---|---|---|---|
| | Income Statement Location | 2018 | 2017 |
| | | Gain (Loss) | |
| Exelon | Operating Revenues | $ 2 | $ (2) |
| Exelon | Purchased Power and Fuel | (1) | — |
| Total Exelon | | $ 1 | $ (2) |

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

*Proprietary Trading (Interest Rate and Foreign Exchange Risk)*

    Generation also executes derivative contracts for proprietary trading purposes to hedge risk associated with the interest rate and foreign exchange components of underlying commodity positions. Gains and losses associated with proprietary trading are reported as Operating revenues in Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income and are included in "Net fair value changes related to derivatives" in Exelon's and Generation's Consolidated Statements of Cash Flows. For the three months ended March 31, 2018 and 2017 Exelon and Generation recognized the following net pre-tax commodity mark-to-market gains (losses).

| | Three Months Ended March 31, | |
| | 2018 | 2017 |
| Income Statement Location | Gain (Loss) | |
|---|---|---|
| Operating Revenues | $           — | $           (1) |

**Credit Risk, Collateral and Contingent-Related Features (All Registrants)**

    The Registrants would be exposed to credit-related losses in the event of non-performance by counterparties on executed derivative instruments. The credit exposure of derivative contracts, before collateral, is represented by the fair value of contracts at the reporting date. For commodity derivatives, Generation enters into enabling agreements that allow for payment netting with its counterparties, which reduces Generation's exposure to counterparty risk by providing for the offset of amounts payable to the counterparty against amounts receivable from the counterparty. Typically, each enabling agreement is for a specific commodity and so, with respect to each individual counterparty, netting is limited to transactions involving that specific commodity product, except where master netting agreements exist with a counterparty that allow for cross product netting. In addition to payment netting language in the enabling agreement, Generation's credit department establishes credit limits, margining thresholds and collateral requirements for each counterparty, which are defined in the derivative contracts. Counterparty credit limits are based on an internal credit review process that considers a variety of factors, including the results of a scoring model, leverage, liquidity, profitability, credit ratings by credit rating agencies, and risk management capabilities. To the extent that a counterparty's margining thresholds are exceeded, the counterparty is required to post collateral with Generation as specified in each enabling agreement. Generation's credit department monitors current and forward credit exposure to counterparties and their affiliates, both on an individual and an aggregate basis.

125

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The following tables provide information on Generation's credit exposure for all derivative instruments, NPNS and applicable payables and receivables, net of collateral and instruments that are subject to master netting agreements, as of March 31, 2018 . The tables further delineate that exposure by credit rating of the counterparties and provide guidance on the concentration of credit risk to individual counterparties. The figures in the tables below exclude credit risk exposure from individual retail counterparties, nuclear fuel procurement contracts and exposure through RTOs, ISOs, NYMEX, ICE, NASDAQ, NGX and Nodal commodity exchanges. Additionally, the figures in the tables below exclude exposures with affiliates, including net receivables with ComEd, PECO, BGE, Pepco, DPL and ACE of $31 million , $21 million , $25 million , $34 million , $9 million , and $5 million as of March 31, 2018 , respectively.

| Rating as of March 31, 2018 | Total Exposure Before Credit Collateral | | Credit Collateral (a) | | Net Exposure | | Number of Counterparties Greater than 10% of Net Exposure | Net Exposure of Counterparties Greater than 10% of Net Exposure | |
|---|---|---|---|---|---|---|---|---|---|
| Investment grade | $ | 986 | $ | 1 | $ | 985 | 2 | $ | 412 |
| Non-investment grade | | 112 | | 46 | | 66 | | | |
| No external ratings | | | | | | | | | |
| Internally rated — investment grade | | 223 | | — | | 223 | | | |
| Internally rated — non-investment grade | | 100 | | 17 | | 83 | | | |
| Total | $ | 1,421 | $ | 64 | $ | 1,357 | 2 | $ | 412 |

| Net Credit Exposure by Type of Counterparty | | As of March 31, 2018 |
|---|---|---|
| Financial institutions | $ | 189 |
| Investor-owned utilities, marketers, power producers | | 656 |
| Energy cooperatives and municipalities | | 438 |
| Other | | 74 |
| Total | $ | 1,357 |

(a)   As of March 31, 2018 , credit collateral held from counterparties where Generation had credit exposure included $41 million of cash and $23 million of letters of credit. The credit collateral does not include non-liquid collateral.

ComEd's power procurement contracts provide suppliers with a certain amount of unsecured credit. The credit position is based on daily, updated forward market prices compared to the benchmark prices. The benchmark prices are the forward prices of energy projected through the contract term and are set at the point of supplier bid submittals. If the forward market price of energy exceeds the benchmark price on a given day, the suppliers are required to post collateral for the secured credit portion after adjusting for any unpaid deliveries and unsecured credit allowed under the contract. The unsecured credit used by the suppliers represents ComEd's net credit exposure. As of March 31, 2018 , ComEd's net credit exposure to suppliers was less than $1 million .

ComEd is permitted to recover its costs of procuring energy through the Illinois Settlement Legislation. ComEd's counterparty credit risk is mitigated by its ability to recover realized energy costs through customer rates. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information.

PECO's unsecured credit used by the suppliers represents PECO's net credit exposure. As of March 31, 2018 , PECO had no material net credit exposure to suppliers.

126

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

PECO's natural gas procurement plan is reviewed and approved annually on a prospective basis by the PAPUC. PECO's counterparty credit risk under its natural gas supply and asset management agreements is mitigated by its ability to recover its natural gas costs through the PGC, which allows PECO to adjust rates quarterly to reflect realized natural gas prices. PECO does not obtain collateral from suppliers under its natural gas supply and asset management agreements. As of March 31, 2018 , PECO had no material credit exposure under its natural gas supply and asset management agreements with investment grade suppliers.

BGE is permitted to recover its costs of procuring energy through the MDPSC-approved procurement tariffs. BGE's counterparty credit risk is mitigated by its ability to recover realized energy costs through customer rates. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information.

BGE's full requirement wholesale electric power agreements that govern the terms of its electric supply procurement contracts, which define a supplier's performance assurance requirements, allow a supplier, or its guarantor, to meet its credit requirements with a certain amount of unsecured credit. As of March 31, 2018 , BGE's net credit exposure to suppliers was immaterial.

BGE's regulated gas business is exposed to market-price risk. At March 31, 2018 , BGE had credit exposure of approximately $12 million related to off-system sales which is mitigated by parental guarantees, letters of credit or right to offset clauses within other contracts with those third-party suppliers.

Pepco's, DPL's and ACE's power procurement contracts provide suppliers with a certain amount of unsecured credit. The amount of unsecured credit is determined based on the supplier's lowest credit rating from the major credit rating agencies and the supplier's tangible net worth. The credit position is based on the initial market price, which is the forward price of energy on the day a transaction is executed, compared to the current forward price curve for energy. To the extent that the forward price curve for energy exceeds the initial market price, the supplier is required to post collateral to the extent the credit exposure is greater than the supplier's unsecured credit limit. The unsecured credit used by the suppliers represents Pepco's, DPL's and ACE's net credit exposure. As of March 31, 2018 , Pepco's, DPL's and ACE's net credit exposures to suppliers were immaterial.

Pepco is permitted to recover its costs of procuring energy through the MDPSC-approved and DCPSC-approved procurement tariffs. DPL is permitted to recover its costs of procuring energy through the MDPSC-approved and DPSC-approved procurement tariffs. ACE is permitted to recover its costs of procuring energy through the NJBPU-approved procurement tariffs. Pepco's, DPL's and ACE's counterparty credit risks are mitigated by their ability to recover realized energy costs through customer rates. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information.

DPL's natural gas procurement plan is reviewed and approved annually on a prospective basis by the DPSC. DPL's counterparty credit risk under its natural gas supply and asset management agreements is mitigated by its ability to recover its natural gas costs through the GCR, which allows DPL to adjust rates annually to reflect realized natural gas prices. To the extent that the fair value of the transactions in a net loss position exceeds the unsecured credit threshold, then collateral is required to be posted in an amount equal to the amount by which the unsecured credit threshold is exceeded. Exchange-traded contracts are required to be fully collateralized without regard to the credit rating of the holder. As of March 31, 2018 , DPL had no credit exposure under its natural gas supply and asset management agreements with investment grade suppliers.

***Collateral (All Registrants)***

As part of the normal course of business, Generation routinely enters into physically or financially settled contracts for the purchase and sale of electric capacity, electricity, fuels, emissions allowances and other energy-related products. Certain of Generation's derivative instruments contain provisions

Electronically Filed - St. Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

that require Generation to post collateral. Generation also enters into commodity transactions on exchanges where the exchanges act as the counterparty to each trade. Transactions on the exchanges must adhere to comprehensive collateral and margining requirements. This collateral may be posted in the form of cash or credit support with thresholds contingent upon Generation's credit rating from each of the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty. These credit-risk related contingent features stipulate that if Generation were to be downgraded or lose its investment grade credit rating (based on its senior unsecured debt rating), it would be required to provide additional collateral. This incremental collateral requirement allows for the offsetting of derivative instruments that are assets with the same counterparty, where the contractual right of offset exists under applicable master netting agreements. In the absence of expressly agreed-to provisions that specify the collateral that must be provided, collateral requested will be a function of the facts and circumstances of the situation at the time of the demand. In this case, Generation believes an amount of several months of future payments (i.e., capacity payments) rather than a calculation of fair value is the best estimate for the contingent collateral obligation, which has been factored into the disclosure below.

The aggregate fair value of all derivative instruments with credit-risk related contingent features in a liability position that are not fully collateralized (excluding transactions on the exchanges that are fully collateralized) is detailed in the table below:

| Credit-Risk Related Contingent Feature | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Gross fair value of derivative contracts containing this feature [a] | $ (2,141) | $ (926) |
| Offsetting fair value of in-the-money contracts under master netting arrangements [b] | 1,562 | 577 |
| Net fair value of derivative contracts containing this feature [c] | $ (579) | $ (349) |

[a]   Amount represents the gross fair value of out-of-the-money derivative contracts containing credit-risk related contingent features ignoring the effects of master netting agreements.
[b]   Amount represents the offsetting fair value of in-the-money derivative contracts under legally enforceable master netting agreements with the same counterparty, which reduces the amount of any liability for which a Registrant could potentially be required to post collateral.
[c]   Amount represents the net fair value of out-of-the-money derivative contracts containing credit-risk related contingent features after considering the mitigating effects of offsetting positions under master netting arrangements and reflects the actual net liability upon which any potential contingent collateral obligations would be based.

Generation had cash collateral posted of $742 million and letters of credit posted of $493 million and cash collateral held of $66 million and letters of credit held of $46 million as of March 31, 2018 for external counterparties with derivative positions. Generation had cash collateral posted of $497 million and letters of credit posted of $293 million and cash collateral held of $35 million and letters of credit held of $33 million at December 31, 2017 for external counterparties with derivative positions. In the event of a credit downgrade below investment grade (i.e., to BB+ by S&P or Ba1 by Moody's), Generation would have been required to post additional collateral of $1.9 billion and $1.8 billion as of March 31, 2018 and December 31, 2017 , respectively. These amounts represent the potential additional collateral required after giving consideration to offsetting derivative and non-derivative positions under master netting agreements.

Generation's and Exelon's interest rate swaps contain provisions that, in the event of a merger, if Generation's debt ratings were to materially weaken, it would be in violation of these provisions, resulting in the ability of the counterparty to terminate the agreement prior to maturity. Collateralization would not be required under any circumstance. Termination of the agreement could result in a settlement payment by Exelon or the counterparty on any interest rate swap in a net liability position. The settlement amount would be equal to the fair value of the swap on the termination date. As of March 31, 2018 , Generation's and Exelon's swaps were in an asset position of $13 million and $9 million , respectively.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

See Note 25 — Segment Information of the Exelon 2017 Form 10-K for further information regarding the letters of credit supporting the cash collateral.

Generation entered into supply forward contracts with certain utilities, including PECO and BGE, with one-sided collateral postings only from Generation. If market prices fall below the benchmark price levels in these contracts, the utilities are not required to post collateral. However, when market prices rise above the benchmark price levels, counterparty suppliers, including Generation, are required to post collateral once certain unsecured credit limits are exceeded. Under the terms of ComEd's standard block energy contracts, collateral postings are one-sided from suppliers, including Generation, should exposures between market prices and benchmark prices exceed established unsecured credit limits outlined in the contracts. As of March 31, 2018 , ComEd held approximately $9 million in collateral from suppliers in association with energy procurement contracts. Under the terms of ComEd's REC and ZEC contracts, collateral postings are required to cover a percentage of the REC and ZEC contract value. As of March 31, 2018 , ComEd held approximately $14 million in collateral from suppliers for REC and ZEC contract obligations. Under the terms of ComEd's long-term renewable energy contracts, collateral postings are required from suppliers for both RECs and energy. The REC portion is a fixed value and the energy portion is one-sided from suppliers should the forward market prices exceed contract prices. As of March 31, 2018 , ComEd held approximately $19 million in collateral from suppliers for the long-term renewable energy contracts. If ComEd lost its investment grade credit rating as of March 31, 2018 , it would have been required to post approximately $10 million of collateral to its counterparties. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information.

PECO's natural gas procurement contracts contain provisions that could require PECO to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon PECO's credit rating from the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty. As of March 31, 2018 , PECO was not required to post collateral for any of these agreements. If PECO lost its investment grade credit rating as of March 31, 2018 , PECO could have been required to post approximately $33 million of collateral to its counterparties.

PECO's supplier master agreements that govern the terms of its DSP Program contracts do not contain provisions that would require PECO to post collateral.

BGE's natural gas procurement contracts contain provisions that could require BGE to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon BGE's credit rating from the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty. As of March 31, 2018 , BGE was not required to post collateral for any of these agreements. If BGE lost its investment grade credit rating as of March 31, 2018 , BGE could have been required to post approximately $49 million of collateral to its counterparties.

DPL's natural gas procurement contracts contain provisions that could require DPL to post collateral. To the extent that the fair value of the natural gas derivative transaction in a net loss position exceeds the unsecured credit threshold, then collateral is required to be posted in an amount equal to the amount by which the unsecured credit threshold is exceeded. The DPL obligations are standalone, without the guaranty of PHI. If DPL lost its investment grade credit rating as of March 31, 2018 , DPL could have been required to post an additional amount of approximately $14 million of collateral to its counterparties.

BGE's, Pepco's, DPL's and ACE's full requirements wholesale power agreements that govern the terms of its electric supply procurement contracts do not contain provisions that would require BGE, Pepco, DPL or ACE to post collateral.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## 11 . Debt and Credit Agreements (All Registrants)

### Short-Term Borrowings

Exelon Corporate, ComEd, BGE, Pepco, DPL and ACE meet their short-term liquidity requirements primarily through the issuance of commercial paper. Generation and PECO meet their short-term liquidity requirements primarily through the issuance of commercial paper and borrowings from the Exelon intercompany money pool. PHI Corporate meets its short-term liquidity requirements primarily through the issuance of short-term notes and the Exelon intercompany money pool. The Registrants may use their respective credit facilities for general corporate purposes, including meeting short-term funding requirements and the issuance of letters of credit.

#### Commercial Paper

The Registrants had the following amounts of commercial paper borrowings outstanding as of March 31, 2018 and December 31, 2017 :

| Commercial Paper Borrowings | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Exelon | $ 1,154 | $ 427 |
| Generation | 165 | — |
| ComEd | 317 | — |
| PECO | 220 | — |
| BGE | 45 | 77 |
| PHI [a] | 407 | 350 |
| Pepco | 60 | 26 |
| DPL | 211 | 216 |
| ACE | 136 | 108 |

_____

(a)   PHI reflects the commercial paper borrowings outstanding of Pepco, DPL and ACE.

#### Short-Term Loan Agreements

On January 13, 2016, PHI entered into a $500 million term loan agreement, which was amended on March 28, 2016. The net proceeds of the loan were used to repay PHI's outstanding commercial paper and for general corporate purposes. Pursuant to the loan agreement, as amended, loans made thereunder bear interest at a variable rate equal to LIBOR plus 1% , and all indebtedness thereunder is unsecured. On March 23, 2017, the aggregate principal amount of all loans, together with any accrued but unpaid interest due under the loan agreement was fully repaid and the loan terminated.  On March 23, 2017, Exelon Corporate entered into a similar type term loan for $500 million which expired March 22, 2018.  The loan agreement was renewed on March 22, 2018 and will expire on March 21, 2019. Pursuant to the loan agreement, loans made thereunder bear interest at a variable rate equal to LIBOR plus 1% and all indebtedness thereunder is unsecured.  The loan agreement is reflected in Exelon's Consolidated Balance Sheet within Short-Term borrowings.

#### Credit Agreements

As of March 15, 2018, the credit agreement for Generation's $30 million  bilateral credit facility was amended to increase the overall facility size to  $95 million . This facility will solely be used by Generation to issue letters of credit.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Long-Term Debt**

*Issuance of Long-Term Debt*

During the three months ended March 31, 2018 , the following long-term debt was issued:

| Company | Type | Interest Rate | Maturity | Amount | Use of Proceeds |
|---|---|---|---|---|---|
| Generation | Energy Efficiency Project Financing | 3.72% | April 30, 2018 | $  1 | Funding to install energy conservation measures for the Smithsonian Zoo project. |
| Generation | Energy Efficiency Project Financing | 3.17% | April 30, 2018 | $  1 | Funding to install energy conservation measures in Brooklyn, NY. |
| Generation | Energy Efficiency Project Financing | 2.61% | September 30, 2018 | $  2 | Funding to install energy conservation measures for the Pensacola project. |
| ComEd | First Mortgage Bonds, Series 124 | 4.00% | March 1, 2048 | $  800 | Refinance one series of maturing first mortgage bonds, to repay a portion of ComEd's outstanding commercial paper obligations and to fund general corporate purposes. |
| PECO | First and Refunding Mortgage Bonds | 3.90% | March 1, 2048 | $  325 | Refinance a portion of maturing mortgage bonds. |

**12 .   Income Taxes (All Registrants)**

**Corporate Tax Reform (All Registrants)**

On December 22, 2017, President Trump signed the TCJA into law. The TCJA makes many significant changes to the Internal Revenue Code, including, but not limited to, (1) reducing the U.S. federal corporate tax rate from 35% to 21% ; (2) creating a 30% limitation on deductible interest expense (not applicable to regulated utilities); (3) allowing 100% expensing for the cost of qualified property (not applicable to regulated utilities); (4) eliminating the domestic production activities deduction; (5) eliminating the corporate alternative minimum tax and changing how existing alternative minimum tax credits can be realized; and (6) changing rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017. The most significant change that impacts the Registrants is the reduction of the corporate federal income tax rate from 35% to 21% beginning January 1, 2018.

Pursuant to the enactment of the TCJA, the Registrants remeasured their existing deferred income tax balances as of December 31, 2017 to reflect the decrease in the corporate income tax rate from 35% to 21% , which resulted in a material decrease to their net deferred income tax liability balances as shown in the table below. Generation recorded a corresponding net decrease to income tax expense, while the Utility Registrants recorded corresponding regulatory liabilities or assets to the extent such amounts are probable of settlement or recovery through customer rates and an adjustment to income tax expense for all other amounts. The amount and timing of potential settlements of the established net regulatory liabilities will be determined by the Utility Registrants' respective rate regulators, subject to certain IRS "normalization" rules. See Note 6 — Regulatory Matters for further information.

The Registrants have completed their assessment of the majority of the applicable provisions in the TCJA and have recorded the associated impacts as of December 31, 2017. As discussed further below, under SAB 118 issued by the SEC in December 2017, the Registrants have recorded provisional income tax amounts as of December 31, 2017 for changes pursuant to the TCJA related to depreciation for which the impacts could not be finalized upon issuance of the Registrants' financial statements, but for which reasonable estimates could be determined.

131

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

For property acquired and placed-in-service after September 27, 2017, the TCJA repeals 50% bonus depreciation for all taxpayers and in addition provides for 100% expensing for taxpayers other than regulated utilities. As a result, Generation will be required to evaluate the contractual terms of its fourth quarter 2017 capital additions and determine if they qualify for 100% expensing under the TCJA as compared to 50% bonus depreciation under prior tax law. Similarly, the Utility Registrants will be required to evaluate the contractual terms of their fourth quarter 2017 capital additions to determine whether they still qualify for the prior tax law's 50% bonus depreciation as compared to no bonus depreciation pursuant to the TCJA.

At Generation, any required changes to the provisional estimates during the measurement period related to the above item would result in an adjustment to current income tax expense at 35% and a corresponding adjustment to deferred income tax expense at 21% and such changes could be material to Generation's future results of operations. At the Utility Registrants, any required changes to the provisional estimates would result in the recording of regulatory assets or liabilities to the extent such amounts are probable of settlement or recovery through customer rates and a net change to income tax expense for any other amounts.

The Registrants expect any final adjustments to the provisional amounts to be recorded by the third quarter of 2018, which could be material to the Registrants' future results of operations or financial positions. The accounting for all other applicable provisions of the TCJA is considered complete based on our current interpretation of the provisions of the TCJA as enacted as of December 31, 2017.

While the Registrants have recorded the impacts of the TCJA based on their interpretation of the provisions as enacted, it is expected that technical corrections or other forms of guidance will be issued during 2018, which could result in material changes to previously finalized provisions. At this time, most states have not provided guidance regarding TCJA impacts and may issue guidance in 2018 which may impact estimates.

The one-time impacts recorded by the Registrants to remeasure their deferred income tax balances at the 21% corporate federal income tax rate as of December 31, 2017 are presented below:

| | Exelon [b] | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Net Decrease to Deferred Income Tax Liability Balances | $ 8,624 | $ 1,895 | $ 2,819 | $ 1,407 | $ 1,120 | $ 1,944 | $ 968 | $ 540 | $ 456 |

| | Exelon | Generation | ComEd | PECO [c] | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Net Regulatory Liability Recorded [a] | 7,315 | N/A | 2,818 | 1,394 | 1,124 | 1,979 | 976 | 545 | 458 |

| | Exelon [b] | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Net Deferred Income Tax Benefit/(Expense) Recorded | $ 1,309 | $ 1,895 | $ 1 | $ 13 | $ (4) | $ (35) | $ (8) | $ (5) | $ (2) |

_____

(a) Reflects the net regulatory liabilities recorded on a pre-tax basis before taking into consideration the income tax benefits associated with the ultimate settlement with customers.

(b) Amounts do not sum across due to deferred tax adjustments recorded at the Exelon Corporation parent company, primarily related to certain employee compensation plans.

(c) Given the regulatory treatment of income tax benefits related to electric and gas distribution repairs, PECO remains in an overall net regulatory asset position as of December 31, 2017 after recording the impacts related to the TCJA. Refer to Note 3 - Regulatory Matters for additional information.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The net regulatory liabilities above include (1) amounts subject to IRS "normalization" rules that are required to be passed back to customers generally over the remaining useful life of the underlying assets giving rise to the associated deferred income taxes, and (2) amounts for which the timing of settlement with customers is subject to determinations by the rate regulators. The table below sets forth the Registrants' estimated categorization of their net regulatory liabilities as of December 31, 2017. The amounts in the table below are shown on an after-tax basis reflecting future net cash outflows after taking into consideration the income tax benefits associated with the ultimate settlement with customers.

|  | Exelon | ComEd | PECO (a) | BGE | PHI | PEPCO | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Subject to IRS Normalization Rules | $ 3,040 | $ 1,400 | $ 533 | $ 459 | $ 648 | $ 299 | $ 195 | $ 153 |
| Subject to Rate Regulator Determination | 1,694 | 573 | 43 | 324 | 754 | 391 | 194 | 170 |
| Net Regulatory Liabilities | $ 4,734 | $ 1,973 | $ 576 | $ 783 | $ 1,402 | $ 690 | $ 389 | $ 323 |

(a)  Given the regulatory treatment of income tax benefits related to electric and gas distribution repairs, PECO remains in an overall net regulatory asset position as of December 31, 2017 after recording the impacts related to the TCJA. As a result, the amount of customer benefits resulting from the TCJA subject to the discretion of PECO's rate regulators are lower relative to the other Utility Registrants. Refer to Note 3 - Regulatory Matters for additional information.

The net regulatory liability amounts subject to the IRS normalization rules generally relate to property, plant and equipment with remaining useful lives ranging from 30 to 40 years across the Utility Registrants.  For the other amounts, rate regulators could require the passing back of amounts to customers over shorter time frames.

**Rate Reconciliation**

The effective income tax rate from continuing operations varies from the U.S. Federal statutory rate principally due to the following:

| | Three Months Ended March 31, 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| U.S. Federal statutory rate | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% |
| Increase (decrease) due to: | | | | | | | | | |
| State income taxes, net of Federal income tax benefit | 4.1 | 2.4 | 8.2 | (3.9) | 6.3 | 4.6 | 1.7 | 6.3 | 6.6 |
| Qualified nuclear decommissioning trust fund income | (0.4) | (1.3) | — | — | — | — | — | — | — |
| Amortization of investment tax credit, including deferred taxes on basis difference | (1.3) | (4.3) | (0.2) | (0.1) | (0.1) | (0.2) | (0.1) | (0.2) | (0.3) |
| Plant basis differences | (2.7) | — | 0.1 | (14.2) | (0.7) | (2.6) | (3.4) | (1.3) | (2.6) |
| Production tax credits and other credits | (2.8) | (9.5) | (0.1) | — | — | — | — | — | — |
| Noncontrolling interests | (0.7) | (2.5) | — | — | — | — | — | — | — |
| Excess deferred tax amortization | (6.0) | — | (7.5) | (4.8) | (8.6) | (10.6) | (12.8) | (7.9) | (8.7) |
| Other | (2.8) | (1.3) | 0.3 | 0.2 | — | — | (0.3) | 0.5 | (3.5) |
| Effective income tax rate | 8.4% | 4.5% | 21.8% | (1.8)% | 17.9% | 12.2% | 6.1% | 18.4% | 12.5% |

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

| | | | | Three Months Ended March 31, 2017 [a] | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| U.S. Federal statutory rate | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% |
| Increase (decrease) due to: | | | | | | | | | |
| State income taxes, net of Federal income tax benefit | 0.9 | 1.0 | 4.9 | 0.1 | 5.2 | 4.9 | 4.6 | 5.3 | 5.6 |
| Qualified nuclear decommissioning trust fund income | 3.5 | 7.8 | — | — | — | — | — | — | — |
| Amortization of investment tax credit, including deferred taxes on basis difference | (0.4) | (0.7) | (0.2) | (0.1) | (0.1) | (0.2) | (0.1) | (0.3) | (0.4) |
| Plant basis differences | (2.4) | — | (0.2) | (13.2) | (0.9) | (3.8) | (5.8) | (1.9) | (3.4) |
| Production tax credits and other credits | (0.7) | (1.5) | — | — | — | — | — | — | — |
| Noncontrolling interest | — | 0.1 | — | — | — | — | — | — | — |
| Merger expenses [b] | (11.5) | (3.4) | — | — | — | (42.4) | (34.2) | (21.9) | (167.1) |
| Fitzpatrick bargain purchase gain | (6.6) | (14.8) | — | — | — | — | — | — | — |
| Other | (0.1) | (0.4) | — | 0.3 | (0.2) | (0.4) | 0.5 | — | (3.0) |
| Effective income tax rate | 17.7% | 23.1% | 39.5% | 22.1% | 39.0% | (6.9)% | 0.0% | 16.2% | (133.3)% |

(a)  Exelon retrospectively adopted the new standard Revenue from Contracts with Customers . The standard was adopted as of January 1, 2018. The effective income tax rates are recast to reflect the impact of the new standard.
(b)  Includes a remeasurement of uncertain state income tax positions for Pepco and DPL.

**Accounting for Uncertainty in Income Taxes**

The Registrants have the following unrecognized tax benefits as of March 31, 2018 and December 31, 2017 :

| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| March 31, 2018 | $   733 | $   464 | $   2 | $   — | $   120 | $   125 | $   59 | $   21 | $   14 |

| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| December 31, 2017 | $   743 | $   468 | $   2 | $   — | $   120 | $   125 | $   59 | $   21 | $   14 |

*Reasonably possible the total amount of unrecognized tax benefits could significantly increase or decrease within 12 months after the reporting date*

*Like-Kind Exchange*

As of March 31, 2018 , Exelon and ComEd have approximately $ 33 million and $2 million , respectively, of unrecognized federal and state income tax benefits that could significantly decrease within the 12 months after the reporting date due to a final resolution of the like-kind exchange litigation described below. The recognition of these unrecognized tax benefits would decrease Exelon and ComEd's effective tax rate.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Settlement of Income Tax Audits, Refund Claims, and Litigation*

As of March 31, 2018 , Exelon, Generation, BGE, PHI, Pepco, DPL, and ACE have approximately $679 million , $ 465 million , $120 million , $ 94 million , $ 59 million , $ 21 million , and $ 14 million of unrecognized federal and state tax benefits that could significantly decrease within the 12 months after the reporting date as a result of completing audits, potential settlements, and the outcomes of pending court cases. Of the above unrecognized tax benefits, Exelon and Generation have $ 458 million that, if recognized, would decrease the effective tax rate. The unrecognized tax benefits related to BGE, Pepco, DPL, and ACE, if recognized, may be included in future regulated base rates and that portion would have no impact to the effective tax rate.

## Other Income Tax Matters

### *Like-Kind Exchange (Exelon and ComEd)*

Exelon, through its ComEd subsidiary, took a position on its 1999 income tax return to defer approximately $ 1.2 billion of tax gain on the sale of ComEd's fossil generating assets. The gain was deferred by reinvesting a portion of the proceeds from the sale in qualifying replacement property under the like-kind exchange provisions of the IRC. The like-kind exchange replacement property purchased by Exelon included interests in three municipal-owned electric generation facilities which were properly leased back to the municipalities. As previously disclosed, Exelon terminated its investment in one of the leases in 2014 and the remaining two leases were terminated in 2016.

The IRS asserted that the Exelon purchase and leaseback transaction was substantially similar to a leasing transaction, known as a SILO, which is a listed transaction that the IRS has identified as a potentially abusive tax shelter. Thus, they disagreed with Exelon's position and asserted that the entire gain of approximately $ 1.2 billion was taxable in 1999. In 2013, the IRS issued a notice of deficiency to Exelon and Exelon filed a petition to initiate litigation in the United States Tax Court. In 2016, the Tax Court held that Exelon was not entitled to defer gain on the transaction. In addition to the tax and interest related to the gain deferral, the Tax Court also ruled that Exelon was liable for $ 90 million in penalties and interest on the penalties. Exelon has fully paid the amounts assessed resulting from the Tax Court decision.

In September 2017, Exelon appealed the Tax Court decision to the U.S. Court of Appeals for the Seventh Circuit and a decision is expected in 2018.

### *State Income Tax Law Changes*

On April 24, 2018, Maryland enacted companion bills, House Bill 1794 and Senate Bill 1090, providing for a phase in of a single sales factor apportionment formula from the current three factor formula for determining an entity's Maryland state income taxes. The single sales factor will be fully phased by 2022.

In the second quarter of 2018, Exelon, Generation, PHI, DPL, and Pepco expect to record an estimated one-time increase to deferred income taxes of approximately $17 million , $5 million , $18 million , $1 million and $17 million , respectively. At PHI, DPL and Pepco, the increase to the Maryland deferred income tax liability will be offset by regulatory assets. Further, the change in tax law is not expected to have a material ongoing impact to Exelon's, Generation's, PHI's, DPL's or Pepco's future results of operations.

135

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

**13 .  Nuclear Decommissioning (Exelon and Generation)**

**Nuclear Decommissioning Asset Retirement Obligations**

Generation has a legal obligation to decommission its nuclear power plants following the expiration of their operating licenses. To estimate its decommissioning obligation related to its nuclear generating stations for financial accounting and reporting purposes, Generation uses a probability-weighted, discounted cash flow model which, on a unit-by-unit basis, considers multiple outcome scenarios that include significant estimates and assumptions, and are based on decommissioning cost studies, cost escalation rates, probabilistic cash flow models and discount rates. Generation updates its ARO annually, unless circumstances warrant more frequent updates, based on its review of updated cost studies and its annual evaluation of cost escalation factors and probabilities assigned to various scenarios.

The following table provides a rollforward of the nuclear decommissioning ARO reflected on Exelon's and Generation's Consolidated Balance Sheets from December 31, 2017 to March 31, 2018 :

| | | |
|---|---|---|
| Nuclear decommissioning ARO at December 31, 2017 [a] | $ | 9,662 |
| Accretion expense | | 117 |
| Net increase due to changes in, and timing of, estimated future cash flows | | 32 |
| Costs incurred related to decommissioning plants | | (4) |
| Nuclear decommissioning ARO at March 31, 2018 [a] | $ | 9,807 |

[a]  Includes $64 million and $13 million for the current portion of the ARO at March 31, 2018 and December 31, 2017 , respectively, which is included in Other current liabilities on Exelon's and Generation's Consolidated Balance Sheets.

During the three months ended March 31, 2018 , Generation's total nuclear ARO increased by approximately $145 million , p rimarily reflecting the accretion of the ARO liability due to the passage of time and the impact of the February 2, 2018 announcement to retire Oyster Creek at the end of its current operating cycle by October 2018. Refer to Note 8 — Early Plant Retirements for additional information regarding the announced early retirement of Oyster Creek.

**Nuclear Decommissioning Trust Fund Investments**

NDT funds have been established for each generation station unit to satisfy Generation's nuclear decommissioning obligations. Generally, NDT funds established for a particular unit may not be used to fund the decommissioning obligations of any other unit.

The NDT funds associated with Generation's nuclear units have been funded with amounts collected from the previous owners and their respective utility customers. PECO is authorized to collect funds, in revenues, for decommissioning the former PECO nuclear plants through regulated rates, and these collections are scheduled through the operating lives of the former PECO plants. The amounts collected from PECO customers are remitted to Generation and deposited into the NDT funds for the unit for which funds are collected. Every five years, PECO files a rate adjustment with the PAPUC that reflects PECO's calculations of the estimated amount needed to decommission each of the former PECO units based on updated fund balances and estimated decommissioning costs. The rate adjustment is used to determine the amount collectible from PECO customers. The most recent rate adjustment occurred on January 1, 2018, and the effective rates currently yield annual collections of approximately $4 million . The next five-year adjustment is expected to be reflected in rates charged to PECO customers effective January 1, 2023. See Note 15 — Asset Retirement Obligations of Exelon's 2017 Form 10-K, for information regarding the amount collected from PECO ratepayers for decommissioning costs.

Exelon and Generation had NDT fund investments totaling $13,275 million and $13,349 million at March 31, 2018 and December 31, 2017 , respectively.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

The following table provides net unrealized gains (losses) on NDT funds for the three months ended March 31, 2018 and 2017 :

| | Exelon and Generation | |
| --- | --- | --- |
| | Three Months Ended March 31, | |
| | 2018 | 2017 |
| Net unrealized gains (losses) on decommissioning trust funds — Regulatory Agreement Units [a] | $ (75) | $ 222 |
| Net unrealized gains (losses) on decommissioning trust funds — Non-Regulatory Agreement Units [b][c] | (96) | 166 |

_____
(a)   Net unrealized gains (losses) related to Generation's NDT funds associated with Regulatory Agreement Units are included in Regulatory liabilities on Exelon's Consolidated Balance Sheets and Noncurrent payables to affiliates on Generation's Consolidated Balance Sheets.
(b)   Excludes $(2) million and $(1) million of net unrealized losses related to the Zion Station pledged assets for the three months ended March 31, 2018 and 2017 , respectively. Net unrealized losses related to Zion Station pledged assets are included in Other current liabilities on Exelon's and Generation's Consolidated Balance Sheets in 2018 and 2017 , respectively.
(c)   Net unrealized gains (losses) related to Generation's NDT funds with Non-Regulatory Agreement Units are included in Other, net on Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income.

Interest and dividends on NDT fund investments are recognized when earned and are included in Other, net on Exelon's and Generation's Consolidated Statements of Operations and Comprehensive Income. Interest and dividends earned on the NDT fund investments for the Regulatory Agreement Units are eliminated in Other, net on Exelon's and Generation's Consolidated Statement of Operations and Comprehensive Income.

Refer to Note 3 — Regulatory Matters and Note 26 — Related Party Transactions of the Exelon 2017 Form 10-K for information regarding regulatory liabilities at ComEd and PECO and intercompany balances between Generation, ComEd and PECO reflecting the obligation to refund to customers any decommissioning-related assets in excess of the related decommissioning obligations.

**Zion Station Decommissioning**

On September 1, 2010, Generation completed an Asset Sale Agreement (ASA) with EnergySolutions Inc. and its wholly owned subsidiaries, EnergySolutions, LLC (EnergySolutions) and ZionSolutions, under which ZionSolutions has assumed responsibility for decommissioning Zion Station, which is located in Zion, Illinois and ceased operation in 1998. See Note 15 — Asset Retirement Obligations of the Exelon 2017 Form 10-K for information regarding the specific treatment of assets, including NDT funds, and decommissioning liabilities transferred in the transaction.

ZionSolutions is subject to certain restrictions on its ability to request reimbursements from the Zion Station NDT funds as defined within the ASA. Therefore, the transfer of the Zion Station assets did not qualify for asset sale accounting treatment and, as a result, the related NDT funds were reclassified to Pledged assets for Zion Station decommissioning within Generation's and Exelon's Consolidated Balance Sheets and will continue to be measured in the same manner as prior to the completion of the transaction. Additionally, the transferred ARO for decommissioning was replaced with a Payable for Zion Station decommissioning in Generation's and Exelon's Consolidated Balance Sheets. Changes in the value of the Zion Station NDT assets, net of applicable taxes, are recorded as a change in the payable to ZionSolutions. At no point will the payable to ZionSolutions exceed the project budget of the costs remaining to decommission Zion Station. Generation has retained its obligation for the SNF. Following ZionSolutions' completion of its contractual obligations and transfer of the NRC license to Generation, Generation will store the SNF at Zion Station until it is transferred to the DOE for ultimate disposal, and will complete all remaining decommissioning activities associated with the SNF dry storage facility. Generation has a liability of approximately $115 million which is included within the nuclear

137

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

decommissioning ARO at March 31, 2018 . Generation also has retained NDT assets to fund its obligation to maintain the SNF at Zion Station until transfer to the DOE and to complete all remaining decommissioning activities for the SNF storage facility. Any shortage of funds necessary to maintain the SNF and decommission the SNF storage facility is ultimately required to be funded by Generation. Any Zion Station NDT funds remaining after the completion of all decommissioning activities will be returned to ComEd customers in accordance with the applicable orders. The following table provides the pledged assets and payables to ZionSolutions, and withdrawals by ZionSolutions at March 31, 2018 and December 31, 2017 :

| | Exelon and Generation | |
| --- | --- | --- |
| | March 31, 2018 | December 31, 2017 |
| Carrying value of Zion Station pledged assets [a] | $ 30 | $ 39 |
| Payable to Zion Solutions [b][c] | 28 | 37 |
| Cumulative withdrawals by Zion Solutions to pay decommissioning costs [d] | 949 | 942 |

_____
(a)  Included in Other current assets within Exelon's and Generation's Consolidated Balance sheets.
(b)  Excludes a liability recorded within Exelon's and Generation's Consolidated Balance Sheets related to the tax obligation on the unrealized activity associated with the Zion Station NDT funds. The NDT funds will be utilized to satisfy the tax obligations as gains and losses are realized.
(c)  Included in Other current liabilities within Exelon's and Generation's Consolidated Balance Sheets.
(d)  Includes project expenses to decommission Zion Station and estimated tax payments on Zion Station NDT fund earnings.

**NRC Minimum Funding Requirements**

NRC regulations require that licensees of nuclear generating facilities demonstrate reasonable assurance that funds will be available in specified minimum amounts to decommission the facility at the end of its life.

Generation filed its biennial decommissioning funding status report with the NRC on March 30, 2017 for all units except for Zion Station which is included in a separate report to the NRC submitted by ZionSolutions (see Zion Station Decommissioning above). The status report demonstrated adequate decommissioning funding assurance for all units except for Peach Bottom Unit 1. As a former PECO plant, financial assurance for decommissioning Peach Bottom Unit 1 is provided by the NDT fund in addition to collections from PECO ratepayers. As discussed under Nuclear Decommissioning Trust Fund Investments above, the amount collected from PECO ratepayers has been adjusted effective January 1, 2018.

On March 28, 2018, Generation submitted its annual decommissioning funding status report with the NRC for shutdown reactors, reactors within five years of shut down except for Zion Station which is included in a separate report to the NRC submitted by EnergySolutions (see Zion Station Decommissioning above), and reactor involved in an acquisition. This report reflected the status of decommissioning funding assurance as of December 31, 2017 and included an update for the acquisition of Fitzpatrick on March 31, 2017, the early retirement of TMI announced on May 30, 2017, an adjustment for the February 2, 2018 announced retirement date of Oyster Creek, and the updated status of Peach Bottom Unit 1 based on the new collections rate described above. As of December 31, 2017 , Generation provided adequate decommissioning funding assurance for all of its shutdown reactors, reactors within five years of shutdown, and reactor involved in an acquisition.

**14 .   Retirement Benefits (All Registrants)**

Exelon sponsors defined benefit pension plans and other postretirement benefit plans for essentially all current employees. Substantially all non-union employees and electing union employees hired on

138

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

or after January 1, 2001 participate in cash balance pension plans. Effective January 1, 2009, substantially all newly-hired union-represented employees participate in cash balance pension plans. Effective February 1, 2018, most newly-hired Generation and BSC non-represented employees are not eligible for pension benefits, and will instead be eligible to receive an enhanced non-discretionary employer contribution in an Exelon defined contribution savings plan. Effective January 1, 2018, most newly-hired non-represented employees are not eligible for OPEB benefits and employees represented by Local 614 are not eligible for retiree health care benefits.

During the first quarter of 2017, in connection with the acquisition of Fitzpatrick, Exelon established a new qualified pension plan and a new OPEB plan, and recorded a provisional obligation for Fitzpatrick employees based on information available at the merger date of $38 million and $11 million , respectively. As permitted by business combinations authoritative guidance, during the third quarter of 2017, Exelon updated those obligations based on a final valuation for Fitzpatrick employees as of the merger date of March 31, 2017. The updated obligations for pension and OPEB were $ 16 million and $ 17 million , respectively. Refer to Note 4 — Mergers, Acquisitions and Dispositions for additional discussion of the acquisition of FitzPatrick.

**Defined Benefit Pension and Other Postretirement Benefits**

During the first quarter of 2018, Exelon received an updated valuation of its pension and OPEB to reflect actual census data as of January 1, 2018. This valuation resulted in an increase to the pension and OPEB obligations of $23 million and $14 million , respectively. Additionally, accumulated other comprehensive loss decreased by $18 million (after tax) and regulatory assets and liabilities increased by $61 million and $1 million , respectively.

The majority of the 2018 pension benefit cost for Exelon-sponsored plans is calculated using an expected long-term rate of return on plan assets of 7.00% and a discount rate of 3.62% . The majority of the 2018 other postretirement benefit cost is calculated using an expected long-term rate of return on plan assets of 6.60% for funded plans and a discount rate of 3.61% .

A portion of the net periodic benefit cost for all plans is capitalized within the Consolidated Balance Sheets. The following table presents the components of Exelon's net periodic benefit costs, prior to capitalization, for the three months ended March 31, 2018 and 2017 .

| | Pension Benefits Three Months Ended March 31, | | Other Postretirement Benefits Three Months Ended March 31, | |
| | 2018 | 2017 (a) | 2018 | 2017 (a) |
|---|---|---|---|---|
| **Components of net periodic benefit cost:** | | | | |
| Service cost | $ 101 | $ 95 | $ 28 | $ 26 |
| Interest cost | 201 | 210 | 43 | 45 |
| Expected return on assets | (312) | (299) | (43) | (41) |
| Amortization of: | | | | |
| Prior service benefit | — | — | (46) | (47) |
| Actuarial loss | 157 | 152 | 16 | 16 |
| **Net periodic benefit cost** | $ 147 | $ 158 | $ (2) | $ (1) |

_____
(a)   FitzPatrick net benefit costs are included for the period after the acquisition date of March 31, 2017.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The amounts below represent Exelon's, Generation's, ComEd's, PECO's, BGE's, BSC's, PHI's, Pepco's, DPL's, ACE's, and PHISCO's allocated portion of the pension and postretirement benefit plan costs. As a result of new pension guidance effective on January 1, 2018, certain balances have been reclassified on Exelon's Consolidated Statements of Operations and Comprehensive Income for the three months ended March 31, 2017. The amounts below represent the Registrants' as well as BSC's and PHISCO's pension and postretirement benefit plan net periodic benefit costs. For Exelon, the service cost component is included in Operating and maintenance expense and Property, plant and equipment for the three months ended March 31, 2018 and 2017, while the non-service cost components are included in Other, net and Regulatory assets for the three months ended March 31, 2018 and in Other, net and Property, plant and equipment for the three months ended March 31, 2017. For the Registrants other than Exelon, the service cost and non-service cost components are included in Operating and maintenance expense and Property, plant and equipment on their consolidated financial statements for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | |
|---|---|---|
| **Pension and Other Postretirement Benefit Costs** | **2018** | **2017** |
| Exelon [(a)(b)] | $ 145 | $ 157 |
| Generation [(b)] | 51 | 54 |
| ComEd | 45 | 44 |
| PECO | 5 | 7 |
| BGE | 15 | 16 |
| BSC [(c)] | 14 | 12 |
| PHI [(a)(d)] | 15 | 24 |
|   Pepco | 4 | 7 |
|   DPL | — | 3 |
|   ACE | 3 | 3 |
|   PHISCO [(d)] | 8 | 11 |

(a)  Exelon reflects the consolidated pension and other postretirement benefit costs of Generation, ComEd, PECO, BGE, BSC, and PHI. PHI reflects the consolidated pension and other postretirement benefit costs of Pepco, DPL, ACE, and PHISCO.

(b)  FitzPatrick net benefit costs are included for the period after the acquisition date of March 31, 2017.

(c)  These amounts primarily represent amounts billed to Exelon's subsidiaries through intercompany allocations. These amounts are not included in the Generation, ComEd, PECO, BGE, PHI, Pepco, DPL or ACE amounts above.

(d)  These amounts represent amounts billed to Pepco, DPL and ACE through intercompany allocations. These amounts are not included in Pepco, DPL or ACE amounts above.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Defined Contribution Savings Plans**

The Registrants participate in various 401(k) defined contribution savings plans that are sponsored by Exelon. The plans are qualified under applicable sections of the IRC and allow employees to contribute a portion of their pre-tax and/or after-tax income in accordance with specified guidelines. All Registrants match a percentage of the employee contributions up to certain limits. The following table presents the matching contributions to the savings plans during the three months ended March 31, 2018 and 2017 , respectively.

| Savings Plan Matching Contributions | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Exelon [a][b] | $            32 | $            30 |
| Generation [b] | 15 | 14 |
| ComEd | 7 | 7 |
| PECO | 2 | 2 |
| BGE | 2 | 2 |
| BSC [c] | 3 | 2 |
| PHI [a][d] | 3 | 3 |
|   Pepco | 1 | 1 |
|   DPL | 1 | 1 |
|   PHISCO [d] | 1 | 1 |

_____

(a)   Exelon reflects the consolidated savings plan matching contributions of Generation, ComEd, PECO, BGE, BSC, and PHI. PHI reflects the consolidated savings plan matching contributions of Pepco, DPL, and PHISCO.

(b)   FitzPatrick net benefit costs are included for the period after the acquisition date of March 31, 2017.

(c)   These amounts primarily represent amounts billed to Exelon's subsidiaries through intercompany allocations. These amounts are not included in the Generation, ComEd, PECO, BGE, PHI, Pepco or DPL amounts above.

(d)   These amounts represent amounts billed to Pepco and DPL through intercompany allocations. These amounts are not included in Pepco or DPL amounts above.

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**15 .   Changes in Accumulated Other Comprehensive Income (Exelon, Generation and PECO)**

The following tables present changes in accumulated other comprehensive income (loss) (AOCI) by component for the three months ended March 31, 2018 and 2017 :

| Three Months Ended March 31, 2018 | Gains and (losses) on Cash Flow Hedges | Unrealized Gains and (losses) on Marketable Securities | Pension and Non-Pension Postretirement Benefit Plan Items | Foreign Currency Items | AOCI of Investments in Unconsolidated Affiliates | Total |
|---|---|---|---|---|---|---|
| **Exelon** [a] | | | | | | |
| Beginning balance | $ (14) | $ 10 | $ (2,998) [d] | $ (23) | $ (1) | $ (3,026) |
| OCI before reclassifications | 8 | — | 18 | 1 | — | 27 |
| Amounts reclassified from AOCI [b] | — | — | 44 | — | — | 44 |
| Net current-period OCI | 8 | — | 62 | 1 | — | 71 |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | — | (10) [c] | — | — | — | (10) |
| Ending balance | $ (6) | $ — | $ (2,936) | $ (22) | $ (1) | $ (2,965) |
| **Generation** [a] | | | | | | |
| Beginning balance | $ (16) | $ 3 | $ — | $ (23) | $ (1) | $ (37) |
| OCI before reclassifications | 7 | — | — | (1) | — | 6 |
| Amounts reclassified from AOCI [b] | — | — | — | — | — | — |
| Net current-period OCI | 7 | — | — | (1) | — | 6 |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | — | (3) [c] | — | — | — | (3) |
| Ending balance | $ (9) | $ — | $ — | $ (24) | $ (1) | $ (34) |
| **PECO** [a] | | | | | | |
| Beginning balance | $ — | $ 1 | $ — | $ — | $ — | $ 1 |
| OCI before reclassifications | — | — | — | — | — | — |
| Amounts reclassified from AOCI [b] | — | — | — | — | — | — |
| Net current-period OCI | — | — | — | — | — | — |
| Impact of adoption of Recognition and Measurement of Financial Assets and Liabilities standard | — | (1) [c] | — | — | — | (1) |
| Ending balance | $ — | $ — | $ — | $ — | $ — | $ — |

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| Three Months Ended March 31, 2017 | Gains and (losses) on Cash Flow Hedges | Unrealized Gains and (losses) on Marketable Securities | Pension and Non-Pension Postretirement Benefit Plan Items | Foreign Currency Items | AOCI of Investments in Unconsolidated Affiliates | Total |
|---|---|---|---|---|---|---|
| **Exelon** (a) | | | | | | |
| Beginning balance | $ (17) | $ 4 | $ (2,610) | $ (30) | $ (7) | $ (2,660) |
| OCI before reclassifications | 2 | 1 | (59) | 1 | 5 | (50) |
| Amounts reclassified from AOCI (b) | 4 | — | 36 | — | — | 40 |
| Net current-period OCI | 6 | 1 | (23) | 1 | 5 | (10) |
| Ending balance | $ (11) | $ 5 | $ (2,633) | $ (29) | $ (2) | $ (2,670) |
| **Generation** (a) | | | | | | |
| Beginning balance | $ (19) | $ 2 | $ — | $ (30) | $ (7) | $ (54) |
| OCI before reclassifications | 2 | — | — | 1 | 6 | 9 |
| Amounts reclassified from AOCI (b) | 4 | — | — | — | — | 4 |
| Net current-period OCI | 6 | — | — | 1 | 6 | 13 |
| Ending balance | $ (13) | $ 2 | $ — | $ (29) | $ (1) | $ (41) |
| **PECO** (a) | | | | | | |
| Beginning balance | $ — | $ 1 | $ — | $ — | $ — | $ 1 |
| OCI before reclassifications | — | — | — | — | — | — |
| Amounts reclassified from AOCI (b) | — | — | — | — | — | — |
| Net current-period OCI | — | — | — | — | — | — |
| Ending balance | $ — | $ 1 | $ — | $ — | $ — | $ 1 |

___

(a) All amounts are net of tax and noncontrolling interest. Amounts in parenthesis represent a decrease in AOCI.

(b) See next tables for details about these reclassifications.

(c) Exelon prospectively adopted the new standard Recognition and Measurement of Financial Assets and Liabilities, The standard was adopted as of January 1, 2018, which resulted in an increase to Retained earnings and Accumulated other comprehensive loss of $10 million , $3 million and $1 million for Exelon, Generation and PECO, respectively. The amounts reclassified related to Rabbi Trusts. See Note 2 — New Accounting Standards for additional information.

(d) Exelon early adopted the new standard Reclassification of Certain Tax Effects from AOCI. The standard was adopted retrospectively as of December 31, 2017 , which resulted in an increase to Exelon's Retained earnings and Accumulated other comprehensive loss of $539 million , primarily related to deferred income taxes associated with Exelon's pension and OPEB obligations. See Note 2 — New Accounting Standards for additional information.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

ComEd, PECO, BGE, PHI, Pepco, DPL and ACE did not have any reclassifications out of AOCI to Net income during the three months ended March 31, 2018 and 2017 . The following tables present amounts reclassified out of AOCI to Net income for Exelon and Generation during the three months ended March 31, 2018 and 2017 .

**Three Months Ended March 31, 2018**

| Details about AOCI components | Items reclassified out of AOCI [a] | Affected line item in the Statement of Operations and Comprehensive Income |
|---|---|---|
| | Exelon | |
| **Amortization of pension and other postretirement benefit plan items** | | |
| Prior service costs [b] | $ 23 | |
| Actuarial losses [b] | (83) | |
| Total before tax | (60) | |
| Tax benefit | 16 | |
| Net of tax | $ (44) | |
| | | |
| **Total Reclassifications** | $ (44) | Comprehensive income |

**Three Months Ended March 31, 2017**

| Details about AOCI components | Items reclassified out of AOCI [a] | | Affected line item in the Statement of Operations and Comprehensive Income |
|---|---|---|---|
| | Exelon | Generation | |
| **Gains and (losses) on cash flow hedges** | | | |
| Other cash flow hedges | $ (7) | $ (7) | Interest expense |
| Total before tax | (7) | (7) | |
| Tax benefit | 3 | 3 | |
| Net of tax | $ (4) | $ (4) | Comprehensive income |
| | | | |
| **Amortization of pension and other postretirement benefit plan items** | | | |
| Prior service costs [b] | $ 23 | $ — | |
| Actuarial losses [b] | (81) | — | |
| Total before tax | (58) | — | |
| Tax benefit | 22 | — | |
| Net of tax | $ (36) | $ — | |
| | | | |
| **Total Reclassifications** | $ (40) | $ (4) | Comprehensive income |

_____
(a)     Amounts in parenthesis represent a decrease in net income.
(b)     This AOCI component is included in the computation of net periodic pension and OPEB cost (see Note 14 — Retirement Benefits for additional details).

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

The following table presents income tax expense (benefit) allocated to each component of other comprehensive income (loss) during the three months ended March 31, 2018 and 2017 :

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Exelon** | | |
| Pension and non-pension postretirement benefit plans: | | |
| Prior service benefit reclassified to periodic benefit cost | $ 6 | $ 10 |
| Actuarial loss reclassified to periodic benefit cost | (22) | (32) |
| Pension and non-pension postretirement benefit plans valuation adjustment | (7) | — |
| Change in unrealized (loss) on cash flow hedges | (3) | (1) |
| Change in unrealized (loss) on investments in unconsolidated affiliates | (1) | (4) |
| Change in unrealized (loss) on marketable securities | — | (1) |
| Total | $ (27) | $ (28) |
| | | |
| **Generation** | | |
| Change in unrealized (loss) on cash flow hedges | $ (3) | $ (1) |
| Change in unrealized (loss) on investments in unconsolidated affiliates | (1) | (3) |
| Total | $ (4) | $ (4) |

**16 .  Earnings Per Share and Equity (Exelon)**

**Earnings per Share**

Basic earnings per share is computed by dividing net income attributable to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share is computed by dividing net income attributable to common shareholders by the weighted average number of common shares outstanding, including the effect of issuing common stock assuming (i) stock options are exercised, and (ii) performance share awards and restricted stock awards are fully vested under the treasury stock method.

The following table sets forth the components of basic and diluted earnings per share and shows the effect of these stock options, performance share awards and restricted stock awards on the weighted average number of shares outstanding used in calculating diluted earnings per share:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Exelon** | | |
| Net income attributable to common shareholders | $ 585 | $ 990 |
| Weighted average common shares outstanding — basic | 966 | 928 |
| Assumed exercise and/or distributions of stock-based awards | 2 | 2 |
| Weighted average common shares outstanding — diluted | 968 | 930 |

The number of stock options not included in the calculation of diluted common shares outstanding due to their antidilutive effect was approximately 5 million and 9 million for the three months ended March 31, 2018 and 2017 , respectively. There were no equity units related to the PHI Merger not included in

145

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

the calculation of diluted common shares outstanding due to their antidilutive effect for the three months ended March 31, 2018 and 2017 . Refer to Note 19 — Shareholders' Equity of the Exelon 2017 Form 10-K for further information regarding the equity units.

Under share repurchase programs, 2 million shares of common stock are held as treasury stock with a cost of $123 million as of March 31, 2018 .

**17 .   Commitments and Contingencies (All Registrants)**

The following is an update to the current status of commitments and contingencies set forth in Note 23 of the Exelon 2017 Form 10-K. See Note 4 — Mergers, Acquisitions and Dispositions of the Exelon 2017 Form 10-K for further discussion on the PHI Merger commitments.

**Commitments**

*PHI Merger Commitments (Exelon, PHI, Pepco, DPL and ACE)*

The merger of Exelon and PHI was approved in Delaware, New Jersey, Maryland and the District of Columbia. Exelon and PHI agreed to certain commitments including where applicable: customer rate credits, funding for energy efficiency and delivery system modernization programs, a green sustainability fund, workforce development initiatives, charitable contributions, renewable generation and other required commitments. In addition, the orders approving the merger in Delaware, New Jersey, and Maryland include a "most favored nation" provision which, generally, requires allocation of merger benefits proportionally across all the jurisdictions.

The following amounts represent total commitment costs for Exelon, PHI, Pepco, DPL and ACE that have been recorded since the acquisition date and the remaining obligations as of March 31, 2018 :

| Description | Expected Payment Period | Pepco | DPL | ACE | PHI | Exelon |
|---|---|---|---|---|---|---|
| Rate credits | 2016 - 2017 | $ 91 | $ 67 | $ 101 | $ 259 | $ 259 |
| Energy efficiency | 2016 - 2021 | — | — | — | — | 122 |
| Charitable contributions | 2016 - 2026 | 28 | 12 | 10 | 50 | 50 |
| Delivery system modernization | Q2 2017 | — | — | — | — | 22 |
| Green sustainability fund | Q2 2017 | — | — | — | — | 14 |
| Workforce development | 2016 - 2020 | — | — | — | — | 17 |
| Other | | 1 | 5 | — | 6 | 29 |
| Total commitments | | $ 120 | $ 84 | $ 111 | $ 315 | $ 513 |
| Remaining commitments | | $ 75 | $ 12 | $ 8 | $ 95 | $ 165 |

In addition, Exelon is committed to develop or to assist in the commercial development of approximately 37 MWs of new generation in Maryland, District of Columbia, and Delaware, 27 MWs of which are expected to be completed by 2018. These investments are expected to total approximately $137 million, are expected to be primarily capital in nature, and will generate future earnings at Exelon and Generation. Investment costs will be recognized as incurred and recorded on Exelon's and Generation's financial statements. Exelon has also committed to purchase 100 MWs of wind energy in PJM, to procure 120 MWs of wind RECs for the purpose of meeting Delaware's renewable portfolio standards, and to maintain and promote energy efficiency and demand response programs in the PHI jurisdictions.

146

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Pursuant to the various jurisdictions' merger approval conditions, over specified periods Pepco, DPL and ACE are not permitted to reduce employment levels due to involuntary attrition associated with the merger integration process and have made other commitments regarding hiring and relocation of positions.

### Constellation Merger Commitments (Exelon and Generation)

In February 2012, the MDPSC issued an Order approving the Exelon and Constellation merger. As part of the MDPSC Order, Exelon agreed to develop or assist in the development of 285 - 300 MWs of new generation. Exelon and Generation have incurred $ 458 million towards satisfying the commitment for new generation development in the State of Maryland, with 220 MW of new generation in operations to date and 10 MW of this commitment satisfied through a liquidated damages payment made in the fourth quarter of 2016. The remaining 55 MW is expected to be satisfied via payment of liquidated damages or execution of a third party PPA, rather than by Generation constructing renewable generating assets. As a result, as of March 31, 2018 Exelon's and Generation's Consolidated Balance Sheets include a $ 50 million liability within Deferred credits and other liabilities for this remaining commitment, to be paid on or before January 15, 2023 unless the period is extended by consent of Exelon and the State. Refer to Note 23 - Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements in the Exelon 2017 Form 10-K for additional information regarding the Constellation Merger Commitments.

### Commercial Commitments (All Registrants)

The Registrants' commercial commitments as of March 31, 2018 , representing commitments potentially triggered by future events were as follows:

|  | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Letters of credit (non-debt) [a] | $ 1,586 | $ 1,533 | $ 2 | $ 1 | $ 5 | $ 1 | $ 1 | $ — | $ — |
| Surety bonds [b] | 1,651 | 1,463 | 9 | 9 | 10 | 66 | 32 | 4 | 5 |
| Financing trust guarantees | 378 | — | 200 | 178 | — | — | — | — | — |
| Guaranteed lease residual values [c] | 22 | — | — | — | — | 22 | 7 | 9 | 6 |
| Total commercial commitments | $ 3,637 | $ 2,996 | $ 211 | $ 188 | $ 15 | $ 89 | $ 40 | $ 13 | $ 11 |

---

(a)  Letters of credit (non-debt) - Exelon and certain of its subsidiaries maintain non-debt letters of credit to provide credit support for certain transactions as requested by third parties. Includes letters of credits issued under credit facility agreements arranged at minority and community banks and nonrecourse debt letters of credits.
(b)  Surety bonds—Guarantees issued related to contract and commercial agreements, excluding bid bonds.
(c)  Represents the maximum potential obligation in the event that the fair value of certain leased equipment and fleet vehicles is zero at the end of the maximum lease term. The maximum lease term associated with these assets ranges from 3 to 8 years. The maximum potential obligation at the end of the minimum lease term would be $58 million , $17 million of which is a guarantee by Pepco, $24 million by DPL and $16 million by ACE. The minimum lease term associated with these assets ranges from 1 to 4 years. Historically, payments under the guarantees have not been made and PHI believes the likelihood of payments being required under the guarantees is remote.

### Nuclear Insurance (Exelon and Generation)

Generation is subject to liability, property damage and other risks associated with major incidents at any of its nuclear stations. Generation has mitigated its financial exposure to these risks through insurance and other industry risk-sharing provisions.

The Price-Anderson Act was enacted to ensure the availability of funds for public liability claims arising from an incident at any of the U.S. licensed nuclear facilities and also to limit the liability of nuclear

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

reactor owners for such claims from any single incident. As of March 31, 2018 , the current liability limit per incident is $13.2 billion and is subject to change to account for the effects of inflation and changes in the number of licensed reactors at least once every five years with the last adjustment effective September 10, 2013. In accordance with the Price-Anderson Act, Generation maintains financial protection at levels equal to the amount of liability insurance available from private sources through the purchase of private nuclear energy liability insurance for public liability claims that could arise in the event of an incident. Effective January 1, 2017, the required amount of nuclear energy liability insurance purchased is $450 million for each operating site. Claims exceeding that amount are covered through mandatory participation in a financial protection pool, as required by the Price Anderson-Act, which provides the additional $13.0 billion per incident in funds available for public liability claims. Participation in this secondary financial protection pool requires the operator of each reactor to fund its proportionate share of costs for any single incident that exceeds the primary layer of financial protection. Exelon's share of this secondary layer would be approximately $2.8 billion , however any amounts payable under this secondary layer would be capped at $ 420 million per year.

In addition, the U.S. Congress could impose revenue-raising measures on the nuclear industry to pay public liability claims exceeding the $13.2 billion limit for a single incident.

As part of the execution of the NOSA on April 1, 2014, Generation executed an Indemnity Agreement pursuant to which Generation agreed to indemnify EDF and its affiliates against third-party claims that may arise from any future nuclear incident (as defined in the Price-Anderson Act) in connection with the CENG nuclear plants or their operations. Exelon guarantees Generation's obligations under this indemnity. See Note 2 — Variable Interest Entities of the Exelon 2017 Form 10-K for additional information on Generation's operations relating to CENG.

Generation is required each year to report to the NRC the current levels and sources of property insurance that demonstrates Generation possesses sufficient financial resources to stabilize and decontaminate a reactor and reactor station site in the event of an accident. The property insurance maintained for each facility is currently provided through insurance policies purchased from NEIL, an industry mutual insurance company of which Generation is a member.

NEIL may declare distributions to its members as a result of favorable operating experience. In recent years NEIL has made distributions to its members, but Generation cannot predict the level of future distributions or if they will continue at all. In March 2018, NEIL declared a supplemental distribution. Generation's portion of the supplemental distribution declared by NEIL is estimated to be $31 million and was recorded as a reduction to Operating and maintenance expense within Exelon and Generation's Consolidated Statements of Operations and Comprehensive Income for the three months ended March 31, 2018, with cash expected to be received during the second quarter 2018.

Premiums paid to NEIL by its members are also subject to a potential assessment for adverse loss experience in the form of a retrospective premium obligation. NEIL has never assessed this retrospective premium since its formation in 1973, and Generation cannot predict the level of future assessments if any. The current maximum aggregate annual retrospective premium obligation for Generation is approximately $ 360 million . NEIL requires its members to maintain an investment grade credit rating or to ensure collectability of their annual retrospective premium obligation by providing a financial guarantee, letter of credit, deposit premium, or some other means of assurance.

NEIL provides "all risk" property damage, decontamination and premature decommissioning insurance for each station for losses resulting from damage to its nuclear plants, either due to accidents or acts of terrorism. If the decision is made to decommission the facility, a portion of the insurance proceeds will be allocated to a fund, which Generation is required by the NRC to maintain, to provide for decommissioning the facility. In the event of an insured loss, Generation is unable to predict the timing of the availability of insurance proceeds to Generation and the amount of such proceeds that would be available. In the event that one or more acts of terrorism cause accidental property damage within a

148

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

twelve-month period from the first accidental property damage under one or more policies for all insured plants, the maximum recovery by Exelon will be an aggregate of $3.2 billion plus such additional amounts as the insurer may recover for all such losses from reinsurance, indemnity and any other source, applicable to such losses.

For its insured losses, Generation is self-insured to the extent that losses are within the policy deductible or exceed the amount of insurance maintained. Uninsured losses and other expenses, to the extent not recoverable from insurers or the nuclear industry, could also be borne by Generation. Any such losses could have a material adverse effect on Exelon's and Generation's financial condition, results of operations and cash flows.

**Environmental Remediation Matters**

*General.*  The Registrants' operations have in the past, and may in the future, require substantial expenditures to comply with environmental laws. Additionally, under Federal and state environmental laws, the Registrants are generally liable for the costs of remediating environmental contamination of property now or formerly owned by them and of property contaminated by hazardous substances generated by them. The Registrants own or lease a number of real estate parcels, including parcels on which their operations or the operations of others may have resulted in contamination by substances that are considered hazardous under environmental laws. In addition, the Registrants are currently involved in a number of proceedings relating to sites where hazardous substances have been deposited and may be subject to additional proceedings in the future. Unless otherwise disclosed, the Registrants cannot reasonably estimate whether they will incur significant liabilities for additional investigation and remediation costs at these or additional sites identified by the Registrants, environmental agencies or others, or whether such costs will be recoverable from third parties, including customers. Additional costs could have a material, unfavorable impact on the Registrants' financial conditions, results of operations and cash flows.

**MGP Sites**

ComEd, PECO, BGE and DPL have identified sites where former MGP activities have or may have resulted in actual site contamination. For almost all of these sites, there are additional PRPs that may share responsibility for the ultimate remediation of each location.

- ComEd has identified 42 sites, 20 of which have been remediated and approved by the Illinois EPA or the U.S. EPA and 22 that are currently under some degree of active study and/or remediation. ComEd expects the majority of the remediation at these sites to continue through at least 2022.

- PECO has identified 26 sites, 17 of which have been remediated in accordance with applicable PA DEP regulatory requirements and 9 that are currently under some degree of active study and/or remediation. PECO expects the majority of the remediation at these sites to continue through at least 2022.

- BGE has identified 13 former gas manufacturing or purification sites, 9 of which the remediation has been completed and approved by the MDE and 4 that require some level of remediation and/or ongoing activity. BGE has determined that a loss associated with these sites is probable and has recorded an estimated liability, which is included in the table below. However, it is reasonably possible that BGE's cost of remediation for one of its sites could be up to $13 million .

- DPL has identified 3 sites, 2 of which remediation has been completed and approved by the MDE or the Delaware Department of Natural Resources and Environmental Control.

149

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The remaining site is under study and the required cost at the site is not expected to be material.

The historical nature of the MGP sites and the fact that many of the sites have been buried and built over, impacts the ability to determine a precise estimate of the ultimate costs prior to initial sampling and determination of the exact scope and method of remedial activity. Management determines its best estimate of remediation costs using all available information at the time of each study, including probabilistic and deterministic modeling for ComEd and PECO, and the remediation standards currently required by the applicable state environmental agency.  Prior to completion of any significant clean up, each site remediation plan is approved by the appropriate state environmental agency.

ComEd, pursuant to an ICC order, and PECO, pursuant to settlements of natural gas distribution rate cases with the PAPUC, are currently recovering environmental remediation costs of former MGP facility sites through customer rates. See Note 6 — Regulatory Matters for additional information regarding the associated regulatory assets. While BGE and DPL do not have riders for MGP clean-up costs, they have historically received recovery of actual clean-up costs in distribution rates.

As of March 31, 2018 and December 31, 2017 , the Registrants had accrued the following undiscounted amounts for environmental liabilities in Other current liabilities and Other deferred credits and other liabilities within their respective Consolidated Balance Sheets:

| March 31, 2018 | Total environmental investigation and remediation reserve | | Portion of total related to MGP investigation and remediation | |
|---|---|---|---|---|
| Exelon | $ | 462 | $ | 313 |
| Generation | | 117 | | — |
| ComEd | | 283 | | 281 |
| PECO | | 29 | | 28 |
| BGE | | 5 | | 4 |
| PHI | | 28 | | — |
| Pepco | | 26 | | — |
| DPL | | 1 | | — |
| ACE | | 1 | | — |

| December 31, 2017 | Total environmental investigation and remediation reserve | | Portion of total related to MGP investigation and remediation | |
|---|---|---|---|---|
| Exelon | $ | 466 | $ | 315 |
| Generation | | 117 | | — |
| ComEd | | 285 | | 283 |
| PECO | | 30 | | 28 |
| BGE | | 5 | | 4 |
| PHI | | 29 | | — |
| Pepco | | 27 | | — |
| DPL | | 1 | | — |
| ACE | | 1 | | — |

*Solid and Hazardous Waste*

150

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

   ***Cotter Corporation.***   The EPA has advised Cotter Corporation (Cotter), a former ComEd subsidiary, that it is potentially liable in connection with radiological contamination at a site known as the West Lake Landfill in Missouri. In 2000, ComEd sold Cotter to an unaffiliated third-party. As part of the sale, ComEd agreed to indemnify Cotter for any liability arising in connection with the West Lake Landfill. In connection with Exelon's 2001 corporate restructuring, this responsibility to indemnify Cotter was transferred to Generation. On May 29, 2008, the EPA issued a Record of Decision (ROD) approving a landfill cover remediation approach. Generation had previously recorded an estimated liability for its anticipated share of a landfill cover remedy that was estimated to cost approximately $90 million in total. By letter dated January 11, 2010, the EPA requested that the PRPs perform a supplemental feasibility study for a remediation alternative that would involve complete excavation of the radiological contamination. On September 30, 2011, the PRPs submitted the supplemental feasibility study to the EPA for review. Since June 2012, the EPA has requested that the PRPs perform a series of additional analyses and groundwater and soil sampling as part of the supplemental feasibility study. This further analysis was focused on a partial excavation remedial option. The PRPs provided the draft final Remedial Investigation and Feasibility Study (RI/FS) to the EPA in January 2018, which formed the basis for EPA's proposed remedy selection, as further discussed below. There are currently three PRPs participating in the West Lake Landfill remediation proceeding. Investigation by Generation has identified a number of other parties who also may be PRPs and could be liable to contribute to the final remedy. Further investigation is ongoing.

   On February 1, 2018, the EPA announced its proposed remedy involving partial excavation of the site with an enhanced landfill cover. The proposed remedy was open for public comment through April 23, 2018 and Generation currently expects that a ROD will be issued during the third quarter of 2018. Thereafter, the EPA will seek to enter into a Consent Decree with the PRPs to effectuate the remedy, which Generation currently expects will occur in late 2018 or early 2019. The estimated cost of the remedy, taking into account the current EPA technical requirements and the total costs expected to be incurred by the PRPs in fully executing the remedy, is approximately $340 million , including cost escalation on an undiscounted basis, which would be allocated among the final group of PRPs. Generation has determined that a loss associated with the EPA's partial excavation and enhanced landfill cover remedy is probable and has recorded a liability included in the table above, that reflects management's best estimate of Cotter's allocable share of the ultimate cost for the entire remediation effort. Given the joint and several nature of this liability, the magnitude of Generation's ultimate liability will depend on the actual costs incurred to implement the ultimate required remediation remedy as well as on the nature and terms of any cost-sharing arrangements with the final group of PRPs. Therefore, it is reasonably possible that the ultimate cost and Generation's associated allocable share could differ significantly once these uncertainties are resolved, which could have a material impact on Exelon's and Generation's future financial conditions, results of operations and cash flows.

   On January 16, 2018, the PRPs were advised by the EPA that it will begin an additional investigation and evaluation of groundwater conditions at the West Lake Landfill. The PRPs have been provided with a draft statement of work that will form the basis of an Administrative Settlement Agreement and Order on Consent for the performance by the PRPs of the groundwater RI/FS and reimbursement of EPA's oversight costs. The purposes of this new RI/FS are to define the nature and extent of any groundwater contamination from the West Lake Landfill site, determine the potential risk posed to human health and the environment, and evaluate remedial alternatives. Generation estimates the undiscounted cost for the groundwater RI/FS for West Lake to be approximately $20 million and Generation has recorded a liability included in the table above, that reflects management's best estimate of Cotter's allocable share of the cost among the PRPs. At this time Generation cannot predict the likelihood or the extent to which, if any, remediation activities will be required and cannot estimate a reasonably possible range of loss for response costs beyond those associated with the RI/FS component. It is reasonably possible, however, that resolution of this matter could have a material, unfavorable impact on Exelon's and Generation's future results of operations and cash flows.

151

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

During December 2015, the EPA took two actions related to the West Lake Landfill designed to abate what it termed as imminent and dangerous conditions at the landfill. The first involved installation by the PRPs of a non-combustible surface cover to protect against surface fires in areas where radiological materials are believed to have been disposed. Generation has accrued what it believes to be an adequate amount to cover its anticipated liability for this interim action, and the work is expected to be completed in 2018. The second action involved EPA's public statement that it will require the PRPs to construct a barrier wall in an adjacent landfill to prevent a subsurface fire from spreading to those areas of the West Lake Landfill where radiological materials are believed to have been disposed. At this time, Generation believes that the requirement to build a barrier wall is remote in light of other technologies that have been employed by the adjacent landfill owner. Finally, one of the other PRPs, the landfill owner and operator of the adjacent landfill, has indicated that it will be making a contribution claim against Cotter for costs that it has incurred to prevent the subsurface fire from spreading to those areas of the West Lake Landfill where radiological materials are believed to have been disposed. At this time, Exelon and Generation do not possess sufficient information to assess this claim and therefore are unable to estimate a range of loss, if any. As such, no liability has been recorded for the potential contribution claim. It is reasonably possible, however, that resolution of this matter could have a material, unfavorable impact on Exelon's and Generation's financial conditions, results of operations and cash flows.

On August 8, 2011, Cotter was notified by the DOJ that Cotter is considered a PRP with respect to the government's clean-up costs for contamination attributable to low level radioactive residues at a former storage and reprocessing facility named Latty Avenue near St. Louis, Missouri. The Latty Avenue site is included in ComEd's indemnification responsibilities discussed above as part of the sale of Cotter. The radioactive residues had been generated initially in connection with the processing of uranium ores as part of the U.S. Government's Manhattan Project. Cotter purchased the residues in 1969 for initial processing at the Latty Avenue facility for the subsequent extraction of uranium and metals. In 1976, the NRC found that the Latty Avenue site had radiation levels exceeding NRC criteria for decontamination of land areas. Latty Avenue was investigated and remediated by the United States Army Corps of Engineers pursuant to funding under FUSRAP. The DOJ has not yet formally advised the PRPs of the amount that it is seeking, but it is believed to be approximately $90 million from all PRPs. The DOJ and the PRPs agreed to toll the statute of limitations until August 2018 so that settlement discussions could proceed. Generation has determined that a loss associated with this matter is probable under its indemnification agreement with Cotter and has recorded an estimated liability, which is included in the table above.

Commencing in February 2012, a number of lawsuits have been filed in the U.S. District Court for the Eastern District of Missouri. Among the defendants were Exelon, Generation and ComEd, all of which were subsequently dismissed from the case, as well as Cotter, which remains a defendant. The suits allege that individuals living in the North St. Louis area developed some form of cancer or other serious illness due to Cotter's negligent or reckless conduct in processing, transporting, storing, handling and/or disposing of radioactive materials. Plaintiffs are asserting public liability claims under the Price-Anderson Act. Their state law claims for negligence, strict liability, emotional distress, and medical monitoring have been dismissed. The complaints do not contain specific damage claims. In the event of a finding of liability against Cotter, it is reasonably possible that Generation would be financially responsible due to its indemnification responsibilities of Cotter described above. The court has dismissed a number of the lawsuits as untimely, and that has been upheld on appeal. The parties have engaged in settlement discussions pursuant to court-ordered mediation and it is expected that resolution of this matter will not have a material, unfavorable impact on Exelon's and Generation's financial conditions, results of operations and cash flows.

**Benning Road Site.** In September 2010, PHI received a letter from EPA identifying the Benning Road site as one of six land-based sites potentially contributing to contamination of the lower Anacostia River. A portion of the site was formerly the location of a Pepco Energy Services electric generating facility. That generating facility was deactivated in June 2012 and plant structure demolition was

152

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

completed in July 2015. The remaining portion of the site consists of a Pepco transmission and distribution service center that remains in operation. In December 2011, the U.S. District Court for the District of Columbia approved a Consent Decree entered into by Pepco and Pepco Energy Services with the DOEE, which requires Pepco and Pepco Energy Services to conduct a Remediation Investigation (RI)/ Feasibility Study (FS) for the Benning Road site and an approximately 10 to 15-acre portion of the adjacent Anacostia River. The RI/FS will form the basis for the remedial actions for the Benning Road site and for the Anacostia River sediment associated with the site. The Consent Decree does not obligate Pepco or Pepco Energy Services to pay for or perform any remediation work, but it is anticipated that DOEE will look to Pepco and Pepco Energy Services to assume responsibility for cleanup of any conditions in the river that are determined to be attributable to past activities at the Benning Road site. Pursuant to Exelon's March 23, 2016 acquisition of PHI, Pepco Energy Services was transferred to Generation.

Since 2013, Pepco and Pepco Energy Services (now Generation) have been performing RI work and have submitted multiple draft RI reports to the DOEE. Once the RI work is completed, Pepco and Generation will issue a draft "final" RI report for review and comment by DOEE and the public. Pepco and Generation will then proceed to develop an FS to evaluate possible remedial alternatives for submission to DOEE. The Court has established a schedule for completion of the RI and FS, and approval by the DOEE, by May 6, 2019.

Upon DOEE's approval of the final RI and FS Reports, Pepco and Generation will have satisfied their obligations under the Consent Decree. At that point, DOEE will prepare a Proposed Plan regarding further response actions. After considering public comment on the Proposed Plan, DOEE will issue a Record of Decision identifying any further response actions determined to be necessary.

PHI, Pepco and Generation have determined that a loss associated with this matter is probable and have accrued an estimated liability, which is included in the table above.

***Anacostia River Tidal Reach .*** Contemporaneous with the Benning RI/FS being performed by Pepco and Generation, DOEE and certain federal agencies have been conducting a separate RI/FS focused on the entire tidal reach of the Anacostia River extending from just north of the Maryland-D.C. boundary line to the confluence of the Anacostia and Potomac Rivers. In March 2016, DOEE released a draft of the river-wide RI Report for public review and comment. The river-wide RI incorporated the results of the river sampling performed by Pepco and Pepco Energy Services as part of the Benning RI/FS, as well as similar sampling efforts conducted by owners of other sites adjacent to this segment of the river and supplemental river sampling conducted by DOEE's contractor. DOEE asked Pepco, along with parties responsible for other sites along the river, to participate in a "Consultative Working Group" to provide input into the process for future remedial actions addressing the entire tidal reach of the river and to ensure proper coordination with the other river cleanup efforts currently underway, including cleanup of the river segment adjacent to the Benning Road site resulting from the Benning RI/FS. Pepco responded that it will participate in the Consultative Working Group but its participation is not an acceptance of any financial responsibility beyond the work that will be performed at the Benning Road site described above. DOEE has advised the Consultative Working Group that the federal and DOEE authorities conducted the remedial investigation and a draft of that report was released to the public on April 1, 2018. Written comments will be accepted by the Agencies until May 14, 2018 and a Public Meeting to present the finding of the RI is scheduled for April 24, 2018. Pepco intends to submit comments, participate in the Public Hearing, and continue its outreach efforts as appropriate to the agencies, governmental officials, community organizations and other key stakeholders. A feasibility study of potential remedies is being prepared by the Agencies and is scheduled to be released in the late summer or early fall of this year. DOEE currently is working under a statutorily mandated date to complete the Record of Decision selecting the final remedy for the project by June 30, 2018. However, on January 11, 2018 the DOEE requested at a hearing of the District of Columbia Council Committee of the Environment that this statutory deadline be extended until December 31, 2019 to reflect the time necessary to complete the investigation. A recommendation by the Committee to the DC Council is

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

expected in the near future. The District of Columbia Council will make the final determination to extend the deadline. An appropriate liability for Pepco's share of investigation costs has been accrued and is included in the table above. Although Pepco has determined that it is probable that costs for remediation will be incurred , Pepco cannot estimate the reasonably possible range of loss at this time and no liability has been accrued for those future costs. It is anticipated that Pepco will likely be in a better position to estimate that range of loss when the draft Feasibility Study for the Project is released. The timing for that release is currently scheduled for late this summer or early fall.

*Conectiv Energy Wholesale Power Generation Sites.* In July 2010, PHI sold the wholesale power generation business of Conectiv Energy Holdings, Inc. and substantially all of its subsidiaries (Conectiv Energy) to Calpine Corporation (Calpine). Under New Jersey's Industrial Site Recovery Act (ISRA), the transfer of ownership triggered an obligation on the part of Conectiv Energy to remediate any environmental contamination at each of the nine Conectiv Energy generating facility sites located in New Jersey. Under the terms of the sale, Calpine has assumed responsibility for performing the ISRA-required remediation and for the payment of all related ISRA compliance costs up to $10 million . Predecessor PHI was obligated to indemnify Calpine for any ISRA compliance remediation costs in excess of $10 million . According to PHI's estimates, the costs of ISRA-required remediation activities at the nine generating facility sites located in New Jersey are in the range of approximately $7 million to $18 million , and predecessor PHI recorded an estimated liability for its share of the estimated clean-up costs. Pursuant to Exelon's March 2016 acquisition of PHI, the Conectiv Energy legal entity was transferred to Generation and the liability for Predecessor PHI's share of the estimated clean- up costs was also transferred to Generation and is included in the table above as a liability of Generation. The responsibility to indemnify Calpine is shared by PHI and Generation.

*Brandywine Fly Ash Disposal Site.* In February 2013, Pepco received a letter from the MDE requesting that Pepco investigate the extent of waste on a Pepco right-of-way that traverses the Brandywine fly ash disposal site in Brandywine, Prince George's County, Maryland, owned by NRG Energy, Inc. (as successor to GenOn MD Ash Management, LLC) (NRG). In July 2013, while reserving its rights and related defenses under a 2000 agreement covering the sale of this site, Pepco indicated its willingness to investigate the extent of, and propose an appropriate closure plan to address, ash on the right-of-way. Pepco submitted a schedule for development of a closure plan to MDE on September 30, 2013 and, by letter dated October 18, 2013, MDE approved the schedule.

Pepco has determined that a loss associated with this matter is probable and has recorded an estimated liability, which is included in the table above. Pepco believes that the costs incurred in this matter may be recoverable from NRG under the 2000 sale agreement, but has not recorded an associated receivable for any potential recovery.

**Litigation and Regulatory Matters**

*PHI Merger*

In July 2015, the OPC, Public Citizen, Inc., the Sierra Club and the Chesapeake Climate Action Network (CCAN) filed motions to stay the MDPSC order approving the Exelon and PHI merger. The Circuit Court judge issued an order denying the motions for stay on August 12, 2015. On January 8, 2016, the Circuit Court judge affirmed the MDPSC's order approving the merger and denied the petitions for judicial review filed by the OPC, the Sierra Club, CCAN and Public Citizen, Inc. On January 19, 2016, the OPC filed a notice of appeal to the Maryland Court of Special Appeals, and on January 21, the Sierra Club and CCAN filed notices of appeal. On January 27, 2017, the Maryland Court of Special Appeals affirmed the Circuit Court's judgment that the MDPSC did not err in approving the merger. The OPC and Sierra Club filed petitions seeking further review in the Court of Appeals of Maryland, which is the highest court in Maryland. On June 21, 2017, the Court of Appeals granted discretionary review of the January 27, 2017 decision by the Maryland Court of Special Appeals. The Maryland Court of Appeals will review the OPC argument that the MDPSC did not properly consider the acquisition premium

154

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

paid to PHI shareholders under Maryland's merger approval standard and the Sierra Club's argument that the merger would harm the renewable and distributed generation markets. The two lower courts examining these issues rejected these arguments, which Exelon believes are without merit. All briefs have been filed and oral arguments were presented to the court on October 10, 2017.

### Asbestos Personal Injury Claims

*Exelon and Generation .*   Generation maintains a reserve for claims associated with asbestos-related personal injury actions in certain facilities that are currently owned by Generation or were previously owned by ComEd and PECO. The estimated liabilities are recorded on an undiscounted basis and exclude the estimated legal costs associated with handling these matters, which could be material.

At March 31, 2018 and December 31, 2017 , Generation had recorded estimated liabilities of approximately $76 million and $78 million , respectively, in total for asbestos-related bodily injury claims. As of March 31, 2018 , approximately $21 million of this amount related to 232 open claims presented to Generation, while the remaining $55 million is for estimated future asbestos-related bodily injury claims anticipated to arise through 2050, based on actuarial assumptions and analyses, which are updated on an annual basis. On a quarterly basis, Generation monitors actual experience against the number of forecasted claims to be received and expected claim payments and evaluates whether adjustments to the estimated liabilities are necessary.

On November 22, 2013, the Supreme Court of Pennsylvania held that the Pennsylvania Workers Compensation Act does not apply to an employee's disability or death resulting from occupational disease, such as diseases related to asbestos exposure, which manifests more than 300 weeks after the employee's last employment-based exposure, and that therefore the exclusivity provision of the Act does not preclude such employee from suing his or her employer in court. The Supreme Court's ruling reverses previous rulings by the Pennsylvania Superior Court precluding current and former employees from suing their employers in court, despite the fact that the same employee was not eligible for workers compensation benefits for diseases that manifest more than 300 weeks after the employee's last employment-based exposure to asbestos. Since the Pennsylvania Supreme Court's ruling in November 2013, Exelon, Generation, and PECO have experienced an increase in asbestos-related personal injury claims brought by former PECO employees, all of which have been accrued for on a claim by claim basis. Those additional claims are taken into account in projecting estimated future asbestos-related bodily injury claims.

On November 4, 2015, the Illinois Supreme Court found that the provisions of the Illinois' Workers' Compensation Act and the Workers' Occupational Diseases Act barred an employee from bringing a direct civil action against an employer for latent diseases, including asbestos-related diseases that fall outside the 25-year limit of the statute of repose. The Illinois Supreme Court's ruling reversed previous rulings by the Illinois Court of Appeals, which initially ruled that the Illinois Worker's Compensation law should not apply in cases where the diagnosis of an asbestos related disease occurred after the 25-year maximum time period for filing a Worker's Compensation claim. As a result of this ruling, Exelon, Generation, and ComEd have not recorded an increase to the asbestos-related bodily injury liability as of March 31, 2018 .

There is a reasonable possibility that Exelon may have additional exposure to estimated future asbestos-related bodily injury claims in excess of the amount accrued and the increases could have a material unfavorable impact on Exelon's, Generation's and PECO's financial conditions, results of operations and cash flows.

### City of Everett Tax Increment Financing Agreement (Exelon and Generation)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

On April 10, 2017, the City of Everett petitioned the Massachusetts Economic Assistance Coordinating Council (EACC) to revoke the 1999 tax increment financing agreement (TIF Agreement) relating to Mystic 8 & 9 on the grounds that the total investment in Mystic 8 & 9 materially deviates from the investment set forth in the TIF Agreement.  On October 31, 2017, a three-member panel of the EACC conducted an administrative hearing on the City's petition. On November 30, 2017, the hearing panel issued a tentative decision denying the City's petition, finding that there was no material misrepresentation that would justify revocation of the TIF Agreement. On December 13, 2017, the tentative decision was adopted by the full EACC. On January 12, 2018, the City filed a complaint in Massachusetts Superior Court requesting, among other things, that the court set aside the EACC's decision, grant the City's request to decertify the Project and the TIF Agreement, and award the City damages for alleged underpaid taxes over the period of the TIF Agreement. Generation vigorously contested the City's claims before the EACC and will continue to do so in the Massachusetts Superior Court proceeding. Generation continues to believe that the City's claim lacks merit. Accordingly, Generation has not recorded a liability for payment resulting from such a revocation, nor can Generation estimate a reasonably possible range of loss, if any, associated with any such revocation.  Further, it is reasonably possible that property taxes assessed in future periods, including those following the expiration of the current TIF Agreement in 2019, could be material to Generation's results of operations and cash flows.

### General

The Registrants are involved in various other litigation matters that are being defended and handled in the ordinary course of business. The assessment of whether a loss is probable or a reasonable possibility, and whether the loss or a range of loss is estimable, often involves a series of complex judgments about future events. The Registrants maintain accruals for such losses that are probable of being incurred and subject to reasonable estimation. Management is sometimes unable to estimate an amount or range of reasonably possible loss, particularly where (1) the damages sought are indeterminate, (2) the proceedings are in the early stages, or (3) the matters involve novel or unsettled legal theories. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including a possible eventual loss.

**Income Taxes**

See Note 12 — Income Taxes for information regarding the Registrants' income tax refund claims and certain tax positions, including the 1999 sale of fossil generating assets.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

**18 .   Supplemental Financial Information (All Registrants)**

**Supplemental Statement of Operations Information**

The following tables provide additional information about the Registrants' Consolidated Statements of Operations and Comprehensive Income for the three months ended March 31, 2018 and 2017 .

| | Three Months Ended March 31, 2018 | | | | | | | | |
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| **Other, Net** | | | | | | | | | |
| Decommissioning-related activities: | | | | | | | | | |
| Net realized income on decommissioning trust funds (a) | | | | | | | | | |
| Regulatory agreement units | $ 46 | $ 46 | $ — | $ — | $ — | $ — | $ — | $ — | — |
| Non-regulatory agreement units | 56 | 56 | — | — | — | — | — | — | — |
| Net unrealized losses on decommissioning trust funds | | | | | | | | | |
| Regulatory agreement units | (75) | (75) | — | — | — | — | — | — | — |
| Non-regulatory agreement units | (96) | (96) | — | — | — | — | — | — | — |
| Net unrealized losses on pledged assets | | | | | | | | | |
| Zion Station decommissioning | (2) | (2) | — | — | — | — | — | — | — |
| Regulatory offset to decommissioning trust fund-related activities (b) | 24 | 24 | — | — | — | — | — | — | — |
| Total decommissioning-related activities | (47) | (47) | — | — | — | — | — | — | — |
| Investment income | 4 | 2 | — | — | — | — | — | — | — |
| Interest income related to uncertain income tax positions | 2 | 1 | — | — | — | — | — | — | — |
| AFUDC — Equity | 18 | — | 6 | 2 | 4 | 6 | 5 | 1 | — |
| Non-service net periodic benefit cost | (10) | — | — | — | — | — | — | — | — |
| Other | 5 | — | 2 | — | — | 5 | 3 | 1 | 1 |
| Other, net | $ (28) | $ (44) | $ 8 | $ 2 | $ 4 | $ 11 | $ 8 | $ 2 | $ 1 |

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| | | Three Months Ended March 31, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Other, Net** | | | | | | | | | |
| Decommissioning-related activities: | | | | | | | | | |
| Net realized income on decommissioning trust funds (a) | | | | | | | | | |
| Regulatory agreement units | $    68 | $    68 | $    — | $    — | $    — | $    — | $    — | $    — | $    — |
| Non-regulatory agreement units | 32 | 32 | — | — | — | — | — | — | — |
| Net unrealized gains on decommissioning trust funds | | | | | | | | | |
| Regulatory agreement units | 222 | 222 | — | — | — | — | — | — | — |
| Non-regulatory agreement units | 166 | 166 | — | — | — | — | — | — | — |
| Net unrealized losses on pledged assets | | | | | | | | | |
| Zion Station decommissioning | (1) | (1) | — | — | — | — | — | — | — |
| Regulatory offset to decommissioning trust fund-related activities (b) | (234) | (234) | — | — | — | — | — | — | — |
| Total decommissioning-related activities | 253 | 253 | — | — | — | — | — | — | — |
| Investment income | 2 | 2 | — | — | — | — | — | — | — |
| Interest income related to uncertain income tax positions | 1 | — | — | — | — | — | — | — | — |
| AFUDC — Equity | 17 | — | 2 | 2 | 4 | 9 | 5 | 2 | 2 |
| Non-service net periodic benefit cost | (26) | — | — | — | — | — | — | — | — |
| Other | 10 | 4 | 2 | — | — | 4 | 3 | 1 | — |
| Other, net | $   257 | $   259 | $    4 | $    2 | $    4 | $   13 | $    8 | $    3 | $    2 |

(a)   Includes investment income and realized gains and losses on sales of investments of the trust funds.
(b)   Includes the elimination of NDT fund activity for the Regulatory Agreement Units, including the elimination of net income taxes related to all NDT fund activity for those units. See Note 15 — Asset Retirement Obligations of the Exelon 2017 Form 10-K for additional information regarding the accounting for nuclear decommissioning.

The following utility taxes are included in revenues and expenses for the three months ended March 31, 2018 and 2017 . Generation's utility tax expense represents gross receipts tax related to its retail operations, and the Utility Registrants' utility tax expense represents municipal and state utility taxes and gross receipts taxes related to their operating revenues. The offsetting collection of utility taxes from customers is recorded in revenues on the Registrants' Consolidated Statements of Operations and Comprehensive Income.

| | Three Months Ended March 31, 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| Utility taxes | $   235 | $   32 | $   61 | $   33 | $   26 | $   83 | $   77 | $   6 | $   — |

| | Three Months Ended March 31, 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| Utility taxes | $   224 | $   32 | $   59 | $   31 | $   26 | $   76 | $   71 | $   5 | $   — |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

**Supplemental Cash Flow Information**

The following tables provide additional information regarding the Registrants' Consolidated Statements of Cash Flows for the three months ended March 31, 2018 and 2017 .

| | Three Months Ended March 31, 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Depreciation, amortization and accretion** | | | | | | | | | |
| Property, plant and equipment [a] | $ 926 | $ 436 | $ 201 | $ 68 | $ 82 | $ 117 | $ 53 | $ 32 | $ 23 |
| Amortization of regulatory assets [a] | 152 | — | 27 | 7 | 52 | 66 | 43 | 13 | 10 |
| Amortization of intangible assets, net [a] | 13 | 12 | — | — | — | — | — | — | — |
| Amortization of energy contract assets and liabilities [b] | 3 | 3 | — | — | — | — | — | — | — |
| Nuclear fuel [c] | 287 | 287 | — | — | — | — | — | — | — |
| ARO accretion [d] | 120 | 120 | — | — | — | — | — | — | — |
| Total depreciation, amortization and accretion | $ 1,501 | $ 858 | $ 228 | $ 75 | $ 134 | $ 183 | $ 96 | $ 45 | $ 33 |

| | Three Months Ended March 31, 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Depreciation, amortization and accretion** | | | | | | | | | |
| Property, plant and equipment [a] | $ 754 | $ 289 | $ 190 | $ 64 | $ 80 | $ 112 | $ 50 | $ 30 | $ 21 |
| Amortization of regulatory assets [a] | 128 | — | 18 | 7 | 48 | 55 | 32 | 9 | 14 |
| Amortization of intangible assets, net [a] | 14 | 13 | — | — | — | — | — | — | — |
| Amortization of energy contract assets and liabilities [b] | 2 | 2 | — | — | — | — | — | — | — |
| Nuclear fuel [c] | 264 | 264 | — | — | — | — | — | — | — |
| ARO accretion [d] | 112 | 110 | — | — | — | — | — | — | — |
| Total depreciation, amortization and accretion | $ 1,274 | $ 678 | $ 208 | $ 71 | $ 128 | $ 167 | $ 82 | $ 39 | $ 35 |

(a)   Included in Depreciation and amortization on the Registrants' Consolidated Statements of Operations and Comprehensive Income.
(b)   Included in Operating revenues or Purchased power and fuel expense on the Registrants' Consolidated Statements of Operations and Comprehensive Income.
(c)   Included in Purchased power and fuel expense on the Registrants' Consolidated Statements of Operations and Comprehensive Income.
(d)   Included in Operating and maintenance expense on the Registrants' Consolidated Statements of Operations and Comprehensive Income.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended March 31, 2018 | | | | | |
| **Other non-cash operating activities:** | | | | | | | | | |
| Pension and non-pension postretirement benefit costs | $ 145 | $ 51 | $ 45 | $ 5 | $ 14 | $ 15 | $ 4 | $ — | $ 3 |
| Loss from equity method investments | 7 | 7 | — | — | — | — | — | — | — |
| Provision for uncollectible accounts | 64 | 11 | 8 | 17 | 8 | 20 | 6 | 8 | 5 |
| Stock-based compensation costs | 29 | — | 8 | — | — | — | — | — | — |
| Other decommissioning-related activity [a] | (31) | (31) | — | — | — | — | — | — | — |
| Energy-related options [b] | (7) | (7) | — | — | — | — | — | — | — |
| Amortization of regulatory asset related to debt costs | 2 | — | 1 | — | — | 1 | — | — | — |
| Amortization of rate stabilization deferral | 7 | — | — | — | — | 7 | 1 | 6 | — |
| Amortization of debt fair value adjustment | (3) | (3) | — | — | — | — | — | — | — |
| Discrete impacts from EIMA and FEJA [c] | (4) | — | (4) | — | — | — | — | — | — |
| Amortization of debt costs | 9 | 3 | 1 | — | — | 1 | — | — | — |
| Provision for excess and obsolete inventory | 13 | 12 | 1 | — | — | — | — | — | — |
| Other | 9 | 2 | (6) | (1) | (2) | 9 | (1) | 5 | 1 |
| Total other non-cash operating activities | $ 240 | $ 45 | $ 46 | $ 21 | $ 20 | $ 53 | $ 10 | $ 19 | $ 9 |
| **Non-cash investing and financing activities:** | | | | | | | | | |
| Increase (decrease) in capital expenditures not paid | $ (177) | $ (131) | $ (48) | $ (25) | $ (11) | $ 61 | $ 19 | $ 14 | $ 27 |
| Increase in PPE related to ARO update | 32 | 32 | — | — | — | — | — | — | — |
| Dividends on stock compensation | 1 | — | — | — | — | — | — | — | — |

160

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| | | | | Three Months Ended March 31, 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Other non-cash operating activities:** | | | | | | | | | |
| Pension and non-pension postretirement benefit costs | $ 157 | $ 54 | $ 44 | $ 7 | $ 16 | $ 24 | $ 7 | $ 3 | $ 3 |
| Loss from equity method investments | 10 | 10 | — | — | — | — | — | — | — |
| Provision for uncollectible accounts | 34 | 9 | 7 | 17 | 5 | (4) | (5) | (1) | 1 |
| Stock-based compensation costs | 31 | — | — | — | — | — | — | — | — |
| Other decommissioning-related activity [a] | (84) | (84) | — | — | — | — | — | — | — |
| Energy-related options [b] | (4) | (4) | — | — | — | — | — | — | — |
| Amortization of regulatory asset related to debt costs | 2 | — | 1 | — | — | 1 | — | — | — |
| Amortization of rate stabilization deferral | (14) | — | — | — | 7 | (21) | (15) | (6) | — |
| Amortization of debt fair value adjustment | (5) | (3) | — | — | — | (2) | — | — | — |
| Discrete impacts from EIMA and FEJA [c] | (24) | — | (24) | — | — | — | — | — | — |
| Amortization of debt costs | 9 | 4 | 1 | — | — | — | — | — | — |
| Provision for excess and obsolete inventory | 2 | 1 | 1 | — | — | — | — | — | — |
| Other | 4 | 3 | 1 | (1) | (4) | (6) | (2) | (3) | (2) |
| Total other non-cash operating activities | $ 118 | $ (10) | $ 31 | $ 23 | $ 24 | $ (8) | $ (15) | $ (7) | $ 2 |
| **Non-cash investing and financing activities:** | | | | | | | | | |
| Increase (decrease) in capital expenditures not paid | $ (193) | $ (56) | $ (66) | $ (42) | $ 1 | $ (5) | $ (6) | $ 9 | $ — |
| Non-cash financing of capital projects | 10 | 10 | — | — | — | — | — | — | — |
| Dividends on stock compensation | 2 | | | | | | | | |

---

(a) Includes the elimination of NDT fund activity for the Regulatory Agreement Units, including the elimination of operating revenues, ARO accretion, ARC amortization, investment income and income taxes related to all NDT fund activity for these units. See Note 15 — Asset Retirement Obligations of the Exelon 2017 Form 10-K for additional information regarding the accounting for nuclear decommissioning.

(b) Includes option premiums reclassified to realized at the settlement of the underlying contracts and recorded in Operating revenues.

(c) Reflects the change in distribution rates pursuant to EIMA and FEJA, which allows for the recovery of distribution costs by a utility through a pre-established performance-based formula rate tariff. Beginning June 1, 2017, also reflects the change in energy efficiency rates pursuant to FEJA, which allows for the recovery of energy efficiency costs by a utility through a pre-established performance-based formula rate tariff. See Note 6 — Regulatory Matters for more information.

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following tables provide a reconciliation of cash, cash equivalents and restricted cash reported within the Registrants' Consolidated Balance Sheets that sum to the total of the same amounts in their Consolidated Statements of Cash Flows.

| March 31, 2018 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 787 | $ 610 | $ 70 | $ 21 | $ 22 | $ 43 | $ 15 | $ 7 | $ 10 |
| Restricted cash | 209 | 127 | 9 | 5 | 2 | 40 | 33 | — | 7 |
| Restricted cash included in other long-term assets | 103 | — | 83 | — | — | 20 | — | — | 20 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ 1,099 | $ 737 | $ 162 | $ 26 | $ 24 | $ 103 | $ 48 | $ 7 | $ 37 |

| December 31, 2017 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 898 | $ 416 | $ 76 | $ 271 | $ 17 | $ 30 | $ 5 | $ 2 | $ 2 |
| Restricted cash | 207 | 138 | 5 | 4 | 1 | 42 | 35 | — | 6 |
| Restricted cash included in other long-term assets | 85 | — | 63 | — | — | 23 | — | — | 23 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ 1,190 | $ 554 | $ 144 | $ 275 | $ 18 | $ 95 | $ 40 | $ 2 | $ 31 |

| March 31, 2017 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 609 | $ 400 | $ 31 | $ 28 | $ 11 | $ 109 | $ 8 | $ 44 | $ 54 |
| Restricted cash | 254 | 140 | 3 | 4 | 43 | 41 | 33 | — | 7 |
| Restricted cash included in other long-term assets | 26 | — | — | — | 3 | 23 | — | — | 23 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ 889 | $ 540 | $ 34 | $ 32 | $ 57 | $ 173 | $ 41 | $ 44 | $ 84 |

| December 31, 2016 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 635 | $ 290 | $ 56 | $ 63 | $ 23 | $ 170 | $ 9 | $ 46 | $ 101 |
| Restricted cash | 253 | 158 | 2 | 4 | 24 | 43 | 33 | — | 9 |
| Restricted cash included in other long-term assets | 26 | — | — | — | 3 | 23 | — | — | 23 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ 914 | $ 448 | $ 58 | $ 67 | $ 50 | $ 236 | $ 42 | $ 46 | $ 133 |

For additional information on restricted cash see Note 1 — Significant Accounting Policies of the Exelon 2017 Form 10-K.

162

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

**Supplemental Balance Sheet Information**

The following tables provide additional information about assets and liabilities of the Registrants as of March 31, 2018 and December 31, 2017 .

| March 31, 2018 | Exelon | Generation | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|---|
| **Property, plant and equipment:** | | | | | | | | | |
| Accumulated depreciation and amortization | $ 21,905 (a) | $ 11,936 (a) | $ 4,391 | $ 3,445 | $ 3,471 | $ 575 | $ 3,224 | $ 1,273 | $ 1,086 |
| **Accounts receivable:** | | | | | | | | | |
| Allowance for uncollectible accounts | $ 369 | $ 115 | $ 89 | $ 68 | $ 31 | $ 66 | $ 24 | $ 22 | $ 20 |
| **December 31, 2017** | **Exelon** | **Generation** | **ComEd** | **PECO** | **BGE** | **PHI** | **Pepco** | **DPL** | **ACE** |
| **Property, plant and equipment:** | | | | | | | | | |
| Accumulated depreciation and amortization | $ 21,064 (b) | $ 11,428 (b) | $ 4,269 | $ 3,411 | $ 3,405 | $ 487 | $ 3,177 | $ 1,247 | $ 1,066 |
| **Accounts receivable:** | | | | | | | | | |
| Allowance for uncollectible accounts | $ 322 | $ 114 | $ 73 | $ 56 | $ 24 | $ 55 | $ 21 | $ 16 | $ 18 |

(a)   Includes accumulated amortization of nuclear fuel in the reactor core of $3,263 million .
(b)   Includes accumulated amortization of nuclear fuel in the reactor core of $3,159 million .

**PECO Installment Plan Receivables (Exelon and PECO)**

PECO enters into payment agreements with certain delinquent customers, primarily residential, seeking to restore their service, as required by the PAPUC. Customers with past due balances that meet certain income criteria are provided the option to enter into an installment payment plan, some of which have terms greater than one year. The receivable balance for these payment agreement receivables is recorded in accounts receivable for the current portion and other deferred debits and other assets for the noncurrent portion. The net receivable balance for installment plans with terms greater than one year was $8 million and $11 million as of March 31, 2018 and December 31, 2017 , respectively. The allowance for uncollectible accounts balance associated with these receivables at March 31, 2018 of $10 million consists of $3 million and $7 million for medium risk and high risk segments, respectively. The allowance for uncollectible accounts balance at December 31, 2017 of $11 million consists of $3 million and $8 million for medium risk and high risk segments, respectively. For further information regarding uncollectible accounts reserve methodology and assessment of the credit quality of the installment plan receivables, refer to Note 1 — Significant Accounting Policies of the Exelon 2017 Form 10-K.

**19 .   Segment Information (All Registrants)**

Operating segments for each of the Registrants are determined based on information used by the chief operating decision maker(s) (CODM) in deciding how to evaluate performance and allocate resources at each of the Registrants.

Exelon has twelve reportable segments, which include ComEd, PECO, BGE, PHI's three reportable segments consisting of Pepco, DPL, and ACE, and Generation's six reportable segments consisting of the Mid-Atlantic, Midwest, New England, New York, ERCOT and all other power regions referred to

163

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

collectively as "Other Power Regions", which includes activities in the South, West and Canada. ComEd, PECO, BGE, Pepco, DPL and ACE each represent a single reportable segment, and as such, no separate segment information is provided for these Registrants. Exelon, ComEd, PECO, BGE, Pepco, DPL and ACE's CODMs evaluate the performance of and allocate resources to ComEd, PECO, BGE, Pepco, DPL and ACE based on net income and return on equity.

The basis for Generation's reportable segments is the integrated management of its electricity business that is located in different geographic regions, and largely representative of the footprints of ISO/RTO and/or NERC regions, which utilize multiple supply sources to provide electricity through various distribution channels (wholesale and retail). Generation's hedging strategies and risk metrics are also aligned to these same geographic regions. Descriptions of each of Generation's six reportable segments are as follows:

- Mid-Atlantic represents operations in the eastern half of PJM, which includes New Jersey, Maryland, Virginia, West Virginia, Delaware, the District of Columbia and parts of Pennsylvania and North Carolina.

- Midwest represents operations in the western half of PJM, which includes portions of Illinois, Pennsylvania, Indiana, Ohio, Michigan, Kentucky and Tennessee, and the United States footprint of MISO, excluding MISO's Southern Region, which covers all or most of North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, the remaining parts of Illinois, Indiana, Michigan and Ohio not covered by PJM, and parts of Montana, Missouri and Kentucky.

- New England represents the operations within ISO-NE covering the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

- New York represents operations within ISO-NY, which covers the state of New York in its entirety.

- ERCOT represents operations within Electric Reliability Council of Texas, covering most of the state of Texas.

- Other Power Regions :

  - South represents operations in the FRCC, MISO's Southern Region, and the remaining portions of the SERC not included within MISO or PJM, which includes all or most of Florida, Arkansas, Louisiana, Mississippi, Alabama, Georgia, Tennessee, North Carolina, South Carolina and parts of Missouri, Kentucky and Texas. Generation's South region also includes operations in the SPP, covering Kansas, Oklahoma, most of Nebraska and parts of New Mexico, Texas, Louisiana, Missouri, Mississippi and Arkansas.

  - West represents operations in the WECC, which includes California ISO, and covers the states of California, Oregon, Washington, Arizona, Nevada, Utah, Idaho, Colorado and parts of New Mexico, Wyoming and South Dakota.

  - Canada represents operations across the entire country of Canada and includes AESO, OIESO and the Canadian portion of MISO.

The CODMs for Exelon and Generation evaluate the performance of Generation's electric business activities and allocate resources based on revenues net of purchased power and fuel expense (RNF). Generation believes that RNF is a useful measurement of operational performance. RNF is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report. Generation's operating revenues include all sales to third parties and affiliated sales to the Utility Registrants. Purchased power costs include all costs associated with the procurement and supply of electricity including capacity, energy

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

and ancillary services. Fuel expense includes the fuel costs for Generation's owned generation and fuel costs associated with tolling agreements. The results of Generation's other business activities are not regularly reviewed by the CODM and are therefore not classified as operating segments or included in the regional reportable segment amounts. These activities include natural gas, as well as other miscellaneous business activities that are not significant to Generation's overall operating revenues or results of operations. Further, Generation's unrealized mark-to-market gains and losses on economic hedging activities and its amortization of certain intangible assets and liabilities relating to commodity contracts recorded at fair value from mergers and acquisitions are also excluded from the regional reportable segment amounts. Exelon and Generation do not use a measure of total assets in making decisions regarding allocating resources to or assessing the performance of these reportable segments.

165

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

An analysis and reconciliation of the Registrants' reportable segment information to the respective information in the consolidated financial statements for the three months ended March 31, 2018 and 2017 is as follows:

**Three Months Ended March 31, 2018 and 2017**

| | Generation (a) | ComEd | PECO | BGE | PHI | Other (b) | Intersegment Eliminations | Exelon |
|---|---|---|---|---|---|---|---|---|
| **Operating revenues (c) :** | | | | | | | | |
| 2018 | | | | | | | | |
| Competitive businesses electric revenues | $ 4,509 | $ — | $ — | $ — | $ — | $ — | $ (391) | $ 4,118 |
| Competitive businesses natural gas revenues | 955 | — | — | — | — | — | (8) | 947 |
| Competitive businesses other revenues | 48 | — | — | — | — | — | — | 48 |
| Rate-regulated electric revenues | — | 1,512 | 634 | 658 | 1,169 | — | (18) | 3,955 |
| Rate-regulated natural gas revenues | — | — | 232 | 319 | 78 | — | (4) | 625 |
| Shared service and other revenues | — | — | — | — | 4 | 451 | (455) | — |
| Total operating revenues | 5,512 | 1,512 | 866 | 977 | 1,251 | 451 | (876) | 9,693 |
| 2017 | | | | | | | | |
| Competitive businesses electric revenues | $ 3,710 | $ — | $ — | $ — | $ — | $ — | $ (328) | $ 3,382 |
| Competitive businesses natural gas revenues | 918 | — | — | — | — | — | — | 918 |
| Competitive businesses other revenues | 250 | — | — | — | — | — | — | 250 |
| Rate-regulated electric revenues | — | 1,298 | 590 | 667 | 1,097 | — | (8) | 3,644 |
| Rate-regulated natural gas revenues | — | — | 206 | 284 | 66 | — | (3) | 553 |
| Shared service and other revenues | — | — | — | — | 12 | 419 | (431) | — |
| Total operating revenues | 4,878 | 1,298 | 796 | 951 | 1,175 | 419 | (770) | 8,747 |
| **Shared service and other revenues** | | | | | | | | |
| **Intersegment revenues (d) :** | | | | | | | | |
| 2018 | $ 400 | $ 14 | $ 2 | $ 6 | $ 4 | 450 | $ (876) | $ — |
| 2017 | 328 | 5 | 1 | 5 | 12 | 419 | (770) | — |
| **Net income (loss):** | | | | | | | | |
| 2018 | $ 186 | $ 165 | $ 113 | $ 128 | $ 65 | $ (21) | $ — | $ 636 |
| 2017 | 399 | 141 | 127 | 125 | 140 | 39 | — | 971 |
| **Total assets:** | | | | | | | | |
| March 31, 2018 | $ 48,375 | $ 30,002 | $ 10,218 | $ 9,195 | $ 21,375 | $ 8,833 | $ (10,980) | $ 117,018 |
| December 31, 2017 | 48,457 | 29,726 | 10,170 | 9,104 | 21,247 | 8,618 | (10,552) | 116,770 |

166

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

(a)    Generation includes the six reportable segments shown below: Mid-Atlantic, Midwest, New England, New York, ERCOT and Other Power Regions. Intersegment revenues for Generation for the three months ended March 31, 2018 include revenue from sales to PECO of $37 million , sales to BGE of $65 million , sales to Pepco of $52 million , sales to DPL of $46 million and sales to ACE of $6 million in the Mid-Atlantic region, and sales to ComEd of $194 million in the Midwest region, which eliminate upon consolidation. For the three months ended March 31, 2017 , intersegment revenues for Generation include revenue from sales to PECO of $45 million , sales to BGE of $134 million , sales to Pepco of $83 million , sales to DPL of $51 million and sales to ACE of $9 million in the Mid-Atlantic region, and sales to ComEd of $5 million in the Midwest region, which eliminate upon consolidation.
(b)    Other primarily includes Exelon's corporate operations, shared service entities and other financing and investment activities.
(c)    Includes gross utility tax receipts from customers. The offsetting remittance of utility taxes to the governing bodies is recorded in expenses on the Registrants' Consolidated Statements of Operations and Comprehensive Income. See Note 18 — Supplemental Financial Information for total utility taxes for the three months ended March 31, 2018 and 2017 .
(d)    Intersegment revenues exclude sales to unconsolidated affiliates. The intersegment profit associated with Generation's sale of certain products and services by and between Exelon's segments is not eliminated in consolidation due to the recognition of intersegment profit in accordance with regulatory accounting guidance. For Exelon, these amounts are included in Operating revenues in the Consolidated Statements of Operations and Comprehensive Income.

**PHI:**

| | Pepco | DPL | ACE | Other (b) | Intersegment Eliminations | PHI |
|---|---|---|---|---|---|---|
| **Operating revenues (a) :** | | | | | | |
| Three Months Ended March 31, 2018 | | | | | | |
| Rate-regulated electric revenues | $ 557 | $ 306 | $ 310 | $ — | $ (4) | $ 1,169 |
| Rate-regulated natural gas revenues | — | 78 | — | — | — | 78 |
| Shared service and other revenues | — | — | — | 113 | (109) | 4 |
| Total operating revenues | 557 | 384 | 310 | 113 | (113) | 1,251 |
| Three Months Ended March 31, 2017 | | | | | | |
| Rate-regulated electric revenues | $ 530 | $ 296 | $ 275 | $ — | $ (4) | $ 1,097 |
| Rate-regulated natural gas revenues | — | 66 | — | — | — | 66 |
| Shared service and other revenues | — | — | — | 12 | — | 12 |
| Total operating revenues | 530 | 362 | 275 | 12 | (4) | 1,175 |
| **Intersegment revenues:** | | | | | | |
| Three Months Ended March 31, 2018 | $ 2 | $ 2 | $ 1 | $ 112 | $ (113) | $ 4 |
| Three Months Ended March 31, 2017 | 1 | 2 | 1 | 13 | (5) | 12 |
| **Net income (loss):** | | | | | | |
| Three Months Ended March 31, 2018 | $ 31 | $ 31 | $ 7 | $ (8) | $ 4 | $ 65 |
| Three Months Ended March 31, 2017 | 58 | 57 | 28 | (15) | 12 | 140 |
| **Total assets:** | | | | | | |
| March 31, 2018 | $ 7,896 | $ 4,383 | $ 3,530 | $ 10,514 | $ (4,948) | $ 21,375 |
| December 31, 2017 | 7,832 | 4,357 | 3,445 | 10,600 | (4,987) | 21,247 |

(a)    Includes gross utility tax receipts from customers. The offsetting remittance of utility taxes to the governing bodies is recorded in expenses on the Registrants' Consolidated Statements of Operations and Comprehensive Income. See Note 18 — Supplemental Financial Information for total utility taxes for the three months ended March 31, 2018 and 2017 .
(b)    Other primarily includes PHI's corporate operations, shared service entities and other financing and investment activities.

    The following tables disaggregate the Registrants' revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors for three months ended March 31, 2018 and 2017 . For Generation, the disaggregation of revenues reflects Generation's two primary products of power sales and natural gas sales, with further disaggregation of power sales provided by geographic region. For the Utility Registrants, the disaggregation of revenues reflects the two primary utility services of rate-regulated electric sales and rate-regulated natural gas sales (where applicable), with further

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

disaggregation of these tariff sales provided by major customer groups. Exelon's disaggregated revenues are consistent with Generation and the Utility Registrants, but exclude any intercompany revenues.

**Competitive Business Revenues (Generation):**

| | Three Months Ended March 31, 2018 | | | | |
|---|---|---|---|---|---|
| | Revenues from external parties [a] | | | | |
| | Contracts with customers | Other [b] | Total | Intersegment Revenues | Total Revenues |
| Mid-Atlantic | $ 1,355 | $ 80 | $ 1,435 | $ 5 | $ 1,440 |
| Midwest | 1,273 | 71 | 1,344 | 2 | 1,346 |
| New England | 725 | 68 | 793 | (1) | 792 |
| New York | 439 | (29) | 410 | (1) | 409 |
| ERCOT | 149 | 59 | 208 | 1 | 209 |
| Other Power Regions | 210 | 109 | 319 | (31) | 288 |
| Total Competitive Businesses Electric Revenues | 4,151 | 358 | 4,509 | (25) | 4,484 |
| Competitive Businesses Natural Gas Revenues | 522 | 433 | 955 | 25 | 980 |
| Competitive Businesses Other Revenues [c] | 134 | (86) | 48 | — | 48 |
| Total Generation Consolidated Operating Revenues | $ 4,807 | $ 705 | $ 5,512 | $ — | $ 5,512 |

| | Three Months Ended March 31, 2017 | | | | |
|---|---|---|---|---|---|
| | Revenues from external customers [a] | | | | |
| | Contracts with customers | Other [b] | Total | Intersegment revenues | Total Revenues |
| Mid-Atlantic | $ 1,494 | $ (65) | $ 1,429 | $ (4) | $ 1,425 |
| Midwest | 980 | 71 | 1,051 | 2 | 1,053 |
| New England | 589 | (40) | 549 | (2) | 547 |
| New York | 303 | (3) | 300 | (3) | 297 |
| ERCOT | 168 | 24 | 192 | (1) | 191 |
| Other Power Regions | 128 | 61 | 189 | (5) | 184 |
| Total Competitive Businesses Electric Revenues | 3,662 | 48 | 3,710 | (13) | 3,697 |
| Competitive Businesses Natural Gas Revenues | 768 | 150 | 918 | 12 | 930 |
| Competitive Businesses Other Revenues [c] | 206 | 44 | 250 | 1 | 251 |
| Total Generation Consolidated Operating Revenues | $ 4,636 | $ 242 | $ 4,878 | $ — | $ 4,878 |

(a)   Includes all wholesale and retail electric sales to third parties and affiliated sales to the Utility Registrants.
(b)   Includes revenues from derivatives and leases.
(c)   Other represents activities not allocated to a region. See text above for a description of included activities. Includes a $3 million decrease to revenues for the amortization of intangible assets and liabilities related to commodity contracts recorded at fair value for the three months ended March 31, 2017 , unrealized mark-to-market losses of $98 million and gains of $44 million for the three months ended March 31, 2018 and 2017 , respectively, and elimination of intersegment revenues.

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Revenues net of purchased power and fuel expense (Generation):**

| | Three Months Ended March 31, 2018 | | | Three Months Ended March 31, 2017 | | |
|---|---|---|---|---|---|---|
| | RNF from external customers [a] | Intersegment RNF | Total RNF | RNF from external customers [a] | Intersegment RNF | Total RNF |
| Mid-Atlantic | $ 836 | $ 14 | $ 850 | $ 755 | $ 18 | $ 773 |
| Midwest | 847 | 13 | 860 | 704 | 11 | 715 |
| New England | 122 | (3) | 119 | 115 | (4) | 111 |
| New York | 282 | 1 | 283 | 143 | — | 143 |
| ERCOT | 106 | (70) | 36 | 94 | (25) | 69 |
| Other Power Regions | 157 | (40) | 117 | 108 | (44) | 64 |
| Total Revenues net of purchased power and fuel expense for Reportable Segments | 2,350 | (85) | 2,265 | 1,919 | (44) | 1,875 |
| Other [b] | (131) | 85 | (46) | 161 | 44 | 205 |
| Total Generation Revenues net of purchased power and fuel expense | $ 2,219 | $ — | $ 2,219 | $ 2,080 | $ — | $ 2,080 |

(a) Includes purchases and sales from/to third parties and affiliated sales to the Utility Registrants.
(b) Other represents activities not allocated to a region. See text above for a description of included activities. Includes a $3 million decrease to RNF for the amortization of intangible assets and liabilities related to commodity contracts for the three months ended March 31, 2017 , unrealized mark-to-market losses of $266 million and $49 million for the three months ended March 31, 2018 and 2017 , respectively, accelerated nuclear fuel amortization associated with announced early plant retirements as discussed in Note 7 - Early Nuclear Plant Retirements of the Combined Notes to Consolidated Financial Statements of $15 million decrease to revenue net of purchased power and fuel expense for the three months ended March 31, 2018 , and the elimination of intersegment revenue net of purchased power and fuel expense.

169

Table of Contents

COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in millions, except per share data, unless otherwise noted)

**Electric and Gas Revenue by Customer Class (ComEd, PECO, BGE, PHI, PECO, DPL, ACE):**

| Revenues from contracts with customers | Three Months Ended March 31, 2018 | | | | | | |
|---|---|---|---|---|---|---|---|
| | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Rate-regulated electric revenues** | | | | | | | |
| Residential | $ 717 | $ 403 | $ 393 | $ 610 | $ 259 | $ 191 | $ 160 |
| Small commercial & industrial | 385 | 101 | 68 | 115 | 32 | 46 | 37 |
| Large commercial & industrial | 152 | 58 | 106 | 259 | 190 | 23 | 46 |
| Public authorities & electric railroads | 14 | 8 | 7 | 14 | 7 | 4 | 3 |
| Other [a] | 230 | 62 | 78 | 156 | 49 | 41 | 66 |
| Total rate-regulated electric revenues [b] | $ 1,498 | $ 632 | $ 652 | $ 1,154 | $ 537 | $ 305 | $ 312 |
| **Rate-regulated natural gas revenues** | | | | | | | |
| Residential | $ — | $ 161 | $ 224 | $ 47 | $ — | $ 47 | $ — |
| Small commercial & industrial | — | 62 | 34 | 18 | — | 18 | — |
| Large commercial & industrial | — | 1 | 47 | 4 | — | 4 | — |
| Transportation | — | 6 | — | 5 | — | 5 | — |
| Other [c] | — | 2 | 27 | 4 | — | 4 | — |
| Total rate-regulated natural gas revenues [d] | $ — | $ 232 | $ 332 | $ 78 | $ — | $ 78 | $ — |
| **Total rate-regulated revenues from contracts with customers** | $ 1,498 | $ 864 | $ 984 | $ 1,232 | $ 537 | $ 383 | $ 312 |
| | | | | | | | |
| **Other revenues** | | | | | | | |
| Revenues from alternative revenue programs | 5 | (1) | (13) | 18 | 19 | 1 | (2) |
| Other rate-regulated electric revenues [e] | 9 | 3 | 4 | 1 | 1 | — | — |
| Other rate-regulated natural gas revenues [e] | — | — | 2 | — | — | — | — |
| **Total other revenues** | 14 | 2 | (7) | 19 | 20 | 1 | (2) |
| **Total rate-regulated revenues for reportable segments** | $ 1,512 | $ 866 | $ 977 | $ 1,251 | $ 557 | $ 384 | $ 310 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**COMBINED NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Dollars in millions, except per share data, unless otherwise noted)**

| Revenues from contracts with customers | Three Months Ended March 31, 2017 | | | | | | |
|---|---|---|---|---|---|---|---|
| | ComEd | PECO | BGE | PHI | Pepco | DPL | ACE |
| **Rate-regulated electric revenues** | | | | | | | |
| Residential | $ 611 | $ 382 | $ 386 | $ 554 | $ 236 | $ 176 | $ 142 |
| Small commercial & industrial | 328 | 97 | 69 | 114 | 34 | 44 | 36 |
| Large commercial & industrial | 107 | 52 | 108 | 257 | 188 | 24 | 45 |
| Public authorities & electric railroads | 12 | 8 | 7 | 15 | 8 | 4 | 3 |
| Other [a] | 218 | 48 | 68 | 126 | 48 | 38 | 43 |
| Total rate-regulated electric revenues [b] | $ 1,276 | $ 587 | $ 638 | $ 1,066 | $ 514 | $ 286 | $ 269 |
| **Rate-regulated natural gas revenues** | | | | | | | |
| Residential | $ — | $ 142 | $ 185 | $ 40 | $ — | $ 40 | $ — |
| Small commercial & industrial | — | 55 | 30 | 17 | — | 17 | |
| Large commercial & industrial | — | — | 44 | 2 | — | 2 | — |
| Transportation | — | 6 | — | 5 | — | 5 | — |
| Other [c] | — | 3 | 14 | 2 | — | 2 | — |
| Total rate-regulated natural gas revenues [d] | $ — | $ 206 | $ 273 | $ 66 | $ — | $ 66 | $ — |
| **Total rate-regulated revenues from contracts with customers** | $ 1,276 | $ 793 | $ 911 | $ 1,132 | $ 514 | $ 352 | $ 269 |
| | | | | | | | |
| **Other revenues** | | | | | | | |
| Revenues from alternative revenue programs | 14 | — | 35 | 30 | 15 | 9 | 6 |
| Other rate-regulated electric revenues [e] | 8 | 3 | 4 | 2 | 1 | 1 | — |
| Other rate-regulated natural gas revenues [e] | — | — | 1 | — | — | — | — |
| Other revenues [f] | — | — | — | 11 | — | — | — |
| **Total other revenues** | 22 | 3 | 40 | 43 | 16 | 10 | 6 |
| **Total rate-regulated revenues for reportable segments** | $ 1,298 | $ 796 | $ 951 | $ 1,175 | $ 530 | $ 362 | $ 275 |

(a)   Includes revenues from transmission revenue from PJM, wholesale electric revenue and mutual assistance revenue.
(b)   Includes operating revenues from affiliates of $14 million , $2 million , $2 million , $4 million , $2 million , $2 million , and $1 million at ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, respectively, for the three months ended March 31, 2018 and $5 million , $1 million , $2 million , $1 million , $1 million , $2 million , and $1 million at ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, respectively, for the three months ended March 31, 2017.
(c)   Includes revenues from off-system natural gas sales.
(d)   Includes operating revenues from affiliates of less than $1 million and $4 million at PECO and BGE, respectively, for the three months ended March 31, 2018 and less than $1 million and $3 million at PECO and BGE, respectively, for the three months ended March 31, 2017 .
(e)   Includes late payment charge revenues.
(f)   Includes operating revenues from affiliates of $11 million at PHI for the three months ended March 31, 2017 .

171

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Item 2.**    **Management's Discussion and Analysis of Financial Condition and Results of Operations**

(Dollars in millions except per share data, unless otherwise noted)

**Exelon**

# Executive Overview

Exelon, a utility services holding company, operates through the following principal subsidiaries:

- *Generation,* whose integrated business consists of the generation, physical delivery and marketing of power across multiple geographical regions through its customer-facing business, Constellation, which sells electricity and natural gas to both wholesale and retail customers. Generation also sells renewable energy and other energy-related products and services.

- *ComEd,* whose business consists of the purchase and regulated retail sale of electricity and the provision of electricity transmission and distribution services in northern Illinois, including the City of Chicago.

- *PECO,* whose business consists of the purchase and regulated retail sale of electricity and the provision of electricity distribution and transmission services in southeastern Pennsylvania, including the City of Philadelphia, and the purchase and regulated retail sale of natural gas and the provision distribution services in the Pennsylvania counties surrounding the City of Philadelphia.

- *BGE,* whose business consists of the purchase and regulated retail sale of electricity and natural gas and the provision of electricity distribution and transmission and gas distribution services in central Maryland, including the City of Baltimore.

- *Pepco,* whose business consists of the purchase and regulated retail sale of electricity and the provision of electricity distribution and transmission in the District of Columbia and major portions of Prince George's County and Montgomery County in Maryland.

- *DPL,* whose business consists of the purchase and regulated retail sale of electricity and the provision of electricity distribution and transmission services in portions of Maryland and Delaware, and the purchase and regulated retail sale of natural gas and the provision of natural gas distribution services in northern Delaware.

- *ACE,* whose business consists of the purchase and regulated retail sale of electricity and the provision of electricity transmission and distribution services in southern New Jersey.

Pepco, DPL and ACE are operating companies of PHI, which is a utility services holding company and a wholly owned subsidiary of Exelon.

Exelon has twelve reportable segments consisting of Generation's six reportable segments (Mid-Atlantic, Midwest, New England, New York, ERCOT and Other Power Regions in Generation), ComEd, PECO, BGE and PHI's three utility reportable segments (Pepco, DPL and ACE). See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for additional information regarding Exelon's reportable segments.

Through its business services subsidiary BSC, Exelon provides its operating subsidiaries with a variety of corporate governance support services including corporate strategy and development, legal, human resources, information technology, finance, real estate, security, corporate communications and

172

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

supply at cost. The costs of these services are directly charged or allocated to the applicable operating segments. The services are provided pursuant to service agreements. Additionally, the results of Exelon's corporate operations include interest costs income from various investment and financing activities.

PHISCO, a wholly owned subsidiary of PHI, provides a variety of support services at cost, including legal, accounting, engineering, distribution and transmission planning, asset management, system operations and power procurement, to PHI and its operating subsidiaries. These services are directly charged or allocated pursuant to service agreements among PHISCO and the participating operating subsidiaries.

Exelon's consolidated financial information includes the results of its eight separate operating subsidiary registrants, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE, which, along with Exelon, are collectively referred to as the Registrants. The following combined Management's Discussion and Analysis of Financial Condition and Results of Operations is separately filed by Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE. However, none of the Registrants makes any representation as to information related solely to any of the other Registrants.

# Financial Results of Operations

### *GAAP Results of Operations*

The following tables set forth Exelon's GAAP consolidated results of operations for the three months ended March 31, 2018 compared to the same period in 2017 . All amounts presented below are before the impact of income taxes, except as noted.

| | | | | | Three Months Ended March 31, | | | | | |
| | | | | | 2018 | | | | 2017 | Favorable (Unfavorable) Variance |
| | Generation | ComEd | PECO | BGE | PHI | Other | Exelon | Exelon | |
|---|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | $ 5,512 | $ 1,512 | $ 866 | $ 977 | $ 1,251 | $ (425) | $ 9,693 | $ 8,747 | $ 946 |
| Purchased power and fuel expense | 3,293 | 605 | 333 | 380 | 520 | (404) | 4,727 | 3,899 | (828) |
| Revenue net of purchased power and fuel expense (a) | 2,219 | 907 | 533 | 597 | 731 | (21) | 4,966 | 4,848 | 118 |
| Other operating expenses | | | | | | | | | |
|    Operating and maintenance | 1,339 | 313 | 275 | 221 | 309 | (73) | 2,384 | 2,438 | 54 |
|    Depreciation and amortization | 448 | 228 | 75 | 134 | 183 | 23 | 1,091 | 896 | (195) |
|    Taxes other than income | 138 | 77 | 41 | 65 | 113 | 12 | 446 | 436 | (10) |
|    Total other operating expenses | 1,925 | 618 | 391 | 420 | 605 | (38) | 3,921 | 3,770 | (151) |
| **Gain on sales of assets and businesses** | 53 | 3 | — | — | — | — | 56 | 4 | 52 |
| **Bargain purchase gain** | — | — | — | — | — | — | — | 226 | (226) |
| **Operating income** | 347 | 292 | 142 | 177 | 126 | 17 | 1,101 | 1,308 | (207) |
| Other income and (deductions) | | | | | | | | | |
|    Interest expense, net | (101) | (89) | (33) | (25) | (63) | (60) | (371) | (373) | 2 |
|    Other, net | (44) | 8 | 2 | 4 | 11 | (9) | (28) | 257 | (285) |
|    Total other income and (deductions) | (145) | (81) | (31) | (21) | (52) | (69) | (399) | (116) | (283) |
| Income (loss) before income taxes | 202 | 211 | 111 | 156 | 74 | (52) | 702 | 1,192 | (490) |
| Income taxes | 9 | 46 | (2) | 28 | 9 | (31) | 59 | 211 | 152 |
| Equity in losses of unconsolidated affiliates | (7) | — | — | — | — | — | (7) | (10) | 3 |
| Net income | 186 | 165 | 113 | 128 | 65 | (21) | 636 | 971 | (335) |
| Net income attributable to noncontrolling interests | 50 | — | — | — | — | 1 | 51 | (19) | (70) |
| **Net income attributable to common shareholders** | $ 136 | $ 165 | $ 113 | $ 128 | $ 65 | $ (22) | $ 585 | $ 990 | $ (405) |

(a)  The Registrants evaluate operating performance using the measure of revenues net of purchased power and fuel expense. The Registrants believe that revenues net of purchased power and fuel expense is a useful measurement because it provides information that can be used to evaluate their operational performance. Revenues net of purchased power and fuel expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

***Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .*** Exelon's Net income attributable to common shareholders was $585 million for the three months ended March 31, 2018 as compared to $990 million for the three months ended March 31, 2017 , and diluted earnings per average common share were $0.60 for the three months ended March 31, 2018 as compared to $1.06 for the three months ended March 31, 2017 .

Revenue net of purchased power and fuel expense, which is a non-GAAP measure discussed below, increased by $118 million for the three months ended March 31, 2018 as compared to the same period in 2017 . The quarter-over-quarter increase in Revenue net of purchased power and fuel expense was primarily due to the following favorable factors:

- Increase of $390 million at Generation primarily due to impact of the New York CES and Illinois ZES (including the impact of zero emission credits generated in Illinois from June 1, 2017 through December 31, 2017), increased nuclear volumes primarily as a result of the acquisition of FitzPatrick, decreased nuclear outage days, increased capacity prices and the addition of two combined-cycle gas turbines in Texas, partially offset by the conclusion of the Ginna Reliability Support Services Agreement and lower realized energy prices;

- Increase of $44 million at PECO, DPL and ACE primarily due to favorable weather conditions within their respective service territories; and

- Increase of $33 million due to higher mutual assistance revenues across all Utility Registrants, primarily at ComEd.

The quarter-over-quarter increase in Revenue net of purchase power and fuel expense was partially offset by the following unfavorable factors:

- Decrease of $217 million at Generation due to mark-to-market losses of $266 million in 2018 compared to $49 million in 2017; and

- Decrease of $57 million at ComEd primarily due to lower revenues resulting from the change to defer and recover over time energy efficiency costs pursuant to FEJA;

- Decrease of $85 million in electric and gas revenues across all Utility Registrants, primarily reflecting lower revenues resulting from the anticipated pass back of TCJA tax savings through customer rates, partially offset by higher utility earnings due to regulatory rate increases at ComEd, BGE and PHI.

Operating and maintenance expense decreased by $54 million for the three months ended March 31, 2018 as compared to the same period in 2017 primarily due to the following favorable factors:

- Decrease of $57 million at ComEd primarily due to the change to defer and recover over time energy efficiency costs pursuant to FEJA;

- Decrease of $38 million at Generation due to lower merger and integration costs primarily related to the FitzPatrick acquisition;

- Decrease of $33 million at Generation due to lower nuclear refueling outage costs; and

- Decrease of $32 million related to a supplemental NEIL insurance distribution at Generation in the first quarter of 2018.

The quarter-over-quarter decrease in Operating and maintenance expense was partially offset by the following unfavorable factors:

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

- Increase of $86 million at PECO and BGE due to increased storm costs;

- Increase of $33 million due to higher mutual assistance expenses across all Utility Registrants, primarily at ComEd; and

- Increase of $22 million at PHI due to uncollectible accounts expense.

Depreciation and amortization expense increased by $195 million primarily due to Generation's first quarter 2018 decision to early retire the Oyster Creek nuclear facility and Generation's second quarter 2017 decision to early retire the Three Mile Island nuclear facility, as well increased depreciation expense as a result of ongoing capital expenditures across all operating companies for the three months ended March 31, 2018 as compared to the same period in 2017 .

Taxes other than income remained relatively consistent for the three months ended March 31, 2018 as compared to the same period in 2017 .

Gain on sales of assets and businesses increased by $52 million for the three months ended March 31, 2018 as compared to the same period in 2017 primarily due to Generation's first quarter 2018 sale of its electrical contracting business.

Bargain purchase gain decreased by $226 million due to the gain associated with the FitzPatrick acquisition in first quarter 2017.

Interest expense, net remained relatively consistent for the three months ended March 31, 2018 as compared to the same period in 2017 .

Other, net decreased by $285 million primarily due to net unrealized and realized losses on NDT funds at Generation for the three months ended March 31, 2018 as compared to net unrealized and realized gains on NDT funds for the same period in 2017 .

Exelon's effective income tax rates for the three months ended March 31, 2018 and 2017 were 8.4% and 17.7% , respectively. The decrease in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily related to tax savings due to the lower federal income tax rate as a result of the TCJA at all Registrants, which is offset in Operating revenues at the Utility Registrants for the anticipated pass back of the tax savings through customer rates. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for further details on TCJA's impact on regulatory proceedings.

For further detail regarding the financial results for the three months ended March 31, 2018 , including explanation of the non-GAAP measure Revenue net of purchased power and fuel expense, see the discussions of Results of Operations by Segment below.

Table of Contents

***Adjusted (non-GAAP) Operating Earnings***

Exelon's adjusted (non-GAAP) operating earnings for the three months ended March 31, 2018 were $925 million , or $0.96 per diluted share, compared with adjusted (non-GAAP) operating earnings of $600 million , or $0.64 per diluted share for the same period in 2017 . In addition to net income, Exelon evaluates its operating performance using the measure of adjusted (non-GAAP) operating earnings because management believes it represents earnings directly related to the ongoing operations of the business.  Adjusted (non-GAAP) operating earnings exclude certain costs, expenses, gains and losses and other specified items.  This information is intended to enhance an investor's overall understanding of period-over-period operating results and provide an indication of Exelon's baseline operating performance excluding items that are considered by management to be not directly related to the ongoing operations of the business.  In addition, this information is among the primary indicators management uses as a basis for evaluating performance, allocating resources, setting incentive compensation targets and planning and forecasting of future periods. Adjusted (non-GAAP) operating earnings is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following tables provide a reconciliation between net income attributable to common shareholders as determined in accordance with GAAP and adjusted (non-GAAP) operating earnings for the three months ended March 31, 2018 as compared to the same period in 2017 .

| | Three Months Ended March 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | | | **2017** | | |
| (All amounts in millions after tax) | | | Earnings per Diluted Share | | | | Earnings per Diluted Share |
| **Net Income Attributable to Common Shareholders** | $ | 585 | $ | 0.60 | $ | 990 | $ | 1.06 |
| Mark-to-Market Impact of Economic Hedging Activities [a]  (net of taxes of $69 and $19, respectively) | | 197 | | 0.20 | | 30 | | 0.03 |
| Unrealized Losses (Gains) Related to NDT Fund Investments [b] (net of taxes of $29 and $67, respectively) | | 66 | | 0.07 | | (99) | | (0.10) |
| Amortization of Commodity Contract Intangibles [c] (net of taxes of $0 and $2, respectively) | | — | | — | | 3 | | — |
| Merger and Integration Costs [d] (net of taxes of $1 and $15, respectively) | | 3 | | — | | 25 | | 0.03 |
| Merger Commitments [e] (net of taxes of $0 and $137, respectively) | | — | | — | | (137) | | (0.15) |
| Plant Retirements and Divestitures [f] (net of taxes of $32 and $0, respectively) | | 92 | | 0.10 | | — | | — |
| Cost Management Program [g] (net of taxes of $1   and $3, respectively) | | 5 | | 0.01 | | 4 | | — |
| Bargain Purchase Gain [h] (net of taxes of $0) | | — | | — | | (226) | | (0.24) |
| Reassessment of State Deferred Income Taxes [i] (entire amount represents tax expense) | | — | | — | | (20) | | (0.02) |
| Tax Settlements [j] (net of taxes of $0 and $1, respectively) | | — | | — | | (5) | | (0.01) |
| Noncontrolling Interests [k] (net of taxes of $5 and $7, respectively) | | (23) | | (0.02) | | 35 | | 0.04 |
| **Adjusted (non-GAAP) Operating Earnings** | $ | 925 | $ | 0.96 | $ | 600 | $ | 0.64 |

Note:
Unless otherwise noted, the income tax impact of each reconciling item between GAAP Net Income and Adjusted (non-GAAP) Operating Earnings is based on the marginal statutory federal and state income tax rates for each Registrant, taking into account whether the income or expense item is taxable or deductible, respectively, in whole or in part. For all items except the unrealized gains and losses related to NDT fund investments, the marginal statutory income tax rates for 2018 and 2017 ranged from 26.0 percent to 29.0 percent and 39.0 percent to 41.0 percent, respectively. Under IRS regulations, NDT fund investment returns are taxed at differing rates for investments if they are in qualified or non-qualified funds. The tax rates applied to unrealized gains and losses related to NDT fund investments were 40.3 percent and 52.6 percent for the three months ended March 31, 2018 and 2017 , respectively.

(a)  Reflects the impact of net gains and losses on Generation's economic hedging activities. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional detail related to Generation's hedging activities.

(b)  Reflects the impact of net unrealized gains and losses on Generation's NDT fund investments for Non-Regulatory Agreement Units. See Note 13 — Nuclear Decommissioning of the Combined Notes to Consolidated Financial Statements for additional detail related to Generation's NDT fund investments.

(c)  Represents the non-cash amortization of intangible assets, net, primarily related to commodity contracts recorded at fair value related to the ConEdison Solutions acquisition.

(d)  Primarily reflects certain costs associated with mergers and acquisitions, including, if and when applicable, professional fees, employee-related expenses and integration activities related to the PHI and FitzPatrick acquisitions in 2017, and the PHI acquisition

178

in 2018. See Note 4 — Mergers, Acquisitions and Dispositions of the Combined Notes to Consolidated Financial Statements for additional detail related to merger and acquisition costs.

(e)  Primarily reflects a decrease in reserves for uncertain tax positions related to the deductibility of certain merger commitments associated with the 2012 CEG and 2016 PHI acquisitions.

(f)  Primarily reflects accelerated depreciation and amortization expenses and increases to materials and supplies inventory reserves associated with Generation's 2018 decision to early retire the Oyster Creek nuclear facility, as well as the accelerated depreciation and amortization expense associated with Generation's 2017 decision to early retire the Three Mile Island nuclear facility, partially offset by a gain associated with Generation's sale of its electrical contracting business

(g)  Represents severance and reorganization costs related to a cost management program.

(h)  Represents the excess fair value of assets and liabilities acquired over the purchase price for the FitzPatrick acquisition.

(i)  Reflects the change in the District of Columbia statutory tax rate.

(j)  Reflects benefits related to the favorable settlement in 2017 of certain income tax positions related to PHI's unregulated business interests.

(k)  Represents elimination from Generation's results of the noncontrolling interests related to certain exclusion items, primarily related to the impact of unrealized gains and losses on NDT fund investments at CENG.

## Significant 2018 Transactions and Developments

### *Regulatory Implications of the Tax Cuts and Jobs Act (TCJA)*

The Utility Registrants have made filings with their respective State regulators to begin passing back to customers the ongoing annual tax savings resulting from the TCJA. The amounts being proposed to be passed back to customers reflect the annual benefit of lower income tax rates and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. The Utility Registrants have identified over $500 million in ongoing annual savings to be returned to customers related to TCJA from their distribution utility operations.

ComEd and BGE have received orders approving the pass back of the ongoing annual tax savings of $201 million and $103 million, respectively, beginning February 1, 2018. DPL received an order from the MDPSC approving the pass back of $14 million of ongoing annual tax savings beginning April 20, 2018 and a one-time bill credit to customers of $2 million for TCJA tax savings from January 1, 2018 through March 31, 2018. Pepco has entered into settlement agreements with parties in both Maryland and the District of Columbia providing for the pass back of the ongoing annual tax savings beginning June 1, 2018 and July 1, 2018, respectively, and one-time bill credits to customers for TCJA tax savings from January 1, 2018 through the effective date of the rate changes. PECO's, DPL Delaware's and ACE's filings are still pending and management cannot predict the amount or timing of the refunds their respective regulators will ultimately approve. For PECO, BGE, DPL Delaware and ACE, it is expected that the treatment of the TCJA tax savings through the effective date of any final customer rate adjustments will be addressed in future rate proceedings.

In addition, ComEd, BGE, Pepco, DPL, and ACE each filed with FERC to revise their transmission formula rate mechanisms to facilitate passing back to customers ongoing annual TCJA tax savings and to permit recovery of transmission-related income tax regulatory assets. PECO is currently in settlement discussions regarding its transmission formula rate and expects to pass back TCJA benefits to customers through its annual formula rate update.

PECO, BGE, Pepco, DPL and ACE recognized new regulatory liabilities in the first quarter 2018 reflecting the TCJA tax savings that are anticipated to be passed back to customers in the future. See Note 6 – Regulatory Matters of the Combined Notes to Consolidated Financial Statements for further information.

### *Early Plant Retirements*

On February 2, 2018, Exelon announced that Generation will permanently cease generation operations at Oyster Creek at the end of its current operating cycle by October 2018. Because of the decision to early retire Oyster Creek in 2018, Exelon and Generation recognized certain one-time charges in the first quarter of 2018 related to a materials and supplies inventory reserve adjustment, employee-related costs and construction work-in-progress impairments, among other items.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

On May 30, 2017, Generation announced it will permanently cease generation operations at Three Mile Island Generating Station (TMI) on or about September 30, 2019. The plant is currently committed to operate through May 2019.

As a result of the early nuclear plant retirement decisions at Oyster Creek and TMI, Exelon and Generation will also recognize annual incremental non-cash charges to earnings stemming from shortening the expected economic useful lives primarily related to accelerated depreciation of plant assets (including any ARC), accelerated amortization of nuclear fuel, and additional ARO accretion expense associated with the changes in decommissioning timing and cost assumptions were also recorded. The following table summarizes the actual incremental non-cash expense item incurred in 2018 and the estimated amount of incremental non-cash expense items expected to be incurred in 2018 and 2019 due to the early retirement decisions.

| Income statement expense (pre-tax) | Actual | | Projected [a] | | | |
|---|---|---|---|---|---|---|
| | Q1 2018 | | 2018 | | 2019 | |
| Depreciation and amortization [b] | | | | | | |
|     Accelerated depreciation [c] | $ | 137 | $ | 550 | $ | 330 |
|     Accelerated nuclear fuel amortization | | 15 | | 55 | | 5 |
| Operating and maintenance [d] | | 26 | | 26 | | — |
| Total | $ | 178 | $ | 631 | $ | 335 |

_____

(a)   Actual results may differ based on incremental future capital additions, actual units of production for nuclear fuel amortization, future revised ARO assumptions, etc.
(b)   Reflects incremental accelerated depreciation and amortization for TMI for the quarter ended March 31, 2018 , and Oyster Creek from February 2, 2018 through March 31, 2018 .
(c)   Reflects incremental accelerated depreciation of plant assets, including any ARC.
(d)   Primarily includes materials and supplies inventory reserve adjustments, employee-related costs and CWIP impairments.

On March 29, 2018, based on ISO-NE capacity auction results for the 2021 - 2022 planning year in which Mystic Unit 9 did not clear, Generation announced it had formally notified grid operator ISO-NE of its plans to early retire its Mystic Generating Station assets on June 1, 2022 absent any interim and long-term solutions for reliability and regional fuel security. The ISO-NE recently announced that it would take a three-step approach to fuel security. First, ISO-NE will make a filing soon to obtain tariff waivers to allow it to retain Mystic 8 and 9 for fuel security for the 2022 - 2024 planning years.  Second, ISO-NE will file tariff revisions to allow it to retain other resources for fuel security in the capacity market if necessary in the future.  Third, ISO-NE will work with stakeholders to develop long-term market rule changes to address system resiliency considering significant reliability risks identified in ISO-NE's January 2018 fuel security report. Changes to market rules are necessary because critical units to the region, such as Mystic Units 8 and 9, cannot recover future operating costs including the cost of procuring fuel. As a result of these developments, Generation completed a comprehensive review of the estimated undiscounted future cash flows of the New England asset group during the first quarter of 2018 and no impairment charge was required. Further developments such as the failure of ISO-NE to adopt interim and long-term solutions for reliability and fuel security could potentially result in future impairments of the New England asset group, which could be material. Refer to Note 7 — Impairment of Long-Lived Assets and Note 8 - Early Plant Retirements of the Combined Notes to Consolidated Financial Statements for additional information.

*Illinois ZEC Procurement*

Pursuant to FEJA, on January 25, 2018, the ICC announced that Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation executed the ZEC procurement contracts with Illinois utilities,

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

including ComEd, effective January 26, 2018 and began recognizing revenue. Winning bidders are entitled to compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA. In the first quarter of 2018, Generation recognized approximately $202 million of revenue, of which $150 million related to ZECs generated from June 1, 2017 through December 31, 2017.

### New Jersey Zero Emission Certificate Program

On April 12, 2018, a bill was passed by both Houses of the New Jersey legislature that would establish a ZEC program providing compensation for nuclear plants that demonstrate to the NJBPU that they meet certain requirements, including that they make a significant contribution to air quality in the state and that their revenues are insufficient to cover their costs and risks. The program provides transparency and includes robust customer protections.  The New Jersey Governor has up to 45 days to sign the bill, with the bill becoming effective immediately upon signing. The NJBPU then has 180 days from the effective date to establish procedures for implementation of the ZEC program and 330 days from the effective date to determine which nuclear power plants are selected to receive ZECs under the program. Selected nuclear plants will receive ZEC payments for each energy year (12-month period from June 1 through May 31) within 90 days after the completion of such energy year. Exelon and Generation continue to work with stakeholders.

### Westinghouse Electric Company LLC Bankruptcy

On March 29, 2017, Westinghouse Electric Company LLC (Westinghouse) and its affiliated debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. On January 4, 2018, Westinghouse announced its agreement to be purchased by an affiliate of Brookfield Business Partners, LLC (Brookfield) for approximately $4.6 billion. On March 28, 2018, the Bankruptcy Court entered an Order confirming the Debtor's Second Amended Joint Plan of Reorganization which provides for the transaction with Brookfield. Closing of the transaction is expected to occur in the third quarter of 2018. Exelon has contracts with Westinghouse primarily related to Generation's purchase of nuclear fuel, as well as a variety of services and equipment purchases associated with the operation and maintenance of nuclear generating stations. In conjunction with the confirmation hearing, Exelon had filed a reservation of rights regarding reorganizing Westinghouse's assumption of all Exelon contracts. Exelon has reached an agreement with Brookfield that all Exelon contracts will be assumed by Brookfield on the closing date. Closing of the transaction is subject to numerous conditions, including regulatory approvals.

### Utility Rates and Base Rate Proceedings

The Utility Registrants file base rate cases with their regulatory commissions seeking increases or decreases to their electric transmission and distribution, and gas distribution rates to recover their costs and earn a fair return on their investments. The outcomes of these regulatory proceedings impact the Utility Registrants' current and future results of operations, cash flows and financial position.

The following tables show the Utility Registrants' completed and pending distribution base rate case proceedings in 2018. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for information on other regulatory proceedings.

### Completed Distribution Base Rate Case Proceedings

| Company | Jurisdiction | Approved Revenue Requirement Increase (Decrease) (in millions) | Approved Return on Equity | Completion Date | Rate Effective Date |
|---------|-------------|----------------|------------------|----------------|-------------------|
| DPL | Maryland (Electric) | $            13 | 9.5% | February 9, 2018 | February 9, 2018 |

181

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Pending Distribution Base Rate Case Proceedings*

| Company | Jurisdiction | Requested Revenue Requirement Increase (Decrease) (in millions) | Requested Return on Equity | Filing Date | Expected Completion Timing |
|---|---|---|---|---|---|
| ComEd | Illinois (Electric) | $ (23) | 8.69% | April 16, 2018 | Fourth quarter 2018 |
| PECO | Pennsylvania (Electric) | $ 82 | 10.95% | March 29, 2018 | Fourth quarter 2018 |
| Pepco | Maryland (Electric) | $ (15) | 9.5% | January 2, 2018 (Updated February 5, 2018, March 8, 2018 and April 20, 2018) | Second quarter 2018 |
| Pepco | District of Columbia (Electric) | $ (24) | 9.525% | December 19, 2017 (Updated on February 9, 2018 and April 17, 2018) | Second quarter 2018 |
| DPL | Delaware (Electric) | $ 12 | 10.1% | August 17, 2017 (Updated October 18, 2017 and February 9, 2018) | Third quarter 2018 |
| DPL | Delaware (Natural Gas) | $ 4 | 10.1% | August 17, 2017 (Updated on November 7, 2017 and February 9, 2018) | Fourth quarter 2018 |

See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for further details on these base rate case proceedings.

**Winter Storm-Related Costs**

During March 2018 there were powerful nor'easter storms that brought a mix of heavy snow, ice and high sustained winds and gusts to the region that interrupted electric service delivery to customers in PECO's, BGE's, Pepco's, DPL's and ACE's service territories. Restoration efforts included significant costs associated with employee overtime, support from other utilities and incremental equipment, contracted tree trimming crews and supplies, which resulted in incremental operating and maintenance expense and incremental capital expenditures in the first quarter of 2018 for PECO, BGE, PHI, Pepco, DPL and ACE. In addition, PHI, Pepco, DPL and ACE recorded regulatory assets for amounts that are probable of recovery through customer rates. The impacts recorded by the Registrants are presented below:

182

| | Customer Outages | Incremental Operating & Maintenance | | Incremental Capital Expenditures |
|---|---|---|---|---|
| | | (in millions) | | |
| Exelon | 1,724,000 | $ | 93 [b] | $ | 93 |
| PECO | 750,000 | 56 | | 36 |
| BGE | 425,000 | 31 | | 18 |
| PHI [a] | 549,000 | 6 [b] | | 39 |
| Pepco | 179,000 | 3 [b] | | 6 |
| DPL | 138,000 | 3 [b] | | 5 |
| ACE | 232,000 | — [b] | | 28 |

(a)  PHI reflects the consolidated customer outages, incremental operating & maintenance and incremental capital expenditures of Pepco, DPL and ACE.
(b)  Excludes amounts that were deferred and recognized as regulatory assets at Exelon, PHI, Pepco, DPL and ACE of $22 million , $22 million , $5 million , $1 million and $16 million , respectively.

## Exelon's Strategy and Outlook for 2018 and Beyond

Exelon's value proposition and competitive advantage come from its scope and its core strengths of operational excellence and financial discipline. Exelon leverages its integrated business model to create value. Exelon's regulated and competitive businesses feature a mix of attributes that, when combined, offer shareholders and customers a unique value proposition:

- The Utility Registrants provide a foundation for steadily growing earnings, which translates to a stable currency in our stock.

- Generation's competitive businesses provide free cash flow to invest primarily in the utilities and in long-term, contracted assets and to reduce debt.

Exelon believes its strategy provides a platform for optimal success in an energy industry experiencing fundamental and sweeping change.

Exelon's utility strategy is to improve reliability and operations and enhance the customer experience, while ensuring ratemaking mechanisms provide the utilities fair financial returns. The Utility Registrants only invest in rate base where it provides a benefit to customers and the community by improving reliability and the service experience or otherwise meeting customer needs. The Utility Registrants make these investments at the lowest reasonable cost to customers. Exelon seeks to leverage its scale and expertise across the utilities platform through enhanced standardization and sharing of resources and best practices to achieve improved operational and financial results. Additionally, the Utility Registrants anticipate making significant future investments in smart meter technology, transmission projects, gas infrastructure, and electric system improvement projects, providing greater reliability and improved service for our customers and a stable return for the company.

Generation's competitive businesses create value for customers by providing innovative energy solutions and reliable, clean and affordable energy. Generation's electricity generation strategy is to pursue opportunities that provide stable revenues and generation to load matching to reduce earnings volatility. Generation leverages its energy generation portfolio to deliver energy to both wholesale and retail customers. Generation's customer-facing activities foster development and delivery of other innovative energy-related products and services for its customers. Generation operates in well-developed energy markets and employs an integrated hedging strategy to manage commodity price volatility. Its generation fleet, including its nuclear plants which consistently operate at high capacity factors, also

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

provide geographic and supply source diversity. These factors help Generation mitigate the current challenging conditions in competitive energy markets.

Exelon's financial priorities are to maintain investment grade credit metrics at each of the Registrants, to maintain optimal capital structure and to return value to Exelon's shareholders with an attractive dividend throughout the energy commodity market cycle and through stable earnings growth. Exelon's Board of Directors has approved a dividend policy providing a raise of 5% each year for the period covering 2018 through 2020, beginning with the March 2018 dividend.

Various market, financial, regulatory, legislative and operational factors could affect the Registrants' success in pursuing their strategies. Exelon continues to assess infrastructure, operational, commercial, policy, and legal solutions to these issues. One key issue is ensuring the ability to properly value nuclear generation assets in the market, solutions to which Exelon is actively pursuing in a variety of jurisdictions and venues. See ITEM 1A. RISK FACTORS of the Exelon 2017 Form 10-K for additional information regarding market and financial factors.

Continually optimizing the cost structure is a key component of Exelon's financial strategy.  In August 2015, Exelon announced a cost management program focused on cost savings of approximately $400 million at BSC and Generation, of which approximately 60% of run-rate savings was achieved by the end of 2017 with the remainder to be fully realized in 2018.  At least 75% of the savings are expected to be related to Generation, with the remaining amount related to the Utility Registrants. Additionally, in November 2017, Exelon announced a new commitment for an additional $250 million of cost savings, primarily at Generation, to be achieved by 2020. These actions are in response to the continuing economic challenges confronting all parts of Exelon's business and industry, necessitating continued focus on cost management through enhanced efficiency and productivity.

### Growth Opportunities

Management continually evaluates growth opportunities aligned with Exelon's businesses, assets and markets, leveraging Exelon's expertise in those areas and offering sustainable returns.

**Regulated Energy Businesses.** The PHI merger provides an opportunity to accelerate Exelon's regulated growth to provide stable cash flows, earnings accretion, and dividend support.  Additionally, the Utility Registrants anticipate investing approximately $26 billion over the next five years in electric and natural gas infrastructure improvements and modernization projects, including smart meter and smart grid initiatives, storm hardening, advanced reliability technologies, and transmission projects, which is projected to result in an increase to current rate base of approximately $11 billion by the end of 2022. The Utility Registrants invest in rate base where beneficial to customers and the community by increasing reliability and the service experience or otherwise meeting customer needs. These investments are made at the lowest reasonable cost to customers.

See Note 3 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements Exelon 2017 Form 10-K for additional information on the Smart Meter and Smart Grid Initiatives and infrastructure development and enhancement programs.

**Competitive Energy Businesses.** Generation continually assesses the optimal structure and composition of its generation assets as well as explores wholesale and retail opportunities within the power and gas sectors. Generation's long-term growth strategy is to ensure appropriate valuation of its generation assets, in part through public policy efforts, identify and capitalize on opportunities that provide generation to load matching as a means to provide stable earnings, and identify emerging technologies where strategic investments provide the option for significant future growth or influence in market development.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Liquidity Considerations**

Each of the Registrants annually evaluates its financing plan, dividend practices and credit line sizing, focusing on maintaining its investment grade ratings while meeting its cash needs to fund capital requirements, retire debt, pay dividends, fund pension and OPEB obligations and invest in new and existing ventures. A broad spectrum of financing alternatives beyond the core financing options can be used to meet its needs and fund growth including monetizing assets in the portfolio via project financing, asset sales, and the use of other financing structures (e.g., joint ventures, minority partners, etc.). The Registrants expect cash flows to be sufficient to meet operating expenses, financing costs and capital expenditure requirements.

Exelon Corporate, Generation, ComEd, PECO, BGE, Pepco, DPL and ACE have unsecured syndicated revolving credit facilities with aggregate bank commitments of $0.6 billion , $5.3 billion , $1 billion , $0.6 billion , $0.6 billion , $0.3 billion , $0.3 billion and $0.3 billion , respectively. Generation also has bilateral credit facilities with aggregate maximum availability of $0.5 billion . See Liquidity and Capital Resources - Credit Matters - Exelon Credit Facilities below.

For further detail regarding the Registrants' liquidity for the three months ended March 31, 2018 , see Liquidity and Capital Resources discussion below.

*Project Financing*

Generation utilizes individual project financings as a means to finance the construction of various generating asset projects. Project financing is based upon a nonrecourse financial structure, in which project debt and equity used to finance the project are paid back from the cash generated by the newly constructed asset once operational. Borrowings under these agreements are secured by the assets and equity of each respective project. The lenders do not have recourse against Exelon or Generation in the event of a default. If a specific project financing entity does not maintain compliance with its specific debt financing covenants, there could be a requirement to accelerate repayment of the associated debt or other project-related borrowings earlier than the stated maturity dates. In these instances, if such repayment was not satisfied, or restructured, the lenders or security holders would generally have rights to foreclose against the project-specific assets and related collateral. The potential requirement to satisfy its associated debt or other borrowings earlier than otherwise anticipated could lead to impairments due to a higher likelihood of disposing of the respective project-specific assets significantly before the end of their useful lives. See Note 11 — Debt and Credit Agreements of the Combined Notes to Consolidated Financial Statements for additional information on nonrecourse debt.

# Other Key Business Drivers and Management Strategies

## Power Markets

*Price of Fuels*

The use of new technologies to recover natural gas from shale deposits is increasing natural gas supply and reserves, which places downward pressure on natural gas prices and, therefore, on wholesale and retail power prices, which results in a reduction in Exelon's revenues. Forward natural gas prices have declined significantly over the last several years; in part reflecting an increase in supply due to strong natural gas production (due to shale gas development).

*DOE Notice of Proposed Rulemaking*

On August 23, 2017, the DOE staff released its report on the reliability of the electric grid. One aspect of the wide-ranging report is the DOE's recognition that the electricity markets do not currently value the resiliency provided by baseload generation, such as nuclear plants. On September 28, 2017,

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

the DOE issued a Notice of Proposed Rulemaking (NOPR) that would entitle certain eligible resilient generating units (i.e., those located in organized markets, with a 90-day supply of fuel on site, not already subject to state cost of service regulation and satisfying certain other requirements) to recover fully allocated costs and earn a fair return on equity on their investment. The DOE's NOPR recommended that the FERC take comments for 45 days after publication in the Federal Register and issue a final order 60-days after such publication.  On January 8, 2018, the FERC issued an order terminating the rulemaking docket that was initiated to address the proposed rule in the DOE NOPR, concluding the proposed rule did not sufficiently demonstrate there is a resiliency issue and that it proposed a remedy that did not appear to be just, reasonable and nondiscriminatory as required under the Federal Power Act. At the same time, the FERC initiated a new proceeding to consider resiliency challenges to the bulk power system and evaluate whether additional FERC action to address resiliency would be appropriate. The FERC directed each RTO and ISO to respond within 60 days to 24 specific questions about how they assess and mitigate threats to resiliency. Interested parties may submit reply comments through May 9, 2018. Exelon has been and will continue to be an active participant in these proceedings, but cannot predict the final outcome or its potential financial impact, if any, on Exelon or Generation.

### PJM Minimum Offer Price Rule Expanded and Repricing Filing

On April 9, 2018, PJM filed a request at FERC seeking approval of its proposed capacity repricing mechanism or, in the alternative, the Minimum Offer Price Rule Expanded (MOPREx) proposal. PJM argues that both proposed approaches are just and reasonable means of resolving the conflict between state policy support for certain resources and the need to provide reasonable prices for non-supported resources because both prevent state-supported resources from suppressing market clearing prices.  PJM expresses a preference for the repricing approach as it "honors the state's legitimate policy choice to promote resources with certain attributes not otherwise valued in the current wholesale market rules; MOPREx does not. Thus, PJM asks FERC to sequentially consider the two proposals; first considering the repricing approach and then considering the MOPREx approach only if FERC cannot accept repricing.  The MOPREx alternative, if selected by FERC, could impact Exelon and Generation as this mechanism could undermine the benefit of Illinois' ZEC program and similar programs that could be developed in other states.  Specifically, under PJM's MOPREx alternative, the MOPR mitigation mechanism would apply to all resources (not just new resources, as is currently done) including ZEC-supported resources, thereby mitigating the effect of state support in offers and rendering it unlikely that ZEC-supported resources will clear the capacity auction.  While numerous exceptions would be available under MOPREx, none would be available to ZEC programs.  PJM asks for a FERC order by June 29, 2018 and an effective date of June 30, 2018.  It is too early to predict the final outcome or its potential financial impact, if any, on Exelon or Generation.

### Section 232 Uranium Petition

On January 16, 2018, two Canadian-owned uranium mining companies with operations in the U.S. jointly submitted a petition to the U.S. Department of Commerce (DOC) seeking relief under Section 232 of the Trade Expansion Act of 1962 (as amended) from imports of uranium products, alleging that these imports threaten national security (the Petition). The Trade Expansion Act of 1962 (the Act) was promulgated by Congress to protect essential national security industries whose survival is threatened by imports. As such, the Act authorizes the Secretary of Commerce (the Secretary) to conduct investigations to evaluate the effects of imports of any item on the national security of the U.S. The Petition alleges that the loss of a viable U.S. uranium mining industry would have a significant detrimental impact on the national, energy, and economic security of the U.S. and the ability of the country to sustain an independent nuclear fuel cycle. The relief sought by the petitioners would require U.S. nuclear reactors to purchase at least 25% of their uranium needs from domestic mines over the next 10 years. If the DOC initiates an investigation, the Secretary has 270 days to prepare and submit a report to President Trump, who then has 90 days to act on the Secretary's recommendations. Exelon and Generation cannot currently predict the outcome of this petition. It is reasonably possible that if this

186

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

petition were successful the resulting increase in nuclear fuel costs in future periods could have a material, unfavorable impact on Exelon's and Generation's results of operations, cash flows and financial positions.

### Energy Demand

Modest economic growth partially offset by energy efficiency initiatives is resulting in flat to declining load growth in electricity for the Utility Registrants. There is an increase in projected load for electricity for PECO, BGE, Pepco and ACE, and a decrease in projected load for electricity at ComEd and DPL. ComEd, PECO, BGE, Pepco, DPL and ACE are projecting load volumes to increase (decrease) by (0.1)% , 0.3% , 1.1% , 2.1% , (1.9)% and 2.9% respectively, in 2018 compared to 2017 .

### Retail Competition

Generation's retail operations compete for customers in a competitive environment, which affect the margins that Generation can earn and the volumes that it is able to serve. The market experienced high price volatility in the first quarter of 2014 which contributed to bankruptcies and consolidations within the industry during the year. However, forward natural gas and power prices are expected to remain low and thus we expect retail competitors to stay aggressive in their pursuit of market share, and that wholesale generators (including Generation) will continue to use their retail operations to hedge generation output.

## Strategic Policy Alignment

As part of its strategic business planning process, Exelon routinely reviews its hedging policy, dividend policy, operating and capital costs, capital spending plans, strength of its balance sheet and credit metrics, and sufficiency of its liquidity position, by performing various stress tests with differing variables, such as commodity price movements, increases in margin-related transactions, changes in hedging practices and the impacts of hypothetical credit downgrades.

Exelon's board of directors declared first quarter 2018 dividends of $0.345 per share on Exelon's common stock. The first quarter 2018 dividend was paid on March 9, 2018. The dividend increased from the fourth quarter 2017 amount to reflect the Board's decision to raise Exelon's dividend 5% each year for the period covering 2018 through 2020, beginning with the March 2018 dividend.

Exelon's board of directors declared second quarter 2018 dividends of $0.345 per share on Exelon's common stock and is payable on June 8, 2018.

All future quarterly dividends require approval by Exelon's Board of Directors.

## Hedging Strategy

Exelon's policy to hedge commodity risk on a ratable basis over three-year periods is intended to reduce the financial impact of market price volatility. Generation is exposed to commodity price risk associated with the unhedged portion of its electricity portfolio. Generation enters into non-derivative and derivative contracts, including financially-settled swaps, futures contracts and swap options, and physical options and physical forward contracts, all with credit-approved counterparties, to hedge this anticipated exposure. Generation has hedges in place that significantly mitigate this risk for 2018 and 2019 . However, Generation is exposed to relatively greater commodity price risk in the subsequent years with respect to which a larger portion of its electricity portfolio is currently unhedged. As of March 31, 2018 , the percentage of expected generation hedged is 91% - 94% , 63% - 66% and 33% - 36% for 2018 , 2019 , and 2020 respectively. The percentage of expected generation hedged is the amount of equivalent sales divided by the expected generation. Expected generation is the volume of energy that best represents our commodity position in energy markets from owned or contracted generating facilities based upon a simulated dispatch model that makes assumptions regarding future market conditions, which are calibrated to market quotes for power, fuel, load following products, and options. Equivalent

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

sales represent all hedging products, such as wholesale and retail sales of power, options and swaps. Generation has been and will continue to be proactive in using hedging strategies to mitigate commodity price risk in subsequent years as well.

Generation procures oil and natural gas through long-term and short-term contracts and spot-market purchases. Nuclear fuel is obtained predominantly through long-term uranium concentrate supply contracts, contracted conversion services, contracted enrichment services, or a combination thereof, and contracted fuel fabrication services. The supply markets for uranium concentrates and certain nuclear fuel services, coal, oil and natural gas are subject to price fluctuations and availability restrictions. Supply market conditions may make Generation's procurement contracts subject to credit risk related to the potential non-performance of counterparties to deliver the contracted commodity or service at the contracted prices. Approximately 58% of Generation's uranium concentrate requirements from 2018 through 2022 are supplied by three producers. In the event of non-performance by these or other suppliers, Generation believes that replacement uranium concentrate can be obtained, although at prices that may be unfavorable when compared to the prices under the current supply agreements. Non-performance by these counterparties could have a material adverse impact on Exelon's and Generation's results of operations, cash flows and financial positions.

The Utility Registrants mitigate commodity price risk through regulatory mechanisms that allow them to recover procurement costs from retail customers.

## Environmental Legislative and Regulatory Developments

Exelon was actively involved in the Obama Administration's development and implementation of environmental regulations for the electric industry, in pursuit of its business strategy to provide reliable, clean, affordable and innovative energy products. These efforts have most frequently involved air, water and waste controls for fossil-fueled electric generating units, as set forth in the discussion below. These regulations have had a disproportionate adverse impact on coal-fired power plants, requiring significant expenditures of capital and variable operating and maintenance expense, and have resulted in the retirement of older, marginal facilities. Due to its low emission generation portfolio, Generation has not been significantly affected by these regulations, representing a competitive advantage relative to electric generators that are more reliant on fossil fuel plants.

Through the issuance of a series of Executive Orders (EO), President Trump has initiated review of a number of EPA and other regulations issued during the Obama Administration, with the expectation that the Administration will seek repeal or significant revision of these rules. Under these EOs, each executive agency is required to evaluate existing regulations and make recommendations regarding repeal, replacement, or modification. The Administration's actions are intended to result in less stringent compliance requirements under air, water, and waste regulations. The exact nature, extent, and timing of the regulatory changes are unknown, as well as the ultimate impact on Exelon's and its subsidiaries results of operations and cash flows.

In particular, the Administration has targeted existing EPA regulations for repeal, including notably the Clean Power Plan, as well as revoking many Executive Orders, reports, and guidance issued by the Obama Administration on the topic of climate change or the regulation of greenhouse gases. The Executive Order also disbanded the Interagency Working Group that developed the social cost of carbon used in rulemakings, and withdrew all technical support documents supporting the calculation. Other regulations that have been specifically identified for review are the Clean Water Act rule relating to jurisdictional waters of the U.S., the Steam Electric Effluent Guidelines relating to waste water discharges from coal-fired power plants, and the 2015 National Ambient Air Quality Standard (NAAQS) for ozone. The review of final rules could extend over several years as formal notice and comment rulemaking process proceeds.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Air Quality*

*Mercury and Air Toxics Standard Rule (MATS).* On December 16, 2011, the EPA signed a final rule to reduce emissions of toxic air pollutants from power plants and signed revisions to the NSPS for electric generating units. The final rule, known as MATS, requires coal-fired electric generation plants to achieve high removal rates of mercury, acid gases and other metals, and to make capital investments in pollution control equipment and incur higher operating expenses. The initial compliance deadline to meet the new standards was April 16, 2015; however, facilities may have been granted an additional one or two-year extension in limited cases. Numerous entities challenged MATS in the D.C. Circuit Court, and Exelon intervened in support of the rule. In April 2014, the D.C. Circuit Court issued an opinion upholding MATS in its entirety. On appeal, the U.S. Supreme Court decided in June 2015 that the EPA unreasonably refused to consider costs in determining whether it is appropriate and necessary to regulate hazardous air pollutants emitted by electric utilities. The U.S. Supreme Court, however, did not vacate the rule; rather, it was remanded to the D.C. Circuit Court to take further action consistent with the U.S. Supreme Court's opinion on this single issue. On April 27, 2017, the D.C. Circuit granted EPA's motion to hold the litigation in abeyance, pending EPA's review of the MATS rule pursuant to President Trump's EO discussed above. Following EPA's review and determination of its course of action for the MATS rule, the parties will have 30 days to file motions on future proceedings. Notwithstanding the Court's order to hold the litigation in abeyance, the MATS rule remains in effect. Exelon will continue to participate in the remanded proceedings before the D.C. Circuit Court as an intervenor in support of the rule.

*Clean Power Plan .* On April 28, 2017, the D.C. Circuit Court issued orders in separate litigation related to the EPA's actions under the Clean Power Plan (CPP) to amend Clean Air Act Section 111(d) regulation of existing fossil-fired electric generating units and Section 111(b) regulation of new fossil-fired electric generating units. In both cases, the Court has determined to hold the litigation in abeyance pending a determination whether the rule should be remanded to the EPA. On October 10, 2017, EPA issued a proposed rule to repeal the CPP in its entirety, based on a proposed change in the Agency's legal interpretation of Clean Air Act Section 111(d) regarding actions that the Agency can consider when establishing the Best System of Emission Reduction ("BSER") for existing power plants. Under the proposed interpretation, the Agency exceeded its authority under the Clean Air Act by regulating beyond individual sources of GHG emissions. The EPA has also indicated its intent to issue an advance notice of proposed rulemaking to solicit information on systems of emission reduction that are in accord with the Agency's proposed revised legal interpretation; namely, only by regulating emission reductions that can be implemented at and to individual sources.

*2015 Ozone National Ambient Air Quality Standards (NAAQS).* On April 11, 2017, the D.C. Circuit ordered that the consolidated 2015 ozone NAAQS litigation be held in abeyance pending EPA's further review of the 2015 Rule. EPA did not meet the October 1, 2017 deadline to promulgate initial designations for areas in attainment or non-attainment of the standard. A number of states and environmental organizations have notified the EPA of their intent to file suit to compel EPA to issue the designations.

*Climate Change.* Exelon supports comprehensive climate change legislation or regulation, including a cap-and-trade program for GHG emissions, which balances the need to protect consumers, business and the economy with the urgent need to reduce national GHG emissions. In the absence of Federal legislation, the EPA is moving forward with the regulation of GHG emissions under the Clean Air Act. In addition, there have been recent developments in the international regulation of GHG emissions pursuant to the United Nations Framework Convention on Climate Change ("UNFCCC" or "Convention"). See ITEM 1. BUSINESS, "Water Quality" of the Exelon 2017 Form 10-K for further discussion.

*Water Quality*

Section 316(b) requires that the cooling water intake structures at electric power plants reflect the best technology available to minimize adverse environmental impacts, and is implemented through state-

level NPDES permit programs. All of Generation's power generation facilities with cooling water systems are subject to the regulations. Facilities without closed-cycle recirculating systems (e.g., cooling towers) are potentially most affected by recent changes to the regulations. For Generation, those facilities are Calvert Cliffs, Clinton, Dresden, Eddystone, Fairless Hills, FitzPatrick, Ginna, Gould Street, Mountain Creek, Handley, Mystic 7, Nine Mile Point Unit 1, Peach Bottom, Quad Cities, and Salem. See ITEM 1. BUSINESS, "Water Quality" for further discussion.

### Solid and Hazardous Waste

In October 2015, the first federal regulation for the disposal of coal combustion residuals (CCR) from power plants became effective. The rule classifies CCR as non-hazardous waste under RCRA. Under the regulation, CCR will continue to be regulated by most states subject to coordination with the federal regulations. Generation has previously recorded accruals consistent with state regulation for its owned coal ash sites, and as such, the regulation is not expected to impact Exelon's and Generation's financial results. Generation does not have sufficient information to reasonably assess the potential likelihood or magnitude of any remediation requirements that may be asserted under the new federal regulations for coal ash disposal sites formerly owned by Generation. For these reasons, Generation is unable to predict whether and to what extent it may ultimately be held responsible for remediation and other costs relating to formerly owned coal ash disposal sites under the new regulations.

See Note 17 — Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements for further detail related to environmental matters, including the impact of environmental regulation.

## Employees

In January 2017, an election was held at BGE which resulted in union representation for approximately 1,394 employees. BGE and IBEW Local 410 are negotiating an initial agreement which could result in some modifications to wages, hours and other terms and conditions of employment. Negotiations have been productive and continue. No agreement has been finalized to date and management cannot predict the outcome of such negotiations. Additionally, prior to commencing negotiations at Braidwood Generating Station with its Security Union, SPFPA Local 228, a rival Union petitioned the NLRB to represent the Security Officers in lieu of the incumbent Union. An election was held and the incumbent Union prevailed. The rival union sought to overturn the election and filed unfair labor practice charges against the incumbent which were denied following an NLRB Regional Hearing. Due to the legal proceedings between the Unions, the existing CBA was extended prior to the NLRB hearing and currently expires in August 2018. Lastly, negotiations for a collective bargaining agreement with Local 501 of Operating Engineers are ongoing with a small unit of employees at Exelon's Hyperion Solutions facility.

# Critical Accounting Policies and Estimates

## Revenue Recognition (All Registrants)

### Sources of Revenue and Determination of Accounting Treatment

The Registrants earn revenues from various business activities including: the sale of power and energy-related products, such as natural gas, capacity, and other commodities in non-regulated markets (wholesale and retail); the sale and delivery of power and natural gas in regulated markets; and the provision of other energy-related non-regulated products and services.

The accounting treatment for revenue recognition is based on the nature of the underlying transaction and applicable authoritative guidance. The Registrants primarily apply the Revenue from

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Contracts with Customers, Derivative, and Alternative Revenue Program (ARP) guidance to recognize revenue as discussed in more detail below.

### Revenue from Contracts with Customers

Under the Revenue from Contracts with Customers guidance, the Registrants recognize revenues in the period in which the performance obligations within contracts with customers are satisfied, which generally occurs when power, natural gas, and other energy-related commodities are physically delivered to the customer. Transactions of the Registrants within the scope of Revenue from Contracts with Customers generally include non-derivative agreements, contracts that are designated as normal purchases and normal sales (NPNS), sales to utility customers under regulated service tariffs, and spot-market energy commodity sales, including settlements with independent system operators.

The determination of Generation's and the Utility Registrants' retail power and natural gas sales to individual customers is based on systematic readings of customer meters, generally on a monthly basis. At the end of each month, amounts of energy delivered to customers since the date of the last meter reading are estimated, and corresponding unbilled revenue is recorded. The measurement of unbilled revenue is affected by the following factors: daily customer usage measured by generation or gas throughput volume, customer usage by class, losses of energy during delivery to customers and applicable customer rates. Increases or decreases in volumes delivered to the utilities' customers and favorable or unfavorable rate mix due to changes in usage patterns in customer classes in the period could be significant to the calculation of unbilled revenue. In addition, revenues may fluctuate monthly as a result of customers electing to use an alternate supplier, since unbilled commodity revenues are not recorded for these customers. Changes in the timing of meter reading schedules and the number and type of customers scheduled for each meter reading date also impact the measurement of unbilled revenue; however, total operating revenues would remain materially unchanged

See Note 5 — Accounts Receivable of the Exelon 2017 Form 10-K for additional information on unbilled revenue.

See Note 1 — Significant Accounting Policies and Note 5 — Revenue from Contracts with Customers of the Combined Notes to Consolidated Financial Statements for more information on the impacts of the new revenue accounting standard effective for annual reporting periods beginning on or after December 15, 2017.

### Derivative Revenues

The Registrants record revenues and expenses using the mark-to-market method of accounting for transactions that are accounted for as derivatives. These derivative transactions primarily relate to commodity price risk management activities. Mark-to-market revenues and expenses include: inception gains or losses on new transactions where the fair value is observable, unrealized gains and losses from changes in the fair value of open contracts, and realized gains and losses.

### Alternative Revenue Program Revenues

Certain of the Utility Registrants' ratemaking mechanisms qualify as Alternative Revenue Programs (ARPs) if they (i) are established by a regulatory order and allow for automatic adjustment to future rates, (ii) provide for additional revenues (above those amounts currently reflected in the price of utility service) that are objectively determinable and probable of recovery, and (iii) allow for the collection of those additional revenues within 24 months following the end of the period in which they were recognized. For mechanisms that meet these criteria, which include the Utility Registrants' formula rate and revenue decoupling mechanisms, the Utility Registrants adjust revenue and record an offsetting regulatory asset or liability once the condition or event allowing additional billing or refund has occurred. The ARP revenues presented in the Utility Registrants' Consolidated Statements of Operations and

Table of Contents

Comprehensive Income include both: (i) the recognition of "originating" ARP revenues (when the regulator-specified condition or event allowing for additional billing or refund has occurred) and (ii) an equal and offsetting reversal of the "originating" ARP revenues as those amounts are reflected in the price of utility service and recognized as Revenue from Contracts with Customers.

ComEd records ARP revenue for its best estimate of the electric distribution, energy efficiency, and transmission revenue impacts resulting from future changes in rates that ComEd believes are probable of approval by the ICC and FERC in accordance with its formula rate mechanisms. BGE, Pepco, and DPL record ARP revenue for their best estimate of the electric and natural gas distribution revenue impacts resulting from future changes in rates that they believe are probable of approval by the MDPSC and/or DCPSC in accordance with their revenue decoupling mechanisms. PECO, BGE, Pepco, DPL and ACE record ARP revenue for their best estimate of the transmission revenue impacts resulting from future changes in rates that they believe are probable of approval by FERC in accordance with their formula rate mechanisms. Estimates of the current year revenue requirement are based on actual and/or forecasted costs and investments in rate base for the period and the rates of return on common equity and associated regulatory capital structure allowed under the applicable tariff. The estimated reconciliation can be affected by, among other things, variances in costs incurred, investments made, allowed ROE, and actions by regulators or courts.

See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for further information.

Management of each of the Registrants makes a number of significant estimates, assumptions and judgments in the preparation of its financial statements. See ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS — CRITICAL ACCOUNTING POLICIES AND ESTIMATES in Exelon's, Generation's, ComEd's, PECO's, BGE's, PHI's, Pepco's, DPL's and ACE's combined 2017 Form 10-K for a discussion of the estimates and judgments necessary in the Registrants' accounting for AROs, goodwill, purchase accounting, unamortized energy assets and liabilities, asset impairments, depreciable lives of property, plant and equipment, defined benefit pension and other postretirement benefits, regulatory accounting, derivative instruments, taxation, contingencies, revenue recognition, and allowance for uncollectible accounts. At March 31, 2018 , the Registrants' critical accounting policies and estimates had not changed significantly from December 31, 2017 .

# Results of Operations By Registrant

## Net Income Attributable to Common Shareholders by Registrant

| | Three Months Ended March 31, | | | | | Favorable (Unfavorable) Variance |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | |
| Exelon | $ | 585 | $ | 990 | $ | (405) |
| Generation | | 136 | | 418 | | (282) |
| ComEd | | 165 | | 141 | | 24 |
| PECO | | 113 | | 127 | | (14) |
| BGE | | 128 | | 125 | | 3 |
| PHI | | 65 | | 140 | | (75) |
| Pepco | | 31 | | 58 | | (27) |
| DPL | | 31 | | 57 | | (26) |
| ACE | | 7 | | 28 | | (21) |

192

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## Results of Operations — Generation

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
| --- | --- | --- | --- |
| | 2018 | 2017 | |
| Operating revenues | $ 5,512 | $ 4,878 | $ 634 |
| Purchased power and fuel expense | 3,293 | 2,798 | (495) |
| Revenues net of purchased power and fuel expense (a) | 2,219 | 2,080 | 139 |
| Other operating expenses | | | |
| Operating and maintenance | 1,339 | 1,492 | 153 |
| Depreciation and amortization | 448 | 302 | (146) |
| Taxes other than income | 138 | 143 | 5 |
| Total other operating expenses | 1,925 | 1,937 | 12 |
| Gain on sales of assets and businesses | 53 | 4 | 49 |
| Bargain purchase gain | — | 226 | (226) |
| Operating income | 347 | 373 | (26) |
| Other income and (deductions) | | | |
| Interest expense, net | (101) | (100) | (1) |
| Other, net | (44) | 259 | (303) |
| Total other income and (deductions) | (145) | 159 | (304) |
| Income before income taxes | 202 | 532 | (330) |
| Income taxes | 9 | 123 | 114 |
| Equity in losses of unconsolidated affiliates | (7) | (10) | 3 |
| Net income | 186 | 399 | (213) |
| Net income (loss) attributable to noncontrolling interests | 50 | (19) | (69) |
| Net income attributable to membership interest | $ 136 | $ 418 | $ (282) |

_____
(a)    Generation evaluates its operating performance using the measure of revenue net of purchased power and fuel expense. Generation believes that revenue net of purchased power and fuel expense is a useful measurement because it provides information that can be used to evaluate its operational performance. Revenue net of purchased power and fuel expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

*Net Income Attributable to Membership Interest*

**Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .** Generation's Net income attributable to membership interest for the three months ended March 31, 2018 decreased compared to the same period in 2017 , primarily due to higher Depreciation and amortization expenses, a Bargain purchase gain in 2017, and lower Other income, partially offset by higher Revenue net of purchased power and fuel expense, lower Operating and maintenance expenses, higher Gain on sales of assets and businesses and lower Income taxes. The increase in Depreciation and amortization is primarily due to accelerated depreciation and amortization expenses associated with Generation's first quarter 2018 decision to early retire the Oyster Creek nuclear facility and Generation's second quarter 2017 decision to early retire TMI. The Bargain purchase gain is due to the acquisition of the FitzPatrick nuclear facility in 2017. The decrease in Other income is primarily due to the change in realized and unrealized gains and losses on NDT funds. The increase in Revenue net of purchased power and fuel expense primarily relates to the impacts of the New York CES and Illinois Zero Emission Standards (including the impact of zero emission credits generated in Illinois from June 1, 2017 through

193

Table of Contents

December 31, 2017), the acquisition of the FitzPatrick nuclear facility and decreased nuclear outage days, and higher capacity prices, partially offset by increased Mark-to-market losses in 2018 compared to 2017, the conclusion of the Ginna Reliability Support Services Agreement and lower realized energy prices, partially offset by the addition of two combined-cycle gas turbines in Texas. The decrease in Operating and maintenance is primarily due to certain costs associated with mergers and acquisitions related to the PHI and FitzPatrick acquisitions, decreased nuclear outage days in 2018, and the impact of a supplemental NEIL distribution, partially offset by increased operating expenses related to the 2017 acquisition of FitzPatrick. The increase in Gain on sales of assets and businesses is primarily due Generation's 2018 sale of its electrical contracting business. The decrease in income taxes is primarily due to tax savings related to TCJA.

### *Revenues Net of Purchased Power and Fuel Expense*

The basis for Generation's reportable segments is the integrated management of its electricity business that is located in different geographic regions, and largely representative of the footprints of ISO/RTO and/or NERC regions, which utilize multiple supply sources to provide electricity through various distribution channels (wholesale and retail). Generation's hedging strategies and risk metrics are also aligned with these same geographic regions. Descriptions of each of Generation's six reportable segments are as follows:

- Mid-Atlantic represents operations in the eastern half of PJM, which includes New Jersey, Maryland, Virginia, West Virginia, Delaware, the District of Columbia and parts of Pennsylvania and North Carolina.

- Midwest represents operations in the western half of PJM, which includes portions of Illinois, Pennsylvania, Indiana, Ohio, Michigan, Kentucky and Tennessee, and the United States footprint of MISO, excluding MISO's Southern Region, which covers all or most of North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, the remaining parts of Illinois, Indiana, Michigan and Ohio not covered by PJM, and parts of Montana, Missouri and Kentucky.

- New England represents the operations within ISO-NE covering the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

- New York represents operations within ISO-NY, which covers the state of New York in its entirety.

- ERCOT represents operations within Electric Reliability Council of Texas, covering most of the state of Texas.

- Other Power Regions :

  - South represents operations in the FRCC, MISO's Southern Region, and the remaining portions of the SERC not included within MISO or PJM, which includes all or most of Florida, Arkansas, Louisiana, Mississippi, Alabama, Georgia, Tennessee, North Carolina, South Carolina and parts of Missouri, Kentucky and Texas. Generation's South region also includes operations in the SPP, covering Kansas, Oklahoma, most of Nebraska and parts of New Mexico, Texas, Louisiana, Missouri, Mississippi and Arkansas.

  - West represents operations in the WECC, which includes California ISO, and covers the states of California, Oregon, Washington, Arizona, Nevada, Utah, Idaho, Colorado, and parts of New Mexico, Wyoming and South Dakota.

  - Canada represents operations across the entire country of Canada and includes AESO, OIESO and the Canadian portion of MISO.

194

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following business activities are not allocated to a region, and are reported under Other: natural gas, as well as other miscellaneous business activities that are not significant to Generation's overall operating revenues or results of operations. Further, the following activities are not allocated to a region, and are reported in Other: amortization of certain intangible assets relating to commodity contracts recorded at fair value from mergers and acquisitions; accelerated nuclear fuel amortization associated with nuclear decommissioning; and other miscellaneous revenues.

Generation evaluates the operating performance of its electric business activities using the measure of Revenue net of purchased power and fuel expense, which is a non-GAAP measurement. Generation's operating revenues include all sales to third parties and affiliated sales to the Utility Registrants. Purchased power costs include all costs associated with the procurement and supply of electricity including capacity, energy and ancillary services. Fuel expense includes the fuel costs for owned generation and fuel costs associated with tolling agreements.

For the three months ended March 31, 2018 and 2017 , Generation's Revenue net of purchased power and fuel expense by region were as follows:

|  | Three Months Ended March 31, | | | |
|  | 2018 | 2017 | Variance | % Change |
| --- | --- | --- | --- | --- |
| Mid-Atlantic [a] | $ 850 | $ 773 | $ 77 | 10.0 % |
| Midwest [b] | 860 | 715 | 145 | 20.3 % |
| New England | 119 | 111 | 8 | 7.2 % |
| New York [d] | 283 | 143 | 140 | 97.9 % |
| ERCOT | 36 | 69 | (33) | (47.8)% |
| Other Power Regions | 117 | 64 | 53 | 82.8 % |
| Total electric revenue net of purchased power and fuel expense | 2,265 | 1,875 | 390 | 20.8 % |
| Proprietary Trading | 6 | — | 6 | — % |
| Mark-to-market losses | (266) | (49) | (217) | 442.9 % |
| Other [c] | 214 | 254 | (40) | (15.7)% |
| Total revenue net of purchased power and fuel expense | $ 2,219 | $ 2,080 | $ 139 | 6.7 % |

(a) Results of transactions with PECO and BGE are included in the Mid-Atlantic region. Results of transactions with Pepco, DPL and ACE are included in the Mid-Atlantic region.
(b) Results of transactions with ComEd are included in the Midwest region.
(c) Other represents activities not allocated to a region. See text above for a description of included activities. Includes amortization of intangible assets related to commodity contracts recorded at fair value of a $3 million decrease to revenue net of purchased power and fuel expense for the three months ended March 31, 2017 , and accelerated nuclear fuel amortization associated with announced early plant retirements as discussed in Note 8 — Early Plant Retirements of the Combined Notes to Consolidated Financial Statements of a $15 million decrease to revenue net of purchased power and fuel expense for the three months ended March 31, 2018 .
(d) Includes the ownership of the FitzPatrick nuclear facility from March 31, 2017.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Generation's supply sources by region are summarized below:

| Supply source (GWhs) | Three Months Ended March 31, | | Variance | % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| Nuclear generation | | | | |
|     Mid-Atlantic [a] | 16,229 | 16,545 | (316) | (1.9)% |
|     Midwest | 23,597 | 22,468 | 1,129 | 5.0 % |
|     New York [a][c] | 7,115 | 4,491 | 2,624 | 58.4 % |
|       Total Nuclear Generation | 46,941 | 43,504 | 3,437 | 7.9 % |
| Fossil and Renewables | | | | |
|     Mid-Atlantic | 900 | 836 | 64 | 7.7 % |
|     Midwest | 455 | 418 | 37 | 8.9 % |
|     New England | 2,035 | 2,077 | (42) | (2.0)% |
|     New York | 1 | 1 | — | — % |
|     ERCOT | 2,949 | 1,370 | 1,579 | 115.3 % |
|     Other Power Regions | 1,993 | 1,423 | 570 | 40.1 % |
|       Total Fossil and Renewables | 8,333 | 6,125 | 2,208 | 36.0 % |
| Purchased Power | | | | |
|     Mid-Atlantic | 766 | 3,398 | (2,632) | (77.5)% |
|     Midwest | 336 | 388 | (52) | (13.4)% |
|     New England | 5,436 | 5,064 | 372 | 7.3 % |
|     New York | — | 28 | (28) | — % |
|     ERCOT | 1,373 | 2,655 | (1,282) | (48.3)% |
|     Other Power Regions | 4,134 | 2,868 | 1,266 | 44.1 % |
|       Total Purchased Power | 12,045 | 14,401 | (2,356) | (16.4)% |
| Total Supply/Sales by Region | | | | |
|     Mid-Atlantic [b] | 17,895 | 20,779 | (2,884) | (13.9)% |
|     Midwest [b] | 24,388 | 23,274 | 1,114 | 4.8 % |
|     New England | 7,471 | 7,141 | 330 | 4.6 % |
|     New York | 7,116 | 4,520 | 2,596 | 57.4 % |
|     ERCOT | 4,322 | 4,025 | 297 | 7.4 % |
|     Other Power Regions | 6,127 | 4,291 | 1,836 | 42.8 % |
| Total Supply/Sales by Region | 67,319 | 64,030 | 3,289 | 5.1 % |

(a)   Includes the proportionate share of output where Generation has an undivided ownership interest in jointly-owned generating plants and includes the total output of plants that are fully consolidated (e.g. CENG).

(b)   Includes affiliate sales to PECO and BGE in the Mid-Atlantic region, affiliate sales to ComEd in the Midwest region and affiliate sales to Pepco, DPL and ACE in the Mid-Atlantic region.

(c)   Includes the ownership of the FitzPatrick nuclear facility from March 31, 2017.

### Mid-Atlantic

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $77 million increase in Revenue net of purchased power and fuel expense in the Mid-Atlantic primarily

reflects higher realized energy prices and increased capacity prices, partially offset by increased nuclear outage days.

### Midwest

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $145 million increase in Revenue net of purchased power and fuel expense in the Midwest was primarily due to the impact of the Illinois Zero Emission Standard (including the impact of zero emission credits generated in Illinois from June 1, 2017 through December 31, 2017) and decreased nuclear outage days, partially offset by lower realized energy prices.

### New England

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $8 million increase in Revenue net of purchased power and fuel expense in New England primarily reflects increased capacity prices, partially offset by lower realized energy prices.

### New York

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $140 million increase in Revenue net of purchased power and fuel expense in New York was primarily due to the impact of the New York CES and the acquisition of FitzPatrick, partially offset by the conclusion of the Ginna Reliability Support Service Agreement and lower realized energy prices.

### ERCOT

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $33 million decrease in Revenue net of purchased power and fuel expense in ERCOT was primarily due to lower realized energy prices, partially offset by the addition of two combined-cycle gas turbines in Texas.

### Other Power Regions

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $53 million increase in Revenue net of purchased power and fuel expense in Other Power Regions was primarily due to higher realized energy prices.

### Proprietary Trading

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $6 million increase in Revenue net of purchased power and fuel expense in Proprietary Trading was primarily due to congestion activity.

### Mark-to-market

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* Mark-to-market losses on economic hedging activities were $266 million for the three months ended March 31, 2018 compared to losses of $49 million for the three months ended March 31, 2017 . See Notes 9 — Fair Value of Financial Assets and Liabilities and 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for information on gains and losses associated with mark-to-market derivatives.

### Other

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* The $40 million decrease in Revenue net of purchased power and fuel expense in Other was due to the

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

decline in revenues related to the energy efficiency business and higher accelerated nuclear fuel amortization associated with announced early plant retirements as discussed in Note 8 — Early Plant Retirements of the Combined Notes to Consolidated Financial Statements, partially offset by higher natural gas portfolio optimization.

### Nuclear Fleet Capacity Factor

The following table presents nuclear fleet operating data for the three months ended March 31, 2018 as compared to the same period in 2017 , for the Generation-operated plants. The nuclear fleet capacity factor presented in the table is defined as the ratio of the actual output of a plant over a period of time to its output if the plant had operated at full average annual mean capacity for that time period. Generation considers capacity factor to be a useful measure to analyze the nuclear fleet performance between periods. Generation has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, these measures are not a presentation defined under GAAP and may not be comparable to other companies' presentations or be more useful than the GAAP information provided elsewhere in this report.

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2018 | 2017 |
| Nuclear fleet capacity factor [a] | 96.5% | 94.0% |
| Refueling outage days [a] | 68 | 95 |
| Non-refueling outage days [a] | 6 | 8 |

(a)   Excludes Salem, which is operated by PSEG Nuclear, LLC. Reflects ownership percentage of stations operated by Exelon. Includes the ownership of the FitzPatrick nuclear facility from March 31, 2017.

**Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .** The nuclear fleet capacity factor increased primarily due to fewer non-refueling and refueling outage days, excluding Salem outages, during the three months ended March 31, 2018 compared to the same period in 2017 .

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

### Operating and Maintenance Expense

The changes in Operating and maintenance expense for the three months ended March 31, 2018 as compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, |
|---|---|
| | Increase (Decrease) [a] |
| Labor, other benefits, contracting, materials [b] | $                    (51) |
| Nuclear refueling outage costs, including the co-owned Salem plants [c] | (33) |
| Corporate allocations | 8 |
| Insurance [d] | (32) |
| Merger and integration costs [e] | (38) |
| Plant retirements and divestitures [f] | 26 |
| Other | (33) |
| Decrease in Operating and maintenance expense | $                  (153) |

_____
(a)   The financial results include Generation's acquisition of the FitzPatrick nuclear generating station from March 31, 2017.
(b)   Primarily reflects decreased spending related to energy efficiency projects.
(c)   Primarily reflects a decrease in the number of nuclear outage days for the three months ended March 31, 2018 compared to 2017 .
(d)   Primarily reflects the impact of a supplemental NEIL insurance distribution.
(e)   Primarily reflects certain costs associated with mergers and acquisitions, including, if and when applicable, professional fees, employee-related expenses and integration activities related to the PHI and FitzPatrick acquisitions in 2017, and the PHI acquisition in 2018.
(f)   Primarily reflects accelerated depreciation and amortization expenses and increases to materials and supplies inventory reserves associated with Generation's 2018 decision to early retire the Oyster Creek nuclear facility, as well as the accelerated depreciation and amortization expense associated with Generation's 2017 decision to early retire the Three Mile Island nuclear facility, partially offset by a gain associated with Generation's sale of its electrical contracting business.

### Depreciation and Amortization Expense

Depreciation and amortization expense for the three months ended March 31, 2018 compared to the same period in 2017 increased primarily due to accelerated depreciation and amortization expenses associated with Generation's first quarter 2018 decision to early retire the Oyster Creek nuclear facility and Generation's second quarter 2017 decision to early retire TMI.

### Taxes Other Than Income

Taxes other than income taxes, which can vary period to period, include non-income municipal and state utility taxes, real estate taxes and payroll taxes. Taxes other than income for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively stable.

### Gain on Sales of Assets and Businesses

Gain on sales of assets and businesses for the three months ended March 31, 2018 compared to the same period in 2017 increased primarily due to Generation's 2018 sale of its electrical contracting business.

### Bargain Purchase Gain

Bargain purchase gain for the three months ended March 31, 2018 compared to the same period in 2017 decreased as a result of the gain associated with the FitzPatrick acquisition in 2017. Refer to Note 4 — Mergers, Acquisitions and Dispositions of the Combined Notes to Consolidated Financial Statements for additional information.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Interest Expense, Net*

Interest expense, net for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively stable.

*Other, Net*

Other, net for the three months ended March 31, 2018 compared to the same period in 2017 decreased primarily due to the change in the realized and unrealized gains and losses related to NDT funds of Non-Regulatory Agreement Units as described in the table below. Other, net also reflects $(7) million and $56 million for the three months ended March 31, 2018 and 2017 , respectively, related to the contractual elimination of income tax expense (benefit) associated with the NDT funds of the Regulatory Agreement Units. Refer to Note 13 — Nuclear Decommissioning of the Combined Notes to Consolidated Financial Statements for additional information regarding NDT funds.

The following table provides unrealized and realized gains and losses on the NDT funds of the Non-Regulatory Agreement Units recognized in Other, net for the three months ended March 31, 2018 and 2017 :

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Net unrealized (losses) gains on decommissioning trust funds | $ (96) | $ 166 |
| Net realized gains on sale of decommissioning trust funds | 28 | 9 |

*Equity in Losses of Unconsolidated Affiliates*

Equity in losses of unconsolidated affiliates for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively stable.

*Effective Income Tax Rate*

Generation's effective income tax rate was 4.5% and 23.1% for the three months ended March 31, 2018 and 2017 , respectively. The decrease in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily related to tax savings due to the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for further discussion of the change in the effective income tax rate.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Results of Operations — ComEd**

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
|---|---|---|---|
| | 2018 | 2017 | |
| **Operating revenues** | $ 1,512 | $ 1,298 | $ 214 |
| Purchased power expense | 605 | 334 | (271) |
| **Revenues net of purchased power expense** [a][b] | 907 | 964 | (57) |
| **Other operating expenses** | | | |
| Operating and maintenance | 313 | 370 | 57 |
| Depreciation and amortization | 228 | 208 | (20) |
| Taxes other than income | 77 | 72 | (5) |
| Total other operating expenses | 618 | 650 | 32 |
| **Gain on sales of assets** | 3 | — | 3 |
| **Operating income** | 292 | 314 | (22) |
| **Other income and (deductions)** | | | |
| Interest expense, net | (89) | (85) | (4) |
| Other, net | 8 | 4 | 4 |
| Total other income and (deductions) | (81) | (81) | — |
| **Income before income taxes** | 211 | 233 | (22) |
| **Income taxes** | 46 | 92 | 46 |
| **Net income** | $ 165 | $ 141 | $ 24 |

_____

(a)   ComEd evaluates its operating performance using the measure of Revenue net of purchased power expense. ComEd believes that Revenue net of purchased power expense is a useful measurement because it provides information that can be used to evaluate its operational performance. In general, ComEd only earns margin based on the delivery and transmission of electricity. ComEd has included its discussion of Revenue net of purchased power expense below as a complement to the financial information provided in accordance with GAAP. However, Revenue net of purchased power expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

(b)   For regulatory recovery mechanisms, including ComEd's electric distribution and transmission formula rates, and riders, revenues increase and decrease i) as fully recoverable costs fluctuate (with no impact on net earnings), and ii) pursuant to changes in rate base, capital structure and ROE (which impact net earnings).

*Net Income*

**Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .** ComEd's Net income for the three months ended March 31, 2018 was higher than the same period in 2017 primarily due to higher electric distribution, transmission and energy efficiency formula rate earnings. The TCJA did not impact ComEd's net income for the three months ended March 31, 2018 as the favorable income tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

*Revenues Net of Purchased Power Expense*

There are certain drivers of Operating revenues that are fully offset by their impact on Purchased power expense, such as commodity, REC, and ZEC procurement costs and participation in customer choice programs. ComEd is permitted to recover electricity, REC, and ZEC procurement costs from retail customers without mark-up. Therefore, fluctuations in these costs have no impact on Revenue net of purchased power expense. See Note 3 — Regulatory Matters of the Exelon 2017 Form 10-K for additional information on ComEd's electricity procurement process.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

All ComEd customers have the choice to purchase electricity from a competitive electric generation supplier. Customer choice programs do not impact ComEd's volume of deliveries, but do affect ComEd's Operating revenues related to supplied energy, which is fully offset in Purchased power expense. Therefore, customer choice programs have no impact on Revenue net of purchased power expense.

Retail deliveries purchased from competitive electric generation suppliers (as a percentage of kWh sales) for the three months ended March 31, 2018 and 2017 , consisted of the following:

|  | Three Months Ended March 31, | |
|  | 2018 | 2017 |
| --- | --- | --- |
| Electric | 69% | 71% |

Retail customers purchasing electric generation from competitive electric generation suppliers at March 31, 2018 and 2017 consisted of the following:

|  | March 31, 2018 | | March 31, 2017 | |
|  | Number of customers | % of total retail customers | Number of customers | % of total retail customers |
| --- | --- | --- | --- | --- |
| Electric | 1,360,000 | 34% | 1,453,000 | 36% |

The changes in ComEd's Revenue net of purchased power expense for the three months ended March 31, 2018 , compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, |
|  | Increase (Decrease) |
| --- | --- |
| Electric distribution revenue | $         (31) |
| Transmission revenue | (6) |
| Energy efficiency revenue [a] | 8 |
| Regulatory required programs [a] | (57) |
| Uncollectible accounts recovery, net | 1 |
| Other | 28 |
| Total decrease | $         (57) |

_____
(a)   Beginning on June 1, 2017, ComEd is deferring energy efficiency costs as a regulatory asset that will be recovered through the energy efficiency formula rate over the weighted average useful life of the related energy efficiency measures.

**Revenue Decoupling.** The demand for electricity is affected by weather conditions. Under FEJA, ComEd revised its electric distribution rate formula effective January 1, 2017 to eliminate the favorable and unfavorable impacts on Operating revenues associated with variations in delivery volumes associated with above or below normal weather, numbers of customers or usage per customer.

Table of Contents

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 30-year period in ComEd's service territory with cooling degree days generally having a more significant impact to ComEd, particularly during the summer months. The changes in heating and cooling degree days in ComEd's service territory for the three months ended March 31, 2018 and 2017 , consisted of the following:

**Heating and Cooling Degree-Days**

| Three Months Ended March 31, | 2018 | 2017 | Normal | % Change 2018 vs. 2017 | % Change 2017 vs. Normal |
|---|---|---|---|---|---|
| Heating Degree-Days | 3,117 | 2,650 | 3,141 | 17.6% | (0.8)% |
| Cooling Degree-Days | — | — | — | n/a | n/a |

*Electric Distribution Revenue.* EIMA and FEJA provide for a performance-based formula rate, which requires an annual reconciliation of the revenue requirement in effect to the actual costs that the ICC determines are prudently and reasonably incurred in a given year. Electric distribution revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed ROE. ComEd's allowed ROE is the annual average rate on 30-year treasury notes plus 580 basis points. In addition, ComEd's allowed ROE is subject to reduction if ComEd does not deliver the reliability and customer service benefits to which it has committed over the ten-year life of the investment program. Electric distribution revenue decreased during the three months ended March 31, 2018 , primarily due to the impact of the lower federal income tax rate, partially offset by increased revenues due to higher rate base and increased Depreciation expense as compared to the same period in 2017 . See Depreciation and amortization expense discussions below and Note 6 — Regulatory Matters and Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information.

*Transmission Revenue.* Under a FERC-approved formula, transmission revenue varies from year to year based upon fluctuations in the underlying costs, capital investments being recovered and the highest daily peak load, which is updated annually in January based on the prior calendar year. Generally, increases/decreases in the highest daily peak load will result in higher/lower transmission revenue. For the three months ended March 31, 2018 , ComEd recorded decreased transmission revenue primarily due to the decreased peak load, partially offset by increased revenues due to higher rate base and increased Depreciation expense as compared to the same period in 2017 . See Operating and maintenance expense below and Note 6 — Regulatory Matters and Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information.

*Energy Efficiency Revenue.* Beginning June 1, 2017, FEJA provides for a performance-based formula rate, which requires an annual reconciliation of the revenue requirement in effect to the actual costs that the ICC determines are prudently and reasonably incurred in a given year. Under FEJA, energy efficiency revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed ROE. ComEd's allowed ROE is the annual average rate on 30-year treasury notes plus 580 basis points. Beginning January 1, 2018, ComEd's allowed ROE is subject to a maximum downward or upward adjustment of 200 basis points if ComEd's cumulative persisting annual MWh savings falls short of or exceeds specified percentage benchmarks of its annual incremental savings goal. See Depreciation and amortization expense discussions below, and Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

*Regulatory Required Programs.* This represents the change in Operating revenues collected under approved rate riders to recover costs incurred for regulatory programs such as ComEd's purchased power administrative costs and energy efficiency and demand response through June 1, 2017 pursuant

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

to FEJA. The riders are designed to provide full and current cost recovery. An equal and offsetting amount has been included in Operating and maintenance expense. See Operating and maintenance expense discussion below for additional information on included programs.

**Uncollectible Accounts Recovery, Net.** Uncollectible accounts recovery, net represents recoveries under ComEd's uncollectible accounts tariff. See Operating and maintenance expense discussion below for additional information on this tariff.

**Other.** Other revenue, which can vary period to period, includes rental revenue, revenue related to late payment charges, assistance provided to other utilities through mutual assistance programs, recoveries of environmental costs associated with MGP sites, and recoveries of energy procurement costs. The increase in Other revenue for the three months ended March 31, 2018 compared to the same period in 2017 primarily reflects mutual assistance revenues associated with hurricane and winter storm restoration efforts. An equal and offsetting amount has been included in Operating and maintenance expense and Taxes other than income.

**Operating and Maintenance Expense**

| | Three Months Ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | | 2017 | | Increase (Decrease) |
| Operating and maintenance expense — baseline | $ | 313 | $ | 313 | $ | — |
| Operating and maintenance expense — regulatory required programs [a] | | — | | 57 | | (57) |
| Total operating and maintenance expense | $ | 313 | $ | 370 | $ | (57) |

(a)   Operating and maintenance expense for regulatory required programs are costs for various legislative and/or regulatory programs that are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

204

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The decrease in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Baseline | |
| Labor, other benefits, contracting and materials [a] | $ 9 |
| Pension and non-pension postretirement benefits expense [a] | 1 |
| Storm-related costs | (6) |
| Uncollectible accounts expense — provision [b] | 2 |
| Uncollectible accounts expense — recovery, net [b] | (1) |
| BSC costs [a] | (3) |
| Other [a] | (2) |
| | — |
| Regulatory required programs | |
| Energy efficiency and demand response programs [c] | (57) |
| Decrease in operating and maintenance expense | $ (57) |

_____
(a)  Includes additional costs associated with mutual assistance programs. An equal and offsetting decrease has been recognized in Operating revenues for the period presented.
(b)  ComEd is allowed to recover from or refund to customers the difference between the utility's annual uncollectible accounts expense and the amounts collected in rates annually through a rider mechanism. During the three months ended March 31, 2018 , ComEd recorded a net increase in Operating and maintenance expense related to uncollectible accounts due to the timing of regulatory cost recovery. An equal and offsetting decrease has been recognized in Operating revenues for the period presented.
(c)  Beginning on June 1, 2017, ComEd is deferring energy efficiency costs as a regulatory asset that will be recovered through the energy efficiency formula rate over the weighted average useful life of the related energy efficiency measures.

### *Depreciation and Amortization Expense*

The increase in Depreciation and amortization expense during the three months ended March 31, 2018 , compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Depreciation expense [a] | $ 11 |
| Regulatory asset amortization [b] | 9 |
| Total increase | $ 20 |

_____
(a)  Primarily reflects ongoing capital expenditures for the three months ended March 31, 2018 .
(b)  Beginning in June 2017, includes amortization of ComEd's energy efficiency formula rate regulatory asset.

### *Taxes Other Than Income*

Taxes other than income, which can vary year to year, include municipal and state utility taxes, real estate taxes and payroll taxes. Taxes other than income taxes remained relatively consistent for the three months ended March 31, 2018 , compared to the same period in 2017 .

### Gain on Sales of Assets

The increase in Gain on sales of assets during the three months ended March 31, 2018 , compared to the same period in 2017 , is due to the sale of land during March 2018.

### Interest Expense, Net

Interest expense, net, remained relatively consistent for the three months ended March 31, 2018 , compared to the same period in 2017 .

### Other, Net

Other, net, remained relatively consistent for the three months ended March 31, 2018 , compared to the same period in 2017 .

### Effective Income Tax Rate

ComEd's effective income tax rate was 21.8% and 39.5% for the three months ended March 31, 2018 and 2017 , respectively. The decrease in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## ComEd Electric Operating Statistics Detail

| Retail Deliveries to Customers (in GWhs) | Three Months Ended March 31, | | % Change | Weather- Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** (a) | | | | |
| Residential | 6,614 | 6,241 | 6.0% | 1.0 % |
| Small commercial & industrial | 7,843 | 7,709 | 1.7% | (0.5)% |
| Large commercial & industrial | 6,837 | 6,683 | 2.3% | 0.7 % |
| Public authorities & electric railroads | 362 | 344 | 5.2% | 2.8 % |
| Total retail deliveries | 21,656 | 20,977 | 3.2% | 0.4 % |

| Number of Electric Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 3,633,369 | 3,605,498 |
| Small commercial & industrial | 379,255 | 375,617 |
| Large commercial & industrial | 1,980 | 2,000 |
| Public authorities & electric railroads | 4,781 | 4,818 |
| Total | 4,019,385 | 3,987,933 |

(a)   Reflects delivery volume from customers purchasing electricity directly from ComEd and customers purchasing electricity from a competitive electric generation supplier, as all customers are assessed delivery charges.

See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of ComEd's revenue disaggregation.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## Results of Operations — PECO

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
| --- | --- | --- | --- |
| | 2018 | 2017 | |
| Operating revenues | $ 866 | $ 796 | $ 70 |
| Purchased power and fuel expense | 333 | 287 | (46) |
| Revenues net of purchased power and fuel expense [a] | 533 | 509 | 24 |
| Other operating expenses | | | |
| Operating and maintenance | 275 | 208 | (67) |
| Depreciation and amortization | 75 | 71 | (4) |
| Taxes other than income | 41 | 38 | (3) |
| Total other operating expenses | 391 | 317 | (74) |
| Operating income | 142 | 192 | (50) |
| Other income and (deductions) | | | |
| Interest expense, net | (33) | (31) | (2) |
| Other, net | 2 | 2 | — |
| Total other income and (deductions) | (31) | (29) | (2) |
| Income before income taxes | 111 | 163 | (52) |
| Income taxes | (2) | 36 | 38 |
| Net income | $ 113 | $ 127 | $ (14) |

[a] PECO evaluates its operating performance using the measures of revenue net of purchased power expense for electric sales and revenue net of fuel expense for gas sales. PECO believes revenue net of purchased power expense and revenue net of fuel expense are useful measurements of its performance because they provide information that can be used to evaluate its net revenue from operations. PECO has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, revenue net of purchased power expense and revenue net of fuel expense figures are not presentations defined under GAAP and may not be comparable to other companies' presentations or more useful than the GAAP information provided elsewhere in this report.

### Net Income

**Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .** PECO's Net income decreased from the same period in 2017 , primarily due to higher Operating and maintenance expense attributable to increased storm restoration costs as a result of winter storms in March 2018, partially offset by higher Operating revenues net of purchase power and fuel expense attributable to favorable weather. The TCJA did not impact PECO's Net income for the three months ended March 31, 2018 as the favorable income tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

### Revenues Net of Purchased Power and Fuel Expense

Electric and natural gas revenue and purchased power and fuel expense are affected by fluctuations in commodity procurement costs. PECO's electric supply and natural gas cost rates charged to customers are subject to adjustments as specifies in the PAPUC-approved tariffs that are designed to recover or refund the difference between the actual cost of electric supply and natural gas and the amount included in rates in accordance with PECO's GSA and PGC, respectively. Therefore, fluctuations in electric supply and natural gas procurement costs have no impact on electric and natural gas revenue net of purchased power and fuel expense.

Electric and natural gas revenue and purchased power and fuel expense are also affected by fluctuations in participation in the Customer Choice Program. All PECO customers have the choice to purchase electricity and natural gas from competitive electric generation and natural gas suppliers, respectively. The customer's Choice of suppliers does not impact the volume of deliveries, but affects revenue collected from customers related to supplied energy and natural gas service. Customer choice program activity has no impact on electric and natural gas revenues net of purchased power and fuel expense.

Retail deliveries purchased from competitive electric generation and natural gas suppliers (as a percentage of kWh and mmcf sales, respectively) for the three months ended March 31, 2018 and 2017 , consisted of the following:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2018 | 2017 |
| Electric | 67% | 70% |
| Natural Gas | 25% | 25% |

Retail customers purchasing electric generation and natural gas from competitive electric generation and natural gas suppliers at March 31, 2018 and 2017 consisted of the following:

|  | March 31, 2018 | | March 31, 2017 | |
|---|---|---|---|---|
|  | Number of customers | % of total retail customers | Number of customers | % of total retail customers |
| Electric | 557,700 | 34% | 589,700 | 36% |
| Natural Gas | 83,800 | 16% | 81,300 | 16% |

The changes in PECO's Operating revenues net of purchased power and fuel expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, 2018 | | |
|---|---|---|---|
|  | Increase (Decrease) | | |
|  | Electric | Natural Gas | Total |
| Weather | $ 17 | $ 12 | $ 29 |
| Volume | — | 3 | 3 |
| Pricing | (7) | (6) | (13) |
| Regulatory required programs | (2) | — | (2) |
| Other | 9 | (2) | 7 |
| Total increase | $ 17 | $ 7 | $ 24 |

**Weather.** The demand for electricity and natural gas is affected by weather conditions. With respect to the electric business, very warm weather in summer months and, with respect to the electric and natural gas businesses, very cold weather in winter months are referred to as "favorable weather conditions" because these weather conditions result in increased deliveries of electricity and natural gas. Conversely, mild weather reduces demand. During the three months ended March 31, 2018 compared to the same period in 2017 , Operating revenue net of purchased power and fuel increased due to favorable weather conditions.

Table of Contents

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 30-year period in PECO's service territory. The changes in heating and cooling degree days in PECO's service territory for the three months ended March 31, 2018 compared to the same periods in 2017 and normal weather consisted of the following:

**Heating and Cooling Degree-Days**

| Three Months Ended March 31, | 2018 | 2017 | Normal | % Change 2018 vs. 2017 | % Change 2018 vs. Normal |
|---|---|---|---|---|---|
| Heating Degree-Days | 2,418 | 2,094 | 2,444 | 15.5% | (1.1)% |
| Cooling Degree-Days | — | — | 1 | —% | (100.0)% |

**Volume.** Operating revenue net of purchased power related to delivery volume, exclusive of the effects of weather, for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent. Operating revenue net of fuel expense for the three months ended March 31, 2018 compared to the same period in 2017 increased due to strong customer growth and moderate economic growth.

**Pricing.** Operating revenues net of purchased power as a result of pricing for the three months ended March 31, 2018 compared to the same period in 2017 decreased primarily due to the pass back through customers rates the tax savings associated with the lower federal income tax rate. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

**Regulatory Required Programs.** This represents the change in Operating revenues collected under approved riders to recover costs incurred for regulatory programs such as smart meter, energy efficiency and the GSA. The riders are designed to provide full and current cost recovery as well as a return. The costs of these programs are included in Operating and maintenance expense, Depreciation and amortization expense and Income taxes. Refer to the Operating and maintenance expense discussion below for additional information on included programs.

**Other.** Other revenue, which can vary period to period, primarily includes wholesale transmission revenue, rental revenue, revenue related to late payment charges and assistance provided to other utilities through mutual assistance programs.

***Operating and Maintenance Expense***

| | Three Months Ended March 31, 2018 | 2017 | Increase (Decrease) |
|---|---|---|---|
| Operating and maintenance expense — baseline | $ 259 | $ 196 | $ 63 |
| Operating and maintenance expense — regulatory required programs [a] | 16 | 12 | 4 |
| Total operating and maintenance expense | $ 275 | $ 208 | $ 67 |

(a) Operating and maintenance expenses for regulatory required programs are costs for various legislative and/or regulatory programs that are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

209

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The changes in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| **Baseline** | |
| Labor, other benefits, contracting and materials | $ 5 |
| Storm-related costs [(a)] | 59 |
| Pension and non-pension postretirement benefits expense | (2) |
| Other | 1 |
| | 63 |
| **Regulatory Required Programs** | |
| Energy efficiency | 4 |
| Total increase | $ 67 |

_____
(a)   Reflects increased costs incurred from the Q1 2018 winter storms.

### Depreciation and Amortization Expense

The changes in Depreciation and amortization expense increased primarily due to ongoing capital spend for the three months ended March 31, 2018 compared to the same period in 2017 .

### Taxes Other Than Income

Taxes other than income, which can vary period to period, include municipal and state utility taxes, real estate taxes and payroll taxes. Taxes other than income increased for the three months ended March 31, 2018 compared to the same period in 2017 due to an increase in gross receipts tax driven by an increase in electric revenue.

### Interest Expense, Net

Interest expense, net for the three months ended March 31, 2018 remained relatively consistent compared to the same period in 2017 .

### Other, Net

Other, net for the three months ended March 31, 2018 remained consistent compared to the same period in 2017 .

### Effective Income Tax Rate

PECO's effective income tax rate was (1.8)% and 22.1% for the three months ended March 31, 2018 and 2017 , respectively. The decrease in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## PECO Electric Operating Statistics

| Retail Deliveries to Customers (in GWhs) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** [a] | | | | |
| Residential | 3,628 | 3,378 | 7.4 % | 0.1 % |
| Small commercial & industrial | 2,029 | 1,976 | 2.7 % | (1.0)% |
| Large commercial & industrial | 3,703 | 3,626 | 2.1 % | 2.0 % |
| Public authorities & electric railroads | 197 | 224 | (12.1)% | (12.1)% |
| Total retail deliveries | 9,557 | 9,204 | 3.8 % | 0.3 % |

| Number of Electric Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 1,474,555 | 1,461,662 |
| Small commercial & industrial | 151,947 | 150,580 |
| Large commercial & industrial | 3,113 | 3,100 |
| Public authorities & electric railroads | 9,541 | 9,798 |
| Total | 1,639,156 | 1,625,140 |

(a)   Reflects delivery volumes from customers purchasing electricity directly from PECO and customers purchasing electricity from a competitive electric generation supplier as all customers are assessed distribution charges.

## PECO Natural Gas Operating Statistics

| Deliveries to Customers (in mmcf) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** [a] | | | | |
| Residential | 20,574 | 18,112 | 13.6 % | 0.9 % |
| Small commercial & industrial | 10,417 | 9,091 | 14.6 % | 2.8 % |
| Large commercial & industrial | 47 | 8 | 487.5 % | 460.6 % |
| Transportation | 7,568 | 7,689 | (1.6)% | (7.8)% |
| Total natural gas deliveries | 38,606 | 34,900 | 10.6 % | (0.3)% |

| Number of Natural Gas Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 478,565 | 473,972 |
| Small commercial & industrial | 44,053 | 43,705 |
| Large commercial & industrial | 4 | 4 |
| Transportation | 768 | 775 |
| Total | 523,390 | 518,456 |

(a)   Reflects delivery volumes from customers purchasing natural gas directly from PECO and customers purchasing natural gas from a competitive natural gas supplier as all customers are assessed distribution charges.

See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of PECO's revenue disaggregation.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## Results of Operations — BGE

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
|---|---|---|---|
| | 2018 | 2017 | |
| Operating revenues | $ 977 | $ 951 | $ 26 |
| Purchased power and fuel expense | 380 | 350 | (30) |
| Revenues net of purchased power and fuel expense (a) | 597 | 601 | (4) |
| Other operating expenses | | | |
|    Operating and maintenance | 221 | 183 | (38) |
|    Depreciation and amortization | 134 | 128 | (6) |
|    Taxes other than income | 65 | 62 | (3) |
|      Total other operating expenses | 420 | 373 | (47) |
| Operating income | 177 | 228 | (51) |
| Other income and (deductions) | | | |
|    Interest expense, net | (25) | (27) | 2 |
|    Other, net | 4 | 4 | — |
|      Total other income and (deductions) | (21) | (23) | 2 |
| Income before income taxes | 156 | 205 | (49) |
| Income taxes | 28 | 80 | 52 |
| Net income | $ 128 | $ 125 | $ 3 |

(a) BGE evaluates its operating performance using the measures of revenue net of purchased power expense for electric sales and revenue net of fuel expense for gas sales. BGE believes revenues net of purchased power and fuel expense are useful measurements of its performance because they provide information that can be used to evaluate its net revenue from operations. BGE has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, revenues net of purchased power and fuel expense figures are not a presentation defined under GAAP and may not be comparable to other companies' presentations or more useful than the GAAP information provided elsewhere in this report.

### *Net Income*

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* BGE's Net income for the three months ended March 31, 2018 was higher than the same period in 2017 , primarily due to higher transmission revenues, which were partially offset by an increase in Operating and maintenance expense attributable to increased storm restoration costs as a result of winter storms in March 2018. The TCJA did not impact BGE's net income for the three months ended March 31, 2018 as the favorable income tax impacts were predominantly offset by lower revenues resulting from the pass back of the tax savings through customer rates.

### *Revenues Net of Purchased Power and Fuel Expense*

There are certain drivers to Operating revenues that are offset by their impact on Purchased power and fuel expense, such as commodity procurement costs and programs allowing customers to select a competitive electric or natural gas supplier. Operating revenues and Purchased power and fuel expense are affected by fluctuations in commodity procurement costs. BGE's electric and natural gas rates charged to customers are subject to periodic adjustments that are designed to recover or refund the difference between the actual cost of purchased electric power and purchased natural gas and the amount included in rates in accordance with the MDPSC's market-based SOS and gas commodity programs, respectively. Therefore, fluctuations in electric supply and natural gas procurement costs have no impact on Revenues net of purchased power and fuel expense.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electric and natural gas revenue and purchased power and fuel expense are also affected by fluctuations in the number of customers electing to use a competitive supplier for electricity and/or natural gas. All BGE customers have the choice to purchase electricity and natural gas from competitive suppliers. The customers' choice of suppliers does not impact the volume of deliveries, but does affect revenue collected from customers related to supplied electricity and natural gas.

Retail deliveries purchased from competitive electricity and natural gas suppliers (as a percentage of kWh and mmcf sales, respectively) for the three months ended March 31, 2018 and 2017 consisted of the following:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2018 | 2017 |
| Electric | 57% | 58% |
| Natural Gas | 46% | 48% |

The number of retail customers purchasing electricity and natural gas from competitive suppliers at March 31, 2018 and 2017 consisted of the following:

|  | March 31, 2018 | | March 31, 2017 | |
|---|---|---|---|---|
|  | Number of Customers | % of total retail customers | Number of customers | % of total retail customers |
| Electric | 340,900 | 26% | 339,600 | 27% |
| Natural Gas | 150,200 | 22% | 149,300 | 22% |

The changes in BGE's Operating revenues net of purchased power and fuel expense for the three months ended March 31, 2018 , compared to the same period in 2017 , consisted of the following:

|  | Three Months Ended March 31, 2018 | | |
|---|---|---|---|
|  | Increase (Decrease) | | |
|  | Electric | Gas | Total |
| Distribution revenue | $ (19) | $ (14) | $ (33) |
| Regulatory required programs | 3 | 3 | 6 |
| Transmission revenue | 13 | — | 13 |
| Other, net | 5 | 5 | 10 |
| Total increase (decrease) | $ 2 | $ (6) | $ (4) |

*Distribution Revenue.* The decrease in distribution revenues for the three months ended March 31, 2018 , compared to the same period in 2017 , was primarily due to the impact of reduced distribution rates to reflect the lower federal income tax rate. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

*Revenue Decoupling.* The demand for electricity and natural gas is affected by weather and usage conditions. The MDPSC allows BGE to record a monthly adjustment to its electric and natural gas distribution revenue from all residential customers, commercial electric customers, the majority of large industrial electric customers, and all firm service natural gas customers to eliminate the effect of abnormal weather and usage patterns per customer on BGE's electric and natural gas distribution volumes, thereby recovering a specified dollar amount of distribution revenue per customer, by customer

class, regardless of fluctuations in actual consumption levels. This allows BGE to recognize revenue at MDPSC-approved distribution charges per customer, regardless of what BGE's actual distribution volumes were for a billing period. Therefore, while this revenue is affected by customer growth (i.e., increase in the number of customers), it will not be affected by volatility in actual weather or usage conditions (i.e., changes in consumption per customer). BGE bills or credits customers in subsequent months for the difference between approved revenue levels under revenue decoupling and actual customer billings.

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 30-year period in BGE's service territory. The changes in heating and cooling degree days in BGE's service territory for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

| Heating and Cooling Degree-Days | | | | % Change | |
|---|---|---|---|---|---|
| Three Months Ended March 31, | 2018 | 2017 | Normal | 2018 vs. 2017 | 2018 vs. Normal |
| Heating Degree-Days | 2,440 | 2,063 | 2,391 | 18.3% | 2.0% |
| Cooling Degree-Days | — | — | — | n/a | n/a |

*Regulatory Required Programs.* Revenue from regulatory required programs are billings for the costs of various legislative and/or regulatory programs that are recoverable from customers on a full and current basis. These programs are designed to provide full cost recovery, as well as a return in certain instances. The costs of these programs are included in Operating and maintenance expense, Depreciation and amortization expense and Taxes other than income in BGE's Consolidated Statements of Operations and Comprehensive Income.

*Transmission Revenue.* Under a FERC approved formula, transmission revenue varies from year to year based upon rate adjustments to reflect fluctuations in the underlying costs, capital investments being recovered and other billing determinants. The increase in transmission revenue for the three months ended March 31, 2018 , compared to the same period in 2017 , was primarily due to increases in capital investment and operating and maintenance expense recoveries. See Operating and Maintenance Expense below and Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

*Other, Net.* Other net revenue, which can vary from period to period, primarily includes late payment fees and other miscellaneous revenue such as service application fees, assistance provided to other utilities through BGE's mutual assistance program and recoveries of electric supply and natural gas procurement costs.

*Operating and Maintenance Expense*

| | Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2018 | 2017 | |
| Operating and maintenance expense — baseline | $ 207 | $ 167 | $ 40 |
| Operating and maintenance expense — regulatory required programs [(a)] | 14 | 16 | (2) |
| Total operating and maintenance expense | $ 221 | $ 183 | $ 38 |

(a) Operating and maintenance expense for regulatory required programs are costs for various legislative and/or regulatory programs that are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

Table of Contents

The changes in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Baseline | |
|    Storm-related costs [a] | $ 27 |
|     Labor, other benefits, contracting and materials | 4 |
|    Uncollectible accounts expense | 3 |
|    BSC costs | 3 |
|    Other | 3 |
| | 40 |
| Regulatory Required Programs | |
|    Other | (2) |
| Total increase | $ 38 |

_____
(a)   Reflects increased storm restoration costs incurred from the Q1 2018 winter storms.

### *Depreciation and Amortization*

The changes in Depreciation and amortization expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Depreciation expense [a] | $ 1 |
| Regulatory asset amortization [b] | (3) |
| Regulatory required programs [c] | 8 |
| Total increase | $ 6 |

_____
(a)   Depreciation expense increased due to ongoing capital expenditures.
(b)   Regulatory asset amortization decreased for the three months ended March 31, 2018 compared to the same period in 2017 primarily due to certain regulatory assets that became fully amortized as of December 31, 2017. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.
(c)   Depreciation and amortization expenses for regulatory required programs are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

215

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Taxes Other Than Income*

Taxes other than income, which can vary period to period, include municipal and state utility taxes, real estate taxes and payroll taxes. Taxes other than income for the three months ended March 31, 2018 , compared to the same period in 2017 , remained relatively consistent.

*Interest Expense, Net*

Interest expense, net for the three months ended March 31, 2018 , compared to the same period in 2017 , remained relatively consistent.

*Other, Net*

Other, net for the three months ended March 31, 2018 , compared to the same period in 2017 , remained relatively consistent.

*Effective Income Tax Rate*

BGE's effective income tax rate was 17.9% and 39.0% for the three months ended March 31, 2018 and 2017 , respectively. The decrease in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## BGE Electric Operating Statistics and Detail

| Retail Deliveries to Customers (in GWhs) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** (a) | | | | |
| Residential | 3,580 | 3,127 | 14.5 % | 3.7% |
| Small commercial & industrial | 784 | 748 | 4.8 % | 2.2% |
| Large commercial & industrial | 3,356 | 3,268 | 2.7 % | 0.1% |
| Public authorities & electric railroads | 67 | 68 | (1.5)% | 8.4% |
| **Total electric deliveries** | 7,787 | 7,211 | 8.0 % | 2.0% |

| Number of Electric Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 1,163,887 | 1,153,688 |
| Small commercial & industrial | 113,675 | 113,238 |
| Large commercial & industrial | 12,148 | 12,084 |
| Public authorities & electric railroads | 270 | 279 |
| Total | 1,289,980 | 1,279,289 |

(a)  Reflects delivery volumes from customers purchasing electricity directly from BGE and customers purchasing electricity from a competitive electric generation supplier as all customers are assessed distribution charges.

216

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**BGE Natural Gas Operating Statistics and Detail**

| Deliveries to Customers (in mmcf) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** (a) | | | | |
| Residential | 21,775 | 18,117 | 20.2% | 1.8% |
| Small commercial & industrial | 4,774 | 3,778 | 26.4% | 6.7% |
| Large commercial & industrial | 15,650 | 14,476 | 8.1% | 1.0% |
| Other (b) | 5,378 | 2,279 | 136.0% | n/a |
| Total natural gas deliveries | 47,577 | 38,650 | 23.1% | 2.0% |

| Number of Gas Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 631,594 | 625,642 |
| Small commercial & industrial | 38,443 | 37,913 |
| Large commercial & industrial | 5,874 | 6,324 |
| Total | 675,911 | 669,879 |

(a)   Reflects delivery volumes from customers purchasing natural gas directly from BGE and customers purchasing natural gas from a competitive natural gas supplier as all customers are assessed distribution charges.

(b)   Other natural gas revenue includes off-system sales of 5,378 mmcfs and 2,279 mmcfs for the three months ended March 31, 2018 and 2017 , respectively.

    See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of BGE's revenue disaggregation.

217

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

## Results of Operations — PHI

PHI's results of operations include the results of its three reportable segments, Pepco, DPL and ACE for all periods presented below. All material intercompany accounts and transactions have been eliminated in consolidation. A separate specific discussion of the results of operations for Pepco, DPL and ACE is presented elsewhere in this report.

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
|---|---|---|---|
| | 2018 | 2017 | |
| **Operating revenues** | $ 1,251 | $ 1,175 | $ 76 |
| **Purchased power and fuel expense** | 520 | 461 | (59) |
| **Revenues net of purchased power and fuel expense** [a] | 731 | 714 | 17 |
| **Other operating expenses** | | | |
| Operating and maintenance | 309 | 256 | (53) |
| Depreciation and amortization | 183 | 167 | (16) |
| Taxes other than income | 113 | 111 | (2) |
| Total other operating expenses | 605 | 534 | (71) |
| **Operating income** | 126 | 180 | (54) |
| **Other income and (deductions)** | | | |
| Interest expense, net | (63) | (62) | (1) |
| Other, net | 11 | 13 | (2) |
| Total other income and (deductions) | (52) | (49) | (3) |
| **Income before income taxes** | 74 | 131 | (57) |
| **Income taxes** | 9 | (9) | (18) |
| **Net income** | $ 65 | $ 140 | $ (75) |

(a) PHI evaluates its operating performance using the measure of revenue net of purchased power and fuel expense for electric and natural gas sales. PHI believes revenue net of purchased power and fuel expense is a useful measurement because it provides information that can be used to evaluate its operational performance. PHI has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, Revenue net of purchased power and fuel expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

### *Net Income*

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* PHI's Net income for the three months ended March 31, 2018 was $65 million compared to $140 million for of three months ended March 31, 2017 . The decrease in Net income reflects an increase in Operating and maintenance expense and an increase in the Depreciation and amortization expense partially offset by the impact of increases in electric distribution base rates and natural gas rates within Revenues net of purchased power and fuel expense. The TCJA did not impact PHI's Net income for the three months ended March 31, 2018 as the favorable income tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

### Revenues Net of Purchased Power and Fuel Expense

Operating revenue net of purchased power and fuel expense, which is a non-GAAP measure discussed above, increased by $17 million for the three months ended March 31, 2018 compared to the same period in 2017 . The increase is primarily attributable to the following factors:

- Increase of $11 million at Pepco primarily related to the impact of the new electric distribution base rates charged to customers in Maryland that became effective in October 2017, the impact of new electric distribution base rates charged to customers in the District of Columbia effective August 2017, and the impact of an increase in the Maryland surcharge rate (which is substantially offset in Taxes other than income), partially offset by the impact of reduced distribution rates to reflect the lower federal income tax rate;

- Increase of $11 million at ACE primarily related to higher average residential and commercial customer usage, favorable weather related sales, and the impact of the new electric distribution base rate charged to customers that became effective in October 2017, partially offset by the impact of reduced distribution rates to reflect the lower federal income tax rate;

- Increase of $2 million at DPL primarily related to favorable weather related sales, partially offset by the impact of reduced distribution base rates to reflect the lower federal income tax rate; and

- Decrease of $8 million at PHI Corporate primarily related to lower affiliate revenues at PHISCO as a result of the completion of integration transition activities.

### Operating and Maintenance Expense

Operating and maintenance expense increased by $53 million for the three months ended March 31, 2018 compared to the same period in 2017 . The increase is attributable to the following factors:

- Increase of $25 million at DPL primarily due to a write-off of construction work-in-progress, higher uncollectible accounts expense as a result of higher accounts receivable, and the absence of integration cost deferrals from 2017;

- Increase of $17 million at Pepco primarily due to higher uncollectible accounts expense as a result of higher accounts receivable;

- Increase of $14 million at ACE primarily due to an increase in labor and contracting expense; and

- Decrease of $5 million at PHI Corporate primarily related to lower labor expense at PHISCO as a result of the completion of integration transition activities.

### Depreciation and Amortization Expense

Depreciation and amortization expense increased by $16 million primarily due to ongoing capital expenditures at Pepco, DPL, and ACE.

### Taxes Other Than Income

Taxes other than income for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

### Interest Expense, Net

Interest expense, net for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

***Other, Net***

Other, net for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

***Effective Income Tax Rate***

   PHI's effective income tax rate was 12.2% and (6.9)% for the three months ended March 31, 2018 and 2017 , respectively. The increase in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the absence of unrecognized tax benefits for Pepco, DPL, and ACE from 2017, partially offset by the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## Results of Operations - Pepco

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
|---|---|---|---|
| | 2018 | 2017 | |
| Operating revenues | $ 557 | $ 530 | $ 27 |
| Purchased power expense | 182 | 166 | (16) |
| Revenues net of purchased power expense [(a)] | 375 | 364 | 11 |
| Other operating expenses | | | |
|    Operating and maintenance | 130 | 113 | (17) |
|    Depreciation and amortization | 96 | 82 | (14) |
|    Taxes other than income | 93 | 90 | (3) |
|      Total other operating expenses | 319 | 285 | (34) |
| Operating income | 56 | 79 | (23) |
| Other income and (deductions) | | | |
|    Interest expense, net | (31) | (29) | (2) |
|    Other, net | 8 | 8 | — |
|      Total other income and (deductions) | (23) | (21) | (2) |
| Income before income taxes | 33 | 58 | (25) |
| Income taxes | 2 | — | (2) |
| Net income | $ 31 | $ 58 | $ (27) |

_____

(a)   Pepco evaluates its operating performance using the measure of revenue net of purchased power expense for electric sales. Pepco believes revenue net of purchased power expense is a useful measurement because it provides information that can be used to evaluate its operational performance. Pepco has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, Revenue net of purchased power expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

### Net Income

**Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .** Pepco's Net income for the three months ended March 31, 2018 , was lower than the same period in 2017 , primarily due to higher Operating and maintenance expense attributable to an increase in Uncollectible accounts expense as a result of higher accounts receivable and higher Depreciation and amortization expense attributable to ongoing capital expenditures, partially offset by higher electric distribution base rates charged to customers in Maryland that became effective in October 2017 and higher electric distribution base rates charged to customers in the District of Columbia that became effective August 2017. The TCJA did not impact Pepco's Net income for the three months ended March 31, 2018 as the favorable tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

### Revenues Net of Purchased Power Expense

Operating revenues include revenue from the distribution and supply of electricity to Pepco's customers within its service territories at regulated rates. Operating revenues also include transmission service revenue that Pepco receives as a transmission owner from PJM at rates regulated by FERC. Transmission rates are updated annually based on a FERC-approved formula methodology. Operating revenues also include work and services performed on behalf of customers, including other utilities,

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

which is generally not subject to price regulation. Work and services includes mutual assistance to other utilities, highway relocation, rentals of pole attachments, late payment fees and collection fees.

Electric revenues and purchased power expense are also affected by fluctuations in participation in the Customer Choice Program. All Pepco customers have the choice to purchase electricity from competitive electric generation suppliers. The customers' choice of supplier does not impact the volume of deliveries, but affects revenue collected from customers related to supplied energy service.

Retail deliveries purchased from competitive electric generation suppliers (as a percentage of kWh sales) for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2018 | 2017 |
| Electric | 62% | 64% |

Retail customers purchasing electric generation from competitive electric generation suppliers at March 31, 2018 and 2017 consisted of the following:

|  | March 31, 2018 | | March 31, 2017 | |
| --- | --- | --- | --- | --- |
|  | Number of customers | % of total retail customers | Number of customers | % of total retail customers |
| Electric | 178,859 | 20% | 179,241 | 21% |

Retail deliveries purchased from competitive electric generation suppliers represented 71% of Pepco's retail kWh sales to the District of Columbia customers and 56% of Pepco's retail kWh sales to Maryland customers for the three months ended March 31, 2018 , respectively and 73% of Pepco's retail kWh sales to the District of Columbia customers and 58% of Pepco's retail kWh sales to Maryland customers for the three months ended March 31, 2017 , respectively.

The changes in Pepco's operating revenues net of purchased power expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, 2018 |
| --- | --- |
|  | Increase (Decrease) |
| Volume | $ 3 |
| Distribution revenue | (1) |
| Regulatory required programs | 14 |
| Transmission revenues | (4) |
| Other | (1) |
| Total increase | $ 11 |

*Volume* . The increase in operating revenue net of purchased power and fuel expense related to delivery volume, exclusive of the effects of weather, for the three months ended March 31, 2018 compared to the same period in 2017 , primarily reflects the impact of residential customer growth.

*Distribution Revenue* .   The decrease in distribution revenues for the three months ended March 31, 2018 compared to the same period in 2017 was primarily due to the impact of reduced distribution

Table of Contents

rates to reflect the lower federal income tax rate partially offset by higher electric distribution base rates charged to customers in Maryland that became effective in October 2017 and higher electric distribution base rates charged to customers in the District of Columbia that became effective August 2017. See Note 6 —Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

*Revenue Decoupling.* Pepco's results historically have been seasonal, generally producing higher revenue and income in the warmest and coldest periods of the year. For retail customers of Pepco in Maryland and in the District of Columbia, revenues are not affected by unseasonably warmer or colder weather because a bill stabilization adjustment (BSA) for retail customers was implemented that provides for a fixed distribution charge per customer. The BSA has the effect of decoupling the distribution revenue recognized in a reporting period from the amount of power delivered during the period. As a result, the only factors that will cause distribution revenue from customers in Maryland and the District of Columbia to fluctuate from period to period are changes in the number of customers and changes in the approved distribution charge per customer. Changes in customer usage (due to weather conditions, energy prices, energy efficiency programs or other reasons) from period to period have no impact on reported distribution revenue for customers to whom the BSA applies.

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 20-year period in Pepco's service territory. The changes in heating and cooling degree days in Pepco's service territory for the three months ended March 31, 2018 compared to the same period in 2017 and normal weather consisted of the following:

| | | | | % Change | |
| Three Months Ended March 31, | 2018 | 2017 | Normal | 2018 vs. 2017 | 2018 vs. Normal |
|---|---|---|---|---|---|
| Heating Degree-Days | 2,129 | 1,748 | 2,129 | 21.8% | —% |
| Cooling Degree-Days | 4 | 4 | 3 | —% | 33.3% |

*Regulatory Required Programs.* This represents the change in Operating revenues collected under approved riders to recover costs incurred for regulatory programs such as energy efficiency programs. The riders are designed to provide full and current cost recovery as well as a return. The costs of these programs are included in Operating and maintenance expense, Depreciation and amortization expense and Taxes other than income in Pepco's Consolidated Statements of Operations and Comprehensive Income. Refer to the Operating and maintenance expense and Depreciation and amortization expense discussion below for additional information on included programs. Revenue from regulatory required programs increased for the three months ended March 31, 2018 , compared to the same period in 2017 , due to increases in the Maryland and District of Columbia surcharge rates and sales due to higher volumes (which are substantially offset in Taxes other than income and Depreciation and amortization expense).

*Transmission Revenues* . Under a FERC-approved formula, transmission revenue varies from year to year based upon fluctuations in the underlying costs, capital investments being recovered, the highest daily peak load and other billing adjustments. The decrease in transmission revenues for the three months ended March 31, 2018 compared to the same period in 2017 is a result of a decrease in network transmission service peak loads.

*Other.* Other revenue, which can vary period to period, includes rental revenue, revenue related to late payment charges, assistance provided to other utilities through mutual assistance programs, and recoveries of other taxes.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

### *Operating and Maintenance Expense*

| | Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2018 | 2017 | |
| Operating and maintenance expense - baseline | $ 132 | $ 114 | $ 18 |
| Operating and maintenance expense - regulatory required programs (a) | (2) | (1) | (1) |
| Total operating and maintenance expense | $ 130 | $ 113 | $ 17 |

(a)   Operating and maintenance expenses for regulatory required programs are costs for various legislative and/or regulatory programs that are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

The changes in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| **Baseline** | |
| Uncollectible accounts expense | 11 |
| Labor and contracting | 2 |
| BSC and PHISCO costs | 3 |
| Other | 2 |
| | 18 |
| **Regulatory required programs** | |
| Purchased power administrative costs | (1) |
| Total increase | $ 17 |

### *Depreciation and Amortization Expense*

The changes in Depreciation and amortization expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Depreciation expense (a) | $ 3 |
| Regulatory asset amortization (b) | 8 |
| Regulatory required programs (c) | 3 |
| Total increase | $ 14 |

(a)   Depreciation expense increased due to ongoing capital expenditures.
(b)   Regulatory asset amortization increased for the three months ended March 31, 2018 compared to the same period in 2017, primarily due to higher amortization of DC PLUG regulatory asset. An equal and offsetting amount has been reflected in Operating revenues.
(c)   Depreciation and amortization expenses for regulatory required programs are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues and Operating and maintenance expense.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

### Taxes Other Than Income

Taxes other than income for the three months ended March 31, 2018 compared to the same period in 2017 , increased due to an increase in the utility taxes that are collected and passed through by Pepco (which is substantially offset in Operating revenues).

### Interest Expense, Net

Interest expense, net for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

### Other, Net

Other, net for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

### Effective Income Tax Rate

Pepco's effective income tax rate was 6.1% and 0.0% for the three months ended March 31, 2018 and 2017 , respectively. The increase in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the absence of an unrecognized tax benefit from 2017, partially offset by the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the change in effective income tax rates.

## Pepco Electric Operating Statistics and Detail

| Retail Deliveries to Customers (in GWhs) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** [a] | | | | |
| Residential | 2,283 | 2,000 | 14.2 % | 3.5 % |
| Small commercial & industrial | 346 | 326 | 6.1 % | 1.8 % |
| Large commercial & industrial | 3,670 | 3,485 | 5.3 % | 3.3 % |
| Public authorities & electric railroads | 176 | 190 | (7.4)% | (7.9)% |
| Total retail deliveries | 6,475 | 6,001 | 7.9 % | 3.0 % |

| Number of Electric Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 797,105 | 785,016 |
| Small commercial & industrial | 53,602 | 53,640 |
| Large commercial & industrial | 21,718 | 21,413 |
| Public authorities & electric railroads | 146 | 136 |
| Total | 872,571 | 860,205 |

(a)   Reflects delivery volumes from customers purchasing electricity directly from Pepco and customers purchasing electricity from a competitive electric generation supplier as all customers are assessed distribution charges.

See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of Pepco's revenue disaggregation.

**Results of Operations - DPL**

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
|---|---|---|---|
| | 2018 | 2017 | |
| **Operating revenues** | $ 384 | $ 362 | $ 22 |
| **Purchased power and fuel expense** | 177 | 157 | (20) |
| **Revenues net of purchased power and fuel expense** [(a)] | 207 | 205 | 2 |
| **Other operating expenses** | | | |
|     Operating and maintenance | 98 | 73 | (25) |
|     Depreciation and amortization | 45 | 39 | (6) |
|     Taxes other than income | 15 | 15 | — |
|         Total other operating expenses | 158 | 127 | (31) |
| **Operating income** | 49 | 78 | (29) |
| **Other income and (deductions)** | | | |
|     Interest expense, net | (13) | (13) | — |
|     Other, net | 2 | 3 | (1) |
|         Total other income and (deductions) | (11) | (10) | (1) |
| **Income before income taxes** | 38 | 68 | (30) |
| **Income taxes** | 7 | 11 | 4 |
| **Net income** | $ 31 | $ 57 | $ (26) |

_____

(a)   DPL evaluates its operating performance using the measure of revenue net of purchased power expense for electric sales and revenue net of fuel expense for natural gas sales. DPL believes revenue net of purchased power expense and revenue net of fuel expense are useful measurements because they provide information that can be used to evaluate its operational performance. DPL has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, Revenue net of purchased power expense and Revenue net of fuel expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

*Net Income*

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017* . DPL's Net income for the three months ended March 31, 2018 , was lower than the same period in 2017 primarily due to higher Operating and maintenance expense attributable to an increase in Uncollectible accounts expense as a result of higher accounts receivable, an absence of integration cost deferrals from 2017 and a write-off of construction work in progress. The TCJA did not impact DPL's Net income for the three months ended March 31, 2018 as the favorable tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

*Revenues Net of Purchased Power and Fuel Expense*

Operating revenues include revenue from the distribution and supply of electricity and natural gas to DPL's customers within its service territories at regulated rates. Operating revenues also include transmission service revenue that DPL receives as a transmission owner from PJM at rates regulated by FERC. Transmission rates are updated annually based on a FERC-approved formula methodology. Operating revenues also include work and services performed on behalf of customers, including other utilities, which is generally not subject to price regulation. Work and services includes mutual assistance to other utilities, highway relocation, rentals of pole attachments, late payment fees and collection fees.

Natural gas operating revenue includes sources that are subject to price regulation (Regulated Gas Revenue) and those that generally are not subject to price regulation (Other Gas Revenue). Regulated

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

gas revenue includes the revenue DPL receives from on-system natural gas delivered sales and the transportation of natural gas for customers within its service territory at regulated rates. Other gas revenue consists of off-system natural gas sales and the short-term release of interstate pipeline transportation and storage capacity not needed to serve customers. Off-system sales are made possible when low demand for natural gas by regulated customers creates excess pipeline capacity.

Electric and natural gas revenues and purchased power and fuel expense are also affected by fluctuations in participation in the Customer Choice Program. All DPL customers have the choice to purchase electricity and natural gas from competitive electric generation and natural gas suppliers, respectively. The customers' choice of suppliers does not impact the volume of deliveries, but affects revenue collected from customers related to supplied energy and natural gas service.

Retail deliveries purchased from competitive electric generation and natural gas suppliers (as a percentage of kWh and mmcf sales, respectively) for the three months ended March 31, 2018 and 2017 , consisted of the following:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Electric | 46% | 50% |
| Natural Gas | 24% | 27% |

Retail customers purchasing electric generation and natural gas from competitive electric generation and natural gas suppliers at March 31, 2018 and 2017 consisted of the following:

| | March 31, 2018 | | March 31, 2017 | |
| --- | --- | --- | --- | --- |
| | Number of customers | % of total retail customers | Number of customers | % of total retail customers |
| Electric | 75,280 | 14.4% | 79,270 | 15.2% |
| Natural Gas | 155 | 0.1% | 156 | 0.1% |

Retail deliveries purchased from competitive electric generation suppliers represented 48% of DPL's retail kWh sales to Delaware customers and 41% of DPL's retail kWh sales to Maryland customers for the three months ended March 31, 2018 , respectively and 53% of DPL's retail kWh sales to Delaware customers and 45% of DPL's retail kWh sales to Maryland customers for the three months ended March 31, 2017 , respectively.

227

The changes in DPL's Operating revenues net of purchased power and fuel expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, 2018 | | | | | |
|  | Increase (Decrease) | | | | | |
|  | Electric | | Gas | | Total | |
| Weather | $ | 5 | $ | 7 | $ | 12 |
| Volume |  | 2 |  | (1) |  | 1 |
| Distribution revenue |  | (8) |  | (5) |  | (13) |
| Transmission revenues |  | 1 |  | — |  | 1 |
| Other |  | 1 |  | — |  | 1 |
| Total increase | $ | 1 | $ | 1 | $ | 2 |

*Revenue Decoupling* . DPL's results historically have been seasonal, generally producing higher revenue and income in the warmest and coldest periods of the year. For retail customers of DPL in Maryland, revenues are not affected by unseasonably warmer or colder weather because a bill stabilization adjustment (BSA) for retail customers was implemented that provides for a fixed distribution charge per customer. The BSA has the effect of decoupling the distribution revenue recognized in a reporting period from the amount of power delivered during the period. As a result, the only factors that will cause distribution revenue from customers in Maryland to fluctuate from period to period are changes in the number of customers and changes in the approved distribution charge per customer. A modified fixed variable rate design, which would provide for a charge not tied to a customer's volumetric consumption of electricity or natural gas, has been proposed for DPL electricity and natural gas customers in Delaware. Changes in customer usage (due to weather conditions, energy prices, energy efficiency programs or other reasons) from period to period have no impact on reported distribution revenue for customers to whom the BSA applies.

*Weather.* The demand for electricity and natural gas in areas not subject to the BSA is affected by weather conditions. With respect to the electric business, very warm weather in summer months and, with respect to the electric and natural gas businesses, very cold weather in winter months are referred to as "favorable weather conditions" because these weather conditions result in increased deliveries of electricity and natural gas. Conversely, mild weather reduces demand. During the three months ended March 31, 2018 compared to the same period in 2017 , operating revenue net of purchased power and fuel expense was higher due to the impact of favorable weather conditions in DPL's service territory.

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 20-year period in DPL's electric service territory and a 30-year period in DPL's natural gas service territory. The changes in heating and cooling degree days in DPL's service territory for the three months ended March 31, 2018 compared to the same period in 2017 and normal weather consisted of the following:

| Electric Service Territory | | | | % Change | |
| Three Months Ended March 31, | 2018 | 2017 | Normal | 2018 vs. 2017 | 2018 vs. Normal |
| Heating Degree-Days | 2,415 | 2,094 | 2,407 | 15.3% | 0.3 % |
| Cooling Degree-Days | 1 | — | 2 | 100.0% | (50.0)% |

228

**Natural Gas Service Territory**

| Three Months Ended March 31, | 2018 | 2017 | Normal | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 2017 vs. 2016 | 2017 vs. Normal |
| Heating Degree-Days | 2,504 | 2,171 | 2,502 | 15.3% | 0.1% |

   *Volume* . The increase in operating revenue net of purchased power and fuel expense related to delivery volume, exclusive of the effects of weather, for the three months ended March 31, 2018 compared to the same period in 2017 , primarily reflects the impact of increased average residential and commercial customer usage.

   *Distribution Revenue* .  The decrease in distribution revenues for the three months ended March 31, 2018 compared to the same period in 2017 was primarily due to the impact of reduced distribution rates to reflect the lower federal income tax rate. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

   *Transmission Revenues* . Under a FERC-approved formula, transmission revenue varies from year to year based upon fluctuations in the underlying costs, capital investments being recovered, the highest daily peak load and other billing adjustments. The transmission revenues for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

   *Other.* Other revenue, which can vary period to period, includes rental revenue, revenue related to late payment charges, assistance provided to other utilities through mutual assistance programs, and recoveries of other taxes.

   *Operating and Maintenance Expense*

| | Three Months Ended March 31, | | Increase (Decrease) |
| --- | --- | --- | --- |
| | 2018 | 2017 | |
| Operating and maintenance expense - baseline | $      97 | $      72 | $      25 |
| Operating and maintenance expense - regulatory required programs [a] | 1 | 1 | — |
| Total operating and maintenance expense | $      98 | $      73 | $      25 |

_____
(a)   Reflects accumulated integration costs that were deferred as regulatory assets in 2017.

   The changes in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 , consisted of the following:

| | Three Months Ended March 31, 2018 |
| --- | --- |
| | Increase (Decrease) |
| Baseline | |
|    Uncollectible accounts expense | 8 |
|    Write-off of construction work in progress | 7 |
|    Merger commitments [a] | 8 |
|    Other | 2 |
| Total increase | $      25 |

_____
(a)   Reflects an absence of integration cost deferrals from 2017.

### *Depreciation and Amortization Expense*

The changes in Depreciation and amortization expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, 2018 |
|---|---|
|  | Increase (Decrease) |
| Depreciation expense [a] | $ 2 |
| Regulatory asset amortization | 4 |
| Total increase | $ 6 |

_____
(a)   Depreciation expense increased due to ongoing capital expenditures.

### *Taxes Other Than Income*

Taxes other than income for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

### *Interest Expense, Net*

Interest expense, net for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

### *Other, Net*

Other, net for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

### *Effective Income Tax Rate*

DPL's effective income tax rate was 18.4% and 16.2% for the three months ended March 31, 2018 and 2017 , respectively. The increase in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the absence of an unrecognized tax benefit from 2017, partially offset by the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## DPL Electric Operating Statistics and Detail

| | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| Retail Deliveries to Customers (in GWhs) | 2018 | 2017 | % Change | |
| **Retail Deliveries** [a] | | | | |
| Residential | 1,551 | 1,359 | 14.1 % | 3.5 % |
| Small commercial & industrial | 569 | 531 | 7.2 % | 3.8 % |
| Large commercial & industrial | 1,079 | 1,064 | 1.4 % | (0.2)% |
| Public authorities & electric railroads | 12 | 13 | (7.7)% | (7.7)% |
| Total retail deliveries | 3,211 | 2,967 | 8.2 % | 2.2 % |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

|  | As of March 31, | |
|---|---|---|
| **Number of Electric Customers** | **2018** | **2017** |
| Residential | 460,863 | 457,663 |
| Small commercial & industrial | 60,962 | 60,289 |
| Large commercial & industrial | 1,383 | 1,411 |
| Public authorities & electric railroads | 625 | 642 |
| Total | 523,833 | 520,005 |

(a)   Reflects delivery volumes from customers purchasing electricity directly from DPL and customers purchasing electricity from a competitive electric generation supplier as all customers are assessed distribution charges.

## DPL Natural Gas Operating Statistics and Detail

|  | Three Months Ended March 31, | | |  |
|---|---|---|---|---|
| **Retail Deliveries to Customers (in mmcf)** | **2018** | **2017** | **% Change** | **Weather - Normal % Change** |
| **Retail Deliveries** (a) | | | | |
| Residential | 4,485 | 3,741 | 19.9% | 3.6 % |
| Small commercial & industrial | 1,878 | 1,686 | 11.4% | (5.0)% |
| Large commercial & industrial | 516 | 505 | 2.2% | 2.2 % |
| Transportation | 2,213 | 2,168 | 2.1% | (2.0)% |
| Total natural gas deliveries | 9,092 | 8,100 | 12.2% | 0.3 % |

|  | As of March 31, | |
|---|---|---|
| **Number of Gas Customers** | **2018** | **2017** |
| Residential | 123,062 | 121,362 |
| Small commercial & industrial | 9,873 | 9,837 |
| Large commercial & industrial | 17 | 18 |
| Transportation | 155 | 156 |
| Total | 133,107 | 131,373 |

(a)   Reflects delivery volumes from customers purchasing natural gas directly from DPL and customers purchasing natural gas from a competitive natural gas supplier as all customers are assessed distribution charges.

See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of DPL's revenue disaggregation.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Results of Operations - ACE**

| | Three Months Ended March 31, | | Favorable (Unfavorable) Variance |
| --- | --- | --- | --- |
| | 2018 | 2017 | |
| Operating revenues | $ 310 | $ 275 | $ 35 |
| Purchased power expense | 161 | 137 | (24) |
| Revenues net of purchased power expense (a) | 149 | 138 | 11 |
| Other operating expenses | | | |
|   Operating and maintenance | 90 | 76 | (14) |
|   Depreciation and amortization | 33 | 35 | 2 |
|   Taxes other than income | 3 | 2 | (1) |
|     Total other operating expenses | 126 | 113 | (13) |
| Operating income | 23 | 25 | (2) |
| Other income and (deductions) | | | |
|   Interest expense, net | (16) | (15) | (1) |
|   Other, net | 1 | 2 | (1) |
|     Total other income and (deductions) | (15) | (13) | (2) |
| Income before income taxes | 8 | 12 | (4) |
| Income taxes | 1 | (16) | (17) |
| Net income | $ 7 | $ 28 | $ (21) |

(a) ACE evaluates its operating performance using the measure of revenue net of purchased power expense for electric sales. ACE believes Revenue net of purchased power expense is a useful measurement of its performance because it provides information that can be used to evaluate its operational performance. ACE has included the analysis below as a complement to the financial information provided in accordance with GAAP. However, Revenue net of purchased power expense is not a presentation defined under GAAP and may not be comparable to other companies' presentations or deemed more useful than the GAAP information provided elsewhere in this report.

*Net Income*

*Three Months Ended March 31, 2018 Compared to Three Months Ended March 31, 2017 .* ACE's Net income for the three months ended March 31, 2018 , was lower than the same period in 2017 , primarily due to higher Income tax expense as a result of a decrease in unrecognized tax liabilities during 2017 and an increase in Operating and maintenance expenses attributable to higher labor and contracting expenses, partially offset by an increase in Revenues net of purchased power expense resulting from higher distribution revenues due to higher average residential and commercial customer usage, favorable weather related sales, and the impact of electric distribution base rate increases approved by the NJBPU effective October 2017. The TCJA did not impact ACE's Net income for the three months ended March 31, 2018 as the favorable income tax impacts were fully offset by lower revenues resulting from the pass back of the tax savings through customer rates.

*Revenues Net of Purchased Power Expense*

Operating revenues include revenue from the distribution and supply of electricity to ACE's customers within its service territories at regulated rates. Operating revenues also include transmission service revenue that ACE receives as a transmission owner from PJM at rates regulated by FERC. Transmission rates are updated annually based on a FERC-approved formula methodology. Operating revenues also include revenue from Transition Bond Charges that ACE receives, and pays to ACE Funding, to fund the principal and interest payments on Transition Bonds, revenue from the resale in

the PJM wholesale markets for energy and capacity purchased under contacts with unaffiliated NUGs, and revenue from transmission enhancement credits. Operating revenues also include work and services performed on behalf of customers, including other utilities, which is generally not subject to price regulation. Work and services includes mutual assistance to other utilities, highway relocation, rentals of pole attachments, late payment fees and collection fees.

Electric revenues and purchased power expense are also affected by fluctuations in participation in the Customer Choice Program. All ACE customers have the choice to purchase electricity from competitive electric generation suppliers. The customer's choice of supplier does not impact the volume of deliveries, but affects revenue collected from customers related to supplied energy service.

Retail deliveries purchased from competitive electric generation suppliers (as a percentage of kWh sales) for the three months ended March 31, 2018 , compared to the same period in 2017 , consisted of the following:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2018 | 2017 |
| Electric | 47% | 49% |

Retail customers purchasing electric generation from competitive electric generation suppliers at March 31, 2018 and 2017 consisted of the following:

|  | March 31, 2018 | | March 31, 2017 | |
| --- | --- | --- | --- | --- |
|  | Number of customers | % of total retail customers | Number of customers | % of total retail customers |
| Electric | 85,462 | 15% | 93,896 | 17% |

The changes in ACE's operating revenue net of purchased power expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

|  | Three Months Ended March 31, 2018 |
| --- | --- |
|  | Increase (Decrease) |
| Weather | $ 3 |
| Volume | 7 |
| Distribution revenue | 3 |
| Regulatory required programs | (2) |
| Transmission revenues | (1) |
| Other | 1 |
| Total increase | $ 11 |

233

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Weather.** The demand for electricity is affected by weather conditions. With respect to the electric business, very warm weather in summer months and very cold weather in winter months are referred to as "favorable weather conditions" because these weather conditions result in increased deliveries of electricity. Conversely, mild weather reduces demand. During the three months ended March 31, 2018 compared to the same period in 2017 , operating revenue net of purchased power and fuel expense was higher due to the impact of favorable weather conditions in ACE's service territory.

For retail customers of ACE, distribution revenues are not decoupled from the distribution of electricity by ACE, and thus are subject to variability due to changes in customer consumption. Therefore, changes in customer usage (due to weather conditions, energy prices, energy savings programs or other reasons) from period to period have a direct impact on reported distribution revenue for customers in ACE's service territory.

Heating and cooling degree days are quantitative indices that reflect the demand for energy needed to heat or cool a home or business. Normal weather is determined based on historical average heating and cooling degree days for a 20-year period in ACE's service territory. The changes in heating and cooling degree days in ACE's service territory for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

| Three Months Ended March 31, | 2018 | 2017 | Normal | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 2018 vs. 2017 | 2018 vs. Normal |
| Heating Degree-Days | 2,413 | 2,150 | 2,474 | 12.2% | (2.5)% |
| Cooling Degree-Days | — | — | 1 | —% | (100.0)% |

**Volume.** During the three months ended March 31, 2018 , compared to the same period in 2017 , the increase in operating revenue net of purchased power expense related to delivery volume, exclusive of the effects of weather, is primarily due to higher average residential and commercial customer usage.

**Distribution Revenue.** The increase in distribution revenue for the three months ended March 31, 2018 , compared to the same period in 2017 , was primarily due to higher electric distribution base rates charged to customers that became effective in October 2017, partially offset by the impact of reduced distribution rates to reflect the lower federal income tax rate. See Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information.

**Regulatory Required Programs.** This represents the change in operating revenues collected under approved riders to recover costs incurred for regulatory programs such as energy efficiency programs. The riders are designed to provide full and current cost recovery as well as a return. The costs of these programs are included in Operating and maintenance expense, Depreciation and amortization expense and Taxes other than income in ACE's Consolidated Statements of Operations and Comprehensive Income. Revenue from regulatory required programs decreased for the three months ended March 31, 2018 , compared to the same period in 2017 , due to a rate decrease effective October 2017 for the ACE Transition Bonds.

**Transmission Revenues.** Under a FERC-approved formula, transmission revenue varies from year to year based upon fluctuations in the underlying costs, capital investments being recovered, the highest daily peak load and other billing adjustments. The transmission revenue net of purchased power expense remained relatively consistent for the three months ended March 31, 2018 compared to the same period in 2017 .

**Other.** Other revenue, which can vary period to period, includes rental revenue, revenue related to late payment charges, assistance provided to other utilities through mutual assistance programs, and recoveries of other taxes.

***Operating and Maintenance Expense***

| | Three Months Ended March 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2018 | 2017 | |
| Operating and maintenance expense - baseline | $ 87 | $ 75 | $ 12 |
| Operating and maintenance expense - regulatory required programs [a] | 3 | 1 | 2 |
| Total operating and maintenance expense | $ 90 | $ 76 | $ 14 |

_____

(a)   Operating and maintenance expenses for regulatory required programs are costs for various legislative and/or regulatory programs that are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues.

The changes in Operating and maintenance expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Baseline | |
| Labor and contracting | $ 9 |
| Uncollectible accounts expense [a] | 3 |
| | 12 |
| Regulatory required programs | |
| Purchased power administrative costs | 2 |
| | |
| Total increase | $ 14 |

_____

(a)   The uncollectible accounts expense is offset in Operating revenues.

***Depreciation and Amortization Expense***

The changes in Depreciation and amortization expense for the three months ended March 31, 2018 compared to the same period in 2017 consisted of the following:

| | Three Months Ended March 31, 2018 |
|---|---|
| | Increase (Decrease) |
| Depreciation expense [a] | $ 1 |
| Regulatory asset amortization | 1 |
| Regulatory required programs [b] | (4) |
| Total decrease | $ (2) |

_____

(a)   Depreciation expense increased due to ongoing capital expenditures.
(b)   Regulatory required programs decreased for the three months ended March 31, 2018 compared to the same period in 2017 as a result of lower revenue due to rate decreases effective October 2017 for the ACE Transition Bonds. Depreciation and amortization expenses for regulatory required programs are recoverable from customers on a full and current basis through approved regulated rates. An equal and offsetting amount has been reflected in Operating revenues and Operating and maintenance expense.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Taxes Other Than Income*

Taxes other than income for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

*Interest Expense, Net*

Interest expense, net for the three months ended March 31, 2018 compared to the same period in 2017 remained relatively consistent.

*Other, Net*

Other, net for the three months ended March 31, 2018 compared to the same period in 2017 , remained relatively consistent.

*Effective Income Tax Rate*

ACE's effective income tax rate was 12.5% and (133.3)% for the three months ended March 31, 2018 and 2017 , respectively. The increase in the effective income tax rate for the three months ended March 31, 2018 as compared to the same period in 2017 is primarily due to the absence of an unrecognized tax benefit from 2017, partially offset by the lower federal income tax rate as a result of the TCJA. See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Statements for additional information regarding the components of the effective income tax rates.

## ACE Electric Operating Statistics and Detail

| Retail Deliveries to Customers (in GWhs) | Three Months Ended March 31, | | % Change | Weather - Normal % Change |
|---|---|---|---|---|
| | 2018 | 2017 | | |
| **Retail Deliveries** [a] | | | | |
| Residential | 990 | 879 | 12.6% | 7.4% |
| Small commercial & industrial | 314 | 283 | 11.0% | 9.0% |
| Large commercial & industrial | 824 | 765 | 7.7% | 6.9% |
| Public authorities & electric railroads | 15 | 13 | 15.4% | 15.4% |
| Total retail deliveries | 2,143 | 1,940 | 10.5% | 7.5% |

| Number of Electric Customers | As of March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Residential | 488,495 | 485,691 |
| Small commercial & industrial | 61,059 | 60,999 |
| Large commercial & industrial | 3,611 | 3,761 |
| Public authorities & electric railroads | 643 | 612 |
| Total | 553,808 | 551,063 |

_____

(a)   Reflects delivery volumes from customers purchasing electricity directly from ACE and customers purchasing electricity from a competitive electric generation supplier as all customers are assessed distribution charges.

See Note 19 — Segment Information of the Combined Notes to Consolidated Financial Statements for the presentation of ACE's revenue disaggregation.

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

# Liquidity and Capital Resources

All results included throughout the liquidity and capital resources section are presented on a GAAP basis.

The Registrants' operating and capital expenditures requirements are provided by internally generated cash flows from operations as well as funds from external sources in the capital markets and through bank borrowings. The Registrants' businesses are capital intensive and require considerable capital resources. Each Registrant's access to external financing on reasonable terms depends on its credit ratings and current overall capital market business conditions, including that of the utility industry in general. If these conditions deteriorate to the extent that the Registrants no longer have access to the capital markets at reasonable terms, the Registrants have access to unsecured revolving credit facilities with aggregate bank commitments of $9 billion . In addition, Generation has $545 million in bilateral facilities with banks which have various expirations between January 2019 and December 2019. The Registrants utilize their credit facilities to support their commercial paper programs, provide for other short-term borrowings and to issue letters of credit. See the "Credit Matters" section below for further discussion. The Registrants expect cash flows to be sufficient to meet operating expenses, financing costs and capital expenditure requirements.

The Registrants primarily use their capital resources, including cash, to fund capital requirements, including construction expenditures, retire debt, pay dividends, fund pension and other postretirement benefit obligations and invest in new and existing ventures. The Registrants spend a significant amount of cash on capital improvements and construction projects that have a long-term return on investment. Additionally, ComEd, PECO, BGE, Pepco, DPL and ACE operate in rate-regulated environments in which the amount of new investment recovery may be delayed or limited and where such recovery takes place over an extended period of time. See Note 11 — Debt and Credit Agreements of the Combined Notes to Consolidated Financial Statements for further discussion of the Registrants' debt and credit agreements.

## NRC Minimum Funding Requirements

NRC regulations require that licensees of nuclear generating facilities demonstrate reasonable assurance that sufficient funds will be available in certain minimum amounts to decommission the facility.  These NRC minimum funding levels are based upon the assumption that decommissioning activities will commence after the end of the current licensed life of each unit.  If a unit fails the NRC minimum funding test, then the plant's owners or parent companies would be required to take steps, such as providing financial guarantees through letters of credit or parent company guarantees or making additional cash contributions to the NDT fund to ensure sufficient funds are available. See Note 13 — Nuclear Decommissioning of the Combined Notes to Consolidated Financial Statements for additional information on the NRC minimum funding requirements.

If a nuclear plant were to early retire there is a risk that it will no longer meet the NRC minimum funding requirements due to the earlier commencement of decommissioning activities and a shorter time period over which the NDT fund investments could appreciate in value. A shortfall could require Exelon to post parental guarantees for Generation's share of the obligations. However, the amount of any required guarantees will ultimately depend on the decommissioning approach adopted at each site, the associated level of costs, and the decommissioning trust fund investment performance going forward. Within two years after shutting down a plant, Generation must submit a post-shutdown decommissioning activities report (PSDAR) to the NRC that includes the planned option for decommissioning the site. As discussed in Note 13 — Nuclear Decommissioning of the Combined Notes to Consolidated Financial Statements, Generation filed its annual decommissioning funding status report with the NRC on March 28, 2018 for shutdown reactors and reactors within five years of shut down. As of March 31, 2018 , across the alternative decommissioning approaches available, Exelon would not be required to post a

237

Table of Contents

parental guarantee for TMI or Oyster Creek. In the event PSEG decides to early retire Salem, Generation estimates a parental guarantee of up to $55 million from Exelon could be required for Salem, dependent upon the ultimate decommissioning approach selected .

Upon issuance of any required financial guarantees, each site would be able to utilize the respective NDT funds for radiological decommissioning costs, which represent the majority of the total expected decommissioning costs. However, the NRC must approve an additional exemption in order for the plant's owner(s) to utilize the NDT fund to pay for non-radiological decommissioning costs (i.e., spent fuel management and site restoration costs). If a unit does not receive this exemption, the costs would be borne by the owner(s). While the ultimate amounts may vary greatly and could be reduced by alternate decommissioning scenarios and/or reimbursement of certain costs under the DOE reimbursement agreements or future litigation, across the four alternative decommissioning approaches available, if TMI or Oyster Creek were to fail to obtain the exemption, Generation estimates it could incur spent fuel management and site restoration costs over the next ten years of up to $235 million and $205 million net of taxes, respectively, dependent upon the ultimate decommissioning approach selected. In the event PSEG decides to early retire Salem and Salem were to fail to obtain the exemption, Generation estimates it could incur spent fuel management and site restoration costs over the next ten years of up to $90 million net of taxes.

## Cash Flows from Operating Activities

### *General*

Generation's cash flows from operating activities primarily result from the sale of electric energy and energy-related products and services to customers. Generation's future cash flows from operating activities may be affected by future demand for and market prices of energy and its ability to continue to produce and supply power at competitive costs as well as to obtain collections from customers.

The Utility Registrants' cash flows from operating activities primarily result from the transmission and distribution of electricity and, in the case of PECO, BGE and DPL, gas distribution services. The Utility Registrants' distribution services are provided to an established and diverse base of retail customers. The Utility Registrants' future cash flows may be affected by the economy, weather conditions, future legislative initiatives, future regulatory proceedings with respect to their rates or operations, competitive suppliers, and their ability to achieve operating cost reductions.

See Notes 3 — Regulatory Matters and 23 — Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements of the Exelon 2017 Form 10-K for further discussion of regulatory and legal proceedings and proposed legislation.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following table provides a summary of the major items affecting Exelon's cash flows from operations for the three months ended March 31, 2018 and 2017 :

| | Three Months Ended March 31, | | | | | |
| | 2018 | | 2017 | | Variance | |
|---|---|---|---|---|---|---|
| Net income | $ | 636 | $ | 971 | $ | (335) |
| Add (subtract): | | | | | | |
| Non-cash operating activities [a] | | 1,998 | | 1,229 | | 769 |
| Pension and non-pension postretirement benefit contributions | | (331) | | (307) | | (24) |
| Income taxes | | 86 | | 50 | | 36 |
| Changes in working capital and other noncurrent assets and liabilities [b] | | (646) | | (753) | | 107 |
| Option premiums received (paid), net | | (27) | | (6) | | (21) |
| Collateral (posted) received, net | | (214) | | (110) | | (104) |
| Net cash flows provided by operations | $ | 1,502 | $ | 1,074 | $ | 428 |

(a)   Represents depreciation, amortization and accretion, net fair value changes related to derivatives, deferred income taxes, provision for uncollectible accounts, pension and other postretirement benefit expense, equity in earnings and losses of unconsolidated affiliates and investments, decommissioning-related items, stock compensation expense, impairment of long-lived assets and other non-cash charges. See Note 18 — Supplemental Financial Information of the Combined Notes to Consolidated Financial Statements for further detail on non-cash operating activity.

(b)   Changes in working capital and other noncurrent assets and liabilities exclude the changes in commercial paper, income taxes and the current portion of long-term debt.

*Pension and Other Postretirement Benefits*

Management considers various factors when making pension funding decisions, including actuarially determined minimum contribution requirements under ERISA, contributions required to avoid benefit restrictions and at-risk status as defined by the Pension Protection Act of 2006 (the Act), management of the pension obligation and regulatory implications. The Act requires the attainment of certain funding levels to avoid benefit restrictions (such as an inability to pay lump sums or to accrue benefits prospectively), and at-risk status (which triggers higher minimum contribution requirements and participant notification).

To the extent interest rates decline significantly or the pension and OPEB plans earn less than the expected asset returns, annual pension contribution requirements in future years could increase. Conversely, to the extent interest rates increase significantly or the pension and OPEB plans earn greater than the expected asset returns, annual pension and OPEB contribution requirements in future years could decrease. Additionally, expected contributions could change if Exelon changes its pension or OPEB funding strategy.

On October 3, 2017, the US Department of Treasury and IRS released final regulations updating the mortality tables to be used for defined benefit pension plan funding, as well as the valuation of lump sum and other accelerated distribution options, effective for plan years beginning in 2018. The new mortality tables reflect improved projected life expectancy as compared to the existing table, which is generally expected to increase minimum pension funding requirements, Pension Benefit Guaranty Corporation premiums and the value of lump sum distributions. The IRS permits plan sponsors the option of delaying use of the new mortality tables for determining minimum funding requirements until 2019, which Exelon has utilized. The one-year delay does not apply for use of the mortality tables to determine the present value of lump sum distributions.

The EMA requires CENG to fund the obligation related to pre-transfer service of employees, including the underfunded balance of the pension and other postretirement welfare benefit plans measured as of July 14, 2014 by making periodic payments to Generation. These payments will be made on an agreed payment schedule or upon the occurrence of certain specified events, such as EDF's disposition of a majority of its interest in CENG. However, in the event that EDF exercises its rights under the Put Option, all payments not made as of the put closing date shall accelerate to be paid immediately prior to such closing date. See Note 2 — Variable Interest Entities of the Combined Notes to Consolidated Financial Statements for additional information regarding the investment in CENG.

### Tax Matters

The Registrants' future cash flows from operating activities may be affected by the following tax matters:

- Pursuant to the TCJA, beginning in 2018 Generation is expected to have higher operating cash flows in the range of approximately $1.2 billion to $1.6 billion for the period from 2018 to 2021, reflecting the reduction in the corporate federal income tax rate and full expensing of capital investments.

  The TCJA is generally expected to result in lower operating cash flows for the Utility Registrants as a result of the elimination of bonus depreciation and lower customer rates. Increased operating cash flows for the Utility Registrants from lower corporate federal income tax rates is expected to be more than offset over time by lower customer rates resulting from lower income tax expense recoveries and the settlement of deferred income tax net regulatory liabilities established pursuant to the TCJA, partially offset by the impacts of higher rate base. The amount and timing of settlement of the net regulatory liabilities will be determined by the Utility Registrants' respective rate regulators, subject to certain IRS "normalization" rules. The table below sets forth the Registrants' estimated categorization of their net regulatory liabilities as of December 31, 2017. The amounts in the table below are shown on an after-tax basis reflecting future net cash outflows after taking into consideration the income tax benefits associated with the ultimate settlement with customers.

| | Exelon | ComEd | PECO (a) | BGE | PHI | PEPCO | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Subject to IRS Normalization Rules | $3,040 | $1,400 | $533 | $459 | $648 | $299 | $195 | $153 |
| Subject to Rate Regulator Determination | 1,694 | 573 | 43 | 324 | 754 | 391 | 194 | 170 |
| Net Regulatory Liabilities | $4,734 | $1,973 | $576 | $783 | $1,402 | $690 | $389 | $323 |

(a) Given the regulatory treatment of income tax benefits related to electric and gas distribution repairs, PECO remains in an overall net regulatory asset position as of December 31, 2017 after recording the impacts related to the TCJA. As a result, the amount of customer benefits resulting from the TCJA subject to the discretion of PECO's rate regulators are lower relative to the other Utility Registrants. Refer to Note 3 - Regulatory Matters for additional information.

Net regulatory liability amounts subject to normalization rules generally may not be passed back to customers any faster than over the remaining useful lives of the underlying assets giving rise to the associated deferred income taxes. Such deferred income taxes generally relate to property, plant and equipment with remaining useful lives ranging from 30 to 40 years across the Utility Registrants. For the remaining amounts, rate regulators could require the passing back of amounts to customers over shorter time frames, which could materially decrease operating cash outflows at each of the Utility Registrants in the near term.

The Utility Registrants expect to fund any such required incremental operating cash outflows using a combination of third party debt financings and equity funding from Exelon in combinations generally consistent with existing capitalization ratio structures. To fund any

additional equity contributions to the Utility Registrants, Exelon would have available to it its typical sources, including, but not limited to, the increased operating cash flows at Generation referenced above, which over time are expected to exceed the incremental equity needs at the Utility Registrants.

The Utility Registrants continue to work with their state regulatory commissions to determine the amount and timing of the passing back of TCJA income tax savings benefits to customers; with filings either made, or expected to be made, at PECO, Pepco, DPL Delaware and ACE, and approved filings at ComEd, BGE and DPL Maryland. The amounts being passed back or proposed to be passed back to customers reflect the benefit of lower income tax expense beginning January 1, 2018 (February 1, 2018 for DPL Delaware), and the settlement of a portion of deferred income tax regulatory liabilities established upon enactment of the TCJA. Refer to Note 3 - Regulatory Matters of the Combined Notes to Consolidated Financial Statements for additional information on their filings.

In general, most states use federal taxable income as the starting point for computing state corporate income tax. Now that the TCJA has been enacted, state governments are beginning to analyze the impact of the TCJA on their state revenues. Exelon is uncertain regarding what the state governments will do, and there is a possibility that state corporate income taxes could change due to the enactment of the TCJA. In 2018, Exelon will be closely monitoring the states' responses to the TCJA as these could have an impact on Exelon's future cash flows.

See Note 12 — Income Taxes of the Combined Notes to Consolidated Financial Information for further information on the amounts of the net regulatory liabilities subject to determinations by rate regulators.

- State and local governments continue to face increasing financial challenges, which may increase the risk of additional income tax, property taxes and other taxes or the imposition, extension or permanence of temporary tax increases.

Cash flows from operations for the three months ended March 31, 2018 and 2017 by Registrant were as follows:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| Exelon | $ | 1,502 | $ | 1,074 |
| Generation | | 855 | | 420 |
| ComEd | | 134 | | 236 |
| PECO | | 19 | | 106 |
| BGE | | 313 | | 208 |
| PHI | | 279 | | 194 |
| Pepco | | 126 | | 29 |
| DPL | | 115 | | 122 |
| ACE | | 59 | | 58 |

Changes in the Registrants' cash flows from operations were generally consistent with changes in each Registrant's respective results of operations, as adjusted by changes in working capital in the

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

normal course of business, except as discussed below. In addition, significant operating cash flow impacts for the Registrants for the three months ended March 31, 2018 and 2017 were as follows:

### Generation

- Depending upon whether Generation is in a net mark-to-market liability or asset position, collateral may be required to be posted with or collected from its counterparties. In addition, the collateral posting and collection requirements differ depending on whether the transactions are on an exchange or in the OTC markets. During the three months ended March 31, 2018 and 2017 , Generation had net payments of counterparty cash collateral of $214 million and $102 million , respectively, primarily due to market conditions that resulted in changes to Generation's net mark-to-market position.

- During the three months ended March 31, 2018 and 2017 , Generation had net payments of approximately $27 million and $6 million , respectively, related to purchases and sales of options. The level of option activity in a given period may vary due to several factors, including changes in market conditions as well as changes in hedging strategy.

### ComEd

- During each of the three months ended March 31, 2018 and 2017 , ComEd posted approximately $8 million of cash collateral with PJM, respectively.  As of March 31, 2018 and 2017 , ComEd had approximately $59 million and $32 million cash collateral posted with PJM, respectively. ComEd's total collateral posted with PJM has increased year over year primarily due to an increase in ComEd's RPM credit requirements and peak market activity with PJM.

For further discussion regarding changes in non-cash operating activities, please refer to Note 18 — Supplemental Financial Information of the Combined Notes to Consolidated Financial Statements.

## Cash Flows from Investing Activities

Cash flows used in investing activities for the three months ended March 31, 2018 and 2017 by Registrant were as follows:

| | Three Months Ended March 31, | |
| | 2018 | 2017 |
|---|---|---|
| Exelon | $ (1,857) | $ (2,283) |
| Generation | (615) | (910) |
| ComEd | (523) | (619) |
| PECO | (215) | (69) |
| BGE | (223) | (202) |
| PHI | (258) | (323) |
| Pepco | (127) | (144) |
| DPL | (65) | (80) |
| ACE | (64) | (87) |

242

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Significant investing cash flow impacts for the Registrants for three months ended March 31, 2018 and 2017 were as follows:

***Exelon and Generation***

- During the three months ended March 31, 2018 , Exelon had proceeds of $79 million relating to the sale of its interest in an electrical contracting business that primarily installs, maintains and repairs underground and high-voltage cable transmission and distribution services.

- During the three months ended March 31, 2017 , Exelon had expenditures of $23 million and $182 million relating to the acquisitions of ConEdison Solutions and the FitzPatrick facility, respectively.

***Capital Expenditure Spending***

*Generation*

Generation has entered into several agreements to acquire equity interests in privately held development stage entities which develop energy-related technologies.  The agreements contain a series of scheduled investment commitments, including in-kind service contributions. There are anticipated expenditures remaining to fund anticipated planned capital and operating needs of the associated companies.

Capital expenditures by Registrant for the three months ended March 31, 2018 and 2017 and projected amounts for the full year 2018 are as follows:

| | Projected Full Year 2018 (a) | Three Months Ended March 31, | |
| | | 2018 | 2017 |
|---|---|---|---|
| Exelon [b] | $ 7,875 | $ 1,880 | $ 2,009 |
| Generation | 2,075 | 628 | 625 |
| ComEd [c] | 2,125 | 531 | 626 |
| PECO | 850 | 217 | 201 |
| BGE | 1,000 | 224 | 206 |
| PHI [d] | 1,525 | 258 | 320 |
| Pepco | 725 | 127 | 139 |
| DPL | 400 | 65 | 82 |
| ACE | 400 | 63 | 88 |

(a)   Total projected capital expenditures do not include adjustments for non-cash activity.
(b)   Includes corporate operations, BSC, and PHISCO rounded to the nearest $25 million.
(c)   The capital expenditures and 2018 projections include approximately $86 million of expected incremental spending pursuant to EIMA, ComEd has committed to invest approximately $2.6 billion over a ten-year period, through 2021, to modernize and storm-harden its distribution system and to implement smart grid technology.
(d)   Includes PHISCO rounded to the nearest $25 million.

Projected capital expenditures and other investments are subject to periodic review and revision to reflect changes in economic conditions and other factors.

*Generation*

Approximately 39% and 11% of the projected 2018 capital expenditures at Generation are for the acquisition of nuclear fuel, and the construction of new natural gas plant and solar facilities, respectively,

Table of Contents

with the remaining amounts reflecting investment in renewable energy and additions and upgrades to existing facilities (including material condition improvements during nuclear refueling outages). Generation anticipates that they will fund capital expenditures with internally generated funds and borrowings.

### *ComEd, PECO, BGE, Pepco, DPL and ACE*

Projected 2018 capital expenditures at the Utility Registrants are for continuing projects to maintain and improve operations, including enhancing reliability and adding capacity to the transmission and distribution systems such as ComEd's reliability related investments required under EIMA, and the Utility Registrants' construction commitments under PJM's RTEP.

The Utility Registrants as transmission owners are subject to NERC compliance requirements. NERC provides guidance to transmission owners regarding assessments of transmission lines. The results of these assessments could require the Utility Registrants to incur incremental capital or operating and maintenance expenditures to ensure their transmission lines meet NERC standards. In 2010, NERC provided guidance to transmission owners that recommended the Utility Registrants perform assessments of their transmission lines. ComEd, PECO and BGE submitted their final bi-annual reports to NERC in January 2014. ComEd and PECO will be incurring incremental capital expenditures associated with this guidance following the completion of the assessments. Specific projects and expenditures are identified as the assessments are completed. ComEd's and PECO's forecasted 2018 capital expenditures above reflect capital spending for remediation to be completed through 2019. BGE, Pepco, DPL and ACE have substantially completed their assessments and thus do not expect significant capital expenditures related to this guidance in 2018 .

The Utility Registrants anticipate that they will fund their capital expenditures with a combination of internally generated funds and borrowings and additional capital contributions from parent.

## Cash Flows from Financing Activities

Cash flows provided by (used in) financing activities for the three months ended March 31, 2018 and 2017 by Registrant were as follows:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2018** | **2017** |
| Exelon | $ 264 | $ 1,184 |
| Generation | (57) | 582 |
| ComEd | 407 | 359 |
| PECO | (53) | (72) |
| BGE | (84) | 1 |
| PHI | (13) | 66 |
| Pepco | 9 | 114 |
| DPL | (45) | (44) |
| ACE | 11 | (20) |

### *Debt*

See Note 11 — Debt and Credit Agreements of the Combined Notes to Consolidated Financial Statements for further details of the Registrants' debt issuances.

244

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Dividends*

Cash dividend payments and distributions during the three months ended March 31, 2018 and 2017 by Registrant were as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Exelon | $ 333 | $ 303 |
| Generation | 188 | 164 |
| ComEd | 114 | 105 |
| PECO | 287 | 72 |
| BGE | 52 | 49 |
| PHI | 71 | 69 |
| Pepco | 25 | 30 |
| DPL | 36 | 30 |
| ACE | 9 | 10 |

Quarterly dividends declared by the Exelon Board of Directors during the three months ended March 31, 2018 and for the second quarter of 2018 were as follows:

| Period | Declaration Date | Shareholder of Record Date | Dividend Payable Date | Cash per Share [a] |
| --- | --- | --- | --- | --- |
| First Quarter 2018 | January 30, 2018 | February 15, 2018 | March 9, 2018 | $ 0.3450 |
| Second Quarter 2018 | May 1, 2018 | May 15, 2018 | June 8, 2018 | $ 0.3450 |

[a]  Exelon's Board of Directors approved an updated dividend policy providing an increase of 5% each year for the period covering 2018 through 2020, beginning with the March 2018 dividend.

*Short-Term Borrowings*

Short-term borrowings incurred (repaid) during the three months ended March 31, 2018 and 2017 by Registrant were as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Exelon | $ 726 | $ 781 |
| Generation | 165 | 18 |
| ComEd | 317 | 365 |
| PECO | 220 | — |
| BGE | (32) | 50 |
| PHI | 57 | (355) |
| Pepco | 34 | 144 |
| DPL | (5) | — |
| ACE | 28 | — |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*Contributions from Parent/Member*

Contributions received from Parent/Member for the three months ended March 31, 2018 and 2017 by Registrant were as follows:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2018** | | **2017** | |
| ComEd (a)(b) | $ | 113 | $ | 100 |
| PHI (b) | | — | | 500 |

_____

(a)  Additional contributions from parent or external debt financing may be required as a result of increased capital investment in infrastructure improvements and modernization pursuant to EIMA and transmission upgrades.

(b)  Contribution paid by Exelon.

*Other*

For the three months ended March 31, 2018 , other financing activities primarily consist of debt issuance costs. See Note 11 — Debt and Credit Agreements of the Combined Notes to Consolidated Financial Statements for further details of the Registrants' debt issuances.

## Credit Matters

The Registrants fund liquidity needs for capital investment, working capital, energy hedging and other financial commitments through cash flows from continuing operations, public debt offerings, commercial paper markets and large, diversified credit facilities. The credit facilities include $9.5 billion in aggregate total commitments of which $8.0 billion was available as of March 31, 2018 , and of which no financial institution has more than 7% of the aggregate commitments for the Registrants. The Registrants had access to the commercial paper market during the first quarter of 2018 to fund their short-term liquidity needs, when necessary. The Registrants routinely review the sufficiency of their liquidity position, including appropriate sizing of credit facility commitments, by performing various stress test scenarios, such as commodity price movements, increases in margin-related transactions, changes in hedging levels and the impacts of hypothetical credit downgrades. The Registrants have continued to closely monitor events in the financial markets and the financial institutions associated with the credit facilities, including monitoring credit ratings and outlooks, credit default swap levels, capital raising and merger activity. See PART I. ITEM 1A. RISK FACTORS of the Exelon 2017 Form 10-K for further information regarding the effects of uncertainty in the capital and credit markets.

The Registrants believe their cash flow from operating activities, access to credit markets and their credit facilities provide sufficient liquidity. If Generation lost its investment grade credit rating as of March 31, 2018 , it would have been required to provide incremental collateral of $1.9 billion to meet collateral obligations for derivatives, non-derivatives, normal purchases and normal sales contracts and applicable payables and receivables, net of the contractual right of offset under master netting agreements, which is well within its current available credit facility capacities of $4.4 billion .

The following table presents the incremental collateral that each Utility Registrant would have been required to provide in the event each Utility Registrant lost its investment grade credit rating at March 31, 2018 and available credit facility capacity prior to any incremental collateral at March 31, 2018 :

| | PJM Credit Policy Collateral | Other Incremental Collateral Required [a] | Available Credit Facility Capacity Prior to Any Incremental Collateral |
|---|---|---|---|
| ComEd | $ 10 | $ — | $ 998 |
| PECO | 3 | 33 | 599 |
| BGE | 10 | 49 | 597 |
| Pepco | 10 | — | 299 |
| DPL | 4 | 14 | 300 |
| ACE | — | — | 300 |

_____
(a)   Represents incremental collateral related to natural gas procurement contracts.

### Exelon Credit Facilities

Exelon Corporate, ComEd, BGE, Pepco, DPL and ACE meet their short-term liquidity requirements primarily through the issuance of commercial paper. Generation and PECO meet their short-term liquidity requirements primarily through the issuance of commercial paper and borrowings from the intercompany money pool. PHI Corporate meets its short-term liquidity requirements primarily through the issuance of short-term notes and the Exelon intercompany money pool. The Registrants may use their respective credit facilities for general corporate purposes, including meeting short-term funding requirements and the issuance of letters of credit.

The following table reflects the Registrants' commercial paper programs supported by the revolving credit agreements and bilateral credit agreements at March 31, 2018 :

### Commercial Paper Programs

| Commercial Paper Issuer | Maximum Program Size [a][b] | Outstanding Commercial Paper at March 31, 2018 | Average Interest Rate on Commercial Paper Borrowings for the Three Months Ended March 31, 2018 |
|---|---|---|---|
| Exelon Corporate | $ 600 | $ — | 1.85% |
| Generation | 5,300 | 165 | 1.93% |
| ComEd | 1,000 | 317 | 1.91% |
| PECO | 600 | 220 | 2.08% |
| BGE | 600 | 45 | 1.86% |
| Pepco | 500 | 60 | 2.01% |
| DPL | 500 | 211 | 1.88% |
| ACE | 350 | 136 | 1.90% |

_____
(a)   Excludes $545 million bilateral credit facilities that do not back Generation's commercial paper program.
(b)   Excludes additional credit facility agreements for Generation, ComEd, PECO, BGE, Pepco, DPL and ACE with aggregate commitments of $49 million , $34 million , $34 million , $5 million , $2 million , $2 million and $2 million , respectively, arranged with minority and community banks located primarily within utilities' service territories. These facilities expire on October 12, 2018. These facilities are solely utilized to issue letters of credit. As of March 31, 2018 , letters of credit issued under these agreements for Generation and BGE totaled $5 million and $2 million , respectively.

In order to maintain their respective commercial paper programs in the amounts indicated above, each Registrant must have credit facilities in place, at least equal to the amount of its commercial paper program. While the amount of outstanding commercial paper does not reduce available capacity under a Registrant's credit facility, a Registrant does not issue commercial paper in an aggregate amount exceeding the then available capacity under its credit facility. At March 31, 2018 , the Registrants had the following aggregate bank commitments, credit facility borrowings and available capacity under their respective credit facilities:

| | | | | | Available Capacity at March 31, 2018 | |
| Borrower | Facility Type | Aggregate Bank Commitment (a)(b)(c) | Facility Draws | Outstanding Letters of Credit (c) | Actual | To Support Additional Commercial Paper (b)(d) |
|---|---|---|---|---|---|---|
| Exelon Corporate | Syndicated Revolver | $ 600 | $ — | $ 45 | $ 555 | $ 555 |
| Generation | Syndicated Revolver | 5,300 | — | 1,121 | 4,179 | 4,014 |
| Generation | Bilaterals | 545 | — | 338 | 207 | — |
| ComEd | Syndicated Revolver | 1,000 | — | 2 | 998 | 681 |
| PECO | Syndicated Revolver | 600 | — | 1 | 599 | 379 |
| BGE | Syndicated Revolver | 600 | — | 3 | 597 | 552 |
| Pepco | Syndicated Revolver | 300 | — | 1 | 299 | 239 |
| DPL | Syndicated Revolver | 300 | — | — | 300 | 89 |
| ACE | Syndicated Revolver | 300 | — | — | 300 | 164 |

___

(a)   Excludes $128 million of credit facility agreements arranged at minority and community banks at Generation, ComEd, PECO, BGE, Pepco, DPL and ACE. These facilities expire on October 12, 2018. These facilities are solely utilized to issue letters of credit. As of March 31, 2018 , letters of credit issued under these agreements for Generation and BGE totaled $5 million and $2 million , respectively.

(b)   Pepco, DPL and ACE's revolving credit facility is subject to available borrowing capacity. The borrowing capacity may be increased or decreased during the term of the facility, except that (i) the sum of the borrowing capacity must equal the total amount of the facility, and (ii) the aggregate amount of credit used at any given time by each of Pepco, DPL or ACE may not exceed $900 million or the maximum amount of short-term debt the company is permitted to have outstanding by its regulatory authorities. The total number of the borrowing reallocations may not exceed eight per year during the term of the facility

(c)   Excludes nonrecourse debt letters of credit, see Note 13 — Debt and Credit Agreements in the Exelon 2017 Form 10-K for further information.

(d)   Excludes $545 million bilateral credit facilities that do not back Generation's commercial paper program.

As of March 31, 2018 , there were no borrowings under Generation's bilateral credit facilities.

248

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Borrowings under Exelon Corporate's, Generation's, ComEd's, PECO's, BGE's, Pepco's, DPL's and ACE's revolving credit agreements bear interest at a rate based upon either the prime rate or a LIBOR-based rate, plus an adder based upon the particular Registrant's credit rating. The adders for the prime based borrowings and LIBOR-based borrowings are presented in the following table:

| | Exelon Corporate | Generation | ComEd | PECO | BGE | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Prime based borrowings | 27.5 | 27.5 | 7.5 | 0.0 | 0.0 | 7.5 | 7.5 | 7.5 |
| LIBOR-based borrowings | 127.5 | 127.5 | 107.5 | 90.0 | 100.0 | 107.5 | 107.5 | 107.5 |

The maximum adders for prime rate borrowings and LIBOR-based rate borrowings are 90 basis points and 165 basis points, respectively. The credit agreements also require the borrower to pay a facility fee based upon the aggregate commitments. The fee varies depending upon the respective credit ratings of the borrower.

Each revolving credit agreement for Exelon Corporate, Generation, ComEd, PECO, BGE, Pepco, DPL and ACE requires the affected borrower to maintain a minimum cash from operations to interest expense ratio for the twelve-month period ended on the last day of any quarter. The following table summarizes the minimum thresholds reflected in the credit agreements for the three months ended March 31, 2018 :

| | Exelon Corporate | Generation | ComEd | PECO | BGE | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Credit agreement threshold | 2.50 to 1 | 3.00 to 1 | 2.00 to 1 | 2.00 to 1 | 2.00 to 1 | 2.00 to 1 | 2.00 to 1 | 2.00 to 1 |

At March 31, 2018 , the interest coverage ratios at the Registrants were as follows:

| | Exelon | Generation | ComEd | PECO | BGE | Pepco | DPL | ACE |
|---|---|---|---|---|---|---|---|---|
| Interest coverage ratio | 6.83 | 13.07 | 11.37 | 8.28 | 10.21 | 6.24 | 8.48 | 5.65 |

An event of default under Exelon, Generation, ComEd, PECO or BGE's indebtedness will not constitute an event of default under any of the others' credit facilities, except that a bankruptcy or other event of default in the payment of principal, premium or indebtedness in principal amount in excess of $100 million in the aggregate by Generation will constitute an event of default under the Exelon Corporate credit facility. An event of default under Pepco, DPL or ACE's indebtedness will not constitute an event of default with respect to the other PHI Utilities under the PHI Utilities' combined credit facility.

The absence of a material adverse change in Exelon's or PHI's business, property, results of operations or financial condition is not a condition to the availability of credit under any of the borrowers' credit agreement. None of the credit agreements include any rating triggers.

### Security Ratings

The Registrants' access to the capital markets, including the commercial paper market, and their respective financing costs in those markets, may depend on the securities ratings of the entity that is accessing the capital markets.

The Registrants' borrowings are not subject to default or prepayment as a result of a downgrading of securities, although such a downgrading of a Registrant's securities could increase fees and interest charges under that Registrant's credit agreements.

249

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

As part of the normal course of business, the Registrants enter into contracts that contain express provisions or otherwise permit the Registrants and their counterparties to demand adequate assurance of future performance when there are reasonable grounds for doing so. In accordance with the contracts and applicable contracts law, if the Registrants are downgraded by a credit rating agency, it is possible that a counterparty would attempt to rely on such a downgrade as a basis for making a demand for adequate assurance of future performance, which could include the posting of collateral. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information on collateral provisions.

### Intercompany Money Pool

To provide an additional short-term borrowing option that will generally be more favorable to the borrowing participants than the cost of external financing, both Exelon and PHI operate an intercompany money pool. Maximum amounts contributed to and borrowed from the money pool by participant and the net contribution or borrowing as of March 31, 2018 , are presented in the following table:

| Exelon Intercompany Money Pool | During the Three Months Ended March 31, 2018 | | As of March 31, 2018 |
| --- | --- | --- | --- |
| Contributed (Borrowed) | Maximum Contributed | Maximum Borrowed | Contributed (Borrowed) |
| Exelon Corporate | $ 551 | $ — | $ 494 |
| Generation | 38 | (389) | (54) |
| PECO | 285 | (233) | (194) |
| BSC | — | (403) | (288) |
| PHI Corporate | — | (35) | (13) |
| PCI | 55 | — | 54 |

| PHI Intercompany Money Pool | During the Three Months Ended March 31, 2018 | | As of March 31, 2018 |
| --- | --- | --- | --- |
| Contributed (Borrowed) | Maximum Contributed | Maximum Borrowed | Contributed (Borrowed) |
| PHI Corporate | $ 28 | $ — | $ 4 |
| PHISCO | 10 | (18) | 1 |

### Investments in Nuclear Decommissioning Trust Funds

Exelon, Generation and CENG maintain trust funds, as required by the NRC, to fund certain costs of decommissioning nuclear plants. The mix of securities in the trust funds is designed to provide returns to be used to fund decommissioning and to offset inflationary increases in decommissioning costs. Generation actively monitors the investment performance of the trust funds and periodically reviews asset allocations in accordance with Generation's NDT fund investment policy. Generation's and CENG's investment policies establish limits on the concentration of holdings in any one company and also in any one industry. See Note  13  — Nuclear Decommissioning of the Combined Notes to Consolidated Financial Statements for further information regarding the trust funds, the NRC's minimum funding requirements and related liquidity ramifications.

### Shelf Registration Statements

Exelon, Generation, ComEd, PECO, BGE, Pepco, DPL and ACE have a currently effective combined shelf registration statement unlimited in amount, filed with the SEC, that will expire in August 2019 . The ability of each Registrant to sell securities off the shelf registration statement or to access the private placement markets will depend on a number of factors at the time of the proposed sale, including

Table of Contents

other required regulatory approvals, as applicable, the current financial condition of the Registrant, its securities ratings and market conditions.

### Regulatory Authorizations

ComEd, PECO, BGE, Pepco, DPL and ACE are required to obtain short-term and long-term financing authority from Federal and State Commissions as follows:

| | Short-term Financing Authority [a] | | | | Long-term Financing Authority [a] | | |
|---|---|---|---|---|---|---|---|
| | Commission | Expiration Date | Amount | | Commission | Expiration Date | Amount |
| ComEd [b] | FERC | December 31, 2019 | $ 2,500 | | ICC | 2019 | $ 583 |
| PECO | FERC | December 31, 2019 | 1,500 | | PAPUC | December 31, 2018 | 950 |
| BGE | FERC | December 31, 2019 | 700 | | MDPSC | N/A | 700 |
| Pepco | FERC | December 31, 2019 | 500 | | MDPSC / DCPSC | December 31, 2020 | 600 |
| DPL | FERC | December 31, 2019 | 500 | | MDPSC / DPSC | December 31, 2020 | 350 |
| ACE | NJBPU | December 31, 2019 | 350 | | NJBPU | December 31, 2019 | 350 |

(a)   Generation currently has blanket financing authority it received from FERC in connection with its market-based rate authority.
(b)   ComEd had $440 million available in long-term debt refinancing authority and $143 million available in new money long term debt financing authority from the ICC as of March 31, 2018 and has an expiration date of June 1, 2019 and March 1, 2019, respectively. On April 9, 2018, ComEd filed an application for $1.5 billion in new money long-term debt financing authority from the ICC and expects approval by August 1, 2018.

# Contractual Obligations and Off-Balance Sheet Arrangements

Contractual obligations represent cash obligations that are considered to be firm commitments and commercial commitments triggered by future events. See Note 23 — Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements in the Exelon 2017 Form 10-K.

Generation, ComEd, PECO, BGE, Pepco, DPL and ACE have obligations related to contracts for the purchase of power and fuel supplies, and ComEd and PECO have obligations related to their financing trusts. The power and fuel purchase contracts and the financing trusts have been considered for consolidation in the Registrants' respective financial statements pursuant to the authoritative guidance for VIEs. See Note 1 — Significant Accounting Policies of the Combined Notes to Consolidated Financial Statements for further information.

For an in-depth discussion of the Registrants' contractual obligations and off-balance sheet arrangements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Contractual Obligations and Off-Balance Sheet Arrangements" in the Exelon 2017 Form 10-K.

Electronically Filed - St. Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**Item 3.    Quantitative and Qualitative Disclosures about Market Risk**

The Registrants are exposed to market risks associated with adverse changes in commodity prices, counterparty credit, interest rates and equity prices. Exelon's RMC approves risk management policies and objectives for risk assessment, control and valuation, counterparty credit approval, and the monitoring and reporting of risk exposures. The RMC is chaired by the chief executive officer and includes the chief risk officer, chief strategy officer, chief executive officer of Exelon Utilities, chief commercial officer, chief financial officer and chief executive officer of Constellation. The RMC reports to the Finance and Risk Committee of the Exelon Board of Directors on the scope of the risk management activities. The following discussion serves as an update to ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK of Exelon's 2017 Annual Report on Form 10-K incorporated herein by reference.

# Commodity Price Risk (All Registrants)

Commodity price risk is associated with price movements resulting from changes in supply and demand, fuel costs, market liquidity, weather conditions, governmental regulatory and environmental policies and other factors. To the extent the total amount of energy Exelon generates and purchases differs from the amount of energy it has contracted to sell, Exelon is exposed to market fluctuations in commodity prices. Exelon seeks to mitigate its commodity price risk through the sale and purchase of electricity, fossil fuel and other commodities.

## Generation

Electricity available from Generation's owned or contracted generation supply in excess of Generation's obligations to customers, including portions of the Utility Registrants' retail load, is sold into the wholesale markets. To reduce commodity price risk caused by market fluctuations, Generation enters into non-derivative contracts as well as derivative contracts, including swaps, futures, forwards and options, with approved counterparties to hedge anticipated exposures. Generation uses derivative instruments as economic hedges to mitigate exposure to fluctuations in commodity prices. Generation expects the settlement of the majority of its economic hedges will occur during 2018 through 2020 .

In general, increases and decreases in forward market prices have a positive and negative impact, respectively, on Generation's owned and contracted generation positions which have not been hedged. Exelon's hedging program involves the hedging of commodity price risk for Exelon's expected generation, typically on a ratable basis over three-year periods. As of March 31, 2018 , the percentage of expected generation hedged is 91% - 94% , 63% - 66% and 33% - 36% for 2018 , 2019 and 2020 , respectively. The percentage of expected generation hedged is the amount of equivalent sales divided by the expected generation. Expected generation is the volume of energy that best represents our commodity position in energy markets from owned or contracted generating facilities based upon a simulated dispatch model that makes assumptions regarding future market conditions, which are calibrated to market quotes for power, fuel, load following products and options. Equivalent sales represent all hedging products, which include economic hedges and certain non-derivative contracts including Generation's sales to the ComEd, PECO and BGE to serve their retail load.

A portion of Generation's hedging strategy may be accomplished with fuel products based on assumed correlations between power and fuel prices, which routinely change in the market. Market price risk exposure is the risk of a change in the value of unhedged positions. The forecasted market price risk exposure for Generation's entire economic hedge portfolio associated with a $5 reduction in the annual average around-the-clock energy price based on March 31, 2018 market conditions and hedged position would be an decrease in pre-tax net income of approximately $44 million , $336 million and $608 million , res pectively, for 2018 , 2019 and 2020 . Power price sensitivities are derived by adjusting power price assumptions while keeping all other price inputs constant. Generation actively manages its portfolio

Table of Contents

to mitigate market price risk exposure for its unhedged position. Actual results could differ depending on the specific timing of, and markets affected by, price changes, as well as future changes in Generation's portfolio. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information.

### Proprietary Trading Activities

Proprietary trading portfolio activity for the three months ended March 31, 2018 resulted in $6 million of pre-tax gains due to net mark-to-market gains of $2 million and realized gains of $4 million . Generation has not segregated proprietary trading activity within the following discussion because of the relative size of the proprietary trading portfolio in comparison to Generation's total Revenue net of purchase power and fuel expense. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information.

### Fuel Procurement

Generation procures natural gas through long-term and short-term contracts, and spot-market purchases. Nuclear fuel assemblies are obtained predominantly through long-term uranium concentrate supply contracts, contracted conversion services, contracted enrichment services, or a combination thereof, and contracted fuel fabrication services. The supply markets for uranium concentrates and certain nuclear fuel services are subject to price fluctuations and availability restrictions. Supply market conditions may make Generation's procurement contracts subject to credit risk related to the potential non-performance of counterparties to deliver the contracted commodity or service at the contracted prices. Approximately 58% of Generation's uranium concentrate requirements from 2018 through 2022 are supplied by three producers. In the event of non-performance by these or other suppliers, Generation believes that replacement uranium concentrates can be obtained, although at prices that may be unfavorable when compared to the prices under the current supply agreements. Non-performance by these counterparties could have a material adverse impact on Exelon's and Generation's results of operations, cash flows and financial positions.

## ComEd

ComEd entered into 20-year contracts for renewable energy and RECs beginning in June 2012. ComEd is permitted to recover its renewable energy and REC costs from retail customers with no mark-up. The annual commitments represent the maximum settlements with suppliers for renewable energy and RECs under the existing contract terms. Pursuant to the ICC's Order on December 19, 2012, ComEd's commitments under the existing long-term contracts were reduced for the June 2013 through May 2014 procurement period. In addition, the ICC's December 18, 2013 Order approved the reduction of ComEd's commitments under those contracts for the June 2014 through May 2015 procurement period, and the amount of the reduction was approved by the ICC in March 2014.

ComEd has block energy contracts to procure electric supply that are executed through a competitive procurement process, which is further discussed in Note 6 — Regulatory Matters of the Combined Notes to Consolidated Financial Statements. The block energy contracts are considered derivatives and qualify for the normal purchases and normal sales scope exception under current derivative authoritative guidance, and as a result are accounted for on an accrual basis of accounting. ComEd does not enter into derivatives for speculative or proprietary trading purposes. For additional information on these contracts, see Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements.

## PECO, BGE, Pepco, DPL and ACE

BGE, Pepco, DPL and ACE have certain full requirements contracts, which are considered derivatives and qualify for the normal purchases and normal sales scope exception under current

derivative authoritative guidance, and as a result are accounted for on an accrual basis of accounting. Other full requirements contracts are not derivatives.

PECO, BGE and DPL have also executed derivative natural gas contracts, which either qualify for the normal purchases and normal sales exception or have no mark-to-market balances because the derivatives are index priced, to hedge their long-term price risk in the natural gas market. The hedging programs for natural gas procurement have no direct impact on their results of operations or financial position.

PECO, BGE, Pepco, DPL and ACE do not enter into derivatives for speculative or proprietary trading purposes. For additional information on these contracts, see Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements.

**Trading and Non-Trading Marketing Activities**

The following tables detail Exelon's, Generation's, ComEd's, PHI's and DPL's trading and non-trading marketing activities is included to address the recommended disclosures by the energy industry's Committee of Chief Risk Officers (CCRO).

The following table provides detail on changes in Exelon's, Generation's, ComEd's, PHI's and DPL's commodity mark-to-market net asset or liability balance sheet position from December 31, 2017 to March 31, 2018 . It indicates the drivers behind changes in the balance sheet amounts. This table incorporates the mark-to-market activities that are immediately recorded in earnings. This table excludes all NPNS contracts and does not segregate proprietary trading activity. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information on the balance sheet classification of the mark-to-market energy contract net assets (liabilities) recorded as of March 31, 2018 and December 31, 2017 .

|  | Exelon | Generation | ComEd | PHI | DPL |
|---|---|---|---|---|---|
| Total mark-to-market energy contract net assets (liabilities) at December 31, 2017 (a) | $ 667 | $ 923 | $ (256) | $ — | $ — |
| Total change in fair value during 2018 of contracts recorded in results of operations | 14 | 14 | — | — | — |
| Reclassification to realized of contracts recorded in results of operations | (279) | (279) | — | — | — |
| Contracts received at acquisition date | — | — | — | — | — |
| Changes in fair value — recorded through regulatory assets and liabilities (b) | (10) | — | (11) | 1 | 1 |
| Changes in allocated collateral | 217 | 218 | — | (1) | (1) |
| Changes in net option premium paid/(received) | 27 | 27 | — | — | — |
| Option premium amortization | 7 | 7 | — | — | — |
| Upfront payments and amortizations (c) | (30) | (30) | — | — | — |
| Total mark-to-market energy contract net assets (liabilities) at March 31, 2018 (a) | $ 613 | $ 880 | $ (267) | $ — | $ — |

(a)   Amounts are shown net of collateral paid to and received from counterparties.
(b)   For ComEd and DPL, the changes in fair value are recorded as a change in regulatory assets or liabilities. As of March 31, 2018 , ComEd recorded a regulatory liability of $267 million related to its mark-to-market derivative liabilities with Generation and unaffiliated suppliers. For the three months ended March 31, 2018 , ComEd also recorded $ 17 million of decreases in fair value and an increase for realized losses due to settlements of $ 6 million recorded in purchased power expense associated with floating-to-fixed energy swap contracts with unaffiliated suppliers.
(c)   Includes derivative contracts acquired or sold by Generation through upfront payments or receipts of cash, excluding option premiums, and the associated amortization.

## Fair Values

The following tables present maturity and source of fair value for Exelon, Generation and ComEd mark-to-market commodity contract net assets (liabilities). The tables provide two fundamental pieces of information. First, the tables provide the source of fair value used in determining the carrying amount of the Registrants' total mark-to-market net assets (liabilities), net of allocated collateral. Second, the tables show the maturity, by year, of the Registrants' commodity contract net assets (liabilities), net of allocated collateral, giving an indication of when these mark-to-market amounts will settle and either generate or require cash. See Note 9 — Fair Value of Financial Assets and Liabilities of the Combined Notes to Consolidated Financial Statements for additional information regarding fair value measurements and the fair value hierarchy.

### *Exelon*

| | | | | Maturities Within | | | | | | | | | | Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 and Beyond | | |
| Normal Operations, Commodity derivative contracts [a][b]: | | | | | | | | | | | | | | |
| Actively quoted prices (Level 1) | $ | (7) | $ | (37) | $ | (15) | $ | 8 | $ | 2 | $ | — | $ | (49) |
| Prices provided by external sources (Level 2) | | (5) | | (11) | | 23 | | 4 | | — | | — | | 11 |
| Prices based on model or other valuation methods (Level 3) [c] | | 442 | | 314 | | 51 | | (13) | | (53) | | (90) | | 651 |
| Total | $ | 430 | $ | 266 | $ | 59 | $ | (1) | $ | (51) | $ | (90) | $ | 613 |

(a)  Mark-to-market gains and losses on other economic hedge and trading derivative contracts that are recorded in results of operations.
(b)  Amounts are shown net of collateral paid to and received from counterparties (and offset against mark-to-market assets and liabilities) of $684 million at March 31, 2018 .
(c)  Includes ComEd's net liabilities associated with the floating-to-fixed energy swap contracts with unaffiliated suppliers.

### *Generation*

| | | | | Maturities Within | | | | | | | | | | Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 and Beyond | | |
| Normal Operations, Commodity derivative contracts [a][b]: | | | | | | | | | | | | | | |
| Actively quoted prices (Level 1) | $ | (7) | $ | (37) | $ | (15) | $ | 8 | $ | 2 | $ | — | $ | (49) |
| Prices provided by external sources (Level 2) | | (5) | | (11) | | 23 | | 4 | | — | | — | | 11 |
| Prices based on model or other valuation methods (Level 3) | | 460 | | 337 | | 73 | | 9 | | (31) | | 70 | | 918 |
| Total | $ | 448 | $ | 289 | $ | 81 | $ | 21 | $ | (29) | $ | 70 | $ | 880 |

(a)  Mark-to-market gains and losses on other economic hedge and trading derivative contracts that are recorded in the results of operations.
(b)  Amounts are shown net of collateral paid to and received from counterparties (and offset against mark-to-market assets and liabilities) of $684 million at March 31, 2018 .

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

*ComEd*

|  | Maturities Within | | | | | | Total Fair Value |
|---|---|---|---|---|---|---|---|
|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 and Beyond | |
| Commodity derivative contracts [a] : | | | | | | | |
| Prices based on model or other valuation methods (Level 3) | $ (18) | $ (23) | $ (22) | $ (22) | $ (22) | $ (160) | $ (267) |

(a)   Represents ComEd's net liabilities associated with the floating-to-fixed energy swap contracts with unaffiliated suppliers.

## Credit Risk, Collateral and Contingent-Related Features (All Registrants)

The Registrants would be exposed to credit-related losses in the event of non-performance by counterparties that execute derivative instruments. The credit exposure of derivative contracts, before collateral, is represented by the fair value of contracts at the reporting date. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for a detailed discussion of credit risk, collateral and contingent-related features.

### Generation

The following tables provide information on Generation's credit exposure for all derivative instruments, normal purchases and normal sales agreements, and applicable payables and receivables, net of collateral and instruments that are subject to master netting agreements, as of March 31, 2018 . The tables further delineate that exposure by credit rating of the counterparties and provide guidance on the concentration of credit risk to individual counterparties and an indication of the duration of a company's credit risk by credit rating of the counterparties. The figures in the tables below exclude credit risk exposure from individual retail customers, uranium procurement contracts, and exposure through RTOs, ISOs and commodity exchanges, which are discussed below. Additionally, the figures in the tables below exclude exposures with affiliates, including net receivables with ComEd, PECO, BGE, Pepco, DPL and ACE of $31 million , $21 million , $25 million , $34 million , $9 million and $5 million as of March 31, 2018 , respectively.

| Rating as of March 31, 2018 | Total Exposure Before Credit Collateral | Credit Collateral (a) | Net Exposure | Number of Counterparties Greater than 10% of Net Exposure | Net Exposure of Counterparties Greater than 10% of Net Exposure |
|---|---|---|---|---|---|
| Investment grade | $ 986 | $ 1 | $ 985 | 2 | $ 412 |
| Non-investment grade | 112 | 46 | 66 | | |
| No external ratings | | | | | |
| Internally rated — investment grade | 223 | — | 223 | | |
| Internally rated — non-investment grade | 100 | 17 | 83 | | |
| Total | $ 1,421 | $ 64 | $ 1,357 | 2 | $ 412 |

256

| | Maturity of Credit Risk Exposure | | | |
| --- | --- | --- | --- | --- |
| Rating as of March 31, 2018 | Less than 2 Years | 2-5 Years | Exposure Greater than 5 Years | Total Exposure Before Credit Collateral |
| Investment grade | $ 894 | $ 92 | $ — | $ 986 |
| Non-investment grade | 104 | 8 | — | 112 |
| No external ratings | | | | |
| Internally rated — investment grade | 161 | 32 | 30 | 223 |
| Internally rated — non-investment grade | 93 | 7 | — | 100 |
| Total | $ 1,252 | $ 139 | $ 30 | $ 1,421 |

| Net Credit Exposure by Type of Counterparty | As of March 31, 2018 |
| --- | --- |
| Financial institutions | $ 189 |
| Investor-owned utilities, marketers, power producers | 656 |
| Energy cooperatives and municipalities | 438 |
| Other | 74 |
| Total | $ 1,357 |

_____
(a)  As of March 31, 2018 , credit collateral held from counterparties where Generation had credit exposure included $41 million of cash and $23 million of letters of credit.

## The Utility Registrants

There have been no significant changes or additions to the Utility Registrants exposures to credit risk that are described in ITEM 1A. RISK FACTORS of Exelon's 2017 Annual Report on Form 10-K.

See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for information regarding credit exposure to suppliers.

# Collateral (All Registrants)

## Generation

As part of the normal course of business, Generation routinely enters into physical or financial contracts for the sale and purchase of electricity, natural gas and other commodities. In accordance with the contracts and applicable law, if Generation is downgraded by a credit rating agency, especially if such downgrade is to a level below investment grade, it is possible that a counterparty would attempt to rely on such a downgrade as a basis for making a demand for adequate assurance of future performance. Depending on Generation's net position with a counterparty, the demand could be for the posting of collateral. In the absence of expressly agreed-to provisions that specify the collateral that must be provided, collateral requested will be a function of the facts and circumstances of the situation at the time of the demand. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for information regarding collateral requirements. See Note 17 — Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements for information regarding the letters of credit supporting the cash collateral.

Generation transacts output through bilateral contracts. The bilateral contracts are subject to credit risk, which relates to the ability of counterparties to meet their contractual payment obligations. Any failure to collect these payments from counterparties could have a material impact on Exelon's and Generation's results of operations, cash flows and financial positions. As market prices rise above or fall below contracted price levels, Generation is required to post collateral with purchasers; as market

257

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

prices fall below contracted price levels, counterparties are required to post collateral with Generation. To post collateral, Generation depends on access to bank credit facilities, which serve as liquidity sources to fund collateral requirements. See ITEM 2. Liquidity and Capital Resources — Credit Matters — Exelon Credit Facilities for additional information.

**The Utility Registrants**

As of March 31, 2018 , ComEd held approximately $9 million in collateral from suppliers in association with energy procurement contracts, approximately $14 million in collateral from suppliers for REC and ZEC contract obligations and approximately $19 million in collateral from suppliers for long-term renewable energy contracts. BGE is not required to post collateral under its electric supply contracts but was holding an immaterial amount of collateral under its electric supply procurement contracts. BGE was not required to post collateral under its natural gas procurement contracts, but was holding an immaterial amount of collateral under its natural gas procurement contracts. PECO, Pepco, DPL and ACE were not required to post collateral under their energy and/or natural gas procurement contracts. See Note 6 — Regulatory Matters and Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information.

## RTOs and ISOs (All Registrants)

All Registrants participate in all, or some, of the established wholesale spot energy markets that are administered by PJM, ISO-NE, ISO-NY, CAISO, MISO, SPP, AESO, OIESO and ERCOT. ERCOT is not subject to regulation by FERC but performs a similar function in Texas to that performed by RTOs in markets regulated by FERC. In these areas, power is traded through bilateral agreements between buyers and sellers and on the spot energy markets that are administered by the RTOs or ISOs, as applicable. In areas where there are no spot energy markets, electricity is purchased and sold solely through bilateral agreements. For sales into the spot energy markets administered by an RTO or ISO, the RTO or ISO maintains financial assurance policies that are established and enforced by those administrators. The credit policies of the RTOs and ISOs may, under certain circumstances, require that losses arising from the default of one member on spot energy market transactions be shared by the remaining participants. Non-performance or non-payment by a major counterparty could result in a material adverse impact on the Registrants' results of operations, cash flows and financial positions.

## Exchange Traded Transactions (Exelon, Generation, PHI and DPL)

Generation enters into commodity transactions on NYMEX, ICE, NASDAQ, NGX and the Nodal exchange ("the Exchanges"). DPL enters into commodity transactions on ICE. The Exchange clearinghouses act as the counterparty to each trade. Transactions on the Exchanges must adhere to comprehensive collateral and margining requirements. As a result, transactions on the Exchanges are significantly collateralized and have limited counterparty credit risk.

## Interest Rate and Foreign Exchange Risk (All Registrants)

The Registrants use a combination of fixed-rate and variable-rate debt to manage interest rate exposure. The Registrants may also utilize fixed-to-floating interest rate swaps, which are typically designated as fair value hedges, to manage their interest rate exposure. In addition, the Registrants may utilize interest rate derivatives to lock in rate levels, which are typically designated as cash flow hedges. These strategies are employed to manage interest rate risks. At March 31, 2018 , Exelon had $800 million of notional amounts of fixed-to-floating hedges outstanding and Exelon and Generation had $636 million of notional amounts of floating-to-fixed hedges outstanding. Assuming the fair value and interest rate hedges are 100% effective, a hypothetical 50 basis point increase in the interest rates associated with unhedged variable-rate debt (excluding Commercial Paper) and fixed-to-floating swaps would result in approximately a $1 million decrease in Exelon Consolidated pre-tax income for the three

258

months ended March 31, 2018 . To manage foreign exchange rate exposure associated with international energy purchases in currencies other than U.S. dollars, Generation utilizes foreign currency derivatives, which are typically designated as economic hedges. See Note 10 — Derivative Financial Instruments of the Combined Notes to Consolidated Financial Statements for additional information.

## Equity Price Risk (Exelon and Generation)

Exelon and Generation maintain trust funds, as required by the NRC, to fund certain costs of decommissioning its nuclear plants. As of March 31, 2018 , Generation's decommissioning trust funds are reflected at fair value on its Consolidated Balance Sheets. The mix of securities in the trust funds is designed to provide returns to be used to fund decommissioning and to compensate Generation for inflationary increases in decommissioning costs; however, the equity securities in the trust funds are exposed to price fluctuations in equity markets, and the value of fixed-rate, fixed-income securities are exposed to changes in interest rates. Generation actively monitors the investment performance of the trust funds and periodically reviews asset allocation in accordance with Generation's NDT fund investment policy. A hypothetical 10% increase in interest rates and decrease in equity prices would result in a $652 million reduction in the fair value of the trust assets. This calculation holds all other variables constant and assumes only the discussed changes in interest rates and equity prices. See ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS for further discussion of equity price risk as a result of the current capital and credit market conditions.

### Item 4.   Controls and Procedures

During the first quarter of 2018 , each of Exelon's, Generation's, ComEd's, PECO's, BGE's, PHI's, Pepco's, DPL's and ACE's management, including its principal executive officer and principal financial officer, evaluated its disclosure controls and procedures related to the recording, processing, summarizing and reporting of information in its periodic reports that it files with the SEC. These disclosure controls and procedures have been designed by all Registrants to ensure that (a) material information relating to that Registrant, including its consolidated subsidiaries, is accumulated and made known to Exelon's management, including its principal executive officer and principal financial officer, by other employees of that Registrant and its subsidiaries as appropriate to allow timely decisions regarding required disclosure, and (b) this information is recorded, processed, summarized, evaluated and reported, as applicable, within the time periods specified in the SEC's rules and forms. Due to the inherent limitations of control systems, not all misstatements may be detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls could be circumvented by the individual acts of some persons or by collusion of two or more people.

Accordingly, as of March 31, 2018 , the principal executive officer and principal financial officer of each of Exelon, Generation, ComEd, PECO, BGE, PHI, Pepco, DPL and ACE concluded that such Registrant's disclosure controls and procedures were effective to accomplish its objectives. All Registrants continually strive to improve their disclosure controls and procedures to enhance the quality of its financial reporting and to maintain dynamic systems that change as conditions warrant.

Beginning January 1, 2018, the Registrants adopted the Revenue from Contracts with Customers standard.  Although the guidance had an immaterial impact on the Registrants' Consolidated Statements of Operations and Comprehensive Income, Consolidated Statements of Cash Flows, Consolidated Balance Sheets and Consolidated Statements of Changes in Shareholders' Equity, they did perform implementation controls, including contract reviews, to adopt the new standard, and implemented certain changes to their ongoing revenue recognition processes and control activities, which included enhancements to contract review and valuation processes, new training, and gathering of information for disclosures.

259

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

    With the exception of the above, there have been no changes in internal control over financial reporting that occurred during the first quarter of 2018 that have materially affected, or are reasonably likely to materially affect, any of Exelon's, Generation's, ComEd's, PECO's, BGE's, PHI's, Pepco's, DPL's and ACE's internal control over financial reporting.

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**PART II — OTHER INFORMATION**

**Item 1.   Legal Proceedings**

The Registrants are parties to various lawsuits and regulatory proceedings in the ordinary course of their respective businesses. For information regarding material lawsuits and proceedings, see (a) ITEM  3 . LEGAL PROCEEDINGS of Exelon's 2017 Form 10-K and (b) Notes 6 — Regulatory Matters and 17 — Commitments and Contingencies of the Combined Notes to Consolidated Financial Statements in PART I, ITEM 1. FINANCIAL STATEMENTS of this Report. Such descriptions are incorporated herein by these references.

**Item 1A.   Risk Factors**

**_Risks Related to Exelon_**

At March 31, 2018 , the Registrants' risk factors were consistent with the risk factors described in the Registrants' combined 2017 Form 10-K in ITEM 1A. RISK FACTORS.

**Item 4.   Mine Safety Disclosures**

**_All Registrants_**

Not applicable to the Registrants.

**Item 6.   Exhibits**

Certain of the following exhibits are incorporated herein by reference under Rule 12b-32 of the Securities and Exchange Act of 1934, as amended. Certain other instruments which would otherwise be required to be listed below have not been so listed because such instruments do not authorize securities in an amount which exceeds 10% of the total assets of the applicable Registrant and its subsidiaries on a consolidated basis and the relevant Registrant agrees to furnish a copy of any such instrument to the Commission upon request.

Table of Contents

| Exhibit No. | Description |
|---|---|
| 4.1 | Supplemental Indenture dated as of February 6, 2018 from Commonwealth Edison Company to BNY Mellon Trust Company of Illinois, as trustee, and D. G. Donovan, as co-trustee (File No. 001-01839, Form 8-K dated February 20, 2018, Exhibit 4.1) |
| 4.2 | One Hundred and Fifteenth Supplemental Indenture dated as of February 1, 2018 from PECO Energy Company to U.S. Bank National Association, as trustee (File No. 000-16844, Form 8-K dated February 23, 2018, Exhibit 4.1) |
| 4.3 | One Hundred and Twentieth Supplemental Indenture, dated April 3, 2018, between DPL and The Bank of New York Mellon, as trustee. |
| 10.1 | Form of Separation Agreement under Exelon Corporation Senior Management Severance Plan (As Amended and Restated Effective November 1, 2015) * Filed herewith. |
| 101.INS | XBRL Instance |
| 101.SCH | XBRL Taxonomy Extension Schema |
| 101.CAL | XBRL Taxonomy Extension Calculation |
| 101.DEF | XBRL Taxonomy Extension Definition |
| 101.LAB | XBRL Taxonomy Extension Labels |
| 101.PRE | XBRL Taxonomy Extension Presentation |

262

Certifications Pursuant to Rule 13a-14(a) and 15d-14(a) of the Securities and Exchange Act of 1934 as to the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2018 filed by the following officers for the following companies:

| | |
|---|---|
| 31-1 | — Filed by Christopher M. Crane for Exelon Corporation |
| 31-2 | — Filed by Jonathan W. Thayer for Exelon Corporation |
| 31-3 | — Filed by Kenneth W. Cornew for Exelon Generation Company, LLC |
| 31-4 | — Filed by Bryan P. Wright for Exelon Generation Company, LLC |
| 31-5 | — Filed by Anne R. Pramaggiore for Commonwealth Edison Company |
| 31-6 | — Filed by Joseph R. Trpik, Jr. for Commonwealth Edison Company |
| 31-7 | — Filed by Michael A. Innocenzo for PECO Energy Company |
| 31-8 | — Filed by Phillip S. Barnett for PECO Energy Company |
| 31-9 | — Filed by Calvin G. Butler, Jr. for Baltimore Gas and Electric Company |
| 31-10 | — Filed by David M. Vahos for Baltimore Gas and Electric Company |
| 31-11 | — Filed by David M. Velazquez for Pepco Holdings LLC |
| 31-12 | — Filed by Donna J. Kinzel for Pepco Holdings LLC |
| 31-13 | — Filed by David M. Velazquez for Potomac Electric Power Company |
| 31-14 | — Filed by Donna J. Kinzel for Potomac Electric Power Company |
| 31-15 | — Filed by David M. Velazquez for Delmarva Power & Light Company |
| 31-16 | — Filed by Donna J. Kinzel for Delmarva Power & Light Company |
| 31-17 | — Filed by David M. Velazquez for Atlantic City Electric Company |
| 31-18 | — Filed by Donna J. Kinzel for Atlantic City Electric Company |

Table of Contents

Certifications Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code (Sarbanes — Oxley Act of 2002) as to the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2018 filed by the following officers for the following companies:

32-1    — Filed by Christopher M. Crane for Exelon Corporation

32-2    — Filed by Jonathan W. Thayer for Exelon Corporation

32-3    — Filed by Kenneth W. Cornew for Exelon Generation Company, LLC

32-4    — Filed by Bryan P. Wright for Exelon Generation Company, LLC

32-5    — Filed by Anne R. Pramaggiore for Commonwealth Edison Company

32-6    — Filed by Joseph R. Trpik, Jr. for Commonwealth Edison Company

32-7    — Filed by Michael A. Innocenzo for PECO Energy Company

32-8    — Filed by Phillip S. Barnett for PECO Energy Company

32-9    — Filed by Calvin G. Butler, Jr. for Baltimore Gas and Electric Company

32-10   — Filed by David M. Vahos for Baltimore Gas and Electric Company

32-11   — Filed by David M. Velazquez for Pepco Holdings LLC

32-12   — Filed by Donna J. Kinzel for Pepco Holdings LLC

32-13   — Filed by David M. Velazquez for Potomac Electric Power Company

32-14   — Filed by Donna J. Kinzel for Potomac Electric Power Company

32-15   — Filed by David M. Velazquez for Delmarva Power & Light Company

32-16   — Filed by Donna J. Kinzel for Delmarva Power & Light Company

32-17   — Filed by David M. Velazquez for Atlantic City Electric Company

32-18   — Filed by Donna J. Kinzel for Atlantic City Electric Company

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

**SIGNATURES**

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**EXELON CORPORATION**

| /s/   CHRISTOPHER M. CRANE | /s/   JONATHAN W. THAYER |
|---|---|
| Christopher M. Crane | Jonathan W. Thayer |
| President and Chief Executive Officer (Principal Executive Officer) and Director | Senior Executive Vice President and Chief Financial Officer (Principal Financial Officer) |

| /s/   FABIAN E. SOUZA |
|---|
| Fabian E. Souza |
| Senior Vice President and Corporate Controller (Principal Accounting Officer) |

May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

   Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**EXELON GENERATION COMPANY, LLC**

| /s/   KENNETH W. CORNEW | /s/   BRYAN P. WRIGHT |
|---|---|
| Kenneth W. Cornew | Bryan P. Wright |
| President and Chief Executive Officer | Senior Vice President and Chief Financial Officer |
| (Principal Executive Officer) | (Principal Financial Officer) |

| /s/   MATTHEW N. BAUER |
|---|
| Matthew N. Bauer |
| Vice President and Controller |
| (Principal Accounting Officer) |

May 2, 2018

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**COMMONWEALTH EDISON COMPANY**

| /s/ ANNE R. PRAMAGGIORE | /s/ JOSEPH R. TRPIK, JR. |
|---|---|
| Anne R. Pramaggiore | Joseph R. Trpik, Jr. |
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer |
| (Principal Executive Officer) | (Principal Financial Officer) |

| /s/ GERALD J. KOZEL |
|---|
| Gerald J. Kozel |
| Vice President and Controller |
| (Principal Accounting Officer) |

May 2, 2018

267

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**PECO ENERGY COMPANY**

| /s/  MICHAEL A. INNOCENZO | /s/  PHILLIP S. BARNETT |
|---|---|
| Michael A. Innocenzo | Phillip S. Barnett |
| President and Chief Executive Officer (Principal Executive Officer) | Senior Vice President, Chief Financial Officer and Treasurer (Principal Financial Officer) |

| /s/  SCOTT A. BAILEY |
|---|
| Scott A. Bailey |
| Vice President and Controller (Principal Accounting Officer) |

May 2, 2018

Table of Contents

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**BALTIMORE GAS AND ELECTRIC COMPANY**

| /s/  CALVIN G. BUTLER, JR. | /s/  DAVID M. VAHOS |
|---|---|
| Calvin G. Butler, Jr. | David M. Vahos |
| Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer (Principal Financial Officer) |
| (Principal Executive Officer) | |
| /s/ ANDREW W. HOLMES | |
| Andrew W. Holmes | |
| Vice President and Controller | |
| (Principal Accounting Officer) | |

May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**PEPCO HOLDINGS LLC**

| /s/ DAVID M. VELAZQUEZ | /s/ DONNA J. KINZEL |
|---|---|
| David M. Velazquez | Donna J. Kinzel |
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer |
| (Principal Executive Officer) | (Principal Financial Officer) |

/s/ ROBERT M. AIKEN

Robert M. Aiken

Vice President and Controller

(Principal Accounting Officer)

May 2, 2018

270

Table of Contents

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**POTOMAC ELECTRIC POWER COMPANY**

| /s/ David M. Velazquez | /s/ Donna J. Kinzel |
|---|---|
| David M. Velazquez | Donna J. Kinzel |
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer |
| (Principal Executive Officer) | (Principal Financial Officer) |

| /s/ Robert M. Aiken | |
|---|---|
| Robert M. Aiken | |
| Vice President and Controller | |
| (Principal Accounting Officer) | |

May 2, 2018

Table of Contents

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**DELMARVA POWER & LIGHT COMPANY**

| /s/ D AVID  M. V ELAZQUEZ | /s/ D ONNA  J. K INZEL |
|---|---|
| David M. Velazquez | Donna J. Kinzel |
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer |
| (Principal Executive Officer) | (Principal Financial Officer) |

| /s/ R OBERT  M. A IKEN |
|---|
| Robert M. Aiken |
| Vice President and Controller |
| (Principal Accounting Officer) |

May 2, 2018

272

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Table of Contents

Pursuant to requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**ATLANTIC CITY ELECTRIC COMPANY**

| /s/ DAVID M. VELAZQUEZ | /s/ DONNA J. KINZEL |
|---|---|
| David M. Velazquez | Donna J. Kinzel |
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer and Treasurer |
| (Principal Executive Officer) | (Principal Financial Officer) |

| /s/ ROBERT M. AIKEN |
|---|
| Robert M. Aiken |
| Vice President and Controller |
| (Principal Accounting Officer) |

May 2, 2018

273

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**This Instrument Prepared By:**

/s/Christie D. Cannon
Christie D. Cannon
Delmarva Power & Light Company
Mailstop 92DC42
500 N. Wakefield Drive
Newark, DE 19702-5440

---

DELMARVA POWER & LIGHT COMPANY

TO

THE BANK OF NEW YORK MELLON,
Trustee.

---

ONE HUNDRED AND TWENTIETH SUPPLEMENTAL
INDENTURE

---

Dated as of January 1, 2018
(but executed on the dates shown on the execution page)

---

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

This **ONE HUNDRED AND TWENTIETH SUPPLEMENTAL INDENTURE** , dated as of the first day of January, 2018 (but executed on the dates hereinafter shown), made and entered into by and between DELMARVA POWER & LIGHT COMPANY, a corporation of the State of Delaware and the Commonwealth of Virginia, hereinafter called the Company and THE BANK OF NEW YORK MELLON, a New York banking corporation, hereinafter called the Trustee;

WITNESSETH:

WHEREAS, the Company heretofore executed and delivered its Indenture of Mortgage and Deed of Trust (hereinafter in this One Hundred and Twentieth Supplemental Indenture called the "Original Indenture"), dated as of October 1, 1943, to The New York Trust Company, a corporation of the State of New York, as Trustee, to which The Bank of New York Mellon is successor Trustee, to secure the First Mortgage Bonds of the Company, unlimited in aggregate principal amount and issuable in series, from time to time, in the manner and subject to the conditions set forth in the Original Indenture granted and conveyed unto the Trustee, upon the trusts, uses and purposes specifically therein set forth, certain real estate, franchises and other property therein described, including property acquired after the date thereof, except as therein otherwise provided; and

WHEREAS, the Original Indenture has been supplemented by one hundred and eighteen supplemental indentures specifically subjecting to the lien of the Original Indenture as though included in the granting clause thereof certain property in said supplemental indentures specifically described and amending and modifying the provisions of the Original Indenture (the Original Indenture, as amended, modified and supplemented by all of the indentures supplemental thereto, including this One Hundred and Twentieth Supplemental Indenture, is hereinafter in this One Hundred and Twentieth Supplemental Indenture called the "Indenture"); and

WHEREAS, the execution and delivery of this One Hundred and Twentieth Supplemental Indenture has been duly authorized by Unanimous Written Consent of the Board of Directors of the Company, and all conditions and requirements necessary to make this One Hundred and Twentieth Supplemental Indenture a valid, binding and legal instrument in accordance with its terms, for the purposes herein expressed, and the execution and delivery hereof, have been in all respects duly authorized; and

2

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

WHEREAS, it is provided in and by the Original Indenture, inter alia, as follows:

"IT IS HEREBY AGREED by the Company that all the property, rights and franchises acquired by the Company after the date hereof (except any hereinbefore or hereinafter expressly excepted) shall (subject to the provisions of Section 9.01 hereof and to the extent permitted by law) be as fully embraced within the lien hereof as if such property, rights and franchises were now owned by the Company and/or specifically described herein and conveyed hereby;"

and

WHEREAS, the Company has acquired certain other property, real, personal and mixed, which heretofore has not been specifically conveyed to the Trustee;

NOW, THEREFORE, this ONE HUNDRED AND TWENTIETH SUPPLEMENTAL INDENTURE WITNESSETH that for and in consideration of the premises and in pursuance of the provisions of the Indenture, the Company has granted, bargained, sold, released, conveyed, assigned, transferred, mortgaged, pledged, set over and confirmed, and by these presents does grant, bargain, sell, release, convey, assign, transfer, mortgage, pledge, set over and confirm unto the Trustee and to its successors in the trust in the Indenture created, to its and their assigns forever, all the following described properties of the Company, and does confirm that the Company will not cause or consent to a partition, either voluntary or through legal proceedings, of property, whether herein described or heretofore or hereafter acquired, in which its ownership shall be as tenant in common, except as permitted by, and in conformity with, the provisions of the Indenture and particularly of Article IX thereof:

[NONE]

Together with all other property, real, personal and mixed, tangible and intangible (except such property as in said Indenture expressly excepted from the lien and operation thereof), acquired by the Company on or prior to December 31, 2017, and not heretofore specifically subjected to the lien of the Indenture.

Also without limitation of the generality of the foregoing, the easements and rights-of-way and other rights in or relating to real estate or the occupancy of the same owned by the Company, and whether used or not used in connection with the Company's operations, which are conveyed to the Company and recorded in the following Real Property Deed Records to which reference is made for a more particular description, to wit:

**DELAWARE**
**New Castle County**

3

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| Instrument Date | Deed Records | Tax ID No. |
|---|---|---|
| 12/16/16 | 20170112-0002218 | 13-021.00-018 |
| 12/08/16 | 20170112-0002219 | 06-034.00-025 |
| 12/08/16 | 20170112-0002220 | 14-021.00-008 |
| 01/11/17 | 20170214-0008302 | 15-026.00-023 |
| 02/03/17 | 20170228-0010513 | 06-046.00-246 |
| 02/07/17 | 20170228-0010512 | 06-122.00-082 |
| 01/17/17 | 20170222-009512 | 07-044.30-002 |
| 02/24/17 | 20170328-0015261 | 14-012.20-124, 14-012.20-001 - 14-012.22-142, 14-012.24-001 - 14-012.24-017 |
| 03/03/17 | 20170328-0015260 | 13-002.30-062 - 13-002.30-123 , 13-007.10-001 - 13-007.10-078, 13-007.20-010 - 13-007.20-026 |
| 04/18/17 | 20170503-0022037 | 06-11100038, 0611100165, 0611100165 |
| 03/04/17 | 2170503-0022036 | 07-01700102 |
| 04/11/17 | 20170503-0022035 | 10-04300022 |
| 04/12/17 | 20170503-0022034 | 15-01100027 |
| 05/02/17 | 20170515-0023813 | 07-02730095, 07-02730106 |
| 04/19/17 | 20170505-0022409 | 06-100.00-022 |
| 05/05/17 | 20170629-0032581 | 06-052.00-231 |
| 06/22/17 | 20170629-0032582 | 09-018.00-081 |
| 06/13/17 | 20170707-0034169 | 10-010.40-212, 10-010.40-380 |
| 06/26/17 | 20170809-0040602 | 15-020.00-062 |
| 07/18/17 | 20170809-0040603 | 08-017.00-002 |
| 06/28/17 | 20170630-0033045 | 06-100.00-067 |
| 07/28/17 | 20170818-0042308 | 10-043.00-022 |
| 04/27/17 | 20170818-0042309 | 06-145.00-050 |
| 08/12/17 | 20170901-0045416 | 15-026.00-210 |
| 8/17/2017 | 20170901-0045417 | 08-037.00-067 |
| 08/23/17 | 20170915-0047648 | 13-012.00-150 |
| Instrument Date | Deed Records | Tax ID No. |
| 9/5/2017 | 20170915-0047646 | 08-037.00-067 |
| 08/31/17 | 201709015-004767 | 06-024.00-447,06-024.00-448, 06-024.00-251 |
| 09/15/17 | 20171013-0053393 | 10-015.00-021, 10-015.00-022 |
| 09/28/17 | 20171013-0053394 | 06-121.00-174 |
| 09/26/17 | 20171013-0053395 | 08-024.10-064 |
| 10/16/17 | 20171116-0060070 | 07-005.00-038 |
| 10/11/17 | 20171116-0060068 | 14-012.00-239 |
| 09/05/17 | 20171116-0060067 | 26-051.00-009 |
| 10/11/17 | 20171116-0060066 | 08-008.30-078 |
| 10/24/17 | 20171116-0060065 | 14-012.21-034 |
| 10/18/17 | 20171116-0060069 | 23-064.00-061, 23-030.00-158 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**DELAWARE**
**Sussex County**

| Instrument Date | Deed Records | | Tax ID No. |
|---|---|---|---|
| | **Book** | **Page** | |
| 09/07/16 | 4625 | 266 | 131-10.00-101.00 |
| 10/06/16 | 4650 | 264 | 334-12.00-106.01 |
| 10/06/16 | 4650 | 266 | 533-4.00-22.00 |
| 12/08/16 | 4650 | 273 | 233-10.00-77.00 |
| 12/09/16 | 4650 | 271 | 233-10.00-77.01 |
| 12/09/16 | 4650 | 268 | 334-14.17-72.00 |
| 12/29/16 | 4650 | 275 | 134-12.00-317.01 |
| 01/19/17 | 4707 | 89 | 134-12.00-170.00 |
| 01/19/17 | 4730 | 217 | 134-12.00-3663.00 |
| 01/27/17 | 4730 | 219 | 134-12.300-428 |
| 02/10/17 | 4688 | 45 | 331-03.00-128.00 |
| 03/05/17 | 4688 | 50 | 532-18.00-14.01 |
| 03/28/17 | 4756 | 282 | 530-10.13-2.00, 530-10.13-2.01 |
| 03/31/17 | 4704 | 103 | 232-12.00-103.00 |
| 04/05/17 | 4756 | 286 | 134-13.00-36.00 |
| 04/07/17 | 4756 | 288 | 334-13.19-70.00 |
| 04/07/17 | 4707 | 91 | 334-13.20-16.00 |
| 04/07/17 | 4756 | 291 | 532-18.00-11.01 |
| 04/12/17 | 4756 | 298 | 334-20.10-1.08, 334-20.10-1.01 |
| 04/25/17 | 4756 | 284 | 334-13.20-33.01 |
| 05/11/17 | 4756 | 300 | 233-16.00-6.02 |
| 06/06/17 | 4756 | 302 | 232-12.15-40.00 |
| 06/09/17 | 4756 | 304 | 532-23.00-1.02 |
| 06/09/17 | 4756 | 306 | 532-23.00-1.03 |
| 06/27/17 | 4756 | 275 | Multiple |
| 07/10/17 | 4770 | 271 | 331-4.00-34.07 334-4.00-34.05 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

| Instrument Date | Deed Records | | Tax ID No. |
|---|---|---|---|
| | Book | Page | |
| 7/18/17 | 4770 | 266 | 132-6.00-230.00 |
| 10/15/17 | 4805 | 41 | 2-30-700.89.00 |

**DELAWARE**
**Kent County**

| Instrument Date | Deed Records | | Tax ID No. |
|---|---|---|---|
| | Instrument Number | | |
| 02/16/17 | 8549 | 81 | 4-00-03800-01-4202-00001 |
| 12/19/16 | 8549 | 84 | 7-00-07200-01-6200-00002 |
| 02/23/17 | 8549 | 87 | 9-00-06500-012900-00001 |
| 08/05/17 | 8778 | 202 | 8-00-113.00-01-03.04.000 |
| 08/26/17 | 8794 | 269 | 9-00-06400-01-5200-00001 |

**MARYLAND**
**Caroline County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Book | Page | | |
| 08/04/16 | 1242 | 44 | 9 | 17&62 |
| 05/05/16 | 1242 | 39 | 105 | 2267 |
| 08/01/16 | 1244 | 132 | 9 | 2,18 |
| 01/27/17 | 1244 | 135 | 11A | 54 |
| 02/13/17 | 1247 | 373 | 11A | 55 |
| 02/13/17 | 1247 | 376 | 11A | 57 |
| 04/10/17 | 1255 | 418 | 18 & 19 | 154 & 156 |
| 04/11/17 | 1255 | 423 | 18 | 147 |
| 04/06/17 | 1259 | 455 | 303 | 650 |
| 05/23/17 | 1259 | 147 | 18 | 146 |
| 05/08/17 | 1259 | 143 | 303 | 648 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**MARYLAND**
**Cecil County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Book | Page | | |
| 12/12/16 | 4015 | 90 | 31 | 31 |
| 02/14/17 | 4035 | 333 | 315 | 2462 |
| 02/14/17 | 4035 | 335 | 316 | 2462 |
| 05/19/16 | 4035 | 339 | 38 | 188 |
| 5/23/2016 | 4035 | 337 | 10 | 23 |
| 09/02/15 | 4035 | 341 | 30 | 20 |
| Instrument Date | Deed Records | | Map | Parcel |
| | Book | Page | | |
| 3/6/2016 | 4035 | 343 | 29 | 84 |
| 04/05/17 | 4065 | 443 | 30 | 17 |
| 04/18/17 | 4065 | 446 | 801 | 298 |
| 01/26/17 | 4065 | 449 | 17 | 639 |
| 03/27/17 | 4065 | 451 | 17 | 3 |
| 05/02/17 | 4095 | 442 | 25 | 232 |
| 05/03/17 | 4095 | 444 | 6 | 68 |
| 05/07/17 | 4079 | 146 | 36 | 12 |
| 05/23/17 | 4095 | 438 | 312 | 2401 |
| 04/05/17 | 4065 | 443 | 30 | 17 |
| 06/08/17 | 4095 | 440 | 24 | 288 |
| 07/21/17 | 4114 | 389 | 36 | 421 |
| 07/12/17 | 4114 | 391 | 401 | 526 |
| 08/04/17 | 4128 | 227 | 14 | 622 |
| 08/17/17 | 4128 | 225 | 19 | 505 |
| 06/29/17 | 4122 | 17 | 9 | 127 |
| 08/03/17 | 4122 | 20 | 19 | 505 |
| 10/31/17 | 4169 | 159 | 25 | 653 |
| 09/16/17 | 4169 | 163 | 21 | 51 |
| 10/10/17 | 4169 | 154 | 31 | 581 |
| 10/13/17 | 4169 | 166 | 25 | 297 |
| 11/01/17 | 4169 | 169 | 31 | 1326 |
| 09/22/17 | 4150 | 161 | 36 | 153 |
| 10/01/17 | 4150 | 159 | 12 | 201 |

**MARYLAND**
**Dorchester County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Liber | Folio | | |
| 05/03/17 | 1403 | 1 | 5 | 35 |
| 06/29/17 | 1410 | 169 | 17 | 10 |
| 05/10/17 | 1410 | 160 | 19 | 72 |
| 06/29/17 | 1410 | 164 | 17 | 10 |
| 07/14/17 | 1416 | 33 | 17 | 10 |

8

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**MARYLAND**
**Kent County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Liber | Folio | | |
| 02/10/17 | 896 | 270 | 52 | 16 |
| 02/02/17 | 896 | 273 | 201 | 976 |
| 04/25/17 | 906 | 68 | 52 | 15 |
| 05/30/17 | 909 | 411 | 41 | 3 |
| 06/21/17 | 914 | 309 | 6 | 4 |
| 09/07/17 | 915 | 47 | 400 | 325 |
| 07/17/17 | 915 | 45 | 100 | 1557 |
| 08/21/17 | 916 | 235 | 400 | 326 |
| 09/01/17 | 917 | 362 | 27 | 17 |
| 10/22/17 | 924 | 342 | 24 | 46 |

9

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**MARYLAND**
**Queen Anne's County**

| Instrument Date | Deed Records | | Map | Parcel | Lot |
|---|---|---|---|---|---|
| | Liber | Folio | | | |
| 10/26/16 | 2632 | 56 | 65 | 41 | 2,3,4 |
| 07/22/16 | 2641 | 393 | 35H | 31 | |
| 07/22/16 | 2641 | 397 | 35H | 78 | |
| 07/22/16 | 2641 | 405 | 35H | 173 | |
| 07/27/16 | 2641 | 401 | 35H | 33 | |
| 05/23/16 | 2641 | 409 | 45 | 14 | |
| 08/19/16 | 2641 | 413 | 63 | 92 | |
| 07/11/16 | 2641 | 417 | 63 | 43 | |
| 06/17/16 | 2641 | 388 | 31 | 38 | |
| 01/30/17 | 2641 | 495 | 59 | 155 | |
| 01/31/17 | 2641 | 491 | 35H | 79 | |
| 01/31/17 | 2641 | 498 | 35H | 113 | |
| 08/26/16 | 2641 | 502 | 63 | 34 | |
| 06/20/16 | 2641 | 506 | 63 | 53 | |
| 01/05/17 | 2641 | 510 | 51G | 1 | |
| 02/08/17 | 2686 | 89 | 51 | 38 | 1-4 |
| 06/27/17 | 2731 | 135 | 24 | 37 | |
| 06/19/17 | 2731 | 132 | 24 | 151 | |
| 08/30/17 | 2766 | 64 | 57 | 127 | 1,2 |
| 08/25/17 | 2766 | 67 | 40 | 12 | |
| 09/06/17 | 2766 | 71 | 35 | 120 | 9 |
| 09/06/17 | 2766 | 49 | 35 | 120 | 1 |
| 09/06/17 | 2766 | 52 | 35 | 120 | 5 |
| 09/06/17 | 2766 | 55 | 35 | 120 | 4 |
| Instrument Date | Deed Records | | Map | Parcel | Lot |
| | Liber | Folio | | | |
| 09/06/17 | 2766 | 58 | 35 | 120 | 7 |
| 09/06/17 | 2766 | 61 | 35 | 120 | 8 |
| 09/06/17 | 2766 | 74 | 35 | 130 | |
| 09/12/17 | 2784 | 72 | 58F | 69 | |
| 09/07/17 | 2784 | 68 | 35 | 120 | 10 |
| 09/28/17 | 2784 | 75 | 57 | 429 | |
| 10/09/17 | 2805 | 206 | 57 | 60 | |
| 10/09/17 | 2805 | 203 | 57 | 274 | 2 |
| 10/09/17 | 2805 | 200 | 57 | 274 | 1 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**MARYLAND**
**Somerset County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Liber | Folio | | |
| 03/09/17 | 946 | 1 | 203 | 1330A |
| 05/16/17 | 950 | 355 | | |
| 08/30/17 | 958 | 93 | 40 | 104 & 127 |

**MARYLAND**
**Talbot County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Liber | Folio | | |
| 01/10/17 | 2419 | 422 | 39 | 105&107 |
| 01/23/17 | 2428 | 128 | 39 | 55 |
| 08/10/16 | 2428 | 124 | 31 | 276 |
| 07/15/16 | 2428 | 149 | 31 | 125 |
| 07/14/16 | 2428 | 132 | 31 | 176 |
| 07/05/16 | 2428 | 136 | 31 | 47 |
| 07/05/16 | 2428 | 140 | 31 | 127 |
| 07/08/16 | 2428 | 144 | 31 | 22,342 |
| 02/20/17 | 2437 | 130 | 39 | 14 |
| 02/28/17 | 2437 | 134 | 48 | 35 |
| 02/19/17 | 2437 | 122 | 31 | 98 |
| 02/27/17 | 2437 | 138 | 31 | 269 |
| 03/07/17 | 2437 | 142 | 39 | 79W |
| 03/14/17 | 2434 | 495 | 58 | 73 |
| 03/14/17 | 2434 | 491 | 58 | 74 |
| 03/14/17 | 2434 | 499 | 48 | 81 |
| 02/13/17 | 2437 | 126 | 39 | 124 |
| 05/15/17 | 2449 | 445 | 53 | 4 |
| Instrument Date | Deed Records | | Map | Parcel |
| | Liber | Folio | | |
| 06/05/17 | 2459 | 484 | 39 | 215 |
| 07/13/17 | 2468 | 151 | 44A | 102 |
| 07/25/17 | 2471 | 265 | 53 | 64 |
| 08/07/17 | 2475 | 320 | 31 | 65 |
| 10/13/17 | 2494 | 149 | 53 | 53 |
| 11/13/17 | 2505 | 29 | 22 | 307 |

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**MARYLAND**
**Wicomico County**

| Instrument Date | Deed Records | | Map | Parcel |
|---|---|---|---|---|
| | Liber | Folio | | |
| 08/10/17 | 4220 | 3 | 102 | 220 |
| 08/10/17 | 4220 | 7 | 42 | 114 |
| 08/03/12 | 4143 | 198 | 58 | 41 |
| 07/03/17 | 4143 | 201 | 104 | 1388 |
| 02/27/17 | 4143 | 205 | 19 | 76 |
| 03/13/17 | 4143 | 195 | 53 | 113 |
| 03/24/17 | 4148 | 121 | 19 | 99 |
| 03/24/17 | 4148 | 125 | 19 | 9 |
| 03/16/17 | 4146 | 397 | 19 | 21 |
| 03/31/17 | 4163 | 271 | 19 | 90 |
| 03/27/17 | 4164 | 73 | 45 | 32 |
| 04/04/17 | 4163 | 266 | 48 | 279 & 753 |
| 05/02/17 | 4167 | 289 | 31 | 304 |
| 04/27/17 | 4167 | 292 | 19 | 64 |
| 05/05/17 | 4175 | 242 | 48 | 372 |
| 05/16/17 | 4175 | 246 | 39 | 406 |
| 06/10/17 | 4191 | 331 | 49 | 27 |
| 07/12/17 | 4208 | 169 | 104 | 2594 |
| 07/19/17 | 4208 | 174 | 58 | |
| 09/07/17 | 4212 | 467 | 51 | 157 |
| 09/25/17 | 4238 | 299 | 115 | 647 |
| 09/20/17 | 4238 | 303 | 141 | 20 |
| 09/19/17 | 4238 | 306 | 50 | 47 |
| 10/12/17 | 4252 | 446 | 49 | 121 |

**MARYLAND**
**Worcester County**

| Instrument Date | Deed Records | | Map | Parcel | Lot |
|---|---|---|---|---|---|
| | Liber | Folio | | | |
| 09/29/16 | 6922 | 386 | 9 | 366 | |
| 01/25/17 | 6938 | 241 | 20 | 142 | |
| 02/16/17 | 6947 | 479 | 19 | 84 | 2 |
| 08/03/17 | 6962 | 1 | 27 | 570 | |
| 01/27/17 | 6961 | 489 | 9 | 331 | |
| 04/09/17 | 6990 | 29 | 10 | 299 | |
| 04/06/17 | 6990 | 32 | 9 | 176 | |
| 04/20/17 | 6997 | 33 | 101 | 41 | |
| 02/23/17 | 6997 | 35 | 10 | 101 | |
| 04/07/17 | 7024 | 331 | 20 | 47 | |
| 05/19/17 | 7033 | 272 | 27 | 146 | |
| 06/08/17 | 7017 | 208 | 27 | 707 | 22 |
| 06/26/17 | 7036 | 127 | 13 | 27 | |
| 06/30/17 | 7054 | 152 | 56 | 31 | |
| 06/20/17 | 7059 | 354 | 26 | 299 | |
| 07/05/17 | 7054 | 157 | 56 | 26 | |
| 10/16/17 | 7116 | 292 | 116 | 5161A | |

13

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

The following is a schedule of bonds issued under the Eighty-Eighth Supplemental Indenture and Credit Line Deed of Trust, effective as of October 1, 1994, that can be designated as First Mortgage Bonds, Series I, which may also be designated as Secured Medium Term Notes, Series I; and First Mortgage Bonds, Pledged Series I.

**First Mortgage Bonds, Series I/Secured Medium Term Notes, Series I**

| Issuance Date | Tranche | Maturity | Principal |
|---|---|---|---|
| 06/19/95 | 7.71% Bonds | 06/01/25 | $100,000,000 |
| 06/19/95 | 6.95% Amortizing Bonds | 06/01/08 | $25,800,000 |
| 11/25/08 | 6.40% Bonds | 12/01/13 | $250,000,000 |

**First Mortgage Bonds, Pledged Series I**

| Issuance Date | Tranche | Maturity | Principal |
|---|---|---|---|
| 10/12/94 | 1994 | 10/01/29 | $33,750,000 |
| **Total Bonds Issued:** | | | $409,550,000 |

14

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

As supplemented and amended by this One Hundred and Twentieth Supplemental Indenture, the Original Indenture and all indentures supplemental thereto are in all respects ratified and confirmed and the Original Indenture and the aforesaid supplemental indentures and this One Hundred and Twentieth Supplemental Indenture shall be read, taken and construed as one and the same instrument.

This One Hundred and Twentieth Supplemental Indenture shall be simultaneously executed in several counterparts, and all such counterparts executed and delivered, each as an original, shall constitute but one and the same instrument.

The recitals of fact contained herein shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same.

The debtor and its mailing address are Delmarva Power & Light Company, Mailstop 92DC42, 500 N. Wakefield Drive, Newark, Delaware 19702-5440. The secured party and its address, from which information concerning the security interest hereunder may be obtained, is The Bank of New York Mellon, 500 Ross Street, 12 th Floor, Pittsburgh, Pennsylvania 15262, Attn: Corporate Trust Administration.

The Company acknowledges that it received a true and correct copy of this One Hundred and Twentieth Supplemental Indenture.

This One Hundred and Twentieth Supplemental Indenture is executed and delivered pursuant to the provisions of Section 5.11 and paragraph (a) of Section 17.01 of the Indenture for the purpose of conveying, transferring and assigning to the Trustee and of subjecting to the lien of the Indenture with the same force and effect as though included in the granting clause thereof the above described property so acquired by the Company on or prior to the date of execution, and not heretofore specifically subject to the lien of the Indenture; but nothing contained in this One Hundred and Twentieth Supplemental Indenture shall be deemed in any manner to affect (except for such purposes) or to impair the provisions, terms and conditions of the Original Indenture, or of any indenture supplemental thereto and the provisions, terms and conditions thereof are hereby expressly confirmed.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

15

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

IN WITNESS WHEREOF, the Company has caused this instrument to be signed in its name and behalf by its President, and its corporate seal to be hereunto affixed and attested by its Assistant Secretary and the Trustee has caused this instrument to be signed in its name and behalf by a Vice President and its corporate seal to be hereunto affixed and attested by an authorized officer, effective as of the 1st day of January, 2018.

## DELMARVA POWER & LIGHT COMPANY

Date of Execution      By    /s/Donna J. Kinzel
                    Donna J. Kinzel, Senior Vice President

March 21, 2018

Attest:

    /s/Brian Buck    [SEAL]
    Brian Buck, Assistant Secretary

STATE OF DELAWARE  )
                ) SS
COUNTY OF NEW CASTLE  )

BE IT REMEMBERED that as of the 21 st day of March, 2018, personally came before me, a notary public for the State of Delaware, Donna J. Kinzel, Senior Vice President of DELMARVA POWER & LIGHT COMPANY, a corporation of the State of Delaware and the Commonwealth of Virginia (the "Company"), party to the foregoing instrument, known to me personally to be such, and acknowledged the instrument to be her own act and deed and the act and deed of the Company; that her signature is in her own proper handwriting; that the seal affixed is the common or corporate seal of the Company; and that her act of signing, sealing, executing and delivering such instrument was duly authorized by resolution of the Board of Directors of the Company.

GIVEN under my hand and official seal the day and year aforesaid.

    /s/Patricia H. Lyons    [SEAL]
    Notary Public, State of Delaware
    My commission expires  Oct 19, 2020

16

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**THE BANK OF NEW YORK MELLON,**
**as Trustee**

Date of Execution          By     /s/Laurence J. O'Brien_____

                                          Laurence J. O'Brien, Vice President

April 3, 2018


                                  Attest:


                                          /s/Latoya S. Elvin_____
                                          Latoya S. Elvin, Vice President


STATE OF NEW JERSEY    )
                                          ) SS.
COUNTY OF PASSAIC     )



        BE IT REMEMBERED that as of this 3 rd day of April, 2018, personally came before me, a Notary Public for the State of New Jersey, Laurence J. O'Brien, Vice President of THE BANK OF NEW YORK MELLON, a New York banking corporation (the "Trustee"), party to the foregoing instrument, known to me personally to be such, and acknowledged the instrument to be his own act and deed and the act and deed of the Trustee; that his signature is his own proper handwriting; that the seal affixed is the common or corporate seal of the Trustee; and that his act of signing, sealing, executing and delivering said instrument was duly authorized by resolution of the Board of Directors of the Trustee.

        GIVEN under my hand and official seal the day and year aforesaid.



                /s/Rick J. Fierro_____



                        **RICK J FIERRO**
                        **Notary Public**
                        **State of New Jersey**
                        **My Commission Expires Nov 24, 2019**



        [SEAL]

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**CERTIFICATE OF RESIDENCE**

THE BANK OF NEW YORK MELLON, successor Trustee to the Trustee within named, hereby certifies that it has a residence at 101 Barclay Street, in the Borough of Manhattan, in The City of New York, in the State of New York.

THE BANK OF NEW YORK MELLON

By   /s/Laurence J. O'Brien
    Laurence J. O'Brien, Vice President

18

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Certification

This document was prepared under the supervision of an attorney admitted to practice before the Court of Appeals of Maryland, or by or on behalf of one of the parties named in the within instrument.


/s/Christie D. Cannon

Christie D. Cannon


19

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**SEPARATION AGREEMENT**

THIS SEPARATION AGREEMENT (this " *Agreement* ") is entered into as of _____, 20__ between Exelon Corporation (" *Exelon* "), _____ ("Subsidiary", and, collectively with Exelon, the " *Company* ") and _____ (the " *Executive* ").

W I T N E S S E T H:

WHEREAS, the Executive is separating from all positions with the Company and its respective affiliates.

NOW, THEREFORE, in consideration of the mutual promise s and agreements contained herein, the adequacy and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

1.      <u>Resignation & Termination of Employment</u> . The Executive's employment will be terminated and Executive hereby resigns, each effective as of the close of business on _____, 20__ (the " *Termination Date* "), from his or her position as _____ and from all other positions as an officer or director of Exelon and its subsidiaries and affiliates. [During the period commencing on the date hereof and ending on the Termination Date, Executive shall cooperate with and assist in the orderly transition of his or her duties, and shall diligently perform such other services reasonably consistent with his or her position as may be requested from time to time. Executive's current base salary and annual incentive target shall remain in effect, and Executive (and his or her eligible dependents) shall also remain eligible to participate in the Company's applicable employee benefit plans, and shall remain subject to and comply with the Company's code of business conduct and other employment policies.]

2.      <u>Payment of Accrued Amounts</u> . The Company shall pay to the Executive the portion of his or her annual salary that has accrued but is unpaid as of the Termination Date and an additional amount representing the Executive's accrued but unused vacation days as of the Termination Date, in each case not later than the second payroll date after the Termination Date.

3.      <u>Severance Payments</u> . The Company shall pay to the Executive:

(a)      cash severance payments in an aggregate amount equal to $_____ which is equal to the product of [2.0 for named executive officers; 1.25 - 2.0 for other officers] times the sum of (i) $_____ (representing the Executive's annual base salary) and (ii) $_____ (representing the Executive's target annual incentive). For named executive officers and other "specified employees" within the meaning of section 409A of the Code, payment shall commence in the form of a lump sum payment of $_____ to be made as of the first payroll date occurring on or after the date that is six months after the Termination Date, followed by substantially equal regular payroll installments of the remainder over a period of [eighteen for named executive officers; twelve to fifteen for other officers] months; for other officers, payment

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

shall commence not later than 45 days after the Termination Date in substantially equal payroll installments over a period of [15 - 24 months]; and

(b)      a pro-rated annual incentive award for [the year in which the Termination Date occurs], the amount of which (if any) shall be determined based on business performance measures in a manner consistent with that applied to active peer executives of Subsidiary (assuming a meaningful impact performance rating) and payable at the time such awards are paid to such executives (but not later than [March 15 of the following year]), and each such payment shall be considered a separate short-term deferral for purposes of section 409A of the Internal Revenue Code (" *Code* ").

4.      <u>Tax Withholding</u> . The Company shall deduct from the amounts payable to the Executive pursuant to this Agreement the amount of all required federal, state and local withholding taxes in accordance with the Executive's Form W-4 on file with the Company and all applicable social security and Medicare taxes.

5.      <u>Outplacement Assistance and Financial Counseling Services</u> . During the twelve-month period following the Termination Date, the Company shall reimburse the Executive for reasonable fees incurred for services rendered to the Executive by a professional outplacement organization selected by the Executive and reasonably acceptable to the Company to provide individual outplacement services, and Executive shall be eligible to receive financial counseling services consistent with the terms and conditions applicable to active peer executives under Exelon's executive perquisite policy. Executive may apply for external positions via search firms which also recruit executives for the Company.

6.      <u>Long Term Incentive Awards</u> . Subject to Executive's timely execution of (and not revoking) the Waiver and Release (as defined in Section 9 below),

(a)      Executive shall remain eligible to receive full long-term [performance share awards for generation/business services company executives /or/ performance cash awards for utility executives] under Exelon's long-term incentive program for the performance cycles commencing in the two years preceding the year in which the Termination Date occurs, and a pro-rated award for the performance cycle commencing in the year in which the Termination Date occurs, the respective amounts (if any) of which shall be determined in a manner consistent with that used to determine the amounts of such awards payable to active executives for such respective periods, and all such awards shall be payable at the time or times such respective awards are paid to active executives and each such award shall be considered a separate, short-term deferral for purposes of section 409A of the Code; and

(b)      Executive's options to purchase common stock of Exelon granted by the Company shall, to the extent not exercised as of the Termination Date, remain exercisable until the (i) the earlier of the respective expiration dates of such options and the date that is ninety days after the Termination Date with respect to merger options other than those granted in 2012 if the Executive has not attained at least age 50 and completed at least 10 years of service, and (ii) until the respective expiration dates of such options with respect to merger options granted in 2012 and other options if the Executive is at least age 50 and has completed 10 or more years of service; and

(c)      the non-vested portions of Executive's [restricted stock unit for generation and business services company executives /or/ restricted cash for utility executives] awards under Exelon's long term incentive program shall become fully vested as of the Termination Date [and, with respect to named executive officers and other "specified employees", payable six months after the Termination Date].

All such awards payable in shares shall be subject to the Company's applicable resale restrictions, if any.

7.      <u>Supplemental Executive Retirement Benefits</u> .  The Executive shall be eligible for a retirement benefit under the Company's applicable supplemental non-qualified pension plan (the " *SERP* ") in accordance with the terms and conditions thereof, except that in determining such benefit, the Executive shall be subject to the Executive's timely execution of the Waiver and Release, be credited with [24 months for named executive officers; 15 -24 months for other officers] additional service calculated as though he or she received the severance benefits specified in Section 3(a) as regular salary and incentive pay over such period (and limited in its application to the amounts of such payments that exceed the compensation limitations applicable to qualified pension plans under the Code) and any other service previously granted to such Executive. Such benefit shall be paid as provided in Section 8(c).

8.      <u>Employee and Other Benefits</u> .

(a)      During the period commencing on the Termination Date and ending [24 months for named executive officers; 15 - 24 months for other officers] after the Termination Date (the " *Severance Period* ") and in satisfaction of COBRA continuation coverage during such period with respect to healthcare benefits, (i) the Executive (and his or her participating dependents) shall be eligible to participate in, and shall receive benefits under Exelon's welfare benefit plans (including medical, dental and vision) in which the Executive (and his or her eligible dependents) were participating immediately prior to the Termination Date, and (ii) the Executive shall be eligible to participate in the life insurance programs in which he or she was a participant immediately prior to the Termination Date, in each case on the same basis as if the Executive had remained actively employed during the Severance Period.

(b)      Following the Severance Period, if the Executive has attained at least age 50 and has completed at least 10 years of service as of the end of the Severance Period, the Executive (and his or her eligible dependents) shall be eligible for retiree benefits in accordance with and subject to the terms and conditions of the Company's applicable health care plans, as in effect for employees of his or her legacy business unit from time to time (including the Company's right to amend or terminate such plans at any time). Such benefits shall not duplicate any benefits that may then be available to the Executive from any other employer and shall be secondary to Medicare.

(c)      The Company shall pay to the Executive, in the time and manner specified in the terms and conditions of such plans and any distribution elections by the Executive in effect thereunder, his or her account balances (if any) under Exelon's applicable deferred compensation plans, as adjusted by any applicable earnings and losses on such account balances, and the Executive's benefit under the supplemental executive retirement plan.

(d)      The Executive shall be entitled to purchase the laptop computer furnished by the Company for his or her use, subject to removal of data and programs as determined by the Company. The Executive shall be responsible for payment of expenses incurred after the

Termination Date with respect to the Company-owned cellular phone furnished for his or her use.

(e)     If the Executive is entitled to any benefit under any employee benefit plan of the Company that is accrued and vested on the Termination Date and that is not expressly referred to in this Agreement, such benefit shall be provided to the Executive in accordance with the terms of such employee benefit plan.

(f)     Notwithstanding Section 8(e) or anything else contained in this Agreement to the contrary, the Executive acknowledges and agrees that he or she is not and shall not be entitled to benefits under any other severance or change in control plan, program, agreement or arrangement, and that the benefits provided under this Agreement shall be the sole and exclusive benefits to which the Executive may become entitled upon his or her termination of employment. In the event the Executive dies prior to executing the Waiver and Release, neither he or she, his or her estate, nor any other person shall be entitled to any further compensation or benefits under this Agreement, unless and until the executor of the Executive's estate (and/or such other heirs or representatives as may be requested by the Company) executes upon Company request and does not revoke such a Waiver and Release.

9.     <u>Waiver and Release</u> . Notwithstanding anything herein to the contrary, Executive's right to the payments and benefits under this Agreement shall be contingent upon (a) Executive having executed and delivered to the Company a waiver and general release agreement in the form attached hereto (the " *Waiver and Release* ") not earlier than the Termination Date but in no event more than 21 days [45 days if a group termination] after the Termination Date (the "Consideration Period"), (b) Executive not revoking such release in accordance with the terms of the release and (c) Executive not violating any of Executive's on-going obligations under this Agreement; provided, however, that the Company has the discretion to pay such benefits prior to receipt of the Waiver and Release and/or the expiration of the revocation period; provided further that if Executive does not execute and deliver the Waiver and Release to the Company prior to the expiration of the Consideration Period or if the Executive revokes the Waiver and Release in accordance with its terms, Executive shall pay to the Company within 10 days following the expiration of the Consideration Period or the date such release was revoked, a lump sum payment of all payments received by Executive to date hereunder.

10.     <u>Restrictive Covenants</u> . The Executive acknowledges and agrees that he or she is bound by, and subject to, the Non-Solicitation and Confidentiality Agreement dated as of _____ (the "Restrictive Covenants") and the Waiver and Release. The Executive shall comply with, and observe, the Restrictive Covenants including, without limitation, the confidential information, non-solicitation and intellectual property provisions and related covenants contained therein, all of which are hereby incorporated by reference. In the event that Executive has breached any of the Restrictive Covenants or the Waiver and Release or has engaged in conduct during his or her employment with the Company that would constitute grounds for termination for Cause (as defined in the Exelon Corporation Senior Management Severance Plan), benefits under this Agreement shall terminate immediately, and Executive shall reimburse Exelon for any benefits received.

11.     <u>Certain Tax Matters</u> .

(a)     If it is determined by Exelon's independent auditors that any severance payment, benefit or enhancement provided to the Executive pursuant to the terms of the this Agreement is or will become subject to any excise tax under section 4999 of the Code, or any similar tax payable under any United States federal, state, local, foreign or other law (" *Excise*

*Taxes* ”), then such payment, benefit or enhancement shall be reduced to the largest amount which would not cause any such Excise Tax to by payable be the Executive and not cause a loss of the related income tax deduction by the Company.

(b)        The parties intend for this Agreement to comply with section 409A of the Code. In the event the timing of any payment or benefit under this Agreement would result in any tax or penalty under section 409A of the Code, the Company may reasonably adjust the timing of such payment or benefit if doing so will eliminate or materially reduce such tax or penalty and amend this Agreement accordingly. Executive acknowledges that Executive has been advised to consult Executive's personal tax advisor concerning this Agreement, and has not relied on the Company for tax advice.

12.      Non-disparagement . The Executive shall not publish, comment upon or disseminate any public statements suggesting or accusing the Company or any of its affiliates, employees, officers, directors or agents of any misconduct or unlawful behavior, or that brings the Company or any of its affiliates or the employees, officers, directors or agents of the Company or any of its affiliates into disrepute, or tarnish any of their images or reputations. The provisions of this Section 12 shall not apply to truthful testimony as a witness, compliance with other legal obligations, assertion of or defense against any claim of breach of this Agreement, or any activity that otherwise may be required or permitted by the lawful order of a court or agency of competent jurisdiction, and shall not require the Executive to make false statements or disclosures.

13.      Publicity . Executive shall not issue or cause the publication of any press release or other announcement with respect to the terms or provisions of this Agreement, nor disclose the contents hereof to any third party (other than to members of his or her immediate family or to tax, financial and legal advisors), without obtaining the consent of Exelon, except where such release, announcement or disclosure shall be required by applicable law or administrative regulation or agency or other legal process.

14.      Other Employment; Other Plans . The Executive shall not be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any provision of this Agreement. The amounts payable hereunder shall not be reduced by any payments received by the Executive from any other employer; *provided* , *however* , that any continued welfare benefits provided for by Section 8(a) shall not duplicate any benefits that are provided to the Executive and his or her family by such other employer and shall be secondary to any coverage provided by Medicare.

15.      Cooperation by the Executive . During the Severance Period, the Executive shall (a) be reasonably available to the Company to respond to requests by them for information pertaining to or relating to matters which may be within the knowledge of the Executive and (b) cooperate with the Company in connection with any existing or future litigation or other proceedings brought by or against the Company, its subsidiaries or affiliates, to the extent Exelon reasonably deems the Executive's cooperation necessary, including truthful testimony in any related proceeding.

16.      Successors; Binding Agreement . This Agreement shall inure to the benefit of and be binding upon the Company and its successors, and by the Executive, his or her spouse, personal or legal representatives, executors, administrators and heirs. This Agreement, being personal, may not be assigned by Executive.

17. <u>Governing Law; Validity</u> . This Agreement shall be interpreted, construed and enforced in accordance with the terms of the Exelon Corporation Senior Management Severance Plan, and the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and section 409A of the Code.

18. <u>Entire Agreement</u> . This Agreement and the Waiver and Release constitute the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede and preempt any other understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof. Executive acknowledges that the Company has made no representations regarding the tax consequences of payments under this Agreement and has had the opportunity to consult Executive's tax advisor.

19. <u>Counterparts</u> . This Agreement may be executed in two counterparts, each of which shall be deemed to be an original and both of which together shall constitute one and the same instrument.

20. <u>Miscellaneous</u> . No provision of this Agreement may be modified or waived unless such modification or waiver is agreed to in writing and executed by the Executive and by a duly authorized officer of the Company. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. Failure by the Executive or the Company to insist upon strict compliance with any provision of this Agreement or to assert any right which the Executive or the Company may have hereunder shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

21. <u>Beneficiary</u> . If the Executive dies prior to receiving all of the amounts payable hereunder (other than amounts payable under any plan referenced in Section 8, which shall be governed by any beneficiary designation in effect thereunder) but after executing the Waiver and Release, such amounts shall be paid, except as may be otherwise expressly provided herein or in the applicable plans, to the beneficiary ( *"Beneficiary"* ) designated with respect to this Agreement by the Executive in writing to the Vice President, Corporate Compensation of the Company during his or her lifetime, which the Executive may change from time to time by new designation filed in like manner without the consent of any Beneficiary; or if no such Beneficiary is designated, to his or her surviving spouse, and if there be none, to his or her estate.

22. <u>Nonalienation of Benefits</u> . Benefits payable under this Agreement shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, prior to actually being received by the Executive, and any such attempt to dispose of any right to benefits payable hereunder shall be void.

23. <u>Severability</u> . If all or any part of this Agreement is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not serve to invalidate any portion of this Agreement not declared to be unlawful or invalid, except that in the event a determination is made that the Restrictive Covenants as applied to the Executive are invalid or unenforceable in whole or in part, then this Agreement shall be void and the Company shall have no obligation to provide benefits hereunder. Any paragraph or part of a paragraph so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such paragraph or part of a paragraph to the fullest extent possible while remaining lawful and valid.

24.    <u>Communications</u>. Nothing in this Agreement or the Waiver and Release shall be construed to prohibit or limit the Executive from filing a charge with, or reporting possible violations of law or regulation to any governmental agency or entity, including but not limited to the National Labor Relations Board, Nuclear Regulatory Commission, U.S. Equal Opportunity Commission, the Department of Labor, the Department of Justice, the Securities Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation, or taking any other action protected under section 211 of the Energy Reorganization Act. The Executive does not need the prior authorization of the Company to make any such charges, reports or disclosures, and is not required to notify the Company that Executive has made such charges reports or disclosures, and no such report or disclosure shall be considered a violation of Section 12 of this Agreement or the Waiver and Release. In addition, neither this Agreement nor the Waiver and Release limits the Executive's ability to receive a monetary award from a government-administered whistleblower award program for providing any such reports or disclosures directly to a governmental agency. Executive acknowledges, however, that the Waiver and Release requires Executive to specifically waive all rights to recover any monetary damages from the Company, including but not limited to lost wages and benefits, lost pay, damages for emotional distress, punitive damages, reinstatement, and attorneys' fees and costs.

25.    <u>Sections</u>. Except where otherwise indicated by the context, any reference to a "Section" shall be to a Section of this Agreement.

IN WITNESS WHEREOF, Exelon and Subsidiary have caused this Agreement to be executed by their duly authorized officers and the Executive has executed this Agreement as of the day and year first above written.

EXELON CORPORATION

By:_____

Senior Vice President &
Chief Human Resource Officer


SUBSIDIARY

By:_____

Vice President, Human Resources


_____

EXECUTIVE

**WAIVER AND RELEASE**
**UNDER**
**SEPARATION AGREEMENT**

In consideration for the Executive's receiving severance benefits under the Separation Agreement (as defined below), _____ (the "Executive") hereby agrees as follows:

1. <u>Release.</u> Except with respect to the Company's obligations under the Separation Agreement by and between Exelon Corporation, [Executive's employing subsidiary] (collectively, the "*Company*") and the Executive dated as of _____, 20__ (the "*Separation Agreement*"), the Executive, on behalf of Executive and his or her heirs, executors, assigns, agents, legal representatives and personal representatives, hereby releases, acquits and forever discharges the Company, its agents, subsidiaries, affiliates, and their respective officers, directors, agents, servants, employees, attorneys, shareholders, successors, assigns and affiliates, of and from any and all claims, liabilities, demands, causes of action, costs, expenses, attorneys fees, damages, indemnities and obligations of every kind and nature, in law, equity, or otherwise, known and unknown, foreseen or unforeseen, disclosed and undisclosed, suspected and unsuspected, arising out of or in any way related to agreements, events, acts or conduct at any time prior to the day of execution of this Waiver and Release, including but not limited to any and all such claims and demands directly or indirectly arising out of or in any way connected with the Executive's employment or other service with the Company, or any of its Subsidiaries or affiliates; the Executive's termination of employment and other service with the Company or any of its subsidiaries or affiliates; claims or demands related to salary, bonuses, commissions, stock, stock options, restricted stock or any other ownership interests in the Company or any of its subsidiaries and affiliates, vacation pay, fringe benefits, expense reimbursements, sabbatical benefits, severance, change in control or other separation benefits, or any other form of compensation or equity; and claims pursuant to any federal, state, local law, statute, ordinance, common law or other cause of action including but not limited to, the federal Civil Rights Act of 1964, as amended; the federal Age Discrimination in Employment Act of 1967, as amended; the federal Americans with Disabilities Act of 1990; the Employee Retirement Income Security Act of 1974, as amended, tort law; contract law; wrongful discharge; discrimination; fraud; defamation; harassment; emotional distress; or breach of the covenant of good faith and fair dealing. This Waiver and Release does not apply to (a) the payment of any benefits to which the Executive may be entitled under the terms of a Company-sponsored tax qualified retirement or savings plan or (b) Executive's entitlement to indemnification, and coverage as an insured, with respect to his service as an officer, director, employee or agent in accordance with the terms and conditions of Article VII of the Exelon Corporation Amended and Restated Bylaws.

2. <u>No Inducement</u> . The Executive agrees that no promise or inducement to enter into this Waiver or Release has been offered or made except as set forth in this Waiver and Release and the Separation Agreement, that the Executive is entering into this Waiver and Release without any threat or coercion and without reliance on any statement or representation made on behalf of the Company or any of its subsidiaries or affiliates, or by any person employed by or representing the Company or any of its subsidiaries or affiliates, except for the written provisions and promises contained in this Waiver and Release and the Separation Agreement.

3. **<u>Advice of Counsel; Time to Consider; Revocation</u> . The Executive acknowledges the following:**

      **(a)**    **The Executive has read this Waiver and Release, and understands its legal and binding effect, including that by signing and not revoking this Waiver and Release the Executive waives and releases any and all claims under the Age Discrimination in Employment Act of 1967, as amended, including but not limited to the Older Workers Benefits Protection Act. The Executive is acting voluntarily and of the Executive's own free will in executing this Waiver and Release.**

      **(b)**    **The Executive has been advised to seek and has had the opportunity to seek legal counsel in connection with this Waiver and Release.**

      **(c) The Executive was given at least [twenty-one (21) / forty-five (45)] days to consider the terms of this Waiver and Release before signing it.**

      **(d) At the time Executive was given this Waiver and Release, Executive was informed that his or her termination was not part of a group separation.**

**The Executive understands that, if the Executive signs the Waiver and Release, the Executive may revoke it within seven (7) days after signing it, provided that Executive will not receive any severance benefits under the Separation Agreement. The Executive understands that this Waiver and Release will not be effective until after the seven-day period has expired and no consideration will be due the Executive.**

    4.    <u>Severability</u> . If all or any part of this Waiver and Release is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any other portion of this Waiver and Release. Any Section or a part of a Section declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of the Section to the fullest extent possible while remaining lawful and valid.

    5.    <u>Amendment</u> . This Waiver and Release shall not be altered, amended, or modified except by written instrument executed by the Company and the Executive. A waiver of any portion of this Waiver and Release shall not be deemed a waiver of any other portion of this Waiver and Release.

    6.    <u>Applicable Law</u> . The provisions of this Waiver and Release shall be interpreted and construed in accordance with the laws of the State of Illinois without regard to its choice of law principles.

    IN WITNESS WHEREOF, the Executive has executed this Waiver and Release as of the date specified below.

            EXECUTIVE

            _____

            DATE: _____

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-1**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Christopher M. Crane, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Exelon Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   CHRISTOPHER M. CRANE

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-2**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Jonathan W. Thayer, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Exelon Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   J ONATHAN  W. T HAYER

Senior Executive Vice President and Chief Financial Officer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-3**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Kenneth W. Cornew, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Exelon Generation Company, LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   K ENNETH  W. C ORNEW

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-4**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Bryan P. Wright, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Exelon Generation Company, LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   B RYAN  P. W RIGHT
_____

Senior Vice President and Chief Financial Officer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-5**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Anne R. Pramaggiore, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Commonwealth Edison Company;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   A NNE  R. P RAMAGGIORE
_____
President and Chief Executive Officer
(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-6**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Joseph R. Trpik, Jr., certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Commonwealth Edison Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   J OSEPH  R. T RPIK , J R .

Senior Vice President, Chief Financial Officer and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-7**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Michael A. Innocenzo, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of PECO Energy Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   MICHAEL A. INNOCENZO

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Exhibit 31-8

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

I, Phillip S. Barnett, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of PECO Energy Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   PHILLIP S. BARNETT

Senior Vice President, Chief Financial Officer
and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-9**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES**
**AND EXCHANGE ACT OF 1934**

I, Calvin G. Butler, Jr., certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Baltimore Gas and Electric Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   CALVIN G. BUTLER, JR.

Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-10**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, David M. Vahos, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Baltimore Gas and Electric Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   DAVID M. VAHOS
_____
Senior Vice President, Chief Financial Officer
and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-11**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, David M. Velazquez, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Pepco Holdings LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D AVID  M. V ELAZQUEZ

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-12**

### CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES AND EXCHANGE ACT OF 1934

I, Donna J. Kinzel, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Pepco Holdings LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D ONNA  J. K INZEL
_____

Senior Vice President, Chief Financial Officer and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-13**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, David M. Velazquez, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Potomac Electric Power Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  DAVID M. VELAZQUEZ

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Exhibit 31-14

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Donna J. Kinzel, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Potomac Electric Power Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  DONNA J. KINZEL

Senior Vice President, Chief Financial Officer and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-15**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, David M. Velazquez, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Delmarva Power & Light Company;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D AVID  M. V ELAZQUEZ

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-16**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, Donna J. Kinzel, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Delmarva Power & Light Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D ONNA  J. K INZEL

Senior Vice President, Chief Financial Officer and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-17**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES
AND EXCHANGE ACT OF 1934**

I, David M. Velazquez, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Atlantic City Electric Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D AVID  M. V ELAZQUEZ

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 31-18**

**CERTIFICATION PURSUANT TO RULE 13a-14(a) AND 15d-14(a) OF THE SECURITIES**
**AND EXCHANGE ACT OF 1934**

I, Donna J. Kinzel, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Atlantic City Electric Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   D ONNA  J. K INZEL

Senior Vice President, Chief Financial Officer and Treasurer

(Principal Financial Officer)

Date: May 2, 2018

**Exhibit 32-1**

**Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code**

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Exelon Corporation for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Exelon Corporation.

/s/   CHRISTOPHER  M. CRANE

Christopher M. Crane

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-2**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Exelon Corporation for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Exelon Corporation.

/s/   JONATHAN W. THAYER
_____
Jonathan W. Thayer
Senior Executive Vice President and Chief Financial Officer

Date: May 2, 2018

**Exhibit 32-3**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Exelon Generation Company, LLC for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Exelon Generation Company, LLC.

/s/   K ENNETH  W. C ORNEW

Kenneth W. Cornew

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-4**

**Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code**

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Exelon Generation Company, LLC for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Exelon Generation Company, LLC.

/s/   B RYAN  P. W RIGHT

Bryan P. Wright

Senior Vice President and Chief Financial Officer

Date: May 2, 2018

**Exhibit 32-5**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Commonwealth Edison Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Commonwealth Edison Company.

/s/   A NNE  R. P RAMAGGIORE

Anne R. Pramaggiore

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-6**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Commonwealth Edison Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Commonwealth Edison Company.

/s/   J OSEPH  R. T RPIK , J R .

Joseph R. Trpik, Jr.

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

**Exhibit 32-7**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

   The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of PECO Energy Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of PECO Energy Company.

/s/   MICHAEL A. INNOCENZO

Michael A. Innocenzo

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-8**

**Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code**

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of PECO Energy Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of PECO Energy Company.

/s/   P HILLIP  S. B ARNETT

Phillip S. Barnett

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-9**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Baltimore Gas and Electric Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Baltimore Gas and Electric Company.

/s/   C ALVIN  G. B UTLER , J R .
_____

Calvin G. Butler, Jr.

Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-10**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Baltimore Gas and Electric Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Baltimore Gas and Electric Company.

/s/  DAVID M. VAHOS
_____

David M. Vahos

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

**Exhibit 32-11**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Pepco Holdings LLC for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Pepco Holdings LLC.

/s/   DAVID M. VELAZQUEZ
_____

David M. Velazquez

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-12**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Pepco Holdings LLC for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Pepco Holdings LLC.

/s/   DONNA J. KINZEL

Donna J. Kinzel

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-13**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Potomac Electric Power Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Potomac Electric Power Company.

/s/   D AVID  M. V ELAZQUEZ
_____

David M. Velazquez

President and Chief Executive Officer

Date: May 2, 2018

**Exhibit 32-14**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Potomac Electric Power Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Potomac Electric Power Company .

/s/   D ONNA  J. K INZEL
_____
Donna J. Kinzel
Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-15**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Delmarva Power & Light Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Delmarva Power & Light Company.

/s/   DAVID M. VELAZQUEZ
_____
David M. Velazquez
President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-16**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Delmarva Power & Light Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Delmarva Power & Light Company .

/s/   D ONNA  J. K INZEL

Donna J. Kinzel

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-17**

**Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code**

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Atlantic City Electric Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Atlantic City Electric Company.

/s/   DAVID M. VELAZQUEZ
_____

David M. Velazquez

President and Chief Executive Officer

Date: May 2, 2018

Electronically Filed - St Louis County - February 04, 2020 - 04:18 PM

**Exhibit 32-18**

### Certificate Pursuant to Section 1350 of Chapter 63 of Title 18 United States Code

The undersigned officer hereby certifies, as to the quarterly report on Form 10-Q of Atlantic City Electric Company for the quarterly period ended March 31, 2018 , that (i) the report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of Atlantic City Electric Company .

/s/   DONNA  J. KINZEL
_____
Donna J. Kinzel

Senior Vice President, Chief Financial Officer and Treasurer

Date: May 2, 2018

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST. LOUIS COUNTY, MISSOURI**

| | | |
|---|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, | ) | |
| BARBARA HOOKS, JOEL HOGAN, | ) | |
| KENNETH NIEBLING, KENDALL LACY, | ) | |
| TANJA LACY, WILLIE CLAY, | ) | |
| BOBBIE JEAN CLAY, ANGELA STATUM, | ) | |
| and MISSOURI RENTALS COMPANY, LLC, | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| COTTER CORPORATION, | ) | **JURY TRIAL DEMANDED** |
| COMMONWEALTH EDISON COMPANY, | ) | |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS AIRPORT | ) | |
| AUTHORITY, A DEPARTMENT OF THE | ) | |
| CITY OF ST. LOUIS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION PETITION**

## I.    INTRODUCTION

Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd") (hereinafter collectively referred to as "Defendants") ask this Court to dismiss Plaintiffs' claims because they believe Plaintiffs' claims are preempted by a federal statute, i.e., the Price-Anderson Act ("PAA").  Defendants advance this argument despite three different Federal District Court Judges in St. Louis presiding over three factually-related cases all recently ruling that the PAA does not apply to this case or related cases and does not preempt Plaintiffs' state law claims. *See Banks v. Cotter Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019); *Kitchin v. Bridgeton Landfill, LLC*, 389 F. Supp. 3d 600 (E.D. Mo. 2019); *Strong v. Republic Services,*

1

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

*Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017).

In *Banks*, *Kitchin* and *Strong*, the Federal District Court in St. Louis squarely addressed the question of whether the PAA applies when Defendants do not have an applicable license or indemnity agreement covering the alleged activities. In all three cases, three different judges determined that there cannot be a "nuclear incident" under the PAA without such an applicable license or indemnity agreement. The judges further ruled that Defendants do not have an applicable license or indemnity agreement and therefore they remanded each matter back to state court.

This matter was initially filed in the Circuit Court of St. Louis County alleging causes of action under Missouri law. Defendants removed the case arguing that the PAA applies and preempts Plaintiffs' state law claims, thereby conferring subject matter jurisdiction in Federal Court. Plaintiffs filed a motion to remand and after the issues were briefed and oral argument was held, Judge John Ross determined that the PAA does not apply to this case and remanded the case based on lack of subject matter jurisdiction under the PAA. *Banks,* 2019 WL 1426259.

Now that the Defendants find themselves back in St. Louis County, they now argue that St. Louis County shares concurrent jurisdiction with the Federal Court. Regardless of which jurisdiction reviews the case, it is clear that every court weighing the record has concluded the PAA does not apply in this case as well as other factually related cases. In the instant case, Judge Ross directly addressed whether, as a matter of statutory construction or under the structure and history of the PAA, a license or indemnity agreement is a prerequisite for the PAA to apply. *Banks*, 2019 WL 1426259, at *6. As Judge Ross wrote in his opinion remanding this case and denying the Defendants' motions to dismiss:

> Defendants' construction overlooks the original purposes and framework of the AEA and the PAA - to require those involved in the nuclear industry to obtain licenses *and maintain financial protections*. When faced with "competing preemption narratives," the Court has the "duty to accept the reading that disfavors

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

preemption."

Id. at *8 (emphasis added) (citing *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1094 (10th Cir. 2015).

Defendants are not participants in the PAA compensation system, and they do not have an appropriate license or indemnity agreement that covers the dumping activities alleged or the radioactive wastes as issue. As such, Plaintiffs have not pled a "nuclear incident" within the meaning of the PAA.  The PAA has a preemptive effect only with respect to "nuclear incidents." Plaintiffs' allegations do not amount to a "nuclear incident" as statutorily defined. Thus, as previously decided, the PAA does not apply and does not preempt Plaintiffs' state law causes of action.

## II.     FACTUAL AND PROCEDURAL HISTORY

Plaintiff Tamia Banks, on behalf of herself and all others similarly situated, filed this property damage claim against Defendants on February 18, 2018 alleging violations of Missouri state law and the Missouri Constitution; Plaintiff Banks filed a substantially similar Amended Petition on April 2, 2018. *See generally* Original Petition and First Amended Petition.

Defendants removed to federal court on April 18, 2018 based on the argument that federal question jurisdiction existed because Plaintiffs' claims arose under the PAA, which preempts all of Plaintiffs' state-law causes of action. *See* Notice of Removal, 4:18-cv-00624 (JAR), Doc. No. 1 at ¶ 18. Plaintiff filed a Motion to Remand asserting that the PAA does not apply to her claims and her claims are not preempted. *See* Motion to Remand and Memo in Support, 4:18-cv-00624 (JAR), Doc. Nos. 38 and 39. The issues were briefed, and oral argument was held. On March 29, 2019, Judge John Ross determined that there is no federal court jurisdiction under the PAA and remanded this matter back to state court. *See* Order of Remand, 4:18-cv-00624 (JAR), Doc. No. 75.

Electronically Filed - St. Louis County - February 05, 2020 - 03:49 PM

After remand, Cotter filed a motion to dismiss based on PAA preemption which was joined by Defendants ComEd, Exelon Corporation, and Exelon Generation Company, LLC. Defendants ComEd, Exelon Corporation, and Exelon Generation Company, LLC also filed a Motion to Dismiss based on lack of personal jurisdiction. Thereafter, Plaintiff Banks filed a substantially similar Second Amended Petition ("SAP") which added additional class representatives and removed Exelon Corporation and Exelon Generation Company, LLC as Defendants.

Currently, this action is against Cotter, ComEd, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis. Cotter is the owner, processor and disposer of the hazardous radioactive wastes that are the subject of this litigation. ComEd is the former parent company of Cotter, and upon the sale of Cotter to General Atomics in 2000, ComEd agreed to indemnify Cotter for certain liabilities associated with radiation contamination in St. Louis. *See* SAP at ¶ 27 - 29.[1] DJR Holdings (formerly known as Futura Coatings, Inc.) and the St. Louis Airport Authority, are the current owners of the properties which are the source of the radioactive contamination found on Plaintiffs' properties. DJR Holdings is the owner of the property located at 9200 Latty Avenue, Hazelwood, Missouri ("Latty Avenue Site") and the St. Louis Airport Authority is the owner of the site formerly known as the St. Louis Airport Site ("SLAPS"). *See* SAP at ¶¶ 79, 82. Despite knowing that significant activities involving radioactive material were conducted on their property in the past, DJR and St. Louis Airport Authority did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek. *See* SAP at ¶¶ 80, 83.

Plaintiffs own property located adjacent to Coldwater Creek. *See* SAP at ¶¶ 18–25. The Plaintiffs' properties, along with the property of other members of the Class, are located within

---

[1] The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001. See SAP at ¶ 29.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

the flood plain of Coldwater Creek. *Id.* Testing on Plaintiffs' properties confirms radioactivity above normal background levels and the source of this radioactivity is small, microscopic particles, which among other things contain the carcinogenic, toxic, radioactive substance known as thorium. *See* SAP at ¶¶ 91-93.  Defendants caused contamination of Plaintiffs' properties through their negligent storage, handling and disposal of radioactive waste. *See id. passim.*

A full description of the factual history can be found in Plaintiffs' well pleaded Second Amended Petition at ¶¶ 53-98. Based on the facts pleaded, it is clear that the radiation areas complained of were nothing more than dumping grounds. Defendants never alerted the authorities of a "nuclear occurrence" or "nuclear incident" at any of these locations because no such incident occurred. This was a dumping ground and no activities which would fall under the scope of the PAA at the time occurred here. It is quite amazing that after years of downplaying the gravity of the situation, Defendants are now prepared to admit that a nuclear incident occurred to support their baseless application of the PAA.

## III.   LEGAL ARGUMENT

### A.  Legal Standard

In the present case, Defendants must, at minimum, prove all of the following in order to sustain their burden in this Motion to Dismiss: (1) that there was a "nuclear incident" as defined in the PAA; (2) they had a disposal license for the wastes in question; (3) they had an indemnity agreement as provided under PAA; and (4) the radioactive wastes at issue (mill tailings and thorium) were subject to the PAA at the relevant times. Defendants have not even attempted to demonstrate any of the above—indeed, they cannot, because on a motion to dismiss all properly pleaded facts must be accepted as true, giving the pleadings their broadest intendment, and all allegations must be construed favorably to the pleader. *Bromwell v. Nixon*, 361 S.W.3d 393, 398 (Mo. banc 2012).

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Missouri law prefers a trial on the merits and courts should interpret the law consistently with this preference.  *Goe v. City of Mexico*, 64 S.W. 3d 836 (Mo. App. E.D. 2001).  A petition will be found sufficient to withstand a motion to dismiss where it invokes the substantive principles of the law which entitle plaintiffs to relief and facts which inform the defendant of what plaintiffs will attempt to establish at trial. *Scheibel v. Hillis*, 531 S.W.2d 285, 290 (Mo. banc. 1976).  A court must not dismiss a suit unless the plaintiff will be unable to prove any set of facts that would entitle her to relief.  *Goe*, 64 S.W.3d at 839.  "A pleader is required to state only the ultimate facts and it is not necessary to plead the facts or circumstances by which the ultimate facts will be established." *Scheibel*, 531 S.W. 2d at 290.

**B.  The Price-Anderson Act Does Not Apply to Plaintiffs' State Law Claims**

The PAA is a comprehensive compensation-oriented system of liability insurance for Department of Energy (DOE) contractors and Nuclear Regulatory Commission (NRC) licensees operating nuclear facilities. In short, the PAA provides a type of "no fault" insurance, by which all liability after an accident is assumed to rest with the facility operator, even though other parties (such as subcontractors or suppliers) might be liable under conventional tort principles. *See* S. REP. 100-70, 14, 1988 U.S.C.C.A.N. 1424, 1426-27. Defendants here argue that they are entitled to protections afforded by the PAA despite the fact they are not and have never been participants in the PAA compensation system.

As previously determined in *Banks*, *Kitchin* and *Strong*, there cannot be a nuclear incident under the PAA without an applicable license or indemnity agreement. *Banks*, 2019 WL 1426259, at *6; *Kitchin*, 389 F. Supp. 3d at 612; *Strong*, 283 F. Supp. 3d at 772. As further determined by *Banks*, *Kitchin* and *Strong*, defendants do not have the requisite license or indemnification agreement to trigger the PAA.  *Banks*, 2019 WL 1426259, at *9; *Kitchin*, 389 F. Supp. 3d at 613; *Strong*, 283 F. Supp. 3d at 774.

6

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Moreover, even if it is determined that that an applicable license or indemnity agreement is not required for the PAA's application or that Defendants possess such a license, the PAA is still inapplicable based on the reasoning in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015). In *Cook*, Judge (now Justice) Neil Gorsuch, determined that the plaintiffs' state law claims were not preempted when a nuclear incident is alleged but unproven. *Id.* Based on the reasoning in *Cook*, Plaintiffs' state law claims are not preempted because a nuclear incident has not been alleged in the first place.

### 1.   <u>Understanding the Background and Purpose of the Price-Anderson Act</u>[2]

In 1954, Congress enacted the Atomic Energy Act ("AEA") to encourage private sector involvement in atomic energy. The AEA provided for federal regulation and licensing of private construction, ownership, and operation of commercial nuclear power reactors. *Pac. Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190 (1983). In 1957, Congress amended the AEA with the PAA "which provided *certain federal licensees* with a system of private insurance, government indemnification, and limited liability for claims of 'public liability.'" *El Paso Nat. Gas Co. v. Neztsosie,* 526 U.S. 473 (1999) (emphasis added).

The PAA was enacted to meet two basic objectives: 1) remove the deterrent to private sector participation in atomic energy presented by the threat of potentially enormous liability in the event of a catastrophic nuclear accident; and 2) ensure that adequate funds are available to the public to satisfy liability claims if such an accident were to occur. NRC*, The Price–Anderson Act— Crossing the Bridge to the Next Century: A Report to Congress* at xii (August 1, 1998).[3] Congress accomplished these goals by 1) requiring that licensees provide financial protection; 2)

---

[2] The following background and summary are largely taken from Senate Report No. 100-70 addressing the Price-Anderson Amendments Act of 1988. S. Rep. No. 100-70, 1988 U.S.C.C.A.N. 1424, 1988 WL 169872.

[3] Available at https://www.nrc.gov/docs/ML1217/ML12170A857.pdf.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

indemnifying the nuclear power industry as necessary; and 3) capping total liability in the event of an incident. *Id.*

As enacted, the PAA established liability limits for commercial power plants licensed by the Atomic Energy Commission ("AEC") (now licensed by the NRC) through a combination of private insurance and indemnification by the federal government. As part of the PAA system, the AEC was authorized to require nuclear licensees or contractors to establish a basic level of insurance or other financial protection to cover their nuclear-related liabilities and in return such licensees or contractors received indemnity agreements under which the government would cover any excess liabilities.

After its enactment in 1957, the PAA has been renewed and amended numerous times. The PAA was first renewed in 1966, at which time Congress required licensees and contractors to waive traditional defenses of state tort law against claims of any extraordinary nuclear occurrence in order to facilitate recovery by Plaintiffs. In 1975 Congress added a provision to the PAA to phase out federal indemnity for NRC licensees and replace it with a self-insurance pool-type arrangement. Under this arrangement, if damages from a commercial nuclear power plant accident were likely to exceed the coverage available from private insurance, each NRC reactor licensee would be assessed up to a capped amount to pay a pro-rated share of the damages in excess of private insurance available. Thus, for accidents likely to exceed the coverage available to NRC licensees from private insurance, the limited liability plan consisted of a combination of the maximum amount of private insurance and contributions made by each of the reactor licensees. Licensees were required to provide proof to the NRC that they had the maximum amount of private nuclear liability insurance. *See* S. Rep. No. 100-70, 43, 1988 U.S.C.C.A.N. 1424, 1452

The PAA was amended again in 1988. The 1988 Amendments broadened federal jurisdiction beyond just "extraordinary nuclear occurrences"—that is, those occurrences involving

"substantial" damages—and created a federal cause of action for "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). Further, the amendments also provided that such public liability actions filed in state court were to be removed to federal court. *Id*.

Thus, since first enacted in 1957, the Price-Anderson compensation system has evolved from a system of primarily federal indemnification for nuclear activities to the current compensation pool/self-insurance type of arrangement for NRC licensees operating nuclear powerplants. S. REP. 100-70, 14, 1988 U.S.C.C.A.N. 1424, 1427. While the PAA has been amended since its enactment, these amendments have not changed the statutory framework of the PAA, i.e. the licensing/indemnity scheme.

### 2.  Scope of the Price-Anderson Act as Determined by the NRC

In 1998, the NRC prepared a report to Congress which detailed the need for continuation or modification of the PAA. In Part 1 of this report, the NRC provided an overview of the PAA system and discusses the scope of the PAA. According to the NRC, "[t]he first major Price-Anderson parameter concerns which licensees it covers." *NRC, The Price–Anderson Act— Crossing the Bridge to the Next Century: A Report to Congress* at 3 (August 1, 1998). As stated in the NRC's report, the PAA only applies to the following categories of licensees: 1) licensees of nuclear power plants having a rated capacity of 100MW(e) or more, 2) licensees authorized to operate nuclear reactors of less than 10 MW(t) capacity, 3) federal agencies licensed to operate nuclear reactors, 4) state-owned educational institutions, and 5) plutonium processing and fuel fabrication facilities. Critically, subsequent to 1977, the NRC also evaluated whether it should exercise its discretionary authority and require financial protection for materials licensees other than those processing plutonium and the NRC decided that "no apparent need existed to extend Price-Anderson to other classes of materials licensees." *NRC, The Price–Anderson Act—Crossing*

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

*the Bridge to the Next Century: A Report to Congress* at 4-5 (August 1, 1998).

In *Skidmore v. Swift & Co*, 323 U.S. 134 (1944), the Supreme Court held that the expertise and informed judgment of the NRC must receive substantial judicial deference by the courts. Accordingly, based on the NRC's expertise and informed judgment, this matter falls outside the scope of the PAA because Cotter only possessed a source material license for uranium and the NRC decided in 1977 that no apparent need existed to extend the PAA to this class of materials licensee.

Put simply, "[t]he scope of Price-Anderson coverage includes any nuclear incident in the course of transportation of nuclear fuel to a reactor site, the storage of fuel at a site, the operation of reactors including discharges of radioactive emissions or effluents, the storage of nuclear wastes at reactor sites, and the transportation of radioactive material from reactors." *NRC, The Price–Anderson Act—Crossing the Bridge to the Next Century: A Report to Congress* at xii (August 1, 1998).

### 3.   The Price-Anderson Act Does Not Apply Without an Applicable Indemnity Agreement or License

Notably, the structure of the PAA has been described as "complicated," "interlocking," and "us[ing] words in unintuitive ways." *Estate of Ware*, 871 F.3d at 280.

As stated above, the 1988 Amendments to the PAA created a federal cause of action for "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2).   A "public liability action" is "any suit asserting public liability." 42 U.S.C. § 2014(hh). "Public liability" means "any legal liability arising out of or resulting from a nuclear incident[.]" 42 U.S.C. § 2014(w). Thus, only lawsuits that involve "nuclear incidents" as defined by the PAA are subject to the PAA. *Kitchin*, 389 F. Supp. 3d at 610-11; *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

186 (5th Cir. 2011); *Strong*, 283 F. Supp. 3d 759; *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013); *Banks*, 2019 WL 1426259. A "nuclear incident" is defined in 42 U.S.C. § 2014(q) as:

> any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material… *provided further,* That as the term is used in section 2210(d)of this title, it shall include any such occurrence outside the United States if such occurrence involves source, special nuclear, or byproduct material owned by, and used by or under contract with, the United States: *And provided further,* That as the term is used in section 2210(c) of this title, it shall include any such occurrence outside both the United States and any other nation if such occurrence arises out of or results from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material licensed pursuant to subchapters V, VI, VII, and IX of this division, which is used in connection with the operation of a licensed stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person licensed by the Nuclear Regulatory Commission to another person licensed by the Nuclear Regulatory Commission.

In this case and related cases, the Federal District Court in St. Louis has squarely addressed the question of whether a "nuclear incident" under the PAA requires the alleged unlawful conduct to have arisen from NRC-licensed activities or under a DOE contract with agreements of indemnification. *Banks*, 2019 WL 1426259; *Kitchin*, 389 F. Supp. 3d 600; *Strong,* 283 F. Supp. 3d 759.  In all of these cases, three different judges held that there cannot be a nuclear incident under the PAA without an applicable license or indemnity agreement covering the activities complained of. *Strong*, 283 F. Supp. 3d at 772; *Banks*, 2019 WL 1426259, at *6; *Kitchin*, 389 F. Supp. 3d at 612. As discussed below in Section III. B. 4., Defendants do not possess an appropriate license or indemnity agreement. Accordingly, the PAA is not applicable and does not preempt Plaintiffs' state law claims.

i.   **Statutory Construction Dictates that the Price-Anderson Act Does Not Apply Without an Applicable License or Indemnity Agreement**

In ascertaining the plain meaning of a statute, the Court relies on established rules of statutory interpretation, looking not only to the particular statutory language at issue, but also the design of the statute as a whole. *DeBough v. Shulman*, 799 F.3d 1210, 1212 (8th Cir. 2015*); United States v. I.L.*, 614 F.3d 817, 820-21 (8th Cir. 2010) (citations omitted). "It is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace and Agric. Implement Workers of Am.,* 523 U.S. 653, 657(1998) (quoting *Deal v. United States*, 508 U.S. 129, 132, (1993)).

As pointed out in the *Kitchin* case, the definition of "nuclear incident" refers to the use of the term in §§ 2210(c) and (d), which govern the PAA's indemnification plan for NRC licensees and DOE contractors. Section 2210(c) requires the NRC, "*with respect to licenses issued* between August 30, 1954, and December 31, 2025," to "agree to indemnify and hold harmless *the licensee* and other persons indemnified ... from public liability arising from nuclear incidents[.] ... *Such a contract of indemnification shall cover public liability arising out of or in connection with the licensed activity.*" 42 U.S.C. § 2210(c) (emphasis added). Section 2210(d) requires the DOE to enter into indemnification agreements with "any person who may conduct activities *under a contract* with the Department of Energy that involve the risk of public liability[.]" 42 U.S.C. § 2210(d)(1)(A) (emphasis added)

As articulated in *Kitchin,* 389 F. Supp. 3d at 612:

> when the definition is read *in toto* and in conjunction with § 2210, "nuclear incidents" are those occurrences within and outside the United States that arise from activities conducted under DOE contracts or in connection with NRC-licensed activity. When considered with the plain text of § 2210(c) and (d) – that public liability actions can arise only from activities under a contract with the DOE or in

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

connection with NRC-licensed activity – I must agree with the court's observation in *Strong* that "the terms 'nuclear incident' and 'occurrence' are inextricably intertwined with 'licenses' and 'indemnification agreements,' thus suggesting licenses and indemnification agreements are an integral part of the PAA's statutory scheme[.]" *Strong*, 283 F. Supp. 3d at 771. In light of this, I also agree with the *Strong* court's conclusion that, therefore, "there cannot be a nuclear incident without an applicable license or indemnity agreement."

Applying a different statutory analysis, the *Strong* and *Banks* decisions reach the same conclusion that there cannot be a nuclear incident without an applicable license or indemnity agreement. *Strong* and *Banks* found the reasoning from *Gilberg v. Stepan Co*., 24 F. Supp.2d 325, 343 (D. N.J. 1998) to be persuasive and found it significant that the definition of nuclear incident uses "occurrence" together with the clause "including an extraordinary nuclear occurrence." An "extraordinary nuclear occurrence" is in relevant part "any event causing a discharge…from its intended place of confinement in amounts off-site, or causing radiation levels offsite…" 42 U.S.C. § 2014(q). As used in the definition of extraordinary nuclear occurrence, "offsite" means "away from 'the location' or 'the contract location' as defined in the applicable Nuclear Regulatory Commission or the Secretary of Energy…indemnity agreement, entered into pursuant to section 2210." *Id*.

*Banks* and *Strong* reason that, as a matter of statutory construction, because of the proximity to and interrelationship between the word "occurrence" and the phrase "extraordinary nuclear occurrence", it was reasoned that "the occurrence which underlies a 'nuclear incident,' can only be an event at 'the location' or 'the contract location' as that term is defined in an indemnity agreement entered into under § 2210. *Banks*, 2019 WL 1426259, at *7. Thus, "[i]n the absence of an indemnification agreement, entered into under 42 U.S.C. § 2210 and covering the activities which gave rise to the liability alleged, there can be no 'occurrence,' that is, no event at the site of 'licensed activity,' that would constitute a "nuclear incident." *Strong*, 283 F. Supp. 3d at 767 (citing

13

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

*Gilberg*, 24 F. Supp.2d at 340).

The decisions in *Banks* and *Strong* acknowledge that there are varied and conflicting opinions regarding whether a license or indemnity agreement is a prerequisite for the PAA to apply. However, "[g]iven the conflicting interpretations of the PAA regarding whether there must be a license or an indemnity agreement for the PAA to apply…and considering that conflicts should be resolved by finding no federal preemption, the Court finds that this matter should be resolved in favor of finding that there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement." *Strong*, 283 F. Supp. 3d at 772; See also *Cook v. Rockwell International, Corp.*, 790 F.3d 1088, 1094 (10th Cir. 2015).

Similarly, in *Samples v. Conoco, Inc.,* 165 F. Supp. 2d 1303 (N.D. Fla. 2001), the Court considered whether a license is necessary for the PAA to apply. Much like the Defendants here, the defendant in *Samples* claimed that the "clear language of the PAA covers any claim of injury to property allegedly caused by certain nuclear material" and that "Congress did not limit the scope of the PAA's 'public liability' provisions to Nuclear Regulatory Commission (NRC) licensees and Department  of Energy (DOE) contractors." *Id*. at 1320–21. Referring to the defendant's argument as "Hogwash," the Court held that "the word 'occurrence' as used in the definition of 'nuclear incident' means 'that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract*, which may cause damage." *Id*. at 1321 (quoting S. REP. NO. 296, at 16 (1957) (quoted in 10 C.F.R. § 8.2at 202 (2001))(emphasis added).

   **ii.**  **Legislative History Dictates that the Price-Anderson Act Does Not Apply Without an Applicable License or Indemnity Agreement**

The PAA's legislative history also supports the conclusion that the PAA does not apply without an applicable license or indemnity agreement. As defined by Congress itself, "[t]he Price-Anderson

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

system is a comprehensive, compensation-oriented system of liability insurance *for Department of Energy contractors and Nuclear Regulatory Commission licensees* operating nuclear facilities." S. Rep. No. 100-70, 14, 1988 U.S.C.C.A.N. 1424, 1426 (emphasis added).

Moreover, S. REP. NO. 85–296, 1957 WL 5103, at *1817–18 (May 9, 1957), is instructive:

> IT WAS NOT THOUGHT THAT AN INCIDENT WOULD NECESSARILY HAVE TO OCCUR WITHIN ANY RELATIVELY SHORT PERIOD OF TIME .... THE *OCCURRENCE* WHICH IS THE SUBJECT OF THIS DEFINITION *IS THAT EVENT AT THE SITE OF THE LICENSED ACTIVITY*, OR ACTIVITY FOR WHICH THE COMMISSION HAS ENTERED IN TO A CONTRACT, WHICH MAY CAUSE DAMAGE, RATHER THAN THE SITE WHERE THE DAMAGE MAY PERHAPS BE CAUSED. THE SITE MUST BE WITHIN THE UNITED STATES.... *IT DOES NOT MATTER WHAT LICENSE MAY BE APPLICABLE* IF THE OCCURENCE IS WITHIN THE UNITED STATES.... *THE INDEMNIFICATION AGREEMENTS ARE INTENDED TO COVER DAMAGES CAUSED BY NUCLEAR INCIDENTS* FOR WHICH THERE MAY BE LIABILITY NO MATTER WHEN THE DAMAGE IS DISCOVERED, I.E., EVEN AFTER THE END OF THE LICENSE. THAT IS WHY THE DEFINITION OF 'NUCLEAR INCIDENT' HAS THE PHRASE 'ANY OCCURENCE * * * CAUSING BODILY INJURY, SICKNESS, DISEASE, OR DEATH' AND WHY THE DEFINITION OF 'PUBLIC LIABILITY' IS TIED TO ANY LEGAL LIABILITY ARISING OUT OF, OR RESULTING FROM, A NUCLEAR INCIDENT. (emphasis added)

It is implicit in the language of the above quoted legislative history that the terms "nuclear incident" and "occurrence" are inextricably intertwined with "licenses" and "indemnification agreements," thus suggesting licenses and indemnification agreements are an integral part of the PAA's statutory scheme and that there cannot be a nuclear incident under PAA purview without an applicable license or indemnity agreement. *Strong*, 283 F. Supp. 3d at 770-71; *Banks*, 2019 WL 1426259, at *7.

"Nothing in the PAA – either originally enacted or through its evolution – provides that it is, or was intended to be, the exclusive remedy for all claims involving nuclear radiation." *Kitchin*, 2019 WL 2027649, at *7. As stated by Judge Ross in this case:

> [I]n light of the PAA's concerns related to liability limitation and indemnification, the Court is not convinced that the 1988 amendments were meant to extend the reach of the PAA to activities not covered by applicable licenses or indemnity agreements. Defendants' construction overlooks the original purposes and framework of the AEA and the PAA – to require those involved in the nuclear industry to obtain licenses and maintain financial protections.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

*Banks*, 2019 WL 1426259, at *8.

Based on the foregoing, the statutory construction and legislative history of the PAA dictate that it to applies only to public liability claims arising out of NRC-licensed activity or DOE-contracted activity operating under indemnification agreements. See *Strong* 283 F. Supp. 3d at 772; *Banks*, 2019 WL 1426259, at *6.

### 4. Cotter's 1969 "Source Material License" does not apply to the mill tailings at issue or the illegal dumping of said tailings

The only possible license Defendants could argue potentially confers jurisdiction under the PAA is Cotter Corporation's 1969 "source material" license. However, all courts that have considered this issue have determined that Cotter's license does not support the PAA's application. Cotter's "source material" license is not relevant because it does not—and could not—apply to the mill tailings central to this litigation. Nor does Cotter's license apply to thorium which is also a radioactive constituent that forms the basis of this litigation. Moreover, Cotter's license does not apply to the complained of activities, namely the illegal disposal of radioactive wastes in Coldwater Creek.

### i. Cotter's License Does Not Apply to the Radioactive Mill Tailings at Issue

The NRC only has the power and authority Congress gives it and it had no authority over mill tailings until 1978 when the Uranium Mill Tailings Radiation Control Act ("UMTRCA") was passed. 42 U.S.C. § 2014(e)(2). See *Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Comm'n.*, 903 F.2d 1, 2–3 (D.C. Cir. 1990) ("The AEA made no provision for regulating waste materials generated during the extraction or concentration of source material."; "[b]y the 1960's and early 1970's, federal and state authorities began to realize that wastes, or 'mill tailings,' resulting from the extraction or concentration of source material posed a significant public health problem."; "Title II brought mill tailings within the NRC's licensing authority by adding a new

16

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

category to the AEA's definition of byproduct material, namely, the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.") (quoting 42 U.S.C. § 2014(e)(2)).

Cotter has never possessed a mill tailings license and its source license is inapplicable. As the *Strong* court held:

> Notably, the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), which first included uranium mill tailings in the definition of byproduct material, states that, except as otherwise provided by 42 U.S.C. § 2014, the amendments made by Title II of the UMTRCA "shall take effect on the date of the enactment of this Act." Moreover, "[r]etroactivity [is] not favored in the law," and "[C]ongressional enactments ... will not be construed to have retroactive effect unless their language requires this result." ***Thus, Cotter's 1969 Source Material License could not have covered uranium mill tailings.***

*Strong*, 283 F. Supp. 3d at 773. (emphasis added, internal citations omitted); See also *Banks*, 2019 WL 1426259, at *9.

Defendants argue that the AEC's licensure of the materials at issue demonstrates that the AEC and later the NRC understood these residues to be subject to their jurisdiction. However, the NRC has authoritatively concluded that mill tailings produced prior to 1978 are not subject to NRC regulations and licenses:

> In 1978, the Uranium Mill Tailings Radiation Control Act (UMTRCA) [Pub. L. No. 95-604] was enacted. As then Chairman Hendrie of the NRC explained to Congress, the agency at the time did not have direct regulatory control over uranium mill tailings. The tailings themselves did not fall into any category of NRC-licensable material. As of 1978, NRC was regulating tailings at active mills indirectly through its licensing of source material milling operations under the Atomic Energy Act of 1954 (AEA), largely as a result of the enactment of the National Environmental Policy Act (NEPA). Operating uranium mill licenses were conditioned to require proper disposition and stabilization for environmental issues after operations had ceased. However, *tailings were not source material licensable by the NRC*. Thus once the underlying source material license terminates, there would no longer be a clear basis for regulating the tailings.

*In the Matter of Envirocare of Utah & Snake River All.,* 56 N.R.C. 53, 2000 WL 34400480 (N.R.C. Dec. 13, 2000) (emphasis added). As stated above, the expertise and informed judgment

of the NRC must receive substantial deference by the courts. *Skidmore,* 323 U.S. 134 (1944). Accordingly, the mill tailings generated by Mallinckrodt's processing operations that ceased in 1957, and which were later purchased and disposed of by Cotter, were not and are not subject to the AEA and therefore cannot provide the basis for a public liability action under the PAA. *See* Declaration of Richard B. Stewart, 4:18-cv-00624 (JAR), Doc. No. 59-1.[4]

Here, throughout the Second Amended Petition, Plaintiffs have specifically alleged that the materials at issue are mill tailings and that these wastes were generated from the processing of uranium ore in downtown St. Louis. *See* SAP at ¶¶ 11, 64, 65. Defendants argue that these allegations are legal conclusions masquerading as fact. This simply is not true. The notion that Cotter's license does not apply to mill tailings is a legal conclusion reached by Judge Hamilton in *Strong,* Judge Ross in this matter, and by the NRC in *Envirocare.*  In contrast, the determination of whether the materials at issue are in fact mill tailings is a factual determination. On a motion to dismiss all properly pleaded facts must be accepted as true, giving the pleadings their broadest intendment, and all allegations must be construed favorably to the pleader. *Bromwell* 361 S.W.3d at 398.

Regardless, Plaintiffs have made sufficient allegations to demonstrate that the materials in question are in fact mill tailings. Following the enactment of UMTRCA in 1978, the definition of byproduct material was amended to include "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." PL 95–604 (HR 13650), PL 95–604, NOVEMBER 8, 1978, 92 Stat 3021 "As the precursor to the nuclear fuel cycle, uranium recovery focuses on extracting (or mining) natural uranium ore from the Earth and concentrating (or milling) that ore."[5] Plaintiffs here alleged that

---

[4] Declaration of Richard B. Stewart is attached hereto as Exhibit 2.
[5] U.S. NRC, Uranium Recovery (Feb. 14, 2019), https://www.nrc.gov/materials/uranium-

Electronically Filed - St. Louis County - February 05, 2020 - 03:49 PM

the wastes created by the uranium ore processing in downtown St. Louis are known in the scientific and regulatory communities as uranium mill tailings that were created as a result of the milling of uranium ore to produce uranium metal by Mallinckrodt. *See* SAP at ¶¶ 62, 64. Plaintiffs also allege that mill tailings from the processing operations in downtown St. Louis were transferred and stored at a site referred to as the St. Louis Airport Site ("SLAPS"). *See* SAP at ¶ 65. Plaintiffs further allege that the mill tailings stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri. *See* SAP at ¶¶ 67, 87. Finally, Plaintiffs allege that in 1969, the radioactive wastes at Latty Avenue were sold to the Cotter Corporation. *See* SAP at ¶ 87. Thus, the radioactive wastes that were purchased by Cotter in 1969 and form the basis of this lawsuit were created as a result of the processing (or milling) of uranium ore. Accordingly, Plaintiffs have plead sufficient facts to establish that the radioactive wastes at issue are, in fact, mill tailings. This is further confirmed by Dr. Marvin Resnikoff – an expert in nuclear waste transportation, storage, and disposal – who demonstrates that the wastes that contaminated Coldwater Creek and Plaintiffs properties are mill tailings created by milling uranium ore in downtown St. Louis. *See* Declaration of Dr. Marvin Resnikoff, 18-cv-00624 (JAR), Doc. No. 59-2.[6]

In addition to the fact that Cotter's license does not apply to mill tailings, the license also does not apply to thorium, a radioactive constituent that forms the basis of this litigation. Plaintiffs have alleged that "[b]etween 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium" and that "Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium." *See* SAP at ¶¶ 72, 73.

---

recovery.html.
[6] Declaration of Dr. Marvin Resnikoff attached as Exhibit 1.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

### ii.    Cotter's License Does Not Apply to the Activities at Issue Here

As determined by Judge Ross in this matter, "Defendants have not established that Cotter's 1969 Source Material License authorizing it 'to receive, possess and import' uranium covered their activities at the sites involved in this case." *Banks*, 2019 WL 1426259, at *9.  Plaintiffs have alleged that "Coldwater Creek is not and has never been a licensed nuclear facility" and "Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek" *See* SAP at ¶ 15.

Thus, Cotter's 1969 license does not apply here because the material at issue is in fact mill tailings and because the license did not cover thorium. Moreover, Cotter's license did not cover the improper dumping activities which are the cause of Plaintiffs' damages. Because there is no applicable license, the PAA does not apply and does not preempt Plaintiffs' state law claims.

### 5.    <u>Assuming *Arguendo* that an Applicable License or Indemnity Agreement is Not Required or that Cotter's 1969 Source Materials License is Determined to be Applicable, the Price-Anderson Act is Still Inapplicable and Does Not Preempt Plaintiffs' State Law Claims</u>

The PAA's legislative history demonstrates Congress' intent to preserve state law remedies in the event of anything other than a nuclear occurrence as statutorily defined. S. REP. 85-296, 1957 U.S.C.C.A.N. 1803, 1810 (The PAA is designed to have "no interference with the state law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity").  After the PAA was enacted, subsequent amendments did not change the overarching framework: The "1966 Amendments expressed Congress' intent to interfere with state law as little as possible, while the 1988 Amendments demonstrated the need for a consolidated forum *in the event of a nuclear incent*…[the] legislative history suggests that Congress did not intend to preempt all state law actions involving nuclear energy – just those rising

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

to the level of a nuclear incident." Daniel Kolomitz, *A Nuclear Threat: Why the Price-Anderson Act Must Be Amended Following Cook v. Rockwell*, 48 Ariz. St. L.J. 853, 860 (2016).

In enacting the PAA, Congress did not preclude maintenance of any and all state law claims for nuclear-related harms. In fact, the legislative history shows Congress recognized that State courts would have a role to play in regard to providing remedies for damages caused by radioactive materials. S. REP. 85-296, 1957 U.S.C.C.A.N. 1803. The PAA applies only to claims involving a nuclear occurrence involving special nuclear, source, or byproduct material arising out of conduct by a defendant operating in accordance with an appropriate government license or indemnity agreement. See 42 U.S.C.§ 2014(q). It does not preempt state law claims that fall outside of its framework. The PAA does not reflect congressional intent to occupy the entire field of all nuclear-related claims; prosecuting nuclear-related state-law claims in state court does not conflict with the PAA's scheme.

The well-reasoned opinion by Judge (now Justice) Gorsuch for the court in *Cook v. Rockwell Int'l Corp*., 790 F.3d 1088, 1099 (10th Cir. 2015), *cert. dismissed sub nom. Dow Chem. Co. v. Cook*, 136 S. Ct. 2055 (2016), provides an exceedingly sound analysis of the issues and justification for these conclusions. *Cook* considered whether the PAA preempts state law claims where a nuclear incident is alleged but unproven. 790 F.3d 1088, 1092 (10th Cir. 2015). In *Cook*, Judge Gorsuch concluded that the PAA did not preempt state law claims. "Where does any of this language—expressly—preempt and preclude all state law tort recoveries for plaintiffs who plead but do not prove nuclear incidents? We just don't see it. Congress knows well how to preempt a field expressly when it wishes." *Id.* at 1095. The court noted that "[n]othing in this language speaks to what happens when a nuclear incident is alleged but unproven. And certainly nothing in it dictates that injured parties in such circumstances are forbidden from seeking or securing traditional state law remedies." *Id.* Here, Plaintiffs are not pursuing a public liability action because there has been

no nuclear incident as it is statutorily defined. Simply put, Plaintiffs do not allege a nuclear incident under PAA. Common sense dictates that when a nuclear incident is not alleged in the first place, a plaintiffs' claims are not preempted.

As Judge Gorsuch correctly determined, the PAA does not extend to all nuclear-related activities and resulting injuries. Nor does it preempt the field, so as to preclude state law recovery for such injuries when they are not subject to compensation under the PAA. Further, the congressional scheme in the PAA functions perfectly in tandem with state court jurisdiction and application of state law actions involving claims not covered by the PAA system. Indeed, the availability of state law claims, which could include punitive damage awards, would strengthen the PAA system by giving operators incentives to subject their activities to federal regulatory and financial responsibility/indemnity requirements.

As *Cook* points out, courts that have stated in unqualified terms that the PAA encompasses all nuclear-related injury claims have failed to address  the limitations in the Act's coverage. 790 F.3d at 1098. The Act covers only claims arising out of a "nuclear incident" "including an extraordinary nuclear occurrence," involving specified nuclear-related materials in activities subject to federal regulation or indemnity agreements. 42 U.S.C.A. § 2210(n)(2); 42 U.S.C. § 2014(w); 42 U.S.C.§ 2014(q); 42 U.S.C.A. § 2014(j). Precluding state law claims that do not meet these limitations would leave injured parties in limbo, without any remedy. As *Cook* emphasized, the PAA should not be interpreted to preempt state law claims that do not fall within its "public liability" scheme. Courts must not interpret federal statutes to preempt traditional state tort law remedies unless congressional intent to do so is clear. *Cipollone v. Liggett Group, Inc*., 505 U.S. 504 (1992); *Riegel v. Medtronic, Inc*., 552 U.S. 312, 334 (2008). No such intent can be found in the PAA. Accordingly, courts should not interpret PAA to preempt state law claims for injuries for which PAA does not itself provide a remedy.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

**6.**   <u>**Applying the Price-Anderson Act to Every Case Involving Nuclear Material**</u>
<u>**or Radiation Leads to Absurd Results**</u>

Defendants propose that PAA grants immunity from state tort liability to anyone who intentionally or unintentionally uses nuclear materials to cause harm. This approach ignores the history, structure, language and purpose of the PAA and would lead to absurd results. Based on Defendants' approach, the PAA would cover all nuclear tortfeasors under any conceivable circumstance. It would cover the properly licensed and indemnified owner of a nuclear plant, as well as any corporate opportunist who foregoes licensing and regulations to conduct operations at their own risk.

Such an extreme interpretation of the PAA was not Congress' intent and it is not supported by the language of the PAA as enacted or any of its amendments. If Congress intended to extend the benefits of the PAA to all nuclear wrongdoers, it would have used a word other than "occurrence" to define "nuclear incident." At the very least, Congress would have provided an alternative definition of "occurrence" to include events that do not take place at a "location" as set forth in an applicable indemnity agreement or license. Congress chose to do neither; thus, "occurrence" continues to have the same meaning as when the PAA was enacted: an event taking place at a location identified in a license or indemnity agreement held by a defendant. This Court should refuse Defendants' invitation to depart from the purpose and language of the PAA by assigning an interpretation that would have absurd consequences and would allow Defendants the protections of the PAA despite not being participants in the PAA system and despite not having the required financial protections and/or indemnity agreement.

**7.**   <u>**Applying Price-Anderson Act Preemption to Encompass all State Law**</u>
<u>**Claims Involving Radiation Violates the Due Process Clause**</u>

The due process clauses under the United States and Missouri constitutions prohibit the taking of life, liberty, or *property* without due process of law. *See Colyer v. State Bd. of*

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

*Registration For Healing Arts*, 257 S.W.3d 139, 144 (Mo. Ct. App. 2008) (citing U.S. Const. amend. XIV, sec. 1; Mo. Const. art. I, sec. 10.) Defendants argue that the PAA encompasses all nuclear-related injury claims including all state-law claims for lost property that in any way involve damage from radiation. *See* Defendants' Motion to Dismiss at p. 17.  As a matter of due process, Congress cannot eliminate longstanding common law rights without providing any "reasonable alternative remedy" unless there is a compelling reason to do so. *PruneYard Shoping Ctr. V. Robins*, 447 U.S. 74, 93-94 (1980).  The guaranty of due process demands that any laws passed by Congress shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be attained. *Nebbia v. New York,* 54 S.Ct. (1934) 505, 523-525. Defendants' interpretation raises serious questions as to the constitutionality of the PAA.

If the PAA completely preempts state tort claims for any injury related to nuclear material, then plaintiffs' *real property* has been taken without due process because Defendants have contaminated it with radioactive by-products, and the PAA (if so interpreted) would give Defendants immunity from all common-law liability not included in the PAA for that injury (including from nuisance) to Plaintiffs' properties. Such an interpretation of the PAA would render at least portions of the PAA unconstitutional under both the Due Process and Takings clauses of the Fifth Amendment of the United States Constitution because Defendants concede that prior to 1988 the PAA would only apply in cases of "extraordinary" nuclear occurrences and not in cases such as this. *See* Defendants' Opposition to Motion to Remand at page 2. (Doc. No. 52)

Moreover, the doctrine of constitutional avoidance dictates that courts avoid interpretations that raise constitutional concerns. "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *See Almendarez-Torres v. U.S.*, 523 U.S. 224, 237-238 (1998) (citations omitted).  The

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

doctrine of constitutional avoidance is "…a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Suarez Martinez*, 543 U.S. 371, 381 (2005) (citation omitted). Accordingly, this Court should avoid the decision of a constitutional question by holding that the PAA does not preempt Plaintiffs' property law claims.

In *Duke Power Company v. Carolina Environmental Study Group, Inc.,* the U.S. Supreme Court found that the PAA's limitation of liability was a rational and acceptable method for Congress to utilize to encourage the private development of electric energy by atomic power; however, the Court did so *before* the 1988 Amendments and the Court never addressed the complete loss of common law rights to litigants in instances where the PAA precludes recovery. 438 U.S. 59 (1978).  *Duke* particularly discussed the PAA's pre-1988 substitute remedy, indicating the indemnity provisions of PAA providing "assurance" of available funds to satisfy potential radiation claims was critical to the Court's decision. The *Duke* court found: "This panoply of remedies and guarantees is at the last a reasonably just substitute for the common-law rights replaced by the Price-Anderson Act. Nothing more is required by the Due Process Clause." *Id.* at 93.  Here, however, Plaintiff and Class would be left without a substitute remedy for their property law claims if this Court determines that the PAA abrogates common law rights. "It is inconceivable that Congress intended to leave victims with no remedy at all." *Silkwood*, 464 U.S. 238, 263 (1984).  It is even more inconceivable that Congress would leave victims without a remedy absent a clear expression of an affirmative intent to do so.

Defendants argue that all state-law claims for lost property that involve damage from radiation are preempted by the PAA – including those not covered by indemnification. Adopting this position would mean that the PAA deprives injured claimants of their common law property

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

rights without any substitute. Per the Supreme Court's analysis in *Duke Power*, this would be an unconstitutional due process violation. Under the canon of constitutional avoidance enunciated by the Supreme Court, courts should construe federal statutes so as to avoid presenting such serious constitutional issues. *United States v. Witkovich*, 353 U.S. 194 (1957); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).

While a given common-law remedy may not necessarily be a *fundamental* right, neither is that right illusory. *Martinez v. California,* 444, U.S. 277, 281-82 (1980). "[A]n individual does have a weighty property interest in having *some* legal means available to redress an injury that would have been compensable at common law." *Ileto v. Glock*, 565 F.3d 1126, 1153 (9th Cir. 2009) (Berzon, J., concurring in part and dissenting in part) (emphasis in original). Another state common-law claim not compensable under the PAA is medical monitoring, which Plaintiffs seek here. *See* SAP at ¶¶ 36, 191-92, and Prayer for Relief at pp. 41-42. Missouri state law allows a claim for medical monitoring, but if state law claims are preempted, as Defendants propose, victims who have a viable claim would lose an important right to that redress. In *Martinez,* the court observed that "the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." 444 U.S. 277, 282 (1980).

Numerous state courts also consider the availability of substitute remedies when assessing statutes that weaken or eliminate common-law rights. In *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, the court held that a statute that limits a remedy must "provide an injured person an effective and reasonable alternative remedy", or the court will apply a heightened standard of review.  974 P.2d 1194, 1198, 1217 (Utah 1999).  In considering a federal due

process challenge to a state law abolishing joint and several liability, the court in *Church v. Rawson Drug & Sundry Co.*, noted that, "in weighing whether a statute which abrogates rights is constitutional, it is appropriate to consider the extent to which the litigant's right to redress is affected", but finding the statute in question "neither deprives litigants of access to the courts nor sets a ceiling on how much they can recover". 842 P.2d 1355, 1365 (Ariz. Ct. App. 1992). Likewise, in *Bair v. Peck*, (striking down a statute that eliminated vicarious liability of employer health care providers) the court stated: "[E]ven if a statute is consistent with public policy, there still must be an adequate substitute remedy conferred on those individuals whose rights are adversely impacted." 811 P.2d 1176,1188 (Kan. 1991).  As importantly, in *Smith v. Dep't of Ins.*, (striking cap on noneconomic damages in medical malpractice cases) the court found: "[W]here a right of access to the courts for redress for a particular injury ... has become a part of the common law of the State ... the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." 507 So. 2d 1080, 1088 (Fla. 1987) (citation and internal quotation marks omitted).

Immunizing defendants from all liability for nuisance and medical monitoring claims would force Plaintiffs, the class, and the public to bear the burden which should be borne by Defendants.  To date, the Supreme Court has not decided what level of constitutional scrutiny applies to a statute that abolishes a common-law cause of action and leaves no substitute remedy. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1150 (9th Cir. 2009) (Berzon, J., concurring in part and dissenting in part); *see also*, *Prune Yard Shopping Ctr. v. Robins*, 447 U.S. 74, 93-94 (1980) (Marshall, J., concurring) ("Quite serious constitutional questions might be raised if a legislature

attempted to abolish certain categories of common-law rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish 'core' common-law rights, including rights against trespass, at least without a compelling showing of necessity or a provision for a reasonable alternative remedy.").  Given the important interests at stake, there is authority for a "heightened" standard of review looking to whether the legislature has provided an alternate remedy.  In *Cook v. Rockwell Int'l. Corp.,* now-Justice Neil Gorsuch observed that plaintiff's argument that Congress cannot eliminate longstanding common law rights without providing any "reasonable alternative remedy" unless there is a "compelling reason to do so" was no "trivial argument". 790 F.3d 1088 (10th Cir. 2015) at FN3.  (There, the Court did not have to resolve the due process argument because the Court found defendants' reading of the statute unconvincing.)

Whether this court ultimately applies a heightened standard of review, any interpretation of the PAA that nullifies common law property rights without providing a substitute remedy of any kind whatsoever cannot stand. Such a ruling would have catastrophic results and, thus, undermine the "public compensation" goal of the PAA.  Therefore, this Court should rule that the PAA does not preempt Plaintiffs' property law claims.

## C. <u>Plaintiffs Have Not Alleged a Nuclear Incident and Are Not Bringing a Public Liability Action</u>

Defendants spend over six (6) pages of their Motion to Dismiss arguing that Plaintiffs have not pleaded a viable claim for which relief can be granted under the Price-Anderson Act.[7] This is a red herring as Plaintiffs are not bringing a public liability action under the PAA. Instead, Plaintiffs are bringing claims under Missouri state law.  As outlined above, these state law claims are not preempted by the PAA.  As outlined below, Plaintiffs have sufficiently

---

[7] *See* Defendants' Motion to Dismiss at pgs. 18-24.

alleged their claims under state law.

### D.  Plaintiffs Have Properly Pleaded Causes of Action Under Missouri State Law

#### 1.  Plaintiffs Need Not Specifically Plead a Dosage Amount

Defendants argue that the Petition is unreasonably vague because Plaintiffs have failed to allege a dosage amount.  Defendants cite to no case law for this proposition.  Defendants also fail to articulate or explain why any of the legal theories that Plaintiffs proceed under would require them to specifically plead a dosage amount.  Moreover, Missouri courts have rejected claims that dosage amounts are somehow dispositive in evaluating pleadings. See *Bennett v. Mallinckrodt*, 698 S.W. 2d 854, 868-69 (Mo. App. E.D. 1985); *Maryland Heights Leasing v. Mallinckrodt Inc.*, 706 S.W.2d 218, 223 (Mo. App. E.D. 1985) (rejecting defendant's claim that plaintiff specifically had to allege that toxic emissions violated federal emission limits).

Plaintiffs here have alleged that radioactive isotopes are among the most toxic materials known to man, and that radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. As such, exposures to radioactive wastes should be as low as reasonably achievable.  See SAP at ¶ 156.  Plaintiffs allege that samples taken on and around their properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.  *See* SAP at ¶ 93.  Plaintiffs further allege that the radioactive contamination that has polluted the Plaintiffs' properties matches the waste fingerprint (or profile) of the radioactive wastes handled by Defendants.  *See* SAP at ¶ 95.  Moreover, Plaintiffs allege that the radioactive contamination was caused by Defendants' improper handling, storage, and disposal of radioactive materials.  *See* SAP at ¶ 96.  In short, Plaintiffs sufficiently allege a claim that Defendants have failed to make every reasonable effort to maintain radiation exposures as low as reasonably achievable and their improper handling and illegal dumping of

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

radioactive residues has caused radioactive particles to migrate onto Plaintiffs' properties.

### 2.  Plaintiffs Adequately Pleaded Trespass

The tort of trespass arises from the direct physical interference with the person or property of another. *Looney v. Hindman,* 649 S.W.2d 207, 212 (Mo. banc 1983).  Where real estate is involved, "trespass is the unauthorized entry upon the land of another, regardless of the amount of force used, even if no damage is done or the injury is slight." *Rosenfeld v. Thoele*, 28 S.W.3d 446, 449 (Mo. Ct. App. 2000).  The unauthorized entry may be made by a person or an object as a result of a person's actions. *Id.*

In *Rychnovsky v. Cole*, the plaintiff alleged defendants' failure to maintain their private sewer line caused sewage to leak onto his property and resulted in damage to his home.  The court determined that "[t]hese facts stated a claim for trespass in that the defendants' sewage made an unauthorized entry onto Rychnovsky's property and created a direct physical interference with the use of his home." 119 S.W.3d 204, 212 (Mo. Ct. App. 2003).  Like in *Rychnovsky*, Plaintiffs here allege that Cotter purchased radioactive wastes and failed to properly dispose of these wastes and that Defendants caused these radioactive materials to migrate and contaminate Plaintiffs' properties.  *See* SAP at ¶¶ 109,112,113.  Plaintiffs further allege that Defendants did not have permission or consent to interfere with their property. *See* SAP at ¶ 121. Thus, Plaintiffs have alleged that Defendants have entered upon Plaintiffs' land and that such entry was unauthorized.  Accordingly, Plaintiffs have sufficiently alleged a claim for trespass.

### 3.  Plaintiffs Adequately Pleaded Nuisance Claims - Cotter's Ownership of Property is Irrelevant to Plaintiffs' Nuisance Allegations

Nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the rights of another to peacefully enjoy his property.  *Frank v. Envtl. Sanitation Mgmt., Inc.,* 687 S.W.2d 876, 880 (Mo. banc 1985).  "There is no exact rule or formula

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

by which the existence of a nuisance or the nonexistence of a nuisance may be determined. 'Necessarily each case must stand upon its own special circumstances, and no definite rule can be given that is applicable in all cases ...'" *Id.* at 881.   The questions of whether a use is "unreasonable" and whether it "substantially" impairs the rights of another to use his or her property are particularly fact intensive and, therefore, best suited for jury resolution.  *Williams v. Monsanto Co.,* 856 S.W.2d 338, 341 (Mo.App.1993).

Defendants argue that they cannot be liable to Plaintiffs for either permanent or temporary nuisance because Cotter was not the property owner of Latty Avenue.  However, Missouri courts have rejected the exact proposition Defendants rely on here.

Missouri law does not support the proposition that nuisance may only arise from the unreasonable use of one's own property.  *City of Greenwood v. Martin Marietta Materials Inc.*, 299 S.W.3d 606, 617 (Mo. App. W.D. 2009); *Rosenfeld v. Thoele*, 28 S.W.3d 446, 452 (Mo. App. E.D. 2000) ( citing 66 C.J.S. *Nuisances* § 75(1998) ("It is not necessary in order to charge a person with liability for a nuisance that he should be the owner of the property on which it is created, but it is sufficient that he created the nuisance or exercises control over the nuisance-causing property."); 58 Am Jur 2d, *Nuisances* § 117 (1989) ("While the defendant in a nuisance action frequently is the owner the property alleged to be the source of the nuisance, property ownership is generally not a prerequisite to nuisance liability.").  Defendants' argument here is completely contrary to current black letter law and should be denied.

Defendants cite two cases for the proposition that ownership of the land is a prerequisite to a nuisance claim.  They first cite *Franks v. Environmental Sanitation Management*, but *Franks* does not hold that property ownership is a key element of nuisance law; the focus in *Franks* is on *use* of land.  687 S.W.2d at 880 ("The crux of a nuisance case is unreasonable land use.").  Cotter

also cites *State ex rel Ely v. Bandall*, a Prohibition-era decision seeking to prohibit the operation of a speak-easy as a nuisance.  220 Mo. App. 1222 (1927).  That case is not relevant to our current understanding of tort law in Missouri; the decision did not address the pleading requirements of a suit for damages.  *Id*.

The current focus in the law is on land *use*.  Plaintiff has alleged that Defendants unreasonably and unlawfully used the land in question to store and use radioactive materials which then contaminated Plaintiffs' property resulting in the unreasonable interference with Plaintiffs' use and enjoyment of their property. (Petition, ¶111, 116, 136, 150, 152).  Having alleged unreasonable use of land which has substantially impaired Plaintiffs' right to peacefully enjoy their property, the Petition sufficiently states a claim.

### 4.  Plaintiffs Adequately Pleaded Negligence

To state a claim for negligence, a plaintiff must allege 1) that defendant has a duty to protect plaintiff from injury; 2) defendant has failed to perform that duty; 3) as a result, plaintiff was injured.  *McComb v. Norfus*, 541 S.W.3d 550, 554 (Mo. banc 2018); *Maryland Heights Leasing Inc. v. Mallinckrodt*, 706 S.W.2d 218, 223 (Mo. App. E.D. 1985).  Defendants argue that Plaintiffs have not adequately pleaded a negligence claim because they have not adequately described the duty Cotter (or ComEd) owes them. "A pleader is required to state only the ultimate facts and it is not necessary to plead the facts or circumstances by which the ultimate facts will be established." *Scheibel*, 531 S.W. 2d at 290.

In *Maryland Heights Leasing, Inc. v. Mallinckrodt*, the defendant moved to dismiss the action for failure to adequately allege breach of duty because the petition did not allege that the radioactive emissions reached a certain level.  706 S.W.2d 218, 223 (Mo. App. E.D. 1985).  The court denied the motion and noted that allegations that the emissions were "unlawful and

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

unreasonable" sufficiently alleged a breach of duty and adequately stated a claim. *Maryland Heights Leasing, Inc.*, 706 S.W.2d at 224. Not only was the "unlawful and unreasonable" allegation sufficient, the court rejected Mallinckrodt's argument that plaintiffs had to allege the violation of federal law. *Id.* at 223-24.

Here, Plaintiffs have alleged that Defendants used radioactive materials in a manner that is *unreasonable*, *unlawful*, malicious and wanton. *See* SAP at ¶ 111, 116, 133. Plaintiffs have further *specifically* alleged that Defendants owed a duty of care to: 1) ensure the safe and legal handling, storage and disposal of radioactive wastes (*see* SAP at ¶ 157); 2) warn or notify Plaintiffs of the potential hazards of exposure to radioactive substances and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future (*see* SAP at ¶ 158); and 3) comply with applicable laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials (*see* SAP at ¶ 159). Plaintiffs further allege that Defendants breached these duties by their reckless and negligent processing, handling, storage, and/or disposal of radioactive waste materials; that Defendants' conduct is in utter non-compliance with applicable laws, regulations, and guidelines; and that Defendants' conduct resulted in the dangerous release of radioactive substances into the communities around Coldwater Creek subjecting Plaintiffs to an unreasonable risk of harm and to actual injuries. *See* SAP at ¶ 160.

The "unlawful and unreasonable" allegation is nearly identical to the allegation the court found sufficient in *Maryland Heights Leasing*. Moreover, Plaintiffs have included specific allegations describing the duty and subsequent breach. Cotter has provided no case law for its position that Plaintiffs need to allege the specific standards or best practices Defendants failed to implement, and this point should be denied.


### 5.  **Plaintiffs Adequately Pleaded Negligence *Per Se***

Defendants' claim that Plaintiffs have inadequately pleaded negligence *per se* is disingenuous; Plaintiffs adequately identified the statutes at issue and the standards Defendants are alleged to have violated.  To state a negligence per se claim, a party must allege 1) violation of a statute or regulation; 2) the injured plaintiff was a member of the class of persons intended to be protected by the statute or regulation; 3) the injury complained of was the kind intended to be prevented by the relevant statute or regulation; and 4) the statutory or regulatory violation caused the injury at issue.  *Dibrill v. Normandy Associates Inc.*, 383 S.W.3d 77, 84-85 (Mo. App. E.D. 2012).

Defendants contend that Plaintiffs have failed to adequately allege what they did or failed to do that violated the statute.  The Second Amended Petition clearly states that Defendants violated the regulations listed in paragraph 171 which are intended to require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.  *See* SAP at ¶ 171.  The Second Amended Petition goes on to state that the injury to land suffered by Plaintiffs violates those statutes.  *See* SAP at ¶ 173.  Defendants are clearly alleged to have violated the relevant statutes by improperly handling and dumping radioactive waste.  *See* SAP at ¶ 175. Defendants call it "particularly troubling" that Plaintiffs rely on air and solid waste regulations. Plaintiffs fail to understand what is "troubling" about relying on solid waste regulations when the management of solid waste is what is at issue in this lawsuit.  Moreover, to Cotter's point that it would be more appropriate to cite to water regulations because of the allegations regarding the contamination of Coldwater Creek, Plaintiffs draw the Court's attention to SAP Paragraph 171 which clearly references the Missouri Clean Water Act.  Plaintiffs have adequately alleged a negligence *per se* claim.

### 6.  **Plaintiffs Adequately Pleaded Strict Liability**

Defendants argue that Plaintiffs have not adequately pleaded strict liability.  Strict liability arises where a party's activities have created a high degree of risk of harm, the harm has been and will be significant, the risk cannot be eliminated, the harm outweighs the operation at issue, and the plaintiff has been injured.  *Bennett v. Mallinckrodt*, 698 S.W. 2d 854, 868-69 (Mo. App. E.D. 1985).  Defendants' argument on this point is particularly specious.  Defendants repeat Plaintiffs' allegations that Defendants "stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, at the SLAPS and Latty Avenue sites," but then goes on to argue that this does not equate to an abnormally dangerous activity.  Once again, Cotter cites to absolutely no precedent for this proposition, and ignores the binding precedent laid out by the Eastern District of Missouri.  In fact, in both *Bennett* and *Maryland Heights Leasing*, the court went out of its way to specifically note that the strict liability was appropriately applied in cases raising the use of nuclear material.  *See, e.g.*, *Bennett*, 698 S.W.2d at 868 ("The nuclear industry is unique in its inherent and, at present, unrectifiable danger  . . . Numerous safety standards have been set to ensure the public welfare, but even with those precautions taken, the potential danger is still enormous. . . . The value of the nuclear industry to society may be great, but the use of nuclear material is not yet so common that strict liability should not be applied at this time.").  In *Maryland Heights*, the court found that plaintiff's allegations that Mallinckrodt operated its plant in a way to cause "unlawful low level radiation create[ing] a high risk of harm to property, leasehold interest . . ." were sufficient to state a claim.  706 S.W.2d at 226.

Here, Defendants argue that Plaintiffs failed to allege that the activities were abnormally dangerous.  This is patently absurd; Plaintiffs spend multiple paragraphs explaining the dangers caused by radioactive materials.  *See* SAP at ¶¶ 5,53-61,156.  Plaintiffs also specifically alleged

that Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste. *See* SAP at ¶ 179. As explained more fully above, claims involving radiation damage meet the "ultrahazardous" element of strict liability. Plaintiffs have also adequately alleged that the location of the processing of such ultrahazardous materials was inappropriate. Specifically, Plaintiffs have alleged that the physical locations at issue in this lawsuit are surrounded by residential neighborhoods and that the processing, storing, and transporting of materials at these specific sites was "unreasonable and unlawful." *See* SAP at ¶¶ 3, 39(a-h). Moreover, it is a reasonable inference that the sites were inappropriate places to process nuclear wastes from the allegations involving Coldwater Creek, which demonstrate that it was unreasonable to store radioactive materials near a location that is responsible for drainage to the sites in question and prone to flooding sites further downstream. *See* SAP at ¶¶ 84-91. Accordingly, Plaintiffs have adequately alleged a claim on a strict liability theory of negligence.

### 7. <u>Plaintiffs Adequately Stated a Claim for Damages as to All State Law Claims</u>

Defendants incorrectly allege that Plaintiffs have not adequately pleaded damages. Injury is an essential element of a negligence claim or a claim arising under a theory of strict liability. *Bennet v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 864-65 (Mo. App. E.D. 1985). As to a nuisance claim, an "injury" may cause either general or special damages. *Maryland Heights Leasing Inc. v. Mallinckrodt, Inc.*, 706 S.W. 2d 218, 222 (Mo. Ct. App. E.D. 1985). If general damages are alleged, no special pleading is required. *Id.*

Plaintiffs have alleged that their property has become contaminated with radioactive waste and material. *See* SAP at ¶¶ 18-25, 92. Plaintiffs have further alleged that testing on their property has shown higher radioactivity beyond background levels. *See* SAP at ¶¶ 93. Their property has been damaged, and they have lost the use and enjoyment of their land. *See* SAP at ¶ 26.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Specifically, Plaintiffs alleged that the radioactive contamination renders their property unfit for normal use and enjoyment and destroys its fair market value.  *See* SAP at ¶ 97.

Defendants argue that Plaintiffs have failed to allege the specific amount of substances, how Defendants damaged Plaintiffs' property, or how the value of the property diminished.  There is no requirement under Missouri law to make such specific factual pleadings.  When confronted with a similar issue in *Bennett v. Mallinckrodt*, the Eastern Court of appeals rejected defendant's argument that plaintiffs' petition failed to state a claim because plaintiffs did not allege that any of the named class had an identifiable and detectable physical injury.  698 S.W.2d 854, 865 (Mo. App. E.D. 1985).  The *Bennett* court noted that vagueness was not grounds for a motion to dismiss.  698 S.W.2d at 865.  The court ultimately found that plaintiffs' allegations of "various health and physical illness" and "injury, damages to health, property, and safety to plaintiffs," were adequate allegations of injury.  *Id*.  Similarly, Plaintiffs here alleged that their property is unfit and that the fair market value has been destroyed due to radioactive contamination.  That allegation is more specific than the "injury, damages to . . . property" allegation that the *Bennet* court found sufficient.  Further, the allegation adequately notifies defendants about what this case involves, and the Court should find that Plaintiffs adequately alleged their injuries as to all legal theories.

### 8.  Plaintiffs Adequately Stated a Civil Conspiracy Claim

A plaintiff brings a civil conspiracy claim when she pleads facts tending to show that 1) two or more persons; 2) with an unlawful objective; 3) after a meeting of the minds; 4) committed an act in furtherance of the conspiracy that 5) caused damages.  *Western Blue Print Co. LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc. 2012).  Conspiracy is not a separate or distinct action; rather it is a vehicle to hold joint tortfeasors jointly and severally liable for the conduct at issue.  *Id*.

Defendants argue that Plaintiffs have not alleged any meeting of the minds.  Yet the Second

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Amended Petition clearly states that "Defendants wrongfully and fraudulently agreed and conspired together to . . . wrongfully releas[e] radioactive wastes." *See* SAP at ¶ 199.  The Second Amended Petition goes on to allege that the "Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein." *See* SAP at ¶ 200.  Defendants then go on to argue that Plaintiffs allege that each defendant acted in its own sphere and never came into contact with another defendant.  Tellingly, this argument lacks a citation to the Second Amended Petition.  Plaintiffs did not, in fact, allege that each defendant acted in its own sphere and never came into contact with another defendant.  This may be an inference from the timeline of events alleged in the Second Amended Petition, but at the pleading stages the court is obligated to construe all inferences in Plaintiffs' favor.  It is just as likely an inference from the allegations in the Second Amended Petition that the defendants agreed to dispose, transport, and store waste in the same manner, leading to Plaintiffs' damages.  Accordingly, Plaintiffs adequately alleged a conspiracy claim.

9.  **Plaintiffs' Allegations Regarding Ultimate Facts as to Defendants Are Sufficiently Plead**

Defendants next argue that Plaintiffs have not adequately supported their claim against Cotter by pleading ultimate facts.  Other than a paragraph in which Defendants recite the Missouri pleading standards, the sole legal citation for this proposition is an unpublished United States District Court opinion interpreting a complaint making allegations under the PAA.  Plaintiffs contended previously and continue to allege that their claims fall outside of the PAA.  A federal court's unpublished interpretation of federal law has no bearing on Missouri pleading standards and all references to *McClurg v. Mallinckrodt* should be disregarded.

Defendants call it "astonishing" that Plaintiffs have not made claims against the party that

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

actually generated the radioactive residues at issue; but Defendants have not explained why Plaintiffs' choice of party is relevant.  Plaintiffs are not obligated to defer to Defendants' judgment about who is more liable; if Defendants believe that Plaintiffs have not sued all of the relevant parties, it may bring its own counterclaims or claims for contribution against any third parties. Moreover, as Plaintiffs painstakingly explain, radioactive materials are problematic precisely because they have such a long half-life, which makes them dangerous for a long period of time after their manufacture.  Defendants' argument that Plaintiffs did not make allegations until almost 30 years after the products at issue were manufactured is irrelevant if the products are still dangerous as alleged in the Petition.

Of course, Defendants' argument that the Petition is problematic because Plaintiffs did not make any allegations until 30 years after the products were manufactured also makes no sense, because Defendants immediately segues into an argument about how Cotter's involvement is "limited to a four-year period of time" which did not begin until 1969.  That is precisely why the Petition is written that way.

Finally, Defendants allege that the use of the term "Defendants" in the plural is problematic because any allegation in which that construction is used is not an ultimate fact.  Defendants of course cites no case law for this proposition.  The Petition makes numerous specific allegations against Cotter.  *See* SAP at ¶¶ 69-73.  In particular, paragraph 72 alleges that Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium at the SLAPS and Latty Avenue sites.  The Petition further makes specific allegations about what happened to those wastes after they were sold to Cotter.  *See* SAP at ¶¶ 87-91.  The Petition also makes numerous allegations against ComEd. See *SAP* at ¶ 29.  These allegations are incorporated by reference into all subsequent counts and Plaintiffs' use of the term "Defendants" is not

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

ambiguous in this regard. Defendants' argument that Plaintiffs did not plead proper facts should be denied.

### 10. **Plaintiffs Have Made Sufficient Class Allegations at this Early Stage**

Class action litigation promotes judicial economy by permitting numerous individuals to litigate common questions of law and fact in a single proceeding. *Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 378 (Mo. App. E.D. 2005). Pursuant to Rule 52.08(c)(1), a determination on whether any proceeding should proceed as a class action should be made as soon as practicable after commencement of the action. Typically, the party seeking class certification has the burden of proof. *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 164 (Mo. App. W.D. 2006). Courts should err on the side of upholding class certification where the question is close. *Id*. Since class certification is amendable, the court should err in favor of, and not against, maintaining the class action. *Id*.

The issue is not whether Plaintiffs have stated a cause of action or whether they will prevail on the merits, but rather whether the requirements of class certification have been met. *Craft*, 190 S.W.3d at 377. A discussion of the merits is completely irrelevant to whether there is a proper class. *Id*. In determining whether a class certification is proper, the issue is not whether plaintiff has stated a cause of action or will prevail under the merits but rather, whether the rules of class certification have been met. *Id*. The most pertinent question in determining whether a class should be certified is whether the class action device provides the most efficient and just method to resolve the controversy at hand. *State ex. rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 860-61 (Mo. banc. 2008).

Pursuant to Rule 52.08(a), a class should be certified if 1) the class is so numerous that joinder of all members is practicable; 2) there are questions of law or fact common to the class; 3)

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

the claims are defenses of the representative are typical of the claims or defenses of the class, and 4) the representative parties will fairly and adequately protect the interests of the class.

Defendants argue in a conclusory manner that Plaintiffs do not meet any of the requirements, but this appears to be nothing more than hyperbole, because Defendants' actual argument is that Plaintiffs' proposed class definition is overbroad. Specifically, Defendants argue that the proposed class contains property owners regardless of whether the property is alleged to be contaminated with radioisotopes.

A class definition that includes more than a small number of uninjured putative members will be problematic. *Hope v. Nissan North America, Inc.*, 353 S.W.3d 68, 77 (Mo. App. W.D. 2011). The class must not be indefinite, amorphous, or vague, but it need not be in its final form at pleadings or "final, precise, and definite" prior to initial certification. *Craft*, 190 S.W.3d at 387; *Hope*, 353 S.W.3d at 79. In *Hope*, the plaintiffs purported to represent a class of Infinity FX Vehicle owners whose vehicles had diminished in value due to a potential defect. 353 S.W.3d at 73. Nissan argued that the proposed class was too vague because ownership of the vehicles was subject to change and because the defect had not manifested itself in all vehicles. *Id*. at 79-80. As to the first point, the court found that the use of time limitations, like the ones invoked in this action, could make the class ascertainable. *Id*. at 79. As to the second point, the court found that the allegation of a latent, but yet unrealized defect was not akin to the allegations of *preference* rejected in *State ex. re. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008), but rather the kind of allegation that required a more developed record. *Hope*, 353 S.W.3d at 80.

Plaintiffs alleged that class members lost property value as a result of the contamination in the Coldwater Creek flood plain. This is not the type of personal preference that the court rejected in *Coca-Cola*. Rather it is a definite measure of damages that can be subjected to a precise formula.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

The class members will be easily ascertainable, and the class may be modified further down the road in this case to exclude uninjured parties.

Defendants have also complained that the medical monitoring subclass is inappropriate because there are no allegations of personal injury.  This completely misunderstands the purpose of medical monitoring.  Typically, medical monitoring provides a vehicle to provide ongoing diagnostic testing to determine whether exposure to toxins has caused or is in the process of causing an injury or illness.  *Meyer ex rel. Coplin v. Fluor Corp*.  220 S.W.3d 712, 714 (Mo. banc 2007).  Medical monitoring is particularly appropriate in toxic tort cases because there is often no immediately diagnosable physical injury or illness; rather the injury may be latent and undiscoverable for long periods of time.  *Id*. at 716.  Defendants argue that Plaintiffs have not pleaded injury, but the very nature of a medical monitoring claim does not require injury today because it anticipates that there may be injury tomorrow.  Plaintiffs also reiterate that they have adequately pleaded exposure to radioactive and toxic materials on behalf of themselves and the class.

Plaintiffs contend that they have adequately identified the class at issue in this lawsuit as to both the property damage and medical monitoring claims.  Missouri precedent requires the court to err in favor of construing a class and modifying the class as necessary as the litigation proceeds.  Accordingly, it would be premature to dismiss the class allegations at this time.

## IV.   CONCLUSION

Defendants' Motion to Dismiss should be denied because, as the federal court above has repeatedly determined, the PAA does not apply to Plaintiffs' claims against Defendants who lacked the proper licenses and indemnity agreements for handling and disposing of the uranium ore processing byproducts at issue here, and because Plaintiffs allege no "nuclear incident" giving rise to PAA liability has occurred here. Entities who operate outside the bounds of PAA's licensing

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

and indemnification provisions do not and *cannot* enjoy the limitations on liability and other benefits of PAA.

WHEREFORE, Plaintiffs respectfully pray this Court deny Defendants' Motion to Dismiss with prejudice, and for such other and further relief as this Court deems proper.

Dated:  February 5, 2020                          Respectfully submitted,

KEANE LAW LLC

*/s/ Nathaniel R. Carroll*
Ryan A. Keane, #62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Suite 1600
St. Louis, MO 63105
314-391-4700
314-244-3778 (fax)
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, #51534
319 North 4th Street, Suite 212
St. Louis, MO   63102
(314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar #17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompson@gmail.com

43

And

RON AUSTIN & ASSOCIATES, L.L.C.
Ron A. Austin, LA Bar # 23630 *pro hac vice*
Catherine Hilton, LA Bar # 27238 *pro hac vice* Lillian
Williams, LA Bar # 37358 *pro hac vice*
920 4th Street
Gretna, Louisiana 70053
Telephone: (504) 227-8100
Facsimile: (504) 227-8122
raustin@ronaustinandassociates.com
chilton@ronaustinandassociates.com

*Attorneys for Plaintiffs and Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 5, 2020, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice and a copy of the filing to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Exhibit 1: Declaration of Dr. Marvin Resnikoff

IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF MISSOURI EASTERN DIVISION

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | |
| Plaintiff, | No. 4:18-CV-00624-JAR |
| v. | |
| COTTER CORPORATION, *ET AL.*, | |
| Defendants. | |

## DECLARATION OF DR. MARVIN RESNIKOFF

    I am Marvin Resnikoff, PhD who files this my declaration under penalty of perjury. I am a physicist who has been studying issues related to radioactive materials and their disposal for over 40 years. My true and correct resume is attached as exhibit "A".  I am personally familiar with the issues relating to the radioactive environmental contamination in St. Louis which forms the basis of the claimed damages in this lawsuit; including but not limited to, how the material was created and ultimately disposed of leading to the contamination of Coldwater Creek.[1] I have read the plaintiff's motion for remand and the defendants opposition. I offer the following statements for the Court's Consideration:

1) The wastes which are the cause of the contamination of Coldwater Creek are known in the scientific and regulatory communities as Uranium Mill Tailings. These wastes were created

---

[1] In particular, as a member of Congressman John LaFalce's Advisory Committee, I reviewed Mallinkrodt's mill tailings sent to the Lake Ontario Ordnance Works in Western New York. I also served as an expert witness for plaintiff's in cases involving the Conquista and Panna Maria uranium mining and milling operations in Texas, the Homestake mill near Milan, New Mexico, the Cotter mill in Canon City, Colorado, and other uranium operations.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt at a site in downtown St. Louis.

2) I have reviewed the licenses which Cotter claims relate to the disposal of the materials which are claimed to have caused the damages sustained by the plaintiff. The licenses held by Cotter regulate the manner in which it handled the radioactive materials contained in the mill tailings.  You will note that the license contains the procedures for handling the materials when Cotter was drying them prior to shipment to its operations in Colorado. This is an extremely important distinction. While the materials themselves were unregulated at the time the regulations governing exposure to workers and members of the public were. In other words, Cotter needed no specific license to own or possess the materials at the time. Once it decided to handle and process the mill tailings it did. No claims have been made that I am aware of relating to the active handling of the mill tailings while Cotters active operations were ongoing for two reasons. One, the materials contaminating Coldwater Creek are Uranium Mill Tailings and by definition were not byproduct material until the passage of the Uranium Mill Tailings Act of 1978. This fact is well known in the scientific and regulatory communities. The AEC licenses refer only to U-238 and not to its decay products including Ra-226 and to thorium, which are not source material and by-products.  Secondly, the claims in this case relate to how Cotter disposed of the materials when it abandoned them in the open environment. No Atomic Energy Commission license was ever issued allowing Cotter to dispose of the materials that I am aware of.

3) I am unaware that any "nuclear incident" took place while Cotter was operating in the area.

I declare under the penalty of perjury that the foregoing is true and correct.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Dated: July 9, 2018                                    *Marvin Resnikoff*
                                                       Marvin Resnikoff, PhD

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM



# RADIOACTIVE WASTE MANAGEMENT ASSOCIATES

**Marvin Resnikoff, Ph.D.**
**Resume**

## EDUCATION:

| | |
|---|---|
| Ph.D., Physics | 1965, University of Michigan |
| M.S., Physics | 1962, University of Michigan |
| B.A., Physics/Math | 1959, University of Michigan |

## SUMMARY OF PROFESSIONAL EXPERIENCE:

Marvin Resnikoff is Senior Associate at Radioactive Waste Management Associates and is an international consultant on radioactive waste management issues. He is Principal Manager at Associates for dose reconstruction and risk assessment studies of radioactive waste facilities and transportation of radioactive materials. A nuclear physicist and a graduate of the University of Michigan, Dr. Resnikoff has worked on radioactive issues since his first project at West Valley, New York in 1974. Throughout his career, he has assisted public interest groups and state and local governments across the US, Canada, Germany and England on radioactive waste storage and transportation issues. He has authored or co-authored four books on radioactive waste issues including *Living Without Landfills*, regarding low-level waste landfills, and *The Next Nuclear Gamble*, regarding transportation of radioactive waste. .

**Radiological Implications of Fracking.** Dr. Resnikoff examined the radiological implications of fracking in papers on indoor radon concentrations and drill rock disposal in landfills from the Marcellus shale formation. For Delaware Riverkeepers (PA), FreshWater Accountability Project (OH) and Residents for the Protection of Lowman and Chemung (NY) he wrote reports that examined the implication of disposal of drill cuttings and drill fluids on landfills and the environment. He examined several fracking sites in Pennsylvania. In October 2011, he was an invited panelist at the annual conference of the Water Environment Federation on the subject of radioactivity in Marcellus shale wastes.

**Dose Reconstruction**. He has conducted dose reconstruction studies of oil pipe cleaners in Mississippi and Louisiana, residents of Canon City, Colorado near a former uranium mill, residents of West Chicago, Illinois near a former thorium processing plant, and residents and former workers at a thorium processing facility in Maywood, New Jersey. He has also served as an expert witness for plaintiffs in Karnes County, Texas, Milan, New Mexico and Uravan, Colorado, who were exposed to radioactivity from uranium mining and milling activities. He has worked on personal injury cases involving former workers and residents at the ITCO and other oil pipe cleaning yards involving NORM in Louisiana and Texas. He also evaluated radiation exposures and risks in worker compensation cases involving former workers at Maywood Chemical Works thorium processing

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

plant.  He also served as an expert witness in a case involving the Port St. Lucie reactors and brain cancer developed by two children and in a case involving clean-up of an abandoned radioactive materials processing facility in Webster, Texas.  He investigated phosphogypsum plants in Florida, Texas and Alberta, Canada and served as an expert witness in a personal injury case involving a Texas phosphogypsum worker.  He served as an expert witness in a case involving plutonium workers at INEEL, and federal border guards in Brownsville, TX.  He is also a member of the Health Physics Society.

**Decommissioning.**  In February 1976, assisted by four engineering students at State University of New York at Buffalo, Dr. Resnikoff authored a paper that, according to *Science*, changed the direction of power reactor decommissioning in the United States.  His paper showed that power reactors could not be entombed for long enough periods to allow the radioactivity to decay to safe enough levels for unrestricted release.  The presence of long-lived radionuclides meant that large volumes of decommissioning waste would still have to go to low-level or high-level waste disposal facilities.  He assisted public interest groups and served as an expert witness before the NRC on decommissioning the Yankee-Rowe, Diablo Canyon, Big Rock Point and CT Yankee reactors.

He conducted studies on the remediation and closure of the leaking Maxey Flats, Kentucky radioactive landfill for Maxey Flats Concerned Citizens, Inc. and of the leaking uranium basin on the NMI/Starmet site in Concord, Massachusetts under grants from the Environmental Protection Agency.  He co-authored a study on the cost of remediating the former West Valley, New York reprocessing plant site.  He also conducted studies of the Wayne and Maywood, New Jersey thorium Superfund sites and proposed low-level radioactive waste facilities at Martinsville (Illinois), Boyd County (Nebraska), Wake County (North Carolina), Ward Valley (California) and Hudspeth County (Texas).  He also served as an expert witness for CRPE, a public interest groups, regarding the proposed expansion of the Buttonwillow, California NORM landfill and for Earthjustice re. the licensing of an irradiation facility near the Honolulu airport in Hawaii.  In August 2010, he was an invited panelist at President Obama's Blue Ribbon Commission on Nuclear Safety.

**Transportation of Irradiated Nuclear Fuel.**  In addition to dose reconstruction and decommissioning cases, Dr. Resnikoff also works on the risk of transporting radioactive material.  Under a contract with the State of Utah, Dr. Resnikoff was a technical consultant to DEQ on the proposed dry cask storage facility for high-level waste at Skull Valley, Utah.  He assisted the State on licensing proceedings before the Nuclear Regulatory Commission.  He has also prepared studies on transportation risks and consequences for the State of Nevada and the Nevada counties: Clark, White Pine, Lander and Churchill.  In addition, he worked for the Southwest Research and Information Center and New Mexico Attorney General on shipments of plutonium-contaminated waste to the WIPP facility in New Mexico.  In June 2000, he was appointed to a Blue Ribbon Panel on Alternatives to Incineration by DOE Secretary Bill Richardson.  He served as a consultant to the New York Attorney General on air shipments of plutonium through New York's Kennedy Airport, and transport of irradiated fuel through New York City.  On hearings before state commissions and in federal court, he investigated proposed dry storage facilities at the Point Beach (WI), Prairie Island (MN), Palisades (MI), Maine Yankee, Connecticut Yankee and Vermont Yankee reactors.  He is presently working for the State of Nevada on Yucca Mountain repository issues before the Nuclear Regulatory Commission (NRC).  He also served as an expert witness for Earthjustice on a proposed

NRC license for a food irradiator at the Honolulu, Hawaii airport,   In 2013, he was an invited panelist before the Nuclear Waste Technical Review Board, Implication of High Burnup nuclear Fuel on decommissioning and transportation.

Dr. Resnikoff is an international expert in nuclear waste management, and has testified often before State Legislatures and the U.S. Congress.  In Canada, he conducted studies on behalf of the Coalition of Environmental Groups and Northwatch for hearings before the Ontario Environmental Assessment Board on issues involving radioactive waste in the nuclear fuel cycle and Elliot Lake tailings and the Interchurch Uranium Coalition in Environmental Impact Statement hearings before a Federal panel regarding the environmental impact of uranium mining in Northern Saskatchewan. He also worked on behalf of the Morningside Heights Consortium regarding radium-contaminated soil in Malvern and on behalf of Northwatch regarding decommissioning the Elliot Lake tailings area before a FEARO panel.  He conducted a study for Concerned Citizens of Manitoba regarding transportation of irradiated fuel to a Canadian high-level waste repository.  He authored a report for Greenpeace on the environmental assessment of a proposed intermediate level waste repository under Lake Huron, and for the Provincial Womens Council of Ontario on radioactive waste management costs in a proceeding before the Ontario Energy Board.  As part of an international team of experts for the State of Lower Saxony, the Gorleben International Review, he reviewed the plans of the nuclear industry to locate a reprocessing and waste disposal operation at Gorleben, West Germany.  He presented evidence at the Sizewell B Inquiry on behalf of the Town and Country Planning Association (England) on transporting nuclear fuel through London.

He has extensively investigated the safety of the West Valley, New York and Barnwell, South Carolina nuclear fuel reprocessing facilities.  His paper on reprocessing economics (Environment, July/August, 1975) was the first to show the marginal economics of recycling plutonium.  He completed a more detailed study on the same subject for the Environmental Protection Agency, "Cost/Benefits of U/Pu Recycle," in 1983.  His paper on decommissioning nuclear reactors (Environment, December, 1976) was the first to show that reactors would remain radioactive for several hundred thousand years.  In March 2004, Dr. Resnikoff was project director and co-author of a study of groundwater contamination at DOE facilities, *Danger Lurks Below*.

Dr. Resnikoff has prepared reports on incineration of radioactive materials, transportation of irradiated fuel and plutonium, reprocessing, and management of low-level radioactive waste.  He has served as an expert witness in state and federal court cases and agency proceedings.  He has served as a consultant to the State of Kansas on low-level waste management, to the Town of Wayne, New Jersey, in reviewing the cleanup of a local thorium waste dump, to WARD on disposal of radium wastes in Vernon, New Jersey, and to the Illinois Attorney General on the expansion of the spent fuel pools at the Morris Operation and the Zion reactor, to the Idaho Attorney General on the transportation of irradiated submarine fuel to the INEL facility in Idaho and to the Alaska Attorney General on shipments of plutonium through Alaska.  He was an invited speaker at the 1976 Canadian meeting of the American Nuclear Society to discuss the risk of transporting plutonium by air.  In July and August 1989, he was an invited guest of Japanese public interest groups, Fishermen's Cooperatives and the Japanese Congress Against A- and H- Bombs (Gensuikin).

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

3

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Dr. Resnikoff was formerly Research Director of the Radioactive Waste Campaign, a public interest organization conducting research and public education on the radioactive waste issue.  His duties with the Campaign included directing the research program on low-level commercial and military waste and irradiated nuclear fuel transportation, writing articles, fact sheets and reports, formulating policy and networking with numerous environmental and public interest organizations and the media.  He is author of the Campaign's book on "low-level" waste, *Living Without Landfills*, and co-author of the Campaign's book, *Deadly Defense, A Citizen Guide to Military Landfills*.

Between 1981 and 1983, Dr. Resnikoff was a Project Director at the Council on Economic Priorities, a New York-based non-profit research organization, where he authored the 390-page study, *The Next Nuclear Gamble, Transportation and Storage of Nuclear Waste*.  The CEP study details the hazard of transporting irradiated nuclear fuel and outlines safer options.

Between 1974 and 1981, he was a lecturer at Rachel Carson College, an undergraduate environmental studies division of the State University of New York at Buffalo, where he taught energy and environmental courses.  The years 1975-1977 he also worked for the New York Public Interest Group (NYPIRG).

In 1973, Dr. Resnikoff was a Fulbright lecturer in particle physics at the Universidad de Chile in Santiago, Chile.  From 1967 to 1973, he was an Assistant Professor of Physics at the State University of New York at Buffalo.  He has written numerous papers in particle physics, under grants from the National Science Foundation.  He is a 1965 graduate of the University of Michigan with a Doctor of Philosophy in Theoretical Physics, specializing in group theory and particle physics.  Dr. Resnikoff is a member of the American Public Health Association and the Health Physics Society.

## PROFESSIONAL EXPERIENCE:

April 1989 - present  **Senior Associate**, Radioactive Waste Management Associates, management of consulting firm focused on radioactive waste issues, evaluation of nuclear transportation and military and commercial radioactive waste disposal facilities.

1978 - 1981; 1983 - April 1989  **Research Director**, Radioactive Waste Campaign, directed research program for Campaign, including research for all fact sheets and the two books, *Living Without Landfills*, and *Deadly Defense*.  The fact sheets dealt with low-level radioactive waste landfills, incineration of radioactive waste, transportation of high-level waste and decommissioning of nuclear reactors.  Responsible for fund-raising, budget preparation and project management.

1981 - 1983  **Project Director**, Council on Economic Priorities, directed project which produced the report *The Next Nuclear Gamble*, on transportation and storage of high-level waste.

1974 - 1981  **Instructor**, Rachel Carson College, State University of New York at Buffalo, taught classes on energy and the environment, and conducted research into the economics of recycling of plutonium from irradiated fuel under a grant from the Environmental Protection Agency.

1975 - 1976  **Project Coordinator**, SUNY at Buffalo, New York Public Interest Research Group, assisted students on research projects, including project on waste from decommissioning nuclear reactor.

1973  **Fulbright Fellowship** at the Universidad de Chile, conducting research in elementary particle physics.

4

Case: 4:18-cv-00624-JAR   Doc. #:  55-2 Filed: 07/16/18   Page: 878 of 10  PageID #: 837

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

1967 - 1972 **Assistant Professor of Physics**, SUNY at Buffalo, conducted research in elementary particle physics and taught a range of graduate and undergraduate physics courses.

1965 - 1967 **Research Associate**, Department of Physics, University of Maryland, conducted research into elementary particle physics.

# PROFESSIONAL ORGANIZATIONS:

Health Physics Society
Water Environment Federation

# SPECIAL SPEAKING ENGAGEMENTS:

| | |
|---|---|
| 1967 | Invited Speaker, w/ O.W. Greenberg, Meeting of the American Physical Society, Washington, D.C., "Symmetric Quark Model of Baryon Resonances," Conf-670414—6. |
| 1976 | Invited Speaker, Meeting of the American Nuclear Society, Toronto, Canada, "Comparison of risk assessments of Pu released during transport." |
| 1976 | Statement before the Subcommittee on Energy and the Environment of the Interior Committee, House of Representatives, on recycling of plutonium. |
| 1977 | Statement before the Subcommittee on Government Operations, House of Representatives, on Nuclear Power Costs |
| 1979 | Chaired panel w/Dr. Karl Morgan and Dr. Alice Stewart, Gorleben International Review, on the health effects of radiation, Hanover, Germany. |
| 2000 | Invited day-long seminar presentation to the California Department of Health on the health effects of radiation |
| 2002 | Testimony before the Committee on Transportation & Infrastructure, United States House of Representatives, on transportation of nuclear materials. |
| 2003 | Presentation before the National Academy of Sciences Study Committee on Transportation of Radioactive Waste, Las Vegas, NV, "Baltimore Tunnel Fire: Implications for SNF Transportation Safety." |
| 2006 | Biglin, K. and Resnikoff, M, Emergency Response to a Nuclear Waste Shipment Accident, Inyo County, June 15, 2006, paper presented at ESRI Annual Conference, August 2006. |
| 2008 | Invited Speaker, Meeting of the American Nuclear Society, Anaheim, CA, "State of Nevada Recommendations for Yucca Mountain Transportation Safety and Security." |
| 2008 | Presentation at Waste Management 2008, Phoenix, AZ, "Fugitive Dust Emissions from Uranium Haul Roads." |
| 2008 | Presentation at Waste Management 2008, Phoenix, AZ, "State of Nevada Perspective on the US DOE Yucca Mountain Transportation Program." |
| 2011 | Invited Panelist, annual conference, Water Environment Federation, Radioactivity in Marcellus shale water. |
| 2013 | Invited Panelist, Nuclear Waste Technical Review Board, Implication of High Burnup nuclear Fuel on decommissioning and transportation. |

## Books and Articles

Resnikoff, M, "Expensive Enrichment," *Environment*, July/August 1975, pp. 28–35.

Harwood, S *et al*, "The Cost of Turning It Off," *Environment*, December 1976, pp.17-26.

M. Resnikoff, "Environmental Perspective." Chapter 7 in "The Politics of Nuclear Waste," edited by William Colglazier, Pergamon Press, 1982

M. Resnikoff, *et al*, "The Next Nuclear Gamble, Transportation and Storage of Nuclear Waste," Council on Economic Priorities, 1983.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Case: 4:20-cv-01227-JAR   Doc. #:  1-52  Filed: 09/10/20   Page: 1080 of 1382 PageID #: 639
Case: 4:19-cv-01227-JAR   Doc. #:  1-52  Filed: 09/10/18   Page: 100 of 104 PageID #: 639
1407

M. Resnikoff, "Shipping Flasks in Severe Rail Accidents," Chapter 18 in "The Urban Transportation of Irradiated Fuel," edited by John Surrey, Macmillan Press, London, 1984.

M. Resnikoff, "Living Without Landfills," Radioactive Waste Campaign, 1988.

M. Resnikoff, *et al*, "Deadly Defense, A Citizen Guide to Military Landfills," Radioactive Waste Campaign, 1989.

M. Marvin Resnikoff, "The Generation Time Bomb: Radioactive and Chemical Wastes." Chapter in "Hidden Dangers: Environmental Consequences of Preparing for War," edited by Anne Ehrlich and John Birks, Sierra Club Books, San Francisco, 1990.

I. Fairlie and M. Resnikoff, "No Dose Too Low," The Bulletin of Atomic Scientists, Nov/Dec 1997.

M. Resnikoff, "Danger Lurks Below," Alliance for Nuclear Accountability, 2004.

M Resnikoff, "Radon in Natural Gas from Marcellus Shale," Ethics in Biology, Engineering & Medicine, Vol. 2, Issue 4, 2011, pp. 317- 331.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Exhibit 2: Declaration of Richard B. Stewart

IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF MISSOURI EASTERN DIVISION

| | |
|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COTTER CORPORATION, *ET AL.*,<br><br>Defendants. | No. 4:18-CV-00624-JAR |

## DECLARATION OF RICHARD B. STEWART

I, RICHARD B. STEWART, 40 Washington Square South, 411F, New York, NY 10012, submit this Declaration on behalf of Plaintiffs in the above titled matter.

**Expert Qualifications**

I am presently University Professor and John Edward Sexton Professor of Law, New York University School of Law, and Director, Frank J. Guarini Center on Environmental, Energy and Land Use Law. As I explain more fully below, I have over forty years' experience researching and teaching U.S. environmental and administrative law at various institutions, including Harvard and NYU. An important specialty of mine is nuclear waste regulation and law. I co-authored an authoritative book on US nuclear waste regulation and law; Richard B Stewart and Jane B Stewart, FUEL CYCLE TO NOWHERE? U.S. LAW AND POLICY ON NUCLEAR WASTE (Vanderbilt University Press, 2011). As shown on my attached curriculum vitae, I've also authored a number of substantial articles on nuclear waste regulation and law. I also have significant experience as a practitioner in these fields, including as Assistant Attorney General for Environment and Natural Resources of the United States Department of Justice ("DOJ"), an office which I held in the period 1989-1991, and as counsel.

I have taught U.S. environmental and administrative law for over 40 years, and have published 18 books and monographs and over 100 articles, essays and book chapters in these fields. I am a graduate of Yale University (summa cum laude), the University of Oxford (University College, Rhodes Scholar, First Class Honors), and Harvard Law School (magna cum laude; Editor, Harvard Law Review). Following a clerkship with Mr.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Justice Potter Stewart, Supreme Court of the United States, I practiced law for several years with the Washington, D.C. law firm of Covington and Burling LLP. I joined the Harvard Law School faculty in 1971 and taught there for 17 years, becoming Byrne Professor of Administrative Law in 1984. I was also a faculty member of the John F. Kennedy School of Government at Harvard in the period 1984- 1989. I joined the NYU Law School faculty in 1992 as Emily Kempin Professor of Law. I hold honorary degrees from the University of Rome La Sapienza and the Erasmus University, Rotterdam. I have also been a visiting professor of law at numerous universities, including Yale University, the University of California-Berkeley, and the European University Institute Florence, and a visiting scholar at the faculty of laws, University College London and Sciences Po Law School, Paris.

In 1989, on appointment by President George H. W. Bush, I became Assistant Attorney General for Environment and Natural Resources of DOJ, leading a staff of 400 lawyers representing the federal government in a wide variety of environmental and natural resources litigation. Among other matters, I was responsible for prosecuting Exxon for the *Exxon Valdez* spill and dealt with other major cases involving spills of oil and hazardous substances.

Following my government service I joined the NYU Law School faculty. From 1993 to 2002 I was of counsel for the law firm of Sidley Austin LLP, specializing in environmental law, in particular hazardous substances liability. Since that time, as well as during my tenure at Harvard, I have been involved in a number of environmental and administrative law cases, including cases involving pollution and hazardous substances liability I have served as a director of the Health Effects Institute and Chairman and Trustee of the Environmental Defense Fund, two leading U.S. nonprofit environmental organizations. My full curriculum vita is attached.

**Factual Background**

This report is based on the following factual assumptions and documents, provided to me by counsel:

In 1942, as a part of the Manhattan Project and pursuant to contracts with the federal government, Mallinckrodt processed uranium ore from the Belgian Congo at a facility in downtown St. Louis, Missouri, in order to extract uranium for use in nuclear weapons. The residues from the ore processing, known as mill tailings, contain radioactive decay products as well as heavy metals. Mallinckrodt ceased processing operations in 1957. Subsequently, the government sold the mill tailings from these operations. These tailings from Congolese ore, along with Colorado Raffinate waste and other contaminated materials, were stored at a site near the St. Louis airport ("SLAPS"). In the 1960s, some of the mill tailings at SLAPs were moved to a storage site on Latty Avenue in Hazelwood, Missouri for processing by Cotter.

In 1969, Cotter Corp. purchased from Commercial Discount Corporation mill tailings that had been stored at both sites as "$U_3O_8$ bearing residues." Cotter at that time issued a full indemnification to Commercial Discount Corporation. On December 3, 1969 the Atomic Energy

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Commission ("AEC") issued a source material license to Cotter for work at the Latty Avenue. On or about November 13, 1974, the AEC terminated the license. There is no evidence that Cotter executed a financial responsibility and indemnity agreement with the government to ensure compensation for third parties that might be injured by its activities regarding the mill tailings. Before 1974, Cotter ceased drying the materials subject to their source license and had the mill tailings transported to the Bridgeton Landfill, leaving residual mill tailings at Latty Avenue, effectively disposing of them without the necessary disposal license.  No license was issued by AEC to Cotter for the disposal of the tailings. I have been informed that the levels of radioactive releases from the restricted area of the Latty Avenue site have exceeded applicable federal health and environmental regulatory standards.

Plaintiffs in the instant case own property within the 100 year flood plain of Coldwater Creek in North St. Louis County, Missouri. They seek to maintain in Missouri state courts claims for damages and other relief for contamination of their property under Missouri law of nuisance and trespass.

**Issues Addressed in this Declaration**

In this Declaration, I provide my expert opinion on two basic issues:

First, do the plaintiffs' claims fall under the exclusive federal jurisdiction of the Price Anderson Act and accordingly must be maintained in federal rather than state court?

Second, are plaintiffs' state law claims for nuisance and trespass preempted by the Price Anderson Act?

>    **I.      Plaintiffs' Claims Do Not Fall Within the Exclusive Jurisdiction of the Price Anderson Act and Accordingly May be Maintained in Missouri State Courts under Missouri State Law**

The Price Anderson Act provides for exclusive federal court jurisdiction over "public liability" claims arising out of a "nuclear incident," which includes "extraordinary nuclear occurrences." The issue in this case is whether injuries caused by releases of radioactivity from the mill tailings disposed of at the SLAPS sites and/or Latty Avenue sites represent such an "incident" or "occurrence." This question of statutory construction must be answered on the basis not only of the statutory language, but the role of Price Anderson Act public liability claims within the overall structure and purpose of the Act. Furthermore, we deal here with the question of whether a federal statute displaces and preempts state jurisdiction over liability claims based on state tort law. Based on federalism considerations, the Supreme Court has held that in such cases a federal statute should not be interpreted as preemptive of traditional state common law remedies unless the intent of Congress to preempt them is clear. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). Applying these considerations and principles to the circumstances here, it is manifest that plaintiffs' claims are not subject to the exclusive federal jurisdiction of the Price Anderson Act, and are not preempted by the Act; accordingly such claims may be maintained in the Missouri state courts.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

The basic purpose of the Price Anderson Act was to redress the disincentives posed by the threat of far-reaching liability to private firms' participation in the development of nuclear power and other nuclear-related activities involving certain types of nuclear materials, specifically special nuclear material, source material, and byproduct material. As set forth in 42 U.S.C. § 2210, the means by which Congress implemented this objective was to provide an a federally administered liability and insurance scheme to pay "public liability" claims (discussed below) in order to ensure compensation for injuries suffered by third parties caused by participating nuclear licensees or contractors, while at the same time providing those licensees or contractors with protection against the risk of massive, uninsurable liabilities. Authority to administer the system was originally given to the Atomic Energy Commission ("AEC"); its regulatory authorities were transferred in 1975 to the Nuclear Regulatory Commission ("NRC") and its operational authorities to the Department of Energy. These government authorities are authorized to require nuclear licensees or contractors to establish a basic level of insurance or other financial responsibility to cover their nuclear-related liabilities; in turn, such licensees or contractors receive indemnity agreements under which the government will cover any excess liabilities. The liability of participating licensees or contractors is capped. Liabilities in excess of the cap are covered by an insurance pool established and overseen by AEC/NRC and financed by premiums assessed against nuclear facility operators. Also, all licensees receiving indemnity agreements are required to pay a fee to the government. This liability cap and insurance umbrella system, including government indemnity agreements, was designed to cushion liability risks for participating licensees and contractors conducting their nuclear related activities in accordance with federal licensing and regulatory requirements.

A. *Plaintiffs' Claims Do Not Fall Within the Jurisdiction of the Price Anderson Act Because the Mill Tailings that Defendants Disposed Are Not Subject to the Atomic Energy Act and the Price Anderson Act*

The Price Anderson Act's public liability provisions cover "nuclear incident" for harms "arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C.§ 2014(q). The terms "special nuclear material," "source material," and "byproduct material." are defined in the Atomic Energy Act ("AEA"). For the reasons explained below, the mill tailings disposed of by Defendants did not fall within any of these three categories of materials, and therefore plaintiffs' claims for injuries caused by radioactive releases from the mill tailings do not fall within the jurisdiction of the Price Anderson Act.

The disposed mill tailings are not "special nuclear material," which the AEA defines (1) plutonium, uranium enriched in the isotope 233 or in the isotope 235 . . . or (2) any material artificially enriched by any of the foregoing . . . but does not include source material." 42 U. S. C. § 2014(aa).

The disposed mill tailings are not "source material," which the AEA defines as "(1) uranium, thorium, or any other material which is determined by the Commission . . . to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." 42 U. S. C. § 2014(z).

4

Accordingly, the mill tailings that Cotter disposed of are not "source material." Nor are they, as explained above, "special nuclear material." Finally, the disposed mill tailings are not "byproduct material." When Cotter disposed of the mill tailings, prior to the 1978 amendments discussed below, the Atomic Energy Act, Section 11(e), defined "byproduct material" as "any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material."  68 Stat. at 922-924 (codified as amended at 42 U.S.C. § 2014). This definition did not include mill tailings from the processing of uranium ores, which does not involve radiation exposures. Accordingly, AEC and subsequently NRC determined that mill tailings were not subject to their AEA regulatory authority. See Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Commission, 903 F.2d 1, 2-3 (D.C. Cir. 1990) ("The AEA made no provision for regulating waste materials generated during the extraction or concentrating of source material.")

Subsequently, Congress in 1978 enacted the Uranium Mill Tailings Radiation Control Act (UMTRCA), establishing a federal program for regulation and remediation of mill tailings. In doing so, it amended the AEA definition of "byproduct material" to include mill tailings, modifying Section 11(e) to add as subsection (2): "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S. C.. § 2014(e)(2). NRC subsequently considered whether this expanded AEA definition of byproduct material applied retroactively to include mill tailings previously generated by facilities that had ceased operations prior to UMTRCA's enactment. In an exceedingly thorough 25 page determination, the Director of the NRC Office of Nuclear Materials Safety and Safeguards determined, on behalf of the Commission, that such tailings are not "byproduct material" covered by the 1978 amendment to AEA and accordingly are not subject to regulation under UMTRCA. *In the Matter of Envirocare of Utah and Snake River Alliance,* 56 NRC 53 (2002). Under the controlling Supreme Court precedent established in *Skidmore v. Swift & Co*, 323 U.S. 134 (1944)  this thorough, cogently reasoned determination, reflecting the expertise and informed judgment of  NRC, must receive substantial judicial deference. Further, the Director's determination accords with the general presumption against interpreting statutes as having retroactive application. *Landgraf v. USI Film Prods,* 511 U.S. 244 (1994). Accordingly, the mill tailings generated by Mallinckrodt's processing operations, that ceased in 1957, and which were disposed of by Cotter, were not and are not "byproduct material" subject to the AEA and therefore cannot provide the basis for a public liability action under the Price Anderson Act.

   B.  *Plaintiffs' Claims Do Not Fall Within the Jurisdiction of the Price Anderson Act
        Because Defendants' Disposal of Mill Tailings Was Not Undertaken Pursuant to an
        Appropriate Federal License or Indemnity Agreement*

As previously explained, the Price Anderson Act's scheme for liability, insurance, and compensation for certain nuclear -related injuries, including capping operator liability, applies only to conduct undertaken pursuant to an appropriate federal license and/or government indemnity agreement. Defendants' disposal of mill tailings was not conducted pursuant to any such license and there is no evidence that it was undertaken pursuant to any such indemnity agreement. Accordingly, the radioactive releases from the St. Louis Airport Site and the Latty Avenue Site do not represent a "nuclear incident" covered by the public liability provisions of

Electronically Filed - St. Louis County - February 05, 2020 - 03:49 PM

the Price Anderson Act, and plaintiffs' claims against defendants are not subject to the Act's federal jurisdiction.

<u>The liability provisions of the Price Anderson Act apply only when the conduct causing injury was carried out in accordance with an appropriate government license and/or indemnity agreement. Nothing in the 1988 Amendments changes this statutory scheme.</u>

The Price Anderson Act provides for a scheme of "public liability" and compensation for injuries arising out of activities involving specified nuclear materials (as discussed above). More specifically, this scheme applies only to a "nuclear incident" "including an extraordinary nuclear occurrence."

"Public liability" is defined in 42 U.S.C. § 2014(w) as:

> any legal liability arising out of or resulting from a nuclear incident ... except ...
> (iii) whenever used in subsections (a), (c), and (k) of section 2210 of this title, claims for loss of, or damages to, or loss of use of property which is located at the site of and used in connection with the *licensed activity* where the nuclear incident occurs. 'Public liability' also includes damage to property of *persons indemnified*: Provided, That such property is covered under the terms of the financial protection required, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs. (Emphasis added)

"Nuclear incident" is defined in 42 U.S.C.§ 2014(q) as:

> *Any occurrence, including an extraordinary nuclear occurrence*, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of *source, special nuclear, or byproduct material*.... And provided further, That as the term is used in section 2210(c) of this title, it shall include any such occurrence outside both the United States and any other nation if such occurrence arises out of or results from the radioactive, toxic, explosive, or other hazardous properties of *source, special nuclear, or byproduct material licensed* pursuant to subchapters V, VI, VII, and IX of this division, which is used in connection with the operation of a *licensed* stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person *licensed* by the Nuclear Regulatory Commission to another person *licensed* by the Nuclear Regulatory Commission. (Emphasis added)

"Extraordinary nuclear occurrence" is defined in 42 U.S.C.A. § 2014(j) as:

> any event causing a discharge or dispersal of *source, special nuclear, or byproduct material* from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite..... The Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or "the contract location" as *defined in the applicable* Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, *indemnity agreement,* entered into pursuant to section 2210 of this title. (Emphasis added)

"Person indemnified" is defined in 42 U.S.C.A. § 2014(t) as:

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

> The term "person indemnified" means (1) with respect to a nuclear incident occurring within the United States or outside the United States as the term is used in section 2210(c) of this title, ... the *person with whom an indemnity agreement is executed or who is required to maintain financial protection*, and any other person who may be liable for public liability .... (Emphasis added)

While hardly a model of legislative drafting, these provisions make sufficiently clear that the Act's public liability provisions are limited to injuries resulting from activities carried on by a party in accordance with a government regulatory license and/or an agreement for government indemnification. This limitation is the logical corollary of the Price Anderson Act scheme of providing a liability cap and insurance umbrella for activities that are subject to government licensing and regulation and/or have a government indemnity agreement. The Act, as amended in 1988 excludes punitive damages in public liability claims; such exclusion is logical in a government supervised insurance system that provides for assured compensation of those suffering injury, for capping nuclear operators' liability, and for government regulatory controls that would provide safeguards against hazard.

Defendants' operations at the Latty Avenue and SLAPS sites do not appear to be the subject of any indemnity agreement with the United States. In fact, the transaction documents show that Cotter indemnified its predecessor in title. Furthermore, the disposal of mill tailings was not undertaken pursuant to an appropriate federal license or government indemnity agreement, and accordingly do not give rise to a "public liability" claim under the exclusive jurisdiction of the Price Anderson Act. The AEC license issued to Cotter, was for "uranium." Cotter's license application stated as the purpose of the license that Cotter "will process the material to recover uranium." Apparently, it never did so; in any event, any efforts that it might have made to do so had ceased prior to the time it abandoned and disposed of the mill tailings at the Latty Avenue site.

There is no evidence that Defendants ever obtained a government indemnity agreement pursuant to the Price Anderson Act for its operations at any of the sites. Thus, Defendants have failed to show that plaintiffs' claims fall within the federal jurisdiction of the Price Anderson Act.

## II. The Price Anderson Act Does Not Preempt Plaintiffs' State Law Trespass and Nuisance Claims

As shown above, plaintiffs state law trespass and nuisance claims do not fall within the exclusive jurisdiction of the Price Anderson Act. As shown in this section of my Declaration, these state law claims are not preempted by the Price Anderson Act. They may accordingly be maintained in the Missouri state courts.

In enacting the Price Anderson Act, Congress did not preclude maintenance of any and all state law claims for nuclear -related harms. As shown above, the Act provides jurisdiction only over those claims involving special nuclear, source, or byproduct material arising out of conduct by a defendant operating in accordance with an appropriate government license and/or indemnity agreement. It does not preempt state law claims that fall outside of its jurisdiction. The Act does not reflect congressional intent to occupy the entire field of all nuclear -related claims, nor would

7

maintenance in state court under state law of claims not covered by the Act conflict with the Act's scheme.

The well-reasoned opinion by Judge (now Justice) Gorsuch for the court in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1099 (10th Cir. 2015), *cert. dismissed sub nom. Dow Chem. Co. v. Cook*, 136 S. Ct. 2055 (2016), provides an exceedingly sound analysis of the issues and justification for these conclusions. As Judge Gorsuch shows, the Price Anderson Act does not extend to all nuclear -related activities and resulting injuries. Nor does it preempt the field, so as to preclude state law recovery for such injuries when they are not subject to compensation under the Act. Further, the congressional scheme in the Act can function perfectly well in tandem with state court decision of state law actions involving claims not covered by the Price Anderson Act system. Indeed, the availability of state law claims, which could include punitive damage awards, would strengthen the Price Anderson Act system by giving operators incentives to subject their activities to federal regulatory and financial responsibility/indemnity requirements.

As *Cook* points out, courts that have stated in unqualified terms that the Price Anderson Act and its exclusive federal jurisdiction encompasses all nuclear-related injury claims have failed to address the limitations in the Act's coverage. As shown above, the Act covers only claims arising out of a "nuclear incident" "including an extraordinary nuclear occurrence," involving specified nuclear-related materials in activities subject to federal regulation and/or indemnity agreements. Precluding state law claims that do not meet these limitations would leave injured parties in limbo, without any remedy.

_____

*Cook*'s refusal to preempt all state law claims was anticipated in *Bennett v. Mallinkrodt, Inc.*, 698 S.W.2d 854 (Mo. Ct. App. 1985), *cert. denied*, 106 S. Ct. 2903 (1986), which held that action by plaintiffs who lived or worked near defendant's radiopharmaceutical plant was not preempted by the Price Anderson Act. The court found that the Act embodied an underlying principle of interfering with state law to the minimum extent necessary. *Id*. at 860-861. After the Supreme Court declined to review the decision, the radiopharmaceutical industry unsuccessfully sought congressional amendment of the Price Anderson Act to preempt state law claims.

As *Cook* properly emphasized, the federalism canon of statutory construction embraced by the Supreme Court dictates that the Price Anderson Act should not be interpreted to preempt state law claims that do not fall within its "public liability" scheme. Court must not interpret federal statutes to preempt traditional state tort law remedies unless the congressional intent to do so is clear. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992);  *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008).  No such intent can be found in the Price Anderson Act .

Furthermore, interpreting the Price Anderson Act to preempt state law claims that do not qualify as "public liability" claims under the Act would leave injured parties without any redress for the harms that they have suffered. Depriving such parties of any remedy at all would likely violate due process. Under the canon of constitutional avoidance enunciated by the Supreme Court, courts should construe federal statutes so as to avoid presenting such serious constitutional issues.  *United States v. Witkovich*, 353 U.S. 194 (1957); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). Accordingly, courts should not interpret the Price Anderson Act to preempt state law claims for injuries for which PAA does not itself provide a remedy.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

I declare under penalty of perjury that the foregoing is true and correct.


Richard B. Stewart     Dated July 7 2018

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

# RICHARD B. STEWART

## - CURRICULUM VITAE -

Employment/Appointments:

> University Professor
> John E. Sexton Professor of Law
> Director, Center on Environmental, Energy and Land Use Law
> New York University

Courses Taught:

> Environmental Law, Administrative Law, International Environmental Law and Policy, Law and Globalization,

Current Research Interests
and Activities:

> Co-founder of major research projects on Global Administrative Law and MegaReg: Regulatory and Justice Dimensions of Economic Globalization, Institute for International Law, New York University School of Law, in collaboration with various universities around the world.,
>
> Currently researching and preparing for publication books/articles on private and hybrid global regulation, "megaregional" trade/regulatory regimes, climate regulation and finance, climate, self-regulation in global supply chains,  nuclear waste law and policy, science, law, and governance in the Arctic, global administrative law, environmental protection and market economics and incentives.

Previous Employment/Appointments:

| | |
|---|---|
| 2012 | Visiting Professor, Yale Law School |
| 2009-10 | Fellow, The Straus Institute for the Advanced Study of Law and Justice |
| 2005-6, 1999 | Visiting Professor of Law, University of Rome "La Sapienza" |

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

| | |
|---|---|
| 2000 | Visiting Professor of Law, University of Bologna |
| 1993-2002 | Of Counsel, Sidley and Austin, specializing in environmental regulation and liabilities |
| 1993: | Jean Monnet Visiting Professor<br>European University Institute, Florence |
| 1991-92: | Visiting Professor of Law<br>Georgetown University School of Law |
| 1989-91: | Assistant Attorney General for Environment and Natural Resources U.S. Department of Justice |
| 1984-89: | Byrne Professor of Administrative Law<br>Harvard Law School<br><br>Member of the Faculty<br>J. F. Kennedy School of Government<br>Harvard University |
| 1986-87: | Visiting Professor of Law<br>University of Chicago Law School |
| 1984: | Visiting Fellow, European University Institute<br>Florence, Italy |
| 1980: | Visiting Scholar<br>U.S. Environmental Protection Agency |
| 1979-80: | Visiting Professor of Law<br>University of California, Berkeley |
| 1975-84: | Professor of Law<br>Harvard Law School |
| 1971-75: | Assistant Professor of Law<br>Harvard Law School |
| 1973: | Special Counsel, Senate Select Committee on<br>Presidential Campaign Activities |
| 1967-71: | Attorney, Covington Burling |

888 Sixteenth Street, N.W.
Washington, DC 20006
Specializing in antitrust, regulatory, and general appellate litigation matters

1966-67:      Law Clerk to Mr. Justice Potter Stewart
              Supreme Court of the United States

<u>Other Current Activities, Memberships, Honors:</u>

Advisory Trustee and Member, Litigation Review Committee, Environmental
Defense Fund

Management Committee and Researcher, Consortium for Risk-Based Evaluation
with Stakeholder Participation (CRESP), university-based nuclear waste cleanup
research and policy institution serving as independent advisor to U.S. Department
of Energy

Editorial Boards: Review of European Community and International
Environmental Law; Oxford Journal of Environmental Law; International Journal
of BioSciences and Technology (hon.)

Member, American Law Institute, Phi Beta Kappa; U.S. College of
Environmental Lawyers.

American Bar Association 2009 Annual Award for Environmental Stewardship

Fellow, International Association of Administrative law

Fellow, American College of Environmental Lawyers

Fellow, American Academy of Arts and Sciences;

Edmond J. Randolph Award, U.S. Department of Justice;

2009 American Bar Association Annual Award for Environmental Stewardship

Rhodes Scholar

Dr. (*honors causa*), Erasmus University, Rotterdam (1993); Awarded for
contributions to environmental law and protection through scholarship on
economic incentives for environmental protection and service as US Assistant
Attorney General in prosecuting EXXON for the Exxon Valdez oil spill.

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Dr. (*honors causa*), University of Rome "La Sapienza" (2005). Awarded for contributions to environmental and administrative law including through scholarship on economic incentives for environmental protection.

Past Activities:

Director, Health Effects Institute, 1997-2007

Principal Investigator, Project on International Trade and Regulatory Conflicts over Genetically Modified Foods and Crops, with special emphasis on position of developing countries. Funded by $435,000 grant from Rockefeller Foundation

Co-Principal Investigator, Project on Capacity-Building for Environmental Legislation in the People's Republic of China, training staff of Environmental Protection Committee of National People's Congress and relevant ministries and assisting them in revising and strengthening China's environmental laws. Grants totally $1.4 million from Asian Development Bank.

Consultant to United Nations Commission on Trade and Developments (UNCTAD) on legal and institutional issues presented in development of international greenhouse gas emissions trading systems.

Member UNEP Group of Experts on Liability and Compensation for Environmental Damage from Military Activities, 1995-1996

Chief Reporter, American Law Institute
Project on Product and Process Injuries, 1985-1989

Member, Board of Trustees, Environmental Defense Fund, 1976-1989 (Chairman, 1980-83). Advisory t Trustee, 1993-present.

U.S. Congress Office of Technology Assessment,
Advisory Committee on New Clean Air Act Issues

Academic Advisory Board, Foundation for Research on Economics and the Environment

Consultant, Administrative Conference of the United States,
U.S. Environmental Protection Agency;
U.S. Federal Trade Commission;
President's Commission on Three Mile Island;
U.S. Congress Office of Technology Assessment;

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

National Research Council Committee on Environmental Decisionmaking and
Chairman, Panel on Legal Considerations

Education:

  1963-66:  Harvard Law School
        LL.B. magna cum laude
        Editor, Harvard Law Review

  1961-63:  Rhodes Scholar, Oxford University.
        MA with First Class Honors in Philosophy,
        Politics and Economics

  1957-61:  Yale University, B.A. summa cum laude
        History, the Arts, Letters.  Junior
        Phi Beta Kappa

  1953-57:  University School, Shaker Heights, Ohio

Permanent address:

  (office)  New York University School of Law
        40 Washington Square South
        New York, NY 10012
        Tel:  Office: (212) 998-6170
          Mobile: (646) 306-1397

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

SELECTED PUBLICATIONS

**Books and Monographs:**

Private and Hybrid Global Regulatory Governance (with Benedict Kingsbury) (forthcoming, Oxford University Press)

Megaregulation Contested: Global Economic Ordering After TPP (co-editor and author) (forthcoming, Oxford University Press, 2018)

Carbon Capture and Storage: Emerging Legal and Regulatory Issue (2d ed. 2018) (co-editor)

Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs –(2016)(with R. Bull. N. Mahboubi & J. Wiener)

Special Issue on Building Blocks for Addressing Climate Change, Climactic Change ( 2016)(with M. Oppenheimer and B. Rudyk)

Hacia El Derecho Administrativo Global: Fundamentos, Principios y Ámbito de Aplicación (2015)
        (with Benedict Kingsbury)

Fuel Cycle to Nowhere? U.S. Law and Policy on Nuclear Waste (2011) (with J. Stewart)

Breaking the Logjam : Environmental Protection that Will Work (2010)(with D. Schoenbrod and K. Wyman)(paper ed. 2012)

Climate Finance: Regulatory and Funding Strategies for Climate Change and Sustainable Development (with B. Kingsbury and B. Rudyk) (editor and principal author)(2009)

Administrative Law and Regulatory Policy (7th ed.)(2008)(with S. Breyer, C. Sunstein & A. Vermuele)

Symposium on Global Administrative Law (37:4 NYU Journal of International Law and Politics, 2005) (ed. with B. Kingsbury)

Symposium on The Emergence of Global Administrative Law (68:3-4 Law and Contemporary Problems, 2005) (ed. with B. Kingsbury, N. Krisch, and J. Weiner)

Beyond Kyoto: Reconstructing Global Climate Policy (2003) (with J. Wiener)

The Reformation of American Administrative Law (in Chinese) (2002)

The Clean Development Mechanism: Building International Private-Public Partnership (United Nations Conference on Trade and Development) (2000) (lead author)

Environmental Law, The Economy, and Sustainable Development: Europe, the United States, and the Global Regime (Cambridge University Press, 2000) (Editor, with R. Revesz & P. Sands)

Legal Issues Presented By a Pilot International Greenhouse Gas Trading System, United Nations
    Conference on Trade and Development (1996) (with P. Sands and J. Wiener)

Natural Resource Damages:  A Legal, Economic and Policy Analysis. Washington, D.C. The
    National Legal Center for the Public Interest (1995)

Analyzing Superfund:  Economics, Science, and Law (Editor, with R. Revesz) (Resources for the Future
    1995)

Markets Versus Environment? (The Robert Schuman Centre, European University Institute) (1995)

Environmental Law and Policy, Little, Brown & Co. (1994) (with P. Menell)

Integration Through Law:  Environmental Protection Policy Law (1985) (with E. Rehbinder) De Guyter
    (paperback edition, 1987)

Environmental Law & Policy (2d ed. 1978) (with J. Krier)

**Articles, Book Chapters, Essays and Reviews:**

Private And Hybrid Governance in a State-Centered World, in Private and Hybrid Global Regulatory
Governance (with Benedict Kingsbury) (forthcoming, Oxford University Press)

Megaregulatory Administrative Law: An Instrument of Political Control**,** in Megaregulation Contested:
Global Economic Ordering After TPP (forthcoming, Oxford University Press, 2018) (co-author)

Introduction: Contested Megaregulation, the Trans-Pacific Partnership, and the Future of Global
Economic Ordering,

TPP as Megaregulation, in Megaregulation Contested: Global Economic Ordering After TPP
(forthcoming, Oxford University Press, 2018) (co-author)

Remote Control: Treaty Requirements for Regulatory Procedures, 104 Cornell L. Rev.104 __
(November 2018)] (co-author)

Lancet Commission on Pollution and Health, Report (2017)(co-author)

State Regulatory Capacity and Administrative Law and Governance under Globalization, in N. Parillo
and J. Mashaw, eds., in N. Parrillo & J. Mashaw, eds Administrative Law from the Inside Out (2017)

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Toward Global Administrative Law? Trajectories and Challenges (in Spanish), in Hacia El Derecho Administrativo Global: Fundamentos, Principios y Ámbito de Aplicación (with Benedict Kingsbury)(2017)

Introduction to Special Issue on the Building Blocks Strategy for Addressing Climate Change, Climactic Change (2016)(with M. Oppenheimer and B. Rudyk)(2015-16)

Global Standards for National Societies, in Sabino Cassese, ed., Elgar Handbook of Global Administrative Law (2016) (2014-15)

Introduction, Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs 1 (2015)(with  R. Bull. N. Mahboubi & J. Wiener) (2014-15)

Remedying Disregard in Global Regulatory Governance: Accountability, Participation and Responsiveness, 108 Am Jl Intl L 211 (2014)

Global Standards for National Societies, in Sabino Cassese, ed., Elgar Handbook of Global Administrative Law (2016)

Introduction, Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs – (forthcoming, 2015)(with  R. Bull. N. Mahboubi & J. Wiener)

Remedying Disregard in Global Regulatory Governance: Accountability, Participation and Responsiveness, 108 Am Jl Intl L 211 (2014)

Solving the Spent Nuclear Fuel Impasse, (with J. Stewart) 21 N.Y.U. Envir. L. J. `1 (2014).

Building Blocks for Global Climate Protection, 32 Stanford Envrtl L Rev 341 (2013) (with M. Oppenheimer and B. Rudyk) (28 May 2013)

A New Strategy for Global Climate Protection, Climactic Change, 28 May 2013 (with M. Oppenheimer and B. Rudyk)

"Administrative Tribunals of International Organizations from the Perspective of the Emerging Global Administrative Law," in *The Development and Effectiveness of International Administrative Law*  (Olufemi Elias, ed., Martinus Nijhoff, 2012) (with Benedict Kingsbury)

Enforcement of Transnational Public Regulation, in, Fabrizio Caffaggi, ed., Enforcement of Transnational Regulation; Ensuring Compliance in a Global World (2012)(paper edition 2014)

The World Trade Organization: Multiple Dimensions of Global Administrative Law (with M. Sanchez Baden), 9 International Journal of Constitutional Law 556 (2011)

Solving the U.S. Nuclear Waste Dilemma. Environmental Law and Policy Review. (2010-11)

The World Trade Organization and Global Administrative Law in Christian Joerges and E-U Petersmann, Constitutionalism, Multilevel Trade Governance, and Social Regulation (2d ed. Forthcoming 2010) (with M. Ratton-Sanchez)

The Emerging Global Climate Regime: Challenges for Developing Countries, in Global Regulatory Governance and the State: India and the Emergence of Global Administrative Law (co-author) (OUP, forthcoming)

GMO Trade Regulation and Developing Countries, 2008 Acta Juridica 320

Legitimacy and Accountability in Global Regulatory Governance: The Emerging Global Administrative Law and the Design and Operation of Administrative Tribunals of International Organizations, Spyrodin Flogaitis, Ed. International Administrative Tribunals in a Changing World (2009)(with Benedict Kingsbury)

U.S. Nuclear Waste Law and Policy: Fixing a Bankrupt System, 16 N.Y.U. Envir. L. J 783 (2008)

States (and Cities) as Actors in Global Climate Regulation: Unitary vs. Plural Architectures, 50 Ariz. L. Rev.681 (2008), selected for The Environmental Law and Policy Annual Review

International Environmental Protection and Regulatory Innovation, in Martin Fuhr, Rainer Wahl and Peter von Wilmowsky, eds, Umwelt und Umweltwissenschaft (2007)

Instrument Choice, in Daniel Bodansky and Junetta Brunee, eds, Oxford Handbook of International Environmental Law (2007)

The Global Regulatory Challenge to U.S. Administrative Law, 37 NYU Journal on International law and Politics 695 (2006)

Foreword: Global Governance as Administration –National and Transnational Approaches to     Global Administrative Law, 68 L & Contemp. Probs. 1 (2005)(co-author)

The Emergence of Global Administrative Law, 68 Law & Contemp. Probs. 15 (2005)(co-author) Published in Chinese, Compilation of Articles on Legal Theory and Legal History 2009:3; in  Spanish, Res Publica Argentina, 2007-3 25.

U.S. Administrative Law: A Model for Global Administrative Law?, 68 Law & Contemp. Probs. 63 (2005)

Il Diritto Admministrativo Globale, in Rivista Trimestrale di Diritto Pubblico, 2005, n. 3, p. 633-640.

Administrative Law in the Twenty-First Century 1 Global Administrative Law Review  204 (in Chinese)(2005);

The GM Cold War: How Developing Countries Can Go From Being Dominoes to Being Players, 13 Rev. Eur. Comm. & Intl L 247 (2004)(with E Meijer).

Practical Climate Change Policy, 20 Issues in Science and Technology 71
        (2004) (with J. Wiener)

Reconstructing Climate Policy: The Paths Ahead in  Carlo Carraro, ed., Governing the Global
        Environment 417(2003). (with J. Wiener)

Administrative Law in the Twenty-First Century, 78 N.Y.U.L. Rev. 437 (2003);

The New Generation of United States Environmental Law, 2002 America Hō 1
        (in Japanese).

Environmental Regulation Under Uncertainty, 10 Research in Law and
        Economics 71 (2002)

The Importance of Law and Economics for European Environmental Law, 2
        Yearbook of European Environmental Law 856 (2002)

The Legal And Institutional Framework For A Plurilateral Greenhouse Gas
        Emissions Trading System IN UNCTAD, Greenhouse Gas Market Perspectives, Trade and
        Investment Implications of Climate Change 82 (2001)

A New Generation of Environmental Regulation?, 29 Capital University Law
        Review 21 (2001)

Environmental Law and Liberty, in Norman Dorsen and Professor Gifford, Democracy and the Rule of
        Law. Washington: CQ Press, 2001.

Designing an International Greenhouse Gas Emissions Trading System, 15 Natural Resources &
        Environment 160  (with James L. Connaughton and Lesley C. Foxhall) (2001)

Global Governance for Sustainable Development, in Progressive Governance for the XXI Century.
        (European University Institute New York University School of Law; 2000.)

Institutional and Legal Issues of Emissions Trading, in UNCTAD Climate Change and Development
        (2000)

Introduction: Environmental Regulation in Multi-Jurisdictional Regimes, in Environmental Law, The
        Economy, and Sustainable Development:  (Richard Revesz, Philippe Sands and Richard Stewart
        eds.) Europe, the United States, and the Global Regime (Cambridge University Press, 2000)

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Economic Incentives for Environmental Protection: Opportunities and Obstacles, in
   Environmental Law, The Economy, and Sustainable Development:  (Richard Revesz,
   Philippe Sands and Richard Stewart eds.) Europe, the United States, and the Global
    Regime (Cambridge University Press, 2000)

The Role of Mitigation and Conservation Measures in Achieving Compliance with Environmental
   Regulatory Programs:  Lessons from Section 316 of the Clean Water Act, 8 NYU Environmental
   Law Journal 237 (2000) (with T. Schoenbaum).

Regulatory Compliance Preclusion of Tort Liability: Limiting the Dual Track
   System, 88 Geo. L. J. 2167 (2000)

Natural Resource Damages:  The New Wave of Environmental Liability, in 1998 Wiley Environmental
   Law Update 263 (C. Volz & P. Gray, eds., 1988) (with J. Connaughton)

Evaluating the New Deal, 22 Harvard Journal of Law & Public Policy 239        (1998)

Environmental Quality as a National Good in a Federal State, 1997 U. Chicago Legal Forum 199

Environmental Statutory Interpretation in China and the United States, 5 N.Y.U. Envt'l. L.J. 556 (1996)

Valuation of Environmental Damage - US and International Law Approaches, 5 Review of European
   Community & International Environmental Law 290 (1996) (with P. Sands)

United States Environmental Regulation:  A Failing Paradigm,15 Jl. L. & Commerce 585 (1996)

Environmental Law, in Fundamentals of American Law, Alan B. Morrison, gen. ed. New York: Oxford
   University Press (1995)

Liability for Natural Resource Damage:  Beyond Tort, in R. Revesz & R. Stewart, eds., Analyzing
   Superfund:  Economics, Science and Law (1995)

Interstate Commerce, Environmental Protection, and U.S. Federal Law, in I Trade & The Environment:
   The Search for Balance (J. Cameron, P. Demaret & D. Geradin, eds.) (1994)

Technology-Based Approaches versus Market-Based Approaches, in P. Sands, Greening International
   Law (1993) (with D. Dudek & J. Wiener)

Environmental Contracts and Covenants:  A United States Perspective, in Jan M. van Dunné, ed.,
   Environmental Contracts and Covenants:  New Instruments for a Realistic Environmental Policy?
   (1993)

Confidentiality in Government Enforcement Proceedings, 2 N.Y.U. Envt'l. L.J. 232 (1993)

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

Electronically Filed - St Louis County - February 05, 2020 - 03:49 PM

The NAFTA:  Trade, Competition, Environmental Protection, 27 International Lawyer 751 (1993)

Environmental Regulation and International Competitiveness, 102 Yale Law Journal 2039 (1993)

Antidotes for the "American Disease", 20 Ecology Law Quarterly 85 (1993)

La Justicia Administrativa En Estados Unidos, in J. Barnes Vasquez, ed., La Justicia Administrativa En
        El Derecho Comparado (1993)

Environmental Law in the United States and the European Community:  Spillovers, Cooperation, Rivalry,
        Institutions 1992 University of Chicago Legal Forum 41

International Trade and the Environment:  Lessons From the Federal Experience, 49 Washington and Lee
        Law Review 1329 (1992)

Environmental Policy for Eastern Europe:  Technology-Based Versus Market-Based Approaches, 17
        Colum. J. Envir. L. 1 (1992) (with D. Dudek & J. Wiener)

The Comprehensive Approach to Global Climate Policy:  Issues of Design and
        Practicality, 9 Ariz. J. of Intl. & Comp. L. 83 (1992) (with J. Wiener)

Models for Environmental Regulation:  Central Planning Versus Market-Based
        Approaches, 19 B.C. Env. Evn. Affs. L. Rev. 547 (1992)

Ambiente, tutela dell, I Encyclopedia Delle Scienze Sociali 146

Regulatory Jurisprudence.  Canous Redux? (Book Review), 79 Calif. L. Rev.
        807 (1991)

Providing Economic Incentives in Environmental Regulation, 8 Yale J. on Reg.
        463 (1991)

Recent Developments in the Field of Liability for Hazardous Wastes under CERCLA and Natural
        Resource Damages in the United States, 4 Milieu Aansprakelijkheid - Environmental Liability
        Law Review 89 (1991); also in Jan M. van Dunné, ed., Transboundary Pollution and Liability:
        The Case of the River Rhine 107 (1991)

Regulatory Law, in Bernard D. Davis, The Genetic Revolution:  Scientific Prospects and Public
        Perceptions 212 (1991)

Madison's Nightmare, 57 U. Chi L. Rev. 335 (1990)

International Aspects of Biotechnology - Implications for Environmental Law

and Policy, 1 Oxford J. Envir. L. 157 (1989) (with Maria Martinez)

Centralization and Its Discontents (Institute of American Culture, Academia Sinica, Tapei) (1988)

I'inculso di Madison:  federalisimo e Stato assistenziale reglomentatore, in Il
     Federalista, 200 Anni Dopo (Guglielmo Negri, ed., 1988)

International Aspects of Biotechnology and Its Use in the Environment in Biotechnology and the
     Environment:  The Regulation of Genetically Engineered Organisms Used in the Environment
     (American Bar Association 1988)

Controlling Environmental Risks Through Economic Incentives, 13 Columbia J. Envir. L. 153 (1988)

Reforming Environmental Law: The Democratic Case for Market Incentives, 13 Columbia J. Envir. L.
     171 (1988) (with Bruce A. Ackerman)

Regulation and the Crisis of Legalization in the United States, in T. Daintith, ed., Law as an Instrument of
     Economic Policy; Comparative and Critical Approaches (1988)

Beyond Delegation Doctrine, 36 Am. Univ. L. Rev. 323 (1987)

Book Review:  Organizational Jurisprudence (Review of Dan-Cohen:  Rights, Persons, and
     Organizations) 101 Harv. L. Rev. 371 (1987)

Crisis in Tort Law? The Institutional Perspective, 54 U. Chi. L. Rev. 184 (1987)

The Judicial Performance of Robert H. Bork in Administrative and Regulatory Law, 9 Cardozo L. Rev.
     135 (1987)

Reconstitutive Law, 46 Md. L. Rev. 86 (1986)

The Role of the Courts in Risk Management, 16 Environmental Law Reporter 10208 (1986)

Federalism and Rights, 19 Ga. L. Rev. 916 (1985)

Reforming Environmental Law, 37 Stan. L. Rev. 301 (1985) (with B. Ackerman)

The Discontents of Legalism:  Interest Group Relations in Administrative Regulation, 1985 Wis. L. Rev.
     655

Legal Integration in Federal Systems:  European Community Environmental Law, 33 Am. J. Comp. L.
     1501 (1985)

Electronically Filed - St. Louis County - February 05, 2020 - 03:49 PM

Economics, Environment, and the Limits of Legal Control, 9 Harv. Envir. L. Rev. 1 (1985), and in B. Sadder, ed., Environmental Protection and Resources Development:  Convergence for Today (1985)

Bureaucratic Justice, 96 Harv. L. Rev. 1952 (1983) (with L. Liebman)

Regulation in a Liberal State, The Role of Non-Commodity Values, 92 Yale L. J.        1537 (1983)

The Limits of Administrative Law, in The Courts:  Separation of Powers (B. Goulet, ed., 1983)

The Legal Structure of Interstate Resource Conflicts, in Regional Conflict and National Policy (K. Price, ed., 1982)

Interstate Resource Conflicts:  The Role of the Federal Courts, 6 Harv. Envir. L.  Rev. 241 (1982)

Public Programs and Private Rights, 95 Harv. L. Rev. 1193 (1981-1982) (with C. Sunstein)

Regulation, Innovation, and Administrative Law:  A Conceptual Framework, 69 Calif. L. Rev. 1259 (1981)

The Legal Regulation of Risk, in Genetics and Law II (A. Milunsky, ed., 1980)

Using Economic Analysis in Teaching Environmental Law:  The Example of Common Law Rules, 1

U.C.L.A. Journal of Environmental Law & Policy 13 (1980) (with J. Krier)

Le "Proceduralisme" Dans le Droit Administratif Americain, 30 Conseil d'Etat Etudes et Documents 303 (1979)

History and Policy Analysis, 31 Stan. L. Rev. 1159 (1979)

Standing for Solidarity, 88 Yale L. J. 1559 (1979)

The Resource Allocation Role of Reviewing Courts:  Common Law Functions in a Regulatory Era, in Collective Decision Making:  Applications from Public Choice Theory (C. Russell, ed., 1979)

Vermont Yankee and the Evolution of Administrative Procedure, 91 Harv. L. R. 1805 (1978)

Paradoxes of Liberty, Integrity, and Fraternity:  The Collective Nature of Environmental Quality and Judicial Review of Administrative Action, 7 Envir. L. 463 (1977)

Pyramids of Sacrifice? Federalism Problems in Mandating State Implementation of Federal Environmental Controls, 86 Yale L.J. 1196 (1977)

Judging the Imponderables of Environmental Policy, in Approaches to Controlling Air Pollution (A. Friedlander, ed., 1978)

The Development of Administrative and Quasi-Constitutional Law in Judicial Review of Environmental Decisionmaking:  Lessons From the Clean Air Act, Iowa L. Rev. (1977); also in Committee on Environmental Decision Making, National Research Council, IIB Decision Making in the Environmental Protection Agency (1977) (with P. Spector)

Energy and the Environment, in Owen and Schultze, eds., Setting National Priorities: The Next Ten Years (1976) (with Roberts)

The Reformation of American Administrative Law, 88 Harv. L. Rev. 1669 (1975)

Book Review, Baxter:  People or Penguins:  The Case for Optimal Pollution, Ackerman and Rose-Ackerman, Sawyer, Henderson:  The Uncertain Search for Environmental Quality, 88 Harv.L. Rev. 1644 (1975) (with M. Roberts)

Book Review, Read, McDonald, Fordham, Pierce, Materials on Legislation, 11 Harvard Journal on Legislation 550 (1974)

The Lawyer and the Legislative Process, 10 Harvard Journal on Legislation 152   (1973)

3/18

Electronically Filed - St Louis County - February 27, 2020 - 04:00 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,  ) ) ) ) ) ) ) ) ) | |
| Plaintiffs,  ) ) | Cause No.  18SL-CC00617-01 |
| vs.  ) ) | Division No. 17 |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,  ) ) ) ) ) ) ) ) ) | |
| Defendants.  ) ) | |

## ENTRY OF APPEARANCE

COMES NOW John F. Cowling of Armstrong Teasdale LLP and enters his appearance

on behalf of Defendant The City of St. Louis (the owner and operator of St. Louis Lambert

International Airport®) in the above-referenced matter.

Electronically Filed - St Louis County - February 27, 2020 - 04:00 PM

ARMSTRONG TEASDALE LLP


By:  */s/ John F. Cowling*
    John F. Cowling       #30920
    Katherine Ricks       #70322
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    jcowling@atllp.com
    kricks@atllp.com

ATTORNEYS FOR DEFENDANT
THE CITY OF ST. LOUIS (THE OWNER AND
OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2020, the foregoing document was electronically filed with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

*/s/ John F. Cowling*

Electronically Filed - St Louis County - February 27, 2020 - 04:02 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,          )
BARBARA HOOKS, JOEL HOGAN,               )
KENNETH NIEBLING, KENDALL LACY,          )
TANJA LACY, WILLIE CLAY,                 )
BOBBIE JEAN CLAY, ANGELA STATUM,         )
and MISSOURI RENTALS                     )
COMPANY, LLC, on behalf of themselves    )
and all others similarly situated,       )
                                         )
                 Plaintiffs,             )     Cause No.  18SL-CC00617-01
                                         )
vs.                                      )     Division No. 17
                                         )
COTTER CORPORATION,                      )
COMMONWEALTH EDISON COMPANY,             )
DJR HOLDINGS, INC. f/k/a FUTURA          )
COATINGS, INC., and ST. LOUIS            )
AIRPORT AUTHORITY, A                     )
DEPARTMENT OF THE CITY OF                )
ST. LOUIS,                               )
                                         )
                 Defendants.             )
                                         )

## ENTRY OF APPEARANCE

COMES NOW Katherine M. Ricks of Armstrong Teasdale LLP and enters her

appearance on behalf of Defendant The City of St. Louis (the owner and operator of St. Louis

Lambert International Airport®) in the above-referenced matter.

Electronically Filed - St Louis County - February 27, 2020 - 04:02 PM

ARMSTRONG TEASDALE LLP


By:  */s/ Katherine M. Ricks*
    John F. Cowling          #30920
    Katherine Ricks         #70322
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    jcowling@atllp.com
    kricks@atllp.com

ATTORNEYS FOR DEFENDANT
THE CITY OF ST. LOUIS (THE OWNER AND
OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2020, the foregoing document was electronically filed with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

                                      */s/ Katherine M. Ricks*

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,  )
BARBARA HOOKS, JOEL HOGAN,        )
KENNETH NIEBLING, KENDALL LACY, )
TANJA LACY, WILLIE CLAY, BOBBIE   )
JEAN CLAY, ANGELA STATUM, AND     )
MISSOURI RENTALS COMPANY, LLC,    )
on behalf of themselves and all others )
similarly situated,               )
                                  )
       Plaintiffs,          )      Cause No:  18SL-CC00617-01
                                  )
vs.                               )      Division No. 17
                                  )
COTTER CORPORATION,               )
COMMONWEALTH EDISON COMPANY, )
DJR HOLDINGS, INC. f/k/a FUTURA    )      **SO ORDERED:**
COATINGS, INC., AND ST. LOUIS      )
AIRPORT AUTHORITY, A              )
DEPARTMENT OF THE CITY OF ST.      )
LOUIS,                            )      _____ Judge    Division 17
                                  )      April 07, 2020
       Defendants.          )

## UNOPPOSED MOTION FOR LEAVE TO FILE RESPONSIVE PLEADING OUT OF TIME

COMES NOW Defendant The City of St. Louis, (the owner and operator of St. Louis Lambert International Airport®) (the "City") and respectfully requests this Court grant the City leave to file its responsive pleading out of time. In support of this unopposed motion, the City states as follows:

This action was initially removed to Federal Court. The case was remanded, and the file in St. Louis County Circuit Court was reopened on April 11, 2019. Plaintiffs filed their Second Amended Class Action Petition on October 29, 2019. After the action was reopened in St. Louis County Circuit Court, Counsel for the City did not receive electronic service and notice of the Second Amended Class Action Petition or other recent filings.

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

The time to file a responsive pleading has expired, but the City respectfully requests that this Court grant it leave to file a responsive pleading out of time, pursuant to Rule 44.01. A copy of the City's responsive pleading is attached hereto.

No party will be prejudiced by the grant of this Motion. While other Defendants have filed motions to dismiss and Plaintiffs have filed responses to those motions, no hearing has occurred. Further, written discovery requests were recently served on January 31, 2020, but Responses to discovery are not yet due. This action is in its infancy, and the City's delayed filing of its responsive pleading will not result in prejudice to any party. Further, Plaintiffs do not oppose the grant of this Motion.

WHEREFORE, because the City's failure to timely file a responsive pleading was the result of excusable neglect, the City respectfully requests this Court grant this motion and permit the City to file its responsive pleading *instanter*.

ARMSTRONG TEASDALE LLP

By: */s/ John F. Cowling*

| John F. Cowling | #30920 |
| Katherine M. Ricks | #70322 |

7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314.621.5070
314.621.5065 (facsimile)
jcowling@atllp.com
kricks@atllp.com

ATTORNEYS FOR DEFENDANT
THE CITY OF ST. LOUIS (THE OWNER
AND OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 27, 2020, the foregoing document was electronically filed with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

/s/ John F. Cowling

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,  )
BARBARA HOOKS, JOEL HOGAN,        )
KENNETH NIEBLING, KENDALL LACY,   )
TANJA LACY, WILLIE CLAY, BOBBIE   )
JEAN CLAY, ANGELA STATUM, AND     )
MISSOURI RENTALS COMPANY, LLC,    )
on behalf of themselves and all others )
similarly situated,               )
                                  )
            Plaintiffs,           )          Cause No:  18SL-CC00617-01
                                  )
vs.                               )          Division No. 17
                                  )
COTTER CORPORATION,               )
COMMONWEALTH EDISON COMPANY, )
DJR HOLDINGS, INC. f/k/a FUTURA    )          **SO ORDERED:**
COATINGS, INC., AND ST. LOUIS     )
AIRPORT AUTHORITY, A              )
DEPARTMENT OF THE CITY OF ST.     )          _____ Div 17
LOUIS,                            )          _____ Judge       Division 17
                                  )          April 07, 2020
            Defendants.           )

## UNOPPOSED MOTION FOR LEAVE TO FILE RESPONSIVE PLEADING OUT OF TIME

COMES NOW Defendant The City of St. Louis, (the owner and operator of St. Louis Lambert International Airport®) (the "City") and respectfully requests this Court grant the City leave to file its responsive pleading out of time. In support of this unopposed motion, the City states as follows:

This action was initially removed to Federal Court. The case was remanded, and the file in St. Louis County Circuit Court was reopened on April 11, 2019. Plaintiffs filed their Second Amended Class Action Petition on October 29, 2019. After the action was reopened in St. Louis County Circuit Court, Counsel for the City did not receive electronic service and notice of the Second Amended Class Action Petition or other recent filings.

Electronically Filed - St. Louis County - February 27, 2020 - 04:08 PM

The time to file a responsive pleading has expired, but the City respectfully requests that this Court grant it leave to file a responsive pleading out of time, pursuant to Rule 44.01. A copy of the City's responsive pleading is attached hereto.

No party will be prejudiced by the grant of this Motion. While other Defendants have filed motions to dismiss and Plaintiffs have filed responses to those motions, no hearing has occurred. Further, written discovery requests were recently served on January 31, 2020, but Responses to discovery are not yet due. This action is in its infancy, and the City's delayed filing of its responsive pleading will not result in prejudice to any party. Further, Plaintiffs do not oppose the grant of this Motion.

WHEREFORE, because the City's failure to timely file a responsive pleading was the result of excusable neglect, the City respectfully requests this Court grant this motion and permit the City to file its responsive pleading *instanter*.

ARMSTRONG TEASDALE LLP

By*: /s/ John F. Cowling*

| John F. Cowling | #30920 |
| Katherine M. Ricks | #70322 |

7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314.621.5070
314.621.5065 (facsimile)
jcowling@atllp.com
kricks@atllp.com

ATTORNEYS FOR DEFENDANT
THE CITY OF ST. LOUIS (THE OWNER
AND OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on February 27, 2020, the foregoing document was electronically filed with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

*/s/ John F. Cowling*

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,      )
BARBARA HOOKS, JOEL HOGAN,           )
KENNETH NIEBLING, KENDALL LACY,      )
TANJA LACY, WILLIE CLAY, BOBBIE      )
JEAN CLAY, ANGELA STATUM, AND        )
MISSOURI RENTALS COMPANY, LLC, on    )
behalf of themselves and all others similarly  )
situated,                            )
                                     )
        Plaintiffs,       )   Cause No:  18SL-CC00617-01
                                     )
                                         Division No. 17
vs.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
DJR HOLDINGS, INC. f/k/a FUTURA
COATINGS, INC., AND ST. LOUIS
AIRPORT AUTHORITY, A DEPARTMENT
OF THE CITY OF ST. LOUIS,

        Defendants.

## <u>MEMORANDUM IN SUPPPORT OF DEFENDANT THE CITY OF<br>ST. LOUIS' MOTION TO DISMISS</u>

Defendant The City of St. Louis (the owner and operator of St. Louis Lambert International Airport®) (the "City"), pursuant to Rules 55.05 and 55.27 of the Missouri Rules of Civil Procedure, moves for dismissal of Plaintiff's Second Amended Class Action Petition.  In support of this motion, the City states as follows:

Plaintiffs' Second Amended Class Action Petition fails to state a claim upon which relief can be granted. Plaintiffs allege damages arising from the storage and transportation of radioactive "mill tailings" on property owned by the City. But claims involving "radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material" are governed solely by the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, the broad-reaching federal regulatory scheme created to preempt state regulation of the health and safety

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

aspects of radioactive materials. The PAA was intended to be the *exclusive* way to pursue claims of the kind asserted in this action. Plaintiffs should not be permitted to circumvent the PAA by erroneously characterizing their claims as colorable under state tort law. Plaintiff's state law claims are entirely preempted by the PAA. And even if Plaintiffs' claims are actionable under state law (which they are not), such claims are insufficiently pleaded and should be dismissed.

While the United States District Court for the Eastern District of Missouri could not conclusively determine that it had federal subject matter jurisdiction, and therefore remanded this case, that court did not conclusively determine that Plaintiffs' claims were not preempted by the PAA as a matter of law. The federal court's discussion of substantive law is not binding on this Court on remand. Accordingly, this Court should now determine the applicability of the PAA.

## LEGAL STANDARD

A pleading must present "a short and plain statement of the facts showing that the pleader is entitled to relief." Rule 55.05. A petition must invoke substantive principles of law entitling plaintiff to relief and allege ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial. *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329 (Mo. banc 2009). Dismissal for failure to state a claim is proper when the petition fails to allege the facts essential to recovery. *Amesquita v. Gilster-Mary Lee Corp.*, 408 S.W.3d 293, 298 (Mo. App. E.D. 2013).

## ARGUMENT

### I.      The Price-Anderson Act Preempts Plaintiffs' State Law Claims

The PAA, as amended in 1988, establishes a federal cause of action known as a "public liability action" for tort claims arising out of incidents involving radioactive materials.  A "public liability action" means a "suit asserting public liability."   42 U.S.C. § 2014(hh).   "Public liability" means "any legal liability arising out of or resulting from a nuclear incident."  *Id.* §

Electronically Filed - St. Louis County - February 27, 2020 - 04:08 PM

2014(w).  A "nuclear incident" involves "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property caused by the "radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* § 2014(q).  A claim under the PAA is the exclusive remedy for public liability claims arising out of a nuclear incident.

Given the expansive nature of the PAA, virtually every circuit court to address the issue has concluded that "the Price-Anderson Act completely preempts state law causes of action for public liability arising out of or resulting from a nuclear incident." *Adkins v. Chevron Corp.*, 960 F. Supp. 2d 761, 767-768 (E.D. Tenn. 2012) (observing that the Third, Seventh, Ninth, Tenth and Eleventh Circuits are in agreement with the Sixth Circuit's conclusion that the PAA completely preempts state law causes of action); *In re Berg Litig.,* 293 F.3d 1127, 1132 (9th Cir. 2002) (observing that a PAA public liability action is plaintiffs' "exclusive means" for pursuing claims arising from a nuclear incident); *Roberts v. Florida Power & Light Co.,* 146 F.3d 1305, 1306 (11th Cir. 1998) ("Congress passed the Price–Anderson Amendments Act of 1988 . . . creating an exclusive federal cause of action for radiation injury."); *Kerr–McGee Corp. v. Farley,* 115 F.3d 1498, 1504 (10th Cir. 1997) (observing that the PAA's provisions "appear broad enough to create a federal forum for any tort claim even remotely involving atomic energy production.  The PAA on its face provides the sole remedy for the torts alleged . . .."); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1100 and 1105 (7th Cir. 1994) (stating that "a new federal cause of action supplants the prior state cause of action . . . . [S]tate regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law."); *In re TMI Litig. Cases Consol. II,* 940 F.2d 832, 854 (3d Cir. 1991) ("After the Amendments Act, no state cause of action based upon public liability exists.  A claim growing out of any nuclear incident is

compensable under the terms of the Amendments Act or *it is not compensable at all.*").

      **A.**    **Plaintiffs' Claims Stem from a "Nuclear Incident" as Defined by the PAA.**

Plaintiffs assert state-law based claims against the Defendants for: (1) trespass; (2) permanent nuisance; (3) temporary nuisance; (4) negligence; (5) negligence per se; (6) strict liability/absolute liability; (7) injunctive relief seeking medical monitoring; (8) punitive damages; (9) civil conspiracy; and against the City only, for (10) inverse condemnation; (11) violation of the Missouri State Constitution's due process guarantee; and (12) violation of the Missouri State Constitution's takings and just compensation clause.  Plaintiffs' Second Amended Class Action Petition ¶¶ 99-220.

The claims arise out of alleged conduct of Defendants over several decades resulting in releases of radioactive materials into the environment in and around Coldwater Creek, a tributary of the Missouri River that runs throughout North St. Louis County, resulting in the alleged radioactive contamination of Plaintiffs' and class members' property and leading to various forms of property damage.  *Id.* at ¶¶ 2, 18-26, 62-98.

Plaintiffs contend they are entitled to monetary recovery stemming from the loss of use and enjoyment of her property; annoyance and discomfort; damage to her personal property; diminution in the market value of her property; costs and expenses incurred as a result of exposure to radioactive emissions, including the cost of remediation and relocation; statutory damages under Missouri state law; punitive and exemplary damages; costs and attorneys' fees plus interest; medical and environmental monitoring and testing; and environmental clean-up. *Id*. at ¶¶ 97-98, 123, 136-138, 150-154, 160-163, 166, 176, 181-184, 187-201, 209, 214-215.

Plaintiffs' allegations and demands for relief fall under the purview of the PAA. According to the Complaint, from 1942 to 1957, uranium ore was processed at a downtown St.

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Louis City Site ("SLDS") in connection with the United States' efforts under the Manhattan Project to develop the first nuclear weapons.  *Id.* at ¶¶ 62-63.  In the late 1940s, the United States government purchased a 21.7-acre tract of land near the Airport to store materials generated from processing activities at SLDS.  *Id.* at ¶ 65.  This site is commonly referred to as the St. Louis Airport Site ("SLAPS").  *Id.*  Thereafter, various radioactive materials resulting from operations at SLDS were stored at SLAPS, and in 1957, radioactively impacted materials were buried on a portion of SLAPS adjacent to Coldwater Creek.  *Id.* at ¶ 66.  Plaintiffs further contend that in the 1960s, some radioactive materials that had been stored at SLAPS were moved to a storage site at Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"), including a portion of the Latty Avenue Site that later became known as the Hazelwood Interim Storage Site ("HISS").  *Id.* at ¶ 67.

In the late 1960s, Cotter allegedly purchased some of the radioactive materials (including "enriched thorium") stored at SLAPS and the Latty Avenue Site from the United States government, and allegedly stored, processed, and transported those materials at and to SLAPS and the Latty Avenue Site.  *Id.* at ¶¶ 69-72.  According to Plaintiffs, various transport and handling activities to and from SLDS, SLAPS, the Latty Avenue Site, and HISS contaminated "haul routes to nearby properties."  *Id.* at ¶ 74.  Furthermore, Plaintiffs allege that storage operations at both SLAPS and the Latty Avenue Site resulted in the dispersal and runoff of radioactive materials into Coldwater Creek.  *Id.* at ¶ 80.

Plaintiffs claim that "[s]ince 1946, radioactive wastes have migrated from the SLAPS, HISS, and Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire . . . one hundred year flood plain of Coldwater Creek."  *Id*. at ¶¶ 88.  Plaintiffs contend that their properties are located within the one hundred year flood plain of Coldwater

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Creek, that there is radioactive contamination present on their properties, that this contamination is linked to radioactive materials "generated in the processing of uranium ores in the St. Louis area," and the contamination is the result of Defendants' actions.  *Id*. at ¶¶ 92-96.  According to Plaintiffs, this has resulted in damage to her property, necessitating, among other things, "a total and complete cleanup of the contamination . . . to prevent and eliminate further contamination." *Id*. at ¶¶ 97-98.

These allegations arise from a "nuclear incident" as defined by the PAA.  Pursuant to the PAA, a "nuclear incident" is broadly defined as "any occurrence . . . within the United States causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous property of source, special nuclear, or byproduct material."  42 U.S.C. § 2014(q).  As a result, Plaintiffs' exclusive remedy is a claim under the PAA, and any state law claims are preempted. The PAA is "broad enough to create a federal forum for any tort claims even remotely involving atomic energy production.  The [PAA] on its face provides the sole remedy for the torts alleged."  *Farley*, 115 F.3d at 1504.

Here, Plaintiffs' claims allegedly stem from a nuclear incident as defined in the PAA. The entire basis for Plaintiffs' Complaint, and the state-law causes of action therein, are their contentions that Plaintiffs' properties are contaminated by radioactive material; that these materials match the "fingerprint" of radioactive materials generated from uranium ore processing activities in the St. Louis area; and that "[t]his contamination was caused by . . . Defendants' improper handling, storage, and disposal of radioactive materials."  Plaintiffs' Second Amended Class Action Petition ¶¶ 92-96.

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Specifically, Plaintiffs' claims allegedly arise from the processing of certain nuclear materials in connection with the Manhattan Project.  *Id.* at ¶ 62.  Plaintiffs maintain that, after the Manhattan Project acquired SLAPS in the late 1940s, radioactive materials were stored at SLAPS, including pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, Colorado raffinate residues, and that in the 1960s, some radioactive materials were shipped from SLAPS to the Latty Avenue Site and HISS, resulting in the radioactive contamination of those sites.  *Id.* at ¶¶ 65-67.

In 1973, the City acquired SLAPS, which had previously been managed by "Mallinckrodt" since 1953.  *Id. at* ¶¶ 77, 79.  According to Plaintiffs, "[d]espite knowing that significant activities involving radioactive material were conducted on [SLAPS], the [City] . . . did nothing to prevent continued dispersal and runoff of . . . radioactive materials into Coldwater Creek."  *Id.* at ¶ 80.

Plaintiffs claim that since 1946, radioactive materials have "migrated from SLAPS, HISS, and the Latty Avenue Site(s) into Coldwater Creek," that these materials "were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek," that the "entire one hundred year floodplain of Coldwater Creek is believed to be contaminated" with radioactive materials, that Plaintiffs' properties, which are within Coldwater Creek's flood plain, "are contaminated by radioactive material," and that "[t]his radioactive contamination was caused by...Defendants' improper handling, storage, and disposal of radioactive materials."  *Id.* at ¶¶ 88, 91-92, 96.

In short, the factual allegations undergirding Plaintiffs' purported injuries all relate to Defendants' alleged conduct in connection with nuclear and radioactive materials.  As a result,

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Plaintiffs' claims arise out of an alleged nuclear incident. Plaintiffs' state law claims are preempted by the PAA.

## B. Plaintiffs Seek to Impose Public Liability for Damages Allegedly Arising from a Nuclear Incident.

Plaintiffs attempt to plead around the PAA, Plaintiffs' Second Amended Class Action Petition ¶¶ 14-17. Plaintiffs' conclusory assertions, however, fail to refute the clear import of their allegations constituting a claim of public liability arising from a nuclear incident. Pursuant to the PAA, a public liability action is the "exclusive federal cause of action" for Plaintiffs' alleged "radiation injur[ies]," *Roberts,* 146 F.3d at 1306. Because the Plaintiffs' claims seek public liability stemming from a nuclear incident, all state law claims are preempted.

Plaintiffs' assertions about the inapplicability of the PAA to her claims are belied by her allegations and publically acknowledged admissions by the United States Government. SLAPS, currently owned by the City of St. Louis, was acquired by the Manhattan Engineer District (MED) and the Atomic Energy Commission (AEC) in 1946. *Intent to Prepare a Remedial Investigation/Feasibility Study – Environmental Impact Statement: Response Actions at Sites in St. Louis. MO*, 57 Fed. Reg. 887, 888 (Jan. 9, 1992). SLAPS was used to store uranium-bearing material generated as a byproduct of the generation of uranium compounds by Mallinckrodt Chemical Works under contracts with the MED and AEC. *Id.* The activities that caused the radioactive materials to be placed at SLAPS, therefore, were performed directly by MED/AEC or its contractor, Mallinckrodt Chemical. In addition, the Department of Energy has "assumed responsibility for: - All contamination, both radioactive and chemical, whether commingled or not at HISS and SLAPS." *Id.* at 889. These activities constitute a nuclear incident.

This court has held, with respect to claims for personal injury arising out the same alleged contamination from SLAPS, SLDS and HISS as Plaintiffs allege as the basis for their property

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

damage claims, that state law claims are preempted and the PAA is the exclusive remedy.

*McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013).  The court stated:

> "To summarize, a 'public liability action' is a suit in which a party asserts that another party bears any legal liability arising out of an incident in which the hazardous properties of radioactive material caused bodily injury, sickness, or property damage." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 194 (5th Cir.2011). "[A] plaintiff who asserts any claim arising out of a 'nuclear incident' as defined in the PAA, 42 U.S.C. § 2014(q), can sue under the PAA or not at all." *Id.* at 193 (citation omitted).

Following the overwhelming authority from a majority of federal circuit courts and this Court's decision in *McClurg*, Plaintiff's state law claims are preempted by the PAA. But Plaintiffs' claims fail to state a claim upon which relief can be granted.

## II.     Plaintiffs' Claims Fail to State a Claim Upon Which Relief Can be Granted.

Plaintiffs failed to sufficiently allege a PAA claim because they fail to plead that the City exceeded federal dose and effluent limits, an element essential to making a claim for relief under the PAA. Further, Plaintiffs' claims fail because they either seek relief not allowed by the PAA, or fail to plead the requisite elements for the requested relief.

Plaintiffs set out separate counts for punitive damages and injunctive relief, which do not independently state claims. *See Church v. Missouri*, 268 F.Supp.3d 992, 1022 (W.D. Mo. 2017); *Landum v. Livingston*, 394 S.W.3d 573, 578 (Mo. App. 1965).. Rather, these are types of remedies that can be asserted as desired relief for other actionable legal theories. Accordingly, Counts VII and VIII should be dismissed.

Further, Plaintiffs have not adequately pleaded a negligence claim because they have not adequately described the duty the City allegedly owes them. To state a claim for negligence, a plaintiff must allege 1) that defendant has a duty to protect plaintiff from injury; 2) defendant has failed to perform that duty; 3) as a result, plaintiff was injured. Plaintiffs do not specify the duty owed to them, making it impossible for the City to defend itself against the overly-vague claims

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

lodged against it.

Likewise, Plaintiffs fail to state a claim for civil conspiracy. "Merely alleging the commission of wrongful acts is conclusory and insufficient to state a claim for civil conspiracy." *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996). To state a claim, Plaintiffs must plead "facts that, if true, constitute an unlawful act." *Id.*  Plaintiffs fail to plead facts sufficient to support an allegation of fraud, which must be pleaded with particularity. *See* Rule 55.15. There was no "meeting of the minds" among the Defendants, and certainly not on the part of the City, which Plaintiffs admit merely purchased the SLAPS property in 1973 and then "did nothing to prevent" alleged contamination of the site and Coldwater Creek. Second Amended Class Action Petition, ¶¶ 79-80. Nowhere in the Petition do Plaintiffs set forth facts to establish that the City conspired with or had any meaningful contact with Cotter, ComEd, or DJ in the context of the SLAPS site. Accordingly, Plaintiffs' civil conspiracy claim against the City should be dismissed for failure to state a claim.

Finally, Plaintiffs fail to sufficiently state claims for inverse condemnation, violation of due process, and taking without just compensation. For each of these claims, Plaintiffs fail to sufficiently plead that the City has deprived Plaintiffs of the use and enjoyment of their properties. For example, Plaintiffs have not indicated that they were forced to abandon their properties, that their properties were no longer usable for residential or commercial purposes, or that their property rights have otherwise been actually negatively affected. The City has not "taken" any Plaintiffs' property, and if it has, it did not do so without due process and just compensation. Accordingly, Counts X, XI, and XII must be dismissed.

### III.    The Class Definition is Overbroad.

Plaintiffs fail to establish facts sufficient to support a class action or to certify the

purported class. A party seeking to certify a class must demonstrate numerosity, commonality, typicality, and adequacy of representation. *See* Rule 52.08. Plaintiffs' proposed class definitions are impermissibly overbroad and do not meet the four required elements of Rule 52.08. For example, Plaintiffs seek to include all property owners within the Coldwater Creek 100-year floodplain, regardless of whether that property is alleged to be contaminated with radioactive materials attributable to the City or to any of the Defendants. Courts routinely reject overbroad class definitions such as the one advanced by Plaintiffs, and this Court should do the same. *See, e.g., Green v. Fred Weber, Inc.*, 254 S,W3d 874, 883 (Mo. banc 2008) (class certification held to be inappropriate where there was no evidence that individuals in the certified geographic area other than the named plaintiff were similarly affected by the complained-of condition). Accordingly, the Court should dismiss Plaintiffs' class allegations because the class definitions are impermissibly overbroad and insufficient to meet the certification requirements of Rule 52.08.

<div align="center"><u>**CONCLUSION**</u></div>

Plaintiffs' Second Amended Class Action Petition should be dismissed because Plaintiffs' claims are preempted by the PAA, and are insufficiently pleaded. Counts I-XII should be dismissed with prejudice.

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

ARMSTRONG TEASDALE LLP


By: */s/ John F. Cowling*
    John F. Cowling        #30920
    Katherine M. Ricks    #70322
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    jcowling@atllp.com
    kricks@atllp.com

ATTORNEYS FOR DEFENDANT
CITY OF ST. LOUIS (THE OWNER AND
OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)


## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2020, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                                           */s/ John F. Cowling*

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS,<br>BARBARA HOOKS, JOEL HOGAN,<br>KENNETH NIEBLING, KENDALL LACY,<br>TANJA LACY, WILLIE CLAY, BOBBIE<br>JEAN CLAY, ANGELA STATUM, AND<br>MISSOURI RENTALS COMPANY, LLC,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>COTTER CORPORATION,<br>COMMONWEALTH EDISON COMPANY,<br>DJR HOLDINGS, INC. f/k/a FUTURA<br>COATINGS, INC., AND ST. LOUIS<br>AIRPORT AUTHORITY, A DEPARTMENT<br>OF THE CITY OF ST. LOUIS,<br><br>        Defendants. | Cause No:  18SL-CC00617-01<br><br>Division 17 |

**DEFENDANT THE CITY OF ST. LOUIS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED CLASS ACTION PETITION**

Defendant the City of St. Louis (the owner and operator of St. Louis Lambert

International Airport®) (the "City"), pursuant to Rules 55.05 and 55.27 of the Missouri Rules of

Civil Procedure, moves for dismissal of Plaintiff's Second Amended Class Action Petition.  In

support of this motion, the City states as follows:

1.      Plaintiff alleges only state law claims that are entirely preempted by the Price-

Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*

2.      A claim under the PAA is the exclusive remedy for public liability claims arising

out of a nuclear incident. The PAA, as amended in 1988, establishes a federal cause of action

known as a "public liability action" for tort claims arising out of incidents involving radioactive

materials "Public liability" means "any legal liability arising out of or resulting from a nuclear

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

incident." *Id.* § 2014(w).  A "nuclear incident" involves "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property caused by the "radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* § 2014(q).

3.     Plaintiff asserts state-law based claims against the Defendants for: (1) trespass; (2) permanent nuisance; (3) temporary nuisance; (4) negligence; (5) negligence per se; (6) strict liability/absolute liability; (7) injunctive relief seeking medical monitoring; (8) punitive damages; (9) civil conspiracy; and against the City only,  for (10) inverse condemnation; (11) violation of the Missouri State Constitution's due process guarantee; and (12) violation of the Missouri State Constitution's takings and just compensation clause.  Plaintiffs' Second Amended Class Action Petition ¶¶ 99-220.

4.     For the reasons stated in the City's Memorandum in Support of Motion to Dismiss, Plaintiffs' Second Amended Class Action Petition fails to state a claim upon which relief can be granted. Plaintiffs' state law claims are insufficiently pleaded, and are preempted by the PAA. Plaintiffs' claims should therefore be dismissed.

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

ARMSTRONG TEASDALE LLP


By: */s/ John F. Cowling*
    John F. Cowling        #30920
    Katherine M. Ricks     #70322
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    jcowling@atllp.com
    kricks@atllp.com

ATTORNEYS FOR DEFENDANT
CITY OF ST. LOUIS (THE OWNER AND
OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)


## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 27, 2020, the foregoing was filed electronically with the

Clerk of the Court to be served by operation of the Court's electronic filing system upon all

counsel of record.

                */s/ John F. Cowling*

Electronically Filed - St Louis County - February 28, 2020 - 01:38 PM

# IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, et al., on behalf of themselves )
and all others similarly situated,                     )
                                                                       )
              Plaintiffs,                                         )
                                                                       )
v.                                                                    )          Cause No. 18SL-CC00617-01
                                                                       )
COTTER CORPORATION,                               )          **JURY TRIAL DEMANDED**
COMMONWEALTH EDISON COMPANY,    )
DJR HOLDINGS, INC. f/k/a FUTURA           )
COATINGS, INC., and ST. LOUIS AIRPORT  )
AUTHORITY, A DEPARTMENT OF THE       )
CITY OF ST. LOUIS,                                      )
                                                                       )
              Defendants.                                       )

## NOTICE OF HEARING

YOU ARE HEREBY NOTIFIED that Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction, and Defendants Cotter Corporation and Commonwealth Edison Company's Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition in the above-captioned matter, will be called for hearing in St. Louis County Circuit Court Division 17 on March 31, 2020 at 9:00 a.m. or as soon thereafter as counsel may be heard.

Dated:  February 28, 2020                    Respectfully submitted,

                                                            KEANE LAW LLC

                                                            /s/ *Nathaniel R. Carroll*
                                                            Ryan A. Keane, #62112
                                                            Nathaniel R. Carroll, #67988
                                                            7777 Bonhomme Ave., Suite 1600
                                                            St. Louis, MO 63105
                                                            314-391-4700
                                                            314-244-3778 (fax)
                                                            ryan@keanelawllc.com
                                                            nathaniel@keanelawllc.com

                                                            *Attorneys for Plaintiffs and Proposed Class*

1

Electronically Filed - St Louis County - February 28, 2020 - 01:38 PM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 28, 2020, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice and a copy of the filing to all parties and attorneys of record, and further served by email on counsel of record at the email addresses listed below:


John F. Cowling – jcowling@armstrongteasdale.com
Katherine M. Ricks – kricks@atllp.com
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Attorneys for the City of St. Louis and St. Louis Airport Authority


Dale A. Guariglia  – daguariglia@bclplaw.com
Erin L. Brooks – erin.brooks@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102

*Attorneys for Defendants Cotter Corporation and Commonwealth Edison Company*
John McGahren – john.mcgahren@morganlewis.com
Stephanie Feingold – stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540

/s/ *Nathaniel R. Carroll*_____

Electronically Filed - St Louis County - March 30, 2020 - 01:28 PM

**IN THE  21ST JUDICIAL CIRCUIT  COURT,        ST. LOUIS COUNTY       , MISSOURI**

Tamia Banks,

       Plaintiff,

              vs.

Cotter Corporation Et Al,

       Defendant.

Case Number:  18SL-CC00617-01

## Entry of Appearance

Comes now undersigned counsel and enters his/her appearance as attorney of record for Tamia Banks, Plaintiff, in the above-styled cause.

/s/ Nathaniel R. Carroll
Nathaniel Richard Carroll
Mo Bar Number: 67988
Attorney for Plaintiff
Keane Law Llc
7777 Bonhomme, Suite 1600
Saint Louis, MO 63105
Phone Number: (314) 391-4700
nathaniel@keanelawllc.com

### Certificate of Service

I hereby certify that on _____March 30th, 2020_____, a copy of the foregoing was sent through the Missouri eFiling system to the registered attorneys of record and to all others by facsimile, hand delivery, electronic mail or U.S. mail postage prepaid to their last known address.

/s/ Nathaniel R. Carroll
Nathaniel Richard Carroll

Electronically Filed - St Louis County - March 25, 2020 - 05:25 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

|  |  |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,<br>       Plaintiffs,<br><br>  v.<br><br>COTTER CORPORATION, et al.,<br><br>      Defendants. | Case No. 18SL-CC00617-01<br>Division No. 17 |

## ENTRY OF APPEARANCE

The undersigned attorneys enter their appearance on behalf of Defendant Commonwealth

Edison Company without waiver of jurisdictional or other defenses.

Dated: March 25, 2020           Respectfully submitted,

                                    */s/ Brian O. Watson*
                                    RILEY SAFER HOLMES & CANCILA LLP
                                    Edward Casmere, #64326MO
                                    Brian O. Watson, #68678MO
                                    70 W. Madison St., Ste. 2900
                                    Chicago, Illinois  60602
                                    (312) 471-8700 (main)
                                    (312) 471-8701 (fax)
                                    ecasmere@rshc-law.com
                                    bwatson@rshc-law.com
                                    docketdept@rshc-law.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies on March 25, 2020, these papers were filed via the Missouri Court's eFiling system, which will serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*

RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois  60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4819-3478-5208, v. 1

Electronically Filed - St Louis County - March 25, 2020 - 05:25 PM

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

|  |  |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>COTTER CORPORATION, et al.,<br><br>          Defendants. | Case No. 18SL-CC00617-01<br>Division No. 17 |

**DEFENDANT COMMONWEALTH EDISON COMPANY'S**
**REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

Commonwealth Edison Company ("ComEd") established that Plaintiffs' Second Amended Class-Action Petition should be dismissed because it fails to create personal jurisdiction over ComEd and fails to state a claim against ComEd.  Plaintiffs' response does not, and cannot, overcome the evidence that ComEd: (1) is not registered to do business in Missouri; (2) is not doing business in Missouri; (3) has not transacted business in Missouri as to any matter which is the subject of this action; (4) does not offer products or services within Missouri; (5) has no employees in Missouri; (6) does not own or lease any real property or facilities in Missouri; and (7) does not maintain any office to do business in Missouri.  (Def.'s Mot. at Ex. 3.)

In their response, Plaintiffs argue new jurisdictional theories that would contravene constitutional and Missouri law and would eviscerate the rights of ComEd.  Plaintiffs claim that personal jurisdiction may be based on ComEd's purchase in 1974 of codefendant Cotter

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

Corporation (N.S.L.) ("Cotter"); ComEd's indemnity agreement with codefendant Cotter; and ComEd's alleged actions as the claimed alter-ego of Cotter.  (Pls.' Opp. at 1, 13-14.)  None of these arguments has merit.

I.      **Plaintiffs Have Not Established Personal Jurisdiction Over ComEd.**

A.      **ComEd's Purchase of Cotter Does Not Establish Personal Jurisdiction.**

Plaintiffs offer no authority for their claim that the "mere act of owning" a subsidiary authorizes personal jurisdiction under Missouri's long-arm statute and subjects a foreign parent corporation to jurisdiction in satisfaction of the Fourteenth Amendment.  (Pls.' Opp'n at 6.)  To the contrary, ComEd's purchase of codefendant Cotter in 1974 is legally irrelevant to this Court's personal jurisdiction analysis.  (Def.'s Mot. at 9-11.)

As ComEd's motion explained, extensive case law—unrebutted by Plaintiffs—makes clear that "ownership of subsidiary is insufficient to justify personal jurisdiction.  Whether a subsidiary is subject to personal jurisdiction in the state has no effect on the jurisdictional inquiry regarding its parent."  *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008); *see also id.* (quoting *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003)) ("A corporation is not doing business in a state merely by the presence of its wholly owned subsidiary.").

Plaintiffs' argument misstates the law.  *Empiregas, Inc., of Noel v. Hoover Ball & Bearing Co.* decided a motion to dismiss based on failure to state a negligence claim; it did not "reverse trial court's dismissal based on lack of personal jurisdiction" or involve any parent-subsidiary relationship as Plaintiffs suggest.  507 S.W.2d 657, 658 (Mo. 1974).  Nor did *State ex rel. Birdsboro Corp. v. Kimberlin* involve any parent-subsidiary relationship; jurisdiction existed because the defendant "shipped the product directly to Cameron, Missouri."  461 S.W.2d 292, 296 (Mo. App. W.D. 1970).  *Myers v. Casino Queen, Inc.* also did not involve any parent-subsidiary relationship; the defendant had direct and substantial contacts with Missouri,

2

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

including advertising in Missouri; engaging in direct mailing campaigns in Missouri; maintaining business relationships and advertising with professional sports teams in Missouri; operating a fleet of shuttle buses in Missouri; and donating to political efforts in Missouri.  689 F.3d 904, 908 (8th Cir. 2012).  None of Plaintiffs' cases supports their argument.

Thus, Plaintiffs' first argument for personal jurisdiction over ComEd fails because none of their cited authority applies where, as here, ComEd does not have any relevant contacts with Missouri and a former subsidiary's contacts are legally irrelevant.

**B.    ComEd's Indemnity Agreement with Cotter Does Not Establish Personal Jurisdiction.**

Plaintiffs' second argument is equally flawed because ComEd did not, as Plaintiffs suggest, "consent to an obligation to stand up in Court wherever Cotter is subject to personal jurisdiction, including the instant lawsuit, and to substitute itself for Cotter on the issue of personal jurisdiction."  (Pls.' Opp. at 7-8.)  Plaintiffs' Second Amended Petition does not make any allegation that ComEd expressly assumed Cotter's liabilities such that it agreed to be subject to Missouri's jurisdiction.

Again, Plaintiffs' response mischaracterizes the law.  *Green v. Montgomery Ward & Co.* did not hold that a "transferor had sufficient contacts to allow an exercise of personal jurisdiction" as Plaintiffs argue.  775 S.W.2d 162, 164 (Mo. App. W.D. 1989).  Rather, the court of appeals in *Green* found that a Mississippi corporation was so closely aligned with its predecessor, an Ohio corporation, that it was a "mere continuation" of the predecessor, the transfer was simply "the move of the corporation from Ohio to Mississippi," and the predecessor had assembled the defective product from parts it acquired in the move.  *Id.*[1]

---

[1]  Plaintiffs' authorities are all inapposite. *See Bennett v. Rapid Am. Corp.*, 816 S.W.2d 677, 678 (Mo. 1981) (remanding because the court found "no allegation ... sufficient to demonstrate that [the predecessor] transacted business in the State of Missouri"); *Williams v.*

Plaintiffs make no such allegation against ComEd.  Nowhere does Plaintiffs' Second Amended Petition allege that ComEd was the "mere continuation" of Cotter, or anything close to the allegations in *Green*.  Indeed, Plaintiffs allege that Cotter still "currently operates as a subsidiary of General Atomics, Inc."  (Pls.' Second Am. Pet'n at ¶ 27.)  Accordingly, Plaintiffs offer no grounds for this Court to exercise jurisdiction over ComEd based on ComEd's alleged indemnity agreement of Cotter.

### C.    Plaintiffs' Alter-Ego Theory Does Not Establish Personal Jurisdiction.

Plaintiffs' final argument has no factual or legal basis that "ComEd through ComEd's actions as alter-ego of Cotter" is subject to personal jurisdiction in Missouri.  (Pls.' Opp. at 1, 13-14.)  As discussed below, Plaintiffs' Second Amended Petition does not claim any actions taken by ComEd in Missouri, let alone any actions taken as an alleged alter-ego of Cotter in Missouri.  Nor do Plaintiffs cite any authority that would support their alter-ego theory of personal jurisdiction over ComEd.  (Pls.' Opp'n at 10-11.)

*Bliss* is dispositive, and Plaintiffs do not try to distinguish its clear holding.  Where, as here, "a subsidiary's presence in the state is primarily to carry on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities."  108 F.R.D. at 131.  Plaintiffs'

---

*Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (refusing to apply Oklahoma law that "successor liability can be imposed when there is a statutory merger or consolidation ... , or, in limited circumstances, a sale or transfer of all, or substantially all, the assets of a corporation"); *City of Richmond, Virginia v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454-55 (4th Cir. 1990) (noting that imputing contacts of predecessor to successor can be done if to do otherwise "would allow corporations to immunize themselves by formalistically changing their titles"); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982) (dealing with a "surviving corporation [who] is liable for all claims"); *United States v. Bliss*, 108 F.R.D. 127, 131-34 (E.D. Mo. 1985) (imputing contacts where two entities "merely exchanged names" and noting that "[t]he test is whether the parent so dominates and controls the subsidiary that the companies lose their separate identities. A court may not exercise jurisdiction solely because a parent owns all the stock of its subsidiary" (citation omitted)).

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

Second Amended Petition makes clear that Cotter and ComEd maintain separate, independent corporations.  (Pls.' Second Am. Pet'n at ¶ 27 (alleging Cotter "currently operates as a subsidiary of General Atomics" and "is a Colorado corporation with its principal place of business in Englewood, Colorado"); *id.* at ¶ 9 (alleging "Cotter continuously and systematically carried on business activities in the State of Missouri"); *id.* at ¶¶ 69-73 (alleging actions taken by Cotter).)  Thus, Plaintiffs' alter-ego theory does not, and cannot, establish personal jurisdiction over ComEd.

> **D.    Plaintiffs' Demand for Jurisdictional Discovery Is Improper Because Their Jurisdictional Allegations Fail as A Matter of Law, Not Fact.**

Plaintiffs also request more jurisdictional discovery from ComEd "on the corporate relationships and any relevant agreements between the relevant entities."  (Pls.' Opp. at 9.)  This request should be denied because Plaintiffs' jurisdictional allegations fail as a matter of law, not fact.  As detailed above, the corporate relationships and agreements cannot create personal jurisdiction over ComEd.  Discovery would not unearth relevant contacts for personal jurisdiction.  *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) ("Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit.").

## II.    Plaintiffs Have Not Stated a Claim Against ComEd.

Additionally, Plaintiffs' Second Amended Petition should be dismissed because it does not state a claim against ComEd.  Plaintiffs point to their allegations in the Second Amended Petition that ComEd was obligated to require Cotter to comply with Missouri law, assumed the environmental safety of Cotter, knew about the alleged radioactive contamination, conspired with Cotter to cover up the radioactivity, and controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination.  (Pls.' Second Am. Pet'n at ¶ 29B.)

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

None of these allegations supports a claim against ComEd.  Where, as here, ComEd and Cotter have corporate formalities preserving their status as distinct entities, ComEd cannot be held liable for Cotter's alleged negligence.  *Bliss*, 108 F.R.D. at 131–2; Def.'s Mot. at 13–15 (collecting authority).  Nor could Plaintiffs amend to cure this fatal defect.  Plaintiffs concede that ComEd did not purchase Cotter until 1974—after Cotter transported and stored the materials at issue—and sold Cotter to an unrelated third party in 2000.  As ComEd's motion established, Plaintiffs cannot amend to allege that ComEd controlled Cotter's behavior or had liability as Cotter's parent company during the relevant time.

## **CONCLUSION**

For these reasons, Defendant Commonwealth Edison Company respectfully requests that this Court grant its motion to dismiss the Second Amended Petition for lack of personal jurisdiction and for failure to state a claim.

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

Dated:  March 26, 2020

Respectfully submitted,

/s/ Brian O. Watson
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq. (ID 046791990N)
*Admitted Pro Hac Vice*
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq. (ID 23182005N)
*Admitted Pro Hac Vice*
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, #32988
daguariglia@bclplaw.com
Erin L. Brooks, #62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

**ATTORNEYS FOR DEFENDANT**
**COMMONWEALTH EDISON**
**COMPANY**

Electronically Filed - St Louis County - March 26, 2020 - 07:44 PM

## CERTIFICATE OF SERVICE

I certify that on March 26, 2020, these papers were filed via the Missouri Court's eFiling system, which will automatically serve an electronic copy upon all counsel of record.

<div align="right">

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

</div>

4818-9505-3750, v. 6

Electronically Filed - St Louis County - March 27, 2020 - 11:32 AM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) | |
| Plaintiff, | ) ) | |
| Vs. | ) ) | Cause No. 18SL-CC00617-01 |
| COTTER CORPORATION, et al., | ) | Division No. 17 |
| Defendants. | ) ) | |

## <u>MOTION TO WITHDRAW</u>

COMES NOW Jennifer C. Pitzer with the law firm of CLAYBORNE & WAGNER LLP, previously Counsel for Plaintiff, TAMIA BANKS, et al, and for her Motion to Withdraw, state as follows:

1.      On October 1, 2019, James Clayborne, the partner assigned to this matter filed a Motion to Withdraw based on a conflict of interest.

2.      The undersigned, perhaps mistakenly, believed that the Motion extended to her representation as well.

3.      Upon information and belief, staff at the court confirmed this interpretation and told Ms. Pitzer's secretary that she would in fact be withdrawn.

4.      The undersigned is still listed as counsel of record and on the service list for this matter.

5.      Counsel respectfully requests that the Court grant her Motion to Withdraw from this matter.

6.      Plaintiffs are ably represented by other counsel and the withdrawal will not prejudice them in any way.

Electronically Filed - St Louis County - March 27, 2020 - 11:32 AM

WHEREFORE, Jennifer C. Pitzer with the law firm of CLAYBORNE & WAGNER LLP, prays this Court enter an order allowing our her to withdraw as counsel for Plaintiff, TAMIA BANKS, et al., in the above-captioned matter.

Respectfully Submitted,

CLAYBORNE & WAGNER LLP

/s/ *Jennifer C. Pitzer*
James F. Clayborne, #45627
Jennifer C. Pitzer, #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on this 27th day of March, 2020, she caused a true and correct copy of **Motion to Withdraw as Counsel** to be e-filed and served upon all attorneys of record via the Court's electronic filing system.

/s/ *Jennifer C. Pitzer*

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, on behalf of herself and all others similarly situated, | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| COTTER CORPORATION, et al., | ) | Division No. 17 |
| | ) | |
| Defendants. | ) | |

## **ORDER**

This cause coming before the Court on Jennifer C. Pitzer's Motion to Withdraw as counsel of record on behalf of Plaintiff, and the Court being fully advised in the premises;

**IT IS HEREBY ORDERED** that Defendant's Jennifer C. Pitzer's Motion to Withdraw as Counsel of Record is **GRANTED.**

**SO ORDERED:**

This _____ day of _____, 2020.


_____
HONORABLE JUDGE

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

**IN THE CIRCUIT COURT OF ST.  LOUIS COUNTY**
**STATE OF MISSOURI**

TAMIA BANKS, REV.  RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE
JEAN CLAY, ANGELA STATUM, and
MISSOURI RENTALS COMPANY, LLC, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

    v.

COTTER CORPORATION, et al.,

        Defendants.

Case No.  18SL-CC00617-01
Division No.  17

**DEFENDANTS COTTER CORPORATION (N.S.L.) AND COMMONWEALTH EDISON COMPANY'S RESERVATION OF THEIR PRICE-ANDERSON ACT DEFENSES AND <u>REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

Defendants Cotter Corporation (N.S.L.) ("Cotter") and Commonwealth Edison Company ("ComEd")[1] showed in painstaking detail that Plaintiffs' Second Amended Class-Action Petition failed to cure the deficiencies of their two prior petitions.  As to the Price-Anderson Act, because Plaintiffs' response relies on matters outside their pleading, Cotter and ComEd agree to reserve these defenses based on the Price-Anderson Act for summary judgment.  As to their remaining arguments, Plaintiffs' response cannot save what they failed to plead.  *First*, Plaintiffs do not allege a breach of the legal standard of care, which is the federal dosage and effluent limits.  *Second*, Plaintiffs fail to support their civil conspiracy claim because merely alleging wrongful acts is conclusory and insufficient under the law.  *Third*, Plaintiffs' class allegations are

---

[1] ComEd files this reply without waiving its motion for lack of personal jurisdiction under Missouri Supreme Court Rule 55.27(a).

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

irretrievably broad and do not satisfy the essential elements—numerosity, commonality, typicality, and adequacy of representation—of a putative class action petition under Rule 52.08. For these reasons, Plaintiffs' Second Amended Class-Action Petition should be dismissed.

I.   **The Price-Anderson Act Defenses Are Reserved for a Summary Judgment Motion with Plaintiffs' Submissions Outside the Pleadings.**

Cotter and ComEd reserve their Price-Anderson Act defenses for summary judgment because Plaintiffs present matters well outside the pleadings, and the Court will benefit from a developed record.  (*E.g.*, Pls.' Opp'n at Ex. 1, Decl.  Marvin Resnikoff; Pls.' Opp'n at Ex. 2, Decl. Richard B.  Stewart; Pls.' Opp'n at 2–3, 16–19.)  Based on Plaintiffs' submissions, all parties should be given reasonable opportunity to present all material for the Court under Rule 55.27(a).  *See Turner Eng'g, Inc. v. 1491155 Weldon Parkway, LLC*, 40 S.W.3d 406, 408 (Mo. App. E.D. 2001) (moving party should "refile the motion so that it complies with Rule 74.04, the summary judgment rule," and the trial court should then "order the opposing party to follow these requirements as well")); *ADP Dealer Servs. Grp. v. Carroll Motor Co*., 195 S.W.3d 1, 6 (Mo. App. E.D. 2005) (if a party does not acquiesce in treating a motion to dismiss as a motion for summary judgment, the trial court "must provide all parties a reasonable opportunity to present all materials made pertinent to a motion for summary judgment").

II.   **Plaintiffs Have Not Stated a Claim Against Cotter and ComEd.**

A.   **Plaintiffs' Negligence and Negligence Per Se Claims Rely On—But Fail to Allege—Any Violation of Federal Dosing Standards for Nuclear Material.**

Plaintiffs claim that Cotter and ComEd offered no case law that Plaintiffs must allege a dosage amount.  (Pls.' Opp. at 29.)  This is incorrect.  Cotter and ComEd were clear that Plaintiffs' state tort claims require, among other things, a duty owed by Cotter and ComEd to Plaintiffs and a breach of that duty.  (Mot. at 25–28.)  Cotter and ComEd established, with support, that the standard of care in federal regulations governing dose and effluent limits for

2

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

radioactive materials should govern Plaintiffs' claims for exposure to radioactive materials.  (*Id.*) Specifically, in 1970–73—the relevant timeframe when Cotter was handling the radioactive materials at issue—the dosing limit applied to radioactive materials for federal licensees was 500 millirems (units of absorbed radiation) under 10 C.F.R.  § 20.105(a) (1969), as Cotter and ComEd cited.

Plaintiffs have offered the Court no competing standard of care or reason why that standard should not apply.  Plaintiffs only cite two 1980s cases in the context of exposure to radioactive substances, which opined that negligence could occur hypothetically while adhering to federal dosage standards, and the reasoning of those cases has since been rejected.  *See, e.g.*, *Hennessy v.  Commonwealth Edison Co.*, 764 F. Supp. 495, 501 (N.D. Ill. 1991) (rejecting *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854 (Mo. App. 1985), because the "Supreme Court has declared, in essence, that states are precluded from regulating the safety aspects of nuclear development and of the handling of hazardous nuclear materials"); *O'Connor v.  Commonwealth Edison Co.*, 748 F. Supp. 672, 676 (C.D. Ill. 1990), *aff'd*, 13 F.3d 1090 (7th Cir. 1994) ("Two Supreme Court cases indicate that the duty the defendants owe the plaintiffs in tort is dictated by federal law.").

As *O'Connor* and *Hennessy* held, the handling and safety standards for nuclear materials are governed exclusively by federal, not state, regulation.  *O'Connor*, 748 F. Supp. at 676; *Hennessy*, 764 F. Supp. at 501; *see also Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm.*, 461 U.S. 190, 211–112 (1983).  Indeed, even cases cited by Plaintiffs, *see, e.g.*, *Bennett*, 698 S.W.2d at 858, found that the exclusive application of federal regulations "is premised on Congress' belief that the NRC [Nuclear Regulatory Commission] is more qualified than the individual states to determine what type of safety

3

standards should be enacted in this complex area."  While 10 C.F.R. § 20.1(c) urges licensees to "make every reasonable effort to maintain radiation exposures . . . as low as is reasonably achievable," *Hennessy* held that this language does *not* "open[] the door to the states to fashion more stringent standards of permissible exposure levels through their tort system."  764 F. Supp. at 501; *accord O'Conner*, 748 F. Supp. at 676 ("the regulation of nuclear energy is an exacting science which requires exacting standards"), *aff'd*, 13 F.3d at 1090.

As a fallback position, Plaintiffs argue that they have sufficiently alleged negligence and negligence per se in their allegations of Defendants' "reckless and negligent processing, handling, storage, and/or disposal of radioactive substances" and that Defendants' "mishandling and improper dumping of radioactive wastes" is a violation of federal regulations.  (Pls.' Opp. at 32–33.)  But Plaintiffs have still not identified *what Cotter and ComEd allegedly did* that Plaintiffs label as recklessly or negligently processing, handling, storing, and/or disposing of radioactive of radioactive substances, or *how* it mishandled radioactive waste, or *what was improper* about its disposing of radioactive wastes.  ComEd's former subsidiary Cotter handled material.  That they allegedly did so recklessly, negligently, through mishandling, or improperly, are legal conclusions and not ultimate facts as required by Missouri law.  *Compare with Sissel v. St. Louis & S.F.R. Co.*, 214 Mo. 515, 113 S.W. 1104, 1105 (1908) (pleading ultimate facts, not simply legal conclusions, to support allegation of negligence).

For these reasons, Plaintiffs have still failed to adequately plead causes of action for negligence and negligence per se, and those claims should be dismissed.

**B.    Plaintiffs Do Not Plead a Civil Conspiracy Claim.**

Plaintiffs' civil conspiracy claim cannot be rescued for two clear reasons.

*First*, Plaintiffs' allegation that Defendants "wrongfully and fraudulently agreed and conspired together" (Pls.' Second Am. Pet. at ¶ 200; Pls.' Opp. at 38) is a legal conclusion.  It

4

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

alleges nothing more than "the commission of wrongful acts," which is "conclusory and insufficient to state a claim for civil conspiracy." *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996).  Plaintiffs do not even attempt to address this authority.

*Second*, as stated above, Plaintiffs allege the wrongful act to include "fraudulently" agreeing and conspiring together to commit negligence, etc.  Plaintiffs ignore Rule 55.15 entirely, which requires fraud to be pled with particularity.

### C.     Plaintiffs Do Not State Sufficient Class Allegations.

Plaintiffs offer no explanation as to how the definitions of the property damage and medical monitoring subclasses are not overbroad.  They do not dispute that they are defined simply by the location of their real property or residence—regardless of whether the property is alleged to be contaminated with the radioactive materials or whether the presence of those materials is attributable to Defendants.  This is a fatal defect.  And, notably, named Plaintiffs themselves have not alleged facts showing any plausible contamination of their property (only that samples "on or around" their property were "above the normal background levels"), which is damning to the typicality element of Rule 52.08.

Plaintiffs cite *Hope v. Nissan North America, Inc.*, 353 S.W.3d 68, 77 (Mo. App. W.D. 2011), in an attempt to apply a lenient standard to an amorphous or ambiguous class, but there the court relied on the fact that the "latent, but yet unrealized defect" alleged, even in Plaintiffs' own words, required a more developed record.  In contrast, the defect is not latent or unrealized here—Plaintiffs' properties are either contaminated or they are not.  The class definition fails here because it is inherently flawed and cannot be fixed with time.

Similarly, Plaintiffs still have not shown the kind or extent of property damage at issue. Plaintiffs fail to address this point other than to note their lost property value claim is not a type of personal preference, but rather a definite measure of damages.  That side-steps the point: Until

5

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

Plaintiffs plead damages with clarity, the commonality of the class on the issue of damages cannot be ascertained.  *Green v. Fred Weber, Inc.*, 254 S.W.3d 874, 883 (Mo. banc 2008) ("it was an abuse of discretion to define the class as including all those residential homeowners within two miles of Weber's quarry").

Finally, Plaintiffs double down on insisting that they have adequately alleged a medical monitoring subclass.  Plaintiffs allege exposure from many sources since 1946—the opposite of "the common fact of exposure to a set of toxins from a single source that is the common and overriding issue in Plaintiff's case."  *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 719 (2007) (claiming exposure from a single source with Doe Run lead smelter); *Elsea v. U.S. Eng'r Co.*, 463 S.W.3d 409, 423 (2015) (claiming exposure from a single source with courthouse air-handling unit project).  Nor do they attempt to deal with clear Missouri authority that without allegations of personal injury, class treatment is not appropriate.  (*Compare* Defs.' Mot. at 37 *with* Pls.' Opp. at 42.)  Instead, Plaintiffs assert—without authority—that they "anticipate[] that there may be injury tomorrow."  Such rank speculation does not create issues of commonality necessary for certification, nor does it grant any of the proposed medical monitoring subclass members standing to pursue such a claim.

### D.    Most Factual Allegations Against Cotter and ComEd Should Be Stricken.

Plaintiffs concede that "Cotter's involvement is 'limited to a four-year period of time' which did not begin until 1969."  (Pls.' Opp. at 39.)  Accordingly, all allegations against Cotter—and by extension, ComEd—outside of that timeframe should be stricken.  Those allegations include, among others, all activity of generating the material at issue and any involvement with the material anywhere but at Latty Avenue.

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

## <u>CONCLUSION</u>

For these reasons, Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company request that this Court grant their motion to dismiss the Second Amended Petition and reserve their defenses based on the Price-Anderson Act for summary judgment.

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

Dated:  March 30, 2020

Respectfully submitted,

*/s/ Brian O.  Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O.  Watson, #68678MO
70 W.  Madison St., Ste.  2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

MORGAN LEWIS & BOCKIUS, LLP
John McGahren, Esq.  (ID 046791990N)
*Admitted Pro Hac Vice*
john.mcgahren@morganlewis.com
Stephanie Feingold, Esq.  (ID 23182005N)
*Admitted Pro Hac Vice*
stephanie.feingold@morganlewis.com
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600 (telephone)
(609) 919-6701 (facsimile)

BRYAN CAVE LEIGHTON PAISNER LLP
Dale A.  Guariglia, #32988
daguariglia@bclplaw.com
Erin L.  Brooks, #62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N.  Broadway, Suite 3600
St.  Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

**ATTORNEYS FOR DEFENDANTS
COTTER CORPORATION (N.S.L.)
AND COMMONWEALTH EDISON
COMPANY**

Electronically Filed - St Louis County - March 30, 2020 - 01:05 PM

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 30, 2020, these papers were filed via the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O.  Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O.  Watson, #68678MO
70 W.  Madison St., Ste.  2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4848-3344-8887, v. 10

9

Electronically Filed - St Louis County - March 30, 2020 - 08:10 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

|  |  |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | Case No. 18SL-CC00617-01 Division No. 17 |

Plaintiffs,

v.

COTTER CORPORATION, et al.,

Defendants.

## ENTRY OF APPEARANCE

The undersigned attorneys enter their appearance on behalf of Defendant Cotter

Corporation (N.S.L.) without waiver of jurisdictional or other defenses.

Dated: March 30, 2020                    Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois  60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

Electronically Filed - St Louis County - March 30, 2020 - 08:10 PM

## CERTIFICATE OF SERVICE

The undersigned attorney certifies on March 30, 2020, these papers were filed via the Missouri Court's eFiling system, which will serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*

RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois  60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4810-4183-6472, v. 1

**IN THE  21ST JUDICIAL CIRCUIT  COURT, _____ ST. LOUIS COUNTY _____, MISSOURI**

Electronically Filed - St Louis County - March 30, 2020 - 01:47 PM

Tamia Banks,

      Plaintiff,

           vs.

Cotter Corporation Et Al,

      Defendant.

Case Number:  18SL-CC00617-01

## Entry of Appearance

Comes now undersigned counsel and enters his/her appearance as attorney of record for Tamia Banks, Plaintiff, in the above-styled cause.

/s/ Ryan A. Keane
Ryan Alexander Keane
Mo Bar Number: 62112
Attorney for Plaintiff
7777 Bonhomme Ave
Suite 1600
Clayton, MO 63105
Phone Number: (314) 391-4700
ryan@keanelawllc.com

### Certificate of Service

I hereby certify that on _____ March 30th, 2020 _____, a copy of the foregoing was sent through the Missouri eFiling system to the registered attorneys of record and to all others by facsimile, hand delivery, electronic mail or U.S. mail postage prepaid to their last known address.

/s/ Ryan A. Keane
Ryan Alexander Keane

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,  )
BARBARA HOOKS, JOEL HOGAN,        )
KENNETH NIEBLING, KENDALL LACY, )
TANJA LACY, WILLIE CLAY, BOBBIE   )
JEAN CLAY, ANGELA STATUM, AND     )
MISSOURI RENTALS COMPANY, LLC,    )
on behalf of themselves and all others )
similarly situated,                )
                                  )
                Plaintiffs,        )       Cause No:  18SL-CC00617-01
                                  )
vs.                               )       Division No. 17
                                  )
COTTER CORPORATION,               )
COMMONWEALTH EDISON COMPANY, )
DJR HOLDINGS, INC. f/k/a FUTURA    )
COATINGS, INC., AND ST. LOUIS      )
AIRPORT AUTHORITY, A              )
DEPARTMENT OF THE CITY OF ST.     )
LOUIS,                            )
                                  )
                Defendants.        )

**SO ORDERED:**

_Judge_          Division 17
April 07, 2020

## UNOPPOSED MOTION FOR LEAVE TO FILE RESPONSIVE PLEADING OUT OF TIME

COMES NOW Defendant The City of St. Louis, (the owner and operator of St. Louis

Lambert International Airport®) (the "City") and respectfully requests this Court grant the City

leave to file its responsive pleading out of time. In support of this unopposed motion, the City

states as follows:

This action was initially removed to Federal Court. The case was remanded, and the file

in St. Louis County Circuit Court was reopened on April 11, 2019. Plaintiffs filed their Second

Amended Class Action Petition on October 29, 2019. After the action was reopened in St. Louis

County Circuit Court, Counsel for the City did not receive electronic service and notice of the

Second Amended Class Action Petition or other recent filings.

Electronically Filed - St. Louis County - February 27, 2020 - 04:08 PM

The time to file a responsive pleading has expired, but the City respectfully requests that this Court grant it leave to file a responsive pleading out of time, pursuant to Rule 44.01. A copy of the City's responsive pleading is attached hereto.

No party will be prejudiced by the grant of this Motion. While other Defendants have filed motions to dismiss and Plaintiffs have filed responses to those motions, no hearing has occurred. Further, written discovery requests were recently served on January 31, 2020, but Responses to discovery are not yet due. This action is in its infancy, and the City's delayed filing of its responsive pleading will not result in prejudice to any party. Further, Plaintiffs do not oppose the grant of this Motion.

WHEREFORE, because the City's failure to timely file a responsive pleading was the result of excusable neglect, the City respectfully requests this Court grant this motion and permit the City to file its responsive pleading *instanter*.

ARMSTRONG TEASDALE LLP

By*: /s/ John F. Cowling*

| | |
|---|---|
| John F. Cowling | #30920 |
| Katherine M. Ricks | #70322 |

7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314.621.5070
314.621.5065 (facsimile)
jcowling@atllp.com
kricks@atllp.com

ATTORNEYS FOR DEFENDANT
THE CITY OF ST. LOUIS (THE OWNER
AND OPERATOR OF ST. LOUIS LAMBERT
INTERNATIONAL AIRPORT®)

Electronically Filed - St Louis County - February 27, 2020 - 04:08 PM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2020, the foregoing document was electronically filed with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

*/s/ John F. Cowling*

Electronically Filed - St Louis County - April 17, 2020 - 04:22 PM

TWENTY-FIRST JUDICIAL CIRCUIT COURT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

| | | |
|---|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, | ) | |
| BARBARA HOOKS, JOEL HOGAN, | ) | |
| KENNETH NIEBLING, KENDALL LACY, | ) | |
| TANJA LACY, WILLIE CLAY, | ) | |
| BOBBIE JEAN CLAY, ANGELA STATUM, | ) | |
| and MISSOURI RENTALS COMPANY, LLC, | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 18SL-CC00617-01 |
| | ) | |
| vs. | ) | Division No. 2 |
| | ) | |
| COTTER CORPORATION, | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | |
| DJR HOLDINGS, INC. f/k/a FUTURA | ) | |
| COATINGS, INC., and ST. LOUIS | ) | |
| AIRPORT AUTHORITY, A DEPARTMENT | ) | |
| OF THE CITY OF ST. LOUIS | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

COMES NOW Marcie J. Vantine, Mehwish Aslam, and Swanson, Martin & Bell, LLP,

and hereby enter their appearance on behalf of Defendant Cotter Corporation (N.S.L).

Respectfully submitted,

By: /s/ Marcie J. Vantine (MO Bar No. 56860)
SWANSON, MARTIN & BELL, LLP
mvantine@smbtrials.com
Mehwish Aslam (MO Bar No. 69801)
maslam@smbtrials.com
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
314.242.0990 (facsimile)
ATTORNEYS FOR DEFENDANT COTTER
CORPORATION (N.S.L.)

Electronically Filed - St Louis County - April 17, 2020 - 04:22 PM

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, the foregoing Appearance was filed via the Missouri Court's eFiling system, which will automatically serve an electronic copy of upon all counsel of record:

By: /s/ Marcie J. Vantine (MO Bar No. 56860)
Marcie J. Vantine, #56860
800 Market Street, Suite 2100
St. Louis, Missouri 63101
Phone: 314-241-7100
Fax: 314-242-0990
mvantine@smbtrials.com

Electronically Filed - St Louis County - Ma                    AM

TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

TAMIA BANKS, on behalf of herself and )
all others similarly situated, )
　　　　　　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　　 )
Vs. )　　　Cause No. 18SL-CC00617-01
　　　　　　　　　　　　　　　　　　 )
COTTER CORPORATION, et al., )　　　Division No. 17　　**SO ORDERED:**
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　Defendants. )

_av 17_

Judge　　　Division 17
April 20, 2020

**MOTION TO WITHDRAW**

COMES NOW Jennifer C. Pitzer with the law firm of CLAYBORNE & WAGNER LLP, previously Counsel for Plaintiff, TAMIA BANKS, et al, and for her Motion to Withdraw, state as follows:

1.　　On October 1, 2019, James Clayborne, the partner assigned to this matter filed a Motion to Withdraw based on a conflict of interest.

2.　　The undersigned, perhaps mistakenly, believed that the Motion extended to her representation as well.

3.　　Upon information and belief, staff at the court confirmed this interpretation and told Ms. Pitzer's secretary that she would in fact be withdrawn.

4.　　The undersigned is still listed as counsel of record and on the service list for this matter.

5.　　Counsel respectfully requests that the Court grant her Motion to Withdraw from this matter.

6.　　Plaintiffs are ably represented by other counsel and the withdrawal will not prejudice them in any way.

Electronically Filed - St Louis County - March 27, 2020 - 11:32 AM

WHEREFORE, Jennifer C. Pitzer with the law firm of CLAYBORNE & WAGNER LLP, prays this Court enter an order allowing our her to withdraw as counsel for Plaintiff, TAMIA BANKS, et al., in the above-captioned matter.

Respectfully Submitted,

CLAYBORNE & WAGNER LLP

/s/ *Jennifer C. Pitzer*
James F. Clayborne, #45627
Jennifer C. Pitzer, #64554
525 West Main Street, Suite 105
Belleville, Illinois  62220
T:  (618) 239-0187
F:  (618) 416-7556
jclayborne@cswlawllp.com

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on this 27th day of March, 2020, she caused a true and correct copy of **Motion to Withdraw as Counsel** to be e-filed and served upon all attorneys of record via the Court's electronic filing system.

/s/ *Jennifer C. Pitzer*

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | Cause No. 18SL-CC00617-01 |
| **vs.** | ) ) | Division No. 18 |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MOTION TO WITHDRAW

COMES NOW, Bryan Cave Leighton Paisner, LLP, by and through the undersigned attorneys, and hereby requests to withdraw its representation of Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company.  Counsel advises the Court that its request to withdraw as counsel is in compliance with Rule 4-1.16.  Among other things, the rule provides that a lawyer may withdraw from representing a client if, among other reasons, withdrawal can be accomplished without material adverse effect on the interests of the client.  There is no material adverse effect as Cotter Corporation (N.S.L.) remains represented by other counsel of record in this matter (Swanson, Martin & Bell, LLP and Riley Safer Holmes & Cancila).

Electronically Filed - St Louis County - April 22, 2020 - 11:04 AM

Electronically Filed - St Louis County - April 22, 2020 - 11:04 AM

Dated:  April 22, 2020                    Respectfully submitted,


                                          /s/      *Erin L. Brooks*
                                          BRYAN CAVE LEIGHTON PAISNER
                                          LLP
                                          Dale A. Guariglia, Mo. Bar 32988
                                          daguariglia@bryancave.com
                                          Erin L. Brooks, Mo. Bar 62764
                                          erin.brooks@bryancave.com
                                          One Metropolitan Square
                                          211 N. Broadway, Suite 3600
                                          St. Louis, Missouri 63102
                                          (314) 259-2000 (telephone)
                                          (314) 259-2020 (facsimile)


                                          *ATTORNEYS FOR DEFENDANTS*
                                          *COTTER CORPORATION N.S.L. &*
                                          *COMMONWEALTH EDISON COMPANY*

## CERTIFICATE OF SERVICE


        The undersigned hereby certifies that on April 22, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the electronic filing system, providing electronic service to all counsel of record.


                            */s/ Erin L. Brooks*

Electronically Filed - St Louis County - April 22, 2020 - 11:04 AM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | | |
|---|---|---|
| **TAMIA BANKS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | Cause No. 18SL-CC00617-01 |
| **vs.** | ) ) | Division No. 18 |
| **COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC.,** and **ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS,** | ) ) ) ) ) ) ) ) ) | **SO ORDERED:** |
| **Defendants.** | ) | Judge          Division 17 |

**SO ORDERED:**

_(signature)_  av 17

Judge          Division 17

April 30, 2020

<u>**MOTION TO WITHDRAW**</u>

COMES NOW, Bryan Cave Leighton Paisner, LLP, by and through the undersigned

attorneys, and hereby requests to withdraw its representation of Defendants Cotter Corporation

(N.S.L.) and Commonwealth Edison Company.  Counsel advises the Court that its request to

withdraw as counsel is in compliance with Rule 4-1.16.  Among other things, the rule provides

that a lawyer may withdraw from representing a client if, among other reasons, withdrawal can

be accomplished without material adverse effect on the interests of the client.  There is no

material adverse effect as Cotter Corporation (N.S.L.) remains represented by other counsel of

record in this matter (Swanson, Martin & Bell, LLP and Riley Safer Holmes & Cancila).

Electronically Filed - St Louis County - April 22, 2020 - 11:04 AM

Dated:  April 22, 2020

Respectfully submitted,

/s/      *Erin L. Brooks*
BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bryancave.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bryancave.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

*ATTORNEYS FOR DEFENDANTS*
*COTTER CORPORATION N.S.L. &*
*COMMONWEALTH EDISON COMPANY*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 22, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the electronic filing system, providing electronic service to all counsel of record.

*/s/ Erin L. Brooks*

2

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST.  LOUIS COUNTY, MISSOURI**

TAMIA BANKS, et al., on behalf of themselves
and all others similarly situated,

        Plaintiffs,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
DJR HOLDINGS, INC. f/k/a FUTURA
COATINGS, INC., and ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

**SO ORDERED:**

*[signature]*  Div 17

Judge      Division 17
April 30, 2020

## MOTION TO SUBSTITUTE AND WITHDRAW COUNSEL

Defendants Cotter Corporation (N.S.L.) ("Cotter") and Commonwealth Edison

Company ("ComEd") request leave to substitute counsel and withdraw the appearances of Erin

Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold.  In support of this motion,

Cotter and ComEd state as follows:

    1.     Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold entered

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    2.     Cotter and ComEd are represented by other counsel who have entered their

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    3.     No party will be prejudiced if this motion is granted.

For these reasons, Defendant Cotter Corporation (N.S.L.) and Commonwealth Edison

Company request that the Court grant leave to substitute counsel, withdraw the appearances of

Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold, and award any further

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

relief deemed fair and proper without waiver of jurisdictional or other defenses.

Dated: April 28, 2020                    Respectfully submitted,

                                         /s/ Brian O. Watson
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         Edward Casmere, #64326MO
                                         Brian O. Watson, #68678MO
                                         70 W. Madison St., Ste. 2900
                                         Chicago, Illinois 60602
                                         (312) 471-8700 (main)
                                         ecasmere@rshc-law.com
                                         bwatson@rshc-law.com
                                         docketdept@rshc-law.com

                                         SWANSON, MARTIN & BELL, LLP
                                         Marcie J. Vantine, #56860MO
                                         One Bank of America Plaza
                                         800 Market Street, Suite 2100
                                         St. Louis, MO 63101
                                         314.242.0903 (telephone)
                                         mvantine@smbtrials.com

                                         MORGAN, LEWIS & BOCKIUS LLP
                                         John McGahren (Pro Hac Vice)
                                         Stephanie Feingold (Pro Hac Vice)
                                         502 Carnegie Center
                                         Princeton, NJ 08540-6241
                                         (609) 919-6600 (main)
                                         john.mcgahren@morganlewis.com
                                         stephanie.feingold@morganlewis.com

                                         BRYAN CAVE LEIGHTON PAISNER LLP
                                         Dale A. Guariglia, #32988MO
                                         Erin L. Brooks, #62764MO
                                         One Metropolitan Square
                                         211 N. Broadway, Suite 3600
                                         St. Louis, Missouri 63102
                                         (314) 259-2000 (main)
                                         daguariglia@bryancave.com
                                         erin.brooks@bryancave.com

                                         **ATTORNEYS FOR DEFENDANTS
                                         COTTER CORPORATION (N.S.L.) AND
                                         COMMONWEALTH EDISON COMPANY**

## CERTIFICATE OF SERVICE

I certify that on April 28, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4838-1340-6138, v. 2

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, et al., on behalf of themselves )<br>and all others similarly situated,                                     )<br>                                                                                              )<br>            Plaintiffs,                                                            )<br>                                                                                              )<br>v.                                                                                         )<br>                                                                                              )<br>COTTER CORPORATION,                                           )<br>COMMONWEALTH EDISON COMPANY,          )<br>DJR HOLDINGS, INC. f/k/a FUTURA                     )<br>COATINGS, INC., and ST. LOUIS AIRPORT       )<br>AUTHORITY, A DEPARTMENT OF THE             )<br>CITY OF ST. LOUIS,                                                   )<br>                                                                                              )<br>            Defendants.                                                       ) | Cause No. 18SL-CC00617-01<br><br>Div. 17 |

## ORDER

Cause called for hearing on the 31st day of March, 2020, on Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction and on Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition.  Due to COVID-19 limitations, the Court, along with counsel for Plaintiffs and counsel for Defendants, appeared via Zoom teleconference and videoconference.  Based on the briefing and the oral argument presented at the hearing, the Court hereby orders the following:

1.      The Court will defer ruling on Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction until the conclusion of two events.  First, Defendant Commonwealth Edison Company ("ComEd") is to submit to the Court, for *in camera* review, the indemnification agreement that ComEd produced in jurisdictional discovery to Plaintiffs, was referenced in Plaintiffs' Second Amended Class-Action Petition, and was raised before the Court during oral argument.  Second, prior to the Court ruling on the motion, Plaintiffs may conduct limited jurisdictional discovery, including discovery related to an alter ego theory

1

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

between ComEd and Defendant Cotter Corporation (N.S.L.) ("Cotter").  Plaintiffs will have leave to amend to file a Third Amended Petition within 30 days after completion of jurisdictional discovery to allege an alter ego theory, only if there is a good faith basis to do so, and to concurrently file supplemental briefing on why the alleged facts establish personal jurisdiction over ComEd.  ComEd shall have 15 days after the filing of a Third Amended Petition and Plaintiffs' supplemental briefing to submit responses to the Third Amended Petition and brief.  The Court will then hold a subsequent hearing to hear argument on the additional materials submitted by the parties before ruling on ComEd's Motion to Dismiss for Lack of Personal Jurisdiction.

2.     Plaintiffs are also entitled to proceed with obtaining discovery pertaining to all Defendants other than ComEd in accordance with the Missouri Supreme Court Rules.  Plaintiffs' discovery to ComEd as a Defendant shall be limited to the jurisdictional issues outlined in Paragraph 1 until the Court issues an order ruling on ComEd's Motion to Dismiss for Lack of Personal Jurisdiction.

3.     The Court reviews Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition under Missouri Supreme Court Rule 55.27(a)(6), and not as a summary judgment motion, and will not consider the affidavits submitted by Plaintiffs in their Response brief.  Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition is granted in part and denied in part, as follows:

a.  Defendants' Motion to Dismiss based on arguments that the Price-Anderson Act preempts Plaintiffs' state law claims is denied as moot;

b.  Defendants' Motion to Dismiss for failure to state a claim under Counts II and III for Temporary Nuisance and Permanent Nuisance is granted, and Plaintiffs are hereby granted leave to amend Counts II and III;

2

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

c.  Defendants' Motion to Dismiss for failure to state a claim under Count IV for Negligence and Count V for Negligence *Per Se* is denied;

d.  Defendants' Motion to Dismiss for failure to state a claim under Count VII for "Injunctive Relief" is granted, in part, and Plaintiffs are hereby granted leave to amend Count VII;

e.  Defendants' Motion to Dismiss for failure to state a claim under Count VIII for "Punitive Damages" is denied;

f.  Defendants' Motion to Dismiss for failure to state a claim under Count IX for Civil Conspiracy is denied without prejudice; and

g.  Defendants' Motion to Dismiss with regard to Plaintiffs' request for the remedy of medical monitoring is denied.

4.  Defendants' motion to dismiss Plaintiffs' property damage class allegations and Plaintiffs' medical monitoring class allegations is denied.

5.  Defendant City of St. Louis' Unopposed Motion for Leave to File a Responsive Pleading Out of Time is granted, but is now moot.


SO ORDERED: _____          DATED:_____
                    The Hon. Joseph Walsh III

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST.  LOUIS COUNTY, MISSOURI

TAMIA BANKS, et al., on behalf of themselves
and all others similarly situated,

        Plaintiffs,

    v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
DJR HOLDINGS, INC. f/k/a FUTURA
COATINGS, INC., and ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

## MOTION TO SUBSTITUTE AND WITHDRAW COUNSEL

Defendants Cotter Corporation (N.S.L.) ("Cotter") and Commonwealth Edison

Company ("ComEd") request leave to substitute counsel and withdraw the appearances of Erin

Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold.  In support of this motion,

Cotter and ComEd state as follows:

    1.      Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold entered

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    2.      Cotter and ComEd are represented by other counsel who have entered their

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    3.      No party will be prejudiced if this motion is granted.

For these reasons, Defendant Cotter Corporation (N.S.L.) and Commonwealth Edison

Company request that the Court grant leave to substitute counsel, withdraw the appearances of

Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold, and award any further

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

relief deemed fair and proper without waiver of jurisdictional or other defenses.

Dated: April 28, 2020                    Respectfully submitted,

                                         /s/ Brian O. Watson
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         Edward Casmere, #64326MO
                                         Brian O. Watson, #68678MO
                                         70 W. Madison St., Ste. 2900
                                         Chicago, Illinois 60602
                                         (312) 471-8700 (main)
                                         ecasmere@rshc-law.com
                                         bwatson@rshc-law.com
                                         docketdept@rshc-law.com

                                         SWANSON, MARTIN & BELL, LLP
                                         Marcie J. Vantine, #56860MO
                                         One Bank of America Plaza
                                         800 Market Street, Suite 2100
                                         St. Louis, MO 63101
                                         314.242.0903 (telephone)
                                         mvantine@smbtrials.com

                                         MORGAN, LEWIS & BOCKIUS LLP
                                         John McGahren (Pro Hac Vice)
                                         Stephanie Feingold (Pro Hac Vice)
                                         502 Carnegie Center
                                         Princeton, NJ 08540-6241
                                         (609) 919-6600 (main)
                                         john.mcgahren@morganlewis.com
                                         stephanie.feingold@morganlewis.com

                                         BRYAN CAVE LEIGHTON PAISNER LLP
                                         Dale A. Guariglia, #32988MO
                                         Erin L. Brooks, #62764MO
                                         One Metropolitan Square
                                         211 N. Broadway, Suite 3600
                                         St. Louis, Missouri 63102
                                         (314) 259-2000 (main)
                                         daguariglia@bryancave.com
                                         erin.brooks@bryancave.com

                                         **ATTORNEYS FOR DEFENDANTS
                                         COTTER CORPORATION (N.S.L.) AND
                                         COMMONWEALTH EDISON COMPANY**

## CERTIFICATE OF SERVICE

I certify that on April 28, 2020, these papers were filed through the Missouri Court's eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4838-1340-6138, v. 2

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI**

TAMIA BANKS, et al., on behalf of themselves )
and all others similarly situated,                             )
                                                                           )
      Plaintiffs,                                                 )
                                                                           )
v.                                                                         )      Cause No. 18SL-CC00617-01
                                                                           )
COTTER CORPORATION,                                 )      Div. 17
COMMONWEALTH EDISON COMPANY,     )
DJR HOLDINGS, INC. f/k/a FUTURA             )
COATINGS, INC., and ST. LOUIS AIRPORT  )
AUTHORITY, A DEPARTMENT OF THE        )
CITY OF ST. LOUIS,                                          )
                                                                           )
      Defendants.                                              )

**SO ORDERED:**

*[signature]* DIV 17

Judge      Division 17
April 30, 2020

**ORDER**

Cause called for hearing on the 31st day of March, 2020, on Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction and on Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition.  Due to COVID-19 limitations, the Court, along with counsel for Plaintiffs and counsel for Defendants, appeared via Zoom teleconference and videoconference.  Based on the briefing and the oral argument presented at the hearing, the Court hereby orders the following:

    1.     The Court will defer ruling on Defendant Commonwealth Edison Company's Motion to Dismiss for Lack of Personal Jurisdiction until the conclusion of two events.  First, Defendant Commonwealth Edison Company ("ComEd") is to submit to the Court, for *in camera* review, the indemnification agreement that ComEd produced in jurisdictional discovery to Plaintiffs, was referenced in Plaintiffs' Second Amended Class-Action Petition, and was raised before the Court during oral argument.  Second, prior to the Court ruling on the motion, Plaintiffs may conduct limited jurisdictional discovery, including discovery related to an alter ego theory

1

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

between ComEd and Defendant Cotter Corporation (N.S.L.) ("Cotter").  Plaintiffs will have leave to amend to file a Third Amended Petition within 30 days after completion of jurisdictional discovery to allege an alter ego theory, only if there is a good faith basis to do so, and to concurrently file supplemental briefing on why the alleged facts establish personal jurisdiction over ComEd.  ComEd shall have 15 days after the filing of a Third Amended Petition and Plaintiffs' supplemental briefing to submit responses to the Third Amended Petition and brief.  The Court will then hold a subsequent hearing to hear argument on the additional materials submitted by the parties before ruling on ComEd's Motion to Dismiss for Lack of Personal Jurisdiction.

2.    Plaintiffs are also entitled to proceed with obtaining discovery pertaining to all Defendants other than ComEd in accordance with the Missouri Supreme Court Rules.  Plaintiffs' discovery to ComEd as a Defendant shall be limited to the jurisdictional issues outlined in Paragraph 1 until the Court issues an order ruling on ComEd's Motion to Dismiss for Lack of Personal Jurisdiction.

3.    The Court reviews Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition under Missouri Supreme Court Rule 55.27(a)(6), and not as a summary judgment motion, and will not consider the affidavits submitted by Plaintiffs in their Response brief.  Defendants' Motion to Dismiss Plaintiffs' Second Amended Class-Action Petition is granted in part and denied in part, as follows:

   a.    Defendants' Motion to Dismiss based on arguments that the Price-Anderson Act preempts Plaintiffs' state law claims is denied as moot;

   b.    Defendants' Motion to Dismiss for failure to state a claim under Counts II and III for Temporary Nuisance and Permanent Nuisance is granted, and Plaintiffs are hereby granted leave to amend Counts II and III;

c.  Defendants' Motion to Dismiss for failure to state a claim under Count IV for Negligence and Count V for Negligence *Per Se* is denied;

d.  Defendants' Motion to Dismiss for failure to state a claim under Count VII for "Injunctive Relief" is granted, in part, and Plaintiffs are hereby granted leave to amend Count VII;

e.  Defendants' Motion to Dismiss for failure to state a claim under Count VIII for "Punitive Damages" is denied;

f.  Defendants' Motion to Dismiss for failure to state a claim under Count IX for Civil Conspiracy is denied without prejudice; and

g.  Defendants' Motion to Dismiss with regard to Plaintiffs' request for the remedy of medical monitoring is denied.

4.     Defendants' motion to dismiss Plaintiffs' property damage class allegations and Plaintiffs' medical monitoring class allegations is denied.

5.     Defendant City of St. Louis' Unopposed Motion for Leave to File a Responsive Pleading Out of Time is granted, but is now moot.

SO ORDERED: _____          DATED:_____
                     The Hon. Joseph Walsh III

Electronically Filed - St Louis County - April 28, 2020 - 11:39 AM

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST. LOUIS COUNTY, MISSOURI**

TAMIA BANKS, et al., on behalf of themselves
and all others similarly situated,

        Plaintiffs,

v.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY,
DJR HOLDINGS, INC. f/k/a FUTURA
COATINGS, INC., and ST. LOUIS AIRPORT
AUTHORITY, A DEPARTMENT OF THE
CITY OF ST. LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

**SO ORDERED:**

_Div 17_

Judge     Division 17
April 30, 2020

<u>**MOTION TO SUBSTITUTE AND WITHDRAW COUNSEL**</u>

    Defendants Cotter Corporation (N.S.L.) ("Cotter") and Commonwealth Edison

Company ("ComEd") request leave to substitute counsel and withdraw the appearances of Erin

Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold.  In support of this motion,

Cotter and ComEd state as follows:

    1.     Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold entered

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    2.     Cotter and ComEd are represented by other counsel who have entered their

appearances on behalf of Cotter and ComEd without waiver of jurisdictional or other defenses.

    3.     No party will be prejudiced if this motion is granted.

    For these reasons, Defendant Cotter Corporation (N.S.L.) and Commonwealth Edison

Company request that the Court grant leave to substitute counsel, withdraw the appearances of

Erin Brooks, Dale Guariglia, John McGahren, and Stephanie Feingold, and award any further

1

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

relief deemed fair and proper without waiver of jurisdictional or other defenses.

Dated: April 28, 2020          Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

SWANSON, MARTIN & BELL, LLP
Marcie J. Vantine, #56860MO
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
mvantine@smbtrials.com

MORGAN, LEWIS & BOCKIUS LLP
John McGahren (Pro Hac Vice)
Stephanie Feingold (Pro Hac Vice)
502 Carnegie Center
Princeton, NJ 08540-6241
(609) 919-6600 (main)
john.mcgahren@morganlewis.com
stephanie.feingold@morganlewis.com

BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, #32988MO
Erin L. Brooks, #62764MO
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (main)
daguariglia@bryancave.com
erin.brooks@bryancave.com

**ATTORNEYS FOR DEFENDANTS**
**COTTER CORPORATION (N.S.L.) AND**
**COMMONWEALTH EDISON COMPANY**

Electronically Filed - St Louis County - April 28, 2020 - 04:18 PM

## CERTIFICATE OF SERVICE

I certify that on April 28, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*

RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

4838-1340-6138, v. 2

Electronically Filed - St Louis County - May 29, 2020 - 06:21 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

|  |  |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COTTER CORPORATION, et al.,<br><br>Defendants. | Case No. 18SL-CC00617<br>Division No. 17 |

<u>**NOTICE OF SERVICE**</u>

PLEASE TAKE NOTICE that Defendant Commonwealth Edison Company's Verified Objections and Responses to Plaintiffs' First Set of Interrogatories and Objections and Responses to Plaintiffs' Request for Production of Documents, Set 1, were served on counsel of record via electronic service on May 29, 2020.

1

Electronically Filed - St Louis County - May 29, 2020 - 06:21 PM

## CERTIFICATE OF SERVICE

The undersigned attorney certifies these papers were served on counsel of record via electronic service on May 29, 2020.

Respectfully submitted,

*/s/ Brian O. Watson*
  Edward Casmere, # 64326
  Brian O. Watson, # 68678
  70 W. Madison St., Ste. 2900
  Chicago, Illinois 60602
  (312) 471-8700 (main)
  (312) 471-8701 (fax)
  ecasmere@rshc-law.com
  bwatson@rshc-law.com

SWANSON MARTIN & BELL LLP
Marcie J. Vantine, #56860MO
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
mvantine@smbtrials.com

**ATTORNEYS FOR DEFENDANT
COMMONWEALTH EDISON COMPANY**

4848-6439-3662, V. 1
4848-6439-3662, V. 1
4848-6439-3662, V. 1

2

Electronically Filed - St Louis County - May 29, 2020 - 06:23 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>COTTER CORPORATION, et al.,<br><br>        Defendants. | Case No. 18SL-CC00617<br>Division No. 17 |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that Defendant Cotter Corporation's (N.S.L.) ("Cotter")

Verified Objections and Responses to Plaintiffs' First Set of Interrogatories and Objections and

Responses to Plaintiffs' Request for Production of Documents, Set 1, were served on counsel of

record via electronic service on May 29, 2020.

1

Electronically Filed - St Louis County - May 29, 2020 - 06:23 PM

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that these papers were served on counsel of record via electronic service on May 29, 2020.

Respectfully submitted,

*/s/ Brian O. Watson*
  Edward Casmere, # 64326
  Brian O. Watson, # 68678
  70 W. Madison St., Ste. 2900
  Chicago, Illinois 60602
  (312) 471-8700 (main)
  (312) 471-8701 (fax)
  ecasmere@rshc-law.com
  bwatson@rshc-law.com

SWANSON MARTIN & BELL LLP
Marcie J. Vantine, #56860MO
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
mvantine@smbtrials.com

**ATTORNEYS FOR DEFENDANT COTTER CORPORATION (N.S.L.)**

4814-2545-7598, V. 1

2

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | Case No. 18SL-CC00617 Division No. 17 |
| Plaintiffs, | **SO ORDERED:** |
| v. | |
| COTTER CORPORATION, et al., | Judge        Division 17 |
| Defendants. | June 09, 2020 |

**STIPULATED PROTECTIVE ORDER
REGARDING THE PRODUCTION OF CONFIDENTIAL INFORMATION**

Upon stipulation and agreement of the parties in accordance with Missouri Rule of Civil Procedure 56.01(c), and it appearing to the Court that there is good cause to enter an appropriate Protective Order to protect confidential, non-public information and materials that may be made available in the course of discovery in this case;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT the following principles and procedures designed to assure the protection of confidential and other non-public information shall govern any and all discovery among the parties:

**CONFIDENTIAL INFORMATION**

1.    Definitions.

(a)    A party may designate the following material as "Confidential": (1) trade secret or other confidential research, development, or commercial information; (2) medical records; and (3) any other information subject to

1

privacy rights (*e.g.*, HIPAA-protected information) or entitled to protection under the Missouri Supreme Court Rules or other applicable law or orders (also "Confidential Material").  The designation of any material as "Confidential" shall represent that the party producing the material or documents (the "Producing Party") has actually reviewed the material and has made a good faith determination that any such material so designated is indeed confidential or subject to protection.

(b)     "Outside Counsel" shall include attorneys (and their support staff) who are not employees of a party or a party's parent company.

(c)     "House Counsel" shall include attorneys who are employees of a party or a party's parent company.

(d)     "Counsel" (without qualifier) shall include Outside Counsel and House Counsel.

2.     <u>Disclosure Limits on Confidential Information</u>. Unless otherwise ordered by the Court or permitted in writing by the party producing and designating the information or item Confidential Information, a receiving party may disclose any information or item designated Confidential Information only to:

(a)     Counsel (including administrative, paralegal, clerical, and secretarial staff employed by such counsel) to a party in this action;

(b)     parties and court personnel, including court reporters and videographers appearing at depositions, hearings, trial or other proceedings in this case;

(c)     non-attorney employees of a party who provide input and/or assistance to Counsel; and

2

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

   (d)  the author or recipient of the document in the ordinary course of business, or individuals identified as the source of the information contained in a document designated as Confidential Information.

  In addition, Confidential Information may be disclosed or made available to the following provided that first (i) a copy of this Order is provided to the receiving party and (ii) the Agreement to Maintain Confidentiality in the form attached as **Exhibit A** is read and executed by the receiving party:

   (a)  outside experts or consultants (together with their administrative staff) retained by a party or Counsel who require the Confidential Information to render opinions relevant to the lawsuit or to otherwise assist Counsel in the prosecution, defense, or settlement of this action;

   (b)  witnesses who are interviewed or who testify at depositions, hearings, or trial, or any such further proceedings which occur in this case, where the Counsel making the disclosure has a good-faith basis to make the disclosure in furtherance of the prosecution or defense of this action;

   (c)  arbitrators and mediators involved in resolving this action;

   (d)  litigation support services, including outside copying services or companies engaged in the business of supporting computerized or electronic litigation discovery or trial preparation, retained by a party or its Counsel for the purpose of assisting that party in this action; and

   (e)  representatives of insurance carriers providing a defense or indemnity to any of the parties.

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

3.     <u>Inadvertent Disclosure of Confidential Information</u>. The inadvertent, unintentional, or *in camera* disclosure of Confidential Information shall not be deemed a waiver, in whole or in part, of any party's claim of confidentiality. Within 15 days of discovering such inadvertent or unintentional disclosure, any party to this Order may advise the other parties that the information or item is to be designated as "Confidential Information" under the terms of this Order.

## DESIGNATION OF CONFIDENTIAL INFORMATION

4.     <u>Form for Designation</u>. Confidential Information shall be so designated by the producing party by marking copies of Confidential Information with the legend "CONFIDENTIAL." The legend "CONFIDENTIAL" must appear on each page of any multi-page image that the producing party contends contains Confidential Information. Marking the legend "CONFIDENTIAL" on the cover of any multi-page document is not sufficient to designate all pages of the document as Confidential Information.

For information produced in some form other than documentary, and for other tangible items, the producing party shall affix in a prominent place on the exterior of the container or containers in which the Confidential Information is stored the legend "CONFIDENTIAL."

In addition, the producing party may redact protected health information, personal medical information, cell phone numbers, credit card information, social security numbers, employee identification numbers, names and identifying information of family members, and home addresses. If additional categories of information for redaction become apparent, the parties agree to meet and confer to resolve redactions.

5.     <u>Time for Designation</u>. Confidential Information shall be designated at the time of production; provided that in the event that a producing party inadvertently fails to designate any Confidential Information as "CONFIDENTIAL" at the time of production, the producing party

4

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

shall re-produce the material, this time designating and stamping the material as "CONFIDENTIAL" as soon as practicable. Upon receipt of the written notice designating previously produced documents as "CONFIDENTIAL," the receiving party shall make a good faith effort to destroy all copies of the Confidential Information that was inadvertently not designated as "CONFIDENTIAL."

A producing party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed Confidential Information. After the inspecting party has identified the documents it wants copied and produced, the producing party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the producing party must affix the appropriate legend ("CONFIDENTIAL") at the top of each page that contains Confidential Information.

Confidential Information has been designated in the cases identified on Exhibit B. A producing party shall continue to treat the Confidential Information as it was designated in the cases identified on Exhibit B, until a court of competent jurisdiction orders otherwise.

6.    <u>Objection to Designation.</u> The designation of Confidential Information is subject to objection by any party.  The burden on any such objection shall be on the producing party. The following procedure shall apply to any such objection.

(a)    <u>Meet and Confer</u>. Any objection to a designation must be submitted in writing to the producing party and must state with specificity the basis for the objection. The parties shall then meet and confer in a good faith effort to resolve the objection. In conferring, the objecting party must explain the

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

basis for its belief that the designation was not proper and must give the producing party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. Unless otherwise agreed by the objecting party, the producing party must respond within 5 business days of the objection and the parties must meet and confer within 10 business days of the objection.

(b)     <u>Judicial Intervention</u>. Any unresolved objections to confidentiality designations must be submitted by the producing party to the Court by motion that identifies the designated material and sets forth the basis for the confidentiality designation.  The motion must be accompanied by a representation by counsel for the movant that counsel has complied with the meet and confer requirements.  The burden on any such motion shall be on the producing party. Until the Court rules on the motion, all parties shall continue to treat the materials as they were designated under the terms of this Order.

7.     <u>Other Exceptions to the Order</u>. This Order is entered without prejudice to the right of the parties to present a motion to the Court for a separate protective order as to any particular document or information that requires restrictions differing from those as specified herein. The party desiring to maintain confidentiality shall have the burden of establishing grounds for confidential treatment. This Order shall not be deemed to prejudice the parties in any way in any future application for modification of this Order.

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

8. <u>Designation of Testimony</u>. Testimony taken at any deposition, conference, hearing, or trial may be designated as Confidential Information either (a) on the record, or (b) within 10 business days of receipt of the transcript. If additional time is requested, the parties agree to meet and confer. Until the designation period expires, the complete deposition transcript and videotape shall be treated as Confidential Information unless otherwise specified in writing or on the record by the producing party. Arrangements shall be made with the court reporter taking and transcribing such proceeding to separately bind such portions of the transcript containing information designated as Confidential Information, and to label such portions appropriately. The designation is subject to objection by any party pursuant to paragraph 6.

9. <u>Effect of Designations</u>. Material designated as Confidential Information under this Order, the information contained therein, and any summaries, copies, abstracts, or other documents derived in whole or in part from material designated as Confidential Information shall be kept strictly confidential; shall be used only for purposes of the prosecution, defense, or settlement of this action, and for no other purposes; and shall only be disclosed in accordance with this Order.

10. <u>Retention of Verifications</u>. Counsel will retain executed copies of Attachment A and will, upon request, reasonably make such executed copies available to other counsel.

**GENERAL PROVISIONS**

11. <u>Additional Permissible Disclosures</u>. Nothing herein shall impose any restrictions on the use or disclosure by a party of material obtained lawfully by such party independent of discovery in this action, whether or not such material is also obtained through discovery in this action, or from disclosing its own Confidential Information as it deems appropriate. Public disclosure by the producing party of Confidential Information will result in such information no longer being subject to the provisions of this Order.

7

12. <u>Filing Under Seal</u>. If a party wishes to use any Confidential Information in affidavits, briefs, memoranda of law, or other papers filed in this Court, or in oral argument presented to this Court (including an objection pursuant to paragraph 6), the party shall not file such information publicly. The parties agree to inquire of the Court the method by which the Court would like Confidential Information submitted and to handle submission of Confidential Information accordingly.  In the absence of direction by the Court, the parties shall file Confidential Information under seal and Confidential Information will be made available only to the Court and to persons specifically authorized by this Order. Unless instructed otherwise by the Court, the party filing any paper that reflects, contains, or includes Confidential Information shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, and the legend "CONFIDENTIAL — FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER OF THIS COURT." The party filing Confidential Information under seal shall publicly file a "Notice of Service of Confidential Information" citing this Order and the designation by the producing party as the basis for the notice. Contemporaneous with filing the notice, the filing party will serve the papers on all parties. The party may file the material under seal with the Court the following business day. At the conclusion of this action, Confidential Information filed with the Court under seal shall be kept under seal or be returned to the party filing it for disposition pursuant to paragraph 16.

13. <u>Disclosure of Privileged Information</u>. If documents or information subject to a claim of attorney-client privilege, work product immunity, trade secret protection, or any other privilege or immunity is produced to another party or parties, whether inadvertently or otherwise, and irrespective of the care taken by the producing party, such production shall in no way

prejudice or otherwise constitute a waiver of, or estoppel as to, in whole or in part, any claim of privilege, work product, trade secret, or other ground for withholding production to which any party producing the documents or information would otherwise be entitled. Any such materials shall be returned promptly to the party producing the documents or information upon request and all copies destroyed upon request, and no use thereof shall be made by the party or parties to whom such documents or information were inadvertently produced.

14.    <u>Withholding or Redacting Privileged Information</u>.  If a party withholds or redacts information from production as privileged material, the party must produce a privilege and redaction log which identifies the document or information withheld by author, custodians, date, recipients (including e-mail addresses where applicable), document type (such as e-mail, Word file, etc.), a general description of the document or communication, and the basis for the claimed privilege.  If there are non-privileged files or documents attached to any privileged communications, the privileged communications must be identified in the privilege log, but the non-privileged documents must be still produced.  Any attachments withheld from production as privileged shall be described in the privilege log in the same manner as set forth above in this paragraph.

15.    <u>Purpose of Order</u>.  This Order is entered solely for the purpose of facilitating the exchange of documents and information between the parties to this action without involving the Court unnecessarily in the process. Nothing in this Order nor the production of any information or document under the terms of this Order shall be deemed a waiver of confidentiality or any type of privilege applicable to any type of information in this or any other action or proceeding. Nothing in this Order shall be construed to affect the evidentiary admissibility of any

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

Confidential Information, and absent order of the Court, there will be no restrictions because of this Order on the use of any document that may be introduced by any party during the trial.

16.     <u>Use at Trial</u>. Absent further order of the Court with respect to treatment of Confidential Information at trial, this Order shall not apply to any Confidential Information once it is introduced at trial and made a part of the trial record in this case. Nothing contained herein shall prevent a party from utilizing at a trial of this case the Confidential Information of another party to the trial or a producing third party. Any party who seeks to use information or documents designated as Confidential Information pursuant to this Order is to notify the producing party within 10 days prior to listing Confidential Information as a trial exhibit that the Confidential Information has been so designated, and to notify the designating party within 48 hours of designating testimony for trial or that has been designated Confidential Information that testimony has been so designated. If any party to the trial or producing party wishes special treatment of Confidential Information at trial, the same shall be sought through separate motion with the Court, and nothing in this Order is intended either to support or to undermine such a motion.

17.     <u>Termination of Case</u>. Within three months of the termination of this case (including any appeal), counsel shall assemble and return to each other all documents, material and testimony designated as Confidential Information and all copies of same, or shall certify the destruction with the producing party.

18.     <u>Application to Non-Parties</u>. Non-parties may invoke the terms of this Order by designating Confidential Information in accordance with the Order.

19.     <u>Third-Party Subpoenas and Document Requests</u>. If any person or entity possessing Confidential Information is subpoenaed (including pursuant to R.S.Mo. Sec. 610.010,

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

et seq.) or served with a document request, and such subpoena or document request demands Confidential Information, the person receiving the subpoena or document request shall give prompt written notice to Counsel for the producing party in this action, and shall, to the extent permitted by law, court rule, and court order, (i) withhold production of the requested Confidential Information until the producing party in this action permits production, or until a court of competent jurisdiction orders otherwise, and (ii) seek to enable the producing party in this action to move to quash or limit the subpoena or document request.  In the event that the producing party fails to take timely action to enforce its designation, the receiving party is under no obligation to itself move to quash or otherwise further seek to enforce the producing party's designation.

20.    <u>Modification</u>. This Order shall not prevent any party from applying to the Court for modification of the Order or for further relief.

21.    <u>Continuing Jurisdiction</u>. This Court shall retain jurisdiction to enforce the terms of this Order.

The undersigned counsel of record for the parties hereby stipulate and consent to entry of the foregoing Stipulated Protective Order.


**PURSUANT TO STIPULATION, IT IS SO ORDERED.**


Dated: _____


_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

STIPULATED AND AGREED:


By:   */s/ Nathaniel R. Carroll (consent)*
      KEANE LAW LLC
      Ryan A. Keane, # 62112
      Nathaniel R. Carroll, # 67988
      7777 Bonhomme Ave., Ste. 1600
      St. Louis, MO 63105
      ryan@keanelawllc.com
      alex@keanelawllc.com

      JOHNSON GRAY, LLC
      Anthony D. Gray, # 51534
      319 North 4th Street, Suite 212
      St. Louis, MO 63102
      agray@johnsongraylaw.com

      COOPER LAW FIRM, L.L.C.
      Barry J. Cooper, Jr.
      Celeste Brustowicz
      Cooper Law Firm, L.L.C.
      1525 Religious Street
      New Orleans, LA 70130
      bcooper@sch-llc.com
      cbrustowicz@sch-llc.com

      RON AUSTIN & ASSOCIATES, L.L.C.
      Ron A. Austin
      920 4th Street
      Gretna, Louisiana 70053
      raustin@austin-associates.net

      *ATTORNEYS FOR PLAINTIFFS*

By:   */s/ Brian O. Watson*
      RILEY SAFER HOLMES &
      CANCILA LLP
      Edward Casmere, # 64326
      Brian O. Watson, # 68678
      70 W. Madison St., Ste. 2900
      Chicago, Illinois  60602
      (312) 471-8700 (main)
      (312) 471-8701 (fax)
      ecasmere@rshc-law.com
      bwatson@rshc-law.com

      SWANSON MARTIN & BELL LLP
      Marcie J. Vantine, #56860MO
      One Bank of America Plaza
      800 Market Street, Suite 2100
      St. Louis, MO 63101
      314.242.0903 (telephone)
      mvantine@smbtrials.com

      *ATTORNEYS FOR DEFENDANTS*
      *COTTER CORPORATION (N.S.L.)*
      *AND COMMONWEALTH EDISON*
      *COMPANY*

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

By:  /s/ John F. Cowling (consent)
     ARMSTRONG TEASDALE LLP
     John F. Cowling #30920
     Katherine M. Ricks #70322
     7700 Forsyth Blvd., Suite 1800
     St. Louis, Missouri 63105
     314.621.5070
     314.621.5065 (facsimile)
     jcowling@atllp.com
     kricks@atllp.com

     *ATTORNEYS FOR DEFENDANT THE
     CITY OF ST. LOUIS (THE OWNER AND
     OPERATOR OF ST. LOUIS LAMBERT
     INTERNATIONAL AIRPORT®)*

By:  /s/ Martin Jansky (consent)
     MARTIN JANSKY LAW FIRM, PC
     S. Martin Jansky, #47022
     2001 S. Big Bend Blvd.
     St. Louis, Missouri 63117
     (314) 881-6144
     f: (314)644-4303
     martin@janskylaw.com

     *ATTORNEYS FOR DEFENDANT DJR
     HOLDINGS, INC.*

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No. 18SL-CC00617 Division No. 17 |
| v. | |
| COTTER CORPORATION, et al., | |
| Defendants. | |

**EXHIBIT A**

**AGREEMENT TO MAINTAIN CONFIDENTIALITY**

The undersigned hereby agrees to the following:

I hereby attest to my understanding that information or documents designated Confidential Information are provided to me subject to a Protective Order in the above-captioned litigation; that I have been given a copy of and have read the Protective Order; and that I agree to be bound by the terms of the Protective Order. I also understand that my execution of this Agreement to Maintain Confidentiality, indicating my agreement to be bound by the Protective Order, is a prerequisite to my review of any information or documents designated as Confidential Information pursuant to the Protective Order.

1

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

I further agree that I shall not disclose to others, except in accordance with the Protective Order, any Confidential Information, as defined therein, in any form whatsoever, and that such Confidential Information will be used only for the purposes authorized by the Protective Order.

I further agree and attest to my understanding that my obligation to honor the confidentiality of the Confidential Information will continue even after this litigation concludes. I further agree that, if I fail to abide by terms of the Protective Order, I will be subject to the jurisdiction of this Court for the purpose of any proceedings relating to enforcement of the Protective Order.

Date: _____          By: _____

Subscribed and sworn to before me this _____ day of _____, _____.

By: _____

2

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

---

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN, KENNETH
NIEBLING, KENDALL LACY, TANJA LACY,
WILLIE CLAY, BOBBIE JEAN CLAY,
ANGELA STATUM, and MISSOURI RENTALS
COMPANY, LLC, on behalf of themselves and all
others similarly situated,

              Plaintiffs,

    v.

COTTER CORPORATION, et al.,

         Defendants.

Case No. 18SL-CC00617
Division No. 17

---

## EXHIBIT B

Confidential Information was previously designated and produced in one or more of the following cases under protective orders that governed the treatment of the Confidential Information:

- *McClurg, et al. v. MI Holdings, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 12-CV-0361);

- *Strong, et al. v. Bridgeton Landfill, LLC, et al.*, Case No. 17SL-CC01632-01, Circuit Court of St. Louis County, Missouri.

*McClurg* was consolidated with 133 other similar lawsuits, and the protective order from *McClurg* applied to those additional cases.  Those cases are as follows:

- *Adams, et al. v. MI Holdings, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 12-CV-0641)

- *Steinmann v. MI Holdings, Inc., et al.*, United States District Court for Eastern District of Missouri (Case No. 12-CV-01942)

- *Schneider, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-0751)

1

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Vorce v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-1160)

- *Lange, et. al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-1483)

- *Bilger v. Mallinckrodt, Inc. et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-2163)

- *Bell v. Mallinckrodt, Inc, et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-2378)

- *McPherson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-cv-02508)

- *Reed, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00033)

- *Robinson, et al. v. Mallinckrodt, Inc. et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00034)

- *O'Laughlin, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00035)

- *Bright, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00036)

- *Anderson, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00037)

- *Gambilin, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00100)

- *Branstetter, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00210)

- *Kelly, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00247)

- *Lloyd, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00283)

- *Headrick, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00351)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Halbrook, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00668)

- *Beatty, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00669)

- *Steinbruegge, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00670)

- *Randall, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00671)

- *McDonald, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00672)

- *Starling, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00912)

- *Burns, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00913)

- *Paglusch v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01046)

- *Banovz, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01523)

- *Jackson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01817)

- *Hegeman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00155)

- *Kelly, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00565)

- *Rogers, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00790)

- *Andres, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00884)

- *Haselby, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00964)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Combest, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01011)

- *Fellin, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01179)

- *Goodson, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01697)

- *Farley, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01909)

- *Beck, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00342)

- *Buchanan, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00343)

- *Brockman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00402)

- *Anderhub, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00655)

- *Alles, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00698)

- *Bohning, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00699)

- *Chapman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00700)

- *Ell, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00701)

- *Harms, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00702)

- *Joyce, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00703)

- *Malon, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00707)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Menke, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00709)

- *Perry, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00710)

- *Reno, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00711)

- *Tiemann, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00712)

- *Wielms, et al., v. Mallinckrodt, Inc., et al*., United States District Court for the Eastern District of Missouri (Case No. 16-cv-00713)

- *Allhoff, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00714)

- *Gettemeier, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00716)

- *Phillips, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00718)

- *Bendyk v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01135)

- *Beachler, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01472)

- *Frazier, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01473)

- *Boughter, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01477)

- *Lipinski, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01479)

- *Buie, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01497)

- *Ponstingl v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-00260)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Holthaus v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01815)

- *McClanahan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01816)

- *Stacey v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01841)

- *Walsh v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01847)

- *Steiner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No.16-cv-01848)

- *Turner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01850)

- *Wojtowicz v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01851)

- *Bottomly v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01852)

- *Lococo  v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01838)

- *Ivy v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01839)

- *Birkla v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01840)

- *Brashears v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01842)

- *Elliott v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01843)

- *Gerick, Jr. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01844)

- *McClain v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01845)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Pauley v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01846)

- *Lyons v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01848)

- *Shafer v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01833)

- *McCarthy v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01828)

- *Strachan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01834)

- *Flynn v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01834)

- *Newman v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01826)

- *Wright v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01826)

- *Miller v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01835)

- *Kujawa v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01827)

- *De La Torres v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01830)

- *Moothart v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01832)

- *Sullivan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01836)

- *Morrison v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01817)

- *Morton v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01818)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Reese v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01819)

- *Salmon v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01820)

- *Stacey v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01821)

- *Sullivan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01822)

- *Woods  v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01823)

- *Barry v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01824)

- *Sampson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01807)

- *Gardner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01806)

- *Weaver v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01808)

- *Jones v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01809)

- *Syas v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01810)

- *Kavanagh v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01811)

- *Williams v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01812)

- *Knecht v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01813)

- *Fernandez v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01814)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Metz v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-00968)

- *Phifer v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01235)

- *Strain v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01289)

- *Bixler v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01290)

- *Barrale v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01291)

- *King v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01292)

- *Parmeter v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01938)

- *Thornton v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-02899)

- *Greaves v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00070)

- *Hewitt v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00199)

- *Klutsarits v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00246)

- *Bushong v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00337)

- *Darrish v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00418)

- *Smith v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00420)

- *Wortham v. Mallinckrodt, LLC, et al.,* United States District Court for the Eastern District of Missouri (Case No. 18-cv-00421)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Williams v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00759)

- *Knight v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-001054)

- *Cunningham v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01055)

- *Webb v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01179)

- *Chappell v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01177)

- *Boucherie v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01175)

- *Hines v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01703)

- *Koterba v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01702)

- *Walick v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01704)

- *Butler v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01701)

4851-7051-9997, v. 1

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    vs.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

### MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

Comes now Brian O. Watson, attorney for Defendant, and requests this Court grant the application for admission submitted by Attorney Jennifer R. Steeve, pursuant to Rule 9.03 of the Missouri Supreme Court Rules.  In support of this Motion, movant states:

1.    That the undersigned is an attorney licensed to practice law in the state of Missouri;

2.    Jennifer R. Steeve is an attorney licensed to practice law in California and an associate of the firm Riley Safer Holmes & Canila LLP, 100 Spectrum Center Drive, Suite 440, Irvine, CA 92618, (949) 359-5500;

3.    Jennifer R. Steeve is currently licensed and in good standing in the State of California, and has completed the application attached as an exhibit to this Motion;

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

4.      That the fee of $410.00 pursuant to Rule 6.01(m) has been paid and the receipt is attached as an exhibit to this Motion;

5.      That the undersigned is aware and agrees that if the Court grants this Motion, he remains designated as local counsel on behalf of the party in this matter.

WHEREFORE, the undersigned respectfully prays that this Court enter an order granting the motion for admission pro hac vice on behalf of the applicant, for this case only.


Dated:  June 8, 2020                              Respectfully submitted,

                                                  */s/ Marcie J. Vantine, #56860MO*
                                                  SWANSON, MARTIN & BELL, LLP
                                                  Marcie J. Vantine, #56860MO
                                                  mvantine@smbtrials.com
                                                  One Bank of America Plaza
                                                  800 Market Street, Suite 2100
                                                  St. Louis, MO 63101
                                                  314.242.0903 (telephone)
                                                  314.242.0990 (facsimile)

                                                  RILEY SAFER HOLMES & CANCILA LLP
                                                  Edward Casmere, #64326MO
                                                  Brian O. Watson, #68678MO
                                                  70 W. Madison St., Ste. 2900
                                                  Chicago, Illinois 60602
                                                  (312) 471-8700 (main)
                                                  (312) 471-8701 (fax)
                                                  ecasmere@rshc-law.com
                                                  bwatson@rshc-law.com
                                                  docketdept@rshc-law.com

                                                  **ATTORNEYS FOR THIRD-PARTY
                                                  DEFENDANT COTTER
                                                  CORPORATION (N.S.L.)**

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

## CERTIFICATE OF SERVICE

I certify that on June 8, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

*/s/ Marcie J. Vantine, #56860MO*

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

# IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

         Plaintiffs,

vs.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

         Defendants.

Case No. 18SL-CC00617-01
Division No. 17

## MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

    I, Jennifer R. Steeve, pursuant to Supreme Court Rule 9.03 and the Local Rules of the Twenty-First Judicial Circuit, request permission to appear and participate as an attorney in this case on behalf of Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company without waiver of jurisdiction and other defenses. In support of this application, and under penalties of perjury as provided by law, I certify that the statements set forth in this instrument are true and correct, and therefore state as follows:

    1.    My name is Jennifer R. Steeve. I am a licensed attorney in good standing in the State of California. My bar number in the State of California is 308082.

    2.    I have never been censured, sanctioned, suspended, disbarred, or otherwise disciplined by any attorney disciplinary authority of any state.

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

3.      I have read, am familiar with, and will abide by the Missouri Code of Civil Procedure, Missouri Supreme Court Rules, and Local Rules of the Twenty-First Judicial Circuit. In particular, I have read and am familiar with the Rules of Professional Conduct set forth in Rule 4 of the Missouri Supreme Court Rules and agree to become subject to discipline by the courts of Missouri.

4.      I agree to immediately notify the Court and all counsel of record in the event any information provided in this application changes or becomes inaccurate.

5.      I authorize the Administrator of any attorney registration and disciplinary authority to disclose to the Presiding Judge in this cause all information contained in the files of such authority concerning my current status, any complaints that have been made, and the disposition thereof.

Name of Applicant:     Jennifer R. Steeve
Firm Name:             Riley Safer Holmes & Cancila LLP
Business address:      100 Spectrum Center Drive, Suite 440, Irvine, CA 92618
Telephone:             (949) 359-5500
E-mail:                jsteeve@rshc-law.com

_____
Jennifer R. Steeve

4819-7638-8281, v. 2

JUDITH ANN MANASCO
Notary Public, Notary Seal
State of Missouri
Jefferson County
Commission # 17246076
My Commission Expires 04-11-2021

2

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM



**CLERK OF THE SUPREME COURT**
STATE OF MISSOURI
POST OFFICE BOX 150
JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

June 3, 2020

*This will hereby acknowledge receipt of $410 as required by*
*Rule 6.01(m) for Jennifer R. Steeve, appearing in Tamia Banks,*
*et al. v. Cotter Corporation, et al., Case No. 18SL-CC00617-01,*
*before the Circuit Court of St. Louis County, State of Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - June 08, 2020 - 10:49 AM

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI**

|  |  |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | Case No. 18SL-CC00617-01 Division No. 17 |
| Plaintiffs, | |
| vs. | |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS, | |
| Defendants. | |

**ORDER FOR ADMISSION OF COUNSEL *PRO HAC VICE***

This cause coming before the Court on the Motion for Admission of Counsel *Pro Hac Vice*, accompanied by the application of Jennifer R. Steeve, and the Court being fully advised in the premises, IT IS ORDERED THAT:

The Motion for Admission of Counsel *Pro Hac Vice* is GRANTED.  Attorney Jennifer R. Steeve is admitted to appear and participate on behalf of Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company without waiver of jurisdiction and other defenses.

SO ORDERED.

Dated:_____        _____
                                                        Judge Joseph L. Walsh, III
                                                        St. Louis County Court, Division 17

CC: Attorneys of records
4852-3549-3561, v. 2

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN, KENNETH
NIEBLING, KENDALL LACY, TANJA LACY,
WILLIE CLAY, BOBBIE JEAN CLAY,
ANGELA STATUM, and MISSOURI RENTALS
COMPANY, LLC, on behalf of themselves and all
others similarly situated,

      Plaintiffs,

      v.

COTTER CORPORATION, et al.,

      Defendants.

Case No. 18SL-CC00617
Division No. 17

**SO ORDERED:**

Judge          Division 17

June 09, 2020

**STIPULATED PROTECTIVE ORDER**
**REGARDING THE PRODUCTION OF CONFIDENTIAL INFORMATION**

Upon stipulation and agreement of the parties in accordance with Missouri Rule of Civil Procedure 56.01(c), and it appearing to the Court that there is good cause to enter an appropriate Protective Order to protect confidential, non-public information and materials that may be made available in the course of discovery in this case;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT the following principles and procedures designed to assure the protection of confidential and other non-public information shall govern any and all discovery among the parties:

**CONFIDENTIAL INFORMATION**

1.    <u>Definitions</u>.

    (a)    A party may designate the following material as "Confidential": (1) trade secret or other confidential research, development, or commercial information; (2) medical records; and (3) any other information subject to

1

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

privacy rights (*e.g.*, HIPAA-protected information) or entitled to protection under the Missouri Supreme Court Rules or other applicable law or orders (also "Confidential Material").  The designation of any material as "Confidential" shall represent that the party producing the material or documents (the "Producing Party") has actually reviewed the material and has made a good faith determination that any such material so designated is indeed confidential or subject to protection.

(b)    "Outside Counsel" shall include attorneys (and their support staff) who are not employees of a party or a party's parent company.

(c)    "House Counsel" shall include attorneys who are employees of a party or a party's parent company.

(d)    "Counsel" (without qualifier) shall include Outside Counsel and House Counsel.

2.    <u>Disclosure Limits on Confidential Information</u>. Unless otherwise ordered by the Court or permitted in writing by the party producing and designating the information or item Confidential Information, a receiving party may disclose any information or item designated Confidential Information only to:

(a)    Counsel (including administrative, paralegal, clerical, and secretarial staff employed by such counsel) to a party in this action;

(b)    parties and court personnel, including court reporters and videographers appearing at depositions, hearings, trial or other proceedings in this case;

(c)    non-attorney employees of a party who provide input and/or assistance to Counsel; and

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

(d)     the author or recipient of the document in the ordinary course of business, or individuals identified as the source of the information contained in a document designated as Confidential Information.

In addition, Confidential Information may be disclosed or made available to the following provided that first (i) a copy of this Order is provided to the receiving party and (ii) the Agreement to Maintain Confidentiality in the form attached as **Exhibit A** is read and executed by the receiving party:

(a)     outside experts or consultants (together with their administrative staff) retained by a party or Counsel who require the Confidential Information to render opinions relevant to the lawsuit or to otherwise assist Counsel in the prosecution, defense, or settlement of this action;

(b)     witnesses who are interviewed or who testify at depositions, hearings, or trial, or any such further proceedings which occur in this case, where the Counsel making the disclosure has a good-faith basis to make the disclosure in furtherance of the prosecution or defense of this action;

(c)     arbitrators and mediators involved in resolving this action;

(d)     litigation support services, including outside copying services or companies engaged in the business of supporting computerized or electronic litigation discovery or trial preparation, retained by a party or its Counsel for the purpose of assisting that party in this action; and

(e)     representatives of insurance carriers providing a defense or indemnity to any of the parties.

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

3.      <u>Inadvertent Disclosure of Confidential Information</u>. The inadvertent, unintentional, or *in camera* disclosure of Confidential Information shall not be deemed a waiver, in whole or in part, of any party's claim of confidentiality. Within 15 days of discovering such inadvertent or unintentional disclosure, any party to this Order may advise the other parties that the information or item is to be designated as "Confidential Information" under the terms of this Order.

## DESIGNATION OF CONFIDENTIAL INFORMATION

4.      <u>Form for Designation</u>. Confidential Information shall be so designated by the producing party by marking copies of Confidential Information with the legend "CONFIDENTIAL." The legend "CONFIDENTIAL" must appear on each page of any multi-page image that the producing party contends contains Confidential Information. Marking the legend "CONFIDENTIAL" on the cover of any multi-page document is not sufficient to designate all pages of the document as Confidential Information.

For information produced in some form other than documentary, and for other tangible items, the producing party shall affix in a prominent place on the exterior of the container or containers in which the Confidential Information is stored the legend "CONFIDENTIAL."

In addition, the producing party may redact protected health information, personal medical information, cell phone numbers, credit card information, social security numbers, employee identification numbers, names and identifying information of family members, and home addresses. If additional categories of information for redaction become apparent, the parties agree to meet and confer to resolve redactions.

5.      <u>Time for Designation</u>. Confidential Information shall be designated at the time of production; provided that in the event that a producing party inadvertently fails to designate any Confidential Information as "CONFIDENTIAL" at the time of production, the producing party

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

shall re-produce the material, this time designating and stamping the material as "CONFIDENTIAL" as soon as practicable. Upon receipt of the written notice designating previously produced documents as "CONFIDENTIAL," the receiving party shall make a good faith effort to destroy all copies of the Confidential Information that was inadvertently not designated as "CONFIDENTIAL."

A producing party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed Confidential Information. After the inspecting party has identified the documents it wants copied and produced, the producing party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the producing party must affix the appropriate legend ("CONFIDENTIAL") at the top of each page that contains Confidential Information.

Confidential Information has been designated in the cases identified on Exhibit B. A producing party shall continue to treat the Confidential Information as it was designated in the cases identified on Exhibit B, until a court of competent jurisdiction orders otherwise.

6.      Objection to Designation. The designation of Confidential Information is subject to objection by any party.  The burden on any such objection shall be on the producing party. The following procedure shall apply to any such objection.

(a)      Meet and Confer. Any objection to a designation must be submitted in writing to the producing party and must state with specificity the basis for the objection. The parties shall then meet and confer in a good faith effort to resolve the objection. In conferring, the objecting party must explain the

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

basis for its belief that the designation was not proper and must give the producing party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. Unless otherwise agreed by the objecting party, the producing party must respond within 5 business days of the objection and the parties must meet and confer within 10 business days of the objection.

(b)     Judicial Intervention. Any unresolved objections to confidentiality designations must be submitted by the producing party to the Court by motion that identifies the designated material and sets forth the basis for the confidentiality designation.  The motion must be accompanied by a representation by counsel for the movant that counsel has complied with the meet and confer requirements.  The burden on any such motion shall be on the producing party. Until the Court rules on the motion, all parties shall continue to treat the materials as they were designated under the terms of this Order.

7.     Other Exceptions to the Order. This Order is entered without prejudice to the right of the parties to present a motion to the Court for a separate protective order as to any particular document or information that requires restrictions differing from those as specified herein. The party desiring to maintain confidentiality shall have the burden of establishing grounds for confidential treatment. This Order shall not be deemed to prejudice the parties in any way in any future application for modification of this Order.

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

8.      <u>Designation of Testimony</u>. Testimony taken at any deposition, conference, hearing, or trial may be designated as Confidential Information either (a) on the record, or (b) within 10 business days of receipt of the transcript. If additional time is requested, the parties agree to meet and confer. Until the designation period expires, the complete deposition transcript and videotape shall be treated as Confidential Information unless otherwise specified in writing or on the record by the producing party. Arrangements shall be made with the court reporter taking and transcribing such proceeding to separately bind such portions of the transcript containing information designated as Confidential Information, and to label such portions appropriately. The designation is subject to objection by any party pursuant to paragraph 6.

9.      <u>Effect of Designations</u>. Material designated as Confidential Information under this Order, the information contained therein, and any summaries, copies, abstracts, or other documents derived in whole or in part from material designated as Confidential Information shall be kept strictly confidential; shall be used only for purposes of the prosecution, defense, or settlement of this action, and for no other purposes; and shall only be disclosed in accordance with this Order.

10.      <u>Retention of Verifications</u>. Counsel will retain executed copies of Attachment A and will, upon request, reasonably make such executed copies available to other counsel.

## **GENERAL PROVISIONS**

11.      <u>Additional Permissible Disclosures</u>. Nothing herein shall impose any restrictions on the use or disclosure by a party of material obtained lawfully by such party independent of discovery in this action, whether or not such material is also obtained through discovery in this action, or from disclosing its own Confidential Information as it deems appropriate. Public disclosure by the producing party of Confidential Information will result in such information no longer being subject to the provisions of this Order.

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

12.    <u>Filing Under Seal</u>. If a party wishes to use any Confidential Information in affidavits, briefs, memoranda of law, or other papers filed in this Court, or in oral argument presented to this Court (including an objection pursuant to paragraph 6), the party shall not file such information publicly. The parties agree to inquire of the Court the method by which the Court would like Confidential Information submitted and to handle submission of Confidential Information accordingly.  In the absence of direction by the Court, the parties shall file Confidential Information under seal and Confidential Information will be made available only to the Court and to persons specifically authorized by this Order. Unless instructed otherwise by the Court, the party filing any paper that reflects, contains, or includes Confidential Information shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, and the legend "CONFIDENTIAL — FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER OF THIS COURT." The party filing Confidential Information under seal shall publicly file a "Notice of Service of Confidential Information" citing this Order and the designation by the producing party as the basis for the notice. Contemporaneous with filing the notice, the filing party will serve the papers on all parties. The party may file the material under seal with the Court the following business day. At the conclusion of this action, Confidential Information filed with the Court under seal shall be kept under seal or be returned to the party filing it for disposition pursuant to paragraph 16.

13.    <u>Disclosure of Privileged Information</u>. If documents or information subject to a claim of attorney-client privilege, work product immunity, trade secret protection, or any other privilege or immunity is produced to another party or parties, whether inadvertently or otherwise, and irrespective of the care taken by the producing party, such production shall in no way

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

prejudice or otherwise constitute a waiver of, or estoppel as to, in whole or in part, any claim of privilege, work product, trade secret, or other ground for withholding production to which any party producing the documents or information would otherwise be entitled. Any such materials shall be returned promptly to the party producing the documents or information upon request and all copies destroyed upon request, and no use thereof shall be made by the party or parties to whom such documents or information were inadvertently produced.

14.     <u>Withholding or Redacting Privileged Information</u>.  If a party withholds or redacts information from production as privileged material, the party must produce a privilege and redaction log which identifies the document or information withheld by author, custodians, date, recipients (including e-mail addresses where applicable), document type (such as e-mail, Word file, etc.), a general description of the document or communication, and the basis for the claimed privilege.  If there are non-privileged files or documents attached to any privileged communications, the privileged communications must be identified in the privilege log, but the non-privileged documents must be still produced.  Any attachments withheld from production as privileged shall be described in the privilege log in the same manner as set forth above in this paragraph.

15.     <u>Purpose of Order</u>.  This Order is entered solely for the purpose of facilitating the exchange of documents and information between the parties to this action without involving the Court unnecessarily in the process. Nothing in this Order nor the production of any information or document under the terms of this Order shall be deemed a waiver of confidentiality or any type of privilege applicable to any type of information in this or any other action or proceeding. Nothing in this Order shall be construed to affect the evidentiary admissibility of any

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

Confidential Information, and absent order of the Court, there will be no restrictions because of this Order on the use of any document that may be introduced by any party during the trial.

16.     Use at Trial. Absent further order of the Court with respect to treatment of Confidential Information at trial, this Order shall not apply to any Confidential Information once it is introduced at trial and made a part of the trial record in this case. Nothing contained herein shall prevent a party from utilizing at a trial of this case the Confidential Information of another party to the trial or a producing third party. Any party who seeks to use information or documents designated as Confidential Information pursuant to this Order is to notify the producing party within 10 days prior to listing Confidential Information as a trial exhibit that the Confidential Information has been so designated, and to notify the designating party within 48 hours of designating testimony for trial or that has been designated Confidential Information that testimony has been so designated. If any party to the trial or producing party wishes special treatment of Confidential Information at trial, the same shall be sought through separate motion with the Court, and nothing in this Order is intended either to support or to undermine such a motion.

17.     Termination of Case. Within three months of the termination of this case (including any appeal), counsel shall assemble and return to each other all documents, material and testimony designated as Confidential Information and all copies of same, or shall certify the destruction with the producing party.

18.     Application to Non-Parties. Non-parties may invoke the terms of this Order by designating Confidential Information in accordance with the Order.

19.     Third-Party Subpoenas and Document Requests. If any person or entity possessing Confidential Information is subpoenaed (including pursuant to R.S.Mo. Sec. 610.010,

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

et seq.) or served with a document request, and such subpoena or document request demands Confidential Information, the person receiving the subpoena or document request shall give prompt written notice to Counsel for the producing party in this action, and shall, to the extent permitted by law, court rule, and court order, (i) withhold production of the requested Confidential Information until the producing party in this action permits production, or until a court of competent jurisdiction orders otherwise, and (ii) seek to enable the producing party in this action to move to quash or limit the subpoena or document request.  In the event that the producing party fails to take timely action to enforce its designation, the receiving party is under no obligation to itself move to quash or otherwise further seek to enforce the producing party's designation.

20.     <u>Modification</u>. This Order shall not prevent any party from applying to the Court for modification of the Order or for further relief.

21.     <u>Continuing Jurisdiction</u>. This Court shall retain jurisdiction to enforce the terms of this Order.

The undersigned counsel of record for the parties hereby stipulate and consent to entry of the foregoing Stipulated Protective Order.


**PURSUANT TO STIPULATION, IT IS SO ORDERED.**


Dated: _____


_____
HON. JOSEPH L. WALSH III
CIRCUIT COURT OF ST. LOUIS COUNTY

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

STIPULATED AND AGREED:


By:    */s/ Nathaniel R. Carroll (consent)*
       KEANE LAW LLC
       Ryan A. Keane, # 62112
       Nathaniel R. Carroll, # 67988
       7777 Bonhomme Ave., Ste. 1600
       St. Louis, MO 63105
       ryan@keanelawllc.com
       alex@keanelawllc.com

       JOHNSON GRAY, LLC
       Anthony D. Gray, # 51534
       319 North 4th Street, Suite 212
       St. Louis, MO 63102
       agray@johnsongraylaw.com

       COOPER LAW FIRM, L.L.C.
       Barry J. Cooper, Jr.
       Celeste Brustowicz
       Cooper Law Firm, L.L.C.
       1525 Religious Street
       New Orleans, LA 70130
       bcooper@sch-llc.com
       cbrustowicz@sch-llc.com

       RON AUSTIN & ASSOCIATES, L.L.C.
       Ron A. Austin
       920 4th Street
       Gretna, Louisiana 70053
       raustin@austin-associates.net

       *ATTORNEYS FOR PLAINTIFFS*

By:    */s/ Brian O. Watson*
       RILEY SAFER HOLMES &
       CANCILA LLP
       Edward Casmere, # 64326
       Brian O. Watson, # 68678
       70 W. Madison St., Ste. 2900
       Chicago, Illinois  60602
       (312) 471-8700 (main)
       (312) 471-8701 (fax)
       ecasmere@rshc-law.com
       bwatson@rshc-law.com

       SWANSON MARTIN & BELL LLP
       Marcie J. Vantine, #56860MO
       One Bank of America Plaza
       800 Market Street, Suite 2100
       St. Louis, MO 63101
       314.242.0903 (telephone)
       mvantine@smbtrials.com

       *ATTORNEYS FOR DEFENDANTS*
       *COTTER CORPORATION (N.S.L.)*
       *AND COMMONWEALTH EDISON*
       *COMPANY*

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

By:    */s/ John F. Cowling (consent)*
ARMSTRONG TEASDALE LLP
John F. Cowling #30920
Katherine M. Ricks #70322
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314.621.5070
314.621.5065 (facsimile)
jcowling@atllp.com
kricks@atllp.com

*ATTORNEYS FOR DEFENDANT THE CITY OF ST. LOUIS (THE OWNER AND OPERATOR OF ST. LOUIS LAMBERT INTERNATIONAL AIRPORT®)*

By:    */s/ Martin Jansky (consent)*
MARTIN JANSKY LAW FIRM, PC
S. Martin Jansky, #47022
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
(314) 881-6144
f: (314)644-4303
martin@janskylaw.com

*ATTORNEYS FOR DEFENDANT DJR HOLDINGS, INC.*

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COTTER CORPORATION, et al.,<br><br>Defendants. | Case No. 18SL-CC00617<br>Division No. 17 |

**EXHIBIT A**

**AGREEMENT TO MAINTAIN CONFIDENTIALITY**

The undersigned hereby agrees to the following:

I hereby attest to my understanding that information or documents designated

Confidential Information are provided to me subject to a Protective Order in the above-captioned

litigation; that I have been given a copy of and have read the Protective Order; and that I agree to

be bound by the terms of the Protective Order. I also understand that my execution of this

Agreement to Maintain Confidentiality, indicating my agreement to be bound by the Protective

Order, is a prerequisite to my review of any information or documents designated as Confidential

Information pursuant to the Protective Order.

1

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

I further agree that I shall not disclose to others, except in accordance with the Protective Order, any Confidential Information, as defined therein, in any form whatsoever, and that such Confidential Information will be used only for the purposes authorized by the Protective Order.

I further agree and attest to my understanding that my obligation to honor the confidentiality of the Confidential Information will continue even after this litigation concludes. I further agree that, if I fail to abide by terms of the Protective Order, I will be subject to the jurisdiction of this Court for the purpose of any proceedings relating to enforcement of the Protective Order.

Date: _____          By: _____

Subscribed and sworn to before me this _____ day of _____, _____.

By: _____

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | Case No. 18SL-CC00617 Division No. 17 |
| Plaintiffs, | |
| v. | |
| COTTER CORPORATION, et al., | |
| Defendants. | |

**EXHIBIT B**

Confidential Information was previously designated and produced in one or more of the following cases under protective orders that governed the treatment of the Confidential Information:

- *McClurg, et al. v. MI Holdings, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 12-CV-0361);

- *Strong, et al. v. Bridgeton Landfill, LLC, et al.*, Case No. 17SL-CC01632-01, Circuit Court of St. Louis County, Missouri.

*McClurg* was consolidated with 133 other similar lawsuits, and the protective order from *McClurg* applied to those additional cases.  Those cases are as follows:

- *Adams, et al. v. MI Holdings, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 12-CV-0641)

- *Steinmann v. MI Holdings, Inc., et al.*, United States District Court for Eastern District of Missouri (Case No. 12-CV-01942)

- *Schneider, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-0751)

1

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Vorce v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-1160)

- *Lange, et. al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-1483)

- *Bilger v. Mallinckrodt, Inc. et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-2163)

- *Bell v. Mallinckrodt, Inc, et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-CV-2378)

- *McPherson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 13-cv-02508)

- *Reed, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00033)

- *Robinson, et al. v. Mallinckrodt, Inc. et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00034)

- *O'Laughlin, et al. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00035)

- *Bright, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00036)

- *Anderson, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00037)

- *Gambilin, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00100)

- *Branstetter, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00210)

- *Kelly, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00247)

- *Lloyd, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00283)

- *Headrick, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00351)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Halbrook, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00668)

- *Beatty, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00669)

- *Steinbruegge, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00670)

- *Randall, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00671)

- *McDonald, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00672)

- *Starling, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00912)

- *Burns, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-00913)

- *Paglusch v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01046)

- *Banovz, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01523)

- *Jackson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 14-cv-01817)

- *Hegeman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00155)

- *Kelly, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00565)

- *Rogers, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00790)

- *Andres, v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00884)

- *Haselby, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-00964)

- *Combest, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01011)

- *Fellin, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01179)

- *Goodson, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01697)

- *Farley, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 15-cv-01909)

- *Beck, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00342)

- *Buchanan, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00343)

- *Brockman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00402)

- *Anderhub, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00655)

- *Alles, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00698)

- *Bohning, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00699)

- *Chapman, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00700)

- *Ell, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00701)

- *Harms, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00702)

- *Joyce, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00703)

- *Malon, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00707)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Menke, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00709)

- *Perry, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00710)

- *Reno, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00711)

- *Tiemann, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00712)

- *Wielms, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00713)

- *Allhoff, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00714)

- *Gettemeier, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00716)

- *Phillips, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-00718)

- *Bendyk v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01135)

- *Beachler, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01472)

- *Frazier, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01473)

- *Boughter, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01477)

- *Lipinski, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01479)

- *Buie, et al., v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01497)

- *Ponstingl v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-00260)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Holthaus v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01815)

- *McClanahan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01816)

- *Stacey v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01841)

- *Walsh v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01847)

- *Steiner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No.16-cv-01848)

- *Turner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01850)

- *Wojtowicz v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01851)

- *Bottomly v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01852)

- *Lococo  v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01838)

- *Ivy v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01839)

- *Birkla v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01840)

- *Brashears v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01842)

- *Elliott v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01843)

- *Gerick, Jr. v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01844)

- *McClain v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01845)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Pauley v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01846)

- *Lyons v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01848)

- *Shafer v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01833)

- *McCarthy v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01828)

- *Strachan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01834)

- *Flynn v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01834)

- *Newman v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01826)

- *Wright v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01826)

- *Miller v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01835)

- *Kujawa v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01827)

- *De La Torres v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01830)

- *Moothart v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01832)

- *Sullivan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01836)

- *Morrison v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01817)

- *Morton v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01818)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Reese v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01819)

- *Salmon v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01820)

- *Stacey v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01821)

- *Sullivan v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01822)

- *Woods  v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01823)

- *Barry v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01824)

- *Sampson v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01807)

- *Gardner v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01806)

- *Weaver v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01808)

- *Jones v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01809)

- *Syas v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01810)

- *Kavanagh v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01811)

- *Williams v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01812)

- *Knecht v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01813)

- *Fernandez v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 16-cv-01814)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Metz v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-00968)

- *Phifer v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01235)

- *Strain v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01289)

- *Bixler v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01290)

- *Barrale v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01291)

- *King v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01292)

- *Parmeter v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-01938)

- *Thornton v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 17-cv-02899)

- *Greaves v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00070)

- *Hewitt v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00199)

- *Klutsarits v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00246)

- *Bushong v. Mallinckrodt, Inc., et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00337)

- *Darrish v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00418)

- *Smith v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00420)

- *Wortham v. Mallinckrodt, LLC, et al.,* United States District Court for the Eastern District of Missouri (Case No. 18-cv-00421)

Electronically Filed - St Louis County - May 29, 2020 - 02:25 PM

- *Williams v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-00759)

- *Knight v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-001054)

- *Cunningham v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01055)

- *Webb v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01179)

- *Chappell v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01177)

- *Boucherie v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01175)

- *Hines v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01703)

- *Koterba v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01702)

- *Walick v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01704)

- *Butler v. Mallinckrodt, LLC, et al.*, United States District Court for the Eastern District of Missouri (Case No. 18-cv-01701)

4851-7051-9997, v. 1

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, et al.,

   Plaintiffs,

  v.

COTTER CORPORATION (N.S.L.), et al.,

   Defendants.

Case No. 18SL-CC00617-01
Division No. 17

COTTER CORPORATION (N.S.L.),

   Third-Party Plaintiff,

  v.

MALLINCKRODT LLC, EVERZINC USA
INC., BRIDGETON LANDFILL, LLC,
REPUBLIC SERVICES, INC., ALLIED
SERVICES, LLC, WESTLAKE LANDFILL,
INC., and ROCK ROAD INDUSTRIES, INC.,

   Third-Party Defendants.

## NOTICE OF FILING

  PLEASE TAKE NOTICE that on June 30, 2020, Defendant Cotter Corporation (N.S.L.)

filed its Third-Party Petition against Mallinckrodt LLC, EverZinc USA Inc., Bridgeton Landfill

LLC, Republic Services, Inc., Allied Services, LLC, Westlake Landfill, Inc, and Rock Road

Industries, Inc. without leave not later than ten days after serving any original answer under

Missouri Supreme Court Rule 52.11.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Dated: June 30, 2020                Respectfully submitted,

/s/ Brian O. Watson
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

SWANSON, MARTIN & BELL, LLP
Marcie J. Vantine, #56860MO
mvantine@smbtrials.com
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
314.242.0990 (facsimile)

**ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)**

## CERTIFICATE OF SERVICE

I certify that on June 30, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

4849-5228-0512, v. 1

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT**
**ST. LOUIS COUNTY, MISSOURI**

| | |
|---|---|
| TAMIA BANKS, et al., | |
| Plaintiffs, | Case No. 18SL-CC00617-01 |
| v. | Division No. 17 |
| COTTER CORPORATION (N.S.L.), et al., | |
| Defendants. | |

TAMIA BANKS, et al.,

        Plaintiffs,

v.

COTTER CORPORATION (N.S.L.), et al.,

        Defendants.

COTTER CORPORATION (N.S.L.),

        Third-Party Plaintiff,

v.

MALLINCKRODT LLC, EVERZINC USA
INC., BRIDGETON LANDFILL, LLC,
REPUBLIC SERVICES, INC., ALLIED
SERVICES, LLC, WESTLAKE LANDFILL,
INC., and ROCK ROAD INDUSTRIES, INC.,

        Third-Party Defendants.

Case No. 18SL-CC00617-01
Division No. 17

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## <u>THIRD-PARTY PETITION</u>

Defendant Cotter Corporation (N.S.L.) ("Cotter") brings this Third-Party Petition against

Mallinckrodt LLC ("Mallinckrodt"), EverZinc USA Inc. ("EverZinc"), Bridgeton Landfill LLC

("Bridgeton"), Republic Services, Inc. ("Republic"), Allied Services, LLC ("Allied"), Westlake

Landfill, Inc. ("Westlake"), and Rock Road Industries, Inc. ("Rock Road") under Missouri

Supreme Court Rule 52.11.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## PARTIES

1.      Cotter is a New Mexico corporation with its principal place of business in Colorado.

2.      Mallinckrodt is a Delaware limited liability company with its principal place of business in Missouri.  Mallinckrodt is the successor to Mallinckrodt Chemical Works and other predecessor entities.

3.      EverZinc is a New York corporation with its principal place of business in North Carolina.  EverZinc is the successor to African Metals Corporation and other predecessor entities.  Upon information and belief, African Metals Corporation was incorporated under the laws of the State of New York; African Metals Corporation changed its name to Afrimet-Indussa Inc.; Afrimet-Indussa Inc. changed its name to Sogem-Afrimet Inc.; Sogem-Afrimet Inc. changed its name to Sogem USA Inc.; Sogem USA Inc. changed its name to Umicore Marketing Services USA Inc.; and Umicore Marketing Services USA Inc. changed its name to EverZinc USA Inc.

4.      Republic is a Delaware corporation with its principal place of business in Arizona.

5.      Bridgeton is a Delaware limited liability company with its principal place of business is in Missouri.

6.      Westlake is a Missouri corporation with its principal place of business in Missouri.

7.      Allied is a Delaware limited liability company with its principal place of business in Arizona.

8.      Rock Road is a Missouri corporation with its principal place of business in Missouri.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this cause of action because the alleged acts took place in St. Louis County, Missouri.

10.     This Court has jurisdiction over the third-party defendants because, under R.S. Mo. § 506.500.1, either they have their principal place of business in Missouri or they otherwise transacted business and committed the alleged acts that form the basis of this cause of action within Missouri, so that they have purposely availed themselves of Missouri law and could reasonably anticipate defending a lawsuit in Missouri.

11.     Venue is proper because, under R.S. Mo. § 508.010.4, Plaintiffs claim they were allegedly first injured in St. Louis County, Missouri.

## FACTS COMMON TO ALL COUNTS

### Direct Allegations Against Defendants

12.     Plaintiffs filed a Second Amended Class-Action Petition against Defendants, a copy of which is attached as Exhibit 1 under Missouri Supreme Court Rules 55.10 and 55.12.

13.     Plaintiffs allege that Defendants are responsible for causing or contributing to radioactive contamination throughout various areas in St. Louis County, Missouri, including Coldwater Creek, the St. Louis Airport Site, the Latty Avenue Site, transit routes, and the alleged Class Area.

14.     Plaintiffs allege property damage and personal injury as a result of alleged contamination.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**Third-Party Allegations Against Mallinckrodt**

**Mallinckrodt's Uranium Operations**

15.     Beginning in World War II, and continuing thereafter, Mallinckrodt contracted with the United States Government in developing the atomic bomb and operated at the St. Louis Downtown Site and the St. Louis Airport Site.

16.     The St. Louis Downtown Site consisted of 210 acres of land on the eastern border of St. Louis, including 44.5 acres occupied by Mallinckrodt and 165 acres of vicinity properties. The Mallinckrodt portion was also known as the Destrehan Street facility.

17.     Under its contract with the United States Government, Mallinckrodt developed a uranium refining process to furnish pure uranium compounds.

18.     From 1942 through 1957, Mallinckrodt refined uranium ores and concentrates at the Destrehan Street facility, leading to radionuclide-containing residues that included K-65, C-701, interim residue plant tailings, scrap metal, Belgian Congo raffinates, Colorado raffinates, C-slag, leached and unleached barium sulfate, and other materials.

19.     From 1942 through 1957, Mallinckrodt manufactured, produced, used, handled, and stored radioactive wastes and other materials at the St. Louis Downtown Site.

20.     In 1946, the United States Government contracted with the State of Missouri to store radioactive wastes and other materials produced by Mallinckrodt at the St. Louis Airport Site.

21.     From 1946 through 1957, Mallinckrodt had radioactive wastes and other materials handled and transported from the St. Louis Downtown Site to the St. Louis Airport Site.

22.     From 1953 until at least 1966, Mallinckrodt operated the St. Louis Airport Site.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

23.     From 1946 through 1966, Mallinckrodt had radioactive wastes and other materials used, handled, and stored at the St. Louis Airport Site.

**Mallinckrodt's Columbium-Tantalum Operations**

24.     Between 1956 and 1985, Mallinckrodt conducted columbium-tantalum operations at the Mallinckrodt St. Louis Plant, which generated unreacted ore containing uranium and thorium and other byproducts.

25.     After the shutdown and decommissioning of its uranium ore processing unit, Mallinckrodt extracted columbium-tantalum pentoxide and byproduct uranium oxide from euxenite ore.

26.     Mallinckrodt's columbium-tantalum operations involved the following: crushing and milling the ore; leaching with hydrofluoric and sulfuric acids; purification by extraction and precipitation; separation of metal fluorides by fractional crystallization; and washing, drying, and calcining the metals to several columbium-tantalum products.

27.     Mallinckrodt had rare earth and thorium residues delivered to the United States General Services Administration and had the residuals and other materials stored, handled, processed, transported, and disposed offsite from the columbium-tantalum operations.

28.     In mid-1961, Mallinckrodt applied a modified process for separation and recovery of columbium-tantalum products, through which approximately half of the natural thorium in the feedstock was retained in the insoluble residue (designated as unreacted ore #1) and the remainder was concentrated in the raffinate after columbium-tantalum extraction.

29.     Mallinckrodt had the raffinate and unreacted ore #1 stored, handled, processed, transported, and disposed of from the columbium-tantalum operations.

Electronically Filed - St. Louis County - June 30, 2020 - 03:43 PM

30.     Upon completion of its contract with the United States Government, Mallinckrodt converted its columbium-tantalum unit into a commercial processing unit utilizing similar processes, except natural uranium in the columbite ore remained in the acid insoluble residue, designated as unreacted ore #10.

31.     Mallinckrodt caused the radioactive wastes and other materials from the columbium-tantalum operations to be used, stored, handled, transported, and disposed of at landfills in the St. Louis area, including West Lake Landfill.

32.     Soil samples and other material analyzed during the remedial investigation process for West Lake Landfill have marks of Mallinckrodt's unreacted ore.

<u>**Mallinckrodt's Other Commercial Operations**</u>

33.     Mallinckrodt disposed of thorium-containing waste and other effluents from its commercial operations at the Mallinckrodt St. Louis Plant into local water bodies and sewers in the St. Louis area, and some of these wastes and effluents were transported to West Lake Landfill.

34.     Before the establishment of the St. Louis Metropolitan Sewer District's Bissel Point Treatment Plant, Mallinckrodt had its process, storm, and sanitary effluents collected in a combined sewer system and discharged directly into the Mississippi River, according to the Formerly Utilized Sites Remedial Action Program of the United States Army Corps of Engineers.

35.     After 1970, Mallinckrodt had thorium-containing waste and other effluents disposed into sewers that went to the St. Louis Metropolitan Sewer District's Bissel Point Treatment Plant, according to the Formerly Utilized Sites Remedial Action Program of the United States Army Corps of Engineers.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

36.     Mallinckrodt had the unreacted ore containing thorium and uranium disposed into the plant sewer, which in turn was discharged to the Metropolitan St. Louis Sewer System, according to Mallinckrodt's July 1977 Application for Source Material License.

37.     Mallinckrodt recovered columbium-tantalum (C-T) operations values from shipping bags, containers, filter press cakes, filter clothes, etc. by first burning, then dissolving the incinerator ash with the incoming ore, and then disposing the residues via the plant sewer, which in turn is discharged to the Metropolitan St. Louis Sewer System.

38.     Mallinckrodt had soluble radionuclides and fine, dispersible solids containing radionuclides discharged to the plant sewer routinely, which in turn is discharged to the Metropolitan St. Louis Sewer System, according to Mallinckrodt's March 1981 Application for Source Material License.

39.     Mallinckrodt had loose material (*i.e.*, material not qualifying as regulated source material but containing low concentrations of uranium and/or thorium) collected, transported, and disposed of at landfills in the St. Louis area, which, upon information and belief, included West Lake Landfill.

### Third-Party Allegations Against EverZinc

40.     In the 1940s, the United States Government purchased ores containing uranium from African Metals n/k/a EverZinc.

41.     African Metals n/k/a EverZinc owned, sold, and distributed pitchblende ores containing uranium that Mallinckrodt processed at the St. Louis Downtown Site.

42.     African Metals n/k/a EverZinc retained ownership of the radioactive wastes and other materials generated by Mallinckrodt except for the uranium content.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

43.     African Metals n/k/a EverZinc had the radioactive wastes and other materials stored at the St. Louis Airport Site under lease agreements with the United States Government.

44.     From approximately 1946 through 1957, the radioactive wastes and other materials were transported from the St. Louis Downtown Site to the St. Louis Airport Site.

45.     Upon information and belief, in June 1959, African Metals n/k/a EverZinc abandoned ownership and disposed of the radioactive wastes and other materials.

46.     Between approximately May 1966 and December 1966, the radioactive wastes and other materials abandoned by African Metals n/k/a EverZinc—including leached barium sulfate residue—were transported by truck from the St. Louis Airport Site to the Latty Avenue Site.

47.     Between approximately July 1973 to October 1973, leached barium sulfate residue abandoned by African Metals n/k/a EverZinc was transported by truck from the Latty Avenue Site to the West Lake Landfill.

**Third-Party Allegations Against the Landfill Defendants**

48.     From 1962 to 1988, West Lake Landfill was owned and operated by Westlake.

49.     During this period, Westlake accepted a variety of demolition material, manufacturing wastes and byproducts, and sanitary waste at West Lake Landfill.

50.     Westlake accepted hazardous substances referenced above, as residues from the production of insecticides and herbicides, waste ink, esters, halogenated intermediates, heavy metals, oils, wastewater sludges, and asbestos.

51.     Some of this material also contained the radioactive waste referenced above, including the 8,700 pounds of leached barium sulfate.

52.     On July 29, 1988, Laidlaw acquired the stock of Westlake.

53.     Westlake changed its name to Laidlaw Waste Systems (Bridgeton) Inc. and continued to operate West Lake Landfill until 1998.

54.     Rock Road purchased a portion of West Lake Landfill containing radioactive waste, and has owned, operated, and managed the portion of West Lake Landfill, and accepted and disposed of hazardous waste at West Lake Landfill.

55.     In 1998, Laidlaw Waste Systems (Bridgeton), Inc. (i.e., Westlake) merged into Bridgeton.

56.     Rock Road also merged into Bridgeton.

57.     Bridgeton is the successor-in-interest to Westlake and Rock Road.

58.     Bridgeton and its sole member (Allied), either directly or through Westlake and Rock Road, have owned, operated, and managed West Lake Landfill and have accepted and disposed of hazardous waste at West Lake Landfill.

59.     In 2008, Republic acquired Bridgeton as the successor-in-interest to Westlake and Rock Road.

60.     Since that time, Republic has overseen and directed the environmental activities of Allied, Bridgeton, Rock Road, and Westlake (collectively, the "Landfill Defendants") with respect to West Lake Landfill.

61.     In 2010, the Landfill Defendants reported to the Missouri Department of Natural Resources that a portion of West Lake Landfill was experiencing elevated temperatures in certain gas extraction wells, suggesting subsurface smoldering.

62.     Shortly thereafter, the smoldering intensified into a subsurface combustion fire, which caused odors and hazardous substances to be released into the air.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

63.     These emissions persisted through at least 2012, when the State of Missouri tested the ambient air around West Lake Landfill and determined the air exceeded ambient concentration levels for benzene and acetaldehyde.

64.     In 2013, and continuing thereafter, portions of West Lake Landfill have generated approximately 150,000 gallons each day of leachate, which the Landfill Defendants treated on site before transporting to disposal facilities in Missouri and Illinois.

65.     The leachate contained hazardous substances and was released from West Lake Landfill into the surrounding environment and groundwater.

66.     The Landfill Defendants, either directly or through their subsidiaries and predecessors, have accepted and disposed of radioactive waste and other hazardous substances at West Lake Landfill.

67.     The Landfill Defendants, either directly or through their subsidiaries and predecessors, have caused or contributed to the improper handling, storage, or disposal of the radioactive waste and other hazardous substances at West Lake Landfill.

## COUNT 1
## CONTRIBUTION AGAINST MALLINCKRODT

68.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

69.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

70.     Mallinckrodt owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

71.     Mallinckrodt failed to use reasonable care that resulted in releases from the St. Louis Downtown Site, the St. Louis Airport Site, the Latty Avenue Site, the West Lake Landfill,

Mallinckrodt St. Louis Plant, and transit routes into the surrounding environment, including the alleged Class Area.

72.     In the unlikely event that Cotter is found liable to Plaintiffs' alleged damages, which Cotter denies, Mallinckrodt is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Mallinckrodt for any alleged damages that may be assessed against Cotter.

73.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Mallinckrodt, thereby barring any such recovery against Cotter.

74.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Mallinckrodt and any such liability must be limited to the percentage of fault apportioned to Cotter.

75.     Accordingly, the jury should award Cotter against Mallinckrodt any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 2
## CONTRIBUTION AGAINST EVERZINC

76.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

77.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

78.     EverZinc owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

79.     EverZinc failed to use reasonable care that resulted in releases from the St. Louis Downtown Site, the St. Louis Airport Site, the Latty Avenue Site, the West Lake Landfill, and transit routes into the surrounding environment, including the alleged Class Area.

80.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, EverZinc is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from EverZinc for any alleged damages that may be assessed against Cotter.

81.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of EverZinc, thereby barring any such recovery against Cotter.

82.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of EverZinc and any such liability must be limited to the percentage of fault apportioned to Cotter.

83.     Accordingly, the jury should award Cotter against EverZinc any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 3
## CONTRIBUTION AGAINST REPUBLIC

84.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

85.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

86.     Republic owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

87.     Republic failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

88.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Republic is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Republic for any alleged damages that may be assessed against Cotter.

89.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Republic, thereby barring any such recovery against Cotter.

90.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Republic and any such liability must be limited to the percentage of fault apportioned to Cotter.

91.     Accordingly, the jury should award Cotter against Republic any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 4
## CONTRIBUTION AGAINST BRIDGETON

92.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

93.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

94.     Bridgeton owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

95.     Bridgeton failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

96.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Bridgeton is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Bridgeton for any alleged damages that may be assessed against Cotter.

97.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Bridgeton, thereby barring any such recovery against Cotter.

98.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Bridgeton and any such liability must be limited to the percentage of fault apportioned to Cotter.

99.     Accordingly, the jury should award Cotter against Bridgeton any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

### COUNT 5
### CONTRIBUTION AGAINST ALLIED

100.    Cotter adopts by reference the allegations in Paragraphs 1 through 67.

101.    Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

102.    Allied owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

14

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

103.    Allied failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

104.    In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Allied is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Allied for any alleged damages that may be assessed against Cotter.

105.    In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Allied, thereby barring any such recovery against Cotter.

106.    In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Allied and any such liability must be limited to the percentage of fault apportioned to Cotter.

107.    Accordingly, the jury should award Cotter against Allied any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 6
## CONTRIBUTION AGAINST ROCK ROAD

108.    Cotter adopts by reference the allegations in Paragraphs 1 through 67.

109.    Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

110.    Rock Road owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

15

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

111.     Rock Road failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

112.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Rock Road is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Rock Road for any alleged damages that may be assessed against Cotter.

113.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Rock Road, thereby barring any such recovery against Cotter.

114.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Rock Road and any such liability must be limited to the percentage of fault apportioned to Cotter.

115.     Accordingly, the jury should award Cotter against Rock Road any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 7
## CONTRIBUTION AGAINST WESTLAKE

116.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

117.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

118.     Westlake owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

119.    Westlake failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

120.    In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Westlake is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Westlake for any alleged damages that may be assessed against Cotter.

121.    In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Westlake, thereby barring any such recovery against Cotter.

122.    In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Westlake, and any such liability must be limited to the percentage of fault apportioned to Cotter.

123.    Accordingly, the jury should award Cotter against Westlake any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

**REQUEST FOR RELIEF**

124.    **WHEREFORE**, Cotter Corporation (N.S.L.) requests judgment in its favor on its Third-Party Petition against Mallinckrodt LLC, EverZinc USA Inc., Bridgeton Landfill LLC, Republic Services, Inc., Allied Services, LLC, Westlake Landfill, Inc., and Rock Road Industries, Inc., an award of court costs, and any further relief as this Court deems just and proper.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## DEMAND FOR JURY TRIAL

Cotter Corporation (N.S.L.) demands a trial by jury of all issues so triable by right.

Dated: June 30, 2020                    Respectfully submitted,

                                        /s/ Brian O. Watson
                                        RILEY SAFER HOLMES & CANCILA LLP
                                        Edward Casmere, #64326MO
                                        Brian O. Watson, #68678MO
                                        Jennifer Steeve, Pro Hac Vice
                                        70 W. Madison St., Ste. 2900
                                        Chicago, Illinois 60602
                                        (312) 471-8700 (main)
                                        (312) 471-8701 (fax)
                                        ecasmere@rshc-law.com
                                        bwatson@rshc-law.com
                                        jsteeve@rshc-law.com
                                        docketdept@rshc-law.com

                                        SWANSON, MARTIN & BELL, LLP
                                        Marcie J. Vantine, #56860MO
                                        mvantine@smbtrials.com
                                        One Bank of America Plaza
                                        800 Market Street, Suite 2100
                                        St. Louis, MO 63101
                                        314.242.0903 (telephone)
                                        314.242.0990 (facsimile)

                                        **ATTORNEYS FOR DEFENDANT
                                        COTTER CORPORATION (N.S.L.)**

18

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## CERTIFICATE OF SERVICE

I certify that on June 30, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

4815-2793-5930, v. 6

# EXHIBIT 1

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**TWENTY-FIRST JUDICIAL CIRCUIT OF THE STATE OF MISSOURI**
**ST. LOUIS COUNTY**

| | |
|---|---|
| **TAMIA BANKS, REV. RONNIE HOOKS,** ) | |
| **BARBARA HOOKS, JOEL HOGAN,** ) | |
| **KENNETH NIEBLING, KENDALL LACY,** ) | |
| **TANJA LACY, WILLIE CLAY,** ) | |
| **BOBBIE JEAN CLAY, ANGELA STATUM,** ) | |
| **and MISSOURI RENTALS** ) | |
| **COMPANY, LLC, on behalf of themselves** ) | |
| **and all others similarly situated,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | **Cause No. 18SL-CC00617** |
| ) | |
| **vs.** ) | **Division No.   2** |
| ) | |
| **COTTER CORPORATION,** ) | |
| **COMMONWEALTH EDISON COMPANY,** ) | **JURY TRIAL DEMANDED** |
| **DJR HOLDINGS, INC. f/k/a FUTURA** ) | |
| **COATINGS, INC., and ST. LOUIS** ) | |
| **AIRPORT AUTHORITY, A** ) | |
| **DEPARTMENT OF THE CITY OF** ) | |
| **ST. LOUIS** ) | |
| ) | |
| **Defendants.** ) | |

## SECOND AMENDED CLASS ACTION PETITION

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan,

Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and

Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by and

through counsel, and for their Second Amended Class Action Petition and causes of action against

Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura

Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, states

and alleges as follows:

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began six decades ago, when Mallinckrodt received in downtown St. Louis City highly concentrated uranium with abnormal levels of radium from Africa. This particular ore was extremely toxic—more so than the ores available from anywhere else in the world. Despite the fact that these materials were some of the most harmful on Earth, Defendants negligently moved them around St. Louis, treating the radioactive materials with less care than a reasonable person might give in moving common household garbage. Vast amounts of radioactive wastes were moved from downtown St. Louis City to the St. Louis Airport, then to Hazelwood.

2.      Radioactive materials have been and will likely continue to be stored in bulk, on the ground, open to the elements, and unattended at sites on and adjacent to Coldwater Creek, which runs throughout North St. Louis County and is a tributary for the Missouri River. These sites included the St. Louis Airport Site ("SLAPS"), a storage facility on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") part of which later became the Hazelwood Interim Storage Site ("HISS"). The Latty Avenue site and the HISS site are contained in the properties located at 9170 Latty Avenue and 9200 Latty Avenue in Hazelwood, Missouri.

3.      Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families.  These everyday St. Louisans now find their lives disrupted, their kids sick, their homes contaminated, their businesses upended, and their properties worthless.  They find their once-quaint neighborhoods filled with technicians testing

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

and prodding their backyards and sampling the dust of their vacuum cleaners to identify the quantity and toxicity of the radioactive material Defendants have dumped into their lives.

4.      Tests conducted by representatives of the United States of America and others now confirm that the areas around Coldwater Creek are contaminated with the same radioactive wastes generated in the processing of uranium ores in the St. Louis area.  The off-site radioactive waste found today in the real property, which consists of businesses and homes, surrounding the Coldwater Creek carries the distinct fingerprint (or profile) of the ore which had been processed in St. Louis and possessed by Defendants and/or their predecessors in interest.

5.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

6.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused.  Instead, Defendants have hidden behind misstatements and omissions, misleading the local public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

7.      It is time that Defendants finally be held accountable for their reckless and tortious conduct.  This particular lawsuit seeks to correct the harm Defendants inflicted on a limited class of victims.

8.      Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct.  Defendants should compensate Plaintiffs for their

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

damages, and provide further relief as set forth below in this Petition.

9.      Pursuant to Missouri common law applicable at the time of Defendants' tortious conduct, which occurred prior to the 2005 enactment of R.S.Mo. § 537.067, Defendants are jointly and severally liable for any and all damages Plaintiffs and the Class have sustained as a result of Defendants' negligent handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental, consequential, nuisance, and trespass damages.

10.     Upon information and belief, by acquiring and continuing to operate ongoing operations throughout time, Defendants are liable for acts and omissions and the consequential damages caused by their predecessors in interest. To the extent that Defendants provided indemnity or committed fraud, they are liable to those to whom they sold or lease the ongoing operations.

11.     Upon information and belief, the properties of all Plaintiffs and the putative class are impacted by uranium mill tailings. The source of the radioactivity is small, microscopic particles yet containable when properly handled. These particles contain hazardous carcinogenic, harmful toxics, and other radioactive substances known as uranium and thorium and their daughter products. Such radioactive waste is legally and commonly referred to as "uranium mill tailings," which result from the processing of uranium ore.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over the subject matter and the parties in this case because the causes of action stated in this Petition arose out of business activities conducted solely in Missouri and out of torts committed solely in Missouri by resident and non-resident defendants.

13.     Venue is proper in this court pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action took place in the locality of St. Louis County,

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Missouri.

14.     Plaintiffs do not allege any causes of action arising under any laws of the United States.

15.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act, because:

    A.     Coldwater Creek is not and has never been a licensed nuclear facility.

    B.     Defendants have never received a license to possess, transport, or dispose of any radioactive wastes on or in Coldwater Creek.

    C.     Defendants did not have a license to dispose of radioactive wastes in Coldwater Creek.

    D.     Defendants did not have a license to handle the particular materials they handled as alleged herein, including enriched thorium.

    E.     Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities.

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims offending traditional state regulations and do not implicate the Price-Anderson Act and its textually manifest objectives related to liability limitation and indemnification.

17.     The Price-Anderson Act does not apply to the indisputably hazardous, toxic and carcinogenic mill tailings at issue in this Petition.

## **THE PARTIES**

### **Plaintiffs**

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

18.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Tamia Banks first learned that her property was in the zone of contamination in 2018.

19.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

20.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek.  His home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

21.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one hundred year flood

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

22.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

23.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

24.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

25.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one hundred year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

26.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including damages to their Property and the loss of use and enjoyment, thereof.

**Defendants**

27.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive mill tailings: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

28.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately after announcing that there was no radioactive contamination on the properties upon which it operated. It was then sold to General Atomics in 2000.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

    A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

    B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of state law and damages to property alleged in the Petition.

29.    Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001.

    A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Petition, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein. ComEd regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried in that locality.

    B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Petition. ComEd furthermore assumed the environmental safety and health

9

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter had operated and which it knowingly and intentionally abandoned immediately prior to its announced sale to ComEd. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter. After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter was the proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

C.  This lawsuit arises out of damages that resulted from the ComEd Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the ComEd Defendants, which gave rise to the violations of state law and damage to property alleged in the Petition.

30.   DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from

Electronically Filed - St. Louis County - June 30, 2020 - 03:43 PM

whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

31.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Petition.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs file this class action petition pursuant to Missouri Supreme Court Rule 52.08 on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one hundred year flood plain of Coldwater Creek[1] in St. Louis County, Missouri as detailed below.

33.     Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

34.     This action is maintainable as a class action and should be certified under Missouri Supreme Court Rule 52.08.

35.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest**

---

[1] FEMA.GOV, https://msc.fema.gov/portal/search?AddressQuery=st.%20louis%20county%2C%20mo#searchresultsanchor (last visited September 24, 2019).

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**and Old Halls Ferry Road to the northeast, as shown in blue in the map in Figure 1 below.**

<p align="center"><strong>Figure 1. Class Area</strong></p>



"Own," in the context of the class definition, includes those who hold any fee simple estate or life estate.

36.   The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast, as shown in the map in Figure 1 above.**

37.   Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

38.    The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

39.    Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

a.    Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste;

b.    Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS");

c.    Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property;

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

d.   Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property;

e.   Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property;

f.   Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

g.   Whether Plaintiffs and Class are entitled to damages; and

h.   Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

40.   The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

41.   Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

42.   Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

43.   Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law

resulting in harm to thousands of Missouri citizens.

44.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

45.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

46.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

47.     All of the class members are citizens of Missouri.

48.     The principal injuries resulting from the conduct of the Defendants were incurred

15

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

in Missouri.

49.     The conduct alleged in this Petition took place in Missouri.

    A.  The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis

    B.  All transportation of radioactive waste alleged herein took place in Missouri

    C.  All processing of radioactive wastes alleged herein took place in Missouri.

    D.  All storage of radioactive waste alleged herein took place in Missouri.

50.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

51.     No class action asserting similar factual allegations has been filed against any of the Defendants in the preceding three years.

52.     For these reasons, this case is maintainable as a class action pursuant to Missouri Rule of Civil Procedure 52.08.

## FACTS

### Radioactive Wastes

53.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

54.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay.  As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

55.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

material.  When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures.  When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

56.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body.  Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin.  The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

57.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious.  The second characteristic is that there are latent biological effects of radiation.

58.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries.  Somatic injuries are damages to the individual exposed.  This can include damages to the skin, reproductive system, blood forming

---

[2] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions.  Ionizing radiation has enough energy to cause changes in atoms through a process called ionization.  Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  *See* Radiation Health Effects, EPA.GOV, https://www.epa.gov/radiation/radiation-health-effects (last visited September 24, 2019).

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

59.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells.  As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase.  These genetic mutations can be passed down to a person's offspring even generations later.  These injuries include birth abnormalities and cancer.

60.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material.  The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate.  For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

61.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[34]

**Radioactive Waste in the St. Louis Area**

[3] *See* S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 1996-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.
[4] *See* Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_InterimSto_PHA-508.pdf.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

62.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[5]  The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

63.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

64.     The wastes created by processing at the SLDS are known in the scientific and regulatory communities as Uranium Mill Tailings and were created as a result of the milling of Uranium Ore to produce uranium metal by Mallinckrodt.

65.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert Airport to store the hazardous, toxic, carcinogenic radioactive mill tailings from the uranium processing operations at the SLDS.   The storage site(s) on and near the airport are now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

66.     Radioactive mill tailings accumulated locally at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, and Colorado raffinate residues. They were stored locally at SLAPS along with contaminated scrap.  Some of these radioactive wastes were stored in bulk on the open ground in piles.

67.     In the 1960's, some of the hazardous, toxic, carcinogenic radioactive mill tailings that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

---

[5]  *See* n.10 (citing Alvarez (2013) and DeGarmo (2006)).

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

68.    These mill tailings, which contained valuable metals, were sold and shipped to various other local destinations, contaminating the Latty Avenue Site with hazardous, toxic and radioactive substances as a result.

69.    In the late 1960's, Cotter and/or its predecessors in interest, and its successors, purchased the hazardous, toxic, carcinogenic radioactive mill tailings associated with both SLAPS and the Latty Avenue Site.

70.    Upon information and belief, as part of the contract between Cotter and/or its predecessors in interest and the federal government for sale of the radioactive waste, Cotter assumed all liability, including ultimate disposition of the waste.

71.    Cotter and/or its predecessors in interest did not receive indemnity from the government in connection with this transaction.

72.    Between 1969 and 1973, Cotter stored, processed, and transported hazardous, toxic, and radioactive wastes, including enriched thorium, associated with both the SLAPS and Latty Avenue sites.

73.    Upon information and belief, Cotter did not have a license to handle or dispose of enriched thorium.

74.    Transport and migration of hazardous, toxic and radioactive mill tailings to/from the SLAPS, the Latty Avenue Site and the HISS also spread hazardous, toxic and radioactive substances along haul routes to nearby properties.

**Saint Louis Airport Site ("SLAPS")**

75.    Upon information and belief, the U.S. Government acquired the Saint Louis Airport Site ("SLAPS") site by condemnation proceedings in 1947.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

76.      Hundreds of thousands of tons of hazardous, toxic, and radioactive mill tailings were transported from the SLDS to the SLAPS for storage, including radium-bearing residues, refined cake, barium sulfate cake, and C-liner slag.

77.      From 1953, the property was managed and operated by Mallinckrodt.

78.      By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS.

79.      In 1973, SLAPS was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

80.      Despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, thereafter did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

**Latty Avenue Site**

81.      Throughout the 1960s, hazardous, toxic, and radioactive wastes residues were removed from the SLAPS in various stages. Some of the wastes were transported to property at 9200 Latty Avenue (now known as the HISS and the Futura Coatings Company properties) for storage.

82.      Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos purchased and/or leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

83.     Despite knowing that significant activities involving radioactive material were conducted on the site, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

### Coldwater Creek

84.     Coldwater Creek flows for 500 feet along the western border of the SLAPS. The creek originates 3.6 miles to the south of the SLAPS and continues for 15 miles in a northeasterly direction through the City of Hazelwood, the City of Florissant, unincorporated areas of St. Louis County, and along the northern edge of the community of Black Jack, until it discharges into the Missouri River. Coldwater Creek is generally accessible to the public, except for approximately 1.2 miles, which flows under the Lambert-St. Louis International Airport. Coldwater Creek is contaminated with hazardous, toxic, and radioactive materials.

85.     Beginning in 1946, the hazardous, toxic, and radioactive waste residues left over from the production process at the SLDS were being transported to the SLAPS for storage. Scrap metal, chemical drums, and other contaminated debris were placed in low areas at the SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

86.     By 1960, there were approximately 50,000 chemical drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS directly adjacent to Coldwater Creek. Coldwater Creek is the major drainage mechanism for the SLAPS and the Latty Avenue Site. Through time, various meanders in Coldwater Creek were backfilled to support construction, resulting in commingling of the site soils and sediments with hazardous, toxic, and radioactive wastes brought to the SLAPS.

22

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

87.     During the 1960s, some of the waste residues were transported to the Latty Avenue Site. In 1969, the hazardous, toxic, and radioactive wastes residues at Latty Avenue were sold to the Cotter Corporation.

88.     Since 1946, radioactive wastes have migrated from the SLAPS, HISS and the Latty Avenue Site(s) into Coldwater Creek and were released or otherwise deposited along the entire FEMA one hundred year flood plain of Coldwater Creek.

89.     Coldwater Creek flows adjacent to the SLAPS, then meanders near the HISS, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

90.     Coldwater Creek floods areas of the North St. Louis County including portions of the SLAPS and the HISS. The runoff from precipitation that enters Coldwater Creek in a given unit of time greatly exceeds the predevelopment quantities. This runoff overloads Coldwater Creek and increases the likelihood of local and area-wide flooding.

91.     As a result of this flooding, the entire one hundred year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

92.     Plaintiffs' properties are contaminated by radioactive material.

93.     Samples taken on and around Plaintiffs' properties confirm an elevated presence of radioactive particles, significantly above the normal background level of radiation.

94.     Plaintiffs' properties neighbor Coldwater Creek and are within its flood plain.  This proximity puts the Plaintiffs' properties in the direct path of radioactive particles and contamination spread in and by Coldwater Creek.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

95.     The radioactive contamination that has polluted the Plaintiffs' properties and continues to threaten to further pollute the Plaintiffs' properties match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.

96.     This radioactive contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

97.     Radioactive contamination of the Plaintiffs' properties renders the Plaintiffs' properties unfit for normal use and enjoyment, creates a stigma attached to the properties, and destroys their fair market value.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

## COUNT I – TRESPASS
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

99.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

100.    Plaintiff Tamia Banks owns and controls the Banks Property located at 4501 Ashby Rd., St. Ann, Missouri, more particularly described above.

101.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control the Hooks Property located at 13712 Old Halls Ferry Rd., Florissant, Missouri, more particularly described above.

102.    Plaintiff Joel Hogan owns and controls the Hogan Property located at 435 Moule Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

103.    Plaintiff Kenneth Niebling owns and controls the Niebling Property located at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

104.    Plaintiffs Kendall Lacy and Tonja Lacy own and control the Lacy Property located at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

105.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control the Clay Property located at 9 Cricket Court, Florissant, Missouri, more particularly described above.

106.    Plaintiff Angela Statum owns and controls the Statum Property located at 7565 Hazelcrest Drive, Florissant, Missouri, more particularly described above.

107.    Plaintiff Missouri Rentals Company, LLC owns and controls the Missouri Rentals Properties, as more particularly described above and listed as follows:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

108.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

109.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

110.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

111.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

112.    Defendants have caused these radioactive materials to migrate from Defendants' property and other storage locations and contaminate Plaintiffs' property.

113.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper disposal of radioactive wastes

114.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

115.    Defendants store and/or transport radioactive materials and other toxic and hazardous wastes, as alleged herein.

116.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

117.    Defendants have caused these radioactive materials to migrate and contaminate Plaintiffs' property.

118.    Defendants willfully, wantonly, and maliciously caused the emission of Radon gas, and radioactive particles onto and around the property of Plaintiffs' property through their use, transport and disposal of radioactive wastes.

119.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate the property of Plaintiffs' property with radioactive particles and other hazardous wastes.

120.    The migration of Radon gas and radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in

26

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

121.    Plaintiffs did not give Defendants permission or consent to interfere with her property in this manner.  Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

122.    The contamination of Plaintiffs' property with Radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

123.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

<div align="center">

**COUNT II – PERMANENT NUISANCE**
**(brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

</div>

124.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

126.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

127.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

128.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

129.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

130.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

131.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

132.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

133.    Defendants unreasonably and unlawfully stored and used radioactive materials at SLAPS, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' property.

134.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

135.    The radioactive contamination created a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

136.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

enjoyment of their property.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

137.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

138.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

### COUNT III – TEMPORARY NUISANCE
### (brought individually and on behalf of the Property Damage Subclass)

139.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

140.    Plaintiff Tamia Banks owns and controls property at 4501 Ashby Road, St. Ann, Missouri, more particularly described above.

141.    Plaintiffs Ronnie Hooks and Barbara Hooks own and control property at 13712 Old Halls Ferry Road, Florissant, Missouri, more particularly described above.

142.    Plaintiff Joel Hogan owns and controls property at 435 Moule Drive, Florissant, Missouri, more particularly described above.

143.    Plaintiff Kenneth Niebling owns and controls property at 210 Versailles Drive, Florissant, Missouri, more particularly described above.

144.    Plaintiffs Kendall Lacy and Tonja Lacy own and control property at 2843 Chapel View Drive, Florissant, Missouri, more particularly described above.

145.    Plaintiffs Willie Clay and Bobbie Jean Clay own and control property at 9 Cricket Court, Florissant, Missouri, more particularly described above.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

146.    Plaintiff Angela Statum owns and controls property at 7565 Hazelcrest Drive, Hazelwood, Missouri, more particularly described above.

147.    Plaintiff Missouri Rentals Company, LLC owns and controls property at the following addresses, more particularly described above:

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT F, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

148.    Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS Site, the Latty Avenue Site, the HISS site, and Coldwater Creek, which adjoins Plaintiffs' properties.

149.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' properties.

150.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of Radon gas and radioactive particles onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties.  Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

151.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

152.    Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

153.    Defendants' use of the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"), and Coldwater Creek prevents Plaintiffs from using the property.

154.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

155.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

156.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man.  When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years.  Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind.  Exposures to radioactive wastes should be as low as is reasonably achievable.

157.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

158.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

159.    Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

160.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm, and to actual injuries to their persons.

161.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

162.     Defendants failed to act to prevent their releases from harming Plaintiffs.

163.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

164.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

165.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of Radon gas, radioactive particles and other hazardous materials onto Plaintiffs' property, in disregard of applicable regulations and property rights.

166.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.  Defendant's negligence diminished Plaintiffs' property value.

167.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

168.    Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

169.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE
### (brought individually by Plaintiffs and on behalf of the Class against all Defendants)

170.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

171.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

172.     Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect

173.     The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

174.     Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

175.     Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of Radon gas and radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

176.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

177.     Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY**
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

178.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

180.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

181.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

182.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value.  Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

183.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

184.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

185.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

**COUNT VII – INJUNCTIVE RELIEF**

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

186.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.    Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

188.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

189.    The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

190.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

191.    Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles.  Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

192.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

193.     Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

### COUNT VIII – PUNITIVE DAMAGES
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

194.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

195.     Defendants committed one or more of the willful, wanton and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

196.     Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

197.     The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

### COUNT IX – CIVIL CONSPIRACY
**(brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

198.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.     Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

200.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

201.     As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

### COUNT X – INVERSE CONDEMNATION

**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

202.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

203.     The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

204.     The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

205.     The St. Louis Airport Authority, a department of the City of St. Louis,  after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

206.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

207.    The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

208.    The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

209.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

210.    The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one hundred year floodplain of Coldwater Creek, renders their property valueless.

## COUNT XI – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION
**(brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

211.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

213.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

214.     The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class' due process and property rights under Article I § 10 of the Missouri Constitution.

215.     As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

### COUNT XII – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION
### (brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)

216.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.     Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

218.     The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

219.     The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one hundred year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

220.     Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., and the St. Louis Airport Authority, a department of the City of St. Louis, as well as awarding the following to Plaintiffs and against Defendants:

a.   an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b.   an award of double damages for malicious trespass as provided for under RSMo. § 537.330;

c.   an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

d.   costs and attorney fees;

e.   interest on the above amounts as allowed by law;

f.   for appropriate injunctive and equitable relief, as permitted by law or equity

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

g. for any further relief this Court deems just and proper.

Dated: October 29, 2019                    Respectfully submitted,

KEANE LAW LLC

/s/ *Nathaniel R. Carroll*
Ryan A. Keane, # 62112
Nathaniel R. Carroll, #67988
7777 Bonhomme Ave., Ste. 1600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
nathaniel@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, # 51534
319 North 4th Street, Suite 212
St. Louis, MO 63102
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Stuart Smith LA Bar # 17805 *pro hac vice*
Barry J. Cooper, Jr., TX Bar # 24057527 *pro hac vice*
Celeste Brustowicz, LA Bar # 16835 *pro hac vice*
Victor Cobb LA Bar # 36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
ssmith@sch-llc.com
bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

and

42

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:   304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 29, 2019, a true and accurate copy of the

foregoing was served by filing it in the court's electronic filing system, which will provide

electronic notice to all parties and attorneys of record.

/s/ *Nathaniel R. Carroll*

TWENTY-FIRST JUDICIAL CIRCUIT COURT OF THE STATE OF MISSOURI
ST. LOUIS COUNTY

TAMIA BANKS, et al.,                    )
                                        )
                                        )
        Plaintiffs,                     )      Cause No. 18SL-CC00617-01
                                        )
        vs.                             )      Division No. 17
                                        )
COTTER CORPORATION, (N.S.L.), et al.,   )
                                        )
        Defendants.                     )
                                        )
COTTER CORPORATION, (N.S.L.),           )
                                        )
        Third-Party Plaintiff,          )
                                        )
        vs.                             )
                                        )
MALLINCKRODT LLC, EVERZINC USA INC.,    )
BRIDGETON LANDFILL, LLC, REPUBLIC SERVICES, )
INC., ALLIED SERVICES, LLC, WEST LAKE   )
LANDFILL, INC., and ROCK ROAD INDUSTRIES, )
INC.,                                   )
                                        )
        Third-Party Defendants.         )

**MEMO REGARDING SERVICE OF THIRD-PARTY PETITION**

COMES NOW Third-Party Plaintiff Cotter Corporation (N.S.L.), ("Cotter") by and through its undersigned counsel, and filed this Memo Regarding Service of Third-Party Petition, stating as follows:

1. On June 30, 2020, Cotter filed its Third-Party Petition against Mallinckrodt LLC ("Mallinckrodt"), EverZinc USA Inc. ("EverZinc"), Bridgeton Landfill LLC ("Bridgeton"), Republic Services, Inc. ("Republic"), Allied Services, LLC ("Allied"), West Lake Landfill, Inc. ("West Lake"), and Rock Road Industries, Inc. ("Rock Road") under Missouri Supreme Court Rule 52.11.

2. Cotter now requests a Summons to be issued to Mallinckrodt, EverZinc, Bridgeton, Republic, Allied, West Lake, and Rock Road.  Fees were paid accordingly via Case.net.

3. Mallinckrodt will be served at its registered agent, CT Corporation Co., Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

4. EverZinc will be served at its registered agent, Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.

5. Bridgeton will be served at its registered agent, CT Corporation Co., Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

6. Republic will be served at its registered agent, CT Corporation Co., Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

7. Allied will be served at its registered agent, CT Corporation Co., Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

8. West Lake will be served at its registered agent, Harvey Ferdman, 671 Clovertrail Drive, Chesterfield, MO 63017.

9. Rock Road will be served at its registered agent, CT Corporation Co., 120 South Central Ave., Clayton, MO 63105.

DATED:   July 2, 2020

Electronically Filed - St Louis County - July 02, 2020 - 11:44 AM

Electronically Filed - St Louis County - July 02, 2020 - 11:44 AM

Respectfully submitted,

/s/ Brian O. Watson

SWANSON, MARTIN & BELL, LLP
Marcie J. Vantine, #56860MO
mvantine@smbtrials.com
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
314.242.0990 (facsimile)

RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)

Electronically Filed - St Louis County - July 02, 2020 - 11:44 AM

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2020, the foregoing Memo was filed via the Missouri Court's eFiling system, which will automatically serve an electronic copy of upon all counsel of record:

By: /s/ Marcie J. Vantine (MO Bar No. 56860)
    Marcie J. Vantine, #56860
    800 Market Street, Suite 2100
    St. Louis, Missouri 63101
    Phone: 314-241-7100
    Fax: 314-242-0990
    mvantine@smbtrials.com

**IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI**

TAMIA BANKS, et al.,

       Plaintiffs,

    v.

COTTER CORPORATION (N.S.L.), et al.,

       Defendants.

_____

COTTER CORPORATION (N.S.L.),

       Third-Party Plaintiff,

    v.

MALLINCKRODT LLC, EVERZINC USA
INC., BRIDGETON LANDFILL, LLC,
REPUBLIC SERVICES, INC., ALLIED
SERVICES, LLC, WESTLAKE LANDFILL,
INC., and ROCK ROAD INDUSTRIES, INC.,

       Third-Party Defendants.

Case No. 18SL-CC00617-01
Division No. 17

**SO ORDERED:**

Judge     Division 17

July 14, 2020

**THIRD-PARTY PETITION**

Defendant Cotter Corporation (N.S.L.) ("Cotter") brings this Third-Party Petition against

Mallinckrodt LLC ("Mallinckrodt"), EverZinc USA Inc. ("EverZinc"), Bridgeton Landfill LLC

("Bridgeton"), Republic Services, Inc. ("Republic"), Allied Services, LLC ("Allied"), Westlake

Landfill, Inc. ("Westlake"), and Rock Road Industries, Inc. ("Rock Road") under Missouri

Supreme Court Rule 52.11.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## PARTIES

1.      Cotter is a New Mexico corporation with its principal place of business in Colorado.

2.      Mallinckrodt is a Delaware limited liability company with its principal place of business in Missouri.  Mallinckrodt is the successor to Mallinckrodt Chemical Works and other predecessor entities.

3.      EverZinc is a New York corporation with its principal place of business in North Carolina.  EverZinc is the successor to African Metals Corporation and other predecessor entities.  Upon information and belief, African Metals Corporation was incorporated under the laws of the State of New York; African Metals Corporation changed its name to Afrimet-Indussa Inc.; Afrimet-Indussa Inc. changed its name to Sogem-Afrimet Inc.; Sogem-Afrimet Inc. changed its name to Sogem USA Inc.; Sogem USA Inc. changed its name to Umicore Marketing Services USA Inc.; and Umicore Marketing Services USA Inc. changed its name to EverZinc USA Inc.

4.      Republic is a Delaware corporation with its principal place of business in Arizona.

5.      Bridgeton is a Delaware limited liability company with its principal place of business is in Missouri.

6.      Westlake is a Missouri corporation with its principal place of business in Missouri.

7.      Allied is a Delaware limited liability company with its principal place of business in Arizona.

2

8.      Rock Road is a Missouri corporation with its principal place of business in Missouri.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this cause of action because the alleged acts took place in St. Louis County, Missouri.

10.      This Court has jurisdiction over the third-party defendants because, under R.S. Mo. § 506.500.1, either they have their principal place of business in Missouri or they otherwise transacted business and committed the alleged acts that form the basis of this cause of action within Missouri, so that they have purposely availed themselves of Missouri law and could reasonably anticipate defending a lawsuit in Missouri.

11.      Venue is proper because, under R.S. Mo. § 508.010.4, Plaintiffs claim they were allegedly first injured in St. Louis County, Missouri.

## FACTS COMMON TO ALL COUNTS

### Direct Allegations Against Defendants

12.      Plaintiffs filed a Second Amended Class-Action Petition against Defendants, a copy of which is attached as Exhibit 1 under Missouri Supreme Court Rules 55.10 and 55.12.

13.      Plaintiffs allege that Defendants are responsible for causing or contributing to radioactive contamination throughout various areas in St. Louis County, Missouri, including Coldwater Creek, the St. Louis Airport Site, the Latty Avenue Site, transit routes, and the alleged Class Area.

14.      Plaintiffs allege property damage and personal injury as a result of alleged contamination.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

**Third-Party Allegations Against Mallinckrodt**

**Mallinckrodt's Uranium Operations**

15.     Beginning in World War II, and continuing thereafter, Mallinckrodt contracted with the United States Government in developing the atomic bomb and operated at the St. Louis Downtown Site and the St. Louis Airport Site.

16.     The St. Louis Downtown Site consisted of 210 acres of land on the eastern border of St. Louis, including 44.5 acres occupied by Mallinckrodt and 165 acres of vicinity properties. The Mallinckrodt portion was also known as the Destrehan Street facility.

17.     Under its contract with the United States Government, Mallinckrodt developed a uranium refining process to furnish pure uranium compounds.

18.     From 1942 through 1957, Mallinckrodt refined uranium ores and concentrates at the Destrehan Street facility, leading to radionuclide-containing residues that included K-65, C-701, interim residue plant tailings, scrap metal, Belgian Congo raffinates, Colorado raffinates, C-slag, leached and unleached barium sulfate, and other materials.

19.     From 1942 through 1957, Mallinckrodt manufactured, produced, used, handled, and stored radioactive wastes and other materials at the St. Louis Downtown Site.

20.     In 1946, the United States Government contracted with the State of Missouri to store radioactive wastes and other materials produced by Mallinckrodt at the St. Louis Airport Site.

21.     From 1946 through 1957, Mallinckrodt had radioactive wastes and other materials handled and transported from the St. Louis Downtown Site to the St. Louis Airport Site.

22.     From 1953 until at least 1966, Mallinckrodt operated the St. Louis Airport Site.

4

23.     From 1946 through 1966, Mallinckrodt had radioactive wastes and other materials used, handled, and stored at the St. Louis Airport Site.

**Mallinckrodt's Columbium-Tantalum Operations**

24.     Between 1956 and 1985, Mallinckrodt conducted columbium-tantalum operations at the Mallinckrodt St. Louis Plant, which generated unreacted ore containing uranium and thorium and other byproducts.

25.     After the shutdown and decommissioning of its uranium ore processing unit, Mallinckrodt extracted columbium-tantalum pentoxide and byproduct uranium oxide from euxenite ore.

26.     Mallinckrodt's columbium-tantalum operations involved the following: crushing and milling the ore; leaching with hydrofluoric and sulfuric acids; purification by extraction and precipitation; separation of metal fluorides by fractional crystallization; and washing, drying, and calcining the metals to several columbium-tantalum products.

27.     Mallinckrodt had rare earth and thorium residues delivered to the United States General Services Administration and had the residuals and other materials stored, handled, processed, transported, and disposed offsite from the columbium-tantalum operations.

28.     In mid-1961, Mallinckrodt applied a modified process for separation and recovery of columbium-tantalum products, through which approximately half of the natural thorium in the feedstock was retained in the insoluble residue (designated as unreacted ore #1) and the remainder was concentrated in the raffinate after columbium-tantalum extraction.

29.     Mallinckrodt had the raffinate and unreacted ore #1 stored, handled, processed, transported, and disposed of from the columbium-tantalum operations.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

30.     Upon completion of its contract with the United States Government, Mallinckrodt converted its columbium-tantalum unit into a commercial processing unit utilizing similar processes, except natural uranium in the columbite ore remained in the acid insoluble residue, designated as unreacted ore #10.

31.     Mallinckrodt caused the radioactive wastes and other materials from the columbium-tantalum operations to be used, stored, handled, transported, and disposed of at landfills in the St. Louis area, including West Lake Landfill.

32.     Soil samples and other material analyzed during the remedial investigation process for West Lake Landfill have marks of Mallinckrodt's unreacted ore.

### Mallinckrodt's Other Commercial Operations

33.     Mallinckrodt disposed of thorium-containing waste and other effluents from its commercial operations at the Mallinckrodt St. Louis Plant into local water bodies and sewers in the St. Louis area, and some of these wastes and effluents were transported to West Lake Landfill.

34.     Before the establishment of the St. Louis Metropolitan Sewer District's Bissel Point Treatment Plant, Mallinckrodt had its process, storm, and sanitary effluents collected in a combined sewer system and discharged directly into the Mississippi River, according to the Formerly Utilized Sites Remedial Action Program of the United States Army Corps of Engineers.

35.     After 1970, Mallinckrodt had thorium-containing waste and other effluents disposed into sewers that went to the St. Louis Metropolitan Sewer District's Bissel Point Treatment Plant, according to the Formerly Utilized Sites Remedial Action Program of the United States Army Corps of Engineers.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

36.     Mallinckrodt had the unreacted ore containing thorium and uranium disposed into the plant sewer, which in turn was discharged to the Metropolitan St. Louis Sewer System, according to Mallinckrodt's July 1977 Application for Source Material License.

37.     Mallinckrodt recovered columbium-tantalum (C-T) operations values from shipping bags, containers, filter press cakes, filter clothes, etc. by first burning, then dissolving the incinerator ash with the incoming ore, and then disposing the residues via the plant sewer, which in turn is discharged to the Metropolitan St. Louis Sewer System.

38.     Mallinckrodt had soluble radionuclides and fine, dispersible solids containing radionuclides discharged to the plant sewer routinely, which in turn is discharged to the Metropolitan St. Louis Sewer System, according to Mallinckrodt's March 1981 Application for Source Material License.

39.     Mallinckrodt had loose material (*i.e.*, material not qualifying as regulated source material but containing low concentrations of uranium and/or thorium) collected, transported, and disposed of at landfills in the St. Louis area, which, upon information and belief, included West Lake Landfill.

### Third-Party Allegations Against EverZinc

40.     In the 1940s, the United States Government purchased ores containing uranium from African Metals n/k/a EverZinc.

41.     African Metals n/k/a EverZinc owned, sold, and distributed pitchblende ores containing uranium that Mallinckrodt processed at the St. Louis Downtown Site.

42.     African Metals n/k/a EverZinc retained ownership of the radioactive wastes and other materials generated by Mallinckrodt except for the uranium content.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

43.     African Metals n/k/a EverZinc had the radioactive wastes and other materials stored at the St. Louis Airport Site under lease agreements with the United States Government.

44.     From approximately 1946 through 1957, the radioactive wastes and other materials were transported from the St. Louis Downtown Site to the St. Louis Airport Site.

45.     Upon information and belief, in June 1959, African Metals n/k/a EverZinc abandoned ownership and disposed of the radioactive wastes and other materials.

46.     Between approximately May 1966 and December 1966, the radioactive wastes and other materials abandoned by African Metals n/k/a EverZinc—including leached barium sulfate residue—were transported by truck from the St. Louis Airport Site to the Latty Avenue Site.

47.     Between approximately July 1973 to October 1973, leached barium sulfate residue abandoned by African Metals n/k/a EverZinc was transported by truck from the Latty Avenue Site to the West Lake Landfill.

**Third-Party Allegations Against the Landfill Defendants**

48.     From 1962 to 1988, West Lake Landfill was owned and operated by Westlake.

49.     During this period, Westlake accepted a variety of demolition material, manufacturing wastes and byproducts, and sanitary waste at West Lake Landfill.

50.     Westlake accepted hazardous substances referenced above, as residues from the production of insecticides and herbicides, waste ink, esters, halogenated intermediates, heavy metals, oils, wastewater sludges, and asbestos.

51.     Some of this material also contained the radioactive waste referenced above, including the 8,700 pounds of leached barium sulfate.

52.     On July 29, 1988, Laidlaw acquired the stock of Westlake.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

53.     Westlake changed its name to Laidlaw Waste Systems (Bridgeton) Inc. and continued to operate West Lake Landfill until 1998.

54.     Rock Road purchased a portion of West Lake Landfill containing radioactive waste, and has owned, operated, and managed the portion of West Lake Landfill, and accepted and disposed of hazardous waste at West Lake Landfill.

55.     In 1998, Laidlaw Waste Systems (Bridgeton), Inc. (i.e., Westlake) merged into Bridgeton.

56.     Rock Road also merged into Bridgeton.

57.     Bridgeton is the successor-in-interest to Westlake and Rock Road.

58.     Bridgeton and its sole member (Allied), either directly or through Westlake and Rock Road, have owned, operated, and managed West Lake Landfill and have accepted and disposed of hazardous waste at West Lake Landfill.

59.     In 2008, Republic acquired Bridgeton as the successor-in-interest to Westlake and Rock Road.

60.     Since that time, Republic has overseen and directed the environmental activities of Allied, Bridgeton, Rock Road, and Westlake (collectively, the "Landfill Defendants") with respect to West Lake Landfill.

61.     In 2010, the Landfill Defendants reported to the Missouri Department of Natural Resources that a portion of West Lake Landfill was experiencing elevated temperatures in certain gas extraction wells, suggesting subsurface smoldering.

62.     Shortly thereafter, the smoldering intensified into a subsurface combustion fire, which caused odors and hazardous substances to be released into the air.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

63.     These emissions persisted through at least 2012, when the State of Missouri tested the ambient air around West Lake Landfill and determined the air exceeded ambient concentration levels for benzene and acetaldehyde.

64.     In 2013, and continuing thereafter, portions of West Lake Landfill have generated approximately 150,000 gallons each day of leachate, which the Landfill Defendants treated on site before transporting to disposal facilities in Missouri and Illinois.

65.     The leachate contained hazardous substances and was released from West Lake Landfill into the surrounding environment and groundwater.

66.     The Landfill Defendants, either directly or through their subsidiaries and predecessors, have accepted and disposed of radioactive waste and other hazardous substances at West Lake Landfill.

67.     The Landfill Defendants, either directly or through their subsidiaries and predecessors, have caused or contributed to the improper handling, storage, or disposal of the radioactive waste and other hazardous substances at West Lake Landfill.

## COUNT 1
## CONTRIBUTION AGAINST MALLINCKRODT

68.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

69.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

70.     Mallinckrodt owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

71.     Mallinckrodt failed to use reasonable care that resulted in releases from the St. Louis Downtown Site, the St. Louis Airport Site, the Latty Avenue Site, the West Lake Landfill,

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Mallinckrodt St. Louis Plant, and transit routes into the surrounding environment, including the alleged Class Area.

72.     In the unlikely event that Cotter is found liable to Plaintiffs' alleged damages, which Cotter denies, Mallinckrodt is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Mallinckrodt for any alleged damages that may be assessed against Cotter.

73.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Mallinckrodt, thereby barring any such recovery against Cotter.

74.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Mallinckrodt and any such liability must be limited to the percentage of fault apportioned to Cotter.

75.     Accordingly, the jury should award Cotter against Mallinckrodt any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

<div align="center">

**COUNT 2**
**CONTRIBUTION AGAINST EVERZINC**

</div>

76.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

77.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

78.     EverZinc owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

<div align="center">11</div>

79.     EverZinc failed to use reasonable care that resulted in releases from the St. Louis Downtown Site, the St. Louis Airport Site, the Latty Avenue Site, the West Lake Landfill, and transit routes into the surrounding environment, including the alleged Class Area.

80.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, EverZinc is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from EverZinc for any alleged damages that may be assessed against Cotter.

81.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of EverZinc, thereby barring any such recovery against Cotter.

82.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of EverZinc and any such liability must be limited to the percentage of fault apportioned to Cotter.

83.     Accordingly, the jury should award Cotter against EverZinc any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 3
## CONTRIBUTION AGAINST REPUBLIC

84.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

85.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

86.     Republic owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

87.   Republic failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

88.   In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Republic is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Republic for any alleged damages that may be assessed against Cotter.

89.   In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Republic, thereby barring any such recovery against Cotter.

90.   In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Republic and any such liability must be limited to the percentage of fault apportioned to Cotter.

91.   Accordingly, the jury should award Cotter against Republic any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

**COUNT 4**
**CONTRIBUTION AGAINST BRIDGETON**

92.   Cotter adopts by reference the allegations in Paragraphs 1 through 67.

93.   Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

94.   Bridgeton owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

95.     Bridgeton failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

96.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Bridgeton is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Bridgeton for any alleged damages that may be assessed against Cotter.

97.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Bridgeton, thereby barring any such recovery against Cotter.

98.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Bridgeton and any such liability must be limited to the percentage of fault apportioned to Cotter.

99.     Accordingly, the jury should award Cotter against Bridgeton any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 5
## CONTRIBUTION AGAINST ALLIED

100.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

101.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

102.     Allied owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

14

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

103.     Allied failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

104.     In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Allied is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Allied for any alleged damages that may be assessed against Cotter.

105.     In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Allied, thereby barring any such recovery against Cotter.

106.     In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Allied and any such liability must be limited to the percentage of fault apportioned to Cotter.

107.     Accordingly, the jury should award Cotter against Allied any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

### COUNT 6
### CONTRIBUTION AGAINST ROCK ROAD

108.     Cotter adopts by reference the allegations in Paragraphs 1 through 67.

109.     Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

110.     Rock Road owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

111.    Rock Road failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

112.    In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Rock Road is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Rock Road for any alleged damages that may be assessed against Cotter.

113.    In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Rock Road, thereby barring any such recovery against Cotter.

114.    In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Rock Road and any such liability must be limited to the percentage of fault apportioned to Cotter.

115.    Accordingly, the jury should award Cotter against Rock Road any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## COUNT 7
## CONTRIBUTION AGAINST WESTLAKE

116.    Cotter adopts by reference the allegations in Paragraphs 1 through 67.

117.    Cotter denies fault for Plaintiffs' alleged damages and preserves all affirmative and other defenses.

118.    Westlake owed Plaintiffs a duty as alleged in the Second Amended Class-Action Petition.

16

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

119.    Westlake failed to use reasonable care that resulted in releases from West Lake Landfill and transit routes into the surrounding environment, including the alleged Class Area.

120.    In the unlikely event that Cotter is found liable for Plaintiffs' alleged damages, which Cotter denies, Westlake is a joint tortfeasor who is liable, in whole or in part, for Plaintiffs' alleged damages, and Cotter is entitled to contribution (or to the extent available, indemnification) from Westlake for any alleged damages that may be assessed against Cotter.

121.    In the unlikely event that any damages are assessed against Cotter, which Cotter denies, any such damages were caused, in whole or in part, by the conduct, fault, acts, carelessness, omissions, and negligence of Westlake, thereby barring any such recovery against Cotter.

122.    In the unlikely event that any fault is assessed against Cotter, which Cotter denies, any such fault must be compared to the fault of Westlake, and any such liability must be limited to the percentage of fault apportioned to Cotter.

123.    Accordingly, the jury should award Cotter against Westlake any amount assessed against Cotter that is more than Cotter's percentage of fault and award Cotter such proportion of the total sum paid as corresponds to Cotter's percentage of fault.

## REQUEST FOR RELIEF

124.    **WHEREFORE**, Cotter Corporation (N.S.L.) requests judgment in its favor on its Third-Party Petition against Mallinckrodt LLC, EverZinc USA Inc., Bridgeton Landfill LLC, Republic Services, Inc., Allied Services, LLC, Westlake Landfill, Inc., and Rock Road Industries, Inc., an award of court costs, and any further relief as this Court deems just and proper.

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## DEMAND FOR JURY TRIAL

Cotter Corporation (N.S.L.) demands a trial by jury of all issues so triable by right.

Dated: June 30, 2020                    Respectfully submitted,

/s/ Brian O. Watson
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

SWANSON, MARTIN & BELL, LLP
Marcie J. Vantine, #56860MO
mvantine@smbtrials.com
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
314.242.0990 (facsimile)

**ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)**

Electronically Filed - St Louis County - June 30, 2020 - 03:43 PM

## CERTIFICATE OF SERVICE

I certify that on June 30, 2020, these papers were filed through the Missouri Court's

eFiling system, which will automatically serve an electronic copy upon all counsel of record.

Respectfully submitted,

*/s/ Brian O. Watson*
RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
Jennifer Steeve, Pro Hac Vice
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
jsteeve@rshc-law.com
docketdept@rshc-law.com

4815-2793-5930, v. 6



## IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
| Plaintiff/Petitioner:<br>TAMIA BANKS<br><br><center>vs.</center> | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO  63105 |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION<br><br><center>vs.</center> | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| Third-Party Defendant/Respondent:<br> MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Third-Party Summons

| |
|---|
| The State of Missouri to:  **ALLIED SERVICES LLC**<br>                       **Alias:** |

**REGISTERED AGENT**
**CT CORPORATION CO**
**1209 ORANGE STREET**
**WILMINGTON, DE  19801**



*COURT SEAL OF*

*ST. LOUIS COUNTY*

       You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.

       **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

21-JUL-2020
Date

_____
Clerk

**Further Information:**
        **GB**

**Sheriff's or Server's Return**

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____, a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____.

Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at

_____ (time).

_____          _____
Printed Name of Sheriff or Server                  Signature Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*          Subscribed and sworn to before me on _____ (date).

My commission expires: _____     _____
                                        Date                                   Notary Public

**Sheriff's Fees, if applicable**

| | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $____10.00____ | |
| Mileage | $_____ | ( _____ miles @ $._____ per mile) |
| **Total** | $_____ | |

**Directions to Sheriff**

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents.  Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO  63105 |
| vs. | |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| vs. | |
| Third-Party Defendant/Respondent:<br> MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Third-Party Summons

The State of Missouri to:  **BRIDGETON LANDFILL LLC**
           **Alias:**

**REGISTERED AGENT**
**CT CORPORATION CO**
**1209 ORANGE STREET**
**WILMINGTON, DE  19801**



*COURT SEAL OF*

*ST. LOUIS COUNTY*

      You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.
      **SPECIAL NEEDS:** If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

21-JUL-2020
Date

Clerk

**Further Information:**
      **GB**

## Sheriff's or Server's Return

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____ , a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____ .

Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                    Signature Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*     Subscribed and sworn to before me on _____ (date).

My commission expires: _____   _____
                                          Date                                        Notary Public

**Sheriff's Fees, if applicable**

| | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $____10.00____ | |
| Mileage | $_____ | ( _____ miles @ $._____ per mile) |
| **Total** | $_____ | |

### Directions to Sheriff

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents.  Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS<br><br><br>vs. | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO 63105 |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION<br><br><br>vs. | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| Third-Party Defendant/Respondent:<br> MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Third-Party Summons

| The State of Missouri to:   EVERZINC USA INC<br>Alias: |
|---|

**REGISTERED AGENT<br>CORPORATION SERVICE CO<br>80 STATE STREET<br>ALBANY, NY  12207-2543**

*COURT SEAL OF*



*ST. LOUIS COUNTY*

      You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.

      **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

<u>21-JUL-2020</u><br>Date

_____<br>Clerk

**Further Information:**<br>      **GB**

### Sheriff's or Server's Return

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____, a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____.

Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____

_____          _____
Date                                                              Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ ( _____ miles @ $._____ per mile) |
| **Total** | $_____ |

### Directions to Sheriff

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents.  Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS<br><br><br>vs. | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO  63105 |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION<br><br>vs. | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| Third-Party Defendant/Respondent:<br>MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
|  | (Date File Stamp) |

## Third-Party Summons

The State of Missouri to:   MALLINCKRODT LLC
Alias:

REGISTERED AGENT
CT CORPORATION CO
1209 ORANGE STREET
WILMINGTON, DE  19801



*COURT SEAL OF*

*ST. LOUIS COUNTY*

You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

21-JUL-2020
Date

_____
Clerk

Further Information:
GB

## Sheriff's or Server's Return

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____, a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____.

Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____        _____
   Printed Name of Sheriff or Server                              Signature Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*        Subscribed and sworn to before me on _____ (date).

My commission expires: _____        _____
                                          Date                                        Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

### Directions to Sheriff

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents.  Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS<br><br><br>vs. | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO  63105 |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION<br><br>vs. | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| Third-Party Defendant/Respondent:<br>MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Third-Party Summons

The State of Missouri to:   MALLINCKRODT LLC
Alias:

REGISTERED AGENT
CT CORPORATION CO
1209 ORANGE STREET
WILMINGTON, DE  19801



*COURT SEAL OF*

*ST. LOUIS COUNTY*

   You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.
   **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

21-JUL-2020
 Date

               /Clerk

**Further Information:**
   **GB**

### Sheriff's or Server's Return

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____, a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____.

Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                     Signature Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*          Subscribed and sworn to before me on _____ (date).

My commission expires: _____          _____

Date                                                      Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ ( _____ miles @ $._____ per mile) |
| **Total** | $_____ |

### Directions to Sheriff

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents. Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 |
|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS<br><br><div align=center>vs.</div> | Plaintiff's/Petitioner's Attorney/Address:<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO 63105 |
| Defendant/Respondent and Third-Party<br>Plaintiff/Petitioner:<br>COTTER CORPORATION<br><br><div align=center>vs.</div> | Defendant's/Respondent's and Third Party<br>Petitioner's/Plaintiff's Attorney/Address:<br>S. MARTIN JANSKY<br>2001 S. BIG BEND BOULEVARD<br>ST LOUIS, MO  63117 |
| Third-Party Defendant/Respondent:<br> MALLINCKRODT LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Third-Party Summons

**The State of Missouri to:  REPUBLIC SERVICES INC**
**Alias:**

CT CORPORATION CO
CORPORATION TRUST CENTER
1209 ORNAGE STREET
WILMINGTON, DE  19801



*COURT SEAL OF*

*ST. LOUIS COUNTY*

    You are summoned to appear before this court to file your pleading to the petition, copy of which is attached, and file your pleading to the third party petition, copy of which is attached, and serve a copy of each of your pleadings on the attorney for the Plaintiff/Petitioner and the attorney for the Defendant/Respondent and the Third-Party Plaintiff/Petitioner, all within 30 days after the service of this summons, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the third-party petition.

    **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

<u>21-JUL-2020</u>
**Date**

_____
Clerk

**Further Information:**
      **GB**

### Sheriff's or Server's Return

I certify that I have served the third-party summons: (check one)

☐ by delivering a copy of the third-party summons and a copy of the petition and a copy of the third-party petition to each of the Third-Party Defendants/Respondents.

☐ by leaving a copy of the third-party summons and a copy of the petition and a copy of the third-party petition at the respective dwelling place or usual abode of each of the Third Party Defendants/ Respondents with

_____, a person of the Third-Party Defendant's/Respondent's family over the age of 15 years.

☐ other _____.


Served at (address) _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).


_____          _____
Printed Name of Sheriff or Server                         Signature Sheriff or Server


**Must be sworn before a notary public if not served by an authorized officer**

*(Seal)*       Subscribed and sworn to before me on _____ (date).

My commission expires: _____        _____
                                              Date                                          Notary Public

---

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $___10.00___ |
| Mileage | $_____ ( _____ miles @ $._____ per mile) |
| **Total** | $_____ |

### Directions to Sheriff

A copy of the summons and a copy of the Plaintiff's/Petitioner's petition and a copy of the third-party petition must be served on each of the Third-Party Defendants/Respondents.  Service is otherwise made in the same manner as an ordinary summons.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>JOSEPH L. WALSH III | Case Number:  18SL-CC00617-01 | **SHERIFF FEE PAID** |
|---|---|---|
| Plaintiff/Petitioner:<br>TAMIA BANKS | Plaintiff's/Petitioner's Attorney/Address<br>ALEXANDER L BRAITBERG<br>7777 Bonhomme Ave.<br>SUITE 1600<br>ST LOUIS, MO  63105 | |
| vs. | | |
| Defendant/Respondent:<br> COTTER CORPORATION | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 | |
| Nature of Suit:<br>CC Other Miscellaneous Actions | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  **WEST LAEK LANDFILL INC**
Alias:

**REGISTERED AGENT**
**HARVEY FERDMAN**
**671 CLOVERTAIL DRIVE**
**CHESTERFIELD, MO  63017**

*COURT SEAL OF*



*ST. LOUIS COUNTY*

       You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
       **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>21-JUL-2020</u>
**Date**

_____
Clerk

**Further Information:**
**GB**

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.
I certify that I have served the above summons by:  (check one)
☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____(title).
☐ other _____.
Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____        _____
                             Date                                 Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____  (_____ miles @ $._____ per mile) |
| **Total** | **$_____** |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    vs.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

## APPLICATION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

    I, Lauren Jaffe, pursuant to Supreme Court Rule 9.03 and the Local Rules of the Twenty-First Judicial Circuit, request permission to appear and participate as an attorney in this case on behalf of Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company without waiver of jurisdiction and other defenses. In support of this application, and under penalties of perjury as provided by law, I certify that the statements set forth in this instrument are true and correct, and therefore state as follows:

    1.    My name is Lauren Jaffe.  I am a licensed attorney in good standing in the State of Illinois.  My bar number in the State of Illinois is 6316795.

    2.    I have never been censured, sanctioned, suspended, disbarred, or otherwise disciplined by any attorney disciplinary authority of any state.

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

3. I have read, am familiar with, and will abide by the Missouri Code of Civil Procedure, Missouri Supreme Court Rules, and Local Rules of the Twenty-First Judicial Circuit. In particular, I have read and am familiar with the Rules of Professional Conduct set forth in Rule 4 of the Missouri Supreme Court Rules and agree to become subject to discipline by the courts of Missouri.

4. I agree to immediately notify the Court and all counsel of record in the event any information provided in this application changes or becomes inaccurate.

5. I authorize the Administrator of any attorney registration and disciplinary authority to disclose to the Presiding Judge in this cause all information contained in the files of such authority concerning my current status, any complaints that have been made, and the disposition thereof.

| | |
|---|---|
| Name of Applicant: | Lauren Jaffe |
| Firm Name: | Riley Safer Holmes & Cancila LLP |
| Business address: | 70 W. Madison Street, Suite 2900, Chicago, IL 60602 |
| Telephone: | (312) 471-8700 |
| E-mail: | ljaffe@rshc-law.com |

Lauren Jaffe

JUDITH ANN MANASCO
Notary Public, Notary Seal
State of Missouri
Jefferson County
Commission # 17244076
My Commission Expires 04-11-2021

Judith Ann Manasco

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

TAMIA BANKS, REV. RONNIE HOOKS,
BARBARA HOOKS, JOEL HOGAN,
KENNETH NIEBLING, KENDALL LACY,
TANJA LACY, WILLIE CLAY, BOBBIE JEAN
CLAY, ANGELA STATUM, and MISSOURI
RENTALS COMPANY, LLC, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

vs.

COTTER CORPORATION,
COMMONWEALTH EDISON COMPANY, DJR
HOLDINGS, INC. f/k/a FUTURA COATINGS,
INC., and ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS,

        Defendants.

Case No. 18SL-CC00617-01
Division No. 17

### MOTION FOR ADMISSION OF COUNSEL *PRO HAC VICE*

Marcie J. Vantine, attorney for Defendants Cotter Corporation (N.S.L.) and

Commonwealth Edison Company, requests that the Court grant the application for admission

submitted by Attorney Lauren Jaffe, without waiver of jurisdictional and other defenses pursuant

to Missouri Supreme Court Rule 9.03.  In support of this motion, movant states:

        1.      The movant is an attorney licensed to practice law in the state of Missouri.

        2.      Lauren Jaffe, is an attorney licensed to practice law in Illinois and a member of

the law firm of Riley Safer Holmes & Cancila LLP, which is located at 70 W. Madison Street,

Suite 2900, Chicago, IL (312) 471-8700.

        2.      Lauren Jaffe, and the law firm of Riley Safer Holmes & Cancila LLP have been

retained by Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company.

Electronically Filed - St. Louis County - August 11, 2020 - 07:46 PM

Lauren Jaffe, desires to be permitted to practice specially in this Court as counsel for Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company.

3.      Lauren Jaffe, is admitted to practice law in the State of Illinois, admitted on November 6, 2014.  Lauren Jaffe currently is licensed and in good standing to practice law in each jurisdiction to which she is admitted.

4.      Neither Lauren Jaffe, nor any member of the firm of Riley Safer Holmes & Cancila LLP with which Lauren Jaffe practices, is under suspension or disbarment by any Court to which Lauren Jaffe is admitted.

5.      Lauren Jaffe is familiar with the Missouri Supreme Court Rules and will at all times abide by and comply with those rules as counsel herein.

6.      Marcie J. Vantine, Swanson, Martin & Bell, LLP, One Bank of America Plaza, 800 Market Street, Suite 2100, St. Louis, MO 63101, 314-242-0903, has agreed to act as associate counsel herein and to sponsor the motion.

7.      The fee of $410.00 pursuant to Rule 6.01(m) has been paid, and the receipt is attached to this motion

**WHEREFORE**, the undersigned respectfully prays that this Court enter an order granting the Motion for Admission *Pro Hac Vice*.

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

Dated:  August 10, 2020

Respectfully submitted,

/s/ Marcie J. Vantine, #56860MO
SWANSON, MARTIN & BELL, LLP
Marcie J. Vantine, #56860MO
mvantine@smbtrials.com
One Bank of America Plaza
800 Market Street, Suite 2100
St. Louis, MO 63101
314.242.0903 (telephone)
314.242.0990 (facsimile)

RILEY SAFER HOLMES & CANCILA LLP
Edward Casmere, #64326MO
Brian O. Watson, #68678MO
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
ecasmere@rshc-law.com
bwatson@rshc-law.com
docketdept@rshc-law.com

**ATTORNEYS FOR DEFENDANTS COTTER CORPORATION (N.S.L.) AND COMMONWEALTH EDISON COMPANY**

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

## CERTIFICATE OF SERVICE

I certify that on Aug. 11, 2020, these papers were filed through the Missouri Court's eFiling system, which will automatically serve an electronic copy upon all counsel of record.

*/s/ Marcie J. Vantine, #56860MO*

4815-8869-3701, v. 1

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

## IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
## ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| TAMIA BANKS, REV. RONNIE HOOKS, BARBARA HOOKS, JOEL HOGAN, KENNETH NIEBLING, KENDALL LACY, TANJA LACY, WILLIE CLAY, BOBBIE JEAN CLAY, ANGELA STATUM, and MISSOURI RENTALS COMPANY, LLC, on behalf of themselves and all others similarly situated, | Case No. 18SL-CC00617-01 Division No. 17 |
| Plaintiffs, | |
| vs. | |
| COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, DJR HOLDINGS, INC. f/k/a FUTURA COATINGS, INC., and ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF THE CITY OF ST. LOUIS, | |
| Defendants. | |

### ORDER FOR ADMISSION OF COUNSEL *PRO HAC VICE*

This cause coming before the Court on the Motion for Admission of Counsel *Pro Hac Vice*, accompanied by the application of Lauren Jaffe, and the Court being fully advised in the premises, IT IS ORDERED THAT:

The Motion for Admission of Counsel *Pro Hac Vice* is GRANTED.  Attorney Lauren Jaffe is admitted to appear and participate on behalf of Defendants Cotter Corporation (N.S.L.) and Commonwealth Edison Company without waiver of jurisdiction and other defenses.

SO ORDERED.

Dated:_____        _____
                                     Judge Joseph L. Walsh, III
                                     St. Louis County Court, Division 17

CC: Attorneys of records
4845-2601-7477, v. 1

Electronically Filed - St Louis County - August 11, 2020 - 07:46 PM

**CLERK OF THE SUPREME COURT**
STATE OF MISSOURI
POST OFFICE BOX 150
JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

August 7, 2020

*This will hereby acknowledge receipt of $410 as required by Rule 6.01(n) for Lauren Jaffe, appearing in Tamia Banks, et al. v. Cotter Corporation, et al., Case No. 18SL-CC00617-01, before the Circuit Court of St. Louis County, State of Missouri.*

Betsy AuBuchon, Clerk

# Your Missouri Courts

ase.net

Judicial Links  |  eFiling  |  Help  |  Contact Us  |  Print         Logon

## 18SL-CC00617-01 - TAMIA BANKS V COTTER CORPORATION ET AL

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

**Sort Date Entries:** ○ Descending   ● Ascending     **Display Options:** All Entries

---

**04/11/2019**    **Reopen From Mandate**
       **Associated Entries: 04/23/2019 - Exhibit Filed** ⊞
       **Associated Entries: 11/08/2019 - Motion to Dismiss** ⊞
       **Associated Entries: 11/08/2019 - Motion to Dismiss** ⊞
       **Associated Entries: 02/04/2020 - Response Filed** ⊞
       **Associated Entries: 02/05/2020 - Response Filed** ⊞

**04/12/2019**    **Judge Assigned**

**04/22/2019**    **Supplemental Filing**
       Plaintifffs Rule 5534 Filing; Federal Docket Summary Report; Electronic Filing Certificate of Service.
       **Filed By:** NATHANIEL RICHARD CARROLL
       **On Behalf Of:** TAMIA BANKS

**04/23/2019**    **Exhibit Filed**
       Supplemental Rule 5534 filing; ECF No 1 - Notice of Removal; ECF No 2 - Civil Cover Sheet; ECF No 3 - Original Filing Form; ECF No 4 - Notice to Plaintiffs of Filing of Removal; ECF No 7 - Consent to Removal of ComEd; ECF No 8 - Consent to Removal of Exelon Corp; ECF No 9 - Consent to Removal of Exelon Gen; ECF No 10 - Consent to Removal of DJR; ECF No 11 - Consent to Removal of Airport; ECF No 12 - Docket Text Order reassigning magistrate judge; ECF No 13 - EOA of John Cowling for Airport; ECF No 14 - Notice of Removal filed in State Court; ECF No 15 - Joint Motion of Extension of Time to file Answer; ECF No 16 - EOA of Dale Guariglia for Cotter; ECF No 17 - Docket text order granting extension of time for Answer; ECF No 18 - Pro Hac Vice; ECF No 19 - Pro Hac Vice; ECF No 20 - Pro Hac Vice; ECF No 21 - Docket Text Order granting pro hac vice; ECF No 22 - Docket Text Order granting pro hac vice; ECF No 23 - Order reassigning case to Judge Ross; ECF No 24 - Cotter Consent Motion to File Excess Pages; ECF No 25 - Docket Text Order granting excess page limits to Cotter; ECF No 26 - EOA Martin Jansky; ECF No 27 - Motion to Dismiss by St Louis City; ECF No 28 - Memo in Support of Motion to Dismiss by St Louis City; ECF No 29 - Motion to Dismiss by DJR Holdings; ECF No 30 - Memo in Support of Motion to Dismiss by DJR; ECF No 31 - Disclosure of Organization Interests; ECF No 32 - Disclosures of Organizational Interests of Com Ed; ECF No 33 - Disclosure of Organizationl Interests of Cotter; ECF No 34 - Corporate Disclosure of Exelon; ECF No 35 - Disclosure of Organizational Interests of Exelon Gen; ECF No 36 - Motion to Dismiss by Cotter; ECF No 36-1 - Ex to Motion to Dismiss by Cotter - Declaration of Feingold; ECF No 37 - Motion to Dismiss of Comed and Exelon; ECF No 37-1 - Exhibit to Motion to Dismiss of Comed and Exelon - Declaration of Peters; ECF No 37-2 - Exhibit to Motion to Dismiss of Comed and Exelon - Declaration of Culver; ECF No 37-3 - Exhibit to Motion to Dismiss of Comed and Exelon - Declaration of Smith; ECF No 38 - Plaintiffs Motion to Remand; ECF No 39 - Plaintiffs Memorandum in Support of Motion to Remand; ECF No 40 - Consent Motion for Extension of time to respond to Motion to Dismiss; ECF No 41 - Docket Text Order granting extension of time to respond to Motion to Dismiss; ECF No 42 - Consent Motion for Extension of Time to Respond to Remand; ECF No 43 - Docket Text Order granting extension of time to respond to Motion for Remand; ECF No 44 - Pro Hac Vice motion; ECF No 45 - Docket Text Order granting Pro Hac Vice; ECF No 46 - Pro Hac Vice; ECF No 47 - Plaintiffs Motion to Stay Motion to Dismiss; Electronic Filing Certificate of Service.
       **Filed By:** NATHANIEL RICHARD CARROLL

**On Behalf Of:** TAMIA BANKS

**Note to Clerk eFiling**
    **Filed By:** NATHANIEL RICHARD CARROLL

**Exhibit Filed**
Federal Document Summary; ECF No 48 - Docket Text Order; ECF No 49 - Order that Defendants shall file a response to Plaintiffs Motion to Stay Proceedings; ECF No 50 - Response to Motion to Stay; ECF No 51 - Memorandum and Order of Plaintiffs Motion to Stay Defendants Motions to Dismiss Pending Resolution of Plaintiffs Motion for Remand; ECF No 52 - Memorandum in Opposition of Motion to Remand Case to State Court; ECF No 52-1 - Affidavit Declaration of Stephanie Feingold; ECF 52-2 - Exhibit A; ECF No 52-4 - Exhibit C; ECF No 52-5 - Exhibit D; ECF No 52-6 - Exhibit E; ECF No 52-7 - Exhibit F; ECF No 52-8 - Exhibit G; ECF No 53 - Memorandum in Opposition; ECF No 54 - Motion for Extension of Time to File Response; ECF No 55 - Docket Text Order; ECF No 56 - Motion to Strike Memorandum in Opposition to Motion; ECF No 57 - Order that Defendants shall file a response to Plaintiffs Motion to Strike Exhibits to Memorandum in Opposition; ECF No 58 - Memorandum in Opposition re Motion to Strike Memorandum in Opposition to Motion; ECF No 59 - Reply to Response to Motion; ECF No 60 - Motion for Leave to Defendants Leave to File a Sur-reply; ECF No 61 - Motion to Substitute AttorneyLaw Firm; ECF No 62 - Entry of Appearance by Kimberly Starr Morr; ECF No 65 - Sur-reply to Motion to Remand Case; ECF No 66 - Order that Plaintiffs Motion for Remand is set for oral argument; ECF No 67 - Motion for Leave to Appear Pro Hac Vice; ECF No 68 - Motion for Leave to Appear Pro Hac Vice; ECF No 71 - Order that Plaintiffs Motion for Remand is taken under Submission; ECF No 72 - Transcript Order Request; ECF No 74 - Entry of Appearance by Nathaniel Carroll for Plaintiff Tamia Banks; ECF No 75 - Memorandum and Order that Plaintiffs Motion for Remand is Granted; ECF No 70 - Minute Entry for proceedings held before District Judge John A Ross; Electronic Filing Certificate of Service.
    **Filed By:** NATHANIEL RICHARD CARROLL
    **On Behalf Of:** TAMIA BANKS
    **Associated Entries:** 04/11/2019 - Reopen From Mandate

04/29/2019    **Exhibit Filed**
ECF No 1-01 - Notice of Removal Part 1; ECF No 1-02 - Notice of Removal Part 2; ECF No 52-03 - Exhibit B to Defendants Opposition to Motion to Remand; Electronic Filing Certificate of Service in response to Exhibit filed on 04/23/2019.
    **Filed By:** NATHANIEL RICHARD CARROLL
    **On Behalf Of:** TAMIA BANKS

**Entry of Appearance Filed**
Entry of Appearance of Erin Brooks; Electronic Filing Certificate of Service.
    **Filed By:** ERIN LYNN BROOKS
    **On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC

**Motion to Dismiss**
Commonwealth Company, Exelon Corporation and Exelon Generation Company, LLCs Motion to Dismiss for Lack of Personal Jurisdiction; Electronic Filing Certificate of Service.
    **Filed By:** ERIN LYNN BROOKS
    **On Behalf Of:** COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC

**Memorandum Filed**
Commonwealth Company, Exelon Corporation and Exelon Generation Company, LLCs Memorandum in Support of Their Motion to Dismiss for Lack of Personal Jurisdiction; Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Proposed Order; Electronic Filing Certificate of Service.
    **Filed By:** ERIN LYNN BROOKS
    **On Behalf Of:** COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC

**Motion to Dismiss**
Motion to Dismiss Plaintiffs Amended Class Action Petition and Suggestions of Law in Support of Motion; Exhibit 1; Proposed Order; Electronic Filing Certificate of Service.
    **Filed By:** ERIN LYNN BROOKS

On Behalf Of: COTTER CORPORATION

| | |
|---|---|
| 05/03/2019 | **Motion Filed** |
| | Motion for Admission Pro Hac Vice of John McGahren; Exhibit A; Exhibit B; Exhibit C; Electronic Filing Certificate of Service. |
| |   **Filed By:** ERIN LYNN BROOKS |
| |   **On Behalf Of:** COTTER CORPORATION |
| | **Motion Filed** |
| | Motion for Admission Pro Hac Vice of Stephanie Feingold; Exhibit A; Exhibit B; Exhibit C; Electronic Filing Certificate of Service. |
| |   **Filed By:** ERIN LYNN BROOKS |
| |   **On Behalf Of:** COTTER CORPORATION |
| 05/09/2019 | **Motion for Apptmnt of Counsel** |
| | Motion for Pro Hac Vice Admission of Celeste Brustowicz; Ex A Receipt for Pro Hac Vice Fees; Electronic Filing Certificate of Service. |
| |   **Filed By:** NATHANIEL RICHARD CARROLL |
| | **Motion for Apptmnt of Counsel** |
| | Motion for Pro Hac Vice Admission of Victor Cobb; Ex A Receipt for Pro Hac Vice Fees; Electronic Filing Certificate of Service. |
| |   **Filed By:** NATHANIEL RICHARD CARROLL |
| 05/13/2019 | **Order** |
| | Order Granting Pro Hac Vice Admission SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | **Order** |
| | Order Granting Pro Hac Vice Admission of Stephanie Feingold.SO ORDERED: JUDGE JOSEPH L. WALSH III |
| 05/15/2019 | **Entry of Appearance Filed** |
| | Entry of Appearance by Dale A Guariglia; Electronic Filing Certificate of Service. |
| |   **Filed By:** DALE A GUARIGLIA |
| |   **On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC |
| | **Order** |
| | Order Granting Pro Hac Vice Admission of Victor Cobb.SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | **Order** |
| | Order Granting Pro Hac Vice Admission of Celeste Brustowicz.SO ORDERED: JUDGE JOSEPH L. WALSH III |
| 05/20/2019 | **Hearing Continued/Rescheduled** |
| |   **Hearing Continued From:** 06/20/2019; 9:00 AM Counsel Status Hearing |
| 05/28/2019 | **Counsel Status Hrng Scheduled** |
| |   **Associated Entries:** 05/20/2019 - Hearing Continued/Rescheduled |
| |   **Scheduled For:** 06/20/2019; 9:00 AM ; JOSEPH L. WALSH III; St Louis County |
| 05/29/2019 | **Counsel Status Hrng Scheduled** |
| |   **Associated Entries:** 06/06/2019 - Hearing Continued/Rescheduled |
| |   **Scheduled For:** 06/17/2019; 9:00 AM ; JOSEPH L. WALSH III; St Louis County |
| 05/31/2019 | **Notice of Hearing Filed** |
| | Notice of Hearing June 17, 2019; Electronic Filing Certificate of Service. |

**Filed By:** ERIN LYNN BROOKS

**On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC

06/05/2019　　**Motion Filed**

Motion for Pro Hac Vice Admission Stuart Smith; Receipt of Pro Hac Vice Request; Electronic Filing Certificate of Service.

　　**Filed By:** RYAN A. KEANE
　　**On Behalf Of:** TAMIA BANKS

**Motion Filed**

Motion for Pro Hac Vice Admission Barry Cooper; Receipt of Pro Hac Vice Request; Electronic Filing Certificate of Service.

　　**Filed By:** RYAN A. KEANE
　　**On Behalf Of:** TAMIA BANKS

**Motion Filed**

Motion for Pro Hac Vice Admission Kevin Thompson; Receipt of Pro Hac Vice Request; Electronic Filing Certificate of Service.

　　**Filed By:** RYAN A. KEANE
　　**On Behalf Of:** TAMIA BANKS

**Motion Filed**

Motion for Pro Hac Vice Admission David Barney; Receipt of Pro Hac Vice Request; Electronic Filing Certificate of Service.

　　**Filed By:** RYAN A. KEANE
　　**On Behalf Of:** TAMIA BANKS

06/06/2019　　**Hearing Continued/Rescheduled**

　　**Hearing Continued From:** 06/17/2019;  9:00 AM Counsel Status Hearing

**Motion Hearing Scheduled**

　　**Associated Entries: 06/10/2019 - Hearing Continued/Rescheduled**
　　**Scheduled For:** 06/17/2019;  9:00 AM ;   JOSEPH L. WALSH III;  St Louis County

06/07/2019　　**Entry of Appearance Filed**

Entry of Appearance of Jennifer Pitzer; Electronic Filing Certificate of Service.

　　**Filed By:** JENNIFER CHRISTINE PITZER
　　**On Behalf Of:** TAMIA BANKS

**Entry of Appearance Filed**

Entry of Appearance of James Clayborne; Electronic Filing Certificate of Service.

　　**Filed By:** JAMES FRANKLIN CLAYBORNE JR.
　　**On Behalf Of:** TAMIA BANKS

06/10/2019　　**Hearing Continued/Rescheduled**

　　**Hearing Continued From:** 06/17/2019;  9:00 AM Motion Hearing

**Motion Hearing Scheduled**

　　**Associated Entries: 06/10/2019 - Hearing/Trial Cancelled**
　　**Associated Entries: 06/10/2019 - Judge/Clerk - Note**
　　**Scheduled For:** 06/14/2019;  9:00 AM ;   JOSEPH L. WALSH III;  St Louis County

**Hearing/Trial Cancelled**

　　**Scheduled For:** 06/14/2019;  9:00 AM ;   JOSEPH L. WALSH III;  St Louis County

**Judge/Clerk - Note**

The Matter set for June 14th and June 17th are hereby cancelled until further notice. Counsels to discuss court date to hear all motions and manage case.

      **Associated Entries: 06/10/2019 - Motion Hearing Scheduled**
      **Associated Entries: 06/10/2019 - Hearing/Trial Cancelled**

| | |
|---|---|
| 06/12/2019 | **Order** |
| | Order for Pro Hac Vice Admission of David R Barney Jr.SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | **Order** |
| | Order for Pro Hac Vice Admission of Kevin W Thompson..SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | **Order** |
| | Order for Pro Hac Vice Admission of Barry Cooper Jr..SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | **Order** |
| | Order for Pro Hac Vice Admission of Stuart Smith. SO ORDERED: JUDGE JOSEPH L. WALSH III |

| | |
|---|---|
| 07/03/2019 | **Proposed Order Filed** |
| | Plaintiffs Motion for Admission of Counsel Pro Hac Vice and Proposed Order; Electronic Filing Certificate of Service. |
| |   **Filed By:** TIMOTHY PAUL HULLA |
| | **Proposed Order Filed** |
| | Plaintiffs Motion for Admission of Counsel Pro Hac Vice and Proposed Order; Electronic Filing Certificate of Service. |
| |   **Filed By:** TIMOTHY PAUL HULLA |
| | **Exhibit Filed** |
| | Plaintiffs Motion for Admission of Counsel Pro Hac Vice and Proposed Order; Electronic Filing Certificate of Service. |
| |   **Filed By:** TIMOTHY PAUL HULLA |
| |   **On Behalf Of:** TAMIA BANKS |

| | |
|---|---|
| 07/11/2019 | **Motion to Strike** |
| | REQUEST TO STRIKE, IN THE ALTERNATIVE, SET FOR CONTRADICTORY HEARING |
| |   **Filed By:** BARRY COOPER JR |
| | **Motion Withdrawn** |
| | Motion to Withdraw Motion for Admission of Counsel Pro Hac Vice; Electronic Filing Certificate of Service. |
| |   **Filed By:** TIMOTHY PAUL HULLA |
| |   **On Behalf Of:** TAMIA BANKS |
| |   **Associated Entries: 07/22/2019 - Order to Withdraw** |
| | **Consent Filed** |
| | Stipulated Protective Order Regarding The Production of Certain Documents for the Limited Purpose of Jurisdictional Review and Analysis; Electronic Filing Certificate of Service. |
| |   **Filed By:** ERIN LYNN BROOKS |
| |   **On Behalf Of:** TAMIA BANKS, COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, EXELON CORPORATION, EXELON GENERATION COMPANY, LLC |

| | |
|---|---|
| 07/15/2019 | **Judge/Clerk - Note** |
| | please contact clerk to set motion to strike hearing. |

| | |
|---|---|
| 07/17/2019 | **Order** |
| | ORDER FOR ADMISSION OF COUNSEL PRO HAC VICE.SO ORDERED: JUDGE JOSEPH L. WALSH III |
| |   **Associated Entries: 07/22/2019 - Order to Withdraw** |

| | |
|---|---|
| 07/22/2019 | **Order to Withdraw** |

Associated Entries: 07/17/2019 - Order ⊞
Associated Entries: 07/11/2019 - Motion Withdrawn ⊞

| 07/23/2019 | **Order** |
| | Stipulated Protective Order.SO ORDERED: JUDGE JOSEPH L. WALSH III |

| 10/01/2019 | **Motion Filed** |
| | Motion to Withdraw as Counsel; Electronic Filing Certificate of Service. |
| | **Filed By:** JAMES FRANKLIN CLAYBORNE JR. |
| | Associated Entries: 10/18/2019 - Motion Granted/Sustained ⊞ |
| | **Notice of Hearing Filed** |
| | Notice of Hearing; Electronic Filing Certificate of Service. |
| | **Filed By:** JAMES FRANKLIN CLAYBORNE JR. |
| | **Motion Hearing Scheduled** |
| | Associated Entries: 10/18/2019 - Motion Granted/Sustained ⊞ |
| | **Scheduled For:** 10/18/2019;  9:00 AM ;  JOSEPH L. WALSH III;  St Louis County |

| 10/11/2019 | **Motion for Leave** |
| | Plaintiffs Motion for Leave to File Second Amended Class Action Petition; Exhibit 1 - Second Amended Class Action Petition; Electronic Filing Certificate of Service. |
| | **Filed By:** NATHANIEL RICHARD CARROLL |
| | **On Behalf Of:** TAMIA BANKS |
| | Associated Entries: 10/18/2019 - Motion Granted/Sustained ⊞ |
| | **Notice of Hearing Filed** |
| | Notice of Hearing for Plaintiffs Motion for Leave to File Second Amended Petition; Electronic Filing Certificate of Service. |
| | **Filed By:** NATHANIEL RICHARD CARROLL |
| | **On Behalf Of:** TAMIA BANKS |

| 10/18/2019 | **Motion Granted/Sustained** |
| | CAUSE CALLED FOR HEARING ON ATTORNEY JAMES CLAYBORNE'S MOTION TO WITHDRAW AND PLAINTIFF'S MOTION FOR LEAVE TO FILED SECOND AMENDED PETITION. MOTION TO WITHDRAW AND MOTION FOR LEAVE ARE HEREBY GRANTED. SO ORDERED: JUDGE JOSEPH L. WALSH III |
| | Associated Entries: 10/01/2019 - Motion Filed ⊞ |
| | Associated Entries: 10/01/2019 - Motion Hearing Scheduled ⊞ |
| | Associated Entries: 10/11/2019 - Motion for Leave ⊞ |
| | **Scheduled For:** 10/18/2019;  9:00 AM ;  JOSEPH L. WALSH III;  St Louis County |

| 10/29/2019 | **Amended Motion/Petition Filed** |
| | Second Amended Class Action Petition; Electronic Filing Certificate of Service. |
| | **On Behalf Of:** TAMIA BANKS |
| | Associated Entries: 04/30/2020 - Order ⊞ |

| 11/08/2019 | **Motion to Dismiss** |
| | Commonwealth Edison Companys Motion to Dismiss for Lack of Personal Jurisdiction; Commonwealth Edison Companys Memorandum in Support of its Motion to Dismiss; Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4; Proposed Order; Electronic Filing Certificate of Service. |
| | **Filed By:** ERIN LYNN BROOKS |
| | **On Behalf Of:** COMMONWEALTH EDISON COMPANY |
| | Associated Entries: 04/30/2020 - Order ⊞ |
| | Associated Entries: 04/11/2019 - Reopen From Mandate |

**Motion to Dismiss**

Motion to Dismiss Plaintiffs Second Amended Class Action Petition and Suggestions of Law in Support of Motion; Exhibit 1; Proposed Order; Electronic Filing Certificate of Service.

    **Filed By:** ERIN LYNN BROOKS

    **On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY

    **Associated Entries:** 04/30/2020 - Order

    **Associated Entries:** 04/11/2019 - Reopen From Mandate

**01/31/2020**     **Certificate of Service**

Certificate of Service - Plaintiffs First Interrogatories and First RFP to ComEd; Electronic Filing Certificate of Service.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

    **Certificate of Service**

Certificate of Service - Plaintiffs First Interrogatories and First RFP to Cotter Corporation; Electronic Filing Certificate of Service.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

    **Certificate of Service**

Certificate of Service - Plaintiffs First Interrogatories and First RFP to DJR Holdings; Electronic Filing Certificate of Service.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

    **Certificate of Service**

Certificate of Service - Plaintiffs First Interrogatories and First RFP to St Louis Airport Authority; Electronic Filing Certificate of Service.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

**02/04/2020**     **Response Filed**

Plaintiffs Response in Opposition to Defendant ComEds Motion to Dismiss for Lack of Personal Jurisdiction; Exhibit A - Excelon 10-Q Filing; Electronic Filing Certificate of Service in response to Dismiss (motion) filed on 11/08/2019.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

    **Associated Entries:** 04/11/2019 - Reopen From Mandate

**02/05/2020**     **Response Filed**

Plaintiffs Response in Opposition to Defendants Motion to Dismiss Plaintiffs Second Amended Class-Action Petition; Exhibit 1 - Declaration of Dr Marvin Resnikoff; Exhibit 2 - Declaration of Richard B Stewart; Electronic Filing Certificate of Service in response to Dismiss (motion) filed on 11/08/2019.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

    **Associated Entries:** 04/11/2019 - Reopen From Mandate

**02/27/2020**     **Entry of Appearance Filed**

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** JOHN FORD COWLING

    **On Behalf Of:** ST. LOUIS AIRPORT AUTHORITY, A DEPT OF THE CITY OF ST. LOUIS

    **Entry of Appearance Filed**

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** KATHERINE MARGARET RICKS

    **On Behalf Of:** ST. LOUIS AIRPORT AUTHORITY, A DEPT OF THE CITY OF ST. LOUIS

**Mot for Leave to File Out/Time**

Unopposed Motion for Leave to File Responsive Pleading Out of Time; Defendant The City of St Louis Motion to Dismiss Plaintiffs Second Amended Class Action Petition; Memorandum in Support of Defendant The City of St Louis Motion to Dismiss; Electronic Filing Certificate of Service.

    **Filed By:** JOHN FORD COWLING

    **On Behalf Of:** ST. LOUIS AIRPORT AUTHORITY, A DEPT OF THE CITY OF ST. LOUIS

    **Associated Entries:** 04/07/2020 - Order Granting Leave

    **Associated Entries:** 04/30/2020 - Order

**02/28/2020**    **Civil Motion Hearing Scheduled**

    **Associated Entries:** 03/31/2020 - Hearing Held

    Scheduled For: 03/31/2020; 9:00 AM ; JOSEPH L. WALSH III; St Louis County

    **Notice of Hearing Filed**

Notice of Hearing on Defendants Motions to Dismiss - 3 31 2020 at 9am; Electronic Filing Certificate of Service in response to Response (other) filed on 02/05/2020; Response (other) filed on 02/04/2020; Dismiss (motion) filed on 11/08/2019; Dismiss (motion) filed on 11/08/2019.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **On Behalf Of:** TAMIA BANKS

**03/25/2020**    **Entry of Appearance Filed**

Entry of Appearance of Defendant Commonwealth Edison Company; Electronic Filing Certificate of Service.

    **Filed By:** BRIAN OCONNOR WATSON

    **On Behalf Of:** COMMONWEALTH EDISON COMPANY

**03/26/2020**    **Reply**

DEFENDANT COMMONWEALTH EDISON COMPANYS REPLY IN SUPPORT OF ITS MOTION TO DISMISS; Electronic Filing Certificate of Service.

    **Filed By:** BRIAN OCONNOR WATSON

    **On Behalf Of:** COMMONWEALTH EDISON COMPANY

**03/27/2020**    **Motion of Withdrawl of Counsel**

Motion to Withdraw as Counsel; Proposed Order; Electronic Filing Certificate of Service.

    **Filed By:** JENNIFER CHRISTINE PITZER

    **On Behalf Of:** TAMIA BANKS

    **Associated Entries:** 04/20/2020 - Order Withdrawing Attorney:

**03/30/2020**    **Reply**

COTTER CORPORATION NSL AND COMMONWEALTH EDISON COMPANYS RESERVATION OF THEIR PRICE-ANDERSON ACT DEFENSES AND REPLY IN SUPPORT OF MOTION TO DISMISS; Electronic Filing Certificate of Service.

    **Filed By:** BRIAN OCONNOR WATSON

    **On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY

    **Entry of Appearance Filed**

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** NATHANIEL RICHARD CARROLL

    **Entry of Appearance Filed**

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** RYAN A. KEANE

    **Entry of Appearance Filed**

Cotter Corporation Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** BRIAN OCONNOR WATSON

**On Behalf Of:** COTTER CORPORATION

| | | |
|---|---|---|
| 03/31/2020 | **Hearing Held** | |

    **Scheduled For:** 03/31/2020; 9:00 AM ; JOSEPH L. WALSH III; St Louis County

**04/07/2020**    **Order Granting Leave**
THE COURT HEREBY GRANTS THE UNOPPOSED MOTION FOR LEAVE TO FILE RESPONSIVE PLEADING OUT OF TIME FILED. SO ORDERED: JUDGE JOSEPH L. WALSH III
    **Associated Entries:** 02/27/2020 - Mot for Leave to File Out/Time   ⊞

**04/17/2020**    **Entry of Appearance Filed**
Appearance on behalf of Defendant Cotter Corporation NSL; Electronic Filing Certificate of Service.
    **Filed By:** MARCIE JANNAE VANTINE
    **On Behalf Of:** COTTER CORPORATION

**04/20/2020**    **Order Withdrawing Attorney:**
THE COURT HEREBY GRANTS THE WITHDRAW OF ATTORNEY JENNIFER PITZER AS COUNSEL FOR PLAINTIFF. SO ORDERED: JUDGE JOSEPH L. WALSH III
    **Associated Entries:** 03/27/2020 - Motion of Withdrawl of Counsel   ⊞

**04/22/2020**    **Motion to Withdraw**
Motion to Withdraw; Electronic Filing Certificate of Service.
    **Filed By:** ERIN LYNN BROOKS
    **On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY
    **Associated Entries:** 04/30/2020 - Order Withdrawing Attorney:   ⊞

**04/28/2020**    **Proposed Order Filed**
Proposed Order related to March 31, 2020 hearing on Defendants Motions to Dismiss -; Electronic Filing Certificate of Service.
    **Filed By:** NATHANIEL RICHARD CARROLL
    **On Behalf Of:** TAMIA BANKS
    **Associated Entries:** 04/30/2020 - Order   ⊞

    **Note to Clerk eFiling**
    **Filed By:** NATHANIEL RICHARD CARROLL

    **Motion for Sub of Counsel**
Cotter Corporation and Commonwealth Edison Companys Motion to Substitute and Withdraw Counsel; Proposed Order Granting Motion to Substitute and Withdraw Counsel; Electronic Filing Certificate of Service.
    **Filed By:** BRIAN OCONNOR WATSON
    **On Behalf Of:** COTTER CORPORATION
    **Associated Entries:** 04/30/2020 - Order to Change Counsel   ⊞

**04/30/2020**    **Order**
SEE SCANNED ORDER FOR DETAILS. SO ORDERED: JUDGE JOSEPH L. WALSH III
    **Associated Entries:** 10/29/2019 - Amended Motion/Petition Filed   ⊞
    **Associated Entries:** 11/08/2019 - Motion to Dismiss   ⊞
    **Associated Entries:** 11/08/2019 - Motion to Dismiss   ⊞
    **Associated Entries:** 02/27/2020 - Mot for Leave to File Out/Time   ⊞
    **Associated Entries:** 04/28/2020 - Proposed Order Filed   ⊞

    **Order Withdrawing Attorney:**
THE COURT HEREBY GRANTS THE WITHDRAW OF BRYAN CAVE LEIGHTON PAISNER, LLP. DEFENDANT COTTER CORPORATION REMAINS REPRESENTED BY OTHER COUNSEL OF

RECORD IN THIS MATTER. SO ORDERED: JUDGE JOSEPH L. WALSH III

**Associated Entries:** 04/22/2020 - Motion to Withdraw ⊞

**Order to Change Counsel**

THE COURT HEREBY GRANTS THE WITHDRAW OF COUNSEL OF ATTORNEYS ERIN BROOKS, DALE GUARIGLIA, JOHN MCGAHREN AND STEPHANIE FEINGOLD. SO ORDERED: JUDGE JOSEPH L. WALSH III

**Associated Entries:** 04/28/2020 - Motion for Sub of Counsel ⊞

| 05/29/2020 | **Stipulation Filed** |
|---|---|

Stipulated Protective Order Regarding The Production of Confidential Information; Electronic Filing Certificate of Service.

**Filed By:** BRIAN OCONNOR WATSON

**On Behalf Of:** COTTER CORPORATION, COMMONWEALTH EDISON COMPANY

**Associated Entries:** 06/09/2020 - Order ⊞

**Notice**

Commonwealth Edison Companys Notice of Service of Verified Objections and Responses to Plaintiffs 1st Set of Interrogatories and Request for Production; Electronic Filing Certificate of Service.

**Filed By:** BRIAN OCONNOR WATSON

**On Behalf Of:** COMMONWEALTH EDISON COMPANY

**Notice**

Cotter Corporations Notice of Service of Verified Objections and Responses to Plaintiffs 1st Set of Interrogatories and Request for Production; Electronic Filing Certificate of Service.

**Filed By:** BRIAN OCONNOR WATSON

**On Behalf Of:** COTTER CORPORATION

| 06/08/2020 | **Motion Filed** |
|---|---|

Motion for Admission of Jennifer Steeve Pro Hac; Electronic Filing Certificate of Service.

**Filed By:** MARCIE JANNAE VANTINE

**Affidavit Filed**

Affidavit of Jennifer Steeve; Electronic Filing Certificate of Service.

**Filed By:** MARCIE JANNAE VANTINE

**Receipt Filed**

Receipt from Missouri Supreme Court; Electronic Filing Certificate of Service.

**Filed By:** MARCIE JANNAE VANTINE

**Proposed Order Filed**

Proposed Order to Admit Jennifer Steeve; Electronic Filing Certificate of Service.

**Filed By:** MARCIE JANNAE VANTINE

**On Behalf Of:** COTTER CORPORATION

| 06/09/2020 | **Order** |
|---|---|

THE COURT HEREBY GRANTS THE STIPULATED PROTECTIVE ORDER REGARDING THE PRODUCTION OF CONFIDENTIAL INFORMATION. SO ORDERED: JUDGE JOSEPH L. WALSH III

**Associated Entries:** 05/29/2020 - Stipulation Filed ⊞

| 06/30/2020 | **Third Party Petition Filed** |
|---|---|

Cotter Corporations Third Party Petition; Exhibit 1; Electronic Filing Certificate of Service.

**Filed By:** BRIAN OCONNOR WATSON

**Associated Entries:** 07/14/2020 - Order ⊞

**Notice**

Notice of Filing of Cotter Corporations Third Party Petition; Electronic Filing Certificate of Service.

**Filed By:** BRIAN OCONNOR WATSON

**On Behalf Of:** COTTER CORPORATION

**07/02/2020**    **Memorandum Filed**
Memorandum regarding Service of Third-Party Defendants; Electronic Filing Certificate of Service.
     **Filed By:** MARCIE JANNAE VANTINE
     **On Behalf Of:** COTTER CORPORATION

**Note to Clerk eFiling**
     **Filed By:** MARCIE JANNAE VANTINE

**07/14/2020**    **Order**
THE COURT HEREBY GRANTS DEFENDANT COTTER CORPORATION'S THIRD-PARTY PETITION
AGAINST MALLINCKRODT LLC, EVERZINE USA INC., BRIDGETON LANDFILL LLC, REPUBLIC
SERVICES, INC., ALLIED SERVICES, LLC, WESTLAKE LANDFILL, INC., AND ROCK ROAD
INDUSTRIES, INC. SO ORDERED: JUDGE JOSEPH L. WALSH III
     **Associated Entries: 06/30/2020 - Third Party Petition Filed** ⊞

**07/21/2020**    **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-63, for MALLINCKRODT LLC.Summons Attached in PDF Form for Attorney to
Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-64, for EVERZINC USA INC.Summons Attached in PDF Form for Attorney to
Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-65, for BRIDGETON LANDFILL LLC.Summons Attached in PDF Form for
Attorney to Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-66, for REPUBLIC SERVICES INC.Summons Attached in PDF Form for
Attorney to Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-67, for ALLIED SERVICES LLC.Summons Attached in PDF Form for Attorney
to Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMCC-6501, for WEST LAEK LANDFILL INC.Summons Attached in PDF Form for
Attorney to Retrieve from Secure Case.Net and Process for Service.

     **3rd Prty Summ Issd-Pers Serv**
Document ID: 20-SMTP-68, for ROCK ROAD INDUSTRIES INC.Summons Attached in PDF Form for
Attorney to Retrieve from Secure Case.Net and Process for Service.

**08/11/2020**    **Motion Filed**
Motion for Admission of Lauren Jaffe; Electronic Filing Certificate of Service.
     **Filed By:** MARCIE JANNAE VANTINE

     **Affidavit Filed**
Affidavit of Lauren Jaffe; Electronic Filing Certificate of Service.
     **Filed By:** MARCIE JANNAE VANTINE

     **Receipt Filed**
Receipt from the Supreme Court of Missouri; Electronic Filing Certificate of Service.
     **Filed By:** MARCIE JANNAE VANTINE

     **Proposed Order Filed**
Proposed Order to Admit; Electronic Filing Certificate of Service.
     **Filed By:** MARCIE JANNAE VANTINE
     **On Behalf Of:** COTTER CORPORATION

| | |
|---|---|
| **09/04/2020** | **Certificate of Service** |
| | Certificate of Service; Electronic Filing Certificate of Service. |
| | **Filed By:** RYAN A. KEANE |
| | **On Behalf Of:** TAMIA BANKS |