UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TAMIA BANKS, *et al*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| COTTER CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | No. 4:20-cv-01227-JAR |
| COTTER CORPORATION, (N.S.L.), ) | |
| ) | |
| Third Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| MALLINCKRODT LLC, et al., ) | |
| ) | |
| Third-Party Defendants. ) | |

## **THIRD AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT**

COME NOW Plaintiffs Tamia Banks, Rev. Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, on behalf of themselves and all others similarly situated, by through counsel, and for their Third Amended And Supplemental Class Action Complaint against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., the St. Louis Airport Authority, a department of the City of St. Louis, and Mallinckrodt, LLC, state and alleges as follows:

1

# I.  <u>PROCEDURAL HISTORY</u>

1.     This action was originally filed in Missouri state court in February 2018. Defendants removed arguing the Price Anderson Act ("PAA"), 42 U.S.C. §2210, provided federal court jurisdiction because Plaintiffs alleged a "nuclear incident." *See* 42 U.S.C. § 2014(q).

2.     Thereafter, this Court granted Plaintiffs' remand motion holding that the PAA was inapplicable because the Defendants did not possess an applicable license or indemnity agreement to establish an occurrence necessary for a "nuclear incident".

3.     While in state court, some limited written discovery was accomplished and motions to dismiss were heard resulting in an order permitting Plaintiffs to conduct jurisdictional discovery pertaining to Commonwealth Edison Company ("ComEd") and granting Plaintiffs leave to amend when that discovery was completed.

4.     Before the jurisdictional discovery was completed[1] and Plaintiffs had a chance to amend, on June 20, 2020, Defendant Cotter Corporation filed a Third-Party Petition naming Mallinckrodt, LLC and other third-party defendants. Mallinckrodt was a contractor for the United States Government and because of its contractual relationship with the federal government, Mallinckrodt removed the case a second time and then filed for bankruptcy.

5.     Plaintiffs filed a motion to sever and remand all non-third-party claims. This Court determined it would retain jurisdiction over the third-party demand against Mallinckrodt and severed and remanded all other claims.

6.     Cotter sought a writ and an appeal; the Eighth Circuit Court of Appeals determined

---

[1] Plaintiffs desire to continue jurisdictional discovery with respect to ComEd. Plaintiffs also note that the Price Anderson Act contains a nationwide service provision establishing jurisdiction over Defendants who have minimum contacts with the United States. See 42 U.S.C. § 2210(n)(2), Fed. R. Civ. P. Rule 4(k).

that Plaintiffs had alleged a "public liability action" arising out of a "nuclear incident" and the PAA provides federal question jurisdiction regardless of whether a defendant has an applicable license or indemnity agreement. 42 U.S.C. § 2210(n)(2).

7.      A Petition for a Writ of Certiorari was filed with the United States Supreme Court; it was denied on November 14, 2022.

8.      Plaintiffs now amend their Petition to (1) convert to a Complaint in conformity with the Federal Rules of Civil Procedure, (2) affirmatively allege a "public liability action" arising from a "nuclear incident" as Cotter has argued and the Eight Circuit has determined, (3) make ***one*** of the third-party defendants an actual defendant, and (4) to satisfy the state court order related to substantive rules of decision under Missouri law.

## II.      __INTRODUCTION__

9.      Plaintiffs own real property in this district. They reside with their families on these properties. They seek redress from the Defendants as their homes and the ground on which they sit are contaminated and will continue to be contaminated with hazardous, toxic, and radioactive waste that each of the Defendants were responsible for.

10.      But for the Defendants negligent acts and omissions, Plaintiffs' properties would not contain these ultra-hazardous radioactive wastes.

11.      Plaintiffs seek money damages for, including but not limited to, diminution of value, loss of use and enjoyment, and/or remediation.

12.      Plaintiffs also seek injunctive relief in the nature of a medical monitoring fund that will provide Plaintiffs with adequate medical testing relevant to their unnecessary exposure that the Defendants caused, and which persists to this day.

13.     Plaintiffs seek to do this as a class action, with suitable sub-classes, as the Court determines are appropriate.

### III.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. § 2210(n)(2), which provides the United States District Court in the district where a nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of or resulting from a nuclear incident.

15.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2) because the nuclear incident or incidents giving rise to Plaintiffs' claims took place in this district.

### IV.     PARTIES

#### Plaintiffs

16.     Plaintiff Tamia Banks is a Missouri citizen who owns real property located at 4501 Ashby Rd., St. Ann, Missouri (the "Banks Property"). The property is approximately 0.23 acres in St. Louis County adjacent to Coldwater Creek. Her home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Banks first learned that her property was in the zone of contamination in 2018.

17.     Plaintiffs Rev. Ronnie Hooks and Barbara Hooks, a married couple, are Missouri citizens who own real property located at 13712 Old Halls Ferry Rd., Florissant, Missouri (the "Hooks Property"). The property is approximately 1.32 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with

radioactive waste materials from Coldwater Creek. The Hooks first learned their property was in the zone of contamination in 2018.

18.     Plaintiff Joel Hogan is a Missouri citizen who owns real property located at 435 Moule Drive, Florissant, Missouri (the "Hogan Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Hogan first learned his property was in the zone of contamination in 2018.

19.     Plaintiff Kenneth Niebling is a Missouri citizen who owns real property located at 210 Versailles Drive, Florissant, Missouri (the "Niebling Property"). The property is approximately 0.1 acres in St. Louis County adjacent to Coldwater Creek. His home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Mr. Niebling first learned his property was in the zone of contamination in 2018.

20.     Plaintiffs Kendall Lacy and Tonja Lacy, a married couple, are Missouri citizens who own real property located at 2843 Chapel View Drive, Florissant, Missouri (the "Lacy Property"). Their home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The property is approximately .21 acres in St. Louis County adjacent to Coldwater Creek. The Lacys first learned their property was in the zone of contamination in 2018.

21.     Plaintiffs Willie Clay and Bobbie Jean Clay, a married couple, are Missouri citizens who own real property located at 9 Cricket Court, Florissant, Missouri (the "Clay Property"). The

property is approximately .25 acres in St. Louis County adjacent to Coldwater Creek. Their home and property, along with the property of other members of the Class, is located within the one-hundred-year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. The Clays first learned their property was in the zone of contamination in 2018.

22.     Plaintiff Angela Statum is a Missouri citizen who owns real property located at 7565 Hazelcrest Drive, Hazelwood, Missouri (the "Statum Property"). The property is in St. Louis County adjacent to Coldwater Creek. Her property, along with the property of other members of the Class, is located within the one hundred year flood plain of Coldwater Creek, and is contaminated with radioactive waste materials from Coldwater Creek. Ms. Statum first learned her property was in the zone of contamination in 2018.

23.     Plaintiff Missouri Rentals Company, LLC is a Missouri LLC which owns real property located at the following addresses (the "MRC Properties"):

> 7411 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7411 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 7431 SIELOFF DRIVE, APT D, Hazelwood, Missouri;
> 7446 SIELOFF DRIVE, APT E, Hazelwood, Missouri;
> 8721 SIELOFF DRIVE, APT H, Hazelwood, Missouri;
> 8729 SIELOFF DRIVE, APT H, Hazelwood, Missouri; and
> 8733 SIELOFF DRIVE, APT G, Hazelwood, Missouri.

The properties are in St. Louis County adjacent to Coldwater Creek. Their properties, along with the property of other members of the Class, are located within the one-hundred-year flood plain of Coldwater Creek, and are contaminated with radioactive waste materials from Coldwater Creek. MRC first learned its properties were in the zone of contamination in 2018.

24.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages, including property damage as well as the loss of use and enjoyment of their property.

6

**Defendants**

25.     There are two defendants that relate in some way to Cotter Corporation, the owner and disposer of the hazardous, toxic, carcinogenic, radioactive waste materials: Cotter Corporation ("Cotter") and Commonwealth Edison Company ("ComEd").

26.     Cotter Corporation ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately prior to announcing that there was no radioactive contamination on the property upon which it operated. It was then sold to General Atomics in 2000.

> A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.
>
> B.  This lawsuit arises out of damages that resulted from the Cotter Defendants' conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter Defendants, which gave rise to the violations of law and damages to property alleged in the Complaint.

27.     Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001. Exelon Generation Company, LLC was split from Exelon and is now known as Constellation Energy Generation,

7

LLC.

A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter. In addition, ComEd owned Cotter at times relevant to this Complaint, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein.

B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Complaint. ComEd furthermore assumed the environmental safety and health functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter controlled and had operated and which it knowingly and intentionally abandoned. ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter.

C.  After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter such that Cotter was a mere instrument or alter ego of ComEd.

D.  ComEd used their control over Cotter to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' and the Class Members' rights, and ComEd's control over Cotter is a proximate cause of the contamination to Plaintiffs' and the Class Members' properties.

E.  This lawsuit arises out of damages that resulted from the ComEd's conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of ComEd, which gave rise to the violations of state law and damage to property alleged in the Complaint.

28.     DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc. Defendant DJR Holdings, Inc. is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Complaint.

29.     The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution. The St. Louis Airport Authority is a Missouri citizen from whom significant relief is sought and whose conduct forms a significant basis of the claims asserted by Plaintiffs, as explained in detail in this Complaint.

30.     Mallinckrodt LLC, a Delaware limited liability company, maintains its headquarters in Missouri at 675 McDonnell Blvd., Hazelwood, MO 63042, and is an indirect affiliate of Mallinckrodt plc, a publicly owned company. Upon information and belief, in 1986, Mallinckrodt Missouri was dismantled and sold to MI Holdings, Inc. and Mallinckrodt, Inc. Upon information and belief, Mallinckrodt Chemical Works is now known as or has been merged into

9

MI Holdings and/or Mallinckrodt, Inc. Upon information and belief, Mallinckrodt LLC is the successor-in-interest to Mallinckrodt, Inc. and Mallinckrodt Chemical Works. Mallinckrodt Nuclear Corporation was formerly a wholly owned subsidiary of Mallinckrodt Chemical Works. All foregoing Mallinckrodt entities will be referred to collectively as "Mallinckrodt."

## V.    FACTS

31.    As detailed herein, the Defendants are individually responsible for radioactive waste materials (hereinafter "RWM") that were generated by Mallinckrodt under its contracts with the United States Government during World War II and thereafter.

32.    Each of these Defendants were lawfully accountable for the property on which the RWM was stored and/or they were responsible for managing the RWM. All of the Defendants failed in this regard, causing the release of hazardous, toxic, and radioactive substances which have now been physically deposited on the Plaintiffs' properties by various means including wind, soil, surface water, and groundwater transmission.

33.    This deposition of RWM on Plaintiffs' properties is above the normal background, it's unique, and readily identifiable from naturally occurring Missouri radiation.

34.    The presence of RWM on Plaintiffs' properties constitutes damage to each property and its presence prevents plaintiffs from the full use and enjoyment of their property.

35.    RWM would not be on Plaintiffs' properties and would not cause these damages but for the acts and omissions of the Defendants.

**Radioactive Wastes**

36.    The RWM generated by Mallinckrodt contain radioactive isotopes including, but not limited to, uranium, thorium, and radium.

37.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

38.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

39.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization[2] which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other detrimental conditions.

40.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally threaten the organs and tissues for as long as it remains inside the body.

41.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious. The second characteristic is that there are latent

---

[2] Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. Ionizing radiation has enough energy to cause changes in atoms through a process called ionization. Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans. Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes.

biological effects of radiation.

42.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

43.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

44.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

45.     Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low

as is reasonably achievable.

46.     Governmental authorities have identified significant increases of cancer and risks of cancer within the Class.[3]

### Mallinckrodt produced radioactive waste materials which were transported to and stored at St. Louis Airport Site

47.     Between 1942 through 1957, under contracts with the United State government, Mallinckrodt processed uranium at a facility located in downtown St. Louis, Missouri. This site is known as the St. Louis Downtown Site ("SLDS").[4][5]

48.     As part of its operations at SLDS, Mallinckrodt processed uranium ore from the Belgian Congo containing high percentages of uranium. The elemental composition of the resulting waste material is unique and with proper testing can be easily identified and distinguished from naturally occurring radiation in Missouri.

49.     Between 1947 and 1957, Mallinckrodt transported RWM from SLDS to a site in North St. Louis County near the Lambert Airport. This site is located next to Coldwater Creek and is known as the St. Louis Airport Site ("SLAPS").

50.     The SLAPS site was managed and operated by Mallinckrodt starting in 1953. Mallinckrodt exercised custody and control over the SLAPS site pursuant to its contract with the

---

[3] See S. Yun et al., Analysis of Cancer Incidence Data in Coldwater Creek Area, Missouri, 199 6-2004, MO DEPT. OF HEALTH & SEN. SERVS., available at https://health.mo.gov/living/healthcondiseases/chronic/cancer/pdf/ccanalysis.pdf.

[4] The MED was formally abolished in 1947. The AEC was abolished in 1974. The AEC's licensing functions were transferred to the newly created Nuclear Regulatory Commission (NRC) and the AEC's research and development responsibilities were transferred to the newly created Energy Research and Development Administration (ERDA). The ERDA was abolished in 1977 and its responsibilities were transferred to the newly created Department of Energy (DOE).

[5] See Evaluation of Community Exposures Related to Coldwater Creek, ATSDR (Apr. 30, 2019), available at https://www.atsdr.cdc.gov/sites/coldwater_creek/docs/St_Louis_Airport_Site_Hazelwood_Interi        mSto_PHA-508.pdf.

United States government.

51.     Over 100,000 tons of RWM accumulated at SLAPS. Mallinckrodt stored these RWM in bulk on the open ground in piles.

52.     Scrap metal, chemical drums, and other contaminated debris were placed in low areas at SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

53.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS along with the RWM.

54.     As a result of Mallinckrodt's acts and omissions at the SLAPS site, Coldwater Creek and Plaintiffs' properties now contain radioactive materials in excess of normal background levels.

**The St. Louis Airport Authority purchased SLAPS and failed to prevent continued dispersal of radioactive materials**

55.     In 1973, the SLAPS site was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

56.     Thereafter, despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

57.     The St. Louis Airport Authority is the current owner of the SLAPS site.

58.     As a result of the St. Louis Airport's acts and omissions at the SLAPS site, Coldwater Creek and Plaintiffs' properties continued to be contaminated with radioactive materials

14

in excess of normal background levels.

**Radioactive waste materials are moved from SLAPS to Latty Avenue**

59.     In the late 1960's, private companies purchased and assumed responsibility for the RWM stored at SLAPS. According to the offer for sale, the RWM constituted source material requiring a license pursuant to the Atomic Energy Act.

60.     The RWM were transported from SLAPS to another site on Coldwater Creek located at 9200 Latty Avenue in Hazelwood, Missouri (part of this site later became known as the Hazelwood Interim Storage Site ("HISS")). The Latty Avenue site is approximately 1 mile downstream from the SLAPS site.

61.     The radioactive waste materials transferred from SLAPS to Latty Avenue include, but are not limited to: (1) pitchblende raffinate, (2) Colorado raffinate, (3) barium sulfate (unleached), (4) barium cake (leached), and (5) miscellaneous residues stored in deteriorated drums.

**Cotter purchased radioactive waste materials and conducted
drying operations at Latty Avenue site**

62.     In 1969, Cotter purchased and assumed responsibility for the RWM stockpiled at Latty Avenue. Cotter also agreed to restore the Latty Avenue site where the RWM were stockpiled.

63.     The Atomic Energy Commission issued Cotter a source material license covering 9200 Latty Avenue pursuant to which Cotter exercised custody and control over the Latty Avenue site.

64.     Cotter never maintained financial protection pursuant to the Price Anderson Act nor did it have an indemnification agreement pursuant to the Price Anderson Act.

65.     After purchasing the RWM, Cotter dried and loaded the RWM onto railcars next to

15

Coldwater Creek at a rate of approximately 400 tons per day. B&K Construction Company was engaged by Cotter for this purpose. At all times, B&K Construction acted as an agent of Cotter and conducted all work under Cotter's source material license. Cotter had the responsibility to ensure B&K was not violating the terms of its license.

66. During Cotter's drying operations at Latty Avenue:

    A. The AEC expressed concerns about a dust problem.

    B. The AEC cited Cotter because sample surveys were "totally inadequate to determine concentrations of radioactive materials to which person are exposed pursuant to 10 CFR 20."

    C. The St. Louis County Health Department noted violations related to the restriction of emission of visible air contaminants.

    D. ██████████████████████████████████████████
██████████████████████████.

    E. ██████████████████████████████████████████
███████████████.

    F. █████████████████████████████.

    G. ██████████████████████████████.

67. At some point during Cotter's operations at Latty Avenue, its dryer broke down. Thereafter, ████████████████████████████████████.

68. In 1973, approximately 18,700 tons of radioactive waste materials remained at the Latty Avenue site. Cotter loaded approximately 10,000 tons of these materials on railcars and shipped them to Colorado. Cotter mixed the remaining radioactive waste materials with

16

contaminated soil and dumped them in the West Lake Landfill.

69.     Cotter never conducted any activities related to Mallinckrodt's contract, or any other contract, with the government.

70.     As a result of Cotter's acts and omissions at the Latty site, Cotter released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time, including but not limited to, 10 C.F.R. §§ 20.105 and 20.106.  As a result of Cotter's acts and omissions at the Latty site and Cotter's releases, Coldwater Creek and Plaintiffs' properties now contain radioactive materials in excess of normal background levels.

71.     Upon information and belief, Cotter's RWM remain on the Latty Avenue site to this day.

### Commonwealth Edison Purchases Cotter and Cotter's License is Terminated Based on Inaccurate Representations

72.     In 1973, ███████████████████████████████████████████
███████████████████████████████████.

73.     On May 8, 1974, in the interest of securing a uranium supply, Commonwealth Edison Company ("ComEd") purchased Cotter Corporation for $18,000,000.00.

74.     George Rifakes became president of Cotter in May 1974. Upon information and belief, Mr. Rifakes was a ComEd employee starting in the 1950's, became a manager at ComEd in the late 1960's and became vice president of ComEd in 1980.

75.     Two days after ComEd purchased Cotter, on May 10, 1974, Cotter filed an application with the AEC to terminate its source material license certifying that the Latty Avenue site was decontaminated.

76.     On November 11, 1974, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.

77.    Two days later, on November 13, 1974, the AEC terminated Cotter's source material license.

78.    Despite Cotter's previous certification that the Latty site was decontaminated, surveys conducted in 1976 at the Latty site showed radiation levels exceeding criteria for decontamination of land areas prior to return to unrestricted use.

79.    In 1977, surveys at the Latty site showed that the site still contained licensable quantities of source material. Thereafter, the NRC informed Cotter and ComEd that its survey "raised a serious question as to whether statements Cotter Corporation made in its application for termination of its license, with regard to contamination levels and removal of all licensable materials, were correct and, hence, whether the Commission's action terminating your license was founded on accurate representations by you."

80.    As a result of Cotter and ComEd's acts and omissions at the Latty site, the Latty site remained contaminated, and Coldwater Creek and Plaintiffs' properties continued to be contaminated with radioactive materials in excess of normal background levels.

**Jarboe Purchased Latty Site and Conducted Decontamination Operations**

81.    In 1978, Jarboe Realty and Investment Company purchased the property located at 9200 Latty Avenue.

82.    Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are

owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

83.     In 1979, the owner of Jarboe Realty and Investment Company, Dean Jarboe, conducted decontamination operations at 9200 Latty Avenue. During this time, 11,000 cubic yards of contaminated soil was excavated from the western half of the property by Coldwater Creek and stockpiled on the eastern half.

84.     In 1980, Jarboe Realty and Investment Company purchased the property located at 9170 Latty Avenue to store the radioactive waste.

85.     Jarboe Realty and Investment Company is the current owner of 9200 and 9170 Latty Avenue.

86.     As a result of Jarboe's acts and omissions, Coldwater Creek and Plaintiffs' properties continued to be contaminated with radioactive materials in excess of normal background levels.

**Defendants acts and omissions contaminated Coldwater Creek with radioactive materials**

87.     Coldwater Creek flows adjacent to the SLAPS site, then meanders next to the Latty site, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

88.     As a result of Defendants acts and omissions at the SLAPS and Latty sites, Coldwater Creek is contaminated with hazardous, toxic and radioactive materials.  The RWM was stored on the SLAPS and Latty sites with various methods, typically on the open ground, sometimes buried, and sometimes in barrels but no matter the method, it was reckless, negligent,

and dangerous to store the materials in this manner.

89.     Since the late 1940's, RWM have migrated from the SLAPS site and the Latty site into Coldwater Creek and were released or otherwise deposited along the entire FEMA one-hundred-year flood plain of Coldwater Creek.

90.     Coldwater Creek was and remains contaminated with RWM; this occurred during the entire time each Defendant was responsible for the RWM and in each location the Defendants had responsibility.

91.     Coldwater Creek has flooded multiple times since 1947, most recently in 2022. It is anticipated that Coldwater Creek will flood again.

92.     As a result of this flooding, the entire one-hundred-year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' radioactive materials contaminated Plaintiffs' properties**

93.     Defendants acts and omissions at the SLAPS and Latty sites have caused the deposition of RWM on Plaintiffs' properties.

94.     Flooding of Coldwater Creek is a significant contributor to deposition of the RWM on plaintiffs' properties.

95.     Samples taken on and around Plaintiffs' properties confirm an elevated presence of RWM, significantly above the normal background radiation for this area of the United States.

96.     The RWM deposited on Plaintiffs' properties is unique and identifiable from naturally occurring Missouri radiation. The RWM that has contaminated Plaintiffs' properties match the waste fingerprint (or profile) of the RWM generated by Mallinckrodt at SLDS which

20

were later stored at SLAPS and Latty.

97.     The RWM was stored on the SLAPS and Latty sites with various methods, typically on the open ground, sometimes buried, and sometimes in barrels but no matter the method, it was reckless, negligent, and dangerous to store the materials in this manner.

98.     Defendants knew or should have known of the hazards associated with their operations, including but not limited to, that their activities, consisting of storing, processing, management, and use would and did lead to migration and contamination on Plaintiffs' properties that would and did result in damage to real property and to the owners of real property. Defendants should have taken appropriate safety measures but utterly failed to do so.

99.     The presence of the RWM on Plaintiffs' properties is damage to each property and its presence prevents plaintiffs from the full use and enjoyment of their property; RWM would not be on the properties and would not cause these damages but for the acts and omissions of the Defendants.

100.    Defendants acts and omissions were the direct and proximate cause of the damage to Plaintiffs' properties including the present harm and that which will occur in the future. Defendants are liable to Plaintiffs for such damages.

**Regulatory history**

101.    Congress first established the Atomic Energy Commission ("AEC") in the Atomic Energy Act of 1946.

102.    In 1954 Congress replaced the Atomic Energy Act of 1946 with the Atomic Energy Act of 1954 which directed the AEC to prepare regulations that would protect public health and safety from radiation hazards.

103.    The AEC's radiation protection regulations, 10 C.F.R. Part 20, became effective

starting in 1957. There were no federal safety standards related to radioactive material before this time.

104.     10 C.F.R. Part 20 was, and still is, only applicable to persons licensed by the AEC (now the NRC).

105.     Mallinckrodt's operations which started in 1942 predate the implementation of 10 CFR Part 20.

106.     The St. Louis Airport Authority has never been a licensee of the AEC/NRC.

107.     Jarboe Realty and Investment Company has never been a licensee of the AEC/NRC.

## VI.     CLASS ACTION ALLEGATIONS

108.     Plaintiffs file this class action complaint pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all Missouri citizens who own or reside on real property with any portion within the FEMA one-hundred-year flood plain of Coldwater Creek in St. Louis County, Missouri as detailed below.

109.     Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

110.     This action is maintainable as a class action and should be certified pursuant to Federal Rules of Civil Procedure 23(a)-(c).

111.     The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

> **All Missouri citizens who currently own any portion of real property located within the FEMA one hundred year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast.**

112.    The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on any portion of real property within the FEMA one-hundred-year flood plain of Coldwater Creek in St. Louis County, Missouri, bounded by St. Charles Rock Road to the southwest and Old Halls Ferry Road to the northeast.**

113.    Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded are owners of property that has or has had any radioactive material license associated with it; this includes, but is not limited to, the SLAPS, Latty Avenue, and HISS sites. Also excluded is any trial judge who may preside over this case. The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

114.    The proposed Class is so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, alleges that the proposed Class may include more than twenty-five local members. The requirement of numerosity is therefore satisfied.

115.    Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes,

the answers to which will drive a class-wide resolution of the claims of the proposed Class. These common questions of law or fact include:

    a.  Whether Defendants engaged in the abnormally dangerous activity of processing, storing or transporting radioactive waste; and

    b.  Whether Defendants unreasonably and unlawfully processed, stored, disposed and/or abandoned, or transported radioactive materials at the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"); and

    c.  Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs and Class Members' property; and

    d.  Whether Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of Radon gas and radioactive particles onto and around Plaintiffs and Class Members' property; and

    e.  Whether Defendants' conduct or omissions affecting land surrounding the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS") resulted in Plaintiffs and Class Members' loss of use and enjoyment of their property; and

    f.  Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions; and

    g.  Whether Plaintiffs and Class are entitled to damages; and

    h.  Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

116.     The claims of the Plaintiffs are typical of the claims of the Class. Plaintiffs and all Class Members own or reside on land within the FEMA one-hundred-year flood plain of Coldwater Creek in St. Louis County, Missouri near the locations where Defendants recklessly stored, transported and dumped radioactive waste.

117.     Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

118.     Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

119.     Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law resulting in harm to thousands of Missouri citizens.

120.     A class action is a superior method for the fair and efficient adjudication of this controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the St. Louis Airport Site ("SLAPS"), the Latty Avenue Site and/or the Hazelwood Interim Storage Site ("HISS"). In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

121.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate actions. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

122.     There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

123.     All of the class members are citizens of Missouri.

124.     The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

125.     The conduct alleged in this Petition took place in Missouri.

126.     The radioactive waste at issue in this case was generated as a result of chemical processes that took place in local facilities in St. Louis, Missouri.

127.     All transportation of radioactive waste alleged herein took place in Missouri

128.     All processing of radioactive wastes alleged herein took place in Missouri.

129.     All storage of radioactive waste alleged herein took place in Missouri.

130.     Defendants engaged in creation, storage, processing and transportation of radioactive wastes in the state of Missouri, benefiting from the protection and operation of Missouri law.

131.     No class action asserting similar factual allegations has been filed against any of

the Defendants in the preceding three years.

132.    For these reasons, this case is maintainable as a class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**COUNT I – PUBLIC LIABILITY ACTION PURSUANT TO**
**THE PRICE ANDERSON ACT**
**(Brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)**

133.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

134.    In 1957, Congress enacted the Price Anderson Act, 42 U.S.C. § 2210, which established indemnification and limited liability for certain AEC licensees and contractors.

135.    In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which created a federal cause of action for "public liability actions" arising from "nuclear incidents."

136.    A "public liability action" is "any suit asserting public liability" 42 U.S.C. § 2014(hh). As relevant here, "public liability" means "any legal liability arising out of or resulting from a 'nuclear incident.'" 42 U.S.C. § 2014(hh).[6]

137.    A "nuclear incident," in turn, is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).

---

[6] There can be no "public liability action" without a "nuclear incident." If there has been no "nuclear incident", Plaintiffs alternatively plead Subparts (A) – (L) below as independent state law causes of action and Plaintiffs' claims should be remanded to state court because there would be no federal court jurisdiction without a "nuclear incident"

138.    As originally pleaded, Plaintiffs alleged that their claims did not fall within the scope of the PAA because none of the defendants had an indemnification agreement pursuant to the PAA such that there could be no occurrence to establish a "nuclear incident". On January 7, 2022, however, the Eighth Circuit Court of Appeals determined that Plaintiffs had alleged a "public liability action" because Plaintiffs claims amounted to a "nuclear incident" regardless of whether a defendant had an applicable license or indemnity agreement.

139.    Consistent with the Eighth Circuit's decision, Plaintiffs now allege an express cause of action, known as a "public liability action", pursuant to the PAA, because their claims arise from a nuclear incident or incidents at the SLAPS and/or Latty sites.

140.    The PAA does not provide any substantive elements for "public liability actions." The PAA only provides that a "public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh).

141.    The PAA does not contain or reference any federal standards, regulations, or thresholds. See 42 U.S.C. § 2210.

142.    Under the umbrella of Plaintiffs' "public liability action", Plaintiffs assert the following causes of action.

## COUNT I, SUBPART (A) - TRESPASS

### (Brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)

143.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

28

144.    Plaintiffs own and control their respective properties, more particularly described above.

145.    As a result of Defendants' acts and omissions at the SLAPS and Latty sites, radioactive waste materials are currently present on Plaintiffs' properties. This is a direct interference with Plaintiffs' properties.

146.    Plaintiffs did not authorize the entry of these radioactive waste materials onto their properties.

147.    Defendants generated massive quantities of extremely dangerous radioactive wastes and failed to ensure their proper disposal.

148.    Defendants purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes.

149.    Defendants intentionally, maliciously, and wantonly disposed of radioactive wastes at a location unfit to handle such wastes.

150.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of the property of Plaintiffs and the Property Damage Subclass ("Plaintiffs' property").

151.    Defendants have caused these radioactive materials to migrate from property controlled by Defendants and contaminate Plaintiffs' property.

152.    Defendants willfully, wantonly, and maliciously caused the emission of radioactive particles onto and around Plaintiffs' property through their improper use, transport and disposal of radioactive wastes.

153.    It was reasonably foreseeable that Defendants' actions would and will continue to

contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

154.    Defendants stored and/or transported radioactive materials and other toxic and hazardous wastes, as alleged herein.

155.    The migration of radioactive particles onto the property of Plaintiffs and of the Property Damage Subclass caused by Defendants has resulted and continues to result in direct physical interference with the property of Plaintiffs and of the Property Damage Subclass. Such contamination is incompatible with the normal use and enjoyment of the property of Plaintiffs and of the Property Damage Subclass.

156.    Plaintiffs did not give Defendants permission or consent to interfere with their property in this manner. Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store radioactive wastes.

157.    The contamination of Plaintiffs' property with radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

158.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs and the Property Damage Subclass have suffered and continue to suffer injury, including decreased property value.

## COUNT I, SUBPART (B) – PERMANENT NUISANCE
### (Brought individually by Plaintiffs and on behalf of the Property Damage Subclass against all Defendants)

159.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

160.    Plaintiffs own and control their respective properties, more particularly described

above.

161.     Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS and Latty Avenue sites which caused or contributed to the presence of radioactive materials on Plaintiffs' properties which substantially impairs Plaintiffs' rights to the use and enjoyment of their properties.

162.     Defendants currently, or at some point in the past, exercised custody and control over the SLAPS or Latty sites and their unreasonable use of the sites caused and contributed to the radioactive contamination of Plaintiffs' properties.

163.     The radioactive contamination creates a permanent stigma which has and will remain attached to the Plaintiffs' properties and the properties of the Class Members.

164.     Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission and migration radioactive materials onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties. Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

165.     Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in the unreasonable interference with Plaintiffs' use and enjoyment of the property.

166.     Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

167.     As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of their properties, Plaintiffs have suffered permanent injury, including decreased

31

property value.

## COUNT I, SUBPART (C) – TEMPORARY NUISANCE

### (Brought individually and on behalf of the Property Damage Subclass)

168.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

169.     Plaintiffs own and control their respective properties, more particularly described above.

170.     Defendants unreasonably and unlawfully stored and used radioactive materials at the SLAPS and Latty Avenue sites which caused or contributed to the presence of radioactive materials on Plaintiffs' properties which substantially impairs Plaintiffs' rights to the use and enjoyment of their properties.

171.     Defendants currently, or at some point in the past, exercised custody and control over the SLAPS or Latty sites and their unreasonable use of the sites caused and contributed to the radioactive contamination of Plaintiffs' properties.

172.     Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission and migration radioactive materials onto and around Plaintiffs' properties, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their properties. Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' properties.

173.     Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed various hazardous substances into Coldwater Creek resulting in the unreasonable interference with Plaintiffs' use and enjoyment of the property.

174.    Defendants' interference with Plaintiffs' use and enjoyment of their property is substantial.

175.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT I, SUBPART (D) – NEGLIGENCE

**(Brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

176.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

177.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

178.    Knowing of the grave dangers posed by these radioactive wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

179.    Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Plaintiffs of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

180.    Further, Defendants had a duty to comply with applicable state, federal, and local

governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

181.    Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These actual and continued releases have subjected Plaintiffs to an unreasonable risk of harm.

182.    Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

183.    Defendants failed to act to prevent their releases from harming Plaintiffs.

184.    Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances in as alleged herein would result in actual and increased risks of damage to Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances.

185.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

186.    Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of radioactive materials and other hazardous materials onto Plaintiffs' property, in disregard of

34

applicable regulations and property rights.

187.     Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

188.     Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

189.     Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT I, SUBPART (E) – NEGLIGENCE PER SE

**(Brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

190.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

191.     Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, and the Missouri Clean Water Act, Mo. Rev. Stat. § 644.051.1, which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

192.     To the extent applicable, Defendants violated the regulations in 10 C.F.R. Part 20, including but not limited to 10 C.F.R. 20.1, 10 C.F.R. 20.105, 10 C.F.R. 20.106, 10 C.F.R. 20.201 and 10 C.F.R. 20.301.

193.     Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act regulations were intended to protect.

194.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act regulations were designed to prevent.

195.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act regulations were the proximate cause of Plaintiffs' injuries.

196.    Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of radioactive particles and other hazardous materials onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

197.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances. Defendant's negligence diminished Plaintiffs' property value.

198.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT I, SUBPART (F) – STRICT LIABILITY/ABSOLUTE LIABILITY
### (Brought individually by Plaintiffs and on behalf of the Class against all Defendants)

199.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

200.    Defendants engaged in the ultrahazardous activity of handling, storing, and/or disposing of radioactive waste.

201.    By handling, storing, and/or disposing of radioactive waste, Defendants have

created and continue to create a high degree of risk of harm to Plaintiffs' and their property.

202.    Defendants have been unable or intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

203.    The risk of harm created by Defendants' acts and omissions is significant.

204.    As a direct result of Defendants' abnormally dangerous activities that resulted in the emission of radioactive materials, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value. Such contamination is incompatible with the normal use and enjoyment of Plaintiff's Property.

205.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

206.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the said activities.

207.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT I, SUBPART (G) – INJUNCTIVE RELIEF

**(Brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

208.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

209.    Defendants have tortiously contaminated the property of Plaintiffs and the proposed Class with hazardous, toxic, carcinogenic, radioactive wastes.

210.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of

37

the property of Plaintiffs and the proposed Class.

211.    The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

212.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

213.    Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles. Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

214.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

215.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Coldwater Creek to the property of Plaintiffs and the proposed Class, decrease the interference with the use and enjoyment of the Banks Property, and further mitigate Plaintiffs' damages.

## COUNT I, SUBPART (H) – PUNITIVE DAMAGES

**(Brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

216.   Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

217.   Defendants committed one or more of the willful, wanton, and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

218.   Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

219.   The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

220.   The PAA does not prohibit punitive damages for conduct occurring before 1988 when 42 U.S.C. § 2210(s) took effect.

221.   The PAA does not prohibit punitive damages for persons who the United States is not obligated to make payments under an agreement of indemnification. See 42 U.S.C. § 2210(s).

222.   Mallinckrodt's PAA indemnification agreement is limited to liability that arises out of or in connection with its contractual activity. The St. Louis Airport Authority, Cotter, ComEd nor Jarboe never conducted any activities connected or related to Mallinckrodt's contractual activity and their liability is not connected or related to Mallinckrodt's contractual activity.

## COUNT I, SUBPART (I) – CIVIL CONSPIRACY

**(Brought individually by Plaintiffs and on behalf of the Class against all Defendants)**

223.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

224.     Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

225.     Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

226.     As a result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

## COUNT I, SUBPART (J) – INVERSE CONDEMNATION

**(Brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

227.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

228.     The St. Louis Airport Authority, a department of the City of St. Louis, owns and operates St. Louis Lambert International Airport, located partially on the SLAPS.

229.     The St. Louis Airport Authority, a department of the City of St. Louis, damaged and effectively took the property of Plaintiffs and the Property Damage Subclass for public use without just compensation.

230.     The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

231.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS, to conceal the nature of the contamination.

232.     The St. Louis Airport Authority, a department of the City of St. Louis, took affirmative steps after taking possession of SLAPS that ensured that radioactive wastes would be leached from the site into Coldwater Creek.

233.     The actions of St. Louis Airport Authority, a department of the City of St. Louis, in damaging and effectively taking Plaintiffs' property, was for public use, specifically, in the operation and maintenance of St. Louis Lambert International Airport.

234.     The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein constituted and invasion and appropriation of the property rights of Plaintiffs and the Property Damage Subclass.

235.     The actions of the St. Louis Airport Authority, a department of the City of St. Louis, as alleged herein, directly and specially affects the property rights of Plaintiffs, in that the hazardous, toxic, carcinogenic, radioactive contamination originating from the St. Louis Airport, which has contaminated the one-hundred-year floodplain of Coldwater Creek, renders their property valueless.

## COUNT I, SUBPART (K) – VIOLATION OF ARTICLE I § 10 OF THE MISSOURI CONSTITUTION

**(Brought individually by all Plaintiffs and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

236.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

237.    Article I § 10 of the Missouri Constitution states "that no person shall be deprived of life, liberty or property without due process of law."

238.    Plaintiffs and Class had, and have, an established constitutional right not to be deprived of their personal property without due process of law.

239.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one-hundred-year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, and thereby depriving Plaintiffs of the use and enjoyment of their land, without due process of law, violated Plaintiffs' and Class's due process and property rights under Article I § 10 of the Missouri Constitution.

240.    As a result of Defendants' conduct, Plaintiffs and Class had, or will have, their constitutional rights violated and will thus suffer irreparable harm if this Court does not enter an injunction or other equitable relief.

## COUNT I, SUBPART (L) – VIOLATION OF ARTICLE I § 26 OF THE MISSOURI CONSTITUTION

**(Brought individually and on behalf of the Property Damage Subclass against the St. Louis Airport Authority, a department of the City of St. Louis)**

241.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

242.    Article I § 26 of the Missouri Constitution states that "private property shall not be taken or damaged for public use without just compensation."

243.    The St. Louis Airport Authority, a department of the City of St. Louis, after taking possession of SLAPS, knowing it was contaminated with radioactive waste, failed to remediate, warn, or otherwise prevent the leaching of wastes and contamination of neighboring properties and Coldwater Creek.

244.    The conduct of the St. Louis Airport Authority, a department of the City of St. Louis, in contaminating the Coldwater Creek one-hundred-year flood plain with hazardous, toxic, carcinogenic, radioactive wastes, as alleged herein, damaged and effectively took private property of Plaintiffs and the Property Damage Subclass.

245.    Neither the St. Louis Airport Authority, the City of St. Louis, nor anyone else, has provided compensation for these takings to Plaintiffs or the Property Damage Subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs Tamia Banks, Ronnie Hooks, Barbara Hooks, Joel Hogan, Kenneth Niebling, Kendall Lacy, Tanja Lacy, Willie Clay, Bobbie Jean Clay, Angela Statum, and Missouri Rentals Company, LLC, pray for judgment in favor of Plaintiffs and against Defendants Cotter Corporation, Commonwealth Edison Company, DJR Holdings, Inc. f/k/a Futura Coatings, Inc., the St. Louis Airport Authority, a department of the City of St. Louis, and Mallinckrodt, LLC, as well as awarding the following to Plaintiffs and against Defendants:

a.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including

43

compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation; and

b.   an award of double damages for malicious trespass as provided for under RSMo. § 537.330; and

c.   an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future; and

d.   costs and attorney fees; and

e.   interest on the above amounts as allowed by law; and

f.   for appropriate injunctive and equitable relief, as permitted by law or equity including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

g.   for any further relief this Court deems just and proper.

Dated:  January ___, 2023        Respectfully submitted,

KEANE LAW LLC

/s/ _____
Ryan A. Keane, #62112
Tanner A. Kirksey, #72882
7711 Bonhomme Ave., Ste. 600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com
tanner@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, #51534
2705 Dougherty Ferry Road, Suite 199
St. Louis, MO 63122
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.

Celeste Brustowicz, LA Bar #16835 *pro hac vice*
Barry J. Cooper, Jr., TX Bar #24057527 *pro hac vice*
Victor Cobb LA Bar #36830 *pro hac vice*
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
cbrustowicz@sch-llc.com
bcooper@sch-llc.com
vcobb@sch-llc.com

and

Kevin W. Thompson (WV Bar #5062) *pro hac vice*
David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:  304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and proposed Class*

45

## <u>CERTIFICATE OF SERVICE</u>

   The undersigned hereby certifies that a true and correct copy of the foregoing was served on all counsel of record via this court's ECF/PACER electronic filing notification system on January \_\_\_, 2023.

/s/_____
